**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| BLACKHAWK MINING LLC, *et al.*,[1] | ) | Case No. 19-_____ (___) |
| Debtors. | ) | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:[2]

**Relief Requested**

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) authorizing the Debtors to pay (i) all prepetition wages, salaries, other compensation, and reimbursable expenses on account of the Workforce Programs (as defined herein), and (ii) continue to administer the Workforce Programs in the ordinary course of business, including payment of prepetition obligations related thereto, and

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Blackhawk Mining LLC (5600); Blackhawk Coal Sales, LLC (9456); Blackhawk Land and Resources, LLC (7839); Blackhawk River Logistics, LLC (3388); Blue Creek Mining, LLC (2427); Blue Diamond Mining, LLC (3488); Eagle Shield, LLC (6721); FCDC Coal, Inc. (6188); Guyandotte Mining, LLC (4882); Hampden Coal, LLC (8241); Kanawha Eagle Mining, LLC (0586); Logan & Kanawha, LLC (3178); Panther Creek Mining, LLC (0627); Pine Branch Land, LLC (9661); Pine Branch Mining, LLC (9681); Pine Branch Resources, LLC (9758); Redhawk Mining, LLC (0852); Rockwell Mining, LLC (3874); Spruce Pine Land Company (2254); Spurlock Mining, LLC (2899); Triad Mining, LLC (7713); and Triad Trucking, LLC (6112). The location of the Debtors' service address in these chapter 11 cases is 3228 Summit Square Place, Suite 180, Lexington, Kentucky 40509.

[2] The facts and circumstances supporting this motion are set forth in the *Declaration of Jesse M. Parrish, Chief Financial Officer of Blackhawk Mining LLC, in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously with this motion and incorporated by reference herein. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the First Day Declaration.

(b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing approximately 21 days from the Petition Date (as defined herein).

**Jurisdiction and Venue**

2. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and Rule 9013-1(m) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

**Background**

5. The Debtors are a privately-owned coal producer operating predominantly in the Central Appalachian Basin of the United States and are a leading producer of metallurgical coal in the United States. The Debtors were founded in 2010 and are headquartered in Lexington, Kentucky. The Debtors' operations have steadily grown from a single mining complex to ten active complexes employing approximately 2,800 employees. The Debtors control approximately 1.37 billion tons of proven and probable coal reserves—over 55% of which are associated with its metallurgical coal segment—and approximately 0.8 billion tons of additional resources. The

Debtors sell their coal production domestically and internationally to a diverse set of end markets, such as steel producers, regulated utilities, and commodity trading houses. The Debtors' revenue for the twelve-month period that ended December 31, 2018, was approximately $1.097 billion. As of the date hereof (the "Petition Date"), the Debtors have approximately $1.09 billion in funded debt.

6. The Debtors commenced these chapter 11 cases to implement their comprehensive, prepackaged plan of reorganization (the "Plan"), a copy of which has been filed contemporaneously herewith. The Plan is the result of extensive negotiations between the Debtors, their first lien lenders, and their second lien lenders, who have agreed on a comprehensive balance sheet restructuring that will reduce the Debtors' debt burden and increase liquidity. More than 90 percent of their first and second lien lenders and more than 80 percent of their equity holders have documented their support for the Plan and the Debtors' chapter 11 cases through a restructuring support agreement (the "RSA"). Under the Plan, the Debtors will equitize all of their approximately $318 million of second lien debt and approximately $350 million of their first lien debt, eliminating a significant portion of the Debtors' debt load, and will provide their first lien lenders with take-back debt on more company-favorable terms. Importantly, the Plan also contemplates that allowed general unsecured claims will remain unimpaired and "ride through" these chapter 11 cases.

7. On the Petition Date, each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this motion, the Debtors filed a motion requesting procedural

consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

**The Debtors' Workforce and Workforce Programs**

8. The Debtors' ability to preserve their businesses and successfully reorganize is dependent on the expertise and continued enthusiasm and service of their overall workforce ("Workforce"). The Workforce performs a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' restructuring. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Workforce includes highly trained personnel who are not easily replaced.

9. In return for their valuable service, the Debtors offer their Workforce: (i) direct compensation in the form of wages, paid time off, and certain bonus programs; (ii) reimbursement programs; (iii) certain employee benefits such as medical, dental, and vision insurance, as well as life insurance, accidental death and dismemberment ("AD&D") insurance, disability insurance, workers' compensation insurance, and a 401(k) savings plan; and (iv) certain other employee-related costs such as payments to benefits consultants, independent directors, and administrators (collectively, and as further described in detail below, the "Workforce Programs").[3]

10. Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Workforce Programs in the ordinary course of business. Out of an

[3] The Workforce Programs include payments to, or on the account of, Union Employees (as defined herein) employed by the following non-debtor subsidiaries: Fanco Plant Loadout, LLC; Black Oak Mining, LLC; Wells Prep Plant, LLC; Rock Lick Prep Plant, LLC; and Gateway Eagle Mining, LLC. The Union Employees are integral to the Debtor's operations, and therefore the Debtors respectfully request the authority to pay any prepetition compensation and reimbursable expenses to the Union Employees on account of the Workforce Programs, and to continue to administer the Workforce Programs in the ordinary course, on account of such Union Employees be included in the relief requested herein

abundance of caution, the Debtors request the right to modify, change, and discontinue any of their Workforce Programs and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

11. By this motion, the Debtors seek authority to pay the aggregate prepetition amounts owed on account of the Workforce Programs set forth in the table below:

| **Workforce Programs** | **Interim Amount** | **Final Amounts** |
|---|---|---|
| **Compensation and Withholding Obligations** | | |
| Wages | $6,600,000 | $6,600,000 |
| Deductions | $500,000 | $500,000 |
| Independent Contractors | $1,000,000 | $1,000,000 |
| Vacation Days, Holidays, and Personal Days | $0 | $435,000 |
| Bonus Programs | $0 | $0 |
| **Reimbursements** | | |
| Business Expenses | $20,000 | $20,000 |
| Credit Card | $0 | $120,000 |
| Vehicle Program | $77,000 | $77,000 |
| **Employee Benefits** | | |
| Medical Insurance | $4,300,000 | $8,600,000 |
| Dental Insurance | $140,000 | $140,000 |
| Vision Insurance | $6,000 | $6,000 |
| Life and AD&D, and Disability Benefits | $195,000 | $325,000 |
| 401(k) Plan | $0 | $0 |
| Workers' Compensation Program | $0 | $5,710,000 |
| Employee Benefits Consultants | $3,000 | $3,000 |
| **Other Employee Benefits** | | |
| Payments to Independent Directors | $20,000 | $20,000 |
| **Total** | **$12,861,000** | **$23,556,000** |

12. As of the Petition Date, the Debtors estimate the total amount outstanding on account of the Workforce Programs is approximately $23,556,000, approximately $12,861,000 of which will become due and owing within the first 21 days of these chapter 11 cases. The Debtors do not believe any Employee is owed any prepetition amounts in excess of the $13,650 priority

wage cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, and the Debtors seek approval to pay such amounts, if any, solely pursuant to the Final Order.

**I. The Debtors' Workforce.**

13. As of the Petition Date, the Workforce includes approximately 2,800 employees (the "Employees"). Approximately 208 of the Employees are employed by Debtor Blackhawk Mining LLC ("BHM," and such employees, the "BHM Employees"), of whom approximately 95 perform administrative functions at the Debtors' headquarters in Lexington, Kentucky (the "Headquarters"). The employees who are employed by Debtors other than BHM (the "Non-BHM Employees") work primarily in the field supporting the Debtors' coal mining operations. In addition to the Employees, the Debtors' Workforce also includes approximately two part-time, Temporary Workers, and varying numbers of independent contractors (the "Independent Contractors"), provided pursuant to the Debtors' contractual arrangements with third-party staffing agencies.

14. Included in the Employee headcount are approximately 230 Employees (the "Union Employees") who are covered by collective bargaining agreements (the "CBAs")[4] between certain non-debtor affiliates and the International Union, United Mine Workers of America ("UMWA"). The remainder of the Debtors' Employees (the "Non-Union Employees") are not covered by collective bargaining agreements. The Union Employees are all employed at

[4] Descriptions in this motion of the CBAs are intended only as a summary, and may be subject to exceptions or conditions set forth in the CBAs. To the extent of a conflict between this motion and the terms of a CBA, the terms of the applicable CBA shall control.

facilities located in West Virginia that were acquired from Patriot National, Inc. ("Patriot") in 2015.[5]

15. If the Debtors fail to pay amounts owed or coming due (the "Workforce Obligations") under the Workforce Programs in the ordinary course, their Workforce will suffer extreme personal hardship. The Debtors' mining operations are primarily located in rural areas and, in some cases, members of the Debtors' Workforce may be unable to pay their basic living expenses if the Debtors are not permitted to pay the prepetition Workforce Obligations in the ordinary course. Such a result would have a highly negative impact on workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates. The Debtors have determined that continuation of the Workforce Programs is vital to preserving and rebuilding Workforce morale during the pendency of these chapter 11 cases and to reducing the level of attrition that might otherwise occur.

## II. Workforce Programs.

### A. Employee Payroll and Payroll Deductions.

16. The Employees are paid bi-weekly on Fridays (or on the preceding business day if these dates fall on a holiday). While each Debtor pays its Employees bi-weekly, the Debtors do not all pay their Employees on the same dates; each Friday, approximately half of the Employees are paid, with the other half being paid the following Friday. The Debtors' average payroll each month is approximately $20 million in the aggregate, based on current salaries and depending on the number of pay periods included in a calendar month. The Debtors utilize Paycor, Inc.

[5] Five facilities acquired from Patriot employ Union Employees: Rock Lick Prep Plant, LLC, Fanco Plant Loadout, LLC, Gateway Eagle Mining, LLC, Wells Prep Plant, LLC, and Black Oak Mining, LLC. A sixth facility, Campbell's Creek Mining, LLC, currently does not operate and has no Employees.

("Paycor") for the administration of payroll for the Employees. Employees are paid one week in arrears, so that they receive their bi-weekly earnings on the Friday directly following the pay period that ended the previous Sunday.

17. In the ordinary course of their businesses, the Debtors may make deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state, and local income, FICA, and other taxes, court-ordered garnishments, as well as for savings programs, repayments for loans taken against the retirement savings program, benefit plans, union dues, insurance and other similar programs (collectively, the "Deductions"). Some deductions are made from each bi-weekly paycheck, while others are deducted less frequently. In 2018, the Debtors' monthly Deductions for Employees have averaged approximately $500,000.

18. Employees may be owed certain prepetition amounts on account of regular compensation earned through the Petition Date. As such, the applicable Deductions have not yet been taken. Additionally, even where Deductions have been withheld from the applicable Employee's paycheck, the Debtors may not yet have forwarded the Deductions to the various third parties to which the Deductions are required to be distributed.

19. The Debtors pay their Employees in arrears for work performed one week or more prior to the Debtors' normal bi-weekly payroll. As a result, such Employees often have a significant amount of unpaid wages and other compensation that has accrued, but is unpaid. As a result, the Debtors estimate that, as of the Petition Date, accrued but unpaid wages and other compensation, including the Deductions, total approximately $6,600,000 (including approximately $250,000 attributable to the Deductions), all of which will come due during the first 21 days of these cases.

**B. Independent Contractors and Consulting Services.**

20. In addition to the Employees, the Debtors also utilize the services of Strata Mine Services, LLC and Lightning Contract Services (each an "Agency," and together, the "Agencies") in connection with engaging independent contractors (the "Independent Contractors") to perform a variety of tasks at the Debtors' mines. In the ordinary course of business, the Agencies provide varying numbers of Independent Contractors at a time based on the Debtors' operational needs. Pursuant to Master Services Agreements between BHM and each Agency (the "Agency Agreements"), the Debtors do not pay wages to, withhold taxes from, or provide benefits or paid time off to the Independent Contractors. Instead, the Debtors pay each Agency for work performed by the Independent Contractors based on hourly rates set forth in a schedule to each Agency Agreement. The Agencies each issue detailed invoices to the Debtors on a weekly basis and the Debtors pay the Agencies within thirty days of receipt of such invoices. In 2018, the Debtors paid approximately $784,000 and approximately $190,000 per month to Strata Mine Services, LLC and Lightning Contract Services, respectively, on account of the Independent Contractors. As of the Petition Date, the Debtors estimate that the accrued and unpaid amounts owed to the Agencies are approximately $1 million, all of which will come due during the first 21 days of these cases.

21. Separately, the Debtors retain Mr. Nicholas Glancy, former president, to provide executive-level consulting services pursuant to a consulting agreement (the "Glancy Agreement") dated as of January 1, 2019. Pursuant to the Glancy Agreement, Mr. Glancy advises the Company on various issues, including those related to financing arrangements. The Debtors pay Mr. Glancy a monthly fee of $5,000 plus an amount equal to the cost of COBRA benefits for Mr. Glancy and his spouse. On average, the Debtors estimate the monthly payments to Mr. Glancy are approximately $6,400. As of the Petition Date, the Debtors estimate that the accrued and unpaid

amounts owed to Mr. Glancy pursuant to the Glancy Agreement are approximately $3,200, all of which will come due during the first 21 days of these cases.

**C. Vacation Days, Holidays, and Personal Days.**

22. As part of their overall compensation, all Employees are entitled to paid time off ("PTO"). Non-Union Employees are entitled to ten days of PTO plus paid holidays—eight for BHM Employees or six for Non-BHM Employees[6]—per year.[7] Additionally, all Non-Union Employees are entitled to up to three paid personal days per year, based on the Employee's length of employment: Employees receive one personal day during their first calendar year of employment, two personal days during their second calendar year of employment, and three personal days during each subsequent calendar year of employment.

23. Union Employees, pursuant to the CBAs, are entitled to ten vacation days, two floating vacation days, and eight paid holidays per year.[8] Under the CBAs, Union Employees are also entitled to PTO with respect to bereavement leave, jury duty, reporting pay, and military duty, and the Company's Union Employees with one year or more of service are also eligible for four days of paid personal or sick leave per year. In addition, pursuant to the CBAs, Union Employees

---

[6] If a designated holiday falls on a weekend, the Debtors in their sole discretion may decide to designate an additional non-weekend day as a holiday.

[7] Approximately twelve Employees receive additional PTO based on agreements with the Debtor at the time of their hiring.

[8] The Company may elect to shut down the mines that employ the Union Employees during three vacation shutdown periods (to coincide with July 4th, Thanksgiving, and Christmas), or to operate the mines continuously and allow the Union Employees to stagger their vacations. By agreement with the UMWA, if the Company elects to shut down for one or more pre-scheduled shutdown periods, but not all three, the Company must first choose the week of Thanksgiving, then the week of July 4th. For the current year, the Company did not operate the week of July 4th and has informed the UMWA that they will not operate the week of Thanksgiving, but will be operating through Christmas.

with at least five years of continuous service receive up to fifteen additional vacation days, based on such Union Employee's length of continuous employment with the Company.[9]

24. Employees do not carry over unused PTO hours or personal days from one calendar year to the next; however, Union Employees are paid at their regular rate for unused PTO. Upon termination or retirement, Non-Union Employees do not receive payment on account of any accrued and unused PTO hours. The Debtors estimate that, as of the Petition Date, total accrued but unpaid PTO liability is approximately $435,000. Although the Debtors request authority to pay such accrued but unpaid vacation liability in the ordinary course of business as necessary, no amounts will be due or owing to any Employee unless and until such Employee is a Union Employee and is no longer employed by the Company (assuming the Union Employee does not use his or her PTO).

**D. Bonus Programs.**

25. In the ordinary course of business, to encourage and reward outstanding performance, the Debtors offer various bonus programs to certain Employees.[10] The Debtors believe such programs are necessary to properly motivate the Employees to outperform and drive value for all stakeholders. By this motion, the Debtors seek authority to continue honoring their obligations under two of the Debtors' bonus programs, solely on a final basis. Additionally, the

---

9 The CBAs also provide that Union Employees that meet certain criteria with respect to length of service and number of hours worked may take up to twelve weeks unpaid leave consistent with the Family and Medical Leave Act of 1993.

10 Additionally, in the ordinary course of business, the Debtors maintain a severance program for certain key employees. By this motion, the Debtors do not seek relief or authority for the Debtors to make any payments under the severance program, but the Debtors reserve the right to request authority to make any such payments or to implement new severance programs in the future to the extent the Debtors deem such authority to be necessary. Any such request will be pursuant to proper notice and hearing with this Court.

Debtors believe that, as of the petition date, no prepetition amounts are outstanding under the bonus programs.[11]

26. The Debtors offer certain Employees with the title of "General Manager" (each such Employee, a "GM") a bonus program (the "GM Bonus Program"), under which the GMs are eligible to earn quarterly awards based on (i) production targets and (ii) cost management targets. As of the Petition Date, the Debtors employ nine GMs that are eligible for the GM Bonus Program. If an eligible GM meets or exceeds his or her production targets and/or cost management targets in a particular quarter, then the GM is eligible to receive a bonus of 5–10% of his or her base salary for that quarter for each target that is met or exceeded. Thus, a GM that meets or exceeds its targets for both production and cost management could receive a bonus of up to 20% of his or her base salary per quarter (*i.e.*, 10% for meeting the production targets and 10% for meeting the cost management targets). Fifty percent of the bonuses under the GM Bonus Program are paid during the first pay period of the second month following the end of the quarter in which the bonus is earned. The remaining 50% is paid one year after the quarter in which the first half of the bonus was paid.

27. The Debtors also maintain other bonus programs, such as a quarterly metric-based bonus program for six senior operational personnel (the "Operational Bonus Program").[12] Under the Operational Bonus Program, senior operational personnel have the opportunity to earn bonuses in the event that they achieve certain objective, quantifiable performance metrics in their given

---

[11] For the avoidance of doubt, the Debtors seek authority to continue honoring their obligations under the GM Bonus Program and Operational Program in the ordinary course of business only with respect to employees who are not "insiders" as that term is defined in 11 U.S.C. § 101(31). To the extent the Debtors wish to award bonuses to insiders, such relief will be sough pursuant to separate motion and order, as needed.

[12] The Debtors reserve the right to request authority to grant future awards under the Supplemental Bonus Programs or to implement new incentive programs in the future. Any such request will be pursuant to proper notice and hearing with this Court.

area of responsibility. That is, if the participants do not achieve their performance metrics, they do not receive a bonus. Additionally, the Operational Bonus Program is paid out in the same manner as the GM Bonus Program—half of the bonus is paid during the first pay period of the second month following the end of the quarter in which the bonus is earned and the remaining half is paid one year after the quarter in which the first half of the bonus was paid. Historically, the Debtors paid, in the aggregate, between $0 and $300,000 quarterly on account of awards under the GM and Operational Bonus Programs.

**E. Employee Reimbursements.**

28. In the ordinary course of their business, the Debtors reimburse Employees for a variety of ordinary, necessary, and reasonable expenses that Employees incur within the scope of their job duties. These include expenses for travel (including lodging, automobile rentals, meals, and internet charges), taxi and mileage costs, and other general business-related expenses. The Debtors also reimburse (or pay directly) required continuing education expenses, professional license fees or dues, and subscriptions. Employees are expected to use sound judgment when incurring the expenses. To be reimbursed, an Employee must submit his or her receipts to a reviewer designated by the Debtors for approval. If approved, the Debtors reimburse the Employee by check when manual checks are cut in the ordinary course of the Debtors' businesses. The Debtors believe that, as of the Petition Date, there is approximately $20,000 in accrued but unpaid amounts owing to Employees for reimbursements on account of business expenses, approximately all of which will come due during the first 21 days of these cases.

29. Certain of the Employees are issued a company credit card (a "<u>Credit Card</u>") through American Express to be utilized for business-related expenses. The Debtors make all Credit Card payments and are reimbursed by Employees for any unapproved expenses. Receipts for expenses charged to a Credit Card must be submitted by the Employee to a reviewer designated

by the Debtors for approval. The average monthly amount paid by the Debtors is approximately $175,000, inclusive of the aggregate amount owed on all Credit Cards. The Debtors believe that approximately $120,000 is accrued but unpaid on account of the Credit Cards of as of the Petition Date, none of which will come due during the first 21 days of these cases. Out of an abundance of caution, however, the Debtors seek authority to pay any accrued but unpaid prepetition amounts in the ordinary course of business.

30. The Debtors also offer certain Employees the ability to participate in a vehicle program (the "Vehicle Program") through which eligible employees who use vehicles in the ordinary course of their work are either provided vehicles by the Debtors or are reimbursed for work-related use of their personal vehicles. For example, the Debtors maintain vehicles at the Debtors' mining facilities that are used on site by GMs and superintendents, and the Debtors' executives frequently use their personal vehicles to travel between Headquarters and the Debtors' mining facilities. As of the Petition Date, approximately 300 Employees participate in the Vehicle Program. The Debtors believe that approximately $77,000 is accrued but unpaid under the Vehicle Program of as of the Petition Date, all of which will come due and owing during the first 21 days of these cases.

31. The Debtors believe that their total prepetition obligations in respect of reimbursable business expenses, the Credit Cards, and the Vehicle Program (the "Reimbursement Obligations") will not exceed $217,000 as of the Petition Date, $97,000 of which will come due in the first 21 days of these cases.

**F. Employee Benefits.**

32. Prior to the Petition Date, the Debtors offered Employees, their eligible spouses, and their dependents various standard employee benefits, including, without limitation, (a) medical insurance, (b) dental insurance, (c) basic term life and AD&D insurance, (d) short-term

disability insurance, (e) savings and related types of benefits, (f) workers' compensation, and (g) miscellaneous other benefits provided to the Employees in the ordinary course of business (collectively, the "Employee Benefits"). As of the Petition Date, the Debtors were obligated to pay certain contributions to or provide benefits under such plans, programs, and policies.

**a. Medical Insurance.**

33. The Debtors offer all Employees the opportunity to obtain basic medical insurance, vision care, prescription drug coverage, and related benefits under plans administered by Anthem Insurance Companies, Inc. ("Anthem"). The medical plan offered to Non-Union Employees is a PPO plan (the "2019 Non-Union Medical Plan"). Non-Union Employees have the option to opt out of medical coverage if they are covered by a family member's insurance plan. For eligible Employees that have completed a certification, the Debtors provide $200 per month into an opt-out health reimbursement account (the "Opt-Out Plan") that is administered by McGregor and Associates ("McGregor").

34. The Union Employees are provided medical insurance through a PPO plan administered by Anthem (the "2019 Union Medical Plan," and together with the 2019 Non-Union Medical Plan and the Opt-Out Plan, the "Medical Plans"),[13] under which eligible Union Employees and their family members have the choice to use providers within the network or to use providers outside of the network (the latter option being subject to higher costs to the Employee).

35. All premium payments under the Medical Plans, as well as payments with respect to the Opt-Out Plan, are fully paid by the Debtors. The Medical Plans are fully insured and the Debtors do not pay separate administrative fees to Anthem. The obligations that the Debtors incur on behalf of the Employees on account of the Medical Plans average approximately $4,300,000

[13] The Debtors' Medical Plans also cover employees of certain of the Debtors' non-debtor affiliates.

per month. Additionally, the Debtors pay monthly administration fees of approximately $5,000 to McGregor. As of the Petition Date, the Debtors estimate that they owe approximately $8.6 million on account of the Medical Plans, including $5,000 in fees owed to McGregor, approximately $4.3 million of which will come due in the first 21 days of these cases.

**b. Dental Insurance.**

36. The Debtors provide all Employees with the option to enroll in a dental insurance plan that is self-insured and administered by Delta Dental Plans Association ("Delta," and the plans, the "Dental Plans"). The Dental Plans cover varying amounts of an Employee's dental expenses, depending on the type of service and whether or not the provider is a Delta participating dentist. The Debtors pay 100% of the claims collected by Delta, and Delta invoices the Debtors monthly for such claims. In addition, the Debtors pay Delta separate administrative fees. On average, the Debtors pay approximately $140,000 to Delta per month on account of the Dental Plans. As of the Petition Date, the Debtors estimate that they owe approximately $140,000 to Delta on account of the Dental Plans, all of which will come due in the first 21 days of these cases.

**c. Vision Insurance.**

37. The Debtors provide all Employees with a self-insured vision insurance plan administered by Anthem (the "Vision Plan"). The Vision Plan covers Employees' routine eye exams, eyeglass frames and lenses, and contact lenses. The Debtors pay 100% of the claims collected and charged by Anthem, as well as separate administrative fees to Anthem. On average, the Debtors pay approximately $25,000 to Anthem per month on account of the Vision Plan, including payment of claims and administrative fees. As of the Petition Date, the Debtors estimate that they owe approximately $6,000 on account of the Vision Plan, all of which will come due in the first 21 days of these cases.

**d. Life and AD&D Insurance, Short-Term Disability Plan, and Group Insurance Programs.**

38. The Debtors provide their Employees, at the Debtors' cost, with basic life and AD&D insurance plans (the "Life and AD&D Plans"), administered by Prudential Financial, Inc. ("Prudential"). The Debtors cover 100% of their Employees' premiums under the Life and AD&D Plans. The Non-Union Employees receive a $100,000 life insurance benefit and a $100,000 AD&D benefit, and can also purchase supplemental life and AD&D insurance at their own cost, with no health questions asked up to certain "guaranteed issue" maximum amounts. The Union Employees receive a $90,000 basic life insurance benefit and a $90,000 basic AD&D benefit.[14] Each month, the Debtors pay approximately $100,000 to Prudential on account of the premiums and administrative fees under the Life and AD&D Plans. As of the Petition Date, the Debtors owe Prudential approximately $150,000 on account of the Life and AD&D Plans, all of which will come due in the first 21 days of these cases.[15]

39. The Non-Union Employees also receive short-term disability insurance (the "STD Plan") at the Debtors' cost, administered by Prudential. Under the STD Plan, if an Employee becomes disabled for at least one day due to injury or fifteen days due to sickness, Prudential pays benefits equal to sixty percent of the Employee's base salary, up to a maximum of $1,000 per week for a period of up to twenty weeks. Each month, the Debtors pay approximately $45,000 to Prudential on account of the STD Plan. As of the Petition Date, the Debtors owe Prudential

[14] The CBAs provide for payment of $90,000 for non-violent death and payment of $180,000 to the miner's named beneficiary for death due solely to violent, external, and accidental means (whether at work or not at work). In addition, the CBAs provide for up to $120,000 for the loss of one or more "members" (including hands, feet, and eyes).

[15] The Debtors maintain one policy with Prudential with respect to the Life and AD&D Plans, but three separate certificates, representing a self-insured plan for the Union Employees, a self-insured plan for the Non-Union Employees who were previously employed by Patriot, and a fully insured plan for other Non-Union Employees. The Debtors only pay separate administrative fees to Prudential with respect to the self-insured plans.

approximately $45,000 on account of the STD Plan, all of which will come due in the first 21 days of these cases.

40. Pursuant to the CBAs, Union Employees with at least six months of service are eligible for sickness and accident payments of $470 per week if injured or sick, regardless of whether such injury or sickness is work-related. In such case, there is a seven day waiting period, absent hospitalization for surgical treatment or intensive care. The maximum duration of such sickness and accident benefits ranges from 6 to 52 weeks, depending on a Union Employee's length of employment. The Debtors are self-insured with respect to sickness and accident benefits for Union Employees, but claims are administered by Prudential.

41. The Debtors also provide their Employees with the opportunity to participate in various supplemental group insurance plans administered by Aflac Inc. ("Aflac"). Beginning in 2018, the Debtors began providing Non-Union Employees with the option of purchasing Group Accident Insurance, Group Critical Illness Insurance, and Group Hospital Indemnity (collectively, the "Group Insurance Programs"), all of which are administered through Aflac. Each month, the Debtors pay approximately $130,000 in the aggregate to Aflac on account of the Group Insurance Programs. The Group Insurance Programs are fully insured and the Debtors do not pay separate administrative fees. As of the Petition Date, the Debtors owe Aflac approximately $130,000 in the aggregate on account of the Group Insurance Plans. Premiums under the Group Insurance Programs are deducted from the applicable Employee's paychecks and reimbursed to the Debtors.

**e. 401(k) Plan.**

42. The Debtors sponsor a 401(k) retirement savings plan (the "401(k) Plan") for their Employees. The 401(k) Plan is administered by Empower Retirement ("Empower"). Under the 401(k) Plan, an Employee may contribute a portion of his or her eligible earnings each year on a pre-tax basis to the 401(k) Plan, subject to limits imposed by federal law. These contributions are

deducted from the paychecks of participating Employees and held in trust on the Employees' behalf—until such amounts can be paid to Empower to be held on the Employee's behalf. In addition, the 401(k) Plan permits Employees to take loans against their individual 401(k) account, and the Debtors deduct loan payments from such Employee's paycheck and remit such amounts to Empower. Currently, approximately 1,200 Employees participate in the 401(k) Plan.

43. The Non-Union Employees are eligible to participate in the 401(k) Plan after sixty days of employment with the Debtors. After six months of employment with the Debtors, a Non-Union Employee becomes eligible for matching contributions provided by the Debtors. The Debtors match contributions of eligible Non-Union Employees dollar for dollar up to three percent of the participating employee's compensation, plus fifty percent of the contribution over that amount, subject to limits imposed by federal law. Pursuant to the CBAs, Union Employees are also eligible to participate in the 401(k) Plan. The company contributes an amount equal to three percent of each Union Employee's gross wages, regardless of whether a particular Union Employee elects to make voluntary contributions. In addition, the company matches any contribution elected by a Union Employee up to an additional three percent of the Union Employee's wages. Thus, if a Union Employee elects to contribute three percent of his or her wages, then the Company will contribute an amount equal to six percent of such Employee's wages.

44. The company contracts with MCF Advisors, LLC ("MCF") to advise on issues relating to the 401(k) Plan. Both Empower and MCF receive fees from the 401(k) Plan; the Debtors do not pay any fees directly to Empower or MCF.

45. Blackhawk paid approximately $2.43 million in aggregate contributions to the 401(k) Plan for the first half of 2019;[16] the Debtors estimate that the aggregate amount of contributions in the second half of 2019 will be similar. The Company's 401(k) contributions, consisting of the matching contributions for all Employees and the additional three percent contribution for all Union Employees, are a critical component of the Employees' compensation. Failure to make such payments would negatively impact morale, place undue hardship on Employees, and potentially result in employee attrition during these chapter 11 cases. Accordingly, the Debtors request authority to continue to make contributions under the 401(k) Plan.

**G. Workers' Compensation.**

46. Under the laws of the various states in which they operate, the Debtors are required to maintain policies and programs, or participate in programs administered by state governments, that provide the Employees with workers' compensation coverage for claims arising from or related to their employment.

47. The Employees are covered under a workers' compensation policy issued by Rockwood Casualty Insurance Company ("Rockwood"). The Debtors pay premiums to Rockwood on a monthly basis, one month in arrears, based on a formula that takes into account monthly payroll, applicable rates based on Employees' job codes, and the state in which they are employed. The Debtors estimate that annual premiums under the Debtors' current policy, which runs from October 1, 2018, to October 1, 2019, will total approximately $10.1 million.

[16] This amount does not include Employee contributions that are deducted from paychecks; this only includes contributions paid by the Debtors.

48. The Debtors' workers' compensation policy with Rockwood has a deductible of $1 million per occurrence. Separate from and in addition to the premiums, the Debtors fund two "loss fund" escrow accounts (the "Loss Fund Escrow Accounts"), administered by Rockwood, to which the Debtors contribute six percent of monthly payroll, paid in arrears on the 15th of each month. A smaller Loss Fund Escrow Account typically holds approximately $700,000 and makes disbursements to beneficiaries on a daily basis, while another larger Loss Fund Escrow Account holds the remainder of the "loss fund" amounts and replenishes the smaller account on a monthly basis. Total payments to the "loss fund" escrow accounts are expected to be approximately $13.8 million annually. Upon the filing of a verified workers' compensation claim by an eligible Employee, Rockwood pays the claim amount directly to the Employee from the escrow account, up to the per occurrence deductible amount.

49. Actual Investment, Inc., a Rockwood affiliate, receives a monthly administrative fee of approximately $122 in connection with administration of the Debtors' "loss fund" escrow account. The Debtors' insurance broker, Van Meter Insurance Group ("Van Meter"), also receives a fee equal to one and a half percent of the Debtors' premiums under the workers' compensation policy. All fees are taken out of the premiums or "loss fund" interest earnings, as applicable, and are not paid directly by the Debtors.

50. As of the Petition Date, the Debtors are expected to pay approximately $5.7 million with respect to their workers' compensation program through the remainder of the policy year ending October 1, 2019, consisting of an estimated $2.23 in premiums and an estimated $3.48 in escrow contributions, none of which will come due in the first 21 days of these cases.[17]

[17] These estimates are based on the Debtors' maintaining current payroll during the duration of the current policy period.

51. It is critical that the Debtors be permitted to continue their workers' compensation program and to pay outstanding prepetition claims, taxes, charges, assessments, premiums, and third-party administrator fees in the ordinary course of business because alternative arrangements for workers' compensation coverage would most certainly be more costly, and the failure to provide coverage may subject the Debtors and/or their officers to severe penalties. Out of an abundance of caution and to facilitate the ordinary course handling of workers' compensation claims, the Debtors further request authority, in their sole discretion, to lift the automatic stay arising under section 362 of the Bankruptcy Code to allow workers' compensation claimants to proceed with their claims under the applicable insurance policy or program and to allow the Debtors or their insurance providers and/or third party administrators to negotiate, settle, and/or litigate workers' compensation claims, and pay resulting amounts, whether such claims arose before or after the Petition Date.

**H. Employee Benefits Consultants.**

52. The Debtors contract with J. Smith Lanier & Co. ("JLC") for consulting services relating to the Employee Benefits. JLC assists the Debtors on an ongoing basis by, among other things, developing strategies to manage and optimize the Employee Benefits, providing information about trends in the employee benefits marketplace, and acting as a liaison between the Debtors and their insurers. JLC receives fees for its services that are deducted from the premiums for the various health plans, and the Debtors do not directly pay any fees to JLC.

53. In addition, the Debtors engage an analytics firm, ZakiPoint Health, Inc. ("Zaki"), to assist in evaluating medical claims to identify potential changes to the Medical Plans, including with respect to plan design changes, administrative changes, or participant communication or education requirements. The Debtors pay quarterly fees of approximately $3,000 to Zaki. As of

the Petition Date, the Debtors estimate that they owe approximately $3,000 to Zaki on account of accrued but unpaid fees, all of which will come due in the first 21 days of these cases.

**I. Payments to Independent Directors.**

54. In the ordinary course of business, the Debtors pay monthly fees and reimburse expenses to six non-Employee members of BHM's board of directors (the "Independent Directors"). The Independent Directors are each paid $190,000 per year in fees, paid monthly in arrears. Additionally, the Debtors reimburse all travel expenses related to attending the board meetings, and the Independent Directors and their spouses are also eligible to receive health, vision, and dental insurance benefits with no premium costs required. The chair of the audit committee receives $15,000 per year payable monthly in arrears, and the chair of the nominations, corporate governance, and compensation committee, and the chair of the budget and finance committee each receive additional cash compensation of $7,500 per year payable monthly in arrears. The Independent Directors' service is necessary for the continued management of the Debtors and, accordingly, it is essential that the Debtors be authorized to pay all prepetition amounts accrued as of the Petition Date to the Independent Directors. As of the Petition Date, the Debtors estimate that the aggregate accrued but unpaid amounts owed to the Independent Directors for fees and expenses is approximately $20,000, all of which will come due in the first 21 days of these cases. In addition, out of an abundance of caution, the Debtors request authority to continue to pay monthly fees and reimburse expenses to the Independent Directors on a postpetition basis in the ordinary course of business.

**J. Other Expenses.**

55. Additionally, in the ordinary course of business the Debtors pay certain amounts for employment-related expenses such as pre-employment drug screenings and physical examinations. Such amounts are paid per occurrence, and are less than $5,000 per month. The

Debtors do not believe any prepetition amounts are outstanding, but, of an abundance of caution, request to pay such amounts, if any, in the ordinary course of business.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Workforce Programs.

#### A. Certain Workforce Programs Are Entitled to Priority Treatment.

56. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Workforce Programs owed to the Employees to priority treatment, to the extent such payments do not exceed $13,650 for each individual as provided for under sections 507(a)(4) and (5) of the Bankruptcy Code. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment in full of certain allowed unsecured claims for (a) wages, salaries, or commissions, including severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). Thus, granting the relief requested herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Workforce Programs at this time enhances value for the benefit of all interested parties.

#### B. Payment of Certain Workforce Programs Is Required by Law.

57. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Furthermore, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts

to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business. *See In re Dameron*, 155 F.3d 718, 721 (4th Cir. 1998). The Debtors therefore respectfully request that the Court recognize that the Withholding Obligations are not property of the Debtors' estates and, regardless of whether the Debtors collected the amounts prior to the Petition Date, authorize the Debtors to transmit such monies to the proper parties in the ordinary course of business.

58. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' restructuring. The Debtors therefore request that the Court authorize the Debtors to maintain the Workers' Compensation Program.

## II. Payment of the Workforce Programs Is A Proper Exercise of the Debtors' Business Judgment.

59. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs,*

*Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims.

60. Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also Armstrong World*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b)).

61. Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's businesses. *See Just for Feet*, 242 B.R. at 825−26. Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize

payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Railway Co.*, 657 F.2d 570 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)). Indeed, at least one court has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *In re CoServ*, 273 B.R. at 497.

62. Payment of the Workforce Obligations is warranted under this authority and the facts of these chapter 11 cases. The Debtors' Workforce will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Workforce Obligations. Additionally, continuing ordinary course benefits will help maintain Workforce morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

63. Moreover, the Workforce provides the Debtors with services necessary to conduct the Debtors' businesses, and the Debtors believe that absent the payment of the Workforce Obligations owed to, or on the account of, the Workforce, the Debtors may experience Workforce turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that

without these payments, the Workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships the Workforce may face. Such members of the Workforce may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' businesses is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Workforce Programs is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

64. Moreover, courts in this district have granted similar relief to that requested in this motion in previous chapter 11 cases. *See, e.g.*, *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 26, 2019) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (same); *In re VER Technologies Holdco*, No. 18-10834, (KG) (Bankr. D. Del. Apr. 6, 2018) (same); *In re PES Holdings, LLC*, No. 18-10122 (KG) (Bankr. D. Del. Jan. 23, 2018) (same); *In re Charming Charlie Holdings Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018) (same).[18] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Workforce Programs in the ordinary course of business and consistent with past practice.

[18] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

## III. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

65. Section 362(a) of the Bankruptcy Code operates to stay:

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

66. 11 U.S.C. § 362(a)(1). Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." *Id.* at § 362(d)(1). Cause exists here to modify the automatic stay to permit the Workforce to proceed with workers' compensation claims in the appropriate judicial or administrative forum. Staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Workforce.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

67. The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, debtor-in-possession financing, and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

68. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture. For the reasons discussed herein, the relief requested is necessary for the Debtors to operate their businesses in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

69. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Reservation of Rights**

70. Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant

to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Notice**

71. The Debtors have provided notice of this motion to the following parties or their respective counsel: (a) the office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' prepetition asset-based revolving credit facility; (d) the administrative agent under the Debtors' prepetition first lien term loan facility; (e) the administrative agent under the Debtors' prepetition second lien term loan facility; (f) counsel to the Crossover Group; (g) counsel to the First Lien Group; (h) the administrative agent under the Debtors' proposed debtor in possession term loan financing facility; (i) the administrative agent under the Debtors' proposed debtor in possession asset-based revolving financing facility; (j) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors operate; (k) the office of the attorneys general for the states in which the Debtors operate; (l) the United States Attorney's Office for the District of Delaware; (m) the Internal Revenue Service; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required

by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

72. No prior request for the relief sought in this motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: July 19, 2019
Wilmington, Delaware

/s/ *L. Katherine Good*
Christopher M. Samis (DE 4909)
L. Katherine Good (DE 5101)
**POTTER ANDERSON CORROON LLP**
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, Delaware 19801-6108
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: csamis@potteranderson.com
kgood@potteranderson.com

*Proposed Counsel to the Debtors and Debtors in Possession*

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
Joseph M. Graham (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
ross.kwasteniet@kirkland.com
joe.graham@kirkland.com

- and -

Stephen E. Hessler, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: stephen.hessler@kirkland.com

*Proposed Counsel to the Debtors and Debtors in Possession*

# **Exhibit A**

## **Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| BLACKHAWK MINING LLC, *et al.*,[1] | ) | Case No. 19-_____ (___) |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | **Re: Docket No. __** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"), (a) authorizing the Debtors to pay (i) undisputed prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) to continue employee benefits programs, in each case in the ordinary course of business, including payment of certain undisputed prepetition obligations related thereto, (b) granting related relief, and (c) scheduling a final hearing to consider approval of the Motion on a final basis, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Blackhawk Mining LLC (5600); Blackhawk Coal Sales, LLC (9456); Blackhawk Land and Resources, LLC (7839); Blackhawk River Logistics, LLC (3388); Blue Creek Mining, LLC (2427); Blue Diamond Mining, LLC (3488); Eagle Shield, LLC (6721); FCDC Coal, Inc. (6188); Guyandotte Mining, LLC (4882); Hampden Coal, LLC (8241); Kanawha Eagle Mining, LLC (0586); Logan & Kanawha, LLC (3178); Panther Creek Mining, LLC (0627); Pine Branch Land, LLC (9661); Pine Branch Mining, LLC (9681); Pine Branch Resources, LLC (9758); Redhawk Mining, LLC (0852); Rockwell Mining, LLC (3874); Spruce Pine Land Company (2254); Spurlock Mining, LLC (2899); Triad Mining, LLC (7713); and Triad Trucking, LLC (6112). The location of the Debtors' service address in these chapter 11 cases is 3228 Summit Square Place, Suite 180, Lexington, Kentucky 40509.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

District of Delaware, dated February 29, 2012, and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on an interim basis as set forth in this Interim Order.

2. The final hearing (the "Final Hearing") on the Motion shall be held on _________, 2019, at__:__ _.m., prevailing Eastern Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _________, 2019.

3. The Debtors are authorized, but not directed, to continue and/or modify, change, and discontinue the Workforce Programs and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law. For the avoidance of doubt, except as otherwise expressly set forth herein, nothing in this Interim Order should be construed as authorizing the Debtors to: (i) pay any amounts to insiders on account of any bonus or incentive programs; or

(ii) make any payment on account of the Workforce Programs that are outside the ordinary course of business without prior Court approval.

4. The Debtors are authorized, but not directed, in their discretion, to pay and honor prepetition amounts related to the Workforce Programs in an aggregate interim amount not to exceed $12,861,000 million, pursuant to this Interim Order.

5. Nothing herein shall be deemed to authorize the payment of any prepetition amounts above the statutory cap imposed by section 507(a)(4) and 507(a)(5) of the Bankruptcy Code with respect to the prepetition amounts owed on account of the Workforce Program, except upon further order of this Court.

6. Nothing herein shall be deemed to authorize the payment of any amounts in satisfaction of bonus or severance obligations, or which may implicate or be subject to section 503(c) of the Bankruptcy Code; *provided* that nothing in this Interim Order shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

7. Pursuant to section 362(d) of the Bankruptcy Code, (a) Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program, and the Debtors are authorized to pay all undisputed prepetition amounts relating thereto in the ordinary course of business, and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) are waived. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program, and any such claims must be pursued in accordance with the applicable Workers' Compensation Program. Payment on account of any recoveries obtained in connection with a

claim brought pursuant to this paragraph is limited to the terms and conditions of the applicable Workers' Compensation Program, including with regard to any policy limits or caps.

8. Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

9. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

10. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored

as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

11. Notwithstanding anything contained in the Motion or this Interim Order, any payment made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with any orders entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility or authorizing the Debtors' use of cash collateral, including, without limitation, and any budget in connection therewith (collectively, the "DIP Order"). To the extent there is any inconsistency between the DIP Order, the Motion, or the Interim Order, the terms of the DIP Order shall control.

12. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

13. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

14. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

15. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

16. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

Dated: __________, 2019
Wilmington, Delaware

_______________________________________
United States Bankruptcy Judge

# Exhibit B

## Proposed Final Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| BLACKHAWK MINING LLC, *et al.*,[1] | ) | Case No. 19-_____ (___) |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | **Re: Docket No. __** |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an final order (this "Final Order"), (a) authorizing the Debtors: (i) to pay undisputed prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) to continue employee benefits programs, in each case in the ordinary course of business, including payment of certain undisputed prepetition obligations related thereto, and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012, and this Court having found that this is a core

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Blackhawk Mining LLC (5600); Blackhawk Coal Sales, LLC (9456); Blackhawk Land and Resources, LLC (7839); Blackhawk River Logistics, LLC (3388); Blue Creek Mining, LLC (2427); Blue Diamond Mining, LLC (3488); Eagle Shield, LLC (6721); FCDC Coal, Inc. (6188); Guyandotte Mining, LLC (4882); Hampden Coal, LLC (8241); Kanawha Eagle Mining, LLC (0586); Logan & Kanawha, LLC (3178); Panther Creek Mining, LLC (0627); Pine Branch Land, LLC (9661); Pine Branch Mining, LLC (9681); Pine Branch Resources, LLC (9758); Redhawk Mining, LLC (0852); Rockwell Mining, LLC (3874); Spruce Pine Land Company (2254); Spurlock Mining, LLC (2899); Triad Mining, LLC (7713); and Triad Trucking, LLC (6112). The location of the Debtors' service address in these chapter 11 cases is 3228 Summit Square Place, Suite 180, Lexington, Kentucky 40509.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth in this Final Order.

2. The Debtors are authorized, but not directed, to continue and/or modify, change, and discontinue the Workforce Programs and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law. For the avoidance of doubt, except as otherwise expressly set forth herein, nothing in this Final Order should be construed as authorizing the Debtors to: (i) pay any amounts to insiders on account of any bonus or incentive programs; or (ii) make any payment on account of the Workforce Programs that are outside the ordinary course of business without prior Court approval.

3. The Debtors are authorized, but not directed, in their discretion, to pay and honor prepetition amounts related to the Workforce Programs.

4. Nothing herein shall be deemed to authorize the payment of any prepetition amounts above the statutory cap imposed by section 507(a)(4) and 507(a)(5) of the Bankruptcy Code with respect to the prepetition amounts owed on account of the Workforce Program, except upon further order of this Court.

5. Nothing herein shall be deemed to authorize the payment of any amounts in satisfaction of bonus or severance obligations that implicate section 503(c) of the Bankruptcy Code; *provided* that nothing herein shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

6. Pursuant to section 362(d) of the Bankruptcy Code, (a) Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program, and the Debtors are authorized to pay all undisputed prepetition amounts relating thereto in the ordinary course of business, and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) are waived. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program and any such claims must be pursued in accordance with the applicable Workers' Compensation Program. Payment on account of any recoveries obtained in connection with a claim brought pursuant to this paragraph is limited to the terms and conditions of the applicable Workers' Compensation Program, including with regard to any policy limits or caps.

7. Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim

is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

8. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

9. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

10. Notwithstanding anything contained in the Motion or this Final Order, any payment made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with any orders entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and/or authorizing the Debtors' use of cash collateral, including, without limitation, and any budget in connection therewith (collectively, the "DIP Order"). To the extent there is any inconsistency between the DIP Order, the Motion, or the Final Order, the terms of the DIP Order shall control.

11. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

12. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

13. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

14. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

Dated: ___________, 2019
Wilmington, Delaware

_______________________________________
United States Bankruptcy Judge