*SOLICITATION VERSION*

**Blackhawk Mining LLC**
**3228 Summit Square Place, Suite 180**
**Lexington, Kentucky 40509**

July 15, 2019

To:  **Holders of Class 3 First Lien Term Loan Claims**
    **Holders of Class 4 Second Lien Term Loan Claims**
    **Holders of Class 10A Class A Blackhawk Interests**
    **Holders of Class 10B Class B Blackhawk Interests**
    **Holders of Class 10C Class C Blackhawk Interests**

---

We deliver to you herewith the attached *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*, dated as of July 15, 2019 (the "Disclosure Statement"), for the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (as may be further amended, modified, or supplemented from time to time and including all exhibits or supplements thereto, the "Plan")[1] and a Ballot so that you may vote to accept or reject the proposed Plan with respect to Blackhawk Mining LLC ("Blackhawk") and certain of its direct and indirect subsidiaries (collectively, the "Debtors").[2]   The Debtors intend to use votes that are returned to its proposed voting agent, Prime Clerk LLC (the "Solicitation Agent"), by **5:00 p.m., prevailing Eastern Time, on July 26, 2019**, to seek approval of the Plan in voluntary reorganization cases that the Debtors intend to commence shortly under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").

The Plan provides for a comprehensive restructuring of the Debtors' obligations, preserves the going-concern value of the Debtors' business, maximizes recoveries available to all constituents, provides for an equitable distribution to the Debtors' stakeholders, and protects the jobs of more than 2,800 employees.  More specifically, the Plan provides, among other things, that:

- each holder of an Allowed First Lien Term Loan Claim shall receive on the Effective Date, in exchange for such Claim, its Pro Rata share of (1) 71% of the New Common Stock; and (2) $225 million of the New First Lien Loan on the terms and conditions set forth in the New First Lien Loan Documents;

---

[1] Capitalized terms used but not defined in this letter shall have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

[2] The Debtors are:  Blackhawk Mining LLC; Blackhawk Coal Sales, LLC; Blackhawk Land and Resources, LLC; Blackhawk River Logistics, LLC; Blue Creek Mining, LLC; Blue Diamond Mining, LLC; Eagle Shield, LLC; FCDC Coal, Inc.; Guyandotte Mining, LLC; Hampden Coal, LLC; Kanawha Eagle Mining, LLC; Logan & Kanawha, LLC; Panther Creek Mining, LLC; Pine Branch Land, LLC; Pine Branch Mining, LLC; Pine Branch Resources, LLC; Redhawk Mining, LLC; Rockwell Mining, LLC; Spruce Pine Land Company; Spurlock Mining, LLC; Triad Mining, LLC; and Triad Trucking, LLC.

- each holder of an Allowed Second Lien Term Loan Claim shall receive on the Effective Date, in exchange for such Claim, its Pro Rata share of 29% of the New Common Stock;

- all holders of Interests in Blackhawk will have the opportunity to accept the Plan in exchange for receiving the benefit of the releases under the Plan;

- all outstanding and undisputed General Unsecured Claims against the Debtors will be unimpaired and unaffected by the restructuring and will be paid in full in Cash, unless otherwise agreed to by Holders of General Unsecured Claims;

- the DIP Lenders will provide the Debtors with debtor-in-possession financing through the DIP ABL Facility and the DIP Term Facility, pursuant to the terms and conditions set forth in the DIP ABL Agreement and the DIP Term Agreement, respectively;

- the DIP ABL Facility, upon interim approval, will roll up Claims arising under the Debtors' Prepetition ABL Facility as the Debtors borrow and repay the DIP ABL Facility on a daily basis, then, upon final approval, will roll up any and all remaining Claims arising under the Debtors' Prepetition ABL Facility, and the DIP ABL Facility will ultimately convert to or be refinanced by the Exit ABL Facility;

- the DIP Term Facility will roll up $100 million of First Lien Term Loan Claims and will raise $50 million through the New Money DIP Loans;

- in exchange for the agreement of Blackhawk's founder, CEO, and Chairman, John Mitchell Potter ("Potter"), to, among other things, (1) continue to serve on the Board of Managers of Reorganized Blackhawk, (2) provide consulting services to Reorganized Blackhawk for a one-year period, (3) cause certain entities under his control to continue to provide the goods and services required under the Potter Group Vendor Contracts, as amended on the terms described in the RSA, (4) waive any entitlement to severance payments, and (5) otherwise support the restructuring on the terms set forth in the RSA, Potter will receive, among other things, negotiated base compensation and a $500,000 Cash payment on the Effective Date; and

- all Administrative Claims, Priority Tax Claims, and Other Secured Claims will be paid in full in Cash or receive such other treatment that renders such Claims unimpaired under the Bankruptcy Code.

The Plan is the product of months of arm's-length, good-faith negotiations between the Debtors, certain holders of First Lien Term Loan Claims and Second Lien Term Loan Claims, Potter, and certain of the Debtors' other key stakeholders. Despite strong, efficient operations and a highly competitive market position, the Debtors are over-leveraged. Through the financial restructuring of the Debtors' capital structure, the Plan will improve the Debtors' financial condition and overall creditworthiness, provide the Debtors with the financial flexibility and stability to grow their business going forward, and leave General Unsecured Claims unimpaired.

The Debtors are seeking your vote on the Plan prior to and after the commencement of their chapter 11 cases. By employing a joint "prepackaged chapter 11 reorganization," the Debtors

anticipate that their day-to-day business operations will not be affected, the duration of their chapter 11 cases will be significantly shortened, and the administration of such cases will be simplified and less costly.

Please review the enclosed Disclosure Statement carefully for details about voting, recoveries, the Debtors' proposed financial restructuring, the Debtors' financial performance, and other matters relevant to your decision whether to vote to accept or reject the Plan.  The Debtors have established the following date for determining who is entitled to vote on the Plan (the "Voting Record Date") and deadline for its proposed Solicitation Agent to receive votes (the "Voting Deadline"):

**VOTING RECORD DATE**: July 11, 2019

**VOTING DEADLINE**:        July 26, 2019, 5:00 p.m., prevailing Eastern Time

Sincerely,

Blackhawk Mining LLC,
on behalf of itself and each of the other Debtors

*/s/ Jesse Parrish*
Jesse Parrish
Chief Financial Officer

iii

THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION *BEFORE AND AFTER* THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532 (THE "BANKRUPTCY CODE"). BECAUSE THE CHAPTER 11 CASES HAVE NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY A BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE OR AS BEING IN COMPLIANCE WITH SECTION 1126(b) OF THE BANKRUPTCY CODE. FOLLOWING COMMENCEMENT OF THE CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK ENTRY OF AN ORDER OF THE BANKRUPTCY COURT (I) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(a) OF THE BANKRUPTCY CODE, (II) APPROVING THE SOLICITATION OF VOTES ON THE PLAN AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(b) OF THE BANKRUPTCY CODE, AND (III) CONFIRMING THE PLAN.

## DISCLOSURE STATEMENT, DATED JULY 15, 2019

SOLICITATION OF VOTES TO ACCEPT OR REJECT
THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

---

### RECOMMENDATION BY THE DEBTORS

THE BOARD OF MANAGERS OR THE SOLE MEMBER OF EACH OF THE DEBTORS, AS APPLICABLE, HAVE UNANIMOUSLY APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT AND RECOMMEND THAT ALL HOLDERS OF CLAIMS AND INTERESTS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.

---

<table>
<tr><td colspan="2" align="center"><strong>DELIVERY OF BALLOTS</strong></td></tr>
<tr><td>1.</td><td>Ballots must be actually received by the Solicitation Agent before the Voting Deadline.</td></tr>
<tr><td>2.</td><td>Ballots may be returned by the following methods: (a) in the enclosed pre-paid, pre-addressed return envelope; (b) via first class mail, overnight courier, or hand delivery to the address set forth below; or (c) via electronic submission through the Solicitation Agent's online voting portal at https://cases.primeclerk.com/blackhawkballots.</td></tr>
</table>

BLACKHAWK MINING BALLOT PROCESSING
C/O PRIME CLERK LLC
ONE GRAND CENTRAL PLACE
60 EAST 42nd STREET (PARK AVENUE), SUITE 1440
NEW YORK, NEW YORK 10165

If you have any questions on the procedures for voting on the Plan, please contact the Solicitation Agent by emailing blackhawkballots@PrimeClerk.com and reference "Blackhawk Mining" in the subject line, or by calling (844) 627-6268 (domestic toll free) or (347) 292-3528 (international toll), and ask for the solicitation group.

**PLEASE NOTE THAT THE DESCRIPTION OF THE PLAN PROVIDED THROUGHOUT THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY PROVIDED FOR CONVENIENCE PURPOSES.**

**THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN.**

**A COPY OF THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IS ATTACHED HERETO AS <u>EXHIBIT A</u>.**

**READERS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE PLAN AND THIS DISCLOSURE STATEMENT.**

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR THE PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.**

**ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL IN THIS DISCLOSURE STATEMENT.**

**ANY DISCUSSION OF FEDERAL, STATE, LOCAL, OR NON-U.S. TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE**

INDIVIDUAL CIRCUMSTANCES PERTAINING TO THE READER OR A HOLDER OF A CLAIM OR INTEREST. READERS AND ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

<u>SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS</u>

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "<u>SEC</u>") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3016(b). The Securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), or any securities regulatory authority of any state under applicable state securities law (collectively, the "<u>Blue Sky Laws</u>"). The prepetition solicitation of votes on the Plan is being made in reliance on the exemption from the registration requirements of the Securities Act provided by section 4(a)(2) of the Securities Act (the "<u>Solicitation</u>"). The Debtors intend to rely on section 1145 of the Bankruptcy Code to exempt the offer, issuance, and distribution of Securities of the Reorganized Debtors in connection with the Solicitation and the Plan from registration under the Securities Act and the Blue Sky Laws. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Readers are cautioned that any forward-looking statements in this Disclosure Statement are based on assumptions that are believed to be reasonable, but are subject to a wide range of risks, including risks associated with the following: (a) future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (b) the relationships with and payment terms provided by trade creditors; (c) additional post-restructuring financing requirements; (d) future dispositions and acquisitions; (e) the effect of competitive products, services, or procuring by competitors; (f) changes to the costs of commodities and raw materials; (g) the proposed restructuring and costs associated therewith; (h) the effect of conditions in the local, national, and global economy on the Debtors; (i) the ability to obtain relief from the bankruptcy court to facilitate the smooth operation of the Debtors' businesses under chapter 11; (j) the confirmation and consummation of the Plan; (k) the terms and conditions of the Exit ABL Facility, the New First Lien Loan, and the New Common Stock to be entered into, or issued, as the case may be, pursuant to the Plan; and (l) each of the other risks identified in this Disclosure Statement. Due to these uncertainties, readers cannot be assured that any forward-looking statements will prove to be correct. The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events, .or otherwise, unless instructed to do so by the Bankruptcy Court.

THIS DISCLOSURE STATEMENT AND THE PLAN CONTAIN MATERIAL NON-PUBLIC INFORMATION CONCERNING THE DEBTORS, THEIR SUBSIDIARIES, AND THEIR RESPECTIVE DEBT AND OTHER SECURITIES. EACH RECIPIENT HEREBY ACKNOWLEDGES THAT IT IS AWARE THAT THE FEDERAL SECURITIES LAWS OF THE UNITED STATES PROHIBIT ANY PERSON WHO IS IN POSSESSION OF MATERIAL NON-PUBLIC INFORMATION ABOUT A COMPANY FROM PURCHASING OR SELLING ANY SECURITIES OF SUCH COMPANY OR FROM COMMUNICATING THE INFORMATION TO ANY OTHER PERSON UNDER CIRCUMSTANCES IN WHICH IT IS REASONABLY FORESEEABLE THAT SUCH PERSON IS LIKELY TO PURCHASE OR SELL ANY SUCH SECURITIES.

You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, financial projections, and other projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of

**actual distributions to Holders of Allowed Claims and Interests, among other things, may be affected by many factors that cannot be predicted.  Any analyses, estimates, or recovery projections may or may not turn out to be accurate.**

KE 60280931

## <u>TABLE OF CONTENTS</u>

Page

I.    Executive Summary ............................................................................................................1
    A.    Purpose of this Disclosure Statement and the Plan .................................................1
    B.    Overview of the Transactions Contemplated by the Plan ........................................1
    C.    Summary of Treatment of Claims and Interests and Description of Recoveries under the
        Plan ..........................................................................................................................3
    D.    Voting on the Plan...................................................................................................3
    E.    Confirmation and Consummation of the Plan ..........................................................4
        1.    Confirmation Hearing ..................................................................................5
        2.    Effect of Confirmation and Consummation of the Plan ................................5
    F.    Additional Plan-Related Documents ........................................................................5

II.   The Debtors' Business Operations and Capital Structure................................................6
    A.    The Debtors' Corporate History .............................................................................6
    B.    The Debtors' Operations .........................................................................................7
        1.    Active Mining Complexes ............................................................................8
        2.    Additional Non-Core Assets .........................................................................8
        3.    The Company's Workforce ...........................................................................8
        4.    Strategic Partnerships ..................................................................................9
        5.    Transportation Diversity ..............................................................................9
        6.    Recent Capital Expenditures ........................................................................9
    C.    The Debtors' Corporate Structure and Prepetition Capital Structure .......................9
        1.    The Prepetition ABL Facility .....................................................................11
        2.    The First Lien Term Loan Facility..............................................................11
        3.    The Second Lien Term Loan Facility ..........................................................11
        4.    The Patriot Unsecured Note ........................................................................12
        5.    Other Secured Debt....................................................................................12
        6.    Unencumbered Assets ................................................................................12

III.  Events Leading to These Chapter 11 Cases ...................................................................13
    A.    Business Investments .............................................................................................13
    B.    2017 Restructuring ................................................................................................13
    C.    Negotiations Regarding a Deleveraging Transaction and the RSA ..........................14
    D.    Negotiations Regarding Certain Significant Unsecured Claims ..............................14

IV.   The Debtors' Proposed Restructuring: Key Components ..............................................14
    A.    The RSA and the Plan ..........................................................................................14
    B.    The Debtors' Proposed Disclosure Statement and Solicitation Process...................16
    C.    Employee and Equity Considerations in the Plan ..................................................17
    D.    The Debtors' First Day Motions and Certain Related Relief ..................................17
    E.    Other Requested First-Day Relief and Retention Applications................................17

V.    Summary of the Plan.......................................................................................................18
    A.    Treatment of Unclassified Claims .........................................................................18
        1.    DIP Claims ................................................................................................18
        2.    Administrative Claims ................................................................................19
        3.    Professional Fee Claims..............................................................................19
        4.    Priority Tax Claims....................................................................................20
    B.    Classification and Treatment of Claims and Interests ............................................21
        1.    Classification of Claims and Interests.........................................................21
        2.    Treatment of Classes of Claims and Interests .............................................22
        1.    Class 1 — Other Secured Claims.................................................................22
        2.    Class 2 — Other Priority Claims .................................................................22

|  | 3. | Class 3 — First Lien Term Loan Claims | 22 |
|  | 4. | Class 4 — Second Lien Term Loan Claims | 23 |
|  | 5. | Class 5 — General Unsecured Claims | 23 |
|  | 6. | Class 6 — Debtor Intercompany Claims | 24 |
|  | 7. | Class 7 — Non-Debtor Intercompany Claims | 24 |
|  | 8. | Class 8 — Section 510(b) Claims | 24 |
|  | 9. | Class 9 — Intercompany Interests | 25 |
|  | 10. | Class 10A — Class A Blackhawk Interests | 25 |
|  | 11. | Class 10B — Class B Blackhawk Interests | 25 |
|  | 12. | Class 10C — Class C Blackhawk Interests | 26 |
|  | 3. | Special Provision Governing Unimpaired Claims | 26 |
|  | 4. | Elimination of Vacant Classes | 26 |
|  | 5. | Voting Classes; Presumed Acceptance by Non-Voting Classes | 26 |
|  | 6. | Subordinated Claims | 26 |
|  | 7. | Intercompany Interests | 26 |
|  | 8. | Controversy Concerning Impairment | 27 |
|  | 9. | Confirmation of Plan Pursuant to Section 1129(b) of the Bankruptcy Code | 27 |
| C. |  | Means for Implementation of the Plan | 27 |
|  | 1. | General Settlement of Claims and Interests | 27 |
|  | 2. | Restructuring Transactions | 27 |
|  | 3. | Sources of Consideration for Plan Distributions | 28 |
|  | 4. | Shareholders Agreement | 29 |
|  | 5. | Potter Settlement | 29 |
|  | 6. | Accounts Payable Settlements | 30 |
|  | 7. | Patriot Unsecured Note Settlement | 30 |
|  | 8. | Exemption from Registration Requirements | 30 |
|  | 9. | Corporate Existence | 30 |
|  | 10. | Corporate Action | 30 |
|  | 11. | Vesting of Assets in the Reorganized Debtors | 31 |
|  | 12. | Cancellation of Notes, Instruments, Certificates, and Other Documents | 31 |
|  | 13. | Effectuating Documents; Further Transactions | 32 |
|  | 14. | Exemptions from Certain Taxes and Fees | 32 |
|  | 15. | New Organizational Documents | 32 |
|  | 16. | Directors and Officers of the Reorganized Debtors | 32 |
|  | 17. | Management Incentive Plan | 33 |
|  | 18. | Preservation of Causes of Action | 33 |
| D. |  | Conditions Precedent to Confirmation and Consummation of the Plan | 34 |
|  | 1. | Conditions Precedent to the Effective Date | 34 |
|  | 2. | Waiver of Conditions Precedent to the Effective Date | 34 |
|  | 3. | Substantial Consummation | 34 |
|  | 4. | Effect of Non-Occurrence of Conditions to Consummation | 34 |
| E. |  | Settlement, Release, Injunction, and Related Provisions | 35 |
|  | 1. | Compromise and Settlement of Claims, Interests, and Controversies | 35 |
|  | 2. | Discharge of Claims | 35 |
|  | 3. | Release of Liens | 35 |
|  | 4. | Debtor Release | 36 |
|  | 5. | Third-Party Release | 36 |
|  | 6. | Exculpation | 37 |
|  | 7. | Injunction | 37 |
|  | 8. | Protection Against Discriminatory Treatment | 38 |
|  | 9. | Recoupment | 38 |
|  | 10. | Reimbursement or Contribution | 38 |
|  | 11. | Term of Injunctions or Stays | 38 |
|  | 12. | Document Retention | 38 |

KE 60280931

| | | |
|---|---|---|
| VI. | **Confirmation of the Plan** | **39** |
| | A. | The Confirmation Hearing | 39 |
| | B. | Deadline to Object to Approval of the Disclosure Statement and Confirmation of the Plan | 39 |
| | C. | Requirements for Approval of the Disclosure Statement | 39 |
| | D. | Requirements for Confirmation of the Plan. | 39 |
| | | 1. | Requirements of Section 1129(a) of the Bankruptcy Code | 39 |
| | | 2. | The Debtor Release, Third-Party Release, Exculpation, and Injunction Provisions | 40 |
| | | 3. | Best Interests of Creditors—Liquidation Analysis | 42 |
| | | 4. | Feasibility/Financial Projections | 42 |
| | | 5. | Acceptance by Impaired Classes | 42 |
| | | 6. | Confirmation Without Acceptance by All Impaired Classes | 42 |
| | | 7. | Valuation of the Debtors | 44 |
| VII. | **Voting Instructions** | **44** |
| | A. | Overview | 44 |
| | B. | Solicitation Procedures | 44 |
| | | 1. | Solicitation Agent | 44 |
| | | 2. | Solicitation Package | 44 |
| | | 3. | Voting Deadline | 44 |
| | | 4. | Distribution of the Solicitation Package and Plan Supplement | 45 |
| | C. | Voting Procedures | 45 |
| | D. | Voting Tabulation | 46 |
| VIII. | **Risk Factors** | **47** |
| | A. | Risks Related to the Restructuring | 47 |
| | | 1. | The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors | 47 |
| | | 2. | Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks | 47 |
| | | 3. | Risks Related to the New First Lien Loan and the New Common Stock | 48 |
| | | 4. | The Terms of the Exit ABL Facility Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court | 49 |
| | | 5. | The Exit ABL Facility Will Be Secured Only to the Extent of the Value of the Assets Granted as Security for the Exit ABL Facility. The Fair Market Value of the Reorganized Debtors Upon Any Foreclosure May Not Be Sufficient to Repay the Holders of the Exit ABL Facility in Full | 49 |
| | | 6. | A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt | 50 |
| | | 7. | Risks Related to Confirmation and Consummation of the Plan | 50 |
| | B. | Risks Related to Recoveries Under the Plan | 52 |
| | | 1. | The Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations | 52 |
| | | 2. | Estimated Valuations of the Debtors, the New First Loan Loan, and the New Common Stock, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values | 53 |
| | | 3. | Holders of Claims That Acquire the New Common Stock Will Assert Significant Control Over the Reorganized Debtors | 53 |
| | | 4. | Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors | 53 |
| | C. | Risks Related to the Offer and Issuance of Securities Under the Plan | 53 |
| | | 1. | The Debtors Do Not Intend to Offer to Register or to Exchange the New Common Stock in a Registered Exchange Offer | 53 |
| | | 2. | There is No Established Market for the New Common Stock | 54 |

KE 60280931

D.     Risk Factors Related to the Business Operations of the Debtors and Reorganized Debtors ........... 54

    1.     The Debtors Will File Voluntary Petitions for Relief Under Chapter 11 of the Bankruptcy Code and Will Be Subject to the Risks and Uncertainties Associated with Any Chapter 11 Restructuring ........................................................................ 54

    2.     Potential for the Loss of Key Members of the Executive Management Team ................ 55

    3.     The Debtors May Not Be Able to Achieve Their Projected Financial Results. ................ 55

    4.     If the Debtors Do Not Obtain Additional Capital to Fund Their Operations and Obligations, the Debtors' Growth May Be Limited ............................................... 56

    5.     Employee and Labor Risks ............................................................................ 56

    6.     New Developments in the Regulation of Greenhouse Gases, Other Air Emissions, Coal Ash, and Other Environmental Matters Could Materially Adversely Affect the Debtors' Customers' Demand for Coal and the Debtors' Financial Condition, Results of Operations, and Cash Flows ....................................................... 56

    7.     The Environmental, Health, and Safety Regulations Applicable to the Debtors' Mining Operations Impose Significant Costs, and Future Regulations or Changes in the Interpretation or Application or Enforcement of Existing Regulations Could Increase those Costs and Limit the Debtors' Ability to Produce Coal .............................. 57

E.     Miscellaneous Risk Factors and Disclaimers .................................................................. 57

    1.     The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed ...................................... 57

    2.     No Legal or Tax Advice Is Provided By This Disclosure Statement ............................. 57

    3.     No Admissions Made .................................................................................. 58

    4.     Failure to Identify Litigation Claims or Projected Objections ................................. 58

    5.     Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors ................................................................................................... 58

    6.     No Representations Outside This Disclosure Statement Are Authorized ...................... 58

**IX.    Important Securities Laws Disclosures ................................................................... 58**

A.     Plan Consideration ..................................................................................................... 58

B.     Exemption from Registration Requirements; Issuance and Resale of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code ............................. 58

    1.     Exemption from Registration Requirements; Issuance and Resale of New Common Stock ...................................................................................... 58

    2.     Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code; Implications for Resale of New Common Stock ................................................. 59

**X.    Certain U.S. Federal Tax Consequences of the Plan ................................................... 60**

A.     Introduction ............................................................................................................... 60

B.     Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors, the Reorganized Debtors, and Equityholders of Blackhawk ......................................................................... 61

    1.     Characterization of the Restructuring Transactions .............................................. 61

    2.     Cancellation of Debt and Reduction of Tax Attributes ......................................... 63

C.     Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 3 and 4 Claims .................................................................................................. 63

    1.     Consequences to Holders of Class 3 Claims ...................................................... 63

    2.     Consequences to Holders of Class 4 Claims ...................................................... 65

    3.     Consequences to Holders of Interests in Blackhawk. ........................................... 66

    4.     Issue Price and Original Issue Discount with Respect to the New First Lien Loan .......... 67

    5.     Accrued Interest ...................................................................................... 67

    6.     Market Discount. ..................................................................................... 68

    7.     U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the New First Lien Loan .......................................................... 68

    8.     U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Common Stock of Corporate Reorganized Blackhawk ................................ 69

    9.     U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Common Stock of Flow-Through Reorganized Blackhawk ........................... 70

|  | 10. | Limitations on Use of Capital Losses | 71 |
|  | 11. | Medicare Tax | 71 |
| D. | | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims | 71 |
|  | 1. | Gain Recognition | 71 |
|  | 2. | U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest and of Owning and Disposing of New First Lien Loan | 72 |
|  | 3. | U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock | 73 |
|  | 4. | FIRPTA | 75 |
|  | 5. | FATCA | 76 |
|  | 6. | Information Reporting and Back-Up Withholding | 76 |

**XI.    Recommendation of the Debtors** .......................................................................... **78**

KE 60280931

## **EXHIBITS**

Exhibit A        Plan of Reorganization

Exhibit B        Corporate Structure of the Debtors

Exhibit C        Restructuring Support Agreement

Exhibit D        Financial Projections

Exhibit E        Valuation Analysis

Exhibit F        Liquidation Analysis

I.    **Executive Summary**

A.    **Purpose of this Disclosure Statement and the Plan.**

Blackhawk Mining LLC ("Blackhawk") and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (each, a "Debtor," collectively, the "Debtors," and, together with Blackhawk's non-Debtor affiliates, the "Company"), submit this disclosure statement (including all exhibits hereto, the "Disclosure Statement") pursuant to sections 1125 and 1126 of the Bankruptcy Code to Holders of Class 3 First Lien Term Loan Claims and Class 4 Second Lien Term Loan Claims against the Debtors and Holders of Class 10A Class A Blackhawk Interests, Class 10B Class B Blackhawk Interests, and Class 10C Class C Blackhawk Interests in connection with the solicitation of acceptances with respect to the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (as may be amended or modified from time to time and including all exhibits and supplements thereto, the "Plan"). A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.[1] The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS AND INTERESTS. THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR IMPLEMENTING A RESTRUCTURING OF THE DEBTORS' BALANCE SHEET. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

B.    **Overview of the Transactions Contemplated by the Plan.**

The Company is a privately-owned coal producer headquartered in Lexington, Kentucky and operating in the Central Appalachian Basin of the United States. Since its founding in 2010, the Company has steadily grown from a single mining complex producing thermal coal to ten active mining complexes in West Virginia and Kentucky producing metallurgical coal, thermal coal, pulverized coal injection, and stoker coal, which the Company sells domestically and abroad to a diverse set of end markets. The Company controls 1.37 billion tons of proven and probable reserves, with an additional 0.8 billion tons of resources. Over 55%, or 0.7 billion tons, of the Company's reserves are associated with its metallurgical coal segment. In 2018, the Company produced approximately 8.8 million tons of metallurgical coal and 4.6 million tons of thermal coal, generating approximately $1.09 billion in revenue—76% attributable to its metallurgical segment and 24% attributable to its thermal segment.

The Company employs approximately 2,800 employees, consisting of approximately 50 employees located at its corporate headquarters and 2,749 employees located at the Company's ten active mining complexes. As of July 15, 2019, the Debtors have approximately $1.09 billion in total funded debt obligations, consisting of approximately $85 million outstanding under a senior secured asset-based revolving credit facility (the "Prepetition ABL Facility"); approximately $639 million in aggregate principal amount outstanding under a first lien term loan credit facility (the "First Lien Term Loan Facility"); approximately $318 million in aggregate principal amount outstanding under a second lien term loan credit facility (the "Second Lien Term Loan Facility"); approximately $16 million in aggregate principal amount outstanding under an unsecured note related to assets acquired from Patriot Coal Corporation (the "Patriot Unsecured Note"); and approximately $28 million in aggregate principal amount outstanding under various equipment financing agreements (the "Other Secured Debt").

To implement a comprehensive financial restructuring of their funded debt, the Debtors will commence chapter 11 cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") after commencement of the solicitation process. The Debtors will seek joint administration

---

[1]    Capitalized terms used but not defined in this Disclosure Statement have the meaning ascribed to such terms in the Plan. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan. **Any summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, is qualified in its entirety by reference to the Plan, the exhibits, and other materials referenced in the Plan, the Plan Supplement, and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

of the Chapter 11 Cases for procedural purposes and, upon commencement of the Chapter 11 Cases, will file the Plan, this Disclosure Statement, and a motion seeking to approve the Disclosure Statement and proposed solicitation process. On July 15, 2019, certain Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims (collectively, the "Consenting Term Lenders"), John Mitchell Potter ("Potter," and together with the Consenting Term Lenders, the "Consenting Parties"), and the Debtors entered into a restructuring support agreement (together with all exhibits thereto, and as amended, restated, and supplemented from time to time, the "RSA") that sets forth the principal terms of the Restructuring Transactions and requires the Consenting Parties to support the Plan.

As set forth in the Plan, the Restructuring Transactions provide for a comprehensive restructuring of Claims against and Interests in the Debtors, de-lever the Company's capital structure and preserve the going-concern value of the Debtors' businesses, maximize recoveries available to all constituents, provide for an equitable distribution to the Debtors' stakeholders, and protect the jobs of the Debtors' more than 2,800 employees. More specifically, the Restructuring Transactions provide, among other things, that:

- each Holder of an Allowed First Lien Term Loan Claim shall receive on the Effective Date, in exchange for such Claim, its Pro Rata share of (1) 71% of the New Common Stock; and (2) $225 million of the New First Lien Loan on the terms and conditions set forth in the New First Lien Loan Documents;

- each Holder of an Allowed Second Lien Term Loan Claim shall receive on the Effective Date, in exchange for such Claim, its Pro Rata share of 29% of the New Common Stock;

- all outstanding and undisputed General Unsecured Claims against the Debtors will be unimpaired and unaffected by the restructuring and will be paid in full in Cash, unless otherwise agreed to by Holders of General Unsecured Claims;

- all holders of Interests in Blackhawk will have the opportunity to accept the Plan in exchange for receiving the benefit of the releases under the Plan;

- the DIP Lenders will provide the Debtors with debtor-in-possession financing through the DIP ABL Facility and the DIP Term Facility, pursuant to the terms and conditions set forth in the DIP ABL Agreement and the DIP Term Agreement, respectively;

- the DIP ABL Facility, upon interim approval, will roll up Claims arising under the Debtors' Prepetition ABL Facility as the Debtors borrow and repay the DIP ABL Facility on a daily basis, then, upon final approval, will roll up any and all remaining Claims arising under the Debtors' Prepetition ABL Facility, and the DIP ABL Facility will ultimately convert to or be refinanced by the Exit ABL Facility;

- the DIP Term Facility will roll up $100 million of First Lien Term Loan Claims and will raise $50 million through the New Money DIP Loans;

- in exchange for the agreement of Blackhawk's founder, CEO, and Chairman, Potter, to, among other things, (1) continue to serve on the Board of Managers of Reorganized Blackhawk, (2) provide consulting services to Reorganized Blackhawk for a one-year period, (3) cause certain entities under his control to continue to provide the goods and services required under the Potter Group Vendor Contracts, as amended on the terms described in the RSA, (4) waive any entitlement to severance payments, and (5) otherwise support the restructuring on the terms set forth in the RSA, Potter will receive, among other things, negotiated base compensation and a $500,000 Cash payment on the Effective Date; and

- all Administrative Claims, Priority Tax Claims, and Other Secured Claims will be paid in full in Cash or receive such other treatment that renders such Claims unimpaired under the Bankruptcy Code.

As described below, you are receiving this Disclosure Statement because you are a Holder of a Claim or Interest entitled to vote to accept or reject the Plan. **Prior to voting on the Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety. As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the**

2

**Debtors undertake no obligation to update any such statement. Certain of these risks, uncertainties, and factors are described in Section VIII of this Disclosure Statement, entitled "Risk Factors."**

C.       **Summary of Treatment of Claims and Interests and Description of Recoveries under the Plan.**

The Plan organizes the Debtors' creditor and equity constituencies into groups called "Classes." For each Class, the Plan describes: (1) the underlying Claim or Interest; (2) the recovery available to the Holders of Claims or Interests in that Class under the Plan; (3) whether the Class is Impaired or Unimpaired under the Plan; (4) the form of consideration, if any, that Holders in such Class will receive on account of their respective Claims or Interests; and (5) whether the Holders of Claims and Interests in such Class are entitled to vote to accept or reject the Plan.

The proposed distributions and classifications under the Plan are based upon a number of factors, including the Debtors' valuation and liquidation analyses. The valuation of the Reorganized Debtors as a going concern is based upon the value of the Debtors' assets and liabilities as of an assumed Effective Date of August 30, 2019, and incorporates various assumptions and estimates, as discussed in detail in the Valuation Analysis prepared by the Debtors, together with their proposed financial advisor and investment banker Centerview Partners LLC ("Centerview").

The table below provides a summary of the classification, description, and treatment of Claims and Interests under the Plan. This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan. For a more detailed description of the treatment of Claims and Interests under the Plan and the sources of satisfaction for Claims and Interests, see Section V of this Disclosure Statement, entitled "Summary of the Plan."

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | Debtor Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 7 | Non-Debtor Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 10A | Class A Blackhawk Interests | Impaired | Entitled to Vote |
| 10B | Class B Blackhawk Interests | Impaired | Entitled to Vote |
| 10C | Class C Blackhawk Interests | Impaired | Entitled to Vote |

D.       **Voting on the Plan.**

Certain procedures will be used to collect and tabulate votes on the Plan, as summarized in Section VII of this Disclosure Statement, entitled "Voting Instructions." Readers should carefully read the voting instructions in Section VII herein.

3

Only Holders of First Lien Term Loan Claims, Second Lien Term Loan Claims, Class A Blackhawk Interests, Class B Blackhawk Interests, and Class C Blackhawk Interests, which are classified in Classes 3, 4, 10A, 10B, and 10C of the Plan, respectively, are entitled to vote on the Plan (the "Voting Classes"). Holders of Claims and Interests in Classes 1, 2, and 5 are conclusively presumed to accept the Plan because they are Unimpaired by the Plan. Holders of Claims in Class 8 (if any) are deemed to reject the Plan because they are Impaired by the Plan and entitled to no recovery under the Plan. Holders of Claims in Classes 6, 7, and 9 are deemed to reject or presumed to accept the Plan because they are (1) Unimpaired under the Plan and presumed to accept the Plan, or (2) Impaired and entitled to no recovery under the Plan and deemed to reject the Plan.

**The Voting Deadline is 5:00 p.m., prevailing Eastern Time, on July 26, 2019.** To be counted as votes to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered (either by using the return envelope provided, by first class mail, overnight courier, personal delivery, or electronic submission) such that it is **actually received** before the Voting Deadline by Prime Clerk LLC (the "Solicitation Agent") as follows:

| DELIVERY OF BALLOTS |
|---|
| 1.   Ballots must be actually received by the Solicitation Agent before the Voting Deadline. |
| 2.   Ballots may be returned by the following methods: (a) in the enclosed pre-paid, pre-addressed return envelope; (b) via first class mail, overnight courier, or hand delivery to the address set forth below; or (c) via electronic submission through the Solicitation Agent's online voting portal at https://cases.primeclerk.com/blackhawkballots. |
| BLACKHAWK MINING BALLOT PROCESSING<br>C/O PRIME CLERK LLC<br>ONE GRAND CENTRAL PLACE<br>60 EAST 42nd STREET (PARK AVENUE), SUITE 1440<br>NEW YORK, NEW YORK 10165 |
| If you have any questions on the procedures for voting on the Plan, please contact the Solicitation Agent by emailing blackhawkballots@PrimeClerk.com and reference "Blackhawk Mining" in the subject line, or by calling (844) 627-6268 (domestic toll free) or (347) 292-3528 (international toll), and ask for the solicitation group. |

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL <u>NOT</u> BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

E.    **Confirmation and Consummation of the Plan.**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. If the Debtors file the Chapter 11 Cases, they will file a motion on the Petition Date requesting that the Bankruptcy Court set a date and time as soon as practicable after the Petition Date for a hearing (such hearing, the "Confirmation Hearing") for the Bankruptcy Court to determine whether the Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code, whether the Debtors' prepetition solicitation of acceptances in support of the Plan complied with section 1126(b) of the Bankruptcy Code, and whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed, as permitted by section 105(d)(2)(B)(2)(v) of the Bankruptcy Code. The Confirmation

Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for Confirmation of the Plan, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to the adequacy of the Disclosure Statement, the Debtors' prepetition solicitation of acceptances in support of the Plan, and Confirmation of the Plan. All such objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received before the deadline to file such objections.

    **1.**        **Confirmation Hearing.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code, the Debtors' solicitation of acceptances in support of the Plan complied with section 1126(b) of the Bankruptcy Code, and the Plan should be Confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed. For a more detailed discussion of the Confirmation Hearing, see Section VI of this Disclosure Statement, entitled "Confirmation of the Plan."

    **2.**        **Effect of Confirmation and Consummation of the Plan.**

Following Confirmation, and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan, the Plan will be Consummated on the Effective Date. Among other things, on the Effective Date, certain release, injunction, exculpation, and discharge provisions set forth in Article VIII of the Plan will become effective. Accordingly, it is important to read the provisions contained in Article VIII of the Plan very carefully so that you understand how Confirmation and Consummation—which effectuates such release, injunction, exculpation, and discharge provisions—will affect you and any Claim or Interest you may hold with respect to the Debtors so that you may cast your vote accordingly. These provisions are described in Section V of this Disclosure Statement.

**F.**        **Additional Plan-Related Documents.**

The Debtors will file certain documents that provide more details about implementation of the Plan in the Plan Supplement, which pursuant to the terms of the Plan will be filed with the Bankruptcy Court no later than seven (7) calendar days before the Confirmation Objection Deadline. The Debtors will serve a notice that will inform all parties that the initial Plan Supplement was filed, list the information included therein, and explain how copies of the Plan Supplement may be obtained. Eligible Holders of Claims and Interests entitled to vote to accept or reject the Plan shall not be entitled to change their vote based on the contents of the Plan Supplement after the Voting Deadline. The Plan Supplement will include:

- the New Organizational Documents;

- the Shareholders Agreement;

- the New First Lien Loan Agreement;

- the Exit ABL Facility Agreement;

- the Restructuring Steps Memorandum;

- the identity of the members of the Reorganized Blackhawk Board and the officers of Reorganized Blackhawk;

- the Rejected Executory Contract and Unexpired Lease List;

- the Assumed Executory Contract and Unexpired Lease List; and

- the schedule of retained Causes of Action.

*THE FOREGOING EXECUTIVE SUMMARY IS ONLY A GENERAL OVERVIEW OF THIS DISCLOSURE STATEMENT AND THE MATERIAL TERMS OF, AND TRANSACTIONS PROPOSED BY, THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO, AND SHOULD BE READ IN CONJUNCTION WITH, THE MORE DETAILED DISCUSSIONS APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN.*

## II.    The Debtors' Business Operations and Capital Structure

### A.    The Debtors' Corporate History.

The Company is a privately-owned coal producer that was founded in 2010 by Potter as a strategic vehicle to acquire coal reserves, active mining operations, and logistical infrastructure located primarily in the Central Appalachian Basin ("CAPP") of the United States.  The Company was founded when Potter acquired a select group of mining assets known as the Spurlock complex in Floyd County, Kentucky.  In 2012, the Company expanded its production further by acquiring a CAPP thermal surface operation known as the Pine Branch complex.

At the conclusion of 2013, the Company was a small, niche producer of CAPP thermal coal with approximately 3.5 million tons of annual production.  Due to the systemic changes in the market for CAPP thermal coals, the Company knew that diversifying the business across different basins and products was critical for long-term survival.  The opportunity for diversification was presented in the chapter 11 cases of a number of large coal producers in the region.  First, in 2014, the Company acquired three mining complexes from the bankruptcy of James River Coal Company.  The Triad complex in southern Indiana gave the Company entry into the Illinois basin thermal markets which, at the time, were one of the only growing markets for thermal coal.[2]  The Company also acquired the Blue Diamond and Hampden complexes in eastern Kentucky and West Virginia, respectively.  These complexes cemented the Company's position as a leader in pulverized coal injection ("PCI") and stoker coal production and provided an entry into the production of high volatile metallurgical coal.

As a result of changing market conditions, the Company shifted its diversification strategy to focus on metallurgical coal, a globally scarce commodity.  In 2015, the Company's most significant acquisition occurred through the purchase of six mining complexes during the bankruptcy of Patriot Coal Corporation.  These complexes consisted primarily of premier metallurgical coal producing operations and reserves and positioned the Company as a domestic leader in the production and sale of metallurgical coal.  By 2018, the Company's annual metallurgical coal production approached 6.9 million tons.  Today, the Company is a leading producer of metallurgical coal in the United States.

As of the Petition Date, the Company operates 19 active underground and 6 active surface mines at its ten active mining complexes in West Virginia and Kentucky and produces more than 13 million tons of coal per year.  The Company's transformation is further illustrated by the following graphic:[3]

---

[2]    Certain sales contracts and reserves associated with the Triad complex were sold in 2016 to meet Blackhawk's liquidity needs while metallurgical markets remained depressed.  The Triad complex has remained idled since.

[3]    The Company's metallurgical coal complexes produce some thermal and stoker coal byproducts that are included in the segment figures illustrated in the below graphic.

6



Source: Company filings and Blackhawk management projections.
(1)   Reflects Blackhawk 2019E Downside projections.
(2)   Met includes HVA and HVB products.

**B.      The Debtors' Operations.**

The Company produces four types of coal: high volatile metallurgical coal, PCI, thermal coal, and stoker coal, with operations predominantly focused on high volatile metallurgical coal. The Company controls 1.37 billion tons of proven and probable coal reserves, with an additional 0.8 billion tons of resources. Over 55 percent, or 0.7 billion tons, of the Company's reserves are associated with its metallurgical coal segment. As illustrated above, in 2018, the Company's metallurgical complexes produced approximately 8.8 million tons of metallurgical coal and 4.6 million tons of thermal coal, generating approximately $1.09 billion in revenue, which resulted in approximately $165 million of EBITDA.

Approximately 76 percent of the Company's revenue in 2018 is attributable to its metallurgical coal operations. Metallurgical coal is a globally scarce ingredient that is critical for the production of coke, an integral component for steel production. Coke is mixed with iron ore and other products in a blast furnace to produce steel. Steelmakers in the United States and abroad blend a variety of metallurgical coal qualities to achieve the required, specific coke chemistry in blast furnaces. The Company also sells PCI and stoker coal, which are specialty coals used in metallurgy and other industrial processes, to the domestic steel industry and a specific group of industrial customers, respectively.

The Company is also a producer of thermal coal, which accounted for approximately 24 percent of the Company's revenue in 2018. Thermal coal is principally used by the electric utility industry to produce steam to drive turbines to generate electricity. As a result, the domestic electric utility industry is the principal customer of thermal coal. The Company has longstanding relationships with many of the utility customers in Southeastern United States.

KE 60280931

1.    **Active Mining Complexes.**

A summary of the Company's ten mining complexes and each of their assets is set forth in the following chart:

| Complex | Location | Mining Method | Reserves (mm tons) | Resources (mm tons) | Reserve Life (Years)[1] | Products |
|---|---|---|---|---|---|---|
| Blue Diamond | Perry and Knott Counties, Kentucky | Underground | 181.5 | 58.7 | 142 | • PCI<br>• Stoker<br>• Thermal |
| Hampden | Mingo and Logan Counties, West Virginia | Underground | 98.6 | 39.2 | 117 | • HV A Met<br>• HV B Met |
| Kanawha Eagle | Boone and Kanawha Counties, West Virginia | Underground | 59.5 | 4.1 | 36 | • HV B Met<br>• Stoker |
| Rockwell | Boone and Wyoming Counties, West Virginia | Underground, Surface | 180.6 | 116.6 | 81 | • HV A Met<br>• HV B Met<br>• Thermal |
| Speed | Kanawha County, West Virginia | Underground | 69.2 | 7.4 | 50 | • HV B Met |
| Spurlock | Floyd County, KY | Underground, Surface | 66.9 | 9.6 | 87 | • PCI<br>• Stoker |
| Winchester | Boone and Kanawha Counties, West Virginia | Underground | 33.6 | 0.6 | 5 | • HV B Met |
| Subtotal Met[2] | | | 689.9 | 236.2 | | |
| Blue Creek | Kanawha County, West Virginia | Underground | 67.8 | 17.1 | 47 | • Thermal |
| Pine Branch | Perry, Breathitt, Knott and Leslie Counties, Kentucky | Surface | 89.6 | 16.6 | 55 | • Thermal |
| Samples | Boone and Kanawha Counties, West Virginia | Surface | 60.2 | 13.0 | 73 | • Thermal<br>• Stoker |
| Subtotal Thermal | | | 217.6 | 46.7 | | |
| Non-Core & Development[3] | Various | Various | 465.6 | 516.3 | | • Various |
| Total | West Virginia, Kentucky | | 1,373.1 | 799.2 | 104 | • HV A Met<br>• HV B Met<br>• PCI<br>• Stoker<br>• Thermal |

(1)    Represents reserves divided by 2019E production.
(2)    Subtotal includes thermal reserves at predominantly metallurgical producing complexes.
(3)    Includes BLR and Triad.

2.    **Additional Non-Core Assets.**

The Company owns a mining complex in Southern Indiana known as Triad.  The Triad complex contains three idled surface mines and one idled underground mine.  In 2016, the Company divested certain contracts and reserves associated with Triad.  The Company intends to reexamine potential coal sales opportunities and, depending on market conditions, will determine whether to reopen Triad's operations or permanently divest the remaining assets.

The Company owns approximately 73 million tons of proven and probable high volatile A metallurgical reserves in northern West Virginia (the "Guffey Reserves").  The Guffey Reserves are ideal for a profitable greenfield development or would have value for other producers in the region.

3.    **The Company's Workforce.**

The Company's dedicated employees form the backbone of its operations.  As of the Petition Date, the Company employs approximately 2,800 employees, of which approximately 2,749 are located at the Company's mining complexes and 50 are located at the corporate headquarters in Lexington, Kentucky.   Approximately 219 employees are represented by the United Mine Workers Association.

To effectively reach customers domestically and abroad, the Company maintains a team of experienced sales and logistics professionals.  The sales and logistics team have developed strong industry partnerships over decades of experience that are crucial to the Company's operations and success of these chapter 11 cases.

### 4.    Strategic Partnerships.

Additionally, the Company maintains mutually beneficial partnerships with certain third parties that assist in marketing the Company's coal. Specifically, after the Company acquired its core metallurgical coal portfolio from the Patriot Coal Corporation bankruptcy in 2015, the Company began a strategic partnership with Xcoal Energy & Resources, LLC ("Xcoal"), a leading global supplier of U.S. origin metallurgical coal. As a partner, Xcoal assists the Company in marketing its metallurgical coal to customers in Europe and Asia.

### 5.    Transportation Diversity.

Whereas the Company's dedicated employees and strong partnerships help drive performance, the Company's transportation diversity and positioning allow it to maintain a broad customer base and ensure lower costs. Specifically, the Company has the ability to transport coal to its customers via railroad, truck, or barge. In addition, over 75 percent of the Company's metallurgical coal production can be shipped via two separate railroads, providing broad access to domestic steelmakers and multiple East Coast ports for export. In 2018, approximately half of the Company's metallurgical coal was sold outside the United States, primarily to European, South American, and Asian steelmakers.

### 6.    Recent Capital Expenditures.

After years of underinvestment from its distressed predecessors, the Company began a recapitalization effort in 2017 to regain efficiency losses that result from aged equipment and infrastructure. Such capital expenditures have included replacing, repairing, or upgrading aging mining equipment, coal preparation, and loading facilities. The Company's investments have begun to bear fruit. For example, based on current projections for fiscal year 2019, the Company's free cash flow per ton of coal sold—a common measure of profitability in the coal industry—has more than quadrupled since 2016. Further, the Company continues to strive for and invest in more efficient operations through similar initiatives, building on its prior success.

### C.    The Debtors' Corporate Structure and Prepetition Capital Structure.

As a privately held company, Blackhawk is not listed on any public exchange. As of July 15, 2019, Blackhawk had approximately 8,750 Class A units, 6,635 Class B units, and 9,108 Class C units outstanding. Generally, holders of Class A units hold voting and economic rights, holders of Class B units hold economic rights but no voting rights, and holders of Class C units only hold voting rights, which are subject to a voting rights agreement with Potter, and the Class C units are subject to expiration upon specified events listed in certain debt documents. Blackhawk's significant equity holders in each class are as follows:

| Class | Equity Holder |
|---|---|
| Class A | JMP Blackhawk, LLC |
| | JMP Coal Holdings, LLC |
| | JMP Holdings, LLC |
| | RWE Trading Americas, Inc. |
| | Griers Creek Advisors, LLC |
| Class B | KH PCX Holdings, Inc. |
| | Caspian BH E LLC |

9

| Class | Equity Holder |
|---|---|
| | N3515A BT LLC |
| | Knighthead Domestic Fund, LP |
| | CPPIB CII US Holdings (2) Inc. |
| Class C | SOLA Ltd. Knighthead Master Fund, LP |
| | Redwood Master Fund Ltd. |
| | Caspian Select Credit Master |
| | CQS Global Funds (Ireland) Public Limited Company - CQS Credit Multi Asset Fund |

As set forth on the structure chart attached hereto as **Exhibit B**, Blackhawk currently owns, directly or indirectly, the 28 entities that compose the Company. Of the wholly-owned entities, 21 entities are obligors of the Company's prepetition funded debt. As of July 15, 2019, the Debtors have approximately $1.09 billion in total funded debt obligations, consisting of: (1) approximately $85 million outstanding under the Prepetition ABL Facility; (2) approximately $639 million in aggregate principal amount outstanding under the First Lien Term Loan Facility; (3) approximately $318 million in aggregate principal amount outstanding under the Second Lien Term Loan Facility; (4) approximately $16 million in aggregate principal amount outstanding under the Patriot Unsecured Note; and (5) approximately $28 million in aggregate principal amount of Other Secured Debt outstanding.

The following table summarizes the Debtors' prepetition capital structure:

| Funded Debt | Maturity[4] | Outstanding Principal Amount as of July 15, 2019 |
|---|---|---|
| Secured Debt | | |
| Prepetition ABL Facility | September 6, 2022 | $85 million |
| First Lien Term Loan Facility | February 17, 2022 | $639 million |
| Second Lien Term Loan Facility | April 27, 2021 | $318 million |
| Equipment Leases | Varies | $28 million |
| Total Secured Debt | | $1.07 billion |
| Unsecured Debt | | |
| Patriot Unsecured Note | October 28, 2021 | $16 million |
| Total Funded Debt | | $1.09 billion |

---

[4]    Subject to certain springing maturities, as provided in the applicable credit agreements.

1.        **The Prepetition ABL Facility.**

On September 6, 2017, the Debtors entered into the Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "ABL Credit Agreement"), which governs an asset-based revolving credit facility among certain Debtors, as borrowers and/or guarantors, MidCap Financial, LLC ("MidCap"), as agent and lender, and the additional lenders from time to time party thereto.  The Prepetition ABL Facility matures on September 6, 2022.  Availability of funds under the Prepetition ABL Facility is capped by a borrowing base calculated as the sum of certain percentages of value of the Debtors' eligible inventory and eligible accounts receivable, not to exceed an aggregate amount equal to $85 million.[5]

The obligations arising under the ABL Credit Agreement are secured by (a) senior, first priority security interests in, and liens upon, a substantial portion of the Debtors' receivables, inventory, as-extracted collateral, deposit, securities and commodities accounts, items related to the foregoing, and the proceeds thereof (collectively, the "ABL Priority Collateral"); and (b) senior, second priority security interests in, and liens upon, the First Lien Priority Collateral (as defined below) (collectively, the "ABL Collateral").

As of July 15, 2019, there is approximately $85 million outstanding under the Prepetition ABL Facility.

2.        **The First Lien Term Loan Facility**.

On February 17, 2017, Blackhawk entered into the First Lien Term Loan Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "First Lien Term Loan Agreement"), which governs a $660,000,000 first lien term loan credit facility (the lenders thereunder, the "First Lien Lenders").  Blackhawk's obligations under the First Lien Term Loan Agreement are guaranteed by the other Debtors. On December 15, 2017, Blackhawk entered into an amendment to the First Lien Term Loan Agreement to, among other things, (a) defer the requirement for Blackhawk to make scheduled term loan repayments to certain First Lien Lenders (the "Initial First Lien B-1 Lenders," and the loans in respect thereof, the "Initial First Lien B-1 Loans"), (b) increase the applicable margin with respect to the Initial First Lien B-1 Loans', and (c) provide for the payment of interest-in-kind to the Initial First Lien B-1 Lenders via the deemed borrowing of $35,537,550.00 from the Initial First Lien B-1 Lenders (resulting in additional principal of $35,537,550.00 due at maturity).  The First Lien Term Loan Facility matures on February 17, 2022.

The obligations arising under the First Lien Term Loan Agreement are secured by (a) senior, first priority security interests in, and liens upon, a substantial portion of the Debtors' equipment, real property, equity interests, intellectual property, intercompany indebtedness, and all other assets and property other than the ABL Collateral (collectively, the "First Lien Priority Collateral") and (b) senior, second priority security interests in, and liens upon, the ABL Priority Collateral.

As of July 15, 2019, there is approximately $639 million outstanding under the First Lien Term Loan Facility.

3.        **The Second Lien Term Loan Facility**.

On October 28, 2015, Blackhawk entered into the Second Lien Term Loan Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Second Lien Term Loan Agreement"), which governs a $229,238,375.55 second lien term loan credit facility (the lenders thereunder, the "Second Lien Lenders").  Blackhawk's obligations under the Second Lien Term Loan Agreement are guaranteed by the other Debtors.  On December 15, 2017, Blackhawk entered into the Fourth Amendment to the Second Lien Term Loan Agreement to, among other things, permit Blackhawk to capitalize, compound, and otherwise add to the unpaid principal amount of certain loans under the Second Lien Term Loan Agreement, held by certain Second Lien Lenders, the interest that otherwise would be payable in cash thereon.  The Second Lien Term Loan Facility matures on April 27, 2021.

---

[5]    The Prepetition ABL originally contemplated a maximum loan amount of $50 million, which was ultimately increased to $85 million pursuant to an amendment dated October 10, 2018.

The obligations arising under the Second Lien Term Loan Agreement are secured by (a) senior, third priority security interests in, and liens upon the First Lien Priority Collateral, subject to the rights of the Prepetition ABL Facility, and (b) senior, third priority security interests in, and liens upon, the ABL Priority Collateral.

As of July 15, 2019, there is approximately $318 million outstanding under the Second Lien Term Loan Facility.

### 4.        The Patriot Unsecured Note.

On October 28, 2015, Blackhawk issued the Patriot Unsecured Note to the Patriot Trust.  The Patriot Unsecured Note matures on October 28, 2021, and has an aggregate principal amount of $15,000,000.  Interest on the Patriot Unsecured Note accrues at a rate of 2.0% per year, which is capitalized and added to the principal amount outstanding on the last business day of each March, June, September, and December of each year, and is payable in cash upon maturity.  As of July 15, 2019, there is approximately $16 million outstanding under the Patriot Unsecured Note.  Blackhawk is the only Company entity obligated under the Patriot Unsecured Note.

### 5.        Other Secured Debt.

Certain of the Debtors entered into equipment financing agreements with Caterpillar Financial Services Corporation, 1st Trust Bank, Inc., NEFPASS LLC, Komatsu Financial Limited Partnership, and Mitsubishi UFJ Lease & Finance (U.S.A.) Inc.  Certain of the Debtors are required to make payments monthly at varying rates described in the equipment financing agreements.  The equipment financing obligations are payable at interest rates between 3.9% and 11.4% with maturity dates ranging from October 2019 through November 2022.  As of July 15, 2019, there is approximately $28 million outstanding under the equipment financing agreements.

### 6.        Unencumbered Assets.

Due to restrictions in certain of Blackhawk's mineral leases, approximately 26% of Blackhawk's mineral reserve assets are unencumbered.  The below chart illustrates the Company's unencumbered reserve tons by complex.

| Mine/Complex | Encumbered (tons, mm) | Unencumbered (tons, mm) | Total (tons, mm) |
|---|---|---|---|
| Spurlock | 66.9 | - | 66.9 |
| Pine Branch | 89.6 | - | 89.6 |
| Blue Diamond | 181.5 | - | 181.5 |
| Triad | 19.6 | - | 19.6 |
| Hampden | 98.6 | - | 98.6 |
| Rockwell | 90.1 | 90.4 | 180.5 |
| Samples | 0.4 | 59.8 | 60.2 |
| Winchester | 2.9 | 30.8 | 33.7 |
| Speed | 6.1 | 63.1 | 69.2 |
| Blue Creek | - | 67.8 | 67.8 |
| Kanawha Eagle | 25.3 | 34.2 | 59.5 |
| BLR | 437.6 | 8.4 | 446.0 |
| **Total** | **1,018.5** | **354.6** | **1,373.1** |
| **% of Total** | **74%** | **26%** | **100%** |

### III.    Events Leading to These Chapter 11 Cases.

**A.    Business Investments.**

As noted above, the Company pursued a strategic acquisition strategy starting around 2014 to acquire various metallurgical assets, including those out of large coal bankruptcies, anticipating that the pricing environment in the metallurgical coal market would improve starting in late 2015.  In part to effectuate these transactions, the Debtors took on certain debt, and ultimately entered into the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement.

The Company's strategic growth proved to be a double-edged sword.  On one hand, it significantly increased the Company's position in the metallurgical coal market at a time when asset prices were depressed relative to today's prices.  The Company continues to benefit from this position in the current market.  The price of high volatile A metallurgical coal has risen from $75 per ton to an average of $188 per ton over the last two years, providing a significant tailwind for the Company.  On the other hand, the pricing environment for metallurgical coal did not improve until late 2016, and the debt attendant to the Company's acquisition strategy in 2015 placed a strain on the Company's ability to maintain its then-existing production profile while continuing to reinvest in the business.  During this time, to defer expenses, the Company permanently closed over 10 coal mines (with over 5 million tons of productive capacity), idled the Triad complex, and depleted inventories of spare equipment, parts, and components.  Furthermore, once the coal markets began to improve, the Company was forced to make elevated capital expenditures and bear unanticipated increases in costs—for example, employment costs rose approximately 25% between 2016 and 2018—to remain competitive.  The confluence of these factors eventually made the Company's financial position untenable.

**B.    2017 Restructuring.**

As described above, in 2017, the Company encountered significant cost inflation from tightening labor markets and rising commodity prices.  This inflation, coupled with the need to make further capital investments, caused the Company to miss its annual budget.  Faced with looming amortization and interest payments on the First Lien Term Loan Facility and Second Lien Term Loan Facility, the Company negotiated an out-of-court consensual restructuring of the First Lien Term Loan Agreement and the Second Lien Term Loan Agreement (the "2017 Restructuring").  The 2017 Restructuring included certain participating First Lien Term Loan Lenders (the "Participating First Lien Lenders")[6] deferring amortization payments for the five quarters beginning in the fourth quarter of 2017 (the "First Lien Deferment") in exchange for (1) increasing the outstanding principal balance owed to the Participating First Lien Lenders by $35.5 million, (2) increasing the interest rate by 50 basis points to Participating First Lien Lenders, and (3) the amendment of certain covenants.  Additionally, certain Second Lien Term Loan Lenders (the "Participating Second Lien Lenders")[7] agreed to defer cash interest payments for the five quarters beginning in the fourth quarter of 2017 (the "Second Lien Deferment," and, together with the First Lien Deferment, the "2017 Deferments") in exchange for, *inter alia*, an 8.5% increase in the interest rate for the deferment period (resulting in a 15% PIK rate to the Participating Second Lien Lenders).  Additionally, as part of the 2017 Restructuring, Blackhawk issued its Class C equity units to certain Participating First Lien Lenders and Participating Second Lien Lenders, providing them the right to appoint independent directors pursuant to Blackhawk's limited liability company operating agreement and certain additional voting rights subject to a voting agreement with Potter.

After the 2017 Restructuring, the Company pursued certain strategic transactions to address its balance sheet issues and rising costs.  The Company's strategic efforts included: (1) pursuing a potential merger with, or acquisition by, certain other metallurgical coal mining companies, (2) executing certain liquidity-generating sale-leaseback transactions involving valuable mining equipment, and (3) pursuing divestitures of certain assets the Company

---

[6]    The Participating First Lien Lenders held approximately 98% of the outstanding principal amount of the First Lien Term Loans.

[7]    The Participating Second Lien Lenders held approximately 89% of the outstanding principal amount of the Second Lien Term Loans.

considered to be non-core assets. Ultimately, these initiatives were not sufficient (or did not come to fruition with respect to any potential mergers or asset sales) to address the Company's over-levered balance sheet.

**C.      Negotiations Regarding a Deleveraging Transaction and the RSA.**

Following the expiration of the 2017 Deferments, in the spring of 2019, Blackhawk was faced with approximately $16 million in mandatory amortization and approximately $20 million in interest payments due under the First Lien Term Loan Facility on March 30, 2019, and April 30, 2019, respectively. Faced with these significant payment obligations and tight capital markets, Blackhawk and its advisors commenced discussions with the Consenting Term Lenders, Potter, and their respective advisors regarding potential transactions that would enable the Debtors to deleverage their balance sheet and address their significant debt service requirements. To facilitate these discussions, on March 29, 2019, Blackhawk and the requisite majority of First Lien Lenders entered into a forbearance agreement with respect to the amortization payment, and MidCap and the requisite majority of Second Lien Lenders entered into separate forbearance agreements to forbear from exercising remedies on account of the cross-default provisions under the applicable prepetition credit agreements. On April 29, 2019, these forbearances agreements were all amended to include the cash interest due under the First Lien Term Loan Facility and the Second Lien Term Loan Facility. Thereafter, to accommodate ongoing negotiations with the parties to the RSA, the three forbearance agreements were further amended to extend the forbearance period through July 21, 2019, subject to earlier termination in limited circumstances, and to address an additional amortization payment under the First Lien Term Loan Facility.

The Debtors Blackhawk used the time permitted by these forbearance agreements to engage in good-faith, arm's-length negotiations with the Consenting Term Lenders, Potter, and certain of Blackhawk's other key stakeholders on the terms of a consensual deleveraging transaction.

On July 15, 2019, the Debtors and the Consenting Term Lenders agreed to the terms of the RSA, a copy of which is attached hereto as **Exhibit C**. The Debtors plan to file voluntary bankruptcy petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware on or about July 19, 2019.

**D.      Negotiations Regarding Certain Significant Unsecured Claims.**

In addition to the negotiations with their secured creditors, the Debtors also maintained an active dialogue with certain large unsecured creditors. To that end, Blackhawk reached a settlement with the Patriot Trust with respect to the Patriot Unsecured Note. The terms of that settlement include that the Patriot Trust will receive a distribution of $500,000 no later than the Effective Date, that a prior settlement between Blackhawk and the Patriot Trust regarding the treatment of Blackhawk's administrative claim in the Patriot Coal Corporation bankruptcy will be amended to reflect that the Patriot Trust will make no payment of any kind to Blackhawk; and that all claims under the Patriot Unsecured Note will be cancelled in full. The Debtors also successfully agreed to extended payment terms with certain significant accounts payable creditors in excess of the $7 million required by the RSA. These agreements are predicated on confirmation of the Plan, and the rights of Blackhawk's counterparties are reserved with respect to their claims if the Plan is not confirmed.

**IV.      The Debtors' Proposed Restructuring: Key Components**.

**A.      The RSA and the Plan.**

The RSA contemplates a comprehensive financial restructuring of the Debtors achieved through the Plan that will de-lever the Debtors' balance sheet by approximately $650 million, while paying in full all non-funded debt claims against the Debtors. The key financial components and commitments of the restructuring are as follows:

KE 60280931

- a commitment for senior secured super-priority debtor-in-possession financing facilities— the DIP ABL Facility and the DIP Term Facility—in an aggregate principal amount of $240 million, pursuant to the terms and conditions set forth in the DIP ABL Agreement and the DIP Term Agreement, respectively;[8]

- a commitment for a post-Effective Date exit facility in an aggregate principal amount of $90 million, pursuant to the terms and conditions set forth in the Exit ABL Facility Documents; and

- the New First Lien Loan, a secured, first-lien term loan facility in an aggregate principal amount of $375 million issued on the Effective Date pursuant to the New First Lien Loan Documents.

The Plan contemplates stakeholder recoveries as follows:

- each holder of an Allowed First Lien Term Loan Claim shall receive on the Effective Date, in exchange for such Claim, its Pro Rata share of (1) 71% of the New Common Stock; and (2) $225 million of the New First Lien Loan on the terms and conditions set forth in the New First Lien Loan Documents;

- each holder of an Allowed Second Lien Term Loan Claim shall receive on the Effective Date, in exchange for such Claim, its Pro Rata share of 29% of the New Common Stock;

- all outstanding and undisputed General Unsecured Claims against the Debtors will be unimpaired and unaffected by the restructuring and will be paid in full in Cash, unless otherwise agreed to by Holders of General Unsecured Claims;

- all holders of Interests in Blackhawk will have the opportunity to accept the Plan in exchange for receiving the benefit of the releases under the Plan;

- settlement of more than $7 million of accounts payable owed to significant vendors, as contemplated by the RSA, by extending or otherwise modifying the payment terms thereof;

- cancellation of the Patriot Unsecured Note in exchange for (1) a $500,000 distribution to the Patriot Trust, to be made no later than the Effective Date; and (2) amendment of a prior settlement between Blackhawk and the Patriot Trust regarding the treatment of Blackhawk's administrative claim in the Patriot Coal Corporation bankruptcy to reflect that the Patriot Trust will make no payment of any kind to Blackhawk;

- all Administrative Claims, Priority Tax Claims, and Other Secured Claims will be paid in full in Cash or receive such other treatment that renders such Claims unimpaired under the Bankruptcy Code; and

- mutual releases among the Debtors and the Consenting Parties, among others.

Pursuant to the RSA, the Debtors have secured key stakeholder support for the Plan and the value-maximizing financial restructuring it contemplates. The Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims party to the RSA and Potter all agreed under the RSA to support the Plan. This consensus will save the Debtors the time and expense of protracted chapter 11 cases and avoid value-destructive disputes between the parties. For example, without the RSA, the Debtors would be forced to file a freefall plan, and one or more parties in interest could seek to reduce the allowed amount of Second Lien Term Loan Claims on the ground that (1) certain of those Claims are based on original issuance discount ("OID") on the Second Lien Term Loan Facility; and (2) an OID-based Claim is a Claim for unmatured interest and, as such, is disallowed by section 502(b)(2) of the Bankruptcy Code. In such event, Holders of Second Lien Term Loan Claims might reasonably be expected to oppose any reduction in the allowed amount of their Claims, leading to litigation and destruction of estate value. The RSA also substantially reduces the risk of value-destructive intercreditor disputes regarding the value of the Debtors' uncumbered property. Specifically, the Company is party to certain unencumbered leases as of the Petition Date (see Section II.C.6 above), the value of

---

[8]    The DIP ABL Facility will roll up all Claims arising under the Prepetition ABL Facility. The DIP Term Facility will roll up $100 million of First Lien Term Loan Claims and raise $50 million through the New Money DIP Loans.

which are subject to dispute.  Without the consensus embodied in the RSA, junior creditors might litigate over the value of such unencumbered property, substantially delaying the Debtors' emergence from chapter 11 and destroying value.[9]

In addition, the Plan provides for a settlement with Potter, Blackhawk's founder, CEO, and Chairman.  In exchange for, among other things, Potter's agreement to (1) continue to serve on the Board of Managers of Reorganized Blackhawk, (2) provide consulting services to Reorganized Blackhawk for a one-year period, (3) cause certain entities under his control to continue to provide the goods and services required under the Potter Group Vendor Contracts, as amended on the terms described in the RSA, (4) waive any entitlement to severance payments, and (5) otherwise support the restructuring on the terms set forth in the RSA, Potter will receive, among other things, negotiated base compensation and a $500,000 Cash payment on the Effective Date (the foregoing settlement, the "Potter Settlement").  The Debtors believe Potter's commitments under the Potter Settlement are essential to their successful reorganization.

Finally, the Debtors maintain a broad "fiduciary out" under the RSA, which provides, in relevant part, "nothing in [the RSA] shall require the Company, or any directors, officers, or employees of the Company (in such person's capacity as a director, officer, or employee) to take any action, or to refrain from taking any action, to the extent that the Company's board of directors determines in good faith, after consultation with outside counsel, that taking such action or refraining from taking such action may be inconsistent with its or their fiduciary obligations under applicable law, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of [the RSA]."

**B.**  **The Debtors' Proposed Disclosure Statement and Solicitation Process.**

Following the execution of the RSA, the Debtors commenced a prepackaged solicitation of the Plan on the date hereof by delivering a copy of the Plan and this related Disclosure Statement (including Ballots) to Holders of Class 3 First Lien Term Loan Claims, Class 4 Second Lien Term Loan Claims, Class 10A Class A Blackhawk Interests, Class 10B Class B Blackhawk Interests, and Class 10C Class C Blackhawk Interests, the only Classes entitled to vote to accept or reject the Plan.  The Debtors have established July 26, 2019, at 5:00 p.m., prevailing Eastern Time, as the deadline for the receipt of votes to accept or reject the Plan (the "Voting Deadline").  The Debtors expect that they will commence the Chapter 11 Cases on or about July 19, 2019.

The Debtors will seek Bankruptcy Court approval of the Voting Deadline at the outset of the Chapter 11 Cases.  As soon as practicable after the Voting Deadline, the Solicitation Agent will file with the Bankruptcy Court the Voting Report setting forth the voting results for Allowed Class 3 First Lien Term Loan Claims, Allowed Class 4 Second Lien Term Loan Claims, Class 10A Class A Blackhawk Interests, Class 10B Class B Blackhawk Interests, and Class 10C Class C Blackhawk Interests.  Based on the execution of the RSA by the Consenting Parties, the Debtors believe that the Voting Report likely will show that the Holders of Claims and Interests entitled to vote on the Plan have overwhelmingly voted to accept the Plan.  Accordingly, on the Petition Date, the Debtors intend to file the Plan, this Disclosure Statement, and a motion to approve the Solicitation Procedures and schedule the Confirmation Hearing to consider approval of this Disclosure Statement and Confirmation of the Plan.  The following table sets forth the timetable for the solicitation process and the anticipated Chapter 11 Cases.

---

[9]     The terms of the DIP Facilities, and the proposed form of the DIP Order, provide that liens and security interests will be granted on any unencumbered leases and other unencumbered property with respect to the DIP ABL Facility and the New Money DIP Loans.

| Proposed Solicitation and Confirmation Timeline | |
|---|---|
| Record Date | July 11, 2019 |
| Commencement of Prepetition Solicitation | July 15, 2019 |
| Anticipated Petition Date | July 19, 2019 |
| Voting Deadline | July 26, 2019, at 5:00 p.m., prevailing Eastern Time |
| Mailing of Confirmation Hearing Notice | One business day after entry of an order approving the Scheduling Motion. |
| Plan Supplement | Seven calendar days before the Confirmation Objection Deadline. |
| Objection Deadline | August 20, 2019, at 5:00 p.m., prevailing Eastern Time, or such other date as the Court may direct |
| Deadline to File Reply Brief | August 24, 2019, at 5:00 p.m., prevailing Eastern Time, or such other date as the Court may direct |
| Anticipated Confirmation Hearing Date | August 27, 2019, or such other date as the Court may direct |

## C.     Employee and Equity Considerations in the Plan.

The Plan contemplates that the Reorganized Debtors will, on or after the Effective Date, adopt and implement the Management Incentive Plan, which shall be funded with synthetic equity structured to be economically equivalent to up to 6.0% of the New Common Stock in Reorganized Blackhawk. The terms and conditions of the Management Incentive Plan (including any related agreements, policies, programs, other arrangements, and the Management Incentive Plan participants) shall be determined solely by the Reorganized Blackhawk Board after the Effective Date. Because such terms and conditions have yet to be determined (and will not be determined until after the Effective Date), the Management Incentive Plan will not be filed in connection with the Chapter 11 Cases.

## D.     The Debtors' First Day Motions and Certain Related Relief.

To minimize disruption to the Debtors' operations and effectuate the terms of the Plan, upon the commencement of the Chapter 11 Cases, the Debtors intend to file motions seeking various relief, including authority to: (1) obtain postpetition financing and use cash collateral; (2) continue utilizing the Debtors' prepetition cash management system, including with respect to intercompany transactions; (3) pay certain prepetition claims in the ordinary course of business; (4) pay prepetition wages and certain administrative costs related to those wages; (5) pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date; and (6) continue entering into and performing under certain contracts for the sale of coal in the ordinary course of business. All of the relief requested by the first-day motions and throughout the Chapter 11 Cases will be subject to any orders regarding the Debtors' use of cash collateral.

Additionally, the Debtors intend to file a motion (or motions) seeking (1) entry of an order scheduling the Confirmation Hearing and approving the form of notices and procedures related thereto, (2) approval of the Disclosure Statement as containing adequate information under section 1125(a) of the Bankruptcy Code, and (3) approval of the Solicitation Procedures.

## E.     Other Requested First-Day Relief and Retention Applications.

The Debtors also plan to file motions and/or applications seeking certain customary relief, including the entry of an order directing the joint administration of the Debtors' Chapter 11 Cases under a single docket and the entry of orders approving the retention of the Debtors' bankruptcy advisors, including Kirkland & Ellis LLP and Kirkland & Ellis International LLP as legal counsel, Centerview Partners LLC as financial advisor and investment banker, AlixPartners, LLP as restructuring advisor, and Prime Clerk LLC as Solicitation Agent.

## V.    Summary of the Plan

SECTION V OF THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS TO THE PLAN.  ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL RELATED TERMS AND PROVISIONS, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.  THE PLAN ITSELF (INCLUDING ATTACHMENTS) AND THE PLAN SUPPLEMENT WILL CONTROL THE TREATMENT OF HOLDERS OF CLAIMS AND INTERESTS UNDER THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION V AND THE PLAN (INCLUDING ANY ATTACHMENTS TO THE PLAN) AND THE PLAN SUPPLEMENT, THE PLAN AND PLAN SUPPLEMENT, AS APPLICABLE, SHALL GOVERN.

### A.    Treatment of Unclassified Claims.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### 1.    DIP Claims.

All DIP ABL Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP ABL Facility on such date, (b) all interest accrued and unpaid thereon to the date of payment, (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP ABL Agreement and the DIP Order, and (d) all other DIP ABL Obligations as defined in the DIP ABL Agreement other than Contingent DIP ABL Obligations.  Except to the extent that a Holder of an Allowed DIP ABL Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP ABL Claim, each such Allowed DIP ABL Claim shall receive on the Effective Date either: (a) payment in full in Cash of such Holder's Allowed DIP ABL Claim or (b) at such Holder's election and agreement by the Debtors, such Holder's Pro Rata share of the Exit ABL Facility.  All reasonable and documented unpaid fees and expenses of the DIP ABL Agent, including reasonable and documented fees, expenses, and costs of its advisors, shall be paid in Cash on the Effective Date.  Contemporaneously with the foregoing receipt of payment in full in Cash or satisfaction through a Pro Rata share of the Exit ABL Facility of the Allowed DIP ABL Claims, except with respect to contingent obligations under the DIP ABL Agreement (which contingent obligations shall survive the Effective Date and shall continue to be governed by the DIP ABL Agreement as provided below), the DIP ABL Facility, the DIP ABL Agreement, and all related loan documents, shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP ABL Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP ABL Agent or the DIP ABL Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP ABL Claims shall be automatically discharged and released, in each case without further action by the DIP ABL Agent or the DIP ABL Lenders.  The DIP ABL Agent and the DIP ABL Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

All DIP Term Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Term Facility on such date, (b) all interest accrued and unpaid thereon to the date of payment, (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP Term Agreement and the DIP Order, and (d) all other Obligations as defined in the DIP Term Agreement other than Contingent DIP Term Obligations.  Except to the extent that a Holder of an Allowed DIP Term Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Term Claim, each such Allowed DIP Term Claim shall receive on the Effective Date such

18

Holder's Pro Rata share of $150,000,000 of the New First Lien Loan. All reasonable and documented unpaid fees and expenses of the DIP Term Agent, including reasonable and documented fees, expenses, and costs of its advisors, shall be paid in Cash on the Effective Date. Contemporaneously with the foregoing satisfaction, except with respect to contingent obligations under the DIP Term Agreement (which contingent obligations shall survive the Effective Date and shall continue to be governed by the DIP Term Agreement as provided below), the DIP Term Facility, the DIP Term Agreement, and all related loan documents shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Term Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Term Agent or the DIP Term Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Term Claims shall be automatically discharged and released, in each case without further action by the DIP Term Agent or the DIP Term Lenders. The DIP Term Agent and the DIP Term Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

      2.      **Administrative Claims.**

Unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors (with the reasonable consent of the Required Consenting Parties), or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

      3.      **Professional Fee Claims.**

      (a)      **Professional Fee Escrow Account**.

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Reorganized Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

(b)        **Final Fee Applications and Payment of Accrued Professional Compensation Claims**.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Reorganized Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

(c)        **Professional Fee Escrow Amount**.

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

(d)        **Post-Confirmation Date Fees and Expenses**.

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten business days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors or the Reorganized Debtors, as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

4.        **Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**B.      Classification and Treatment of Claims and Interests.**

**1.      Classification of Claims and Interests.**

The Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan:

| Class | Claim or Interest | Status | Voting Rights | Projected Plan Recovery (%)[10] |
|-------|-------------------|--------|---------------|---------------------------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 3 | First Lien Term Loan Claims | Impaired | Entitled to Vote | 93.8%[11] |
| 4 | Second Lien Term Loan Claims | Impaired | Entitled to Vote | 39.0% |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 6 | Debtor Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) | 100% / 0 % |
| 7 | Non-Debtor Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) | 100% / 0% |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |
| 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) | 100% / 0% |
| 10A | Class A Blackhawk Interests | Impaired | Entitled to Vote | 0% |
| 10B | Class B Blackhawk Interests | Impaired | Entitled to Vote | 0% |
| 10C | Class C Blackhawk Interests | Impaired | Entitled to Vote | 0% |

---

[10]    The projected Plan recoveries for Classes 10A, 10B, and 10C do not take in account the potential value of the Debtor Release or Third-Party Release, which is speculative and uncertain.

[11]    The projected recovery for First Lien Term Loan Claims excludes debt rolled up pursuant to the Plan.

KE 60280931

**2.**     **Treatment of Classes of Claims and Interests.**

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

1.     Class 1 — Other Secured Claims

    (a)     *Classification*:  Class 1 consists of any Other Secured Claims.

    (b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

        (i)     payment in full in Cash;

        (ii)     delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

        (iii)     reinstatement of such Allowed Other Secured Claim; or

        (iv)     such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)     *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.     Class 2 — Other Priority Claims

    (a)     *Classification*:  Class 2 consists of any Other Priority Claims.

    (b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

        (i)     payment in full in Cash; or

        (ii)     such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)     *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.     Class 3 — First Lien Term Loan Claims

    (a)     *Classification*:  Class 3 consists of any First Lien Term Loan Claims against any Debtor.

    (b)     *Allowance*:  On the Effective Date, First Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $538,974,437, plus any accrued but unpaid interest,

fees, and other expenses arising under or in connection with the First Lien Term Loan Agreement.

    (c)    *Treatment*: Except to the extent that a Holder of an Allowed First Lien Term Loan Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each First Lien Term Loan Claim, each Holder of an Allowed First Lien Term Loan Claim shall receive its Pro Rata share of:

        (i)    $225,000,000 of the New First Lien Loan; and

        (ii)    71% of the New Common Stock in Reorganized Blackhawk.

    (d)    *Voting*: Class 3 is Impaired under the Plan. Holders of Allowed First Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

4.    Class 4 — Second Lien Term Loan Claims

    (a)    *Classification*: Class 4 consists of any Second Lien Term Loan Claims against any Debtor.

    (b)    *Allowance*: On the Effective Date, Second Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $318,307,228, plus any accrued but unpaid interest, fees, and other expenses arising under or in connection with the Second Lien Term Loan Agreement.

    (c)    *Treatment*: Except to the extent that a Holder of an Allowed Second Lien Term Loan Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Second Lien Term Loan Claim, each Holder of an Allowed Second Lien Term Loan Claim shall receive its Pro Rata share of 29% of the New Common Stock in Reorganized Blackhawk.

    (d)    *Voting*: Class 4 is Impaired under the Plan. Holders of Allowed Second Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

    (e)    Distributions to each Holder of an Allowed Second Lien Term Loan Claim shall be subject to the terms of the Second Lien Term Loan Agreement and the rights of the Second Lien Term Loan Agent as set forth thereunder and in Article IV.K of the Plan.

5.    Class 5 — General Unsecured Claims

    (a)    *Classification*: Class 5 consists of any General Unsecured Claims against any Debtor.

    (b)    *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed Claim (including pursuant to a Vendor Agreement or the Patriot Trust RSA), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim, each Holder of an Allowed General Unsecured Claim shall receive either:

        (i)    payment in Cash in an amount equal to such Allowed General Unsecured Claim in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim; or

        (ii)    payment in Cash, including interest, if applicable, as required by contract or applicable law, in an amount equal to such Allowed General Unsecured Claim, upon the later of (A) the Effective Date, (B) the date on which such General

Unsecured Claim becomes an Allowed Claim, or (C) such other date as may be ordered by the Bankruptcy Court. Notwithstanding anything in the foregoing to the contrary, the Allowed Claim of the Patriot Trust shall be paid pursuant to the terms of the Patriot Trust RSA.

(c)    *Voting*: Class 5 is Unimpaired under the Plan. Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

6.    Class 6 — Debtor Intercompany Claims

(a)    *Classification*: Class 6 consists of any Debtor Intercompany Claims.

(b)    *Treatment*: Except to the extent otherwise provided in the Restructuring Steps Memorandum, each Allowed Debtor Intercompany Claim shall, at the option of the applicable Debtors, either on or after the Effective Date, be:

(i)    reinstated;

(ii)    converted to equity; or

(iii)    extinguished, compromised, addressed, cancelled, or settled, without any distribution on account of such Claims.

(c)    *Voting*: Holders of Allowed Debtor Intercompany Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Allowed Debtor Intercompany Claims are not entitled to vote to accept or reject the Plan

7.    Class 7 — Non-Debtor Intercompany Claims

(a)    *Classification*: Class 7 consists of any Non-Debtor Intercompany Claims.

(b)    *Treatment*: Except to the extent otherwise provided in the Restructuring Steps Memorandum, each Allowed Non Debtor Intercompany Claim shall, at the option of the applicable Debtors, be:

(i)    reinstated;

(ii)    converted to equity; or

(iii)    extinguished, compromised, addressed, cancelled, or settled, without any distribution on account of such Claims.

(c)    *Voting*: Holders of Allowed Non-Debtor Intercompany Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Allowed Non-Debtor Intercompany Claims are not entitled to vote to accept or reject the Plan.

8.    Class 8 — Section 510(b) Claims

(a)    *Classification*: Class 8 consists of any Section 510(b) Claims.

24

(b)  *Allowance*:  Notwithstanding anything to the contrary in the Plan, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.  The Debtors are not aware of any asserted Class 8 Claim and believe that no Section 510(b) Claims exist.

(c)  *Treatment*:  Allowed Section 510(b) Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and Holders of Allowed Section 510(b) Claims shall not receive any distribution on account of such Allowed Section 510(b) Claims..

(d)  *Voting*:  Class 8 is Impaired.  Holders, if any, of Allowed Section 510(b) Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders, if any, of Allowed Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

9.    Class 9 — Intercompany Interests

(a)  *Classification*:  Class 9 consists of all Interests in the Debtors other than Blackhawk.

(b)  *Treatment*:  On the Effective Date, Intercompany Interests shall be, at the option of the Debtors, either.

(i)   reinstated in exchange for the Debtors' and the Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims; or

(ii)  discharged, cancelled, released, and extinguished and of no further force or effect without any distribution on account of such Interests.

For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor unless otherwise provided in the Restructuring Steps Memorandum.

(c)  *Voting*:  Holders of Intercompany Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

10.   Class 10A — Class A Blackhawk Interests

(a)  *Classification*:  Class 10A consists of all Class A Blackhawk Interests.

(b)  *Treatment*:  On the Effective Date, all Class A Blackhawk Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and Holders of Class A Blackhawk Interests will not receive any distribution on account of such Interests.  Holders of Class A Blackhawk Interests that vote to accept the Plan shall be a "Released Party" for purposes of the Debtor Release and the Third-Party Release.

(c)  *Voting*:  Class 10A is Impaired under the Plan.  Holders of Class A Blackhawk Interests are entitled to vote to accept or reject the Plan.

11.   Class 10B — Class B Blackhawk Interests

(a)  *Classification*:  Class 10B consists of all Class B Blackhawk Interests.

(b) *Treatment*:  On the Effective Date, all Class B Blackhawk Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and Holders of Class B Blackhawk Interests will not receive any distribution on account of such Interests.  Holders of Class B Blackhawk Interests that vote to accept the Plan shall be a "Released Party" for purposes of the Debtor Release and the Third-Party Release.

(c) *Voting*:  Class 10B is Impaired under the Plan.  Holders of Class B Blackhawk Interests are entitled to vote to accept or reject the Plan.

12. Class 10C — Class C Blackhawk Interests

(a) *Classification*:  Class 10C consists of all Class C Blackhawk Interests.

(b) *Treatment*:  On the Effective Date, all Class C Blackhawk Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and Holders of Class C Blackhawk Interests will not receive any distribution on account of such Interests.  Holders of Class C Blackhawk Interests that vote to accept the Plan shall be a "Released Party" for purposes of the Debtor Release and the Third-Party Release.

(c) *Voting*:  Class 10C is Impaired under the Plan.  Holders of Class C Blackhawk Interests are entitled to vote to accept or reject the Plan.

**3.      Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

**4.      Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**5.      Voting Classes; Presumed Acceptance by Non-Voting Classes.**

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

**6.      Subordinated Claims.**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**7.      Intercompany Interests.**

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes

of administrative convenience and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to provide management services to certain other Debtors and Reorganized Debtors, to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors and Reorganized Debtors to the holders of certain Allowed Claims. For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

### 8. Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 9. Confirmation of Plan Pursuant to Section 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor; *provided* that Article III.I of the Plan shall not limit the respective rights of each party to the RSA or the DIP ABL Agent and DIP ABL Lenders under the DIP ABL Agreement.

## C. Means for Implementation of the Plan.

### 1. General Settlement of Claims and Interests.

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including with respect to issues related to the value of the Debtors' unencumbered property.

### 2. Restructuring Transactions.

On and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions set forth in the Restructuring Steps Memorandum and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan and the RSA, which transactions may include, as applicable: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (a), pursuant to applicable state law; (d) the execution and delivery of the Shareholders Agreement and the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor; (e) the execution and delivery of the New First Lien Loan Documents and Exit ABL Facility Documents (in both cases, including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (f) the execution and delivery of the New Organizational Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable), and the issuance, distribution, or reservation, as applicable, of the New Common Stock, as set forth herein; (g) the adoption of the Management Incentive Plan and the issuance and reservation of the Management Incentive Plan Equity to the

27

participants in the Management Incentive Plan on the terms and conditions set by the Reorganized Blackhawk Board after the Effective Date; (h) all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Blackhawk, which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (i) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

3.      **Sources of Consideration for Plan Distributions.**

The Debtors shall fund distributions under the Plan, as applicable, with:  (a) the New First Lien Loan; (b) the New Common Stock; (c) the Exit ABL Facility; and (d) the Debtors' Cash on hand.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  The issuance, distribution, or authorization, as applicable, of certain securities in connection with the Plan, including the New First Lien Loan and the New Common Stock, will be exempt from SEC registration, as described more fully below in Section V.C.8 of this Disclosure Statement.

(a)      **Issuance and Distribution of the New First Lien Loan.**

On the Effective Date, the Reorganized Debtors shall (a) execute and deliver the New First Lien Loan Documents and such documents shall become effective in accordance with their terms, and (b) issue (i) $225,000,000 of the New First Lien Loan to the Holders of the First Lien Term Loan Claims on the terms and conditions set forth in the New First Lien Loan Documents and (ii) $150,000,000 of the New First Lien Loan to the Holders of the DIP Term Claims on the terms and conditions set forth in the New First Lien Loan Documents, to collectively total $375,000,000.  On and after the Effective Date, the New First Lien Loan Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.  The terms and conditions of the New First Lien Loan Documents shall bind Reorganized Blackhawk and each other Entity that enters into such New First Lien Loan Documents as a guarantor.  Any Entity's entry into the New First Lien Loan Agreement shall be deemed as its agreement to the terms of such New First Lien Loan Documents, as amended or modified from time to time following the Effective Date in accordance with its terms.

(b)      **Exit ABL Facility.**

On the Effective Date, the Reorganized Debtors shall execute and deliver the Exit ABL Facility Documents and such documents shall become effective in accordance with their terms.  The Exit ABL Facility shall be a $90 million secured revolving credit facility.  If the ABL Discharge (as defined in the DIP Order) has not occurred prior to the Effective Date, the Exit ABL Facility shall provide for the indefeasible payment of the Prepetition ABL Debt (as defined in the DIP Order) outstanding as of the Effective Date in full in Cash, including interest and fees through the date of repayment (at the non-default contract rate), on or as soon as practicable after the Effective Date.

On and after the Effective Date, the Exit ABL Facility Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.  The terms and conditions of the Exit ABL Facility Agreement shall bind Reorganized Blackhawk and each other Entity that enters into such Exit ABL Facility Agreement as a guarantor.  Any Entity's entry into the Exit ABL Facility Agreement shall be deemed as its agreement to the terms of such Exit ABL Facility Agreement, as amended or modified from time to time following the Effective Date in accordance with its terms.

(c)      **Issuance and Distribution of the New Common Stock.**

On the Effective Date, the New Common Stock shall be issued and distributed to the Entities entitled to receive the New Common Stock pursuant to the Plan in accordance with the Restructuring Steps Memorandum.  The issuance of New Common Stock shall be authorized without the need for any further corporate action and without any action by the Holders of Claims or other parties in interest.  All of the New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

KE 60280931

Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance, as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, as applicable, including the Shareholders Agreement and the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution of the New Common Stock.  Any Entity's acceptance of New Common Stock shall be deemed as its agreement to the New Organizational Documents and the Shareholders Agreement, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.  The New Common Stock will not be registered on any exchange as of the Effective Date and shall not meet the eligibility requirements of the Depository Trust Company.

(d)    **Cash on Hand**.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand to fund distributions to certain Holders of Claims, including the payment of Allowed General Unsecured Claims as set forth in Article III of the Plan.

4.    **Shareholders Agreement.**

On the Effective Date, Reorganized Blackhawk shall enter into and deliver the Shareholders Agreement, in substantially the form included in the Plan Supplement, to each Holder of New Common Stock, and such parties shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Blackhawk.

5.    **Potter Settlement.**

Contemporaneous with execution of the RSA, Potter resigned as the CEO of Blackhawk and entered into a 12-month consulting services agreement with Blackhawk (the "Potter Consulting Services Agreement"), which will be assumed pursuant to the Plan.  Pursuant to the Potter Consulting Services Agreement, Potter shall serve as a consultant to Blackhawk (or Reorganized Blackhawk, as applicable) for the term of the agreement and the Executive Employment Agreement, dated as of July 21, 2017, by and between Potter and Blackhawk (the "Old Employment Agreement") shall be terminated and all claims under the Old Employment Agreement (including for severance and other benefits) shall be waived by Potter.  The Potter Consulting Services Agreement, shall provide, among other things, that: (a) Potter shall serve as consultant to Blackhawk (or Reorganized Blackhawk, as applicable) at the discretion of the Board (as defined in Exhibit A to the RSA); (b) Potter shall be compensated for such services at an annual rate of $950,000; (c) Potter may terminate his services to Blackhawk (or Reorganized Blackhawk, as applicable) upon 15 days' notice, following which Potter shall not be entitled to further compensation under the Potter Consulting Services Agreement; (d) if Blackhawk (or Reorganized Blackhawk, as applicable) terminates Potter's services as consultant other than for good cause or as a result of Potter's disability, Potter shall continue to receive the compensation due under the Potter Consulting Services Agreement through the end of the Potter Consulting Services Agreement's 12-month term; *provided* that Potter shall not receive any other contractual termination benefits; and (e) upon the expiration of the Potter Consulting Services Agreement's 12-month term, or any other termination of the Potter Consulting Services Agreement, Potter shall immediately be deemed to have resigned, and shall resign, from the Board (as defined in Exhibit A to the RSA); *provided*, however, that Potter will continue to serve on Blackhawk's board of directors until the Effective Date.

On the Effective Date, the Debtors shall assume the Potter Consulting Services Agreement, and Potter and the Reorganized Debtors shall perform thereunder pursuant to the terms and conditions of the Potter Consulting Services Agreement.  On and after the Effective Date, the Potter Group Entities that are party to the Potter Group Vendor Contracts shall continue to satisfy their obligations under the Potter Group Vendor Contracts, as amended on the terms described in the RSA.  In exchange for performing under the Potter Consulting Services Agreement and the modifications to the Potter Group Vendor Contracts set forth in the RSA, Potter shall receive on the Effective Date: (a) $500,000 in Cash (plus reimbursement for his reasonable attorneys' fees incurred in connection with the negotiation and execution of the Potter Consulting Services Agreement up to a maximum of $60,000); (b) title to two vehicles, as set forth in the RSA and Potter Consulting Services Agreement; (c) the benefit of the Debtor and third-party releases under the Plan; and (d) a right of first offer with respect to the Reorganized Debtors' thermal coal assets, including, but not limited to, the Spurlock, Pine Branch, Blue Diamond, Samples, and Blue Creek mining complexes, which right of first offer shall expire one year from the date on which the Potter Consulting Services Agreement was executed (or earlier if Blackhawk or Reorganized Blackhawk, as applicable, terminates Potter's services for good cause).

6.      **Accounts Payable Settlements.**

The Debtors have agreed to extended payment terms with certain accounts payable creditors in excess of the $7 million required by the RSA, which were documented in various Vendor Agreements.  On the Effective Date, the Debtors shall assume the Vendor Agreements, and the applicable vendors and the Reorganized Debtors shall perform thereunder pursuant to the terms and conditions of the applicable Vendor Agreement.

7.      **Patriot Unsecured Note Settlement.**

The Debtors have entered into a settlement with the Patriot Trust with respect to the Patriot Unsecured Note. The terms of that settlement include that:  (a) the Patriot Trust will receive a distribution of $500,000 no later than the Effective Date; (b) a prior settlement between Blackhawk and the Patriot Trust regarding the treatment of Blackhawk's administrative claim in the Patriot Coal Corporation bankruptcy will be amended to reflect that the Patriot Trust will make no payment of any kind to Blackhawk; and (c) the occurrence of the foregoing events will be in full satisfaction of all claims under the Patriot Unsecured Note, which will be cancelled in full pursuant to the Plan.

8.      **Exemption from Registration Requirements.**

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Stock pursuant to the Plan is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The shares of New Common Stock to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) subject to the terms of the Shareholders Agreement, are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

9.      **Corporate Existence.**

Except as otherwise provided in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

10.     **Corporate Action.**

On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects, including:  (a) adoption or assumption, as applicable, of the agreements with existing management; (b) selection of the directors, managers, and officers for the Reorganized Debtors; (c) implementation of the Restructuring Transactions; (d) the applicable Reorganized Debtors' entry into the Exit ABL Facility Documents and New First Lien Loan Documents; and (e) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit ABL Facility Documents, the New First Lien Loan Documents and the Shareholders Agreement, and any and all

other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals described in this Section V.C.10 shall be effective notwithstanding any requirements under non-bankruptcy law.

11.    **Vesting of Assets in the Reorganized Debtors.**

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the Exit ABL Facility Documents and the New First Lien Loan Documents and the Liens securing obligations on account of Other Secured Claims that are Reinstated pursuant to the Plan, if any). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

12.    **Cancellation of Notes, Instruments, Certificates, and Other Documents.**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims shall be cancelled, and the obligations of the Debtors or the Reorganized Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged and deemed satisfied in full, and the Term Loan Agents shall be released from all duties thereunder; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of (a) allowing Holders of Allowed Claims to receive distributions under the Plan; (b) allowing and preserving the rights of the Term Loan Agents and DIP Agents to make distributions pursuant to the Plan; (c) preserving the Term Loan Agents', the Prepetition ABL Agent's, and the DIP Agents' rights to compensation and indemnification as against any money or property distributable to the Prepetition ABL Lenders, Holders of First Lien Term Loan Claims, Second Lien Term Loan Claims, DIP ABL Claims, and DIP Term Claims, including permitting the Term Loan Agents and DIP Agents to maintain, enforce, and exercise its charging liens against such distributions; (d) preserving all rights, including rights of enforcement, of the Term Loan Agents, the Prepetition ABL Agent, and DIP Agents against any person other than a Released Party (including the Debtors), including with respect to indemnification or contribution from the Prepetition ABL Lenders, Holders of the First Lien Term Loan Claims, Second Lien Term Loan Claims, DIP ABL Claims, and DIP Term Claims pursuant and subject to the terms of the Prepetition ABL Credit Agreement, the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement, the DIP ABL Agreement, and the DIP Term Agreement as in effect on the Effective Date; (e) permitting the Term Loan Agents, the Prepetition ABL Agent, and DIP Agents to enforce any obligation (if any) owed to the Term Loan Agents, the Prepetition ABL Agent, or DIP Agents under the Plan; (f) permitting the Prepetition ABL Agent, the Term Loan Agents, and the DIP Agents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; (g) permitting the DIP Agents, the DIP ABL Lenders, the DIP Term Lenders, the Prepetition ABL Agent, the Prepetition ABL Lenders, the First Lien Term Loan Agent, the First Lien Term Loan Lenders, the Second Lien Term Loan Agent, and the Second Lien Term Loan Lenders to assert any rights with respect to the Contingent DIP Term Obligations, the Contingent DIP ABL Obligations, the Contingent Prepetition ABL Obligations, the Contingent First Lien Term Loan Obligations or the Contingent Second Lien Term Loan Obligations, as applicable; and (h) permitting the Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, *however*, that (i) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan and (ii) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan. The Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents shall be discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents and their representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents shall be relieved of and released from any obligations and duties arising thereunder. The fees, expenses, and costs of the Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents, including fees, expenses, and costs of its professionals incurred after the Effective Date in connection with the First Lien Term Loan Agreement, the Second Lien Term Loan

31

Agreement, the Prepetition ABL Agreement, the DIP Term Agreement, and the DIP ABL Agreement, as applicable, and reasonable and documented costs and expenses associated with effectuating distributions pursuant to the Plan will be paid by the Reorganized Debtors in the ordinary course.

13.    **Effectuating Documents; Further Transactions.**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the RSA, the Exit ABL Facility Documents, the New First Lien Loan Documents, the New Organizational Documents, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

14.    **Exemptions from Certain Taxes and Fees.**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors, including the Exit ABL Facility, the New First Lien Loan, and the New Common Stock; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral as security for any or all of the Exit ABL Facility and the New First Lien Loan; or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

15.    **New Organizational Documents.**

The New Organizational Documents shall, among other things: (a) contain the terms and minority protections consistent with the RSA; (b) authorize the issuance, distribution, and reservation of the New Common Stock to the Entities entitled to receive such Interests under the Plan; and (c) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, prohibit the issuance of non-voting equity Securities.

On or immediately before the Effective Date, Blackhawk or Reorganized Blackhawk, as applicable, will file its New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in its state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation, to the extent required for such New Organizational Documents to become effective. After the Effective Date, Reorganized Blackhawk may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of such documents.

16.    **Directors and Officers of the Reorganized Debtors.**

On the Effective Date, the Reorganized Blackhawk Board shall consist of five persons and will include: (a) the CEO Director; (b) one director selected by Knighthead; (c) one director selected by Solus; (d) one independent director selected by Knighthead and Solus, subject to the consent, not to be unreasonably withheld, of the majority of a three-member committee consisting of members of the Ad Hoc Group of First Lien Lenders, which three-member

committee shall be selected by members of the Ad Hoc Group of First Lien Lenders holding at least 50.01% of the First Lien Term Loan Claims held by such group; and (e) one independent director acceptable to a group consisting of each Holder (other than Knighthead and Solus) that will be entitled to receive under the Plan at least 10% of the New Common Stock issued on the Effective Date, with the consent of Knighthead and Solus (such consent not to be unreasonably withheld), as set forth in the RSA.  On the Effective Date, the terms of the current members of the Blackhawk board of directors shall expire, and the Reorganized Blackhawk Board will include those directors set forth in the list of directors of the Reorganized Debtors included in the Plan Supplement; *provided* that, as set forth in the RSA, prior to the selection of a Chief Executive Officer of Reorganized Blackhawk by the Reorganized Blackhawk Board to replace John Mitchell Potter, the seat of the CEO Director shall be filled by a member of the executive team selected by a majority of the remaining members of the Reorganized Blackhawk Board until a new individual becomes the Chief Executive Officer of Reorganized Blackhawk.

On the Effective Date, the officers and overall management structure of Reorganized Blackhawk, and all officers and management decisions with respect to Reorganized Blackhawk (and/or any of its direct or indirect subsidiaries), compensation arrangements, and affiliate transactions shall only be subject to the approval of the Reorganized Blackhawk Board.

From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, including the Shareholders Agreement and the New Organizational Documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.  To the extent that any such director or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors will disclose the nature of any compensation to be paid to such director or officer.

17.    **Management Incentive Plan.**

On or after the Effective Date, the Reorganized Debtors shall adopt and implement the Management Incentive Plan, which shall be funded with the Management Incentive Plan Equity.  The Reorganized Blackhawk Board shall be authorized to institute such Management Incentive Plan, enact and enter into related policies and agreements, and distribute the Management Incentive Plan Equity to participants based on the terms and conditions determined by the Reorganized Blackhawk Board.  For the avoidance of doubt, the terms and conditions of the Management Incentive Plan (including any related agreements, policies, programs, other arrangements, and the Management Incentive Plan participants) shall be determined solely by the Reorganized Blackhawk Board after the Effective Date.

18.    **Preservation of Causes of Action.**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than those Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.  For the avoidance of doubt, the retained Causes of Action shall not include any Causes of Action: (a) of any kind or nature with respect to the Patriot Trust, its trustee or the Patriot Trust Debtor Affiliates, or (b) expressly contemplated to be released under the RSA or the Potter Consulting Services Agreement, so long as the parties to such agreements do not opt out of the releases contained in Article VIII of the Plan.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**  Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or

otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

### D.    Conditions Precedent to Confirmation and Consummation of the Plan.

#### 1.    Conditions Precedent to the Effective Date.

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

- the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance consistent with the approval rights set forth in the RSA and the DIP ABL Agreement;

- the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

- the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been filed and shall be in form and substance consistent with the approval rights set forth in the RSA and the DIP ABL Agreement;

- the Exit ABL Facility Documents, the New First Lien Loan Documents, the Shareholders Agreement, and the New Organizational Documents, respectively, shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements;

- all Professional Fee Claims and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court; and

- all reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by all of the attorneys, advisors, and other professionals payable under the RSA and the DIP Order shall have been paid in Cash.

#### 2.    Waiver of Conditions Precedent to the Effective Date.

The Debtors, with the reasonable consent of the Required Consenting Term Lenders and the DIP ABL Agent, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

#### 3.    Substantial Consummation.

Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

#### 4.    Effect of Non-Occurrence of Conditions to Consummation.

If the Effective Date does not occur with respect to any of Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (b) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

34

E.      **Settlement, Release, Injunction, and Related Provisions.**

1.      **Compromise and Settlement of Claims, Interests, and Controversies.**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

2.      **Discharge of Claims.**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan  (including, with respect to the Contingent DIP ABL Obligations, the Contingent DIP Term Obligations, the Contingent Prepetition ABL Obligations, the Contingent First Lien Term Loan Obligations, and the Contingent Second Lien Term Loan Obligations, in each case which are not discharged hereunder), or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims or Non-Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan or voted to reject the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan  (including, with respect to the Contingent DIP ABL Obligations, the Contingent DIP Term Obligations, the Contingent Prepetition ABL Obligations, the Contingent First Lien Term Loan Obligations, and the Contingent Second Lien Term Loan Obligations, in each case which are not discharged under the Plan).

3.      **Release of Liens.**

**Except (a) with respect to the Liens securing (i) the Exit ABL Facility, (ii) the New First Lien Loan, and (iii) Other Secured Claims that are Reinstated pursuant to the Plan, or (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, at the sole cost of and expense of the Reorganized Debtors, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.**

4.        **Debtor Release.**

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition ABL Facility, the First Lien Term Loan, the Second Lien Term Loan, the DIP Order, the DIP Facilities, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the RSA, the Disclosure Statement, the Exit ABL Facility, the New First Lien Loan, the Potter Settlement, the New Organizational Documents, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the Exit ABL Facility, the New First Lien Loan, the Potter Settlement, the New Organizational Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act, or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (b) any retained Causes of Action.

5.        **Third-Party Release.**

Effective as of the Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition ABL Facility, the First Lien Term Loan, the Second Lien Term Loan, the DIP Order, the DIP Facilities, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the RSA, the Disclosure Statement, the Exit ABL Facility, the New First Lien Loan, the Potter Settlement, the New Organizational Documents, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Exit ABL Facility, the New First Lien Loan, the Potter Settlement, the New Organizational Documents, or the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the

KE 60280931

Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) the Patriot Trust and Patriot Trust Debtor Affiliates from any claims filed in the Patriot Chapter 11 Cases, other than with respect to any claims filed by the Debtors or any Affiliates of the Debtors, (c) any claims or other rights, including rights of setoff, counterclaim, or recoupment, with respect to any claims filed in the Patriot Chapter 11 Cases (except to the extent expressly released pursuant to the Patriot Plan), and (d) any Cause of Action maintained by the Patriot Trust or the Patriot Trust Debtor Affiliates with respect to any Released Party or any other Entity (other than the Debtors or any Affiliates of the Debtors) that existed as of the date of substantial consummation of the Patriot Plan or that otherwise is based on or relating to, or in any manner arising from, in whole or in part, the Patriot Chapter 11 Cases or any dealings or transactions relating to or in any manner arising therefrom.

6.      **Exculpation.**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

7.      **Injunction.**

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any

37

**encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

       **8.**       **Protection Against Discriminatory Treatment.**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

       **9.**       **Recoupment.**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

       **10.**       **Reimbursement or Contribution.**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

       **11.**       **Term of Injunctions or Stays.**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

       **12.**       **Document Retention.**

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

KE 60280931

## VI.    Confirmation of the Plan

### A.    The Confirmation Hearing.

At the Confirmation Hearing, the Bankruptcy Court will determine whether to approve the Disclosure Statement and whether the Plan should be Confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed.  **The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Solicitation Procedures.**

### B.    Deadline to Object to Approval of the Disclosure Statement and Confirmation of the Plan.

Upon commencement of the Chapter 11 Cases and scheduling of the Confirmation Hearing, the Debtors will provide notice of the Confirmation Hearing, and, if approved by the Bankruptcy Court, the notice will provide that objections to the Disclosure Statement and Confirmation of the Plan must be filed and served at or before 5:00 p.m., prevailing Eastern Time, on August 20, 2019.  Unless objections to the Disclosure Statement or Confirmation of the Plan are timely served and filed, they may not be considered by the Bankruptcy Court.

### C.    Requirements for Approval of the Disclosure Statement.

Pursuant to sections 1125(g) and 1126(b) of the Bankruptcy Code, prepetition solicitation of votes to accept or reject a chapter 11 plan must comply with applicable federal or state securities laws and regulations (including the registration and disclosure requirements thereof) or, if such laws and regulations do not apply, provide "adequate information" under section 1125 of the Bankruptcy Code.  At the Confirmation Hearing the Debtors will seek a determination from the Bankruptcy Court that the Disclosure Statement satisfies sections 1125(g) and 1126(b) of the Bankruptcy Code.

### D.    Requirements for Confirmation of the Plan.

#### 1.    Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation are the following:  (a) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims or Interests has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (b) the Plan is feasible; and (c) the Plan is in the "best interests" of Holders of Impaired Claims and Interests (*i.e.*, Holders of Class 3 Claims, Holders of Class 4 Claims, Holders of Class 6 Claims and Class 7 Interests, if applicable, Holders of Class 8 Claims (if any), and Holders of Class 10A, Class 10B, and Class 10C Interests).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment:  (a) made before Confirmation will be

reasonable or (b) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

## 2.    The Debtor Release, Third-Party Release, Exculpation, and Injunction Provisions.

Article VIII of the Plan provides for releases of certain claims and Causes of Action the Debtors may hold against the Released Parties. The Released Parties are: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the First Lien Term Loan Lenders; (d) each of the Second Lien Term Loan Lenders; (e) the First Lien Term Loan Agent; (f) the Second Lien Term Loan Agent; (g) each of the Potter Group Entities; (h) each of the New First Lien Loan Lenders; (i) the New First Lien Loan Agent; (j) the Prepetition ABL Agent; (k) each of the Prepetition ABL Lenders; (l) the DIP ABL Agent; (m) each of the DIP ABL Lenders; (n) the DIP Term Agent; (o) each of the DIP Term Lenders; (p) the Patriot Trust and its trustee; (q) the Patriot Trust Debtor Affiliates; (r) all Holders of Class A Blackhawk Interests, Class B Blackhawk Interests, and Class C Blackhawk Interests, in each case that vote to accept the Plan; and (s) with respect to each of the foregoing entities in clauses (a) through (r), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, managed accounts or funds, participants, and each of their respective current and former equity holders, officers, directors, managers, principals, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided*, the release in favor of the Potter Group Entities and John Mitchell Potter shall include and be effective as to all matters previously invoiced and paid between any of the Potter Group Entities and the Debtors as of the Petition Date but shall not apply to the continuing obligations between any of the Potter Group Entities and the Debtors under the terms of the agreements assumed by the Debtors; *provided*, *however*, that any Entity identified in the foregoing clauses (a) through (r) that opts out of the releases shall not be a "Released Party."

Article VIII of the Plan provides for releases of certain claims and Causes of Action that Holders of Claims or Interests may hold against the Released Parties in exchange for the good and valuable consideration and the valuable compromises made by the Released Parties (the "Third-Party Release"). The Holders of Claims and Interests who are releasing certain claims and Causes of Action against non-Debtors under the Third-Party Release include: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Term Loan Lenders; (d) each of the Potter Group Entities; (e) each of the New First Lien Loan Lenders; (f) the New First Lien Loan Agent; (g) the Prepetition ABL

Agent; (h) each of the Prepetition ABL Lenders; (i) the DIP ABL Agent; (j) each of the DIP ABL Lenders; (k) the DIP Term Agent; (l) each of the DIP Term Lenders; (m) the First Lien Term Loan Agent; (n) the Second Lien Term Loan Agent; (o) the Patriot Trust and its trustee; (p) the Patriot Trust Debtor Affiliates; (q) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan; (r) all Holders of Claims or Interests that vote to reject the Plan or do not vote to accept or reject the Plan but, in either case, do not affirmatively elect to "opt out" of being a releasing party by timely objecting to the Plan's third-party release provisions; (s) all Holders of Claims or Interests that are deemed to reject the Plan that do not affirmatively elect to "opt out" of being a releasing party by timely objecting to the Plan's third-party release provisions; (t) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (s), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, managed accounts or funds, participants, and each of their respective current and former equity holders, officers, directors, managers, principals, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively.

Article VIII of the Plan provides for the exculpation of each Exculpated Party for certain acts or omissions taken in connection with the Chapter 11 Cases. The released and exculpated claims are limited to those claims or Causes of Action that may have arisen in connection with, related to, or arising out of the Plan, this Disclosure Statement, or the Chapter 11 Cases. The Exculpated Parties are: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) any statutory committees appointed in the Chapter 11 Cases and each of their respective members; and (d) with respect to each of the foregoing in clauses (a) through (c), such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Article VIII of the Plan permanently enjoins Entities who have held, hold, or may hold Claims, Interests, or Liens that have been discharged or released pursuant to the Plan or are subject to exculpation pursuant to the Plan from asserting such Claims, Interests, or Liens against each Debtor, the Reorganized Debtors, and the Released Parties.

Under applicable law, a debtor release of the Released Parties is appropriate where: (a) there is an identity of interest between the debtor and the third party, such that a suit against the released non-debtor party is, at core, a suit against the debtor or will deplete assets of the estate; (b) there is a substantial contribution by the non-debtor of assets to the reorganization; (c) the injunction is essential to the reorganization; (d) there is overwhelming creditor support for the injunction; and (e) the chapter 11 plan will pay all or substantially all of the claims affected by the injunction. *Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013). Importantly, these factors are "neither exclusive nor are they a list of conjunctive requirements," but "[i]nstead, they are helpful in weighing the equities of the particular case after a fact-specific review." *Id.* Further, a chapter 11 plan may provide for a release of third party claims against non-debtors, such as the Third-Party Release, where such releases are consensual. *Id.* at 304–06. In addition, exculpation is appropriate where it applies to estate fiduciaries. *Id.* at 306. Finally, an injunction is appropriate where it is necessary to the reorganization and fair pursuant to section 105(a) of the Bankruptcy Code. *In re W.R. Grace & Co.*, 475 B.R. 34, 107 (D. Del. 2012). In addition, approval of the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of Confirmation of the Plan will be limited to the extent such releases, exculpations, and injunctions are permitted by applicable law.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to the Debtors' restructuring proceedings, and each of the Released Parties has contributed value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of the Plan. The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors further believe that such releases, exculpations, and injunctions are a necessary part of the Plan. In addition, the Debtors believe the Third-Party Release is entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware. See *Indianapolis Downs*, 486 B.R. at 304–06. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of Confirmation of the Plan.

3.    **Best Interests of Creditors—Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (a) has accepted the plan, or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit F**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation.  Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

4.    **Feasibility/Financial Projections.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan of reorganization is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the chapter 11 plan).  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared certain unaudited pro forma financial statements with regard to the Reorganized Debtors (the "Financial Projections"), which projections and the assumptions upon which they are based are attached as **Exhibit D**.  Based on these Financial Projections, the Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

5.    **Acceptance by Impaired Classes.**

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim receives cash equal to the allowed amount of that claim or, with respect to any equity interest, the holder of such interest receives value equal to the greater of (i) any fixed liquidation preference to which the holder of such equity interest is entitled, (ii) the fixed redemption price to which such holder is entitled, or (iii) the value of the interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance.  For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan.  Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

6.    **Confirmation Without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminately unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

42

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

(a)    **No Unfair Discrimination**.

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan.  The test does not require that the treatment be the same or equivalent, but that the treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  Accordingly, the Debtors believe that the Plan meets the standard to demonstrate that the Plan does not unfairly discriminate and the Debtors will be prepared to meet their burden to establish that there is no unfair discrimination as part of Confirmation of the Plan.

(b)    **Fair and Equitable Test**.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.  There is no Class receiving more than a 100% recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100% recovery or agreed to receive a different treatment under the Plan.

(i)    **Secured Claims**.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (A) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (B) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the claimant's liens.

(ii)    **Unsecured Claims**.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (A) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (B) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

(iii)     **Interests**.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (A) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (B) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

7.      **Valuation of the Debtors.**

The Debtors' investment banker, Centerview, has prepared an independent valuation analysis, which is attached to this Disclosure Statement as **Exhibit E** (the "Valuation Analysis"). The Valuation Analysis should be considered in conjunction with the Risk Factors discussed in Section VIII of this Disclosure Statement, entitled "Risk Factors," and the Financial Projections. The Valuation Analysis is dated as of July 2, 2019, and is based on data and information as of that date. Holders of Claims and Interests should carefully review the information in **Exhibit E** in its entirety. The Debtors believe that the Valuation Analysis demonstrates that the Plan is "fair and equitable" to the non-accepting classes.

## VII.   Voting Instructions

A.      **Overview.**

Holders of Claims and Interests entitled to vote should carefully read the below voting instructions.

B.      **Solicitation Procedures.**

1.      **Solicitation Agent.**

The Debtors have proposed to retain Prime Clerk LLC to act, among other things, as the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan. The Solicitation Agent will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will file the Voting Report as soon as practicable after the Voting Deadline.

2.      **Solicitation Package.**

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims and Interests in the Voting Classes:

- the Debtors' cover letter in support of the Plan;

- the appropriate Ballot and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto (which may be distributed in paper or USB-flash drive format).

3.      **Voting Deadline.**

The period during which Ballots with respect to the Plan will be accepted by the Debtors will terminate at **5:00 p.m. prevailing Eastern Time on July 26, 2019**, unless the Debtors extend the date until which Ballots will be accepted. Except to the extent that the Debtors so determine or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).

The Debtors reserve the right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline.  The Debtors will give notice of any such extension in a manner deemed reasonable to the Debtors in their discretion.  There can be no assurance that the Debtors will exercise its right to extend the Voting Deadline.

4.        **Distribution of the Solicitation Package and Plan Supplement.**

The Debtors will cause the Solicitation Agent to distribute the Solicitation Package to Holders of Claims and Interests in the Voting Classes on July 15, 2019, which is 11 days before the Voting Deadline (a total of 9 business days).

The Solicitation Package (except the Ballots) may also be obtained from the Solicitation Agent by: (a) calling the Debtors' restructuring hotline at (844) 627-6268 (domestic toll-free) or (347) 292-3528  (international toll), and asking for the Solicitation Group; (b) emailing blackhawkballots@primeclerk.com and referencing "Blackhawk Mining" in the subject line; or (c) writing to the following address:  Blackhawk Mining Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street (Park Avenue), Suite 1440, New York, NY 10165.  When the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.primeclerk.com/blackhawk, or for a fee at https://ecf.deb.uscourts.gov/.

The Debtors will file the Plan Supplement in accordance with the terms of the Plan.  As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement at no cost from the Solicitation Agent by:  (a) calling the Solicitation Agent at one of the telephone numbers set forth above; (b) visiting the Debtors' restructuring website, https://cases.primeclerk.com/blackhawk; or (c) emailing the Solicitation Agent at the email address set forth above.

C.        **Voting Procedures.**

July 11, 2019, (the "Voting Record Date"), is the date that was used for determining which Holders of Claims and Interests are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim or Interest in the Voting Classes to have such Holder's Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (a) using the enclosed pre-paid, pre-addressed return envelope; (b) via first class mail, overnight courier, or hand delivery to the Solicitation Agent at Blackhawk Mining Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street (Park Avenue), Suite 1440, New York, NY 10165; or (c) via electronic submission through the Solicitation Agent's online voting portal at https://cases.primeclerk.com/blackhawkballots, so that such Holder's Ballot is **actually received** by the Solicitation Agent before the Voting Deadline.

The Debtors are providing the Solicitation Package to Holders of Class 3 First Lien Term Loan Claims, Holders of Class 4 Second Lien Term Loan Claims, Holders of Class 10A Class A Blackhawk Interests, Holders of Class 10B Class B Blackhawk Interests, and Holders of Class 10C Class C Blackhawk Interests.  If a Holder of a Claim or Interest in a Voting Class transfers all of such Claim or Interest to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim or Interest is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim or Interest and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the transfer complies with the applicable requirements under the RSA, if applicable.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM OR INTEREST BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM OR INTEREST MUST VOTE ALL OF ITS CLAIMS OR INTERESTS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM OR INTEREST HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS OR INTERESTS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS OR INTERESTS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR INTEREST IN THE VOTING CLASSES FOLLOWS THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT.

D.      **Voting Tabulation.**

A Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim. Only Holders of Claims and Interests in the Voting Classes shall be entitled to vote with regard to such Claims and Interests.

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to confirmation of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

To the extent there are multiple Claims or Interests within Voting Classes, the Debtors may, in their discretion, and to the extent possible, aggregate the Claims or Interests of any particular Holder within a Voting Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The following Ballots will not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder; (b) any Ballot cast by a person or entity that does not hold a Claim or Interest that is entitled to vote on the Plan; (c) any unsigned Ballot; (d) any Ballot not marked to accept or reject the Plan, or marked both to accept and reject the Plan; (e) any Ballot received after the Voting Deadline, unless otherwise determined by the Debtors; and (f) any Ballot submitted by a party not entitled to cast a vote with respect to the Plan.

As soon as practicable after the Voting Deadline, the Solicitation Agent will file the Voting Report with the Bankruptcy Court. The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged. The Solicitation Agent will attempt to reconcile the amount of any Claim reported on a Ballot with the Debtors' records, but in the event such amount cannot be timely reconciled without undue effort on the part of the Solicitation Agent, the amount shown in the Debtors' records shall govern. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be

46

under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

## VIII.  Risk Factors

BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.

A.     **Risks Related to the Restructuring.**

1.     **The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors.**

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets and any other transaction that would maximize the value of the Debtors' estates.  The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors.  For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

2.     **Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks.**

The Restructuring Transactions are generally designed to reduce the Debtors' cash interest expense, improve the Debtors' liquidity and provide the Debtors' greater flexibility to generate long-term growth.  Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, changes in the Debtors' industry and changes in commodity prices.  As a result of these risks, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

47

3.    **Risks Related to the New First Lien Loan and the New Common Stock.**

The following are some of the risks that apply to Holders of Claims against the Debtors or other parties who become Holders of the New First Lien Loan or the New Common Stock pursuant to the Plan.  There are additional risk factors related to ownership of the New First Lien Loan and the New Common Stock that Holders of Claims against the Debtors should consider before deciding to vote to accept or reject the Plan.

(a)    **The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors**.

The Debtors have not obtained or requested an opinion from any bank or other firm as to the fairness of the consideration under the Plan.

(b)    **The Terms of the New First Lien Loan and the New Common Stock Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court**.

The terms of the New First Lien Loan and the New Common Stock are subject to change based on negotiations between the Debtors and the Consenting Parties.  Holders of Claims and Interests that are not the Consenting Parties will not participate in these negotiations and the results of such negotiations may alter the terms of the New First Lien Loan or the New Common Stock in a material manner.  As a result, the final terms of the New First Lien Loan or the New Common Stock may be less favorable to Holders of Claims or Interests than as described herein and in the Plan.

(c)    **The Terms of the Shareholders Agreement Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court.**

The terms of the Shareholders Agreement are subject to change based on negotiations between the Debtors and the Consenting Parties.  Holders of Claims and Interests that are not the Consenting Parties will not participate in these negotiations and the results of such negotiations may affect the rights of shareholders in Reorganized Blackhawk following the Effective Date.

(d)    **The New First Lien Loan Will Have a Later Maturity Than the First Lien Term Loan Facility and Any Holder of First Lien Term Loan Claims May Be Subject to Greater Risk That the Debtors Will Be Unable to Repay or Refinance the New First Lien Loan Upon Maturity**.

If the Plan is implemented, following the Effective Date, the New First Lien Loan will have a later maturity than the First Lien Term Loan Facility.  Holders of the First Lien Term Loan Claims will be exposed to the risk of nonpayment on the New First Lien Loan for a longer period than under the First Lien Term Loan Facility.

(e)    **The New First Lien Loan Will Be Secured Only to the Extent of the Value of the Assets Granted as Security for the New First Lien Loan.  The Fair Market Value of the Reorganized Debtors Upon Any Foreclosure May Not Be Sufficient to Repay the Holders of the New First Lien Loan in Full**.

The New First Lien Loan will be secured by a first-priority lien on substantially the same assets as the DIP Term Facility (the "New First Lien Collateral").[12]  The fair market value of the New First Lien Collateral may not be sufficient to repay both the New First Lien Loan and all of the Holders of other debt holding a security interest in the New First Lien Collateral, if any, upon any foreclosure.  The fair market value of the New First Lien Collateral is subject to fluctuations based on factors that include, among other things, a decline in revenue in the Debtors' businesses.  The amount to be received by creditors upon a sale of any New First Lien Collateral would be dependent on numerous factors, including the value obtainable by selling the New First Lien Collateral at the time, general market and economic conditions, and the timing and the manner of sale.

---

[12]    Any assets subject to a lien under the DIP Term Facility that would not have been required to be subject to a lien under the prepetition First Lien Term Loan Facility will not constitute New First Lien Collateral.

KE 60280931

In the event that a subsequent bankruptcy or similar proceeding is commenced by or against the Reorganized Debtors, Holders of the New First Lien Loan may be deemed to have an unsecured claim if the Reorganized Debtors' obligation under the New First Lien Loan exceeds the value of the New First Lien Collateral. Upon a finding by a bankruptcy court that the New First Lien Loan is under-collateralized, the Claims in the bankruptcy proceeding with respect to such debt instrument, absent an election by the Holders of the New First Lien Loan pursuant to section 1111(b) of the Bankruptcy Code, would be bifurcated between a Secured Claim and an Unsecured Claim, and the Unsecured Claim would not be entitled to the benefits of security in the New First Lien Collateral. Additionally, some or all accrued but unpaid interest may be disallowed in any bankruptcy proceeding.

The security interests granted in favor of the administrative agent under the New First Lien Loan Documents (the "New First Lien Loan Agent") are subject to practical problems generally associated with the realization of security interests in collateral. For example, the New First Lien Loan Agent may need to obtain the consent of a third party to obtain or enforce a security interest in a contract, and the Debtors cannot assure Holders of the New First Lien Loan that the New First Lien Loan Agent will be able to obtain any such consent. The consents of any third parties may not be given when required to facilitate a foreclosure on any particular assets. Accordingly, the New First Lien Loan Agent may not have the ability to foreclose upon such assets, and the value of the New First Lien Collateral may significantly decrease.

(f)     **The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service Their Debt and May Be Forced to Take Other Actions to Satisfy their Obligations, Which May Not Be Successful**.

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt, including the Exit ABL Facility and the New First Lien Loan.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the Exit ABL Facility and the New First Lien Loan. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

4.     **The Terms of the Exit ABL Facility Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court**.

The terms of the Exit ABL Facility Documents have not been finalized and are subject to change based on negotiations between the Debtors, the Exit ABL Facility Secured Parties, and the Consenting Term Lenders. Holders of Claims and Interests that are not the Consenting Term Lenders will not participate in these negotiations and the results of such negotiations may affect the rights of the holders of the New First Lien Loan or the New Common Stock following the Effective Date. As a result, the final terms of the Exit ABL Facility Documents may be less favorable to Holders of Claims and Interests than as described herein and in the Plan.

5.     **The Exit ABL Facility Will Be Secured Only to the Extent of the Value of the Assets Granted as Security for the Exit ABL Facility. The Fair Market Value of the Reorganized Debtors Upon Any Foreclosure May Not Be Sufficient to Repay the Holders of the Exit ABL Facility in Full**.

The Exit ABL Facility will be secured by a first-priority lien on substantially the same assets as the DIP ABL Facility (the "Exit ABL Facility Collateral"). The fair market value of the Exit ABL Facility Collateral may not be sufficient to repay both the Exit ABL Facility and all of the Holders of other debt holding a security interest in the Exit ABL Facility Collateral, if any, upon any foreclosure. The fair market value of the Exit ABL Facility Collateral

49

is subject to fluctuations based on factors that include, among other things, a decline in revenue in the Debtors' businesses. The amount to be received by creditors upon a sale of any Exit ABL Facility Collateral would be dependent on numerous factors, including the value obtainable by selling the Exit ABL Facility Collateral at the time, general market and economic conditions, and the timing and the manner of the sale.

In the event a subsequent bankruptcy or similar proceeding is commenced by or against the Reorganized Debtors, Holders of the Exit ABL Facility may be deemed to have an unsecured claim if the Reorganized Debtors' obligation under the Exit ABL Facility exceeds the value of the Exit ABL Facility Collateral. Upon a finding by a bankruptcy court that the Exit ABL Facility is under-collateralized, the Claims in the bankruptcy proceeding with respect to such debt instrument, absent an election by the Holders of the Exit ABL Facility pursuant to section 1111(b) of the Bankruptcy Code, would be bifurcated between a Secured Claim and an Unsecured Claim, and the Unsecured Claim would not be entitled to the benefits of security in the Exit ABL Facility Collateral. Additionally, some or all accrued but unpaid interest may be disallowed in any bankruptcy proceeding.

The security interests granted in favor of the administrative agent under the Exit ABL Facility Documents (the "Exit ABL Agent") are subject to practical problems generally associated with the realization of security interests in collateral. For example, the Exit ABL Agent may need to obtain the consent of a third party to obtain or enforce a security interest in a contract, and the Debtors cannot assure Holders of the Exit ABL Facility that the Exit ABL Agent will be able to obtain any such consent. The consents of any third parties may not be given when required to facilitate a foreclosure on any particular assets. Accordingly, the Exit ABL Agent may not have the ability to foreclose upon such assets, and the value of the Exit ABL Facility Collateral may significantly decrease.

6.      **A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt**.

The Debtors' or the Reorganized Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable. Downgrades in the Reorganized Debtors' long-term debt ratings may make it more difficult to refinance their debt and increase the cost of any debt that they may incur in the future.

7.      **Risks Related to Confirmation and Consummation of the Plan**.

(a)      **The RSA May Be Terminated**.

As more fully set forth in Sections 10 through 14 of the RSA, the RSA may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones relating to the filing, confirmation, and consummation of the Plan, and breaches by the Debtors and/or the Consenting Parties of their respective obligations under the RSA. In the event that the RSA is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

(b)      **Conditions Precedent to Confirmation May Not Occur**.

As more fully set forth in Article IX of the Plan, the occurrence of Confirmation and the Effective Date are each subject to a number of conditions precedent. If each condition precedent to Confirmation is not met or waived, the Plan will not be Confirmed, and if each condition precedent to Consummation is not met or waived, the Effective Date will not take place. In the event that the Plan is not Confirmed or is not Consummated, the Debtors may seek Confirmation of a new plan. Pursuit of a new plan would be subject to limitations in the DIP Order and the DIP Facilities, and may require consents or concessions from the DIP Agents and the DIP Lenders. The Debtors can provide no assurances that such consents or concessions would be obtained. If the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

(c)      **Parties in Interest May Object to the Plan's Classification of Claims and Interests**.

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class. The Debtors

believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(d)     **The Debtors May Not Be Able to Satisfy Vote Requirements**.

Pursuant to section 1126(c) of the Bankruptcy Code, section 1129(a)(7)(A)(i) of the Bankruptcy Code will be satisfied with respect to Class 3 and Class 4 if Holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in each Class that vote on the Plan cast votes to accept the Plan. There is no guarantee that the Debtors will receive the necessary acceptances from Holders of Claims in the Voting Classes. Pursuant to section 1126(d) of the Bankruptcy Code, section 1129(a)(7)(A)(i) of the Bankruptcy Code will be satisfied with respect to Classes 10A, 10B, and 10C, if Holders of at least two-thirds in amount of the Allowed Interests in each Class that vote on the Plan cast votes to accept the Plan. There is no guarantee that the Debtors will receive the necessary acceptances from Holders of Interests in the Voting Classes. If the Voting Classes vote to reject the Plan, the Debtors may elect to amend the Plan, commence chapter 11 cases notwithstanding rejection of the Plan in accordance with the RSA, or continue operating under the current *status quo* outside of chapter 11.

(e)     **The Debtors May Not Be Able to Secure Confirmation**.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (i) the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes; (ii) the plan is not likely to be followed by a liquidation or a need for further financial reorganization unless liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting Holders of Claims and Interests within a particular Class under the plan will not be less than the value of distributions such Holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A dissenting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement and the voting results are appropriate, the Bankruptcy Court can decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

If the Plan is not Confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests, as applicable.

Subject to the limitations contained in the Plan, the Debtors, with the reasonable consent of the Required Consenting Term Lenders, reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Any modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan, such as a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan.

(f)     **Parties in Interest May Object to the Releases Contained in the Plan**.

Confirmation is also subject to the Bankruptcy Court's approval of the settlement, release, injunction, and related provisions described in Article VIII of the Plan. Certain parties in interest may assert that the Debtors cannot demonstrate that they meet the standards for approval of releases, exculpations, and injunctions established by the United States Court of Appeals for the Third Circuit.

(g)    **The Debtors May Not Be Able to Pursue Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes**.

Generally, a bankruptcy court may confirm a plan under the Bankruptcy Code's "cramdown" provisions over the objection of an impaired non-accepting class of claims or interests if at least one impaired class of claims has accepted the plan (with acceptance being determined without including the vote of any "insider" in that accepting class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting impaired classes.

As to Classes 3 and 4 (First Lien Term Loan Claims and Second Lien Term Loan Claims, respectively), while the Debtors believe they have secured Plan support from the Holders of Claims well in excess of the requisite two-thirds in amount and more than one-half in number of the Allowed Class 3 First Lien Term Loan Claims and Allowed Class 4 Second Lien Term Loan Claims pursuant to the RSA, the amount required for an accepting Class of Claims pursuant to section 1126(c) of the Bankruptcy Code, there is no guarantee that those Holders will vote in those Claims favor of the Plan.  If Class 3 or Class 4 does not vote to accept the Plan, the Debtors would be required to seek to enforce the RSA against any breaching Consenting Term Lenders, as well as other relief, which could include an alternative chapter 11 plan of reorganization or a process through which to liquidate their assets.  There can be no assurances that the Debtors will confirm a chapter 11 plan and emerge as a reorganized company in that event, and it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests in that instance.  In addition, the pursuit of an alternative restructuring proposal may result in, among other things, increased expenses relating to Professional Fee Claims.

Finally, to the extent that a Voting Class votes to reject the Plan, the Debtors may not be able to seek to "cramdown" such Voting Class under section 1129(b) of the Bankruptcy Code because there is no other impaired Class of Claims entitled to vote under the Plan.

(h)    **The Debtors May Object to the Amount or Classification of a Claim or Interest**.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection or dispute.  Any Holder of a Claim or Interest that is subject to an objection or dispute may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(i)    **The Debtors' Historical Financial Information May Not Be Comparable to the Financial Information of the Reorganized Debtors**.

As a result of Consummation and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

(j)    **The Effective Date May Not Occur**.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

B.    **Risks Related to Recoveries Under the Plan.**

1.    **The Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations.**

The Financial Projections represent management's best estimate of the future financial performance of the Debtors or the Reorganized Debtors, as applicable, based on currently known facts and assumptions about future operations of the Debtors or the Reorganized Debtors, as applicable, as well as the U.S. and world economy in general and the relevant industries in which the Debtors operate.  There is no guarantee that the Financial Projections will be realized, and actual financial results may differ significantly from the Financial Projections.  To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the

Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due, or may not be able to meet their operational needs, all of which may negatively affect the value of the New First Lien Loan and the New Common Stock.  Further, a failure of the Reorganized Debtors to meet their projected financial results could lead to cash flow and working capital constraints, which may require the Debtors to seek additional working capital.  The Reorganized Debtors may be unable to obtain such working capital when required, or may only be able to obtain such capital on unreasonable or cost prohibitive terms.  For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors, and also have a negative effect on the value of the New First Lien Loan and the New Common Stock.  In addition, if any such required capital is obtained in the form of equity, the New Common Stock to be issued to Holders of Allowed Class 3 First Lien Term Loan Claims and Allowed Class 4 Second Lien Term Loan Claims under the Plan could be diluted.

2. **Estimated Valuations of the Debtors, the New First Loan Loan, and the New Common Stock, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.**

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers.

3. **Holders of Claims That Acquire the New Common Stock Will Assert Significant Control Over the Reorganized Debtors.**

Upon Consummation of the Plan, Holders of Allowed Class 3 First Lien Term Loan Claims and Allowed Class 4 Second Lien Term Loan Claims will become Holders of 100% of the New Common Stock in Reorganized Blackhawk pursuant to the Plan.  As a result, following Consummation, certain Holders of Allowed Class 3 First Lien Term Loan Claims and/or Allowed Class 4 Second Lien Term Loan Claims may exercise substantial influence over the Reorganized Debtors and their affairs.

4. **Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors.**

Holders of Allowed Claims should carefully review Section X of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

C. **Risks Related to the Offer and Issuance of Securities Under the Plan.**

1. **The Debtors Do Not Intend to Offer to Register or to Exchange the New Common Stock in a Registered Exchange Offer.**

The New Common Stock has not been registered under the Securities Act or any state securities laws and, subject to the discussion of section 1145 of the Bankruptcy Code below and as summarized in Section IX of this Disclosure Statement, entitled "Important Securities Laws Disclosures" unless so registered, may not be re-offered or re-sold except pursuant to an exemption from the registration requirements of the Securities Act and applicable state securities laws.  The Debtors do not intend to register the New Common Stock under the Securities Act or to offer to exchange the New Common Stock in an exchange offer registered under the Securities Act.  As a result, the New Common Stock may be transferred or re-sold only in transactions exempt from the securities registration requirements of federal and applicable state laws.  In addition, the Debtors are not subject to the reporting requirements of the Securities Act, and Holders of the New Common Stock will not be entitled to any information except as expressly required by the Shareholders Agreement.

KE 60280931

The Debtors believe that the issuance of the New Common Stock with respect to Allowed Claims is covered by section 1145 of the Bankruptcy Code. Accordingly, the Debtors believe that the New Common Stock to be issued to Holders of Allowed Class 3 First Lien Term Loan Claims and Allowed Class 4 Second Lien Term Loan Claims on account of such Claims may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is (a) an "underwriter" (as discussed in Section IX.B.2 below) with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code; or (b) an affiliate of the Reorganized Debtors (or has been such an "affiliate" within 90 days of such transfer).

The information which the Debtors are required to provide in order to issue the New Common Stock may be less than the Debtors would be required to provide if the New Common Stock were registered. Among other things, the Debtors may not be required to provide: (a) separate financial information for any subsidiary; (b) selected historical consolidated financial data of Blackhawk; (c) selected quarterly financial data of Blackhawk; (d) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers. This lack of information could impair your ability to evaluate your ownership and the marketability of the New Common Stock.

### 2. There is No Established Market for the New Common Stock.

The New Common Stock will be a new issuance of Securities and there is no established trading market for those Securities. The Debtors do not intend to apply for the New Common Stock to be listed on any securities exchange or to arrange for quotation on any automated dealer quotation system. You may not be able to sell your New Common Stock at a particular time or at favorable prices. As a result, the Debtors cannot assure you as to the liquidity of any trading market for the New Common Stock. Accordingly, you may be required to bear the financial risk of your ownership of the New Common Stock indefinitely. If a trading market were to develop, future trading prices of the New Common Stock may be volatile and will depend on many factors, including: (a) the Debtors' operating performance and financial condition; (b) the interest of securities dealers in making a market for them; and (c) the market for similar Securities.

### D. Risk Factors Related to the Business Operations of the Debtors and Reorganized Debtors.

### 1. The Debtors Will File Voluntary Petitions for Relief Under Chapter 11 of the Bankruptcy Code and Will Be Subject to the Risks and Uncertainties Associated with Any Chapter 11 Restructuring.

For the duration of the Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include, among other things:

- the Debtors' ability to obtain approval of the Bankruptcy Court with respect to pleadings and motion papers filed in the Chapter 11 Cases from time to time;

- the Debtors' ability to obtain creditor and Bankruptcy Court approval for, and then to Consummate, the Plan to emerge from bankruptcy;

- the occurrence of any event, change, or other circumstance that could give rise to the termination of the RSA;

- the Debtors' ability to obtain and maintain normal trade terms with service providers and maintain contracts that are critical to their operations;

- the Debtors' ability to attract, motivate, and retain key employees;

- the Debtors' ability to attract and retain customers; and

- the Debtors' ability to fund and execute their business plan.

The Debtors will also be subject to risks and uncertainties with respect to the actions and decisions of creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Plan.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with their customers, as well as their suppliers and employees, which, in turn, could adversely affect the Debtors' operations and financial condition. Also, pursuant to the Bankruptcy Code, the Debtors need Bankruptcy Court approval for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot predict or quantify the ultimate effect that events occurring during the Chapter 11 Cases will have on their businesses, financial condition, and results of operations.

As a result of the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty. While operating as debtors in possession, and subject to approval of the Bankruptcy Court, or otherwise as permitted in the normal course of business or Bankruptcy Court order, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities. Further, the Plan could materially change the amounts and classifications of assets and liabilities reported in the historical consolidated financial statements. The historical consolidated financial statements do not include any adjustments to the reported amounts of assets or liabilities that might be necessary as a result of Confirmation.

### 2.      Potential for the Loss of Key Members of the Executive Management Team.

If the Debtors were to lose key members of their senior management team on account of the Chapter 11 Cases or otherwise, the Debtors' business, financial condition, liquidity, and results of operations could be adversely affected.

### 3.      The Debtors May Not Be Able to Achieve Their Projected Financial Results.

The financial projections set forth in this Disclosure Statement represent the best estimate of the future financial performances of the Debtors based on currently known facts and assumptions about future operations as well as the United States and world economies in general and, specifically, the coal industry. The actual financial results may differ significantly from the projections. If the Debtors do not achieve their projected financial results, then the value of the Debtors debt or equity issued pursuant to the Plan may experience a decline and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. There are numerous factors and assumptions inherent in estimating the quantities and qualities of, and costs to mine, coal reserves, many of which are beyond the Debtors' control, including the following:

(a)      quality of the coal;

(b)      geological and mining conditions;

(c)      the percentage of coal ultimately recoverable;

(d)      the assumed effects of regulation, including the issuance of required permits, taxes, including severance and excise taxes and royalties, and other payments to governmental agencies;

(e)      assumptions concerning the timing for the development of the reserves;

(f)      assumptions concerning physical access to the reserves; and

(g)      assumptions concerning equipment and productivity, future coal prices, operating costs, including for critical supplies such as fuel, tires and explosives, capital expenditures and development and reclamation costs.

As a result, estimates of the quantities and qualities of economically recoverable coal attributable to any particular group of properties, classifications of reserves based on risk of recovery, estimated cost of production, and estimates of future net cash flows expected from these properties as prepared by different engineers, or by the same engineers at different times, may vary materially because of changes in the above factors and assumptions. Actual production recovered from identified reserve areas and properties, and revenues and expenditures associated with the Debtors' mining operations, may vary materially from estimates. Any inaccuracy in the Debtors' estimates related to their reserves could result in decreased profitability from lower than expected revenues and/or higher than expected costs.

### 4. If the Debtors Do Not Obtain Additional Capital to Fund Their Operations and Obligations, the Debtors' Growth May Be Limited.

The Debtors may require additional capital to fund their operations and obligations, which will depend on several factors, including:

- the Debtors' ability to enter into new customer agreements and to extend the duration of existing agreements;

- the success rate of the Debtors' sales efforts;

- costs of recruiting and retaining qualified personnel;

- expenditures and investments to implement the Debtors' business strategy; and

- the identification and successful completion of acquisitions.

If the Debtors cannot raise additional capital, the Debtors may be required to curtail internal growth initiatives and/or forgo the pursuit of acquisitions. The Debtors do not know whether additional financing will be available on commercially acceptable terms, if at all, when needed. If sufficient funding is not available or is not available on commercially acceptable terms, the Debtors' ability to fund their operations, support the growth of their business, or otherwise respond to competitive pressures could be significantly delayed or limited, which could materially adversely affect the Debtors' business, financial condition, or results of operations.

### 5. Employee and Labor Risks.

Given the nature of the specialized work the Debtors perform, many of the Debtors' employees are trained in and possess specialized technical skills. When unemployment rates for such skilled laborers are low, it can be difficult for the Debtors to find qualified and affordable personnel. The Debtors may be unable to hire and retain a sufficient skilled labor force necessary to support the Debtors' operating requirements and growth strategy. The Debtors' labor expenses may increase as a result of a shortage in the supply of skilled personnel. Additionally, the Debtors may also be forced to incur significant training expenses if they are unable to hire employees with the requisite skills. Accordingly, labor shortages or increased labor or training costs could materially adversely affect the Debtors' business, financial condition, or results of operations.

The Debtors' mining operations can place the Debtors' employees and others in difficult or dangerous environments. If the Debtors fail to implement appropriate safety procedures or if the Debtors' procedures fail, the Debtors' employees, subcontractors and others may suffer injuries. The failure to comply with such procedures or applicable regulations, including those established by the Occupational Safety and Health Administration, could subject the Debtors to losses and liability and adversely impact the Debtors' ability to obtain projects in the future.

### 6. New Developments in the Regulation of Greenhouse Gases, Other Air Emissions, Coal Ash, and Other Environmental Matters Could Materially Adversely Affect the Debtors' Customers' Demand for Coal and the Debtors' Financial Condition, Results of Operations, and Cash Flows.

One by-product of burning coal is carbon dioxide, which has been reported in certain studies to be linked as a contributor to climate change. Current and potential international, federal, state, regional or local laws, regulations

or court orders addressing carbon dioxide, other greenhouse gas emissions, coal ash, emissions of sulfur dioxide, nitrogen oxides, mercury or other hazardous air pollutants, or particulate matter, will likely require additional controls on coal-fueled power plants and industrial boilers and may cause some users of coal to close existing facilities, reduce construction of new facilities or switch from coal to alternative fuels. These ongoing and future developments may have a material adverse impact on the global supply and demand for coal, and as a result could materially adversely affect the Debtors' financial condition, results of operations and cash flows. Even in the absence of future regulatory developments, increased awareness of, and any adverse publicity regarding, greenhouse gas and other air emissions and coal ash disposal associated with coal and coal-fueled power plants, could adversely affect the Debtors' and the Debtors' customers' reputations and reduce demand for coal.

7.      **The Environmental, Health, and Safety Regulations Applicable to the Debtors' Mining Operations Impose Significant Costs, and Future Regulations or Changes in the Interpretation or Application or Enforcement of Existing Regulations Could Increase those Costs and Limit the Debtors' Ability to Produce Coal.**

Federal and state authorities regulate the coal mining industry with respect to matters such as employee health and safety, permitting and licensing requirements, the protection of the environment, plants and wildlife, reclamation and restoration of mining properties after mining is completed, surface subsidence from underground mining, and the effects that mining has on groundwater quality and availability. Numerous governmental permits and approvals are required for mining operations.

The costs, liabilities, and requirements associated with addressing the outcome of inspections and complying with these environmental, health, and safety requirements are often significant and time-consuming and may delay commencement or continuation of exploration or production. New or revised legislation or administrative regulations (or a change in judicial or administrative interpretation, application or enforcement of existing laws and regulations), including proposals related to the protection of the environment or employee health and safety, that would further regulate and tax the coal industry or users of coal, may also require the Debtors or their customers to change operations significantly or incur increased costs, which may materially adversely affect the Debtors' mining operations and their cost structure. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal fines or penalties, the acceleration of cleanup and site restoration costs, the issuance of injunctions to limit or cease operations, and the suspension or revocation of permits and other enforcement measures that could have the effect of limiting production from the Debtors' operations.

Additionally, the Mine Safety and Health Administration (the "MSHA") may order the temporary closure of mines in the event of a perceived imminent danger to miners' safety or health or for certain violations of safety rules. The Debtors' customers may challenge the Debtors' issuance of force majeure notices in connection with such closures. If these challenges are successful, the Debtors could be obligated to make up lost shipments, to reimburse customers for the additional costs to purchase replacement coal, or, in some cases, to terminate certain sales contracts. Existing and future environmental, health, and safety regulations, and the enforcement thereof, could have a material adverse effect on the Debtors' financial condition, results of operations, and cash flows.

E.      **Miscellaneous Risk Factors and Disclaimers.**

1.      **The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2.      **No Legal or Tax Advice Is Provided By This Disclosure Statement.**

This Disclosure Statement is not legal advice to any person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult its own legal counsel

and accountant with regard to any legal, tax, and other matters concerning its Claim. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

### 3.        No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

### 4.        Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

### 5.        Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

### 6.        No Representations Outside This Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure voting Holders' acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by voting Holders in arriving at their decision. Voting Holders should promptly report unauthorized representations or inducements to counsel to the Debtors and the Office of the United States Trustee for the District of Delaware.

## IX.        Important Securities Laws Disclosures

### A.        Plan Consideration.

The Plan provides for the Reorganized Debtors to distribute (1) $225 million of the New First Lien Loan to Holders of Allowed Class 3 First Lien Term Loan Claims; (2) $150 million of the New First Lien Loan to Holders of Allowed DIP Term Claims (on the terms and conditions set forth in the DIP Term Agreement); (3) 71% of the New Common Stock in Reorganized Blackhawk to Holders of Allowed Class 3 First Lien Term Loan Claims; and (4) 29% of the New Common Stock in Reorganized Blackhawk to Holders of Allowed Class 4 Second Lien Term Loan Claims. The Debtors believe that shares of New Common Stock may constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and all applicable state Blue Sky Laws.

### B.        Exemption from Registration Requirements; Issuance and Resale of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code.

#### 1.        Exemption from Registration Requirements; Issuance and Resale of New Common Stock.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for

cash and property. In reliance upon these exemptions, the offer, issuance and distribution of the New Common Stock in respect of Claims as contemplated by the Plan will not be registered under the Securities Act or any applicable state Blue Sky Laws.

The Debtors believe that the issuance of the New Common Stock in respect of Claims as contemplated by the Plan is covered by section 1145 of the Bankruptcy Code. Accordingly, the Debtors believe that such New Common Stock may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed in Section IX.B.2 below) with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, or an affiliate of the Reorganized Debtors (or has been such an "affiliate" within 90 days of such transfer). The Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption. In addition, the New Common Stock to be issued in respect of Claims as contemplated by the Plan generally may be able to be resold without registration under applicable state Blue Sky Laws by a Holder that is not an underwriter or an affiliate of the Reorganized Debtors pursuant to various exemptions provided by the respective Blue Sky Laws of those states. However, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.

Recipients of the New Common Stock to be issued in respect of Claims as contemplated by the Plan are advised to consult with their own legal advisors as to the availability and applicability of section 1145 of the Bankruptcy Code to such New Common Stock and any other potential exemption from registration under the Securities Act or applicable state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock to be issued in respect of Claims as contemplated by the Plan is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. For the avoidance of doubt, all of the New Common Stock shall be subject to the terms of the Shareholders Agreement.

The Debtors do not have any contract, arrangement, or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent, or any other person for soliciting votes to accept or reject the Plan. The Debtors have received assurances that no person will provide any information to Holders of First Lien Term Loan Claims or Second Lien Term Loan Claims relating to the solicitation of votes on the Plan other than to refer such Holders to the information contained in this Disclosure Statement. In addition, no broker, dealer, salesperson, agent, or any other person, is engaged or authorized to express any statement, opinion, recommendation, or judgment with respect to the relative merits and risks of the Plan. Thus, no person will receive any commission or other remuneration, directly or indirectly, for soliciting votes to accept or reject the Plan or in connection with the offer of any Securities that may be the deemed to occur in connection with voting on the Plan.

### 2. Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code; Implications for Resale of New Common Stock.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions of an entity that is not an issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer," for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter"

contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code may suggest that a creditor who owns 10% or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the New Common Stock to be issued in respect of Claims as contemplated by the Plan would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock to be issued in respect of Claims as contemplated by the Plan and, in turn, whether any Person may freely resell such New Common Stock. The Debtors recommend that potential recipients of the New Common Stock to be issued in respect of Claims as contemplated by the Plan consult their own counsel concerning their ability to freely trade such securities without registration under the federal and applicable state Blue Sky Laws.

Under certain circumstances, Holders of the New Common Stock to be issued in respect of Claims as contemplated by the Plan who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

## X.    Certain U.S. Federal Tax Consequences of the Plan

**A.    Introduction.**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the IRC, the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims or Interests in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax exempt organizations, small business investment companies, foreign taxpayers, Persons who are related to the Debtors

within the meaning of the IRC, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, the New Common Stock, or the New First Lien Loan, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the IRC). This discussion does not address special considerations that may apply to persons who are both Holders of Claims and Interests Holders. This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder or a partnership.

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors, the Reorganized Debtors, and Equityholders of Blackhawk.**

**1.      Characterization of the Restructuring Transactions.**

Blackhawk is treated as a partnership for U.S. federal income tax purposes. Accordingly, the U.S. federal income tax consequences of the Restructuring Transactions will generally be borne by Blackhawk's equityholders rather than Blackhawk and the other Debtors.[13]  Among other things, the cancellation of Claims against Blackhawk should give rise to cancellation of debt income ("COD Income"), which COD Income generally should be allocated to Blackhawk's equityholders.

The Debtors have not yet determined how the Restructuring Transactions will be structured. There are currently two anticipated alternatives, and the Plan contemplates that either alternative may be used. First, the Restructuring Transactions may comprise a recapitalization of Blackhawk, in which case Blackhawk, or any successor or assign thereto (treated either as a corporation or partnership for U.S. federal income tax purposes) ("Recapitalized Blackhawk"), will issue the New Common Stock (the "Recapitalization Structure").

---

[13]      Certain of Blackhawk's direct or indirect subsidiaries are entities taxable as corporations for U.S. federal income tax purposes (the "Corporate Subsidiaries"). The Claims discussed in this disclosure are not held with respect to the Corporate Subsidiaries, and, as such, this discussion does not address the tax consequences of the Restructuring Transactions as they relate to the Corporate Subsidiaries.

In the event Recapitalized Blackhawk will be treated as a corporation, this discussion assumes that the conversion of Blackhawk to a corporation will not occur prior to the consummation of the Plan. If, in a Recapitalization Structure, Blackhawk is converted to a corporation contemporaneously with or following the consummation of the Plan (a "Post-Consummation Conversion"), the applicable tax treatment is somewhat unclear. In general, when the debt of a partnership is cancelled, its creditors are equitized, and existing equityholders' interests are cancelled, there is some uncertainty in the U.S. federal income tax treatment. It could be that Holders of Claims are treated as contributing their claims to the existing partnership entity in a transaction governed by Section 721 of the Tax Code, potentially resulting in the allocation of certain items of taxable income, loss, gain, and deduction to equityholders whose interests are being cancelled. On the other hand, it could be the case that the existing partnership is deemed to transfer its assets to creditors in a taxable transaction, with a new partnership immediately being formed, in which case the tax consequences would generally be the same as a taxable disposition of the partnership's assets for an amount equal to their value (or, if the debt is nonrecourse debt for certain U.S. federal income tax purposes, for an amount equal to the adjusted issue price of the debt). This uncertainty is highlighted further here, because certain Holders of Claims against Blackhawk that are receiving equity of Reorganized Blackhawk are current Holders of Interests in Blackhawk. As a result, it is unclear whether, for U.S. federal income tax purposes, all equityholders would in fact be treated as having their equity interests cancelled. The Debtors are continuing to evaluate the proper tax treatment if a Recapitalization Structure is used and a Post-Consummation Conversion occurs.

Second, the Restructuring Transactions may comprise a taxable transfer of all of Blackhawk's assets to an entity (treated either as a corporation or partnership for U.S. federal income tax purposes) newly formed by a nominee of the creditors ("NewCo Blackhawk," and such structure, a "NewCo Structure"). A NewCo Structure could be accomplished in one of two ways. First, the assets of Blackhawk may be transferred to NewCo Blackhawk in exchange for all of the stock associated with NewCo Blackhawk (together with an assumption of liabilities by NewCo Blackhawk), which consideration Blackhawk would then distribute to Holders of Claims pursuant to the Plan in the form of New Common Stock. Alternatively, Holders of Claims against the Debtors could be treated as contributing such Claims to NewCo Blackhawk in a transaction intended to be treated as tax-free under section 351 of the IRC, with the assets of Blackhawk transferred to NewCo Blackhawk (or a wholly owned subsidiary of NewCo Blackhawk) in exchange for the cancellation of the Claims that were contributed to NewCo Blackhawk (together with an assumption of liabilities by NewCo Blackhawk) (a "NewCo 351 Transaction"). Regardless of how a NewCo Structure is consummated, Blackhawk's items of gain or loss in connection with such taxable disposition should be allocated to Blackhawk's equityholders. Such gain or loss, in the aggregate, should generally be equal to the difference between the aggregate fair market value of the assets transferred or deemed transferred by Blackhawk and Blackhawk's aggregate tax basis in such assets. NewCo Blackhawk should receive Blackhawk's assets with a tax basis equal to fair market value as of the Effective Date. In a NewCo Structure, in addition to any items of gain or loss, any COD Income would be allocated to Blackhawk's existing equityholders. In a NewCo 351 Transaction, if any Holders of Claims had a tax basis in their contributed Claim that was less than the value of the assets received by NewCo Blackhawk from Blackhawk in exchange for such Claim, NewCo Blackhawk would recognize taxable income, potentially without any offsetting taxable losses to offset such taxable income. As described more fully in the accompanying footnote, it may also be possible for the Restructuring Transactions to take the form of a hybrid transaction (under which NewCo Blackhawk would not recognize the gain described in the previous sentence), whereby only certain Holders with basis in their Claims in excess of the fair market value of such Claims contribute their Claims in a transaction intended to be governed by section 351 of the IRC.[14]

---

[14]    Where NewCo Blackhawk is treated as a corporation for U.S. federal income tax purposes, the Restructuring Transactions may also be structured so that, in the following order: (1) certain Holders of Claims contribute their Claims to NewCo Blackhawk in exchange for at least 80% of the stock of NewCo Blackhawk in a transaction intended to be governed by section 351 of the IRC, (2) NewCo Blackhawk contributes its remaining stock (representing less than 20% of its total stock) to a wholly owned subsidiary ("NewCo Sub"); (3) simultaneously, (i) NewCo Blackhawk purchases a percentage of Blackhawk's assets in exchange for the cancellation of the Claims against Blackhawk which NewCo Blackhawk received in step 1, with such interest proportionate to the value attributable to the cancelled Claims, and (ii) NewCo Sub purchases a percentage of Blackhawk's assets in exchange for NewCo Sub's NewCo Blackhawk stock, with such interest proportionate to the value attributable to the NewCo Blackhawk stock, in each case of prongs (i) and (ii), together with a proportionate assumption of liabilities; (4) NewCo Blackhawk contributes its interest in Blackhawk's assets to NewCo Sub, and (5) Blackhawk distributes the NewCo Blackhawk stock which it received in step 3(ii) to the Holders of Claims entitled to NewCo

2.        **Cancellation of Debt and Reduction of Tax Attributes.**

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

A taxpayer will not, however, be required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "Bankruptcy Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"); (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credits. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.

As noted above, in connection with the Restructuring Transactions, the Debtors expect to realize COD Income. The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan. Because the Plan provides that the Holders of Allowed First Lien Term Loan Claims will receive their pro rata share of the New First Lien Loan and the New Common Stock in Reorganized Blackhawk, and that Holders of Allowed Second Lien Term Loan Claims will receive their pro rata share of the New Common Stock in Reorganized Blackhawk, the amount of COD Income will depend on the issue price of the New First Lien Loan and the fair market value of the New Common Stock. These values cannot be known with certainty until after the Plan is consummated.

Under section 108(d)(6) of the IRC, when an entity that is a flow-through entity (such as Blackhawk) realizes COD Income, its partners are treated as receiving their allocable share of such COD Income and the Bankruptcy Exception (and related attribute reduction) are applied at the partner level rather than at the entity level.

**C.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 3 and 4 Claims.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

1.        **Consequences to Holders of Class 3 Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each Holder of an Allowed Class 3 First Lien Term Loan Claim will receive its Pro Rata share of (a) the New Common Stock in Reorganized Blackhawk (i.e., Recapitalized Blackhawk in the case of the Recapitalization Structure and NewCo Blackhawk in the case of the NewCo Structure), and (b) the New First Lien Loan.

---

Blackhawk stock who did not contribute their Claims to NewCo Blackhawk in step 1 (such transaction, a "Hybrid NewCo 351 Transaction"). Assuming that the form of the Hybrid NewCo 351 Transaction is respected for U.S. federal income tax purposes, then it is expected for purposes of this discussion that Holders of Claims who contribute their Claims to NewCo Blackhawk pursuant to Step 1 of the Hybrid NewCo 351 Transaction would realize the same U.S. federal income tax consequences as would participants in a NewCo 351 Transaction, and Holders of Claims who do not contribute their Claims to NewCo Blackhawk pursuant to Step 1 of the Hybrid NewCo 351 Transaction would realize the same U.S. federal income tax consequences as would participants in a NewCo Structure in which a NewCo 351 Transaction does not occur and NewCo Blackhawk is treated as a corporation for U.S. federal income tax purposes.

KE 60280931

If the Plan is implemented pursuant to a Recapitalization Structure, Reorganized Blackhawk is treated as a partnership for U.S. federal income tax purposes ("Flow-Through Reorganized Blackhawk"), and Flow-Through Reorganized Blackhawk is treated as a continuation of Blackhawk for U.S. federal income tax purposes[15], then Holders of Allowed Class 3 First Lien Term Loan Claims are expected to be treated as receiving their pro rata share of (a) New Common Stock in an exchange governed by section 721 of the IRC in which no gain or loss is realized (other than with respect to any amounts received that are attributable to accrued but untaxed interest), and (b) the New First Lien Loan in a taxable exchange under section 1001 of the IRC. The portion of the Class 3 Claim exchanged for New Common Stock and the portion of the Class 3 Claim exchanged for the New First Lien Loan will be determined in proportion to the relative fair market values of the consideration received. A U.S. Holder's tax basis in the New Common Stock received should be equal to such Holder's tax basis in the portion of its Claim exchanged therefor and a U.S. Holder's holding period in the New Common Stock received should include the period that such Holder held such Claim, other than, in each case, with respect to amounts attributable to accrued but untaxed interest. With respect to the receipt of the New First Lien Loan, other than with respect to any amounts received that are attributable to accrued but untaxed interest, each U.S. Holder should recognize gain or loss in an amount equal to the difference between (a) the issue price of the New First Lien Loan received and (b) such U.S. Holder's adjusted basis, if any, in the applicable portion of such Class 3 Claim. The character of such gain or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the rules regarding market discount and accrued but untaxed interest, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such U.S. Holder's tax basis in the New First Lien Loan received should be equal to the issue price of such New First Lien Loan, and such U.S. Holder's holding period in such consideration should begin on the day after the Effective Date.

If (a) the Plan is implemented pursuant to a NewCo Structure in which a NewCo 351 Transaction does not occur, regardless of whether Reorganized Blackhawk is treated as a corporation or partnership for U.S. federal income tax purposes, or (b) the Plan is implemented pursuant to a Recapitalization Structure and  Reorganized Blackhawk takes the form of Flow-Through Reorganized Blackhawk but Flow-Through Reorganized Blackhawk is not treated as a continuation of Blackhawk for U.S. federal income tax purposes, then Holders of Class 3 Claims are expected to be treated as receiving their distribution under the Plan in a taxable exchange under section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, each U.S. Holder should recognize gain or loss in an amount equal to the difference between (a) the fair market value of the New Common Stock received and the issue price of the New First Lien Loan received and (b) such U.S. Holder's adjusted basis, if any, in such Class 3 Claim. The character of such gain or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the rules regarding market discount and accrued but untaxed interest, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such U.S. Holder's tax basis in (a) the New Common Stock received should be equal to its fair market value, and (b) the New First Lien Loan received should be equal to the issue price of the debt. Such U.S. Holder's holding period in such consideration should begin on the day after the Effective Date.

If the Plan is implemented pursuant to a Recapitalization Structure and Reorganized Blackhawk is treated as a corporation for U.S. federal income tax purposes ("Corporate Reorganized Blackhawk"), it is generally expected that the form of the transaction will be that creditors contribute claims to a partnership in exchange for certain consideration, and then immediately thereafter that partnership converts to a corporation for U.S. federal income tax purposes. Accordingly, in the case of Corporate Reorganized Blackhawk, the treatment of Holders of Class 3 Claims will depend on whether, in the moment before Reorganized Blackhawk converts to a corporation for U.S. federal income tax purposes, Reorganized Blackhawk (at that point still a partnership for U.S. federal income tax purposes) is treated as a continuation of Blackhawk for U.S. federal income tax purposes. If Reorganized Blackhawk were so treated as a continuation of Blackhawk for U.S. federal income tax purposes, then it is generally expected that Holders of Class 3 Claims would (a) realize the same U.S. federal income tax consequences on the exchange of their claims

---

[15]    Whether Flow-Through Reorganized Blackhawk would be treated as a continuation of Blackhawk for U.S. federal income tax purposes is unclear.

(as opposed to the consequences of go-forward ownership) as if the Plan were implemented pursuant to a Recapitalization Structure, Reorganized Blackhawk took the form of Flow-Through Reorganized Blackhawk, and Flow-Through Reorganized Blackhawk were treated as a continuation of Blackhawk for U.S. federal income tax purposes, and (b) be treated as exchanging their partnership interests in Reorganized Blackhawk for corporate stock of Reorganized Blackhawk without recognizing any additional gain or loss.  If Reorganized Blackhawk were not so treated as a continuation of Blackhawk for U.S. federal income tax purposes, then it is generally expected that Holders of Class 3 Claims would (a) realize the same U.S. federal income tax consequences on the exchange of their claims (as opposed to the consequences of go-forward ownership of Reorganized Blackhawk) as described in the immediately preceding paragraph, and (b) be treated as exchanging their partnership interests in Reorganized Blackhawk for corporate stock of Reorganized Blackhawk without recognizing any additional gain or loss.

If the Plan is implemented pursuant to a NewCo Structure in which a NewCo 351 Transaction does occur, then if Holders of Allowed Class 3 First Lien Term Loan Claims are treated as contributing such Claims to NewCo Blackhawk, such contribution may be governed by section 351 of the Tax Code.  Subject to the rules regarding accrued but untaxed interest, a Holder of such Claim should recognize gain, if any, but not loss, to the extent of any "other property" (within the meaning of Section 351(b) of the IRC) received (in this case, the New First Lien Loan) with the amount of gain equal to the lesser of (a) the issue price of the New First Lien Loan received and (b) the difference between (i) the fair market value of the New Common Stock received and the issue price of the New First Lien Loan received and (ii) such Holder's adjusted basis, if any, in such Claim.  Such Holder's tax basis in the New Common Stock received, apart from amounts allocable to accrued but untaxed interest, should generally equal the Holder's tax basis in its Allowed Class 3 First Lien Term Loan Claim surrendered therefor increased by gain, if any, recognized by such Holder in the transaction, decreased by the issue price of the New First Lien Loan received. Subject to the rules regarding accrued but untaxed interest, a Holder of an Allowed Class 3 First Lien Term Loan Claim's holding period for its New Common Stock should include the holding period for the exchanged Claim.  With respect to the New First Lien Loan, the Holder's tax basis in such property should be equal to its issue price, and the Holder's holding period should begin on the day following the receipt of such property.

2.      **Consequences to Holders of Class 4 Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each Holder of an Allowed Class 4 Second Lien Term Loan Claim will receive its Pro Rata share of the New Common Stock in Reorganized Blackhawk (*i.e.*, Recapitalized Blackhawk in the case of the Recapitalization Structure and NewCo Blackhawk in the case of the NewCo Structure).

If the Plan is implemented pursuant to a Recapitalization Structure, Reorganized Blackhawk takes the form of Flow-Through Reorganized Blackhawk, and Flow-Through Reorganized Blackhawk is treated as a continuation of Blackhawk for U.S. federal income tax purposes,[16] then Holders of Allowed Class 4 Second Lien Term Loan Claims are expected to be treated as receiving their pro rata share of New Common Stock in an exchange governed by section 721 of the IRC on which no gain or loss is realized (other than with respect to any amounts received that are attributable to accrued but untaxed interest).  A U.S. Holder's tax basis in the New Common Stock received should be equal to such Holder's tax basis in its Claim exchanged therefor and a U.S. Holder's holding period in the New Common Stock received should include the period that such Holder held such Claim, other than, in each case, with respect to amounts attributable to accrued but untaxed interest.

If (a) the Plan is implemented pursuant to a NewCo Structure in which a NewCo 351 Transaction does not occur, regardless of whether Reorganized Blackhawk is treated as a corporation or partnership for U.S. federal income tax purposes, or (b) the Plan is implemented pursuant to a Recapitalization Structure and  Reorganized Blackhawk takes the form of Flow-Through Reorganized Blackhawk but Flow-Through Reorganized Blackhawk is not treated as a continuation of Blackhawk for U.S. federal income tax purposes, then Holders of Class 4 Claims are expected to be treated as receiving their distribution under the Plan in a taxable exchange under section 1001 of the IRC.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest, each U.S. Holder should recognize gain or loss in an amount equal to the difference between (a) the fair market value of the New Common Stock received and (b) such U.S. Holder's adjusted basis, if any, in such Class 4 Claim.  The character of such gain

---

[16]     As noted above, whether Flow-Through Reorganized Blackhawk would be treated as a continuation of Blackhawk for U.S. federal income tax purposes is unclear.

or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the rules regarding market discount and accrued but untaxed interest, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such U.S. Holder's tax basis in the consideration received should equal the fair market value of such property as of the date such property is distributed to the U.S. Holder, and such U.S. Holder's holding period in such consideration should begin on the day after the Effective Date.

If the Plan is implemented pursuant to a Recapitalization Structure and Reorganized Blackhawk takes the form of Corporate Reorganized Blackhawk, the treatment of Holders of Class 4 Claims will depend on whether, in the moment before Reorganized Blackhawk converts to a corporation for U.S. federal income tax purposes, Reorganized Blackhawk (at that point still a partnership for U.S. federal income tax purposes) is treated as a continuation of Blackhawk for U.S. federal income tax purposes. If Reorganized Blackhawk were so treated as a continuation of Blackhawk for U.S. federal income tax purposes, then it is generally expected that Holders of Class 4 Claims would (a) realize the same U.S. federal income tax consequences on the exchange of their claims (as opposed to the consequences of go-forward ownership) as if the Plan were implemented pursuant to a Recapitalization Structure, Reorganized Blackhawk took the form of Flow-Through Reorganized Blackhawk, and Flow-Through Reorganized Blackhawk were treated as a continuation of Blackhawk for U.S. federal income tax purposes, and (b) be treated as exchanging their partnership interests in Reorganized Blackhawk for corporate stock of Reorganized Blackhawk without recognizing any additional gain or loss. If Reorganized Blackhawk were not so treated as a continuation of Blackhawk for U.S. federal income tax purposes, then it is generally expected that Holders of Class 4 Claims would (a) realize the same U.S. federal income tax consequences on the exchange of their claims (as opposed to the consequences of go-forward ownership of Reorganized Blackhawk) as described in the immediately preceding paragraph, and (b) be treated as exchanging their partnership interests in Reorganized Blackhawk for corporate stock of Reorganized Blackhawk without recognizing any additional gain or loss.

If the Plan is implemented pursuant to a NewCo Structure in which a NewCo 351 Transaction does occur, then if Holders of Allowed Class 4 Second Lien Term Loan Claims are treated as contributing such Claims to NewCo Blackhawk, such contribution may be governed by section 351 of the Tax Code. Subject to the rules regarding accrued but untaxed interest, a Holder of such Claim should not recognize gain or loss on the exchange. Such Holder's tax basis in the New Common Stock received, apart from amounts allocable to accrued but untaxed interest, should generally equal the Holder's tax basis in its Allowed Class 4 Second Lien Term Loan Claim surrendered therefor. Subject to the rules regarding accrued but untaxed interest, a Holder of an Allowed Class 4 Second Lien Term Loan Claim's holding period for its interest in the New Common Stock received should include the holding period for the exchanged Claim.

3.      **Consequences to Holders of Interests in Blackhawk.**

Pursuant to the Plan, Class A Blackhawk Interests, Class B Blackhawk Interests, and Class C Blackhawk Interests will be cancelled without any distributions on account thereof.

As noted above, Blackhawk is taxed as a partnership for U.S. federal income tax purposes. Accordingly, taxable items of income (including cancellation of debt income resulting from the cancellation of Claims pursuant to the Plan, as well as other potential items of taxable income in respect of the Debtors' assets resulting from the consummation of the Plan) will be allocated to Holders of Interests consistent with Blackhawk's organizational documents and applicable U.S. federal income tax law. Additionally, Holders of Interests will, for U.S. federal income tax purposes, be deemed to receive a distribution in an amount equal to the Debtors' liabilities that were previously allocated to them under the applicable partnership tax rules, and such deemed distribution could result in taxable income to a Holder to the extent such distribution exceeds a Holder's tax basis in its Interest.

Holders will be able to claim a loss (which may be a capital loss subject to significant limitations) with respect to any basis remaining in their Interests in Blackhawk after the consequences of the Plan are taken into account. Additionally, to the extent losses previously allocated by Blackhawk to a Holder were "suspended" or deferred under any relevant tax rules, following the consummation of the Plan, a Holder may be able to deduct some or all of such losses (and such losses may be available as an offset for taxable income allocated to such Holders as a result of the Plan).

The U.S. federal income tax consequences of the Plan to Holders of Interests is complex, and such Holders should consult their own tax advisors regarding such consequences.

4.    **Issue Price and Original Issue Discount with Respect to the New First Lien Loan.**

As noted above, Holders of Allowed Class 3 First Lien Term Loan Claims will receive their Pro Rata share of the New First Lien Loan in partial satisfaction of their Claims. The amount of gain or loss recognized by U.S. Holders of such Claims will be determined, in part, by the issue price of a U.S. Holder's Pro Rata share of the new debt received. The determination of "issue price" for purposes of this analysis will depend, in part, on whether the new debt is traded on an established market for U.S. federal income tax purposes. The issue price of a debt instrument that is traded on an established market (or that is issued for Claims against the Debtors that are so traded) would be the fair market value of such debt instrument (or the Claims so traded, if the new debt instrument is not traded) on the Effective Date as determined by such trading. The issue price of a debt instrument that is neither so traded nor issued for Claims so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). New debt instruments (or Claims against the Debtors) may be traded on an established market for these purposes even if no trades actually occur and there are merely firm or indicative quotes with respect to such new debt or Claims.

Whether Claims against the Debtors and/or the New First Lien Loan will be traded on an established market for these purposes cannot be predicted with certainty.

Were either Claims against the Debtors and/or the New First Lien Loan treated as traded on an established market for these purposes, then, as a result, the issue price of the new debt instruments being issued would likely not equal the stated redemption price at maturity and such debt instruments could be treated as issued with OID.

Where debt instruments are treated as being issued with OID, a U.S. Holder of such debt instrument will generally be required to include any OID in income over the term of such debt instrument in accordance with a constant yield-to-maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when such U.S. Holder received cash payments of interest on such debt instrument (other than cash attributable to qualified stated interest, which is includible in income in accordance with the U.S Holder's normal method of tax accounting). Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash. Any OID that a U.S. Holder includes in income will increase the tax basis of the U.S. Holder in its interest in such debt instrument. A U.S. Holder of an interest in such new debt instruments will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such debt instruments by the amount of such payments. In general, interest (including OID) received or accrued by U.S. Holders should be treated as ordinary income.

5.    **Accrued Interest.**

To the extent that any amount received by a U.S. Holder of a Claim under the Plan is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

KE 60280931

6.      **Market Discount.**

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

7.      **U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the New First Lien Loan.**

(a)      **Payments of Qualified Stated Interest**.

Payments or accruals of "qualified stated interest" (as defined below) on the New First Lien Loan will be taxable to a U.S. Holder as ordinary income at the time that such payments are accrued or are received in accordance with such Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the New First Lien Loan, at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

(b)      **Original Issue Discount**.

A debt instrument is treated as issued with OID for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by at least a de minimis amount.

The amount of OID (if any) on the New First Lien Loan will be the difference between the "stated redemption price at maturity" (the sum of all payments to be made on the debt instrument other than "qualified stated interest") of the New First Lien Loan and the "issue price" (as discussed above) of the New First Lien Loan.  A U.S. Holder (whether a cash or accrual method taxpayer) generally will be required to include the OID in gross income (as ordinary income) as the OID accrues (on a constant yield to maturity basis), in advance of the Holder's receipt of cash payments attributable to this OID.  In general, the amount of OID includible in the gross income of a U.S. Holder will be equal to a ratable amount of OID with respect to the note for each day in an accrual period during the taxable year or portion of the taxable year on which a U.S. Holder held the note. An accrual period may be of any length and the accrual periods may vary in length over the term of the note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the final day of an accrual period or on the first day of an accrual period.  The amount of OID allocable to any accrual period is an amount equal to the excess, if any, of (i) the product of the note's adjusted issue price at the beginning of such accrual period and its yield to maturity, determined on the basis of a compounding assumption that reflects the length of the accrual period over (ii) the sum of the qualified stated interest payments on the notes allocable to the accrual period. The adjusted issue price of a note at the beginning of any accrual period generally equals the issue price of the note increased by the amount of all previously accrued OID and decreased by any cash payments previously made on the note other than payments of qualified stated interest. The rules regarding OID are complex. You should consult your own tax advisors regarding the consequences of OID, including the amount of OID that you would include in gross income for a taxable year.

68

        (c)        **Acceleration of Income Recognition for Certain U.S. Holders**.

Accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in Section 451 of the Code) generally will be required to include certain items of income such as OID no later than the time such amounts are reflected on such a financial statement. This could result in an acceleration of income recognition for income items differing from the above description. Holders should consult their tax advisors with regard to interest and OID concerning the New First Lien Loan.

        (d)        **Sale, Taxable Exchange or other Taxable Disposition**.

Upon the disposition of the New First Lien Loan by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount realized on the disposition (other than amounts attributable to accrued but unpaid interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the New First Lien Loan, as applicable. A U.S. Holder's adjusted tax basis will generally be equal to the holder's initial tax basis in the New First Lien Loan, increased by any accrued OID previously included in such holder's gross income. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such New First Lien Loan for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

        8.        **U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Common Stock of Corporate Reorganized Blackhawk.**

        (a)        **Dividends on New Common Stock of Corporate Reorganized Blackhawk**.

Any distributions made on account of the New Common Stock of Corporate Reorganized Blackhawk will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Corporate Reorganized Blackhawk as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

        (b)        **Sale, Redemption, or Repurchase of New Common Stock of Corporate Reorganized Blackhawk**.

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock of Corporate Reorganized Blackhawk. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above.

9.    **U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Common Stock of Flow-Through Reorganized Blackhawk.**

Items of income, gain, loss, and deduction of Flow-Through Reorganized Blackhawk will be allocated to U.S. Holders of the New Common Stock of Flow-Through Reorganized Blackhawk as provided in the New Organizational Documents. Each item generally will have the same character as if the U.S. Holder had realized the item directly. U.S. Holders will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from Flow-Through Reorganized Blackhawk for such taxable year, and thus may incur income tax liabilities in excess of any cash distributions from Flow-Through Reorganized Blackhawk.

A U.S. Holder is allowed to deduct its allocable share of Flow-Through Reorganized Blackhawk's losses (if any) only to the extent of such U.S. Holder's adjusted tax basis (discussed below) in the New Common Stock at the end of the taxable year in which the losses occur. In addition, various other limitations in the IRC may significantly limit a U.S. Holder's ability to deduct its allocable share of deductions and losses of Flow-Through Reorganized Blackhawk against other income.

Flow-Through Reorganized Blackhawk will provide each U.S. Holder with the necessary information to report its allocable share of Flow-Through Reorganized Blackhawk's tax items for U.S. federal income tax purposes. However, no assurance can be given that Flow-Through Reorganized Blackhawk will be able to provide such information prior to the initial due date of the U.S. Holder's U.S. federal income tax return and U.S. Holders may therefore be required to apply to the IRS for an extension of time to file their tax returns.

Flow-Through Reorganized Blackhawk will determine how items will be reported on Flow-Through Reorganized Blackhawk's U.S. federal income tax returns in accordance with the New Organizational Documents, and all U.S. Holders of New Common Stock of Flow-Through Reorganized Blackhawk will be required under the IRC to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event that Flow-Through Reorganized Blackhawk's income tax returns are audited by the IRS, the tax treatment of Flow-Through Reorganized Blackhawk's income, gain, loss, and deductions generally will be determined at the Flow-Through-Reorganized-Blackhawk level in a single proceeding, rather than in individual audits of U.S. Holders of New Common Stock. Flow-Through Reorganized Blackhawk's "partnership representative" will have considerable authority under the IRC and the New Organizational Documents to make decisions affecting the tax treatment and procedural rights of the U.S. Holders of New Common Stock.

A U.S. Holder of New Common Stock generally will not recognize gain or loss on the receipt of a distribution of cash or property from Flow-Through Reorganized Blackhawk (provided that such U.S. Holder is not treated as exchanging such U.S. Holder's share of Flow-Through Reorganized Blackhawk's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the IRC, and together, "ordinary income items") for other partnership property). A U.S. Holder, however, will recognize gain on the receipt of a distribution of cash and, in some cases, marketable securities, from Flow-Through Reorganized Blackhawk (including any constructive distribution of money resulting from a reduction of the U.S. Holder's share of Flow-Through Reorganized Blackhawk's indebtedness) to the extent such distribution or the fair market value of such marketable securities distributed exceeds such U.S. Holder's adjusted tax basis in the New Common Stock. Such distribution would be treated as gain from the sale or exchange of the New Common Stock of Flow-Through Reorganized Blackhawk, which is described below.

A U.S. Holder's adjusted tax basis in the New Common Stock generally will be equal to such U.S. Holder's initial tax basis, increased by the sum of (a) any additional capital contribution such U.S. Holder makes to Flow-Through Reorganized Blackhawk; (b) the U.S. Holder's allocable share of the income of Flow-Through Reorganized Blackhawk; and (c) increases in the U.S. Holder's allocable share of Flow-Through Reorganized Blackhawk's indebtedness, and reduced, but not below zero, by the sum of (a) the U.S. Holder's allocable share of Flow-Through Reorganized Blackhawk's losses, and (b) the amount of money or the adjusted tax basis of property distributed to such U.S. Holder, including constructive distributions of cash resulting from reductions in such U.S. Holder's allocable share of Flow-Through Reorganized Blackhawk's indebtedness.

A sale of all or part of the New Common Stock of Flow-Through Reorganized Blackhawk will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such U.S. Holder's adjusted tax basis for the New Common Stock

70

disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the New Common Stock has been held for more than one year, except to the extent (a) that the proceeds of the sale are attributable to a U.S. Holder's allocable share of certain of Flow-Through Reorganized Blackhawk's ordinary income items and such proceeds exceed the U.S. Holder's adjusted tax basis attributable to such ordinary income items and (b) of previously allowed bad debt or ordinary loss deductions. A U.S. Holder's ability to deduct any loss recognized on the sale of the New Common Stock will depend on the U.S. Holder's own circumstances and may be restricted under the IRC.

### 10.    Limitations on Use of Capital Losses.

A U.S. Holder of an Allowed Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 11.    Medicare Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of stock.

### D.    Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock and the New First Lien Loan.

### 1.    Gain Recognition.

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to

30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

> **2.      U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest and of Owning and Disposing of New First Lien Loan.**
>
> > **(a)      Payments of Interest (Including Interest Attributable to Accrued, Untaxed Interest).**

Subject to the discussion of backup withholding and FATCA below, interest income (which, for purposes of this discussion of Non-U.S. Holders, includes OID and accrued but untaxed interest, including in each case any such amounts paid to a Non-U.S. Holder under the Plan) of a Non-U.S. Holder that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

- the Non-U.S. Holder does not own, actually or constructively, a 10% or greater interest in Reorganized Blackhawk (or, in the case of interest received pursuant to the Plan, Blackhawk) within the meaning of Section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to Reorganized Blackhawk (or, in the case of interest received pursuant to the Plan, Blackhawk), actually or constructively through the ownership rules under Section 864(d)(4) of the IRC;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives Reorganized Blackhawk (or, as applicable, Blackhawk) or Reorganized Blackhawk's (or, as applicable, Blackhawk's) paying agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest on the New First Lien Loan paid to a Non-U.S. Holder or interest paid to a Non-U.S. Holder pursuant to the Plan that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30% rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

If interest on the New First Lien Loan or interest paid to a Non-U.S. Holder pursuant to the Plan is effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder ("ECI"), the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30% withholding tax described above will not apply, provided the appropriate statement is provided to the Reorganized Blackhawk (or, with respect to interest received pursuant to the Plan, Blackhawk) or Reorganized Blackhawk's (or, as applicable, Blackhawk's) paying agent) unless an applicable income tax treaty provides otherwise.  To claim an exemption from withholding, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  If a Non-U.S. Holder is eligible for the benefits of any income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the treaty if the Non-U.S. Holder claims the benefit of the treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30% rate, or, if applicable, a lower treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically.  Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax

treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

(b)        **Sale, Taxable Exchange, or Other Disposition of the New First Lien Loan**.

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of the New First Lien Loan (other than any amount representing accrued but unpaid interest on the loan) unless:

- the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Holder is present in the United States for 183 or more days in the taxable year and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the holder will generally be taxed on the net gain derived from the disposition of the New First Lien Loan under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above.  To claim an exemption from withholding, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  If an individual Non-U.S. Holder falls under the second of these exceptions, the holder generally will be subject to U.S. federal income tax at a rate of 30% (unless a lower applicable treaty rate applies) on the amount by which the gain derived from the disposition exceeds such Holder's capital losses allocable to sources within the United States for the taxable year of the sale.

3.        **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock.**

(a)        **Dividends on New Common Stock of Corporate Reorganized Blackhawk**.

Any distributions made with respect to New Common Stock of Corporate Reorganized Blackhawk will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Corporate Reorganized Blackhawk, as determined under U.S. federal income tax principles.  Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

(b)        **Sale, Redemption, or Repurchase of New Common Stock of Corporate Reorganized Blackhawk**.

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock of Corporate Reorganized Blackhawk unless: (i) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the

73

United States; (ii) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (iii) the issuer of such New Common Stock is or has been during a specified testing period a "U.S. real property holding corporation" (a "USRPHC") under the FIRPTA rules (as defined and discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty). The FIRPTA rules are discussed in greater detail below.

(c)        **Ownership of New Common Stock of Flow-Through Reorganized Blackhawk**.

Non-U.S. Holders treated as engaged in a U.S. trade or business are subject to U.S. federal income tax at the graduated rates applicable to U.S. persons on their net income that is considered to be effectively connected with such U.S. trade or business ("ECI"). Non-U.S. Holders that are corporations may also be subject to a 30% branch profits tax on ECI. The 30% rate applicable to branch profits may be reduced or eliminated under the provisions of an applicable income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is organized.

It is expected that Flow-Through Reorganized Blackhawk's method of operation will result in a determination that Flow-Through Reorganized Blackhawk is engaged in a U.S. trade or business with the result that some portion of Flow-Through Reorganized Blackhawk's income is properly treated as ECI with respect to Non-U.S. Holders. If a Non-U.S. Holder were treated as being engaged in a U.S. trade or business in any year because of an investment in New Common Stock of Flow-Through Reorganized Blackhawk in such year, (i) the Non-U.S. Holder's share of Flow-Through Reorganized Blackhawk's ECI will be subject to tax at regular U.S. federal income tax rates and, if the Non-U.S. Holder is a corporation for U.S. federal income tax purposes, may also be subject to U.S. branch profits tax, (ii) the gain on a disposition of the Non-U.S. Holder's interest in Flow-Through Reorganized Blackhawk would be treated as ECI to the extent such gain is attributable to assets of Flow-Through Reorganized Blackhawk that generate ECI (and the acquiror in such disposition would be required to withhold 10% of the amount realized by such Non-U.S. Holder on such disposition), (iii) the Non-U.S. Holder generally would be required to file a U.S. federal income tax return (even if no income allocated to the Non-U.S. Holder is ECI), and (iv) Flow-Through Reorganized Blackhawk would be required to withhold U.S. federal income tax with respect to the Non-U.S. Holder's share of Flow-Through Reorganized Blackhawk's income that is ECI. Furthermore, all or a portion of a Non-U.S. Holder's New Common Stock of Flow-Through Reorganized Blackhawk may be attributable to U.S. real property, in which case gain on sale or exchange of such New Common Stock could be treated for U.S federal income tax purposes as effectively connected income under the FIRPTA rules described below, even if Flow-Through Reorganized Blackhawk were not otherwise treated as engaged in a U.S. trade or business, in which case such gains would be subject to U.S. federal income tax at regular rates applicable to U.S. persons and FIRPTA withholding (at a rate of 15%, as described below) by the transferee may apply to the total amount realized.

Non-U.S. Holders may have to supply certain beneficial ownership statements to Flow-Through Reorganized Blackhawk (which would be available to the IRS) to obtain reductions in U.S. federal withholding tax on interest and to obtain benefits under U.S. income tax treaties, to the extent applicable.

In general, different rules from those described above apply in the case of Non-U.S. Holder subject to special treatment under U.S. federal income tax law, including a Non-U.S. Holder (i) who has an office or fixed place of business in the United States or is otherwise carrying on a U.S. trade or business; (ii) who is an individual present in the United States for 183 or more days or has a "tax home" in the United States for U.S. federal income tax purposes; or (iii) who is a former citizen or resident of the United States.

Non-U.S. Holders are urged to consult their tax advisors with regard to the U.S. federal income tax consequences to them of acquiring, holding and disposing of the New Common Stock, as well as the effects of state, local and non-U.S. tax laws, as well as eligibility for any reduced withholding benefits.

4.    FIRPTA

Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), gain on the disposition of certain investments in U.S. real property is subject to U.S. federal income tax in the hands of Non-U.S. Holders and treated as ECI that is subject to U.S. federal net income tax even if a Non-U.S. Holder is not otherwise engaged in a U.S. trade or business.  Different rules apply with respect to the New Common Stock of Flow-Through Reorganized Blackhawk, on the one hand, and the New Common Stock of Corporate Reorganized Blackhawk, on the other hand.

With respect to New Common Stock of Corporate Reorganized Blackhawk, rules with respect to U.S. real property holding corporations ("USRPHCs") may apply. In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50% of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held such interest. Although the Debtors have not performed an analysis to definitively determine whether Corporate Reorganized Blackhawk will constitute a USRPHC, companies that are engaged in the Debtors' line of business typically, if not always, constitute USRPHCs and, as such, it is highly likely that Corporate Reorganized Blackhawk would be a USRPHC. Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute ECI.  Further, the buyer of the New Common Stock of Corporate Reorganized Blackhawk may be required to withhold a tax equal to 15% of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS. However, in the event the New Common Stock of Corporate Reorganized Blackhawk are "regularly traded on an established securities market" within the meaning of FIRPTA, the withholding obligation described above would not apply, even if a Non-U.S. Holder is subject to the substantive FIRPTA tax.

Under the FIRPTA rules, if the stock of a USRPHC is regularly traded on an established securities market, a person that holds 5% or less of such stock will not be subject to substantive FIRPTA taxation or FIRPTA withholding upon a disposition of its shares, and FIRPTA withholding upon dispositions will generally be inapplicable other than in the case of certain distributions and redemptions by the issuer.  Whether and when the New Common Stock of Corporate Reorganized Blackhawk will be considered regularly traded on an established securities market will depend, in part, on whether a market develops in such equity, and cannot currently be determined.

The FIRPTA provisions will also not apply if, at the time of a disposition, the corporation does not directly or indirectly hold any United States real property interests ("USRPIs") and it had directly or indirectly disposed of all of the USRPIs it directly or indirectly owned in one or more fully taxable transactions.

In the case of Flow-Through Reorganized Blackhawk, the Debtors anticipate that at least a substantial amount of the assets of Flow-Through Reorganized Blackhawk and its subsidiaries will constitute USRPIs.  An interest in a partnership is treated as a USRPI if 50% or more of the value of gross partnership assets consists of USRPIs and 90% or more of the value of the gross partnership assets consists of USRPIs plus cash and cash equivalents (the "50/90 Test").  It is unclear whether New Common Stock of Flow-Through Reorganized Blackhawk will qualify as a USRPI pursuant to the 50/90 Test.  Even if New Common Stock of Flow-Through Reorganized Blackhawk did not qualify as a USRPI pursuant to the 50/90 Test, however, as described above, a Non-U.S. Holder's gain with respect to a sale of equity in an entity taxed as a partnership that is engaged in a U.S. trade or business will be treated as ECI to the extent it relates to the underlying U.S. trade or business.

As such, regardless of whether New Common Stock of Flow-Through Reorganized Blackhawk qualifies as a USRPI pursuant to the 50/90 Test,  a disposition of assets by Flow-Through Reorganized Blackhawk and its subsidiaries generally will subject a Non-U.S. Holder of Flow-Through Reorganized Blackhawk to taxation as if the ECI rules discussed above applied (even if Flow-Through Reorganized Blackhawk and its subsidiaries were not otherwise determined to be engaged in a U.S. trade or business), either because (a) such assets are USRPIs (in which

75

event a Non-U.S. Holder would be subject to FIRPTA taxation on its distributive share of the partnership gain as if such Holder had realized such gain directly from the disposition of the USRPI), or (b) because such assets are attributable to a U.S. trade or business (as described above), and in each case certain withholding requirements would also apply, as described above. Additionally, if New Common Stock of Flow-Through Reorganized Blackhawk did not qualify as a USRPI pursuant to the 50/90 Test, then, nevertheless, the disposition of interests in Flow-Through Reorganized Blackhawk would be treated as a disposition of a proportionate share of any USRPIs owned by Flow-Through Reorganized Blackhawk for purposes of substantive FIRPTA taxation as well as certain withholding requirements, and any such gain would be subject to U.S. income tax under the ECI rule noted above. Finally, if New Common Stock of Flow-Through Reorganized Blackhawk qualifies as a USRPI pursuant to the 50/90 Test, then substantive FIRPTA taxation and FIRPTA withholding requirements (at 15% of the amount realized) would apply to the entire amount realized.

5.    FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

6.    Information Reporting and Back-Up Withholding.

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

KE 60280931

## XI.    Recommendation of the Debtors

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

Blackhawk Mining LLC,
on behalf of itself and each of the other Debtors

By:  */s/ Jesse Parrish*

Name:  Jesse Parrish
Title:  Chief Financial Officer

Prepared By:

Christopher M. Samis (DE 4909)
L. Katherine Good (DE 5101)
**POTTER ANDERSON CORROON LLP**
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, Delaware 19801-6108
Telephone:        (302) 984-6000
Facsimile:        (302) 658-1192
Email:              csamis@potteranderson.com
                       kgood@potteranderson.com

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
Joseph M. Graham (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:
                       james.sprayregen@kirkland.com
                       ross.kwasteniet@kirkland.com
                       joe.graham@kirkland.com

- and -

Stephen E. Hessler, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:              stephen.hessler@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

KE 60280931

**Exhibit A**

**Plan of Reorganization**

KE 60280931

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BLACKHAWK MINING LLC, *et al.*,[1] | ) Case No. 19-_____ (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

### DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

---

THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126.  THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.

---

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
Joseph M. Graham (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

-and-

Stephen E. Hessler, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Christopher M. Samis (DE 4909)
L. Katherine Good (DE 5101)
**POTTER ANDERSON CORROON LLP**
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, Delaware 19801-6108
Telephone:      (302) 984-6000
Facsimile:      (302) 658-1192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  July 15, 2019

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  Blackhawk Mining LLC (5600); Blackhawk Coal Sales, LLC (9456); Blackhawk Land and Resources, LLC (7839); Blackhawk River Logistics, LLC (3388); Blue Creek Mining, LLC (2427); Blue Diamond Mining, LLC (3488); Eagle Shield, LLC (6721); FCDC Coal, Inc. (6188); Guyandotte Mining, LLC (4882); Hampden Coal, LLC (8241); Kanawha Eagle Mining, LLC (0586); Logan & Kanawha, LLC (3178); Panther Creek Mining, LLC (0627); Pine Branch Land, LLC (9661); Pine Branch Mining, LLC (9681); Pine Branch Resources, LLC (9758); Redhawk Mining, LLC (0852); Rockwell Mining, LLC (3874); Spruce Pine Land Company (2254); Spurlock Mining, LLC (2899); Triad Mining, LLC (7713); and Triad Trucking, LLC (6112).  The location of the Debtors' service address in these chapter 11 cases is 3228 Summit Square Place, Suite 180, Lexington, Kentucky 40509.

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................................1

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW, AND OTHER REFERENCES**................................................................1
    A.        *Defined Terms* ....................................................................................................1
    B.        *Rules of Interpretation* ......................................................................................12
    C.        *Computation of Time* .........................................................................................13
    D.        *Governing Law* ..................................................................................................13
    E.        *Reference to Monetary Figures* .........................................................................13
    F.        *Reference to the Debtors or the Reorganized Debtors* ......................................13
    G.        *Controlling Document* .......................................................................................13

**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS** ................................................13
    A.        *DIP Claims*........................................................................................................13
    B.        *Administrative Claims* .......................................................................................14
    C.        *Professional Fee Claims* ....................................................................................15
    D.        *Priority Tax Claims* ...........................................................................................16

**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**..........16
    A.        *Classification of Claims and Interests* ...............................................................16
    B.        *Treatment of Classes of Claims and Interests* ...................................................17
    C.        *Special Provision Governing Unimpaired Claims* .............................................21
    D.        *Elimination of Vacant Classes* ..........................................................................21
    E.        *Voting Classes; Presumed Acceptance by Non-Voting Classes* .........................21
    F.        *Subordinated Claims* .........................................................................................22
    G.        *Intercompany Interests* ......................................................................................22
    H.        *Controversy Concerning Impairment*.................................................................22
    I.         *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*...................22

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** .......................................22
    A.        *General Settlement of Claims and Interests* .......................................................22
    B.        *Restructuring Transactions* ...............................................................................22
    C.        *Sources of Consideration for Plan Distributions* ..............................................23
    D.        *Shareholders Agreement* ....................................................................................25
    E.        *Potter Settlement* ...............................................................................................25
    F.        *Vendor Agreements* ............................................................................................25
    G.        *Exemption from Registration Requirements* .......................................................25
    H.        *Corporate Existence* ..........................................................................................26
    I.         *Corporate Action* ..............................................................................................26
    J.         *Vesting of Assets in the Reorganized Debtors* ....................................................26
    K.        *Cancellation of Notes, Instruments, Certificates, and Other Documents* ...........26
    L.        *Effectuating Documents; Further Transactions* .................................................27
    M.       *Exemptions from Certain Taxes and Fees* ..........................................................27
    N.        *New Organizational Documents* ........................................................................28
    O.        *Directors and Officers* .......................................................................................28
    P.        *Management Incentive Plan*................................................................................29
    Q.        *Preservation of Causes of Action* ......................................................................29

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .....................29
    A.        *Assumption of Executory Contracts and Unexpired Leases*................................29
    B.        *Claims Based on Rejection of Executory Contracts or Unexpired Leases*...................30
    C.        *Cure of Defaults and Objections to Cure and Assumption* ................................30

|   |   |   |   |
|---|---|---|---|
| *D.* | *Insurance Policies and Surety Bonds* | ........................................................... | 31 |
| *E.* | *Indemnification Provisions* | ................................................................. | 31 |
| *F.* | *Director, Officer, Manager, and Employee Liability Insurance* | ......................... | 32 |
| *G.* | *Employee and Retiree Benefits.* | ............................................................ | 32 |
| *H.* | *Modifications, Amendments, Supplements, Restatements, or Other Agreements* | ...... | 32 |
| *I.* | *Reservation of Rights* | ........................................................................ | 33 |
| *J.* | *Nonoccurrence of Effective Date.* | .......................................................... | 33 |
| *K.* | *Contracts and Leases Entered Into After the Petition Date* | ............................. | 33 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ...........................................**33**

|   |   |   |   |
|---|---|---|---|
| *A.* | *Timing and Calculation of Amounts to Be Distributed* | ................................. | 33 |
| *B.* | *Distributions on Account of Obligations of Multiple Debtors* | .......................... | 33 |
| *C.* | *Distribution Agent* | ............................................................................ | 34 |
| *D.* | *Rights and Powers of Distribution Agent* | ............................................... | 34 |
| *E.* | *Delivery of Distributions* | .................................................................... | 34 |
| *F.* | *Manner of Payment* | .......................................................................... | 35 |
| *G.* | *Compliance Matters* | .......................................................................... | 35 |
| *H.* | *No Postpetition or Default Interest on Claims* | .......................................... | 35 |
| *I.* | *Allocation Between Principal and Accrued Interest* | ..................................... | 35 |
| *J.* | *Setoffs and Recoupment* | ..................................................................... | 35 |
| *K.* | *Claims Paid or Payable by Third Parties* | ................................................ | 36 |

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS**.....................**36**

|   |   |   |   |
|---|---|---|---|
| *A.* | *Disputed Claims Process* | ..................................................................... | 36 |
| *B.* | *Claims Administration Responsibilities.* | ................................................. | 37 |
| *C.* | *Estimation of Claims and Interests* | ....................................................... | 37 |
| *D.* | *Adjustment to Claims Without Objection* | ................................................ | 37 |
| *E.* | *No Distributions Pending Allowance* | ..................................................... | 37 |
| *F.* | *Distributions After Allowance* | ............................................................. | 38 |
| *G.* | *No Interest* | ..................................................................................... | 38 |

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ....................**38**

|   |   |   |   |
|---|---|---|---|
| *A.* | *Compromise and Settlement of Claims, Interests, and Controversies* | ................. | 38 |
| *B.* | *Discharge of Claims* | ......................................................................... | 38 |
| *C.* | *Release of Liens* | .............................................................................. | 39 |
| *D.* | *Debtor Release* | ................................................................................ | 39 |
| *E.* | *Third-Party Release* | ......................................................................... | 39 |
| *F.* | *Exculpation* | ................................................................................... | 40 |
| *G.* | *Injunction* | ..................................................................................... | 41 |
| *H.* | *Protection Against Discriminatory Treatment* | .......................................... | 41 |
| *I.* | *Recoupment* | ................................................................................... | 41 |
| *J.* | *Reimbursement or Contribution* | ........................................................... | 41 |
| *K.* | *Term of Injunctions or Stays* | ............................................................... | 42 |
| *L.* | *Document Retention* | .......................................................................... | 42 |

**ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**....................................**42**

|   |   |   |   |
|---|---|---|---|
| *A.* | *Conditions Precedent to the Effective Date.* | ............................................ | 42 |
| *B.* | *Waiver of Conditions Precedent* | ........................................................... | 43 |
| *C.* | *Substantial Consummation* | ................................................................. | 43 |
| *D.* | *Effect of Non-Occurrence of Conditions to Consummation* | ............................ | 43 |

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**...........................**43**

|   |   |   |   |
|---|---|---|---|
| *A.* | *Modification of Plan* | ......................................................................... | 43 |
| *B.* | *Effect of Confirmation on Modifications* | ................................................ | 43 |
| *C.* | *Revocation or Withdrawal of Plan* | ........................................................ | 43 |

**ARTICLE XI. RETENTION OF JURISDICTION** ...................................................................................**44**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ..............................................................................**45**
    A.     *Immediate Binding Effect* ..................................................................................45
    B.     *Additional Documents* .....................................................................................45
    C.     *Statutory Fees* ..................................................................................................46
    D.     *Payment of Certain Fees and Expenses* ...........................................................46
    E.     *Reservation of Rights* ......................................................................................46
    F.     *Successors and Assigns* ....................................................................................46
    G.     *Service of Documents* .......................................................................................46
    H.     *Entire Agreement* .............................................................................................49
    I.     *Plan Supplement Exhibits* ...............................................................................49
    J.     *Non-Severability* ..............................................................................................49
    K.     *Votes Solicited in Good Faith* ..........................................................................49
    L.     *Waiver or Estoppel* ..........................................................................................49
    M.     *Closing of Chapter 11 Cases* ...........................................................................49

KE 60280927

## INTRODUCTION

Blackhawk Mining LLC and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY, PARTICULARLY HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

A.      *Defined Terms*

1.      "*Ad Hoc Group of First Lien Lenders*" means the group of certain Holders of First Lien Term Loan Claims represented by Shearman & Sterling LLP.

2.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; and (b) Allowed Professional Fee Claims.

3.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity was a debtor in a case under the Bankruptcy Code.

4.      "*Allowed*" means with respect to any Claim or Interest, except as otherwise provided in the Plan: (a) a Claim that either (i) is not Disputed or (ii) has been allowed by a Final Order; (b) a Claim that is allowed, compromised, settled, or otherwise resolved (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court by a Final Order, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; (c) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order; or (d) a Claim or Interest as to which a Proof of Claim or Proof of Interest, as applicable, has been timely filed and as to which no objection has been filed.

5.      "*Assumed Executory Contracts and Unexpired Leases*" means those Executory Contracts and Unexpired Leases to be assumed by the applicable Reorganized Debtors, as set forth on the Assumed Executory Contract and Unexpired Lease List.

6.      "*Assumed Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases (with proposed cure amounts) that will be assumed by the Reorganized Debtors, which list shall be included in the Plan Supplement.

7.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

8. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

9. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

10. "*Blackhawk*" means Blackhawk Mining LLC, a Kentucky limited liability company.

11. "*Blackhawk Operating Agreement*" means that certain Fifth Amended and Restated Operating Agreement of Blackhawk, dated as of December 15, 2017, as amended, modified, or supplemented from time to time in accordance with its terms.

12. "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

13. "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

14. "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

15. "*CEO Director*" means the Chief Executive Officer of Reorganized Blackhawk.

16. "*Chapter 11 Cases*" means the procedurally consolidated cases filed or to be filed (as applicable) for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

17. "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors, whether or not assessed or Allowed.

18. "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Solicitation Agent.

19. "*Class*" means a category of Holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

20. "*Class A Blackhawk Interests*" means the Class A Units in Blackhawk, as defined in the Blackhawk Operating Agreement.

21. "*Class B Blackhawk Interests*" means the Class B Units in Blackhawk, as defined in the Blackhawk Operating Agreement.

22. "*Class C Blackhawk Interests*" means the Class C Units in Blackhawk, as defined in the Blackhawk Operating Agreement.

2

23.    "*Confirmation*" means entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

24.    "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

25.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and section 1128 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan.

26.    "*Confirmation Objection Deadline*" means the date that is at least five (5) Business Days prior to the date first set by the Bankruptcy Court for the Confirmation Hearing.

27.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and approving the Disclosure Statement.

28.    "*Consenting Parties*" means, collectively, the Consenting First Lien Term Loan Lenders, the Consenting Second Lien Term Loan Lenders, and the Potter Group Entities.

29.    "*Consenting First Lien Term Loan Lenders*" means, collectively, the Consenting First Lien Lenders as defined in the RSA.

30.    "*Consenting Second Lien Term Loan Lenders*" means, collectively, the Consenting Second Lien Lenders as defined in RSA.

31.    "*Consummation*" means the occurrence of the Effective Date.

32.    "*Contingent DIP ABL Obligations*" means all of the Debtors' obligations under the DIP ABL Agreement and the DIP Order that are contingent and/or unliquidated as of the Effective Date, other than DIP ABL Claims that are paid in Full in Cash as of the Effective Date and contingent indemnification obligations as to which a claim has been asserted as of the Effective Date.

33.    "*Contingent DIP Term Obligations*" means all of the Debtors' obligations under the DIP Term Agreement and the DIP Order that are contingent and/or unliquidated as of the Effective Date, other than DIP Term Claims that are paid in Full in Cash as of the Effective Date and contingent indemnification obligations as to which a Claim has been asserted as of the Effective Date.

34.    "*Contingent First Lien Term Loan Obligations*" means all of the Debtors' obligations under the First Lien Term Loan Agreement that are contingent and/or unliquidated as of the Effective Date, other than First Lien Term Loan Claims that are paid in Full in Cash as of the Effective Date and contingent indemnification obligations as to which a Claim has been asserted as of the Effective Date.

35.    "*Contingent Prepetition ABL Obligations*" means all of the Debtors' obligations under the Prepetition ABL Credit Agreement that are contingent and/or unliquidated as of the Effective Date, other than the Obligations (defined thereunder) that are paid in Full in Cash pursuant to the ABL Discharge (as defined in the DIP Order) and contingent indemnification obligations as to which a Claim has been asserted as of the Effective Date.

36.    "*Contingent Second Lien Term Loan Obligations*" means all of the Debtors' obligations under the Second Lien Term Loan Agreement that are contingent and/or unliquidated as of the Effective Date, other than Second Lien Term Loan Claims that are paid in Full in Cash as of the Effective Date and contingent indemnification obligations as to which a Claim has been asserted as of the Effective Date.

37.    "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under

3

section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

38.    "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") maintained by the Debtors as of the Petition Date for liabilities against any of the Debtors' current or former directors, managers, and officers.

39.    "*Debtor Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

40.    "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.D of the Plan.

41.    "*DIP ABL Agent*" means MidCap Funding IV Trust, solely in its capacity as administrative agent and collateral agent under the DIP ABL Facility, together with its respective successors and assigns solely in such capacity.

42.    "*DIP ABL Agreement*" means that certain senior secured super-priority debtor-in-possession credit agreement by and among the Debtors, as borrowers and/or guarantors, the DIP ABL Agent, and the lenders party thereto, including any and all notes, instruments, and any other document delivered pursuant thereto or entered into in connection therewith, in each case as amended, modified, or supplemented from time to time.

43.    "*DIP ABL Claim*" means any Claim arising under the DIP ABL Agreement, including all Claims for any fees and expenses of the DIP ABL Agent and the DIP ABL Lenders thereunder.

44.    "*DIP ABL Facility*" means that certain debtor-in-possession asset-based credit facility available pursuant to the terms and conditions of DIP ABL Agreement in the aggregate principal amount of up to $90 million.

45.    "*DIP ABL Lenders*" means, collectively, the banks, financial institutions, and other lenders party to the DIP ABL Agreement from time to time, each solely in their capacity as such.

46.    "*DIP Agents*" means, together, the DIP ABL Agent and the DIP Term Agent.

47.    "*DIP Claims*" means, together, the DIP ABL Claims and the DIP Term Claims.

48.    "*DIP Facilities*" means, together, the DIP ABL Facility and DIP Term Facility.

49.    "*DIP Lenders*" means, together, the DIP ABL Lenders and the DIP Term Lenders.

50.    "*DIP Order*" means, collectively, the interim and final orders entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP ABL Agreement and the DIP Term Agreement.

51.    "*DIP Term Agent*" means Cantor Fitzgerald Securities, in its capacity as administrative agent and collateral agent under the DIP Term Facility, together with its respective successors and assigns solely in such capacity.

52.    "*DIP Term Agreement*" means that certain senior secured super-priority debtor-in-possession credit agreement by and among the Debtors, as borrowers and/or guarantors, the DIP Term Agent, as administrative agent, and the lenders party thereto, any and all notes, instruments, and any other document delivered pursuant thereto or entered into in connection therewith, in each case as amended, modified, or supplemented from time to time.

53.    "*DIP Term Claim*" means any Claim arising under the DIP Term Agreement, including any Claims for fees and expenses of the DIP Term Agent and DIP Term Lenders thereunder.

4

54. "*DIP Term Facility*" means that certain debtor-in-possession financing facility, available pursuant to the terms and conditions of the DIP Term Agreement in the aggregate principal amount of up to $150 million, consisting of up to $50 million in New Money DIP Loans and up to $100 million in Roll-Up DIP Loans.

55. "*DIP Term Lenders*" means, collectively, the banks, financial institutions, and other lenders party to the DIP Term Agreement, from time to time, each solely in their capacity as such.

56. "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

57. "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest, or any portion thereof, (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code, or (b) for which a Proof of Claim or Proof of Interest or a motion for payment has been timely filed with the Bankruptcy Court, to the extent the Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order; *provided*, *however*, that in no event shall a Claim that is deemed Allowed pursuant to this Plan be a Disputed Claim.

58. "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan, *provided* that the Second Lien Term Loan Agent shall be the Distribution Agent for the Second Lien Term Loan Claims in accordance with the Second Lien Term Loan Agreement.

59. "*Distribution Record Date*" means the date for determining which Holders of Allowed Claims and Interests are eligible to receive distributions pursuant to the Plan, which date shall be the Effective Date.

60. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.

61. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

62. "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

63. "*Exculpated Party*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) any statutory committees appointed in the Chapter 11 Cases and each of their respective members; and (d) with respect to each of the foregoing in clauses (a) through (c), such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

64. "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

65. "*Exit ABL Agent*" means MidCap Funding IV Trust or its designated Affiliate, in its capacity as agent under the Exit ABL Facility Documents, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the Exit ABL Facility Documents.

66. "*Exit ABL Facility*" means a senior secured asset-based revolving credit facility in an amount up to $90 million, which shall be consistent with the Exit ABL Facility Documents.

67.    "*Exit ABL Facility Agreement*" means that certain credit and security agreement, dated as of the Effective Date, by and among the Reorganized Debtors and the Exit ABL Facility Secured Parties, and which shall be included in the Plan Supplement.

68.    "*Exit ABL Facility Documents*" means, collectively, the Exit ABL Facility Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

69.    "*Exit ABL Facility Secured Parties*" means the lenders under the Exit ABL Facility, including the banks, financial institutions, institutional investors, or other entities serving as agents, arrangers, book runners, and/or letter of credit issuers thereto, each solely in their capacity as such.

70.    "*First Lien Term Loan Agent*" means Cantor Fitzgerald Securities, and its predecessors thereto prior to the Petition Date, each solely in its capacity as administrative agent and collateral agent under the First Lien Term Loan Facility.

71.    "*First Lien Term Loan Agreement*" means that certain credit agreement, dated as of February 17, 2017, as amended, supplemented, or modified from time to time, by and among the Debtors as borrowers or guarantors, the First Lien Term Loan Lenders, and the First Lien Term Loan Agent, as administrative agent.

72.    "*First Lien Term Loan Claim*" means all Claims against any Debtor arising under, derived from, or based upon the First Lien Term Loan Agreement.

73.    "*First Lien Term Loan Facility*" means that certain prepetition first lien secured term loan credit facility provided for under the First Lien Term Loan Agreement in the original aggregate principal amount of $660,000,000 between certain of the Debtors as obligors or guarantors and the First Lien Term Loan Lenders.

74.    "*First Lien Term Loan Lenders*" means, collectively, the banks, financial institutions, and other lenders party to the First Lien Term Loan Agreement from time to time, each solely in their capacity as such.

75.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

76.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, is not subject to any pending stay and as to which the time to reasonable appeal, move for reargument, reconsideration, or rehearing, or seek certiorari has expired and no appeal, motion for reargument, reconsideration, or rehearing or petition for certiorari has been timely taken or filed, or as to which any appeal that has been taken, motion for reargument, reconsideration, or rehearing that has been granted or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

77.    "*General Unsecured Claim*" means any Claim that is not secured and is not a Contingent DIP ABL Obligation, a Contingent DIP Term Obligation, a Contingent Prepetition ABL Obligation, a Contingent First Lien Term Loan Obligation, a Contingent Second Lien Term Loan Obligation, a DIP Claim, an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a First Lien Term Loan Claim, a Second Lien Term Loan Claim, a Debtor Intercompany Claim, a Non-Debtor Intercompany Claim, or a Section 510(b) Claim.

78.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

79.    "*Holder*" means an Entity holding a Claim or an Interest, or, if applicable, an Entity receiving or retaining Interests in Blackhawk, the New First Lien Loan, or the New Common Stock, as applicable.

6

80.    "*Impaired*" means, with respect to any Class of Claims or Interests, a Claim or an Interest that is not Unimpaired.

81.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in place immediately prior to the Effective Date whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, or contracts for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents and such current and former directors, officers, and managers' respective Affiliates.

82.    "*Intercompany Interest*" means an Interest held by a Debtor or an Affiliate of a Debtor.

83.    "*Interest*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

84.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

85.    "*Knighthead*" means Knighthead Capital Management, LLC, a Delaware limited liability company.

86.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

87.    "*Management Incentive Plan*" means the management incentive plan to be implemented with respect to Reorganized Blackhawk (and/or its subsidiaries) after the Effective Date, which plan shall reserve the Management Incentive Plan Equity for distributions to its participants on the terms and conditions to be determined by the Reorganized Blackhawk Board.

88.    "*Management Incentive Plan Equity*" means synthetic equity interests to be issued pursuant to the Management Incentive Plan, which shall economically represent up to 6 percent of the value of the New Common Stock in Reorganized Blackhawk as of the Effective Date, on a fully diluted basis.

89.    "*New Common Stock*" means the common stock, limited liability company membership units, or functional equivalent thereof of Reorganized Blackhawk to be issued on the Effective Date.

90.    "*New First Lien Loan*" means that certain term loan facility in an aggregate principal amount of $375,000,000 issued pursuant to the New First Lien Loan Documents.

91.    "*New First Lien Loan Agent*" means Cantor Fitzgerald Securities, solely in its capacity as administrative agent and collateral agent under the New First Lien Loan Documents, together with its successors, assigns, or any replacement administrative agent appointed pursuant to the terms of the New First Lien Loan Documents.

92.    "*New First Lien Loan Agreement*" means that certain credit and security agreement, dated as of the Effective Date, by and among the Reorganized Debtors, the New First Lien Loan Agent, and the lenders party thereto, which shall be included in the Plan Supplement.

93.    "*New First Lien Loan Documents*" means, collectively, the New First Lien Loan Agreement and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, which shall be in form and substance consistent with the RSA.

94.    "*New Money DIP Claim*" means any Claim arising under, derived from, or based upon the New Money DIP Loans.

95.    "*New Money DIP Loans*" means up to $50,000,000 in new money delayed draw term loans provided by the DIP Term Lenders pursuant to the DIP Term Agreement and DIP Order.

96.    "*New Organizational Documents*" means the form of certificate or articles of incorporation, bylaws, or such other applicable formation documents (if any) of Reorganized Blackhawk, each of which shall be included in the Plan Supplement and materially consistent with the RSA, and in form and substance reasonably acceptable to the DIP ABL Agent or Exit ABL Agent in all material respects.

97.    "*Non-Debtor Intercompany Claim*" means any Claim held by a non-Debtor Affiliate of the Debtors against a Debtor.

98.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

99.    "*Other Secured Claim*" means any Secured Claim, other than a DIP Claim, a Contingent Prepetition ABL Obligation, a First Lien Term Loan Claim and Second Lien Term Loan Claim.

100.    "*Patriot Chapter 11 Cases*" means the jointly administered chapter 11 cases captioned *In re Patriot Coal Corporation*, Case No. 15-32450 (KLP), in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.

101.    "*Patriot Plan*" means the chapter 11 plan confirmed in the Patriot Chapter 11 Cases, as may be amended, supplemented, or modified from time to time in accordance with its terms.

102.    "*Patriot Trust*" means the PCC Liquidating Trust established in connection with the Patriot Chapter 11 Cases.

103.    "*Patriot Trust Debtor Affiliates*" means the debtors in the Patriot Chapter 11 Cases.

104.    "*Patriot Trust RSA*" means that certain Restructuring Support Agreement, dated as of July 15, 2019, among Blackhawk and the trustee of the Patriot Trust.

105.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

106.    "*Petition Date*" means the date on which each of the Debtors commence the Chapter 11 Cases.

107.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan to be filed by the Debtors as may be amended, supplemented, altered, or modified from time to time on the terms set forth herein, and which includes:  (a) the New Organizational Documents; (b) the New First Lien Loan Agreement; (c) the Exit ABL Facility Agreement; (d) the Shareholders Agreement; (e) Restructuring Steps Memorandum; (f) the identity of the members of the Reorganized Blackhawk Board and the officers of Reorganized Blackhawk; (g) the Rejected Executory Contract and Unexpired Lease List; (h) the Assumed Executory Contract and Unexpired Lease List; (i) the schedule of retained Causes of Action; and (j) any other necessary documentation related to the Restructuring Transactions, each of which shall be in form and substance consistent with the RSA.

108.    "*Potter Group Entity*" means, respectively, and in each case, in such capacity, those Entities owned or controlled by John Mitchell Potter that are counterparties to the Potter Group Vendor Contracts with the Debtors.

109.    "*Potter Group Vendor Contracts*" means the "Affiliate Contracts" as defined in the Restructuring Term Sheet attached thereto as Schedule 1.

8

110.    "*Potter Consulting Services Agreement*" means that certain consulting services agreement, dated as of July 15, 2019, by and between Blackhawk and John Mitchell Potter.

111.    "*Potter Settlement*" means that certain settlement set forth in Article IV.E hereof.

112.    "*Prepetition ABL Agent*" means MidCap Funding IV Trust, and its predecessors thereto prior to the Petition Date, each solely in its capacity as administrative agent under the Prepetition ABL Facility.

113.    "*Prepetition ABL Credit Agreement*" means that certain credit agreement, dated as of September 6, 2017, as amended, supplemented, or modified from time to time, by and among the Debtors as borrowers or guarantors, the Prepetition ABL Lenders, and the Prepetition ABL Agent.

114.    "*Prepetition ABL Facility*" means that certain prepetition asset-based credit facility with aggregate commitments of $85,000,000 under the Prepetition ABL Credit Agreement between certain of the Debtors as obligors or guarantors and the Prepetition ABL Lenders.

115.    "*Prepetition ABL Lenders*" means, collectively, the banks, financial institutions, and other lenders party to the Prepetition ABL Credit Agreement from time to time, each solely in their capacity as such.

116.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

117.    "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

118.    "*Professional*" means an Entity retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

119.    "*Professional Fee Claims*" means all Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Confirmation Date that the Bankruptcy Court has not denied by Final Order.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

120.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount, *provided* that the Cash funds in the Professional Fee Escrow Account shall be increased from Cash on hand at the Reorganized Debtors to the extent applications are filed after the Effective Date in excess of the amount of Cash funded into the escrow as of the Effective Date.

121.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.C of the Plan.

122.    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

123.    "*Proof of Interest*" means a proof of Interest filed in any of the Debtors in the Chapter 11 Cases.

124.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

125.     "*Rejected Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases that will be rejected by the Reorganized Debtors pursuant to the Plan, which list shall be included in the Plan Supplement.

126.     "*Released Party*" means collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the First Lien Term Loan Lenders; (d) each of the Second Lien Term Loan Lenders; (e) the First Lien Term Loan Agent; (f) the Second Lien Term Loan Agent; (g) each of the Potter Group Entities; (h) each of the New First Lien Loan Lenders; (i) the New First Lien Loan Agent; (j) the Prepetition ABL Agent; (k) each of the Prepetition ABL Lenders; (l) the DIP ABL Agent; (m) each of the DIP ABL Lenders; (n) the DIP Term Agent; (o) each of the DIP Term Lenders; (p) the Patriot Trust and its trustee; (q) the Patriot Trust Debtor Affiliates; (r) all Holders of Class A Blackhawk Interests, Class B Blackhawk Interests, and Class C Blackhawk Interests, in each case that vote to accept the Plan; and (s) with respect to each of the foregoing entities in clauses (a) through (r), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, managed accounts or funds, participants, and each of their respective current and former equity holders, officers, directors, managers, principals, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided*, the release in favor of the Potter Group Entities and John Mitchell Potter shall include and be effective as to all matters previously invoiced and paid between any of the Potter Group Entities and the Debtors as of the Petition Date but shall not apply to the continuing obligations between any of the Potter Group Entities and the Debtors under the terms of the agreements assumed by the Debtors; *provided*, *however*, that any Entity identified in the foregoing clauses (a) through (r) that opts out of the releases shall not be a "Released Party."

127.     "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Term Loan Lenders; (d) each of the Potter Group Entities; (e) each of the New First Lien Loan Lenders; (f) the New First Lien Loan Agent; (g) the Prepetition ABL Agent; (h) each of the Prepetition ABL Lenders; (i) the DIP ABL Agent; (j) each of the DIP ABL Lenders; (k) the DIP Term Agent; (l) each of the DIP Term Lenders; (m) the First Lien Term Loan Agent; (n) the Second Lien Term Loan Agent; (o) the Patriot Trust and its trustee; (p) the Patriot Trust Debtor Affiliates; (q) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan; (r) all Holders of Claims or Interests that vote to reject the Plan or do not vote to accept or reject the Plan but, in either case, do not affirmatively elect to "opt out" of being a releasing party by timely objecting to the Plan's third-party release provisions; (s) all Holders of Claims or Interests that are deemed to reject the Plan that do not affirmatively elect to "opt out" of being a releasing party by timely objecting to the Plan's third-party release provisions; (t) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (s), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, managed accounts or funds, participants, and each of their respective current and former equity holders, officers, directors, managers, principals, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively.

128.     "*Reorganized Blackhawk*" means either (a) Blackhawk, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, or (b) a new corporation, limited liability company, or partnership that may be formed, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Common Stock to be distributed pursuant to the Plan.

129.     "*Reorganized Blackhawk Board*" means the Board of Directors (or other applicable governing body) of Reorganized Blackhawk.

130.     "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Blackhawk.

10

131.    "*Required Consenting First Lien Lenders*" means the Required Consenting First Lien Lenders as defined in the RSA.

132.    "*Required Consenting Parties*" means, collectively, the Required Consenting First Lien Lenders, the Required Consenting Second Lien Lenders, and the Potter Group Entities party to the RSA from time to time.

133.    "*Required Consenting Second Lien Lenders*" means the Required Consenting Second Lien Lenders as defined in the RSA.

134.    "*Required Consenting Term Lenders*" means the Required Consenting First Lien Lenders and the Required Consenting Second Lien Lenders.

135.    "*Restructuring Steps Memorandum*" means the summary of transaction steps to complete the restructuring contemplated by the Plan, which shall be included in the Plan Supplement.

136.    "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

137.    "*Roll-Up DIP Claim*" means any Claim arising under, derived from, or based upon the Roll-Up DIP Loans.

138.    "*Roll-Up DIP Loans*" means the $100,000,000 of the First Lien Term Loan Claims rolled-up pursuant to the DIP Term Agreement and DIP Order.

139.    "*RSA*" means that certain Restructuring Support Agreement, dated as of July 15, 2019, by and among the Debtors and the Consenting Parties, including all exhibits and attachments thereto, and as amended, restated, and supplemented from time to time in accordance with its terms.

140.    "*SEC*" means the Securities and Exchange Commission.

141.    "*Second Lien Term Loan Agent*" means Cortland Capital Market Services LLC, and its predecessors thereto prior to the Petition Date, each in its capacity as administrative agent under the Second Lien Term Loan Facility.

142.    "*Second Lien Term Loan Agreement*" means that certain Credit Agreement, dated as of October 28, 2015, (as amended, supplemented, or modified from time to time) among certain of the Debtors as borrowers or guarantors and the Second Lien Term Loan Lenders.

143.    "*Second Lien Term Loan Claim*" means all Claims against any Debtor arising under, derived from, or based upon the Second Lien Term Loan Agreement.

144.    "*Second Lien Term Loan Facility*" means that certain prepetition second lien secured term loan credit facility provided for under the Second Lien Term Loan Agreement in the original aggregate principal amount of up to $229,238,375.55 between certain of the Debtors as obligors or guarantors and the Second Lien Term Loan Lenders.

145.    "*Second Lien Term Loan Lenders*" means, collectively, the banks, financial institutions, and other lenders party to the Second Lien Term Loan Agreement from time to time, each solely in their capacity as such.

146.    "*Section 510(b) Claim*" means any Claim arising from:  (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

147.    "*Secured Claim*" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

148.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

149.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

150.    "*Shareholders Agreement*" means that certain shareholders agreement that will govern certain matters related to the governance of Reorganized Blackhawk and the New Common Stock, which shall be included in the Plan Supplement.

151.    "*Solicitation Agent*" means Prime Clerk, LLC, the notice, claims, and solicitation agent retained by the Debtors for the Chapter 11 Cases.

152.    "*Solus*" means Solus Alternative Asset Management LP, a New York limited partnership.

153.    "*Term Loan Agents*" means the First Lien Term Loan Agent and the Second Lien Term Loan Agent.

154.    "*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article VIII.E of the Plan.

155.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

156.    "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

157.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

158.    "*Vendor Agreements*" means, collectively, the promissory notes and similar agreements entered into by Blackhawk with certain of the Debtors' vendors, setting forth the terms of the repayment for certain General Unsecured Claims that otherwise arose prior to the Petition Date.

B.    *Rules of Interpretation*

For purposes of the Plan, except as otherwise provided in this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in the Plan to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (3) unless otherwise specified, all references in the Plan to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (4) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (5) any effectuating provisions may be interpreted by the Debtors (subject to the terms of the RSA) or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the terms "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words

"without limitation"; and (13) except as otherwise provided in the Plan, any reference to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.      *Computation of Time*

Unless otherwise specifically stated in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between the Plan, the RSA, and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control.  In the event of any inconsistency between the Plan Supplement and the Confirmation Order, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

A.      *DIP Claims*

1.      DIP ABL Claims

All DIP ABL Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP ABL Facility on such date, (ii) all interest accrued and unpaid thereon to the date of payment, (iii) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP ABL Agreement and the DIP Order, and (iv) all other DIP ABL Obligations as defined in the DIP ABL Agreement other than Contingent DIP ABL Obligations.  Except to the extent that a Holder of an Allowed DIP ABL Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP ABL Claim, each such Allowed DIP ABL Claim shall receive on the Effective Date

either: (i) payment in full in Cash of such Holder's Allowed DIP ABL Claim or (ii) at such Holder's election and agreement by the Debtors, such Holder's Pro Rata share of the Exit ABL Facility. All reasonable and documented unpaid fees and expenses of the DIP ABL Agent, including reasonable and documented fees, expenses, and costs of its advisors, shall be paid in Cash on the Effective Date. Contemporaneously with the foregoing receipt of payment in full in Cash or satisfaction through a Pro Rata share of the Exit ABL Facility of the Allowed DIP ABL Claims, except with respect to contingent obligations under the DIP ABL Agreement (which contingent obligations shall survive the Effective Date and shall continue to be governed by the DIP ABL Agreement as provided below), the DIP ABL Facility, the DIP ABL Agreement, and all related loan documents, shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP ABL Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP ABL Agent or the DIP ABL Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP ABL Claims shall be automatically discharged and released, in each case without further action by the DIP ABL Agent or the DIP ABL Lenders. The DIP ABL Agent and the DIP ABL Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

2.    DIP Term Claims

All DIP Term Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Term Facility on such date, (ii) all interest accrued and unpaid thereon to the date of payment, (iii) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP Term Agreement and the DIP Order, and (iv) all other Obligations as defined in the DIP Term Agreement other than Contingent DIP Term Obligations. Except to the extent that a Holder of an Allowed DIP Term Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Term Claim, each such Allowed DIP Term Claim shall receive on the Effective Date such Holder's Pro Rata share of $150,000,000 of the New First Lien Loan. All reasonable and documented unpaid fees and expenses of the DIP Term Agent, including reasonable and documented fees, expenses, and costs of its advisors, shall be paid in Cash on the Effective Date. Contemporaneously with the foregoing satisfaction, except with respect to contingent obligations under the DIP Term Agreement (which contingent obligations shall survive the Effective Date and shall continue to be governed by the DIP Term Agreement as provided below), the DIP Term Facility, the DIP Term Agreement, and all related loan documents shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Term Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Term Agent or the DIP Term Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Term Claims shall be automatically discharged and released, in each case without further action by the DIP Term Agent or the DIP Term Lenders. The DIP Term Agent and the DIP Term Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

B.    *Administrative Claims*

Unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors (with the reasonable consent of the Required Consenting Parties), or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

14

C.      *Professional Fee Claims*

1.      Professional Fee Escrow Account

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Reorganized Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

2.      Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Reorganized Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

3.      Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.      Post-Confirmation Date Fees and Expenses.

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the

15

Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten business days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors or the Reorganized Debtors, as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

D.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests*

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|:-----:|-------------------|:------:|:-------------:|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 7 | Non-Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |

16

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 10A | Class A Blackhawk Interests | Impaired | Entitled to Vote |
| 10B | Class B Blackhawk Interests | Impaired | Entitled to Vote |
| 10C | Class C Blackhawk Interests | Impaired | Entitled to Vote |

B.      *Treatment of Classes of Claims and Interests*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

1.      Class 1 — Other Secured Claims

   (a)      *Classification*:  Class 1 consists of any Other Secured Claims.

   (b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

      (i)      payment in full in Cash;

      (ii)      delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

      (iii)      Reinstatement of such Allowed Other Secured Claim; or

      (iv)      such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

   (c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 — Other Priority Claims

   (a)      *Classification*:  Class 2 consists of any Other Priority Claims.

   (b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

      (i)      payment in full in Cash; or

      (ii)      such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 — First Lien Term Loan Claims

(a)    *Classification*: Class 3 consists of any First Lien Term Loan Claims against any Debtor.

(b)    *Allowance:* On the Effective Date, First Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $538,974,437, plus any accrued but unpaid interest, fees, and other expenses arising under or in connection with the First Lien Term Loan Agreement.

(c)    *Treatment*: Except to the extent that a Holder of an Allowed First Lien Term Loan Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each First Lien Term Loan Claim, each Holder of an Allowed First Lien Term Loan Claim shall receive its Pro Rata share of:

(i)    $225,000,000 of the New First Lien Loan; and

(ii)    71% of the New Common Stock in Reorganized Blackhawk.

(d)    *Voting*: Class 3 is Impaired under the Plan. Holders of Allowed First Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

4.    Class 4 — Second Lien Term Loan Claims

(a)    *Classification*: Class 4 consists of any Second Lien Term Loan Claims against any Debtor.

(b)    *Allowance:* On the Effective Date, Second Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $318,307,228, plus any accrued but unpaid interest, fees, and other expenses arising under or in connection with the Second Lien Term Loan Agreement.

(c)    *Treatment*: Except to the extent that a Holder of an Allowed Second Lien Term Loan Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Second Lien Term Loan Claim, each Holder of an Allowed Second Lien Term Loan Claim shall receive its Pro Rata share of 29% of the New Common Stock in Reorganized Blackhawk.

(d)    *Voting*: Class 4 is Impaired under the Plan. Holders of Allowed Second Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

(e)    Distributions to each Holder of an Allowed Second Lien Term Loan Claim shall be subject to the terms of the Second Lien Term Loan Agreement and the rights of the Second Lien Term Loan Agent as set forth thereunder and in Article IV.K hereof.

5.    Class 5 — General Unsecured Claims

(a)    *Classification*: Class 5 consists of any General Unsecured Claims against any Debtor.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed Claim (including pursuant to a Vendor Agreement or the Patriot Trust RSA), in full and final satisfaction, settlement, release, and

18

discharge of and in exchange for each Allowed Claim, each Holder of an Allowed General Unsecured Claim shall receive either:

(i)      payment in Cash in an amount equal to such Allowed General Unsecured Claim in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim; or

(ii)      payment in Cash, including interest, if applicable, as required by contract or applicable law, in an amount equal to such Allowed General Unsecured Claim, upon the later of (A) the Effective Date, (B) the date on which such General Unsecured Claim becomes an Allowed Claim, or (C) such other date as may be ordered by the Bankruptcy Court. Notwithstanding anything in the foregoing to the contrary, the Allowed Claim of the Patriot Trust shall be paid pursuant to the terms of the Patriot Trust RSA.

(c)      *Voting*: Class 5 is Unimpaired under the Plan. Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

6.      Class 6 — Debtor Intercompany Claims

(a)      *Classification*: Class 6 consists of any Debtor Intercompany Claims.

(b)      *Treatment*: Except to the extent otherwise provided in the Restructuring Steps Memorandum, each Allowed Debtor Intercompany Claim shall, at the option of the applicable Debtors, either on or after the Effective Date, be:

(i)      Reinstated;

(ii)      converted to equity; or

(iii)      extinguished, compromised, addressed, cancelled, or settled, without any distribution on account of such Claims.

(c)      *Voting*: Holders of Allowed Debtor Intercompany Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Allowed Debtor Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.      Class 7 — Non-Debtor Intercompany Claims

(a)      *Classification*: Class 7 consists of any Non-Debtor Intercompany Claims.

(b)      *Treatment*: Except to the extent otherwise provided in the Restructuring Steps Memorandum, each Allowed Non-Debtor Intercompany Claim shall, at the option of the applicable Debtors, be:

(i)      Reinstated;

(ii)      converted to equity; or

(iii)      extinguished, compromised, addressed, cancelled, or settled, without any distribution on account of such Claims.

19

(c)    *Voting*:  Holders of Allowed Non-Debtor Intercompany Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Non-Debtor Intercompany Claims are not entitled to vote to accept or reject the Plan.

8.    Class 8 — Section 510(b) Claims

(a)    *Classification*:  Class 8 consists of any Section 510(b) Claims.

(b)    *Allowance*:  Notwithstanding anything to the contrary in the Plan, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.  The Debtors are not aware of any asserted Class 8 Claim and believe that no Section 510(b) Claims exist.

(c)    *Treatment*:  Allowed Section 510(b) Claims, if any, shall be  discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and Holders of Allowed Section 510(b) Claims shall not receive any distribution on account of such Allowed Section 510(b) Claims.

(d)    *Voting*:  Class 8 is Impaired.  Holders, if any, of Allowed Section 510(b) Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders, if any, of Allowed Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

9.    Class 9 — Intercompany Interests

(a)    *Classification*:  Class 9 consists of all Interests in the Debtors other than Blackhawk.

(b)    *Treatment*:  On the Effective Date, Intercompany Interests shall be, at the option of the Debtors, either:

(i)    Reinstated in exchange for the Debtors' and the Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims; or

(ii)    discharged, cancelled, released, and extinguished and of no further force or effect without any distribution on account of such Interests.

For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor unless otherwise provided in the Restructuring Steps Memorandum.

(c)    *Voting*:  Holders of Intercompany Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

10.    Class 10A — Class A Blackhawk Interests

(a)    *Classification*:  Class 10A consists of all Class A Blackhawk Interests.

(b)    *Treatment*:  On the Effective Date, all Class A Blackhawk Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and Holders of Class A Blackhawk Interests will not receive any distribution on account of such Interests.  Holders of Class A Blackhawk Interests that vote

20

to accept the Plan shall be a "Released Party" for purposes of the Debtor Release and the Third-Party Release.

(c)    *Voting*:  Class 10A is Impaired under the Plan.  Holders of Class A Blackhawk Interests are entitled to vote to accept or reject the Plan.

11.    Class 10B — Class B Blackhawk Interests

(a)    *Classification*:  Class 10B consists of all Class B Blackhawk Interests.

(b)    *Treatment*:  On the Effective Date, all Class B Blackhawk Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and Holders of Class B Blackhawk Interests will not receive any distribution on account of such Interests.  Holders of Class B Blackhawk Interests that vote to accept the Plan shall be a "Released Party" for purposes of the Debtor Release and the Third-Party Release.

(c)    *Voting*:  Class 10B is Impaired under the Plan.  Holders of Class B Blackhawk Interests are entitled to vote to accept or reject the Plan.

12.    Class 10C — Class C Blackhawk Interests

(a)    *Classification*:  Class 10C consists of all Class C Blackhawk Interests.

(b)    *Treatment*:  On the Effective Date, all Class C Blackhawk Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and Holders of Class C Blackhawk Interests will not receive any distribution on account of such Interests.  Holders of Class C Blackhawk Interests that vote to accept the Plan shall be a "Released Party" for purposes of the Debtor Release and the Third-Party Release.

(c)    *Voting*:  Class 10C is Impaired under the Plan.  Holders of Class C Blackhawk Interests are entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

21

F.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

G.      *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests, but for the purposes of administrative convenience and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to provide management services to certain other Debtors and Reorganized Debtors, to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors and Reorganized Debtors to the holders of certain Allowed Claims. For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

H.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor; *provided* that this Article III.I shall not limit the respective rights of each party to the RSA or the DIP ABL Agent and DIP ABL Lenders under the DIP ABL Agreement.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests*

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including with respect to issues related to the value of the Debtors' unencumbered property.

B.      *Restructuring Transactions*

On and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions set forth in the Restructuring Steps Memorandum and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan and the RSA, which transactions may include, as applicable:

(a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (a), pursuant to applicable state law; (d) the execution and delivery of the Shareholders Agreement and the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor; (e) the execution and delivery of the New First Lien Loan Documents and Exit ABL Facility Documents (in both cases, including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (f) the execution and delivery of the New Organizational Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable) and the issuance, distribution, reservation, or dilution, as applicable, of the New Common Stock, as set forth herein; (g) the adoption of the Management Incentive Plan and the issuance and reservation of the Management Incentive Plan Equity to the participants in the Management Incentive Plan on the terms and conditions set by the Reorganized Blackhawk Board after the Effective Date; (h) all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Blackhawk, which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (i) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

C.    *Sources of Consideration for Plan Distributions*

The Debtors shall fund distributions under the Plan, as applicable, with: (1) the New First Lien Loan; (2) the New Common Stock; (3) the Exit ABL Facility; and (4) the Debtors' encumbered Cash on hand. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain securities in connection with the Plan, including the New First Lien Loan and the New Common Stock, will be exempt from SEC registration, as described more fully in Article IV.G below.

1.    Issuance and Distribution of the New First Lien Loan

On the Effective Date, the Reorganized Debtors shall (a) execute and deliver the New First Lien Loan Documents and such documents shall become effective in accordance with their terms, and (b) issue (i) $225,000,000 of the New First Lien Loan to the Holders of the First Lien Term Loan Claims on the terms and conditions set forth in the New First Lien Loan Documents and (ii) $150,000,000 of the New First Lien Loan to the Holders of the DIP Term Claims on the terms and conditions set forth in the New First Lien Loan Documents, to collectively total $375,000,000. On and after the Effective Date, the New First Lien Loan Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms. The terms and conditions of the New First Lien Loan Documents shall bind Reorganized Blackhawk and each other Entity that enters into such New First Lien Loan Documents as a guarantor. Any Entity's entry into the New First Lien Loan Agreement shall be deemed as its agreement to the terms of such New First Lien Loan Documents, as amended or modified from time to time following the Effective Date in accordance with its terms.

Confirmation shall be deemed approval of the New First Lien Loan Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees and expenses paid in connection therewith), and, to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to obtain the New First Lien Loan, including the New First Lien Loan Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent,

authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate the New First Lien Loan.

On the Effective Date, immediately upon receipt of the payments required in Article II.A hereof, all of the claims, liens, and security interests to be granted in accordance with the terms of the New First Lien Loan Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New First Lien Loan Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such other liens and security interests as may be permitted under the New First Lien Loan Documents, and (c) subject to contractual subordination pursuant to the intercreditor agreement between the Exit ABL Agent and the New First Lien Loan Agent, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

2.      Exit ABL Facility

On the Effective Date, the Reorganized Debtors shall execute and deliver the Exit ABL Facility Documents and such documents shall become effective in accordance with their terms. The Exit ABL Facility shall be a $90 million secured revolving credit facility. If the ABL Discharge (as defined in the DIP Order) has not occurred prior to the Effective Date, the Reorganized Debtors shall provide for the indefeasible payment of the Prepetition ABL Debt (as defined in the DIP Order) outstanding as of the Effective Date in full in Cash, including interest and fees through the date of repayment (at the non-default contract rate), on or as soon as practicable after the Effective Date, with the proceeds of the Exit ABL Facility or otherwise.

On and after the Effective Date, the Exit ABL Facility Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms. The terms and conditions of the Exit ABL Facility Agreement shall bind Reorganized Blackhawk and each other Entity that enters into such Exit ABL Facility Agreement as a guarantor. Any Entity's entry into the Exit ABL Facility Agreement shall be deemed as its agreement to the terms of such Exit ABL Facility Agreement, as amended or modified from time to time following the Effective Date in accordance with its terms.

Confirmation shall be deemed approval of the Exit ABL Facility Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and, to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to obtain the Exit ABL Facility, including the Exit ABL Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate the Exit ABL Facility.

On the Effective Date, immediately upon receipt of the payments required in Article II.A hereof, all of the claims, liens, and security interests to be granted in accordance with the terms of the Exit ABL Facility Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit ABL Facility Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit ABL Facility Documents, and (c) subject to contractual subordination pursuant to the intercreditor agreement between the Exit ABL Agent and the New First Lien Loan Agent, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

3.      Issuance and Distribution of the New Common Stock

On the Effective Date, the New Common Stock shall be issued and distributed to the Entities entitled to receive the New Common Stock pursuant to the Plan in accordance with the Restructuring Steps Memorandum. The

issuance of New Common Stock shall be authorized without the need for any further corporate action and without any action by the Holders of Claims or other parties in interest.  All of the New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution, issuance, and/or dilution, as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution, issuance, and/or dilution, as applicable, including the Shareholders Agreement and the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution of the New Common Stock.  Any Entity's acceptance of New Common Stock shall be deemed as its agreement to the New Organizational Documents and the Shareholders Agreement, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.  The New Common Stock will not be registered on any exchange as of the Effective Date and shall not meet the eligibility requirements of the Depository Trust Company.

4.      Cash on Hand

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand to fund distributions to certain Holders of Claims, including the payment of Allowed General Unsecured Claims as set forth in Article III of the Plan.

D.      *Shareholders Agreement*

On the Effective Date, Reorganized Blackhawk shall enter into and deliver the Shareholders Agreement, in substantially the form included in the Plan Supplement, to each Holder of New Common Stock, and such parties shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Blackhawk.

E.      *Potter Settlement*

On the Effective Date, the Debtors shall assume the Potter Consulting Services Agreement, and John Mitchell Potter and the Reorganized Debtors shall perform thereunder pursuant to the terms and conditions of the Potter Consulting Services Agreement.  On and after the Effective Date, the Potter Group Entities that are party to the Potter Group Vendor Contracts agree to continue to satisfy their obligations under the Potter Group Vendor Contracts, as amended on the terms described in the RSA.  In exchange for performing under the Potter Consulting Services Agreement and the modifications to the Potter Group Vendor Contracts set forth in the RSA, John Mitchell Potter shall receive (a) $500,000 in Cash on the Effective Date, and (b) reimbursement for his reasonable attorney's fees incurred in connection with the negotiation and execution of the Potter Consulting Services Agreement up to a maximum of $60,000.

F.      *Vendor Agreements*

On the Effective Date, the Debtors shall assume the Vendor Agreements, and the applicable vendors and the Reorganized Debtors shall perform thereunder pursuant to the terms and conditions of the applicable Vendor Agreement.

G.      *Exemption from Registration Requirements*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Stock pursuant to the Plan is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The shares of New Common Stock to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) subject to the terms of the Shareholders Agreement, are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

KE 60280927

H.      *Corporate Existence*

Except as otherwise provided in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

I.      *Corporate Action*

On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the agreements with existing management; (2) selection of the directors, managers, and officers for the Reorganized Debtors; (3) implementation of the Restructuring Transactions; (4) the applicable Reorganized Debtors' entry into the Exit ABL Facility Documents and New First Lien Loan Documents; and (5) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit ABL Facility Documents, the New First Lien Loan Documents and the Shareholders Agreement, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy law.

J.      *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the Exit ABL Facility Documents and the New First Lien Loan Documents and the Liens securing obligations on account of Other Secured Claims that are Reinstated pursuant to the Plan, if any). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

K.      *Cancellation of Notes, Instruments, Certificates, and Other Documents*

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims shall be cancelled, and the obligations of the Debtors or the Reorganized Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged and deemed satisfied in full, and the Term Loan Agents shall be released from all duties thereunder; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of (1) allowing Holders of Allowed Claims to receive distributions under the Plan, (2) allowing and preserving the rights of the Term Loan Agents and DIP Agents to make distributions pursuant to the Plan, (3) preserving the Term Loan Agents', the Prepetition ABL Agent's, and the DIP Agents' rights to compensation and indemnification as against any money or property distributable to the Prepetition ABL Lenders, Holders of First Lien Term Loan Claims, Second Lien Term Loan Claims, DIP ABL Claims, and DIP Term Claims, including permitting the Term Loan Agents and DIP Agents

26

to maintain, enforce, and exercise its charging liens against such distributions, (4) preserving all rights, including rights of enforcement, of the Term Loan Agents, the Prepetition ABL Agent, and DIP Agents against any person other than a Released Party (including the Debtors), including with respect to indemnification or contribution from the Prepetition ABL Lenders, Holders of the First Lien Term Loan Claims, Second Lien Term Loan Claims, DIP ABL Claims, and DIP Term Claims pursuant and subject to the terms of the Prepetition ABL Credit Agreement, the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement, the DIP ABL Agreement, and the DIP Term Agreement as in effect on the Effective Date, (5) permitting the Term Loan Agents, the Prepetition ABL Agent, and DIP Agents to enforce any obligation (if any) owed to the Term Loan Agents, the Prepetition ABL Agent, or DIP Agents under the Plan, (6) permitting the Prepetition ABL Agent, the Term Loan Agents, and the DIP Agents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, (7) permitting the DIP Agents, the DIP ABL Lenders, the DIP Term Lenders, the Prepetition ABL Agent, the Prepetition ABL Lenders, the First Lien Term Loan Agent, the First Lien Term Loan Lenders, the Second Lien Term Loan Agent, and the Second Lien Term Loan Lenders to assert any rights with respect to the Contingent DIP Term Obligations, the Contingent DIP ABL Obligations, the Contingent Prepetition ABL Obligations, the Contingent First Lien Term Loan Obligations or the Contingent Second Lien Term Loan Obligations, as applicable, and (8) permitting the Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, *however*, that (a) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan and (b) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan.  The Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents shall be discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents and their representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents shall be relieved of and released from any obligations and duties arising thereunder.  The fees, expenses, and costs of the Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents, including fees, expenses, and costs of its professionals incurred after the Effective Date in connection with the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement, the Prepetition ABL Agreement, the DIP Term Agreement, and the DIP ABL Agreement, as applicable, and reasonable and documented costs and expenses associated with effectuating distributions pursuant to the Plan will be paid by the Reorganized Debtors in the ordinary course.

L.     *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the RSA, the Exit ABL Facility Documents, the New First Lien Loan Documents, the New Organizational Documents, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

M.     *Exemptions from Certain Taxes and Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors, including the Exit ABL Facility, the New First Lien Loan, and the New Common Stock; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral as security for any or all of the Exit ABL Facility and the New First Lien Loan; or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code

27

filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

N.    *New Organizational Documents*

The New Organizational Documents shall, among other things:  (1) contain the terms and minority protections consistent with the RSA; (2) authorize the issuance, distribution, and reservation of the New Common Stock to the Entities entitled to receive such Interests under the Plan; and (3) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, prohibit the issuance of non-voting equity Securities.

On or immediately before the Effective Date, Blackhawk or Reorganized Blackhawk, as applicable, will file its New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in its state of incorporation or formation in accordance with the applicable laws of their respective state of incorporation or formation, to the extent required for such New Organizational Documents to become effective.  After the Effective Date, Reorganized Blackhawk may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of such documents.

O.    *Directors and Officers*

On the Effective Date, the Reorganized Blackhawk Board shall consist of five persons and will include: (1) the CEO Director; (2) one director selected by Knighthead; (3) one director selected by Solus; (4) one independent director selected by Knighthead and Solus, subject to the consent, not to be unreasonably withheld, of the majority of a three-member committee consisting of members of the Ad Hoc Group of First Lien Lenders, which three-member committee shall be selected by members of the Ad Hoc Group of First Lien Lenders holding at least 50.01% of the First Lien Term Loan Claims held by such group; and (5) one independent director acceptable to a group consisting of each Holder (other than Knighthead and Solus) that will be entitled to receive under the Plan at least 10% of the New Common Stock issued on the Effective Date, with the consent of Knighthead and Solus (such consent not to be unreasonably withheld), as set forth in the RSA.  On the Effective Date, the terms of the current members of the Blackhawk board of directors shall expire, and the Reorganized Blackhawk Board will include those directors set forth in the list of directors of the Reorganized Debtors included in the Plan Supplement; *provided* that, as set forth in the RSA, prior to the selection of a Chief Executive Officer of Reorganized Blackhawk by the Reorganized Blackhawk Board to replace John Mitchell Potter, the seat of the CEO Director shall be filled by a member of the executive team selected by a majority of the remaining members of the Reorganized Blackhawk Board until a new individual becomes the Chief Executive Officer of Reorganized Blackhawk.

On the Effective Date, the officers and overall management structure of Reorganized Blackhawk, and all officers and management decisions with respect to Reorganized Blackhawk (and/or any of its direct or indirect subsidiaries), compensation arrangements, and affiliate transactions shall only be subject to the approval of the Reorganized Blackhawk Board.

From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, including the Shareholders Agreement and the New Organizational Documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.  To the extent that any such director or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors will disclose the nature of any compensation to be paid to such director or officer.

*P.      Management Incentive Plan*

On or after the Effective Date, the Reorganized Debtors shall adopt and implement the Management Incentive Plan, which shall be funded with the Management Incentive Plan Equity.  The Reorganized Blackhawk Board shall be authorized to institute such Management Incentive Plan, enact and enter into related policies and agreements, and distribute the Management Incentive Plan Equity to participants based on the terms and conditions determined by the Reorganized Blackhawk Board.  For the avoidance of doubt, the terms and conditions of the Management Incentive Plan (including any related agreements, policies, programs, other arrangements, and the Management Incentive Plan participants) shall be determined solely by the Reorganized Blackhawk Board after the Effective Date.

*Q.      Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.  For the avoidance of doubt, the retained Causes of Action shall not include any Causes of Action: (1) of any kind or nature with respect to the Patriot Trust, its trustee or the Patriot Trust Debtor Affiliates, or (2) expressly contemplated to be released under the RSA or the Potter Consulting Services Agreement, so long as the parties to such agreements do not opt out of the releases contained in Article VIII of the Plan.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**  Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.      Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, and regardless of whether such Executory Contract or Unexpired Lease is identified on the Assumed Executory Contract and Unexpired Lease List, unless such Executory Contract and Unexpired Lease:  (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumption and assignment, or rejections, as applicable, of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Lease List, and the Rejected Executory Contract and Unexpired Leases List, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed

29

pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Notwithstanding anything to the contrary in the Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List and the Assumed Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Solicitation Agent and served on the Reorganized Debtors no later than thirty days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.G of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.      *Cure of Defaults and Objections to Cure and Assumption*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Within seven calendar days before the Confirmation Objection Deadline, the Debtors shall provide notices of proposed cure amounts to counterparties to Executory Contracts and Unexpired Leases, which shall include a description of the procedures for objecting to assumption thereof based on the proposed cure amounts or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code).  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served, and actually received by the counsel to the Debtors, counsel to the Consenting Term Lenders, counsel to the DIP ABL Agent, the Solicitation Agent, and the U.S. Trustee no later than 5:00 p.m., prevailing Eastern Time, on the date that is twenty-one calendar days after the Debtors cause such notices to be mailed to the counterparties to such Executory Contracts and Unexpired Leases.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

In the event of a dispute regarding:  (1) the amount of any payments to cure such a default; (2) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

D.      *Insurance Policies and Surety Bonds*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.  Except as set forth in Article V.F of the Plan, nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor.  For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

On the Effective Date, (1) all of the Debtors' obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Reorganized Debtors, (2) surety bonds and related indemnification and collateral agreements entered into by any Debtor will be vested and performed by the applicable Reorganized Debtor and will survive and remain unaffected by entry of the Confirmation Order, and (3) the Reorganized Debtors shall be authorized to enter into new surety bond agreements and related indemnification and collateral agreements, or to modify any such existing agreements, in the ordinary course of business.  The applicable Reorganized Debtors will continue to pay all premiums and other amounts due, including loss adjustment expenses, on the existing surety bonds as they become due prior to the execution and issuance of new surety bonds.  Surety bond providers shall have the discretion to replace (or issue name-change riders with respect to) any existing surety bonds or related general agreements of indemnity with new surety bonds and related general agreements of indemnity on the same terms and conditions provided in the applicable existing surety bonds or related general agreements of indemnity.

E.      *Indemnification Provisions*

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' governance documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, and agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.  None of the Reorganized Debtors will amend and/or restate their respective governance documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

KE 60280927

On and as of the Effective Date, any of the Debtors' indemnification obligations with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by the Chapter 11 Cases.

F.      *Director, Officer, Manager, and Employee Liability Insurance*

On or before the Effective Date, the Debtors, on behalf of the Reorganized Debtors, shall be authorized to and shall purchase and maintain directors, officers, managers, and employee liability tail coverage for the six (6)-year period following the Effective Date for the benefit of the Debtors' current and former directors, managers, officers, and employees on terms no less favorable to such persons than their existing coverage under the D&O Liability Insurance Policies with available aggregate limits of liability upon the Effective Date of no less than the aggregate limit of liability under the existing D&O Liability Insurance Policies.

After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any such policies (including, if applicable, any "tail policy") with respect to conduct occurring as of the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full six-year term of such policy regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

On and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

G.      *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the Reorganized Blackhawk Board under the Debtors' respective formation and constituent documents, the Reorganized Debtors shall:  (1) amend, adopt, assume, and/or honor in the ordinary course of business any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans, retention plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order; *provided* that the consummation of the transactions contemplated in the Plan shall not constitute a "change in control" with respect to any of the foregoing arrangements.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

H.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

32

I.        *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have thirty calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

J.        *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

K.        *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.        *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such Claim becomes an Allowed Claim or Interest) each Holder of an Allowed Claim and Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class and in the manner provided in the Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article VII.  Except as otherwise provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

B.        *Distributions on Account of Obligations of Multiple Debtors*

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan; *provided* that Claims held by a single Entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor.  Any such Claims shall be released and discharged pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.  For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee fees until such time as a particular case is closed, dismissed, or converted.

C.      *Distribution Agent*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Distribution Agent on the Effective Date. The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

D.      *Rights and Powers of Distribution Agent*

1.      Powers of the Distribution Agent

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

E.      *Delivery of Distributions*

1.      Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the Distribution Agent, as appropriate: (a) to the signatory set forth on any Proof of Claim or Proof of Interest filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Interest is filed or if the Debtors have not been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim or Proof of Interest; or (c) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

The amount of any reasonable fees and out-of-pocket expenses incurred by the DIP Agents or Term Loan Agents on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the DIP Agents or Term Loan Agents in connection with effectuating distributions under the Plan shall be paid in Cash by the Reorganized Debtors.

2.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the later of (a) the Effective Date and (b) the date of the distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the

34

Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged of and forever barred.

3.        No Fractional Distributions

No fractional notes or shares, as applicable, of the Exit ABL Facility, the New First Lien Loan, or the New Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an applicable Allowed Claim would otherwise result in the issuance of a number of notes or shares, as applicable, of the Exit ABL Facility, the New First Lien Loan, or the New Common Stock that is not a whole number, the actual distribution of notes or shares, as applicable, of the Exit ABL Facility, the New First Lien Loan, or the New Common Stock shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized notes and shares, as applicable, of the Exit ABL Facility, the New First Lien Loan, or New Common Stock shall be adjusted as necessary to account for the foregoing rounding.

F.        *Manner of Payment*

At the option of the Distribution Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

G.        *Compliance Matters*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

H.        *No Postpetition or Default Interest on Claims*

Unless otherwise specifically provided for in the Plan, the DIP Order, or the Confirmation Order, and notwithstanding any documents that govern the Debtors' prepetition indebtedness to the contrary, (1) postpetition and/or default interest shall not accrue or be paid on any Claims and (2) no Holder of a Claim shall be entitled to: (a) interest accruing on or after the Petition Date on any such Claim; or (b) interest at the contract default rate, as applicable.

I.        *Allocation Between Principal and Accrued Interest*

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Petition Date.

J.        *Setoffs and Recoupment*

Unless otherwise provided in the Plan or the Confirmation Order, each Debtor and each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against or recoup any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of

35

such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled as of the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off or recoup any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff or recoupment on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 of the Bankruptcy Code or otherwise.

K.      *Claims Paid or Payable by Third Parties*

        1.      Claims Paid by Third Parties

        A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent that a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

        2.      Claims Payable by Third Parties

        The availability, if any, of insurance policy proceeds for the satisfaction of an Allowed Claim shall be determined by the terms of the insurance policies of the Debtors or Reorganized Debtors, as applicable.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Solicitation Agent without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

        3.      Applicability of Insurance Policies

        Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS**

A.      *Disputed Claims Process*

        Holders of Claims and Interests need not file a Proof of Claim or Proof of Interest, as applicable, with the Bankruptcy Court and shall be subject to the Bankruptcy Court process only to the extent provided in the Plan, except to the extent a Claim arises on account of rejection of an Executory Contract or Unexpired Lease in accordance with Article V.B hereof.  On and after the Effective Date, except as otherwise provided in the Plan, all Allowed Claims shall be paid pursuant to the Plan in the ordinary course of business of the Reorganized Debtors and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced.  Other than Claims arising from the rejection of an Executory Contract or Unexpired Lease, if the Debtors or the Reorganized Debtors dispute any Claim or Interest, such dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases

36

had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. Solely to the extent that an Entity is required to file a Proof of Claim and the Debtors or the Reorganized Debtors, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this Article VII of the Plan.  For the avoidance of doubt, there is no requirement to file a Proof of Claim or Proof of Interest (or move the Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan.  Notwithstanding the foregoing, Entities must file cure objections as set forth in Article V.C hereof to the extent such Entity disputes the amount of the cure set forth in the Assumed Executory Contract and Unexpired Lease List.  **All Proofs of Claim required to be filed by the Plan that are filed after the date that they are required to be filed pursuant to the Plan shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority to:  (1) file, withdraw, or litigate to judgment, objections to Claims or Interests; (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.Q of the Plan.

C.      *Estimation of Claims and Interests*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *No Distributions Pending Allowance*

Notwithstanding any other provision hereof, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

KE 60280927

F.       *Distributions After Allowance*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

G.       *No Interest*

Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.       *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.       *Discharge of Claims*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan  (including, with respect to the Contingent DIP ABL Obligations, the Contingent DIP Term Obligations, the Contingent Prepetition ABL Obligations, the Contingent First Lien Term Loan Obligations, and the Contingent Second Lien Term Loan Obligations, in each case which are not discharged hereunder), or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims or Non-Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan or voted to reject the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan  (including, with respect to the Contingent DIP ABL Obligations, the Contingent DIP Term Obligations, the Contingent Prepetition ABL Obligations,

the Contingent First Lien Term Loan Obligations, and the Contingent Second Lien Term Loan Obligations, in each case which are not discharged hereunder).

C.      *Release of Liens*

Except (1) with respect to the Liens securing (a) the Exit ABL Facility, (b) the New First Lien Loan, and (c) Other Secured Claims that are Reinstated pursuant to the Plan, or (2) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, at the sole cost of and expense of the Reorganized Debtors, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

D.      *Debtor Release*

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition ABL Facility, the First Lien Term Loan, the Second Lien Term Loan, the DIP Order, the DIP Facilities, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the RSA, the Disclosure Statement, the Exit ABL Facility, the New First Lien Loan, the Potter Settlement, the New Organizational Documents, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the Exit ABL Facility, the New First Lien Loan, the Potter Settlement, the New Organizational Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act, or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (2) any retained Causes of Action.

E.      *Third-Party Release*

Effective as of the Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action,

whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition ABL Facility, the First Lien Term Loan, the Second Lien Term Loan, the DIP Order, the DIP Facilities, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the RSA, the Disclosure Statement, the Exit ABL Facility, the New First Lien Loan, the Potter Settlement, the New Organizational Documents, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Exit ABL Facility, the New First Lien Loan, the Potter Settlement, the New Organizational Documents, or the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (2) the Patriot Trust and Patriot Trust Debtor Affiliates from any claims filed in the Patriot Chapter 11 Cases, other than with respect to any claims filed by the Debtors or any Affiliates of the Debtors, (3) any claims or other rights, including rights of setoff, counterclaim, or recoupment, with respect to any claims filed in the Patriot Chapter 11 Cases (except to the extent expressly released pursuant to the Patriot Plan), and (4) any Cause of Action maintained by the Patriot Trust or the Patriot Trust Debtor Affiliates with respect to any Released Party or any other Entity (other than the Debtors or any Affiliates of the Debtors) that existed as of the date of substantial consummation of the Patriot Plan or that otherwise is based on or relating to, or in any manner arising from, in whole or in part, the Patriot Chapter 11 Cases or any dealings or transactions relating to or in any manner arising therefrom.

F.    *Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on

40

**account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

G.    *Injunction*

**Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

H.    *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.    *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.    *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent, or (2) the relevant Holder of a Claim has filed

41

a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

K.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

L.      *Document Retention*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

# ARTICLE IX.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance consistent with the approval rights set forth in the RSA and the DIP ABL Agreement;

2.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3.      the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been filed and shall be in form and substance consistent with the approval rights set forth in the RSA and the DIP ABL Agreement;

4.      the Exit ABL Facility Documents, shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements;

5.      the New First Lien Loan Documents, shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements;

6.      the New Organizational Documents and the Shareholders Agreement shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements;

7.      all Professional Fee Claims and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court; and

8.      all reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by all of the attorneys, advisors, and other professionals payable under the RSA or the DIP Order, shall have been paid in Cash.

B.      *Waiver of Conditions Precedent*

The Debtors, with the reasonable consent of the Required Consenting Term Lenders and the DIP ABL Agent, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

C.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

D.      *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (2) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification of Plan*

Subject to the limitations contained in the Plan and the RSA and the consent rights and limitations in the DIP ABL Agreement, the Debtors, with the reasonable consent of the Required Consenting Term Lenders, reserve the right to modify the Plan prior to Confirmation and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the consent rights and limitations in the DIP ABL Agreement (or the Exit ABL Agreement with respect to provisions relating to the treatment, rights, or terms of the Exit ABL Facility), the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

Without limiting the respective rights of each party to the RSA or the DIP ABL Agent and DIP ABL Lenders, the Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if the Confirmation Date or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute

a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Interests (as applicable) are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      adjudicate, decide, or resolve any and all matters related to the Restructuring Transactions;

10.     adjudicate, decide, or resolve any and all matters related to enforcement of the RSA;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the

44

Confirmation Order, or the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

13.     hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI.K.1 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and, subject to any applicable forum selection clauses, contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

14.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17.     enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18.     enforce all orders previously entered by the Bankruptcy Court; and

19.     hear any other matter not inconsistent with the Bankruptcy Code;

*Provided, however*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court, and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the RSA.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

45

C.    *Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, will be paid by each of the applicable Reorganized Debtors for each quarter (including any fraction thereof) until the applicable Chapter 11 Case of such Reorganized Debtor is converted, dismissed, or closed, whichever occurs first.

D.    *Payment of Certain Fees and Expenses*

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, shall pay on the Effective Date all then-outstanding reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by all of the attorneys, advisors, and other professionals payable under the RSA or the DIP Order. Any such costs and expenses that are attorneys' fees and expenses shall be submitted to the Debtors or the Reorganized Debtors in the form of summary invoices of the relevant law firms. The Debtors and, after the Effective Date, the Reorganized Debtors, shall continue to pay, reimburse and honor Contingent DIP ABL Obligations, Contingent DIP Term Obligations, Contingent Prepetition ABL Obligations, Contingent First Lien Term Loan Obligations, and Contingent Second Lien Term Loan Obligations. In addition, the Reorganized Debtors shall continue to pay when due and payable in the ordinary course, reasonable and documented fees and expenses of the Ad Hoc Crossholder Lender Group Advisors (as defined in the RSA) and the Ad Hoc First Lien Lender Group Advisors (as defined in the RSA) related to implementation, consummation, or defense of the Plan. Counsel to the DIP Agents, the Term Loan Agents, the First Lien Term Loan Lenders, and Second Lien Term Loan Lenders shall be authorized to disburse any and all retainer monies in its possession to reimburse the reasonable fees and expenses of such counsel.

E.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.    *Service of Documents*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Debtors:**

Blackhawk Mining LLC
3228 Summit Square Place, Suite 180,
Lexington, Kentucky 40509
Attention: Jesse Parrish
E-mail: jparrish@blackhawkmining.com

With copies to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Facsimile: (312) 862-2200
Attention: Ross M. Kwasteniet, P.C. and Joseph M. Graham, Esq.
E-mail: ross.kwasteniet@kirkland.com, joe.graham@kirkland.com

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York, 10022
Facsimile: (212) 446-4900
Attention: Stephen E. Hessler, P.C.
E-mail: stephen.hessler@kirkland.com

Potter Anderson Corroon LLP
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801-6108
Facsimile: (302) 658-1192
Attention: Christopher M. Samis, Esq., and L. Katherine Good, Esq.
Email: csamis@potteranderson.com; kgood@potteranderson.com

**If to the Consenting Term Lenders:**

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn: Brian M. Resnick, Esq., Dylan Consla, Esq., and Daniel Meyer, Esq.
Email: brian.resnick@davispolk.com, dylan.consla@davispolk.com; daniel.meyer@davispolk.com

**If to the Ad Hoc Group of First Lien Lenders:**

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
Attn: Fredric Sosnick
      Ned. S. Schodek
Email: fsosnick@shearman.com
       ned.schodek@shearman.com

**If to the DIP ABL Agent or Exit ABL Agent:**

MidCap Funding IV Trust
c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn: Account Manager for Blackhawk transaction
Facsimile: 301-941-1450
E-mail: notices@midcapfinancial.com

With copies to:

MidCap Funding IV Trust
c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200

47

Bethesda, Maryland 20814
Attn: General Counsel
Facsimile: 301-941-1450
E-mail: legalnotices@midcapfinancial.com

Hogan Lovells US LLP
390 Madison Avenue
New York, New York 10017
Facsimile: (212) 918-3100
Attn: Deborah K. Staudinger, Esq.
Email: deborah.staudinger@hoganlovells.com

**If to the DIP Term Agent, First Lien Term Loan Agent, or New First Lien Loan Agent:**

Cantor Fitzgerald Securities
110 East 59th Street
New York, New York 10022
Attn: Nils E. Horning, Esq.
Facsimile: (646) 219-1180
Email: nhorning@cantor.com

With copies to:

Cantor Fitzgerald Securities
900 West Trade Street, Suite 725
Charlotte, North Carolina 28202
Attn: Bobbie Young
Facsimile: (646) 390-1764
Email: byoung@cantor.com

Herrick, Feinstein LLP
Two Park Avenue
New York, New York, 10016
Attn: Eric A. Stabler, Esq. and Steven B. Smith, Esq.
Email: establer@herrick.com, ssmith@herrick.com

**If to the Second Lien Term Loan Agent:**

Cortland Capital Market Services LLC
225 W. Washington Street, 9th Floor
Chicago, Illinois 60606
Attn: Legal Department and Tad White

With copies to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Attn: Alex Cota, Esq. and Gabriel E. Sasson, Esq.
Email: acota@stroock.com, gsasson@stroock.com

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002 requiring such Entity to file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

**H.      Entire Agreement**

Except as otherwise indicated, and without limiting the effectiveness of the RSA, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**I.      Plan Supplement Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from https://cases.primeclerk.com/blackhawk or the Bankruptcy Court's website at www.del.uscourts.gov/bankruptcy.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, the Plan Supplement shall control.  The documents considered in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

**J.      Non-Severability**

Except as set forth in Article VIII of the Plan, the provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Required Consenting Parties (and without the consent of the New First Lien Loan Agent solely with respect to provisions relating to the treatment, rights, or terms of the New First Lien Loan), and the DIP ABL Agent (and without the consent of the Exit ABL Agent with respect to provisions relating to the treatment, rights, or terms of the Exit ABL Facility), *provided* that any such deletion or modification must be consistent with the RSA; and (3) non-severable and mutually dependent.

**K.      Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

**L.      Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the RSA, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

**M.      Closing of Chapter 11 Cases**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

Dated:  July 15, 2019

Respectfully submitted,

By: */s/ Jesse Parrish*
  Name:  Jesse Parrish
  Title:   Chief Financial Officer

Prepared by:

Christopher M. Samis (DE 4909)
L. Katherine Good (DE 5101)
**POTTER ANDERSON CORROON LLP**
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, Delaware 19801-6108
Telephone:    (302) 984-6000
Facsimile:    (302) 658-1192
Email:        csamis@potteranderson.com
               kgood@potteranderson.com
               - and -

James H.M. Sprayregen, P.C.

Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
Joseph M. Graham (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
ross.kwasteniet@kirkland.com
               joe.graham@kirkland.com
               - and -

Stephen E. Hessler, P.C. (*pro hac vice* pending)

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        stephen.hessler@kirkland.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**Exhibit B**

**Corporate Structure of the Debtors**

KE 60280931



**Exhibit C**

**Restructuring Support Agreement**

*Execution Version*

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, and including the exhibits hereto, this "<u>Agreement</u>"), dated as of July 15, 2019, is entered into by and among the following parties (each, a "<u>Party</u>" and, collectively, the "<u>Parties</u>"):

  i.    Blackhawk Mining LLC, together with certain of their direct and indirect subsidiaries (collectively, the "<u>Company</u>");

  ii.   the undersigned holders of claims (and together with their respective successors and permitted assigns, the "<u>Consenting First Lien Lenders</u>") under the First Lien Credit Agreement (as defined herein);

  iii.  the undersigned holders of claims (and together with their respective successors and permitted assigns, the "<u>Consenting Second Lien Lenders</u>") under the Second Lien Credit Agreement (as defined herein); and

  iv.   John Mitchell Potter ("<u>Potter</u>").

# <u>RECITALS</u>

**WHEREAS**, the Parties have engaged in good faith, arm's-length negotiations regarding certain restructuring transactions (the "<u>Restructuring Transactions</u>") pursuant to the terms and conditions set forth in this Agreement, including a joint prepackaged plan of reorganization for the Company that is consistent with the terms and conditions of the term sheet attached hereto as **<u>Exhibit A</u>** (the "<u>Restructuring Term Sheet</u>")[1] (including all exhibits thereto, and as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms and this Agreement, the "<u>Plan</u>");

**WHEREAS**, it is anticipated that the Restructuring Transactions will be implemented through jointly administered voluntary cases commenced by the Company (the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), pursuant to the Plan, which will be filed by the Company in the Chapter 11 Cases;

**WHEREAS**, (i) certain Consenting First Lien Lenders or affiliates thereof (in their capacities as such, the "<u>DIP Term Lenders</u>") have committed to provide debtor-in-possession term loan financing (the "<u>DIP Term Financing</u>") and otherwise extend credit to the Company during the pendency of the Chapter 11 Cases and (ii) the Consenting First Lien Lenders and the Consenting Second Lien Lenders have agreed to the Company's use of cash collateral, which DIP Term Financing and use of cash collateral shall be on terms consistent with the term sheet attached

---

[1]    Unless otherwise noted, capitalized terms used but not immediately defined have the meanings given to such terms elsewhere in this Agreement or in the Term Sheets (including any exhibits thereto), as applicable.

hereto as **Exhibit B** (the "DIP Term Sheet") and otherwise pursuant to the DIP Orders and the DIP Term Loan Credit Documents (each as defined herein);

      **WHEREAS**, the Parties have engaged in good faith, arm's-length negotiations regarding certain issues relating to the governance of the Reorganized Company on terms consistent with the term sheet attached hereto as **Exhibit C** (the "Corporate Governance Term Sheet");

      **WHEREAS**, the Parties have engaged in good faith, arm's-length negotiations with the trustee of the PCC Liquidating Trust regarding treatment of that certain Unsecured Promissory Note dated as of October 28, 2015, among the Company as Payor and the PCC Liquidating Trust on terms consistent with the term sheet attached hereto as **Exhibit D** (the "PCC Note Term Sheet" and, collectively with the Restructuring Term Sheet, the DIP Term Sheet, and the Corporate Governance Term Sheet, the "Term Sheets").

      **NOW, THEREFORE**, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

## AGREEMENT

      1.    **Definitions**.  The following terms shall have the following definitions:

      "Ad Hoc Crossholder Lender Group" means that certain ad hoc group of First Lien Lenders and Second Lien Lenders consisting of funds and accounts managed or controlled by Knighthead, Solus, and Redwood Capital Management, LLC.

      "Ad Hoc First Lien Lender Group" means that certain ad hoc group of First Lien Lenders represented by Shearman & Sterling LLP.

      "Ad Hoc Crossholder Lender Group Advisors" means Davis Polk & Wardwell LLP and one additional local counsel as local counsel for the Ad Hoc Crossholder Lender Group.

      "Ad Hoc First Lien Lender Group Advisors" means Shearman & Sterling LLP and one additional local counsel as local counsel for the Ad Hoc First Lien Lender Group.

      "Agreement" has the meaning set forth in the preamble hereof and includes all of the exhibits attached hereto.

      "Agreement Effective Date" means the date upon which this Agreement shall become effective and binding upon each of the Parties pursuant to the terms of Section 2 hereof.

      "Alternative Transaction" means any dissolution, winding up, liquidation, reorganization, recapitalization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets (other than in ordinary course sales or sales of *de minimis* assets), financing (debt or equity), plan proposal, or restructuring of the Company, other than the Restructuring Transactions.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals hereof.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals hereof.

"<u>Chapter 11 Cases</u>" has the meaning set forth in the recitals hereof.

"<u>Company</u>" has the meaning set forth in the preamble hereof.

"<u>Company Advisors</u>" means, collectively, Kirkland & Ellis LLP, Centerview Partners, and AP Services, LLC.

"<u>Confirmation Order</u>" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"<u>Consenting First Lien Lenders</u>" has the meaning set forth in the preamble hereof.

"<u>Consenting Second Lien Lenders</u>" has the meaning set forth in the preamble hereof.

"<u>Definitive Documentation</u>" means the definitive documents and agreements governing the Restructuring Transactions, including the documents listed in Section 4 hereof and any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan.

"<u>DIP Term Claims</u>" means claims arising under the DIP Term Credit Documents.

"<u>DIP Term Credit Agreement</u>" means the postpetition debtor-in-possession term loan credit agreement for the DIP Term Financing having the terms and conditions set forth in the DIP Term Sheet.

"<u>DIP Term Credit Documents</u>" means, collectively, the DIP Credit Agreement and the DIP Orders, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements (including the intercreditor agreement setting forth the relative rights and priorities in the DIP Collateral among the DIP Term Lenders and the lenders under the DIP ABL Facility), security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"<u>DIP Term Financing</u>" has the meaning set forth in the recitals hereof.

"<u>DIP Term Lenders</u>" has the meaning set forth in the recitals hereof.

"<u>DIP Term Loan Commitment Parties</u>" means each (i) Consenting First Lien Lender listed on **<u>Exhibit F</u>** hereto or that executes this Agreement after the Agreement Effective Date and before the date of entry of the interim DIP Order and indicates on its signature page that it agrees to be deemed to be added to Exhibit F hereto and (ii) First Lien Lender that is not a Consenting First Lien Lender but that, as set forth in the DIP Term Sheet, enters into a written agreement after the Agreement Effective Date and before the date of entry of the interim DIP Order evidencing its DIP Term Commitment.

3

"DIP Orders" means, collectively, the interim and final orders authorizing the use of cash collateral and approving the DIP Term Financing and the debtor-in-possession asset based revolving credit agreement, each on terms materially consistent with the DIP Term Sheet.

"DIP Term Sheet" has the meaning set forth in the recitals hereof.

"Disclosure Statement" means the disclosure statement (and all exhibits thereto) with respect to the Plan.

"First Lien Credit Agreement" means that certain First Lien Term Loan Credit Agreement, dated as of February 17, 2017, as amended, restated, modified, or supplemented from time to time in accordance with its terms, by and among Blackhawk Mining LLC, as borrower, each of the guarantors party thereto, Cantor Fitzgerald Securities, as administrative agent, and the First Lien Lenders.

"First Lien Lenders" means the lenders party to the First Lien Credit Agreement.

"First Lien Loan Documents" means, collectively, the First Lien Credit Agreement, security agreement, intercreditor agreement, and any other collateral and ancillary documents, including any forbearance agreements, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

"First Lien Claims" means claims outstanding under the First Lien Loan Documents.

"Forbearance Agreements" mean, collectively, (i) that certain First Lien Term Loan Forbearance Agreement dated as of March 29, 2019, among the Company, the subsidiaries of the Company party thereto, Cantor Fitzgerald as Administrative Agent, and the First Lien Lenders party thereto, as amended on April 29, 2019, May 16, 2019, May 31, 2019, and June 14, 2019, and as may be amended, restated, extended, supplemented, or otherwise modified from time to time in accordance with its terms, and (ii) that certain Second Lien Term Loan Forbearance Agreement dated as of March 29, 2019, among the Company, the subsidiaries of the Company party thereto, Cortland Capital Markets Services LLC as Administrative Agent, and the Second Lien Lenders party thereto, as amended on April 29, 2019, May 16, 2019, May 31, 2019, and June 14, 2019, and as may be amended, restated, extended, supplemented, or otherwise modified from time to time in accordance with its terms.

"Knighthead" means Knighthead Capital Management, LLC.

"Majority Consenting First Lien Lenders" means the Consenting First Lien Lenders who hold, in the aggregate, more than 50% in principal amount outstanding of all First Lien Claims held by Consenting First Lien Lenders.

"Majority Consenting Second Lien Lenders" means the Consenting Second Lien Lenders who hold, in the aggregate, more than 50% in principal amount outstanding of all Second Lien Claims held by Consenting Second Lien Lenders.

"Milestones" means the milestones set forth in the DIP Term Sheet.

4

"New First Lien Loan" means the New First Lien Loan (as defined in the Restructuring Term Sheet) to be provided to each holder of First Lien Loans under the Plan on account of such holder's First Lien Claim.

"New First Lien Loan Credit Agreement" means the credit agreement for the New First Lien Loan having terms and conditions as set forth in the Restructuring Term Sheet.

"New First Lien Loan Documents" means, collectively, the New First Lien Loan Credit Agreement and any related agreements, documents, and instruments delivered or entered into in connection with the New First Lien Loan, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents related to or executed in connection therewith.

"Party" and "Parties" have the meanings set forth in the preamble hereof.

"Petition Date" means the date the Company commences the Chapter 11 Cases.

"Plan" has the meaning set forth in the recitals hereof.

"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company with the Bankruptcy Court, and which shall include (a) the Shareholders Agreement and (b) the New First Lien Loan Credit Agreement.

"Potter" has the meaning set forth in the preamble hereof.

"Required Consenting First Lien Lenders" means the Consenting First Lien Lenders who hold, in the aggregate, at least 66.67% in principal amount outstanding of all First Lien Claims held by Consenting First Lien Lenders.

"Required Consenting Second Lien Lenders" means the Consenting Second Lien Lenders who hold, in the aggregate, at least 66.67% in principal amount outstanding of all Second Lien Claims held by Consenting Second Lien Lenders.

"Restructuring Support Parties" means, collectively, the Consenting First Lien Lenders, the Consenting Second Lien Lenders, and Potter, whether in their capacity as a creditor or equityholder of the Company.

"Restructuring Term Sheet" has the meaning set forth in the recitals hereof.

"Restructuring Transactions" has the meaning set forth in the recitals hereof.

"Retention Order" means an order of the Bankruptcy Court, consistent with the engagement letter between the Company and the respective Company Advisor, authorizing the Company to retain and employ the respective Company Advisor.

"Second Lien Credit Agreement" means that certain Second Lien Term Loan Credit Agreement, dated as of October 28, 2015, as amended, restated, modified, or supplemented from

5

time to time in accordance with its terms, by and among, Blackhawk Mining LLC, as borrower, each of the guarantors party thereto, Cortland Capital Market Services LLC, as administrative agent, in its capacity as administrative agent, and the Second Lien Lenders.

"Second Lien Lenders" means the lenders party to the Second Lien Credit Agreement.

"Second Lien Loan Documents" means, collectively, the Second Lien Credit Agreement and any letter of credit documentation, security agreement, intercreditor agreement, and any other collateral and ancillary documents, including any forbearance agreements, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

"Second Lien Claims" means claims outstanding under the Second Lien Loan Documents.

"Shareholders Agreement" means the stockholders' agreement, or other similar agreement (including, if applicable, an operating agreement or limited liability company agreement), setting forth the rights and obligations of the holders of the equity of the reorganized Company following the effective date of the Plan having the terms and conditions set forth in the Corporate Governance Term Sheet.

"Solicitation Materials" means the ballots and other related materials drafted in connection with the solicitation of acceptances of the Plan.

"Solicitation Order" means the order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials.

"Solus" means Solus Alternative Asset Management LP.

"Term Sheets" has the meaning set forth in the recitals hereof.

"Termination Date" means the date on which termination of this Agreement is effective.

"Transfer" means to sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, in whole or in part, a party's right, title, or interest in respect of any of such party's claims (including First Lien Claims and Second Lien Claims) against, or interests in, the Company, or the deposit of any of such party's claims against or interests in the Company, as applicable, into a voting trust, or the grant of any proxies, or entry into a voting agreement with respect to any such claims or interests.

"Transferor" means the Restructuring Support Party making a Transfer.

"Transferee Joinder" means a transferee joinder substantially in the form attached hereto as **Exhibit E**.

Capitalized terms used but not defined herein shall have the meanings given to such terms in the Term Sheets.  Unless otherwise specified, references in this Agreement to any Section or clause refer to such Section or clause as contained in this Agreement.  The words "herein," "hereof," and "hereunder" and other words of similar import in this Agreement refer to this Agreement as a whole, and not to any particular Section or clause contained in this Agreement.  Wherever from

6

the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter genders.  The words "including," "includes," and "include" shall each be deemed to be followed by the words "without limitation".  Wherever the consent or the written consent of a Party is required, the other Parties may rely on email correspondence from counsel to such Party.

2.    **Agreement Effective Date**.    The Agreement Effective Date shall occur immediately upon delivery to the Parties of executed and released signature pages for this Agreement from (a) the Company, (b) Consenting First Lien Lenders holding, in aggregate, at least two-thirds in principal amount of all First Lien Claims, (c) Consenting Second Lien Lenders holding, in aggregate, at least two thirds in principal amount of all Second Lien Claims, and (d) Potter.  Upon the Agreement Effective Date, this Agreement shall be deemed effective and thereafter the terms and conditions herein may only be amended, modified, waived, or otherwise supplemented as set forth in <u>Section 30</u> hereof.

3.    **Term Sheets**.  The Term Sheets are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Term Sheets.  In the event of any inconsistency between this Agreement (excluding the Term Sheets) and the Term Sheets, the Term Sheets shall govern.

4.    **Definitive Documentation**.

(a)    The Definitive Documentation shall include:

(i)    the Plan;

(ii)    the Plan Supplement and the documents contained therein;

(iii)    the Confirmation Order;

(iv)    the Disclosure Statement, the motion seeking approval of the Disclosure Statement, the Solicitation Materials, and the Solicitation Order;

(v)    the DIP Orders, the DIP Term Credit Documents and the debt documents with respect to the DIP ABL Facility;

(vi)    the New First Lien Loan Documents and the debt documents with respect to the ABL exit facility that is contemplated by the Term Sheets;

(vii)    Shareholders Agreement; and

(viii)    organizational documents of the Reorganized Company.

(b)    Except as set forth herein, the Definitive Documentation (and any modifications, restatements, supplements, or amendments to any of them)

7

will, after the Agreement Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all respects with the terms of this Agreement and otherwise be in form and substance reasonably satisfactory to each of (i) the Company, (ii) the Required Consenting First Lien Lenders, and (iii) the Required Consenting Second Lien Lenders.

5. **Milestones**. The Company shall implement the Restructuring Transactions in accordance with the Milestones. The Company may extend a Milestone only with the express prior written consent of the Required Consenting First Lien Lenders and the Required Consenting Second Lien Lenders.

6. **Commitment of the Restructuring Support Parties**. Each Restructuring Support Party shall (severally and not jointly) from the Agreement Effective Date until the occurrence of the Termination Date:

(a) support and take all actions commercially reasonably necessary to support consummation of the Restructuring Transactions in accordance with the terms and conditions of this Agreement, by: (i) when properly solicited to do so, voting all of its claims (including all of its First Lien Claims and all of its Second Lien Claims) against, or interests in, as applicable, the Company now or hereafter owned by such Restructuring Support Party (or for which such Restructuring Support Party now or hereafter serves as the nominee, investment manager, or advisor for holders thereof) to accept the Plan; (ii) timely returning a duly-executed ballot in connection therewith and using commercially reasonable efforts to return such ballots by July 17, 2019, at 5:00 p.m., prevailing Eastern Time; and (iii) supporting and not "opting out" of any releases under the Plan and affirmatively opting into such releases if required to do so;

(b) not seek, support, or solicit an Alternative Transaction;

(c) not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its tender, consent, or vote with respect to the Plan;

(d) use commercially reasonable efforts to support, and not object to, or materially delay or impede, or take any other action to materially interfere, directly or indirectly, with the Restructuring Transactions;

(e) use commercially reasonable efforts to support, and not object to, or materially delay or impede, or take any other action to materially interfere, directly or indirectly, with the entry by the Bankruptcy Court of any of the DIP Orders, and shall (a) not propose, support, or file a pleading with the Bankruptcy Court seeking entry of an order authorizing, directly or indirectly, any use of cash collateral or debtor-in-possession financing other than as proposed in each of the DIP Orders, (b) not direct the applicable administrative agent under the First Lien Loan or the Second Lien Loan to

8

propose, file, support, or file a pleading with the Bankruptcy Court seeking entry of an order authorizing, directly or indirectly, any use of cash collateral or debtor-in-possession financing other than as proposed in each of the DIP Orders and, to the extent such administrative agent proposes, files, supports or files such a pleading, shall direct such agent to withdraw such proposal, support, or pleading, or (c) not object to, or otherwise take any other action to materially oppose, the granting of any liens under the DIP Orders that prime the prepetition liens securing the First Lien Claims and Second Lien Claims;

(f)     not file or support, and not direct the applicable administrative agent under the First Lien Loan or the Second Lien Loan to file or support, any motion or pleading with the Bankruptcy Court that is not materially consistent with this Agreement;

(g)     refrain from taking any action, either directly or indirectly, to abandon such Party's interests in the Company or otherwise take any action that could have the effect of causing the Company's other equityholders being allocated items of taxable income, gain, loss, or deduction (including cancellation of indebtedness income) that would have been allocated to such Party (or any successor to such Party) in the absence of any such action;

(h)     prevent any entity in which such Party has a direct or indirect interest from taking any action that would violate Section 6(g) hereof;

(i)     use good faith efforts to cooperate with the other Restructuring Support Parties to develop Restructuring Transactions that produce a tax-efficient outcome;

(j)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional or alternative provisions to address any such impediment; and

(k)     not object to, or otherwise contest, any application filed with the Bankruptcy Court seeking: (i) entry of the Retention Orders, authorizing the Company to retain and employ the Company Advisors; or (ii) allowance of any completion, transaction, or success fee (or similar fee) set forth in the respective Company Advisor's engagement letter with the Company so long as such completion, transaction, or success fee (or similar fee) is consistent with the terms of the applicable Company Advisor's Retention Order.

Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by any Restructuring Support Party nor the acceptance of the Plan by any Restructuring Support Party shall (v) be construed as an obligation of any Restructuring Support Party to advance any funds to or purchase any securities of the Company or the Reorganized Company, other than

9

pursuant and subject to the DIP Term Credit Agreement; (w) be construed to prohibit any Restructuring Support Party from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documentation, or exercising rights or remedies specifically reserved herein; (x) be construed to prohibit or limit any Restructuring Support Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, from the Agreement Effective Date until the occurrence of the Termination Date, such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement, are not prohibited by this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions; (y) limit the ability of a Restructuring Support Party to sell or enter into any transactions in connection with its claims (including all of its First Lien Claims and all of its Second Lien Claims) against, or interests in, as applicable, the Company now or hereafter owned by such Restructuring Support Party, subject to Section 18 of this Agreement; or (z) require any Restructuring Support Party to take any action prohibited by any intercreditor agreement with respect to the First Lien Credit Agreement or Second Lien Credit Agreement.

7.    **DIP Commitments**. Subject to the conditions set forth in the DIP Term Sheet, the DIP Term Loan Commitment Parties, severally and not jointly, agree to provide (or cause any of its designees to provide) their respective shares of the New Money DIP Commitments (as defined in the DIP Term Sheet) on the terms and conditions substantially as set forth in the DIP Term Sheet. For the avoidance of doubt, upon termination or expiration of this Agreement in accordance with its terms, the commitment of the DIP Term Loan Commitment Parties made pursuant to this Section 7 to enter into the DIP Term Credit Agreement and provide their respective shares of the DIP Term Commitments shall terminate; provided, however, that upon the execution of the DIP Term Credit Agreement, the DIP Term Credit Agreement shall govern the New Money DIP Commitments and any termination thereof.

8.    **Commitment of Potter**. In addition to the obligations set forth in Section 6 hereof, Potter shall, from the Agreement Effective Date until the occurrence of the Termination Date:

(a)    direct any entity which he manages or controls either directly or indirectly to comply with the obligations set forth in Section 6 hereof;

(b)    cause certain entities that he manages or controls to continue to satisfy such entity's obligations under the Affiliate Contracts listed on Schedule 1 to the Restructuring Term Sheet; and

(c)    until removed by the other members of the Board of Managers at their sole discretion, continue to serve during the pendency of the Chapter 11 Cases on the Board of Managers of those Company entities that Potter served on before the Petition Date; *provided* that, for the avoidance of doubt, this Agreement shall in no way limit Potter's fiduciary duties under applicable law in his capacity as a member of such Board of Managers.

9. **Commitment of the Company**.  The Company shall, from the Agreement Effective Date until the occurrence of the Termination Date:

(a) commence the Chapter 11 Cases before the expiration of the Forbearance Agreements;

(b) timely (i) file the motion seeking entry, and seek entry by the Bankruptcy Court of each, of the DIP Orders, (ii) file the Disclosure Statement and the motion seeking entry of the Solicitation Order and seek entry by the Bankruptcy Court of the Solicitation Order, and (iii) file the Plan and seek entry by the Bankruptcy Court of the Confirmation Order;

(c) (i) support and use commercially reasonable efforts to execute and complete the Restructuring Transactions set forth in the Plan and this Agreement and (ii) negotiate in good faith all Definitive Documentation that is subject to negotiation as of the Agreement Effective Date and take any and all necessary and appropriate actions in furtherance of the Plan and this Agreement;

(d) timely file a formal objection to any motion filed with the Bankruptcy Court by a party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Chapter 11 Cases;

(e) timely file a formal objection to any motion filed with the Bankruptcy Court by a party seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(f) timely file (i) a formal objection to any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the First Lien Claims; and (ii) a formal objection to any motion, application or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Second Lien Claims;

(g) timely comply with all Milestones;

(h) to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in this Agreement or the Plan, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, in consultation with the Required Consenting First Lien Lenders and the Required Consenting Second Lien Lenders;

11

(i)     as soon as reasonably practicable, notify the Consenting First Lien Lenders and the Consenting Second Lien Lenders of any governmental or third party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened) that would prevent, hinder, or delay the consummation of the transactions contemplated in this Agreement or the Plan of which the Company Advisors have actual knowledge by furnishing written notice to the Consenting First Lien Lenders and Consenting Second Lien Lenders within two Business Days of actual knowledge of such event;

(j)     as soon as reasonably practicable, notify the Consenting First Lien Lenders and Consenting Second Lien Lenders of any material breach by the Company of which the Company Advisors have actual knowledge in respect of any of the obligations, representations, warranties, or covenants set forth in this Agreement by furnishing written notice to the Consenting First Lien Lenders and Consenting Second Lien Lenders within two Business Days of actual knowledge of such breach;

(k)     pay in cash (i) prior to the Petition Date, all reasonable and documented fees and expenses accrued prior to the Petition Date for which invoices or receipts are furnished by the (x) Ad Hoc Crossholder Lender Group Advisors, (y) the Ad Hoc First Lien Lender Group Advisors, and (z) one counsel to any First Lien Lender holding at least $150 million in principal amount of First Lien Loans, (ii) after the Petition Date, subject to any applicable orders of the Bankruptcy Court, all reasonable and documented fees and expenses incurred on and after the Petition Date from time to time, but in any event within seven days of delivery to the Company of any applicable invoice or receipt, by the (x) Ad Hoc Crossholder Lender Group Advisors, (y) the Ad Hoc First Lien Lender Group Advisors, and (z) one counsel to any First Lien Lender holding at least $150 million in principal amount of First Lien Loans, and (iii) on the Plan Effective Date, all reasonable and documented fees and expenses incurred by the (x) Ad Hoc Crossholder Lender Group Advisors, (y) Ad Hoc First Lien Lender Group Advisors, and (z) one counsel to any First Lien Lender holding at least $150 million in principal amount of First Lien Loans that are outstanding in connection with the Restructuring Transactions;

(l)     provide draft copies of all material pleadings, including "first day" and other motions (excluding retention applications) and any responsive pleadings required to be filed under this Agreement, that the Company intends to file with the Bankruptcy Court in any of the Chapter 11 Cases to counsel to the Ad Hoc Crossholder Lender Group and counsel to the Ad Hoc First Lien Lender Group at least two Business Days (or as soon as is reasonably practicable under the circumstances) prior to the date when the Company intends to file such document, and shall consult in good faith with each such counsel regarding the form and substance of any such proposed filing;

(m)     not seek, solicit, or support any Alternative Transaction;

(n)     except as expressly contemplated by this Agreement, not engage in material non-ordinary course transaction or make any material non-ordinary course payment, including entry into any new key employee incentive plan or key employee retention plan or similar arrangement, or any new or amended agreement regarding executive compensation without the prior written consent of the Required Consenting First Lien Lenders and Required Consenting Second Lien Lenders; and

(o)     as soon as reasonably practicable after the occurrence thereof, notify the Consenting First Lien Lenders and the Consenting Second Lien Lenders if the Company, or any directors, officers, or employees of the Company determines to take or refrain from taking any action, or takes or refrains from taking any action, on the basis of Section 17 hereof;

10.     **Consenting First Lien Lenders Termination Events**.  The Majority Consenting First Lien Lenders shall have the right, but not the obligation, upon notice to the other Parties provided in accordance with Section 28 hereof, to terminate this Agreement as to all Parties upon the occurrence of any of the following events, unless waived, in writing, by the Required Consenting First Lien Lenders on a prospective or retroactive basis:

(a)     the failure to meet any of the Milestones unless such Milestone is extended in accordance with Section 5 of this Agreement, *provided* that, if such failure is the result of any act, omission, or delay on the part of a Consenting First Lien Lender in violation of such Consenting First Lien Lender's obligations under this Agreement, such Consenting First Lien Lender may not be among the Required Consenting First Lien Lenders exercising their termination right with respect thereto under this Section 10(a);

(b)     the occurrence of a material breach of this Agreement by (i) the Company, (ii) Potter, or (iii) one or more Consenting Second Lien Lenders holding Second Lien Loans in an aggregate outstanding principal amount such that non-breaching Consenting Second Lien Lenders hold less than 66.7% of the aggregate outstanding principal amount of Second Lien Loans; that has not been cured (if susceptible to cure) before five business days after written notice to the Company in accordance with Section 28(a) hereof of such material breach by the Company or Consenting Second Lien Lender or Lenders, as applicable, asserting such termination;

(c)     the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(d)     the dismissal of one or more of the Chapter 11 Cases without the prior written consent of the Required Consenting First Lien Lenders;

13

(e)      the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(f)      notice of an "Event of Default" (as defined in the DIP Term Credit Agreement or the DIP ABL Credit Agreement, as applicable) has been given or declared under either the DIP Term Facility or the DIP ABL Facility and has not been waived or timely cured in accordance therewith;

(g)      any Definitive Documentation is not consistent in all respects with the terms of this Agreement and otherwise in form and substance reasonably satisfactory to the Required Consenting First Lien Lenders, *provided* that Majority Consenting First Lien Lenders must provide five business days' written notice to the Company in accordance with Section 28(a) hereof of any such proposed termination and the Company shall have such time to amend or modify such Definitive Documentation such that the applicable Definitive Documentation shall be consistent in all respects with the terms of this Agreement and otherwise in form and substance reasonably satisfactory to the Required Consenting First Lien Lenders;

(h)      the Company (i) files or announces that it will proceed with an Alternative Transaction or (ii) withdraws or announces its intention not to support the Plan;

(i)      the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of any of the Restructuring Transactions; *provided*, *however*, that the Company shall have five business days after the issuance of such ruling or order to obtain relief that would allow consummation of the applicable Restructuring Transactions in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement or (ii) is reasonably acceptable to the Required Consenting First Lien Lenders;

(j)      a breach by the Company of any representation, warranty, or covenant of the Company set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) has not been cured five business days after the receipt by the Company of written notice given in accordance with Section 28(a) with a description of such breach from any of the Required Consenting First Lien Lenders;

(k)      the Company files a motion, application, or adversary proceeding (or the Company supports any such motion, application, or adversary proceeding filed or commenced by any third party) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or

14

subordination of, any portion of the First Lien Claims or asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims; or

(l)  the Company, or any directors, officers, or employees of the Company, takes any action or refrains from taking any action on the basis of <u>Section 17</u> hereof.

11.  **Consenting Second Lien Lenders Termination Events**.  The Majority Consenting Second Lien Lenders shall have the right, but not the obligation, upon notice to the other Parties provided in accordance with <u>Section 28</u> hereof, to terminate this Agreement as to all Parties upon the occurrence of any of the following events, unless waived, in writing, by the Required Consenting Second Lien Lenders on a prospective or retroactive basis:

(a)  the failure to meet any of the Milestones unless such Milestone is extended in accordance with <u>Section 5</u> of this Agreement, *provided* that, if such failure is the result of any act, omission, or delay on the part of a Consenting Second Lien Lender in violation of such Consenting Second Lien Lender's obligations under this Agreement, such Consenting Second Lien Lender may not be among the Required Consenting Second Lien Lenders exercising their termination right with respect thereto under this Section 11(a);

(b)  the occurrence of a material breach of this Agreement by (i) the Company, (ii) Potter, or (iii) one or more Consenting First Lien Lenders holding First Lien Loans in an aggregate outstanding principal amount such that non-breaching Consenting First Lien Lenders hold less than 66.7% of the aggregate outstanding principal amount of First Lien Loans; that has not been cured (if susceptible to cure) before five business days after written notice to the Company in accordance with <u>Section 28(a)</u> hereof of such material breach by the Company or Consenting First Lien Lender or Lenders, as applicable, asserting such termination;

(c)  the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(d)  the dismissal of one or more of the Chapter 11 Cases without the prior written consent of the Required Consenting Second Lien Lenders;

(e)  the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(f) notice of an "Event of Default" (as defined in the DIP Term Credit Agreement or the DIP ABL Credit Agreement, as applicable) has been given or declared under either the DIP Term Facility or the DIP ABL Facility and has not been waived or timely cured in accordance therewith;

(g) any Definitive Documentation is not consistent in all respects with the terms of this Agreement and otherwise in form and substance reasonably satisfactory to the Required Consenting Second Lien Lenders, *provided* that the Majority Consenting Second Lien Lenders must provide five business days' written notice to the Company in accordance with Section 28(a) hereof of any such proposed termination and the Company shall have such time to amend or modify such Definitive Documentation such that the applicable Definitive Documentation shall be consistent in all respects with the terms of this Agreement and otherwise in form and substance reasonably satisfactory to the Required Consenting Second Lien Lenders;

(h) the Company (i) files or announces that it will proceed with an Alternative Transaction or (ii) withdraws or announces its intention not to support the Plan;

(i) the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of any of the Restructuring Transactions; *provided*, *however*, that the Company shall have five business days after the issuance of such ruling or order to obtain relief that would allow consummation of the applicable Restructuring Transactions in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement or (ii) is reasonably acceptable to the Required Consenting Second Lien Lenders;

(j) a breach by the Company of any representation, warranty, or covenant of the Company set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) has not been cured five business days after the receipt by the Company of written notice given in accordance with Section 28(a) with a description of such breach from the Required Consenting Second Lien Lenders;

(k) the Company files a motion, application, or adversary proceeding (or the Company supports any such motion, application, or adversary proceeding filed or commenced by any third party) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Second Lien Claims or asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims; or

16

(l)    the Company, or any directors, officers, or employees of the Company, takes any action or refrains from taking any action on the basis of <u>Section 17</u> hereof.

12.    **Potter Termination Events**.    Potter shall have the right, but not the obligation, upon notice to the other Parties provided in accordance with <u>Section 28</u> hereof, to terminate this Agreement as to all Parties upon the occurrence of any of the following events, unless waived, in writing, by Potter on a prospective or retroactive basis:

(a)    the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(b)    the dismissal of one or more of the Chapter 11 Cases without the prior written consent of Potter;

(c)    the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(d)    the Company (i) amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that is materially inconsistent with this Agreement, (ii) suspends or revokes the Restructuring Transactions, or (iii) publicly announces its intention to take any such action listed in the foregoing provisos (i) and (ii), but, in each case, only to the extent such action can reasonably be expected to have a material adverse impact on the rights of Potter under this Agreement; or

(e)    the Company (i) files or announces that it will proceed with an Alternative Transaction or (ii) withdraws or announces its intention not to support the Plan.

13.    **The Company's Termination Events**.    The Company may, upon notice to the Restructuring Support Parties, terminate this Agreement as to all Parties upon the occurrence of any of the following events, unless waived, in writing, by the Company on a prospective or retroactive basis:

(a)    a material breach by (i) Consenting First Lien Lenders holding First Lien Loans in an aggregate outstanding principal amount such that non-breaching Consenting First Lien Lenders hold less than 66.7% of the aggregate outstanding principal amount of First Lien Loans, (ii) one or more Consenting Second Lien Lenders holding Second Lien Loans in an aggregate outstanding principal amount such that non-breaching Consenting Second Lien Lenders hold less than 66.7% of the aggregate outstanding principal amount of Second Lien Loans, or (iii) Potter of any representation, warranty, or covenant of such party set forth in this Agreement that (to the extent curable) has not been cured before five

17

business days after notice to all Restructuring Support Parties given in accordance with <u>Section 28</u> hereof of such breach;

(b)    any of the Definitive Documentation (including any amendment or modification thereof) is filed with the Bankruptcy Court or otherwise finalized, or has become effective, that is not materially consistent with this Agreement or otherwise reasonably satisfactory to the Company, and such inconsistency has not been cured before five business days after notice to all Restructuring Support Parties given in accordance with <u>Section 28</u> hereof of such breach;

(c)    the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring Transactions; *provided*, *however*, that the Company has made commercially reasonable, good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement;

(d)    upon written notice to each Restructuring Support Party delivered in accordance with <u>Section 28</u> hereof that the Board of Managers of the Company has determined in good faith, after consultation with outside counsel, that proceeding with the Restructuring Transactions contemplated by this Agreement would be inconsistent with the continued exercise of its fiduciary duties as set forth in <u>Section 17</u> hereof; or

(e)    The Requisite Consenting First Lien Lenders terminate this Agreement in accordance with <u>Section 10</u> or the Requisite Consenting Second Lien Lenders terminate this Agreement in accordance with <u>Section 11</u>.

Specific performance shall not be available as a remedy if this Agreement is terminated in accordance with <u>Section 13(d)</u> hereof.  All Consenting First Lien Lenders and Consenting Second Lien Lenders reserve all rights they may have, including the right (if any) to challenge any exercise by the Company of its fiduciary duties.

14.    **Mutual Termination; Automatic Termination; Individual Termination**.

(a)    This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among Blackhawk Mining LLC, on behalf of the Company, the Required Consenting First Lien Lenders, and the Required Consenting Second Lien Lenders.

(b)    Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically without further required action upon the occurrence of the Plan Effective Date.

(c)    Any Restructuring Support Party may terminate this Agreement as to itself only, upon written notice to the other Parties in accordance with Section 28,

18

in the event that (i) this Agreement, including the Term Sheets, or the Definitive Documentation are amended, supplemented, or otherwise modified, or the terms thereunder are waived, without its consent in such a way as to (x) adversely and materially modify the economic treatment contemplated for such Restructuring Support Party in this Agreement, including the Term Sheets, as in effect on the Agreement Effective Date or (y) add any material obligations to the Restructuring Support Party from those contemplated in this Agreement, including the Term Sheets, as in effect on the Agreement Effective Date; provided that such written notice shall be given by the applicable Restructuring Support Party within five (5) Business Days of such waiver, amendment, supplement, or other modification; or (ii) the Plan Effective Date has not occurred within a timeframe consistent with the Milestones.

15.     **Automatic Stay**.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination of this Agreement by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice); *provided*, *however*, that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

16.     **Effect of Termination**.  Upon the termination of this Agreement, this Agreement shall be of no further force or effect with respect to any Restructuring Support Party, and each Restructuring Support Party shall: (a) be released from its commitments, undertakings, and agreements under or related to this Agreement, (b) have the rights and remedies that it would have had, had it not entered into this Agreement, and (c) be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement; provided an individual termination by a Restructuring Support Party pursuant to Section 14(c) shall only terminate this Agreement as to such Restructuring Support Party, and the immediately foregoing clauses (a) – (c) of this Section 16 shall apply to such Restructuring Support Party and this Agreement shall remain in full force and effect as to all other Parties.  Any and all consents tendered by any Restructuring Support Party (or the applicable Restructuring Support Party in the case of an individual termination) prior to such termination shall be deemed, for all purposes, to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions, the Plan, and this Agreement or otherwise and such consents may be changed or resubmitted; *provided*, *however*, that if the approval of the Bankruptcy Court shall be required under applicable law in order for a Restructuring Support Party to change or resubmit such consents, then the Company shall not oppose any attempt by such Restructuring Support Party to terminate, change, or resubmit the consent under this <u>Section 16</u>.  The termination of this Agreement shall not relieve or absolve any Party of any liability for any breaches of this Agreement that preceded the termination of the Agreement.  Notwithstanding anything to the contrary in this Agreement, the foregoing shall not be construed to prohibit the Company or any Restructuring Support Party from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before the Termination Date.  Except as expressly provided

in this Agreement, nothing in this Agreement is intended to, or does, in any manner waive, limit, impair, or restrict any right or ability of any Restructuring Support Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any other Restructuring Support Party.

17.     **Fiduciary Duties.**  Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the Company, or any directors, officers, or employees of the Company (in such person's capacity as a director, officer, or employee) to take any action, or to refrain from taking any action, to the extent that the Company's board of managers determines in good faith, after consultation with outside counsel, that taking such action or refraining from taking such action may be inconsistent with its or their fiduciary obligations under applicable law, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement; provided, however, that in the event of such determination by the Company's board of managers (to the extent that the Company does not terminate this Agreement in accordance with this Section 17 and Section 13(d) hereof) either or both of the Consenting First Lien Lenders and Consenting Second Lien Lenders may terminate this Agreement in accordance with Section 10 or Section 11 hereof.  The Company, in its sole discretion, may (but shall not be required to) terminate this Agreement in accordance with Section 13(d) hereof, and specific performance shall not be available as a remedy if this Agreement is terminated in accordance with this Section 17 and Section 13(d) hereof or Section 10(l) or Section 11(l) hereof.  All Consenting First Lien Lenders and Consenting Second Lien Lenders reserve all rights they may have, including the right (if any) to challenge any exercise by the Company of its fiduciary duties.

18.     **Transfers of Claims and Interests**.  Each Restructuring Support Party shall not make a Transfer, unless such Transfer is to another Restructuring Support Party or any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the Company the Transferee Joinder.  Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations.  Any Transfer made in violation of this Section 18 shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Company and/or any Restructuring Support Party, and shall not create any obligation or liability of the Company or any other Restructuring Support Party to the purported transferee.

19.     **Further Acquisition of Claims or Interests**.  Except as set forth in Section 18, nothing in this Agreement shall be construed as precluding any Restructuring Support Party or any of its affiliates from acquiring additional DIP Claims, First Lien Claims, Second Lien Claims, or interests in the instruments underlying the DIP Claims, First Lien Claims, or Second Lien Claims; *provided*, *however*, that any such additional DIP Claims, First Lien Claims or Second Lien Claims acquired by any Restructuring Support Party or by any of its affiliates shall automatically be subject to the terms and conditions of this Agreement.  Upon any such further acquisition by a Restructuring Support Party or any of its affiliates, such Restructuring Support Party shall promptly notify counsel to the Company.

20. **Consents and Acknowledgments**.

    (a)    Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for acceptances of the Plan for purposes of sections 1125, 1126, and 1127 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.

    (b)    By executing this Agreement, each Restructuring Support Party (including, for the avoidance of doubt, any entity that may execute this Agreement or a Transferee Joinder after the Agreement Effective Date) consents to the Company's use of its cash collateral and incurrence of debtor-in-possession financing expressly as authorized by, and subject to the terms of, this Agreement and the Definitive Documentation, until the termination of this Agreement as to such Restructuring Support Party.

    (c)    By executing this Agreement, each Restructuring Support Party (including, for the avoidance of doubt, any entity that may execute this Agreement or a Transferee Joinder after the Agreement Effective Date) forbears from exercising remedies with respect to any Default or Event of Default as defined under the First Lien Loan Documents and Second Lien Loan Documents, as applicable, that is caused by the Company's entry into this Agreement or the other documents related to this Agreement and the transactions contemplated in this Agreement, and agrees to direct the applicable administrative agent to not exercise remedies to the extent that any other First Lien Lender or Second Lien Lender directs such agent to exercise such remedies.

21. **Representations and Warranties**.

    (a)    Each Restructuring Support Party hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

        (i)    it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

        (ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

        (iii)    to the extent it is a Consenting First Lien Lender or Consenting Second Lien Lender, the execution and delivery by it of this Agreement does not violate its certificates of incorporation, or bylaws, or other organizational documents;

(iv)    the execution, delivery, and performance by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, except (i) any of the foregoing as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities or "blue sky" laws, (ii) any of the foregoing as may be necessary and/or required in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (iii) filings of amended certificates of incorporation or articles of formation or other organizational documents with applicable state authorities, and other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the Company, and (iv) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to make, obtain or take, as applicable, would not be reasonably likely, individually or in the aggregate, to materially delay or materially impair the ability of any Party hereto to consummate the transactions contemplated hereby;

(v)    this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(vi)    it is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended, with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement, the Disclosure Statement, the Plan, and any other Definitive Documentation, and it has made its own analysis and decision to enter into this Agreement; and

(vii)    it (A) either (1) is the sole owner of the claims and interests identified below its name on its signature page hereof and in the amounts set forth therein, or (2) has all necessary investment or voting discretion with respect to the principal amount of claims and interests identified below its name on its signature page hereof, and has the power and authority to bind the owner(s) of such claims and interests to the terms of this Agreement; (B) is entitled (for its own accounts or for the accounts of such other owners) to all of the rights and economic benefits of such claims and interests; and (C) to the knowledge of the individuals working on the Restructuring

22

Transactions, does not directly or indirectly own any First Lien Claims or Second Lien Claims, other than as identified below its name on its signature page hereof.

(b)    Each Company entity hereby represents and warrants on a joint and several basis (and not any other person or entity other than each Company entity) that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(i)    it has the requisite corporate or other organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part, including approval of each of the independent directors of each of the corporate entities that comprise the Company;

(iii)    the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or those of any of its affiliates in any material respect, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Company undertaking to implement the Restructuring Transactions through the Chapter 11 Cases) under any material contractual obligation to which it or any of its affiliates is a party;

(iv)    the execution and delivery by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, other than, for the avoidance of doubt, the actions with governmental authorities or regulatory bodies required in connection with implementation of the Restructuring Transactions;

(v)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability; and

23

(vi)     it has sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

22.     **Relationship Among Parties**.  Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint; (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; (iv) the Parties hereto acknowledge that this agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Company, the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended, and no action taken by any Party pursuant to this Agreement shall be deemed to create a presumption that the Parties are, in any way, acting as a "group"; and (v) none of the Restructuring Support Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, the Company or any of the Company's other lenders or stakeholders, including as a result of this Agreement or the transactions contemplated hereby.

23.     **Remedies**.  It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder, *provided* specific performance shall not be an available remedy against the Company if the Company terminates this Agreement in accordance with, and subject to, Section 13(d) hereof.  The Parties agree that such relief will be their only remedy against the applicable breaching Party or Parties with respect to any such breach, and that in no event will any Party be liable for monetary damages under or in connection with this Agreement.

24.     **Governing Law & Jurisdiction**.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction, except where preempted by the Bankruptcy Code.  By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought in the United States District Court for the Southern District of New York, and by executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party

24

agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.  By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

25.    **Waiver of Right to Trial by Jury**.  Each of the Parties waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort or otherwise, between any of the Parties arising out of, connected with, relating to, or incidental to the relationship established between any of them in connection with this Agreement.  Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

26.    **Successors and Assigns**.  Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

27.    **No Third-Party Beneficiaries**.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

28.    **Notices**.  All notices (including any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing.  Any notice of termination or breach shall be delivered to all other Parties.

(a)    If to the Company:

Blackhawk Mining, LLC
3228 Summit Square Place
Suite 180
Lexington, Kentucky 40509
Attn:  Jesse Parrish
Email: jparrish@blackhawkmining.com

*With a copy to:*

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:    Stephen E. Hessler, P.C.
            Derek Hunter
Email: stephen.hessler@kirkland.com
            derek.hunter@kirkland.com

25

- and -

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn:   Ross M. Kwasteniet, P.C.
        Joseph M. Graham
        Christopher Hayes
Email: ross.kwasteniet@kirkland.com
       joe.graham@kirkland.com
       christopher.hayes@kirkland.com

(b)     If to the Ad Hoc Crossholder Lender Group:

To each member of the Ad Hoc Crosshholder Lender Group at the addresses
or e-mail addresses set forth below each such member's signature page to
this Agreement (or to the signature page to a Joinder Agreement as the case
may be).

*With a copy to:*

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn:   Brian M. Resnick
        Dylan Consla
        Daniel Meyer
Email: brian.resnick@davispolk.com
       dylan.consla@davispolk.com
       daniel.meyer@davispolk.com

(c)     If to the Ad Hoc First Lien Lender Group:

To each member of the Ad Hoc First Lien Lender Group at the addresses or
e-mail addresses set forth below each such member's signature page to this
Agreement (or to the signature page to a Joinder Agreement as the case may
be).

*With a copy to*:

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
Attn:   Fredric Sosnick
        Ned. S. Schodek
Email: fsosnick@shearman.com

ned.schodek@shearman.com

(d)    If to John Mitchell Potter:

Blackhawk Mining, LLC
3228 Summit Square Place
Lexington, Kentucky 40509
Attn: Mitch Potter
Email: mpotter@blackhawkmining.com

*With a copy to:*

Stoll Keenon Ogden PLLC
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507-1801
Attn:   William M. Lear Jr.
        Adam M. Back
Email: william.lear@skofirm.com
       adam.back@skofirm.com

29.    **Entire Agreement**.  This Agreement (including the Exhibits and Schedules) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement, other than, for the avoidance of doubt, the Forbearance Agreements.

30.    **Amendments**.  Except as otherwise provided herein, this Agreement (including the Term Sheets) may not be modified, amended, or supplemented without the prior written consent of the Company, the Required Consenting First Lien Lenders, the Required Consenting Second Lien Lenders, and, solely to the extent that such modification, amendment, or supplement has an adverse effect on Potter, Potter, *provided*, *however*, that any modification, amendment, supplement or change to (a) the definition of Required Consenting First Lien Lenders or the threshold of Consenting First Lien Lenders set forth in <u>Section 10</u> shall also require the written consent of each Consenting First Lien Lender, (b) the definition of Required Consenting Second Lien Lenders or the threshold of Consenting Second Lien Lenders set forth in <u>Section 11</u> shall also require the written consent of each Consenting Second Lien Lender, (c) this <u>Section 30</u> shall require the written consent of the Company, each Consenting First Lien Lender, each Consenting Second Lien Lender, and Potter, (d) this Agreement that treats or affects any Consenting First Lien Lender or Consenting Second Lien Lender in a manner that is disproportionally adverse, on an economic or non-economic basis, to the treatment of other First Lien Claims or Second Lien Claims, as applicable, shall also require the written consent of such Consenting First Lien Lender or Consenting Second Lien Lender, as applicable, or (e) the Corporate Governance Term Sheet that materially and adversely affects the rights or economic terms provided to a Consenting First Lien Lender or Consenting Second Lien Lender shall also require the written consent of such Consenting First Lien Lender or Consenting Second Lien Lender.

31.    **Reservation of Rights**.   Subject to and except as expressly provided in this Agreement or in any amendment thereof agreed upon by the Parties pursuant to the terms hereof, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in the Chapter 11 Cases.   Without limiting the foregoing sentence in any way, if the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, nothing in this Agreement shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims and defenses, and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses.   This Agreement shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.   Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.   This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto.   Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations relating to this Agreement shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

32.    **Counterparts**.   This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

33.    **Disclosures**.   The Company shall use commercially reasonable efforts to submit drafts to the Ad Hoc Crossholder Lender Group Advisors and the Ad Hoc First Lien Lender Group Advisors of any press releases and public documents that constitute the disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two Business Days or as soon as reasonably practicable prior to making any such disclosure, and the Company shall consult with the Ad Hoc Crossholder Lender Group Advisors and the Ad Hoc First Lien Lender Group Advisors in good faith regarding the form and substance of such disclosure(s).   This Agreement, as well as its terms, its existence, and the existence of the negotiation of its terms are expressly subject to any existing confidentiality agreements executed by and among any of the Parties as of the date hereof (including any such provisions in the First Lien Loan Documents and the Second Lien Loan Documents); *provided*, *however*, that (i) such information may be disclosed to First Lien Lenders and Second Lien Lenders not party hereto, subject to the confidentiality provisions in the First Lien Loan Documents and/or the Second Lien Loan Documents, as applicable, and (ii) after the Petition Date, the Parties may disclose the existence of, or the terms of, this Agreement or any other material term of the transaction contemplated herein without the express written consent of the other Parties, *provided*, *further*, that no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Party), other than advisors to the Company, the principal amount or percentage of any Loans or other interests held by the Consenting First Lien Lenders or Consenting Second Lien Lenders, in each case, without such Consenting First Lien Lender or Consenting Second Lien Lender's prior written consent.

34.    **Headings**.   The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

28

35.     **Interpretation**.  This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.

36.     **Computation of Time**. Rule 9006(a) of the Federal Rules of Bankruptcy Procedure applies in computing any period of time prescribed or allowed herein only to the extent such period of time governs a Milestone pertaining to the entry of an order by the Bankruptcy Court in the Chapter 11 Cases.

[*Signatures and exhibits follow*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date and year first written above.

**BLACKHAWK MINING LLC BHM-WV, LLC**
**BLACK OAK MINING, LLC**
**BLACKHAWK COAL SALES, LLC**
**BLACKHAWK LAND AND RESOURCES,**
**LLC**
**BLACKHAWK RIVER LOGISTICS, LLC**
**BLUE CREEK MINING, LLC**
**BLUE DIAMOND MINING, LLC**
**CAMPBELL'S CREEK MINING, LLC**
**EAGLE SHIELD, LLC**
**FANCO PLANT LOADOUT, LLC**
**FCDC COAL, INC.**
**GATEWAY EAGLE MINING, LLC**
**GUYANDOTTE MINING, LLC**
**HAMPDEN COAL, LLC**
**KANAWHA EAGLE MINING, LLC**
**LOGAN & KANAWHA, LLC**
**PANTHER CREEK MINING, LLC**
**PINE BRANCH LAND, LLC**
**PINE BRANCH MINING, LLC**
**PINE BRANCH RESOURCES, LLC**
**REDHAWK MINING, LLC**
**ROCK LICK PREP PLANT, LLC**
**ROCKWELL MINING, LLC**
**SPRUCE PINE LAND COMPANY**
**SPURLOCK MINING, LLC**
**TRIAD MINING, LLC**
**TRIAD TRUCKING, LLC**
**WELL PREP PLANT, LLC**

By: _____
Name: Jesse Parrish
Title: Chief Financial Officer

*[Company Signature Page to Restructuirng Support Agreement]*

**Redwood Opportunity Master Fund, Ltd.**
By: REDWOOD CAPITAL MANAGEMENT, LLC,
its Investment Manager

By
Name:      Jonathan Kolatch
Title:       Managing Member

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:
Redwood Opportunity Master Fund, Ltd.
910 Sylvan Avenue
Englewood Cliffs, NJ 07632
Fax: 201-568-1340
Attention: Toni Healey
Email: thealey@redwoodcap.com

**REDWOOD MASTER FUND, LTD.**
By: REDWOOD CAPITAL MANAGEMENT, LLC,
its Investment Manager

By

Name:     Jonathan Kolatch
Title:      Managing Member

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:
Redwood Master Fund, Ltd.
910 Sylvan Avenue
Englewood Cliffs, NJ 07632
Fax: 201-568-1340
Attention: Toni Healey
Email: thealey@redwoodcap.com

[*Signature Page to Restructuring Support Agreement*]

**REDWOOD DRAWDOWN MASTER FUND, L.P.**
By: REDWOOD CAPITAL MANAGEMENT, LLC
its Investment Manager

By
Name:     Jonathan Kolatch
Title:     Managing Member

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:
Redwood Drawdown Master Fund, Ltd.
910 Sylvan Avenue
Englewood Cliffs, NJ 07632
Fax: 201-568-1340
Attention: Toni Healey
Email: thealey@redwoodcap.com

[*Signature Page to Restructuring Support Agreement*]

**Corbin Opportunity Fund, L.P.**
By: Corbin Capital Partners, L.P.,
its Investment Manager

By
Name:    Daniel Friedman
Title:    General Counsel

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:
Redwood Master Fund, Ltd.
910 Sylvan Avenue
Englewood Cliffs, NJ 07632
Fax: 201-568-1340
Attention: Toni Healey
Email: thealey@redwoodcap.com

**LENDER**

SOL Loan Funding LLC
By:



Name:
Lauri Pool
Title:
Director


Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:


<u>Notice Address</u>:
1301 Fannin, Ste 1700
Houston, Texas 77002




Fax: 877-637-5516

Attention:
Lauri Pool
Email:
Lauri.Pool@virtusllc.com

**LENDER**

BLANFORD CAPITAL COMPANY #4, LLC

By: 

Name:     R. Scott Chisholm
Title:      Authorized Signer

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:

Blanford Capital Company #4, LLC
227 West Monroe St., Suite 4900
Chicago, IL 60606

Attention:   Operations
Email:        chioperations@guggenheimpartners.com

**LENDER**

**Solus Opportunities IDF Series Interests of the SALI Multi-Series Fund, L.P.**
By: Solus Alternative Asset Management LP
Its Investment Subadvisor

By:
Name:     Gordon J. Yeager
Title:      Executive Vice President

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:



Notice Address:

Solus Alternative Asset Management LP
Address: 410 Park Avenue - 11th Floor
New York, NY 10022 USA
Attn: Solus Compliance Officer

Fax: (212) 284-4338
Email: compliance@soluslp.com,
notices@soluslp.com

**LENDER**

**Solus Long-Term Opportunities Fund Master LP**
By: Solus Alternative Asset Management LP
Its Investment Advisor

By: 

Name:    Gordon J. Yeager
Title:     Executive Vice President

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:

Solus Alternative Asset Management LP
Address: 410 Park Avenue - 11th Floor
New York, NY 10022 USA
Attn: Solus Compliance Officer

Fax: (212) 284-4338
Email: compliance@soluslp.com,
notices@soluslp.com

**LENDER**

**Solus Opportunities Fund 1 LP**
By: Solus Alternative Asset Management LP
Its Investment Advisor

By: _____
Name:    Gordon J. Yeager
Title:    Executive Vice President

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:



Notice Address:

Solus Alternative Asset Management LP
Address: 410 Park Avenue - 11th Floor
New York, NY 10022 USA
Attn: Solus Compliance Officer

Fax: (212) 284-4338
Email: compliance@soluslp.com,
notices@soluslp.com

**LENDER**

**Solus Opportunities Fund 3 LP**
By: Solus Alternative Asset Management LP
Its Investment Advisor

By:
Name:
Title:
    Gordon J. Yeager
    Executive Vice President

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:



Notice Address:

Solus Alternative Asset Management LP
Address: 410 Park Avenue - 11th Floor
New York, NY 10022 USA
Attn: Solus Compliance Officer

Fax: (212) 284-4338
Email: compliance@soluslp.com,
notices@soluslp.com

**LENDER**

**Solus Opportunities Fund 4 LP**
By: Solus Alternative Asset Management LP
Its Investment Advisor

By:
Name:
Title:      Gordon J. Yeager
             Executive Vice President

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:



Notice Address:

Solus Alternative Asset Management LP
Address: 410 Park Avenue - 11th Floor
New York, NY 10022 USA
Attn: Solus Compliance Officer

Fax: (212) 284-4338
Email: compliance@soluslp.com,
notices@soluslp.com

**LENDER**

**Solus Opportunities Fund 5 LP**
By: Solus Alternative Asset Management LP
Its Investment Advisor

By:
Name:
Title:     Gordon J. Yeager
          Executive Vice President

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:



Notice Address:

Solus Alternative Asset Management LP
Address: 410 Park Avenue - 11th Floor
New York, NY 10022 USA
Attn: Solus Compliance Officer

Fax: (212) 284-4338
Email: compliance@soluslp.com,
notices@soluslp.com

**LENDER**

**SOLA LTD**
By: Solus Alternative Asset Management LP
Its Investment Advisor



By:
Name: Gordon J. Yeager
Title: Executive Vice President

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:

Solus Alternative Asset Management LP
Address: 410 Park Avenue - 11th Floor
New York, NY 10022 USA
Attn: Solus Compliance Officer

Fax: (212) 284-4338
Email: compliance@soluslp.com,
notices@soluslp.com

**LENDER**

**Solus Senior High Income Fund LP**
By: Solus Alternative Asset Management LP
Its Investment Advisor

By:
Name:
Title:
Gordon J. Yeager
Executive Vice President

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:



Notice Address:

Solus Alternative Asset Management LP
Address: 410 Park Avenue - 11th Floor
New York, NY 10022 USA
Attn: Solus Compliance Officer

Fax: (212) 284-4338
Email: compliance@soluslp.com,
notices@soluslp.com

**LENDER**

**Ultra Master Ltd**
By: Solus Alternative Asset Management LP
Its Investment Advisor

By:
Name:
Title:    Gordon J. Yeager
          Executive Vice President

Principal Amount of First Lien Claims:    

Principal Amount of Second Lien Claims:

Notice Address:

Solus Alternative Asset Management LP
Address: 410 Park Avenue - 11th Floor
New York, NY 10022 USA
Attn: Solus Compliance Officer

Fax: (212) 284-4338
Email: compliance@soluslp.com,
notices@soluslp.com

**LENDER**

**Ultra NB LLC**
By: Solus Alternative Asset Management LP
Its Investment Manager

By: _____

Name:         Gordon J. Yeager

Title:          Executive Vice President

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:

Solus Alternative Asset Management LP
Address: 410 Park Avenue - 11th Floor
New York, NY 10022 USA
Attn: Solus Compliance Officer

Fax: (212) 284-4338
Email: compliance@soluslp.com,
notices@soluslp.com

**KNIGHTHEAD MASTER FUND, LP**
**By: Knighthead Capital Management,**
**LLC, its Investment Manager**

Name:  Laura Torrado
Title:   Authorized Signatory

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Principal Amount of Second Lien Claims – NON Consenting:



Notice Address: 1140 Sixth Avenue, 12th Floor
              New York, NY 10036

**KNIGHTHEAD ANNUITY & LIFE**
**ASSURANCE COMPANY**
**By: Knighthead Capital Management,**
**LLC, its Investment Advisor**

Name:  Laura Torrado
Title:   Authorized Signatory

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Principal Amount of Second Lien Claims – NON Consenting:

Notice Address: 1140 Sixth Avenue, 12th Floor
              New York, NY 10036

**KNIGHTHEAD (NY) FUND, LP**
**By: Knighthead Capital Management,**
**LLC, its Investment Advisor**

Name:   Laura Torrado
Title:    Authorized Signatory

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Principal Amount of Second Lien Claims – NON Consenting:

Notice Address: 1140 Sixth Avenue, 12th Floor
            New York, NY 10036

**AP 20141, LLC**

Name:   Laura Torrado
Title:    Authorized Signatory

Principal Amount of Second Lien Claims:

Notice Address: 1140 Sixth Avenue, 12th Floor
            New York, NY 10036

**AP 2015 1, LLC**

Name:   Laura Torrado
Title:    Authorized Signatory

Principal Amount of Second Lien Claims:

Notice Address: 1140 Sixth Avenue, 12th Floor
New York, NY 10036

**J.H. LANE PARTNERS MASTER FUND, LP**



By:
Name:       Haskel Ginsberg
Title:        CFO

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:

J.H. Lane Partners Master Fund, LP
126 East 56th Street, Suite 1620
New York, NY  10022
Phone 212-899-9793
Fax:
Attention:
Email:  hginsberg@jhlanepartners.com

**CASPIAN SELECT CREDIT MASTER FUND, LTD.**
**CASPIAN SOLITUDE MASTER FUND, L.P.**
**CASPIAN HLSC1, LLC**
**SUPER CASPIAN CAYMAN FUND LIMITED**
**CASPIAN SC HOLDINGS, L.P.**
**CASPIAN FOCUSED OPPORTUNITIES FUND, L.P.**
**BLACKSTONE ALTERNATIVE MULTI STRATEGY SUB FUND IV L.L.C.**

**By Caspian Capital LP, as investment advisor/sub advisor of the above funds and accounts**

By:
Name:       Kathryn Murtagh
Title:         Authorized Signatory

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:

Caspian Capital LP
10 East 53rd Street
35th Floor
New York, NY  10022
USA

Attention: Caspian Legal
Email: Legal@caspianlp.com

**YORK GLOBAL FINANCE BDH, LLC**



By:
Name:       Richard Swanson
Title:       General Counsel

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

<u>Notice Address:</u>

767 5th Avenue, 17th Floor
New York, NY 10153
Phone 212-300-1300
Fax: 212-300-1301
Attention: Kevin Carr
Email:  operations@yorkcapital.com

**JEFFERIES LEVERAGED CREDIT PRODUCTS, LLC**

By: _William P. McLoughlin_____
Name:        William P. McLoughlin
Title:        Senior Vice President

Principal Amount of First Lien Claims:        ██████████

Principal Amount of Second Lien Claims:        ██████████

Notice Address:

Jefferies Leverage Credit Products, LLC
520 Madison Avenue
New York, NY 10022
Phone 212-708-2823
Fax:
Attention: Eric Geller
Email: Eric.Geller@Jefferies.com

**CPPIB CANADA INC.**
**CPPIB CREDIT INVESTMENTS INC.**


By: _____
Name:        Geoff Souter
Title:        Authorized Signatory


By: _____
Name:        Paul Shopiro
Title:        Authorized Signatory


Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:

One Queen Street East | Suite 2500 | Toronto, ON | M5C 2W5 | Canada

Fax: 416-868-1993
Attention: Paul Shopiro
Email:  pshopiro@cppib.com

**RICHMOND HILL INVESTMENTS, LLC and RICHMOND HILL INVESTMENT CO., LP as Investment Managers of ESSEX EQUITY JOINT INVESTMENT VEHICLE, LLC, RICHMOND HILL CAPITAL PARTNERS, LP and ESSEX EQUITY HIGH INCOME JOINT INVESTMENT VEHICLE, LLC**



By: _____
Name:        Ryan P. Taylor
Title:         Managing Partner

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:

Richmond Hill
375 Hudson Street, 12th Floor
New York, NY 10014
Phone:  212-989-2700
Fax:
Attention:
Email:  rtaylor@rhiclp.com

**CANYON CAPITAL ADVISORS LLC**
(on behalf of its participating funds and/or accounts)


By:
Name:          Jonathan M. Kaplan
Title:         Authorized Signatory


**CANYON PARTNERS REAL ESTATE LLC**
(on behalf of its participating funds and/or accounts)


By:
Name:          Jonathan M. Kaplan
Title:         Authorized Signatory


Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:


Notice Address:

2000 Avenue of the Stars, 11th FL
Los Angeles, CA 90067
Attention: Legal Department
Email:
legal@canyonpartners.com;
pbae@canyonpartners.com

**GRACECHURCH OPPORTUNITIES FUND LIMITED**

By:

Name:        Atholl Wilton

Title:       Authorized Signatory

Principal Amount of First Lien Claims:



Principal Amount of Second Lien Claims:

Notice Address:

Loan Operations, CQS (UK) LLP
4th Floor, One Strand
London WC2N 5HR
Fax:
Attention:
Email:

*[Signature Page to Restructuring Support Agreement]*

**BIWA FUND LIMITED**

By:

Name:    Atholl Wilton

Title:    Authorized Signatory

Principal Amount of First Lien Claims:    ███████████

Principal Amount of Second Lien Claims:    ████████████

Notice Address:

Loan Operations, CQS (UK) LLP
4th Floor, One Strand
London WC2N 5HR
Fax:
Attention:
Email:

*[Signature Page to Restructuring Support Agreement]*

**MERCER MULTI-ASSET CREDIT FUND, A SUB-FUND OF MERCER QIF FUND PLC**

By:

Name:        Atholl Wilton

Title:        Authorized Signatory


Principal Amount of First Lien Claims:        ██████████

Principal Amount of Second Lien Claims:        ██████████


Notice Address:

Loan Operations, CQS (UK) LLP
4th Floor, One Strand
London WC2N 5HR
Fax:
Attention:
Email:

**CQS CREDIT MULTI ASSET FUND, A SUB-FUND OF CQS GLOBAL FUNDS (IRELAND) LIMITED**

By:
Name:      Atholl Wilton
Title:      Authorized Signatory


Principal Amount of First Lien Claims:    ███████

Principal Amount of Second Lien Claims:    ███████


<u>Notice Address</u>:

Loan Operations, CQS (UK) LLP
4th Floor, One Strand
London WC2N 5HR
Fax:
Attention:
Email:

**GRACECHURCH LOANS FUND, A SUB-FUND OF CQS GLOBAL FUNDS (IRELAND) LIMITED**

By:
Name:     Atholl Wilton
Title:      Authorized Signatory

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:

Loan Operations, CQS (UK) LLP
4th Floor, One Strand
London WC2N 5HR
Fax:
Attention:
Email:

*[Signature Page to Restructuring Support Agreement]*

**CQS ACS FUND, AS SUB-FUND OF CQS GLOBAL FUNDS ICAV**



By:
Name:          Atholl Wilton
Title:           Authorized Signatory

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:

Loan Operations, CQS (UK) LLP
4th Floor, One Strand
London WC2N 5HR
Fax:
Attention:
Email:

**CQS AIGUILLE DU CHARDONNET MF S.C.A. SICAV-SIF**

By:
Name:         Atholl Wilton
Title:         Authorized Signatory

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:

Loan Operations, CQS (UK) LLP
4th Floor, One Strand
London WC2N 5HR
Fax:
Attention:
Email:

**John Mitchell Potter**

Notice Address:

Blackhawk Mining, LLC
3228 Summit Square Place
Lexington, Kentucky 40509
Attn:  Mitch Potter
Email: mpotter@blackhawkmining.com

ACKNOWLEDGED AND AGREED, that the undersigned Consenting First Lien Lender is deemed to be added to **Exhibit F** hereto.

**LENDER**



By:                     ~~MRP~~ **Trading I B, LLC**
Name:                John Sinna
Title:                   Authorized Signatory

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:
60 S. 6th Street, Suite 3720
Minneapolis, MN 55402

Fax:
Attention:
John Sinna / Teri Salberg

Email:
john.sinna@mcgintyroad.com
teri.salberg@mcgintyroad.com

ACKNOWLEDGED AND AGREED, that the undersigned Consenting First Lien Lender is deemed to be added to **Exhibit F** hereto.

**LENDER**    Graham Macro Strategic Ltd.

By:    Graham Capital Management, L.P., as sole Director
Name:    Brian Douglas
Title:    COO

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:



Notice Address:

Graham Macro Strategic Ltd.
40 Highland Avenue
Norwalk, CT 06853

Fax:  203-899-3500
Attention: Mike Adams
Email: madams@grahamcapital.com

ACKNOWLEDGED AND AGREED, that the undersigned Consenting First Lien Lender is deemed to be added to **Exhibit F** hereto.

**LENDER**
Polygon Convertible Opportunity Master Fund

By: Polygon Global Partners LLP, its investment manager

By:
Name:      Michael Humphries
Title:      Authorized Signatory

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:

Fax:
Attention:
Email:

ACKNOWLEDGED AND AGREED, that the undersigned Consenting First Lien Lender
is deemed to be added to **Exhibit F** hereto.

**LENDER**



By:
Name: Philip Asimpano   for Scotts Core Special
Title: Authorized Signatory for Scotts Cove Special
Credit Master Fund Inc

Principal Amount of First Lien Claims:

Principal Amount of Second Lien Claims:

Notice Address:

Fax:
Attention:
Email:

**Exhibit A** to the Restructuring Support Agreement

**Restructuring Term Sheet**

## BLACKHAWK MINING LLC

## RESTRUCTURING TERM SHEET

*This term sheet (this "**Restructuring Term Sheet**") describes the material terms of a restructuring (the "**Restructuring**") proposed by that certain group (the "**Group**") of lenders under (i) that certain First Lien Term Loan Credit Agreement, dated as of February 17, 2017 (the "**First Lien Credit Agreement**") among Blackhawk Mining LLC ("**Blackhawk Mining**", the "**Borrower**" or the "**Company**"), as borrower, the lenders from time to time party thereto (each a "**First Lien Lender**" and collectively, the "**First Lien Lenders**"), and Cantor Fitzgerald Securities, as administrative agent (all loans made thereunder collectively, the "**First Lien Loans**") and/or (ii) that certain Second Lien Term Loan Credit Agreement, dated as of October 28, 2015 (the "**Second Lien Credit Agreement**") among Blackhawk Mining, as borrower, the lenders from time to time party thereto (each a "**Second Lien Lender**" and collectively, the "**Second Lien Lenders**") and Cortland Capital Market Services LLC, as administrative agent (all loans made thereunder collectively, the "**Second Lien Loans**"). This Restructuring Term Sheet does not include a description of all the relevant terms and conditions of the Restructuring and none of the parties shall be required to consummate the Restructuring, whether on the terms set forth herein or otherwise, unless and until the definitive agreements in respect of the Restructuring are fully executed and delivered by the parties, and then only to the extent set forth therein. This Restructuring Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is intended to be entitled to the protections of Rule 408 of the Federal Rules of Evidence and all other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions.*

| Restructuring Overview | |
|---|---|
| *Implementation* | The Restructuring will be structured and implemented through a prepackaged plan of reorganization (the "**Plan**") substantially consistent with the terms set forth in this Restructuring Term Sheet.[2]<br><br>The venue for any such chapter 11 proceedings in connection with the Plan shall be the District of Delaware. |
| *DIP Facilities* | First Lien Lenders party to the RSA (defined below) shall have the right to participate in the provision, pro rata to the principal amount of First Lien Loans held by each such First Lien Lender, to the Company of a secured superpriority debtor-in-possession financing facility (the "**DIP Term Facility**," and lenders thereunder the "**Term DIP Lenders**") in an aggregate principal amount of $150 million, consisting of: (i) $50 million in respect of new money funding (the "**New Money DIP** |

---

[2] Provided that the parties hereto shall work in good faith to implement the Restructuring out of court rather than through a prepackaged plan of reorganization, if reasonably practicable.

| | |
|---|---|
| | **Loans**") and (ii) a roll-up of $100 million of First Lien Loans (the "**Roll-Up DIP Loans**").<br><br>Concurrently with entering into the DIP Term Facility, the Company will enter into a debtor-in-possession asset-based revolving facility in an aggregate principal amount of up to $90 million (the "**DIP ABL Facility**" and, together with the DIP Term Facility, the "**DIP Facilities**").<br><br>Obligations under the DIP Facilities shall be allowed superpriority administrative claims and shall be secured by liens on all property of the Company (provided that the Roll-Up DIP Loans shall not be secured by liens on real property leases that, as of the Petition Date, are not subject to valid and perfected liens securing the Prepetition First Lien Term Loans in accordance with the Prepetition First Lien Term Loan Agreement because the consent of the applicable lessor to the creation of a security interest in favor of the Prepetition First Lien Term Lenders has not been obtained), with the relative rights and priorities among the lenders under the DIP Term Facility and DIP ABL Facility to be set forth in an intercreditor agreement, which will be in form and substance consistent with the Intercreditor Agreement, dated as of September 6, 2017, among the Company, the other grantors party thereto, and the agents party to the First Lien Credit Agreement and that certain Credit Agreement, dated as of September 6, 2017, providing an asset-based revolving credit facility to the Company (the "**ABL Credit Agreement**").<br><br>Terms and conditions with respect to the DIP Facilities shall be consistent with this Restructuring Term Sheet and the Blackhawk Mining LLC DIP Term Facility Term Sheet attached to the RSA as **Exhibit B** thereto and otherwise acceptable to the Required Consenting First Lien Lenders (as defined in the RSA). |
| *Required Support* | Commencement of solicitation of the Plan shall be conditioned on execution of a Restructuring Support Agreement (the "**RSA**") consistent with this Restructuring Term Sheet (and otherwise containing customary terms) by the following parties (the "**Required Supporting Parties**"):<br>• Holders of at least two-thirds in principal amount of the First Lien Loans (the "**Required First Lien Lenders**");<br>• Holders of at least two-thirds in principal amount of the Second Lien Loans (the "**Required Second Lien Lenders**");<br>• The Company; and<br>• John Mitchell Potter ("**Potter**").<br>It shall also be a condition precedent to the effectiveness of the RSA that each lender under the ABL Credit Agreement consents to treatment of |

2

| | the ABL on substantially the same terms as provided for by this Restructuring Term Sheet. |
|---|---|

| **Treatment of Key Parties** | |
|---|---|
| *Treatment of DIP Facilities;[3] Terms of New First Lien Loans* | Loans under the DIP ABL Facility shall be paid in cash in full on the effective date of the Plan (the "**Plan Effective Date**") or shall, at the option of the Borrower, convert into a new exit ABL facility.<br><br>Each Term DIP Lender will receive its pro rata share (based on the outstanding principal amount of Term DIP Loans held by such Term DIP Lender) of $150 million (out of a total of $375 million) of new first lien term loans (the "**New First Lien Loans**"), which shall be governed by a credit agreement (the "**New First Lien Credit Agreement**") with terms substantially the same as those set forth in the First Lien Credit Agreement except with respect to the following provisions:[4]<br><br>(i) The Applicable Margin for LIBOR Loans shall be 9.50%, with a LIBOR floor of 2.00%;<br>(ii) The Maturity Date shall be four years after the Plan Effective Date;<br>(iii) The Applicable ECF Percentage shall be revised in accordance with the following table:<br><br>{{TABLE}}<br><br>(iv) The Borrowing Date shall be the effective date of the New First Lien Credit Agreement;<br>(v) Scheduled Term Loan Repayments shall be 0.50% per quarter, beginning on December 31, 2019;<br>(vi) The Liquidity Reserve shall be $100 million;<br>(vii) The CapEx Cap shall be $100 million; |

Table referenced above ({{TABLE}}):

| Consolidated Leverage Ratio | Applicable ECF Percentage |
|---|---|
| >2.00x | 100% |
| 1.00x to 2.00x | 75% |
| <1.00x | 50% |

---

[3] Capitalized terms used in this section but not otherwise defined in this Restructuring Term Sheet have the meanings ascribed to them in the First Lien Credit Agreement.

[4] In addition, Section 9.03(b) of the First Lien Credit Agreement shall be amended to make reference to "clause (b)" in place of "clause (ii)," which is intended to correct a typo in the existing First Lien Credit Agreement.

(viii)   Incurrence under the ABL Asset Priority Lien Documents shall be capped at $90 million;

(ix)   The call protection provisions shall be revised to provide for payment of 106% of principal for the first year after the Plan Effective Date, 104.5% for the second year, 103% for the third year and 102% for the fourth year;

(x)   Section 8.03(j) shall be modified to provide that (1) no Restricted Payments may be made pursuant thereto if (i) Liquidity would be less than the Liquidity Reserve as of the most recent Excess Cash Payment Date before or after giving effect to such Restricted Payment or (ii) the Consolidated First Lien Leverage Ratio for the most recently ended period of four consecutive Fiscal Quarters of the Borrower for which the financial statements are available exceeds 2.00 to 1:00 both before and after giving effect to such Restricted Payment and (2) Restricted Payments may be made pursuant thereto (I) if the Consolidated First Lien Leverage Ratio for the most recently ended period of four consecutive Fiscal Quarters of the Borrower for which the financial statements are available is less than or equal to 2.00 to 1:00 but greater than or equal to 1.00 to 1.00, in each case both before and after giving effect to such Restricted Payment, so long as Term Loans in an amount no less than the amount of such Restricted Payment are prepaid (which prepayment shall include the prepayment premium set forth in Section 4.01(c)) on or prior to the date such Restricted Payment is made, subject to customary provisions permitting the lenders under the New First Lien Credit Agreement to decline to receive any such prepayment (for the avoidance of doubt, any exercise of such right shall not otherwise affect whether such Restricted Payment may be made) and (II) if the Consolidated First Lien Leverage Ratio for the most recently ended period of four consecutive Fiscal Quarters of the Borrower for which the financial statements are available is less than 1.00 to 1.00.

(xi)   Any prepayment made in connection with Restricted Payments shall be treated as a dollar-for-dollar credit against any Excess Cash Flow prepayments described in clause (x) above.

(xii)   The references to "$50,000,000" in each of (1) clause (a) of the definition of Maximum Incremental Amount, (2) clause (a) of the definition of Maximum Ratio Amount and (3) Section 8.04(o) shall, in each case, be replaced with "$25,000,000";

(xiii)   Section 8.04 shall be modified to provide that any Indebtedness for borrowed money permitted thereby with an aggregate principal amount in excess of $25,000,000 that is either (x) secured by a Lien that is junior to the Liens securing the Obligations or (y) unsecured and, in either case, provided solely

4

by one or more Significant Holders (to be defined as any entity that holds (together with its affiliates) more than 10% of the voting stock of the Company) shall be subject to subordination terms satisfactory to the Required First Lien Lenders;

(xiv)  Solely for purposes of Section 8.03(j), the Consolidated First Lien Leverage Ratio shall be calculated without regard to (1) clauses (a)(ix) and (x) of the definition of "Consolidated EBITDA" and (2) Section 1.03(b);

(xv)  The definition of "Required Lenders" shall be revised to mean "at any time, Lenders the sum of whose outstanding Loans and Commitments, without duplication, at such time represents at least 57.5% of the sum of all outstanding Loans and Commitments at such time"; and

(xvi)  The Maximum Leverage Covenant shall be as set forth in the table below.

| Fiscal Quarter Ending | First Lien Net Leverage Ratio |
|---|---|
| September 30, 2019 and earlier | n/a |
| December 31, 2019 | 3.00x |
| March 31, 2020 | 3.00x |
| June 30, 2020 | 3.00x |
| September 30, 2020 | 3.00x |
| December 31, 2020 | 3.00x |
| March 31, 2021 | 2.75x |
| June 30, 2021 | 2.75x |
| September 30, 2021 | 2.75x |
| December 31, 2021 | 2.75x |
| March 31, 2022 | 2.50x |
| June 30, 2022 | 2.50x |
| September 30, 2022 and thereafter | 2.50x |

Except as expressly set forth above, the terms of the New First Lien Credit Agreement shall be no less favorable to the First Lien Lenders than those contained in the First Lien Credit Agreement.  For the avoidance of doubt, except as expressly set forth above, the basket exceptions to the negative covenant regarding limitations on indebtedness in the New First Lien Credit Agreement will be identical to those contained in the First Lien Credit Agreement, subject to changes to reflect changes to the Company's capital structure following implementation of the Plan.[5]

---

[5] There shall not be baskets for 2L debt or PCC note, etc. that are being discharged.

| | |
|---|---|
| *Treatment of ABL* | The claims under the ABL Credit Agreement shall be satisfied in connection with the creeping rollup of the DIP ABL Facility as set forth in the DIP Term Sheet and shall not be treated separately as a class under the Plan. |
| *Treatment of First Lien Loans[6]* | Each First Lien Lender will receive (i) its pro rata share (based on the outstanding principal amount of First Lien Loans (after giving effect to any Roll-Up DIP Loans) held by such First Lien Lender on the Plan Effective Date) of $225 million (out of a total of $375 million) of New First Lien Loans and (ii) its pro rata share of 71.0% of the equity of the Company following the Plan Effective Date (the "**Reorganized Company**"). |
| *Treatment of Second Lien Loans[7]* | In satisfaction of the Second Lien Loans, which shall be cancelled in full in connection with the Restructuring, each Second Lien Lender will receive its pro rata share of 29.0% of the equity of the Reorganized Company. |
| *Treatment of General Unsecured Claims* | Subject to the PCC Note Settlement and the AP Settlements, general unsecured claims shall be unimpaired under the Plan. |
| *Treatment of Existing Equity* | Cancelled and entitled to no distribution, but holders of equity that vote in favor of the Plan will receive the benefit of the Plan's release provisions. |

| **Other Terms** | |
|---|---|
| *PCC Note Settlement* | The Plan will provide for the settlement of that certain Unsecured Promissory Note (the "**PCC Note**") dated October 28, 2015, issued by the Company and the PCC Liquidating Trust, in the original principal amount of approximately $15 million, for a $500,000 payment to the PCC Liquidating Trust and waiver of $100,000 due from the PCC Liquidating Trust (in each case on the Plan Effective Date), on the terms and conditions set forth in the term sheet attached to the RSA as **Exhibit D** thereto. |

---

[6] First Lien Claims (as defined in the RSA) include all accrued and unpaid interest as of the Petition Date (as defined in the RSA).

[7] Second Lien Claims (as defined in the RSA) include all accrued and unpaid interest as of the Petition Date (as defined in the RSA).

| | |
|---|---|
| *AP Settlements* | The Plan will provide for (i) the settlement of a minimum of $7 million in accounts payable to be paid out on terms reasonably acceptable to the Company and the Ad Hoc Crossholder Lender Group (as defined in the RSA), and (ii) approximately $5.5 million in royalty payments currently in arrears to be paid in June 2019 or later.<br><br>Debt Commitment Agreement payment = $800k, to be paid on the Plan Effective Date. |
| *John Mitchell Potter Settlement* | Potter shall continue to serve as CEO until such time (the "**Termination Date**") that (i) current Board of Managers (or equivalent governing body) (the "**Current Board**") selects a replacement CEO, which replacement CEO shall be acceptable to the Ad Hoc Crossholder Lender Group, (ii) the Board of Managers (or equivalent governing body) of the Reorganized Company (the "**Reorganized Board**" and the Current Board or Reorganized Board, as applicable, the "**Board**") selects a replacement CEO or (iii) the Services Agreement (defined below) is executed by the parties thereto.  On or prior to the earlier of (i) one day prior to the date of commencement of chapter 11 proceedings with respect to the Company or (ii) the Termination Date: (A) the Executive Employment Agreement, dated as of July 21, 2017, by and between Potter and the Company (the "**Old Employment Agreement**") shall be terminated and all claims under the Old Employment Agreement, including for severance and other benefits, compensation and rights, shall be waived by Potter and (B) the Company and Potter shall enter into a new Service Agreement approved in advance by the Ad Hoc Crossholder Lender Group (the "**Service Agreement**").<br><br>The Service Agreement shall run for the 12-month period from the date of its execution and shall provide that Potter shall serve as a consultant to the Company, at the discretion of the Board (the "**Services**").  The Service Agreement shall include the following terms:<ul><li>Compensation shall be at an annual rate of $950,000.  Such compensation shall be inclusive of compensation for serving on the Board, if applicable.</li><li>Potter may terminate his Services to the Company upon 15 days' notice, after which time Potter shall not be entitled to further compensation under the Service Agreement.</li><li>If the Company terminates Potter's Services other than for good cause or as a result of Potter's disability, Potter shall continue to receive the compensation due under the Service Agreement through the end of the 12-month term of the Service Agreement. No other contractual termination benefits shall be provided.</li><li>Upon the expiration of the 12-month term, any other termination of the Service Agreement or upon removal by the other members</li></ul> |

|  | of the Board at their sole discretion, Potter shall immediately be deemed to have resigned, and shall resign, from the Board.<br><br>In exchange for Potter's agreement to (i) continue to serve on the Board and agree to the modifications to the terms of his service set forth above, and (ii) cause certain entities under his control to continue to provide the goods and services required under the affiliate contracts listed on **Schedule 1** attached hereto (the "**Affiliate Contracts**"), the Company shall:<br><br>• assume the Affiliate Contracts, with the amendments noted in Annex A;<br>• pay $500,000 to Potter on the Plan Effective Date;<br>• transfer title to the following two vehicles to Potter: 2017 GMC Truck (VIN: 1GT42YEY1HF159448) and 2018 GMC Truck (VIN: 1GK2CKJ9JR228977);<br>• provide Potter with the benefit of the Debtor and "third-party" releases (the "**JMP Plan Releases**") in the Plan; and<br>• grant Potter, for one year following the Termination Date (or earlier if the Company terminates Potter's Services for good cause), a right of first offer (the "**ROFO**") with respect to the Company's thermal coal assets, including, but not limited to, the Spurlock, Pine Branch, Blue Diamond, Samples, and Blue Creek mining complexes (the "**ROFO Assets**") on the following terms:<br>    o The Company shall notify Potter prior to commencing a sales process with respect to some or all of the ROFO Assets and allow Potter the opportunity to bid on such assets prior to or upon the commencement of such sales process;<br>    o In the event the Company receives an unsolicited offer for any ROFO Assets, the Company shall notify Potter of such offer and allow Potter the opportunity to bid on such assets if the Company decides to commence a sales process in response to such unsolicited offer; and<br>    o The ROFO shall not be applicable to any transaction involving all or substantially all of the assets or equity of the Company. |
|---|---|
| *Releases* | The Plan and the Confirmation Order will contain usual and customary exculpation provisions, Debtor releases and "third-party" releases, including with respect to the DIP Lenders, First Lien Lenders, Second Lien Lenders, Potter and the trustee of the PCC Liquidating Trust. |
| *Board Observer Rights* | Until the Plan Effective Date, each member of the Ad Hoc Crossholder Lender Group shall be entitled to designate one observer to the Current |

8

| | |
|---|---|
| | Board of the Company, and any committee thereof. Such observers shall have no obligation to refrain from using information received in such role in dealings with the Company and related matters. Such board observer rights shall be structured to preserve attorney-client privilege. |
| *Governance of Reorganized Company* | The Reorganized Board shall consist of five members, as provided below:<br>• One appointee of Knighthead;<br>• One appointee of Solus;<br>• One appointee acceptable to Knighthead and Solus, subject to the consent, not to be unreasonably withheld, of the majority of a three-member committee consisting of members of the Ad Hoc First Lien Lender Group selected by members of the Ad Hoc First Lien Lender Group holding at least 50.01% of the loans held by such group;<br>• One appointee acceptable to a group consisting of each holder (other than Knighthead and Solus) that will be entitled to receive under the Plan at least 10% of the equity of the Reorganized Company, with the consent of Knighthead and Solus not to be unreasonably withheld; and<br>• The Chief Executive Officer of the Reorganized Company if there is a Chief Executive Officer at the relevant time.<br><br>During the period in which no person is serving as the CEO, the applicable board seat shall be filled by a member of the executive team selected by a majority of the remaining Board members until a new individual becomes the CEO of the Company.<br><br>Approval by a majority of the Reorganized Board will be required for the sale of all or substantially all of the Reorganized Company's assets or equity. |
| *Management Team* | As of the Plan Effective Date, the identity, and terms of employment of, the members of the management team shall be satisfactory to the Ad Hoc Crossholder Lender Group. |
| *Management Incentive Plan* | Equity of the Reorganized Company may be issued in amount sufficient to fund a management incentive plan (the "**Management Incentive Plan**") with up to 6% of the equity of the Reorganized Company (the |

| | "**MIP Equity**"),[8] subject to a vesting schedule to be determined by the Reorganized Board. |
|---|---|

---

[8] The MIP Equity shall be non-voting or synthetic equity structured to be economically equivalent to such percentage of undiluted equity.

## Schedule 1

- Office Lease Agreement for 3228 Summit Square Place, Suite 180 and Suite 200, Lexington, KY dated October 9, 2012, between Stillwater Development, LLC and Blackhawk Mining LLC, as amended by that certain Office Lease Agreement Amendment No. 1 dated August 8, 2014, and that certain Office Lease Agreement Amendment No. 2 dated May 1, 2015;

- Commercial Lease Agreement for 30 Little Creek Rd., Pikeville, KY 41501 dated January 1, 2013, between Potter Holdings, LLC and Blackhawk Mining LLC, as supplemented;

- Dry Lease Agreement (Bell 407), dated September 29, 2015, between JMP Coal Holdings, LLC and Blackhawk Mining LLC;

- Aircraft Storage and Office Space Agreement, dated April 1, 2017, between Cedar Creek Development, LLC and Blackhawk Mining LLC;

- Contractor Service Agreement (refuse hauling), dated December 1, 2015, between Blue Creek Mining, LLC and Hawkeye Contracting Company, LLC (contract term amended to extend one year from date of filing; either party may terminate or rebid at end of year by giving notice at least 90 days prior to year-end; otherwise contract term automatically extended for one year);

- Contractor Service Agreement (refuse hauling), dated December 1, 2015, between Panther Creek Mining, LLC and Hawkeye Contracting Company, LLC (contract term amended to extend one year from date of filing; either party may terminate or rebid at end of year by giving notice at least 90 days prior to year-end; otherwise contract term automatically extended for one year);

- Contractor Service Agreement (refuse hauling), dated December 19, 2018, between Kanawha Eagle Mining, LLC and Hawkeye Contracting Company, LLC (contract term amended to extend one year from date of filing; either party may terminate or rebid at end of year by giving notice at least 90 days prior to year-end; otherwise contract term automatically extended for one year);

- Contractor Services Agreement (general services) dated March 1, 2011, between Hawkeye Contracting Company, LLC and Blackhawk Mining LLC, as supplemented (contract term amended to extend one year from date of filing; either party may terminate or rebid at end of year by giving notice at least 90 days prior to year-end; otherwise contract term automatically extended for one year); and

- Marketing Agreement dated July 9, 2018, between Condor Holdings, LLC and Blackhawk Mining LLC.

**Exhibit B** to the Restructuring Support Agreement

**DIP Term Sheet**

**BLACKHAWK MINING LLC**
**DIP TERM FACILITY TERM SHEET**

This term sheet (the "**DIP Term Facility Term Sheet**") sets forth the principal terms of a secured debtor-in-possession credit facility (the "**DIP Term Facility**"; the credit agreement evidencing the DIP Term Facility, the "**DIP Term Credit Agreement**" and, together with the other definitive documents governing the DIP Term Facility, the "**DIP Term Documents**," each of which shall be in form and substance reasonably acceptable to the DIP Term Borrower (as defined below), the DIP Term Agent and the DIP Term Lenders (each as defined herein)). The DIP Term Credit Agreement otherwise shall be subject to the DIP Term Facility Documentation Principles (as defined below) and shall be entered into with the DIP Term Borrower and certain of its subsidiaries in connection with their respective cases under chapter 11 (the "**Cases**"; the debtors and debtors-in-possession thereunder, the "**Debtors**" and each a "**Debtor**") of title 11 of the United States Code (the "**Bankruptcy Code**"). The DIP Term Facility will be subject to the approval of the Bankruptcy Court (as defined herein) and consummated in the Cases in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), in accordance with (i) the DIP Orders (as defined herein) of the Bankruptcy Court authorizing the Debtors to enter into the DIP Term Facility and (ii) the DIP Term Documents to be executed by the Debtors.

| SUMMARY OF PRINCIPAL TERMS | |
|---|---|
| **DIP Term Borrower** | Blackhawk Mining LLC, as a debtor and debtor-in-possession (the "**DIP Term Borrower**" or the "**Company**"). |
| **Guarantors** | Each existing and future domestic subsidiary of the DIP Term Borrower (other than the Non-Filing Subsidiaries (as defined below)), each as a debtor and debtor-in-possession (the "**Guarantors**" and, together with the DIP Term Borrower, the "**Loan Parties**"), it being understood and agreed that (a) each subsidiary of the DIP Term Borrower that is an obligor under the DIP ABL Facility and/or any of the Prepetition Facilities described below shall be a Guarantor and (b) each of the following subsidiaries of the DIP Term Borrower shall not be required to be a Guarantor so long as it remains an immaterial subsidiary (and does not hold any material assets) and does not become a debtor and debtor-in-possession (collectively, the "**Non-Filing Subsidiaries**"): BHM-WV, LLC, Fanco Plant Loadout, LLC, Campbell's Creek Mining, LLC, Black Oak Mining, LLC, Wells Prep Plant, LLC, Rock Lick Prep Plant, LLC and Gateway Eagle Mining, LLC. |
| **DIP Term Agent** | Cantor Fitzgerald Securities, as administrative agent and collateral agent (in such capacities, the "**DIP Term Agent**") |
| **DIP Term Lenders** | Funds managed or advised by the Consenting First Lien Lenders (as defined in the restructuring support agreement to which this DIP Term Facility Term Sheet is attached (the "**Restructuring Support Agreement**")) (including Knighthead Capital Management, LLC (such applicable funds, "**Knighthead**"), Solus Alternative Asset Management LP (such applicable funds, "**Solus**"), Redwood Capital Management, LLC (such applicable funds, "**Redwood**"), the Ad Hoc First Lien Lender Group (as defined in the Restructuring Support Agreement and, together with Knighthead, Solus and Redwood, the "**Specified Lenders**") and the other Prepetition First Lien Term Lenders (as defined below) that choose to participate in the DIP Term Facility, each of which is a Prepetition First Lien Term Lender (as defined below) on the Petition Date (as defined below), as lenders under the DIP Term Facility (in such capacities, collectively, the "**DIP Term Lenders**"). |

| | |
|---|---|
| | The aggregate amount of the New Money DIP Commitments (as defined below) will be offered for participation to each lender under the Prepetition First Lien Term Loan Agreement (as defined below) (each, a "**Prepetition First Lien Term Lender**"), in each case up to such Prepetition First Lien Term Lender's pro rata share of the loans outstanding under the Prepetition First Lien Term Loan Agreement (the "**Prepetition First Lien Term Loans**").  As of the effective date of the Restructuring Support Agreement (the "**RSA Effective Date**"), the Specified Lenders have agreed to provide the full amount of the New Money DIP Commitments.  To the extent any other Prepetition First Lien Term Lender (that is not a Specified Lender) desires to provide New Money DIP Commitments, such Prepetition First Lien Term Lender may, following the RSA Effective Date but prior to the date of the entry of the Interim DIP Order, elect to provide New Money DIP Commitments up to its pro rata share of the Prepetition First Lien Term Loans by either (i) submitting a signature page to the Restructuring Support Agreement indicating its New Money DIP Commitment or (ii) entering into a written agreement evidencing its New Money DIP Commitment (any such Prepetition First Lien Term Lender, a "**Later-Electing Prepetition First Lien Term Lender**"), in which case the New Money DIP Commitments of the Specified Lenders at the time of such election shall be reduced on a pro rata basis by the aggregate amount of the New Money DIP Commitments of such Later-Electing Prepetition First Lien Term Lender. |
| **Amount & Type** | A multiple-draw senior secured debtor-in-possession U.S. dollar term loan credit facility in an aggregate principal amount not to exceed $150 million (the commitments under the DIP Term Facility, the "**DIP Term Commitments**"; the loans under the DIP Term Facility, the "**DIP Term Loans**"), consisting of: (i) up to $50 million in respect of new money funding (the "**New Money DIP Loans**") and (ii) a roll-up of up to $100 million of Prepetition First Lien Term Loans as provided below, subject to the terms and conditions of this DIP Term Facility Term Sheet and the DIP Term Documents.  The borrowing of DIP Term Loans shall permanently decrease the DIP Term Commitments, and any DIP Term Loans repaid may not be reborrowed. <br><br>The DIP Term Lenders shall make the New Money DIP Loans available to the DIP Term Borrower in up to two draws in the following manner (in each case upon the satisfaction of the conditions precedent described below): <br><br>(a)    A first draw of New Money DIP Loans on the Closing Date (as defined below) in an aggregate principal amount of up to $35 million (the related commitments, the "**Initial New Money DIP Commitments**"). <br><br>(b)    A second draw of New Money DIP Loans within one business day after the entry of the Final DIP Order in an aggregate principal amount of up to $15 million (the related commitments, the "**Delayed Draw New Money DIP Commitments**" and, together with the Initial New Money DIP Commitments, the "**New Money DIP Commitments**"). <br><br>An amount of Prepetition First Lien Term Loans held by DIP Term Lenders will be automatically substituted and exchanged for DIP Term Loans ("**Roll-Up DIP Loans**") in an amount equal to $2.00 for each $1.00 of New Money |

| | |
|---|---|
| | DIP Loans funded by the DIP Term Lenders on each borrowing date (the "**Roll-Up**"). |
| **Termination Date** | The earliest of (i) the date falling six months after the commencement of the Cases (such commencement date, the "**Petition Date**"), (ii) the effective date of any Chapter 11 plan for the reorganization of the DIP Term Borrower or any other Debtor, (iii) the consummation of a sale or other disposition of all or substantially all assets of the Debtors under Bankruptcy Code section 363, (iv) the date of acceleration of the obligations under the DIP Term Facility and termination of the unused DIP Term Commitments upon and during the continuance of an event of default under the DIP Term Facility and (v) 45 days after the date of entry of the Interim DIP Order (or such later date as agreed to by the Required DIP Term Lenders (as defined below)), unless the Final DIP Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**Termination Date**"). |
| **DIP ABL Facility** | Concurrently with entering into the DIP Term Facility, the Debtors will enter into a debtor-in-possession asset-based revolving facility in an aggregate principal amount of up to $90 million (the "**DIP ABL Facility**" and, together with the DIP Term Facility, the "**DIP Facilities**"), with MidCap Financial Trust as the administrative agent thereunder (the "**DIP ABL Agent**" and, together with the DIP Term Agent, the "**DIP Agents**"). |
| **Exit Financing** | Upon confirmation of the Acceptable Plan (as defined below) and the Company's emergence from bankruptcy, the DIP Term Loans will be converted into exit term loans in accordance with the Acceptable Plan and the Restructuring Support Agreement and otherwise upon terms satisfactory to the Required DIP Term Lenders. |
| **Interest Rate** | LIBOR + 9.50% per annum, with a LIBOR floor of 2.00%. |
| **Default Interest** | All overdue amounts will bear interest at a rate equal to 2.00% per annum plus the rate otherwise applicable to the relevant DIP Term Loans. |
| **Amortization** | None. |
| **Mandatory Prepayments** | Mandatory prepayments under the DIP Term Facility shall be required with 100% of the net cash proceeds from (a) issuance of any indebtedness (with exceptions for permitted indebtedness) and (b) sales or other dispositions (including casualty and condemnation events) of any assets (excluding sales of inventory in the ordinary course of business and other customary exceptions to be mutually agreed). |
| | Any mandatory prepayments prior to the effective date of an Acceptable Plan shall be applied, first, to repayment of the New Money DIP Loans until repaid in full, and second, to repayment of the Roll-Up DIP Loans, until repaid in full. |
| **Voluntary Prepayments** | Amounts outstanding under the DIP Term Facility may be voluntarily repaid at any time without premium or penalty, except as provided under the headings "Fees" and "Yield Protection"; *provided* that no voluntary prepayment of the Roll-Up DIP Loans shall be permitted until the New Money DIP Loans shall have been repaid in full. |
| **Interim DIP Order** | The interim order approving the DIP Facilities, which shall be in form and substance acceptable to the Required DIP Term Lenders and the required lenders under the DIP ABL Facility (the "**Interim DIP Order**"), shall, among other |

| | |
|---|---|
| | things, authorize and approve (i) the borrowing and making of the New Money DIP Loans in an amount up to $35 million, (ii) the Roll-Up, (iii) the granting of the super-priority claims and liens against the Debtors and their assets in accordance with this DIP Term Facility Term Sheet and the DIP Term Documents, (iv) the payment of all reasonable and documented fees and expenses (including the fees and expenses of outside counsel) required to be paid to the DIP Term Agent and the DIP Term Lenders as described in "Fees and Expenses; Indemnification" by the Debtors, (v) the use of cash collateral, *provided that* the Adequate Protection (as defined below) shall be granted in accordance with the terms set forth in this DIP Term Facility Term Sheet and (vi) the payment of the fees described under the heading "Fees" below, which payment shall not be subject to reduction, setoff or recoupment. |
| **Final DIP Order** | The final order approving the DIP Facilities, which shall be substantially in the same form as the Interim DIP Order (with such modifications as are necessary to convert the Interim DIP Order into a final order) and in form and substance acceptable to the Required DIP Term Lenders and the required lenders under the DIP ABL Facility (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"), shall, among other things, authorize and approve the DIP Term Borrower to draw the full amount of the New Money DIP Commitments. |
| **Prepetition Facilities**[9] | "**Prepetition ABL Credit Agreement**" – that certain Credit Agreement, dated as of September 6, 2017, and the "Secured Parties" thereunder, the "**Prepetition ABL Secured Parties**", and the administrative agent thereunder, the "**Prepetition ABL Agent**". <br><br> "**Prepetition First Lien Term Loan Agreement**" – that certain First Lien Term Loan Credit Agreement, dated as of February 17, 2017, the "Secured Parties" thereunder, the "**Prepetition FLTL Secured Parties**", and the administrative agent thereunder, the "**Prepetition First Lien Agent**". <br><br> "**Prepetition Second Lien Term Loan Agreement**" – that certain Second Lien Term Loan Credit Agreement, dated as of October 28, 2015, the "Secured Parties" thereunder, the "**Prepetition Second Lien Secured Parties**" and, together with the Prepetition FLTL Secured Parties and the Prepetition ABL Secured Parties, the "**Prepetition Secured Parties**", and the administrative agent thereunder, the "**Prepetition Second Lien Agent**". <br><br> The Prepetition First Lien Term Loan Agreement and the Prepetition Second Lien Term Loan Agreement are collectively referred to herein as the "**Prepetition Term Loan Agreements**". <br><br> Collectively, the agreements described above are referred to herein as the "**Prepetition Credit Agreements**," and the secured obligations thereunder, collectively, the "**Prepetition Secured Obligations**" and all "Collateral" securing such Prepetition Secured Obligations, the "**Prepetition Collateral**". |
| **DIP Collateral** | All present and after acquired property (whether tangible, intangible, real, personal or mixed) of the Loan Parties, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries of |

---

[9] In each case, as amended, supplemented or otherwise modified prior to the date hereof.

|  | the Loan Parties, including, for the avoidance of doubt, any equity or other interests in the Loan Parties' non-Debtor and/or jointly-owned subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, subject to customary exclusions and excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law but, subject to entry of the Final DIP Order, including the proceeds thereof (collectively, the "**DIP Collateral**" and the liens on the DIP Collateral securing the DIP Facilities, the "**DIP Liens**"), it being understood and agreed that the Roll-Up DIP Loans shall not be secured by liens on real property leases that, as of the Petition Date, are not subject to valid and perfected liens securing the Prepetition First Lien Term Loans in accordance with the Prepetition First Lien Term Loan Agreement because the consent of the applicable lessor to the creation of a security interest in favor of the Prepetition First Lien Term Lenders has not been obtained (all such leased real property, the "**Specified Excluded Unencumbered Property**"). |
|  | The relative rights and priorities in the DIP Collateral among the DIP Term Lenders and the lenders under the DIP ABL Facility will be set forth in an intercreditor agreement, which will be in form and substance consistent with that certain Intercreditor Agreement, dated as of September 6, 2017 (as amended, restated, supplemented or otherwise modified from time to time), among the Company, the other grantors party thereto, the Prepetition First Lien Agent and the Prepetition ABL Agent (the "**Prepetition Intercreditor Agreement**"). |
|  | It is also understood and agreed that the collateral package for the DIP Facilities will also include the equity interests of the Borrower pledged by certain of its non-Debtor equity holders. |
| **Priority Under the DIP Term Facility** | All obligations of the DIP Term Borrower and the Guarantors to the DIP Term Lenders and to the DIP Term Agent (collectively, the "**DIP Term Obligations**") shall, subject to the Carve-Out (as defined on Exhibit A attached hereto), at all times: |
|  | a.  be entitled to superpriority administrative expense claim status in the Case of such Loan Party, except that such claims in respect of the Roll-Up DIP Loans will be junior to such claims in respect of the New Money DIP Loans; |
|  | b.  be secured by a perfected (i) first priority security interest and lien on the DIP Collateral (other than, in the case of the Roll-Up DIP Loans, the Specified Excluded Unencumbered Property) of each Loan Party that constitutes Term Loan Priority Collateral (to be defined in a manner consistent with Prepetition Intercreditor Agreement and such other modifications to reflect the commencement of the Cases) and (ii) second priority security interest and lien on the DIP Collateral of each Loan Party that constitutes ABL Priority Collateral (to be defined in a manner consistent with Prepetition Intercreditor Agreement and such other modifications to reflect the commencement of the Cases), in each case that is not subject to valid, perfected and unavoidable liens as of the Petition Date (subject to customary exclusions); and |

|  |  |
|---|---|
|  | c. except as otherwise provided below with respect to the existing liens of the Prepetition Secured Parties with respect to Term Loan Priority Collateral, (i) be secured by a junior perfected security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral is subject to (A) valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date and permitted under the Prepetition Term Loan Agreements and (B) valid and unavoidable permitted liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code ((A) and (B) together, the "**Permitted Prior Liens**") and (ii) be secured by a junior perfected security interest and lien on the DIP Collateral that constitutes ABL Priority Collateral of each Loan Party to the extent subject to Prepetition ABL Secured Party Adequate Protection Liens; and

d. pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected priming security interest and lien on the DIP Collateral of each Loan Party to the extent such DIP Collateral is subject to existing liens that secure the Prepetition Secured Obligations; *provided* the liens securing the DIP Term Obligations on ABL Priority Collateral shall be immediately junior to the liens securing the obligations under the Prepetition ABL Credit Agreement (including adequate protection liens).

In each case above, the liens securing the Roll-Up DIP Loans shall be junior to the liens securing the obligations in respect of the New Money DIP Loans, it being understood and agreed that the Roll-Up DIP Loans will not be secured by the Specified Excluded Unencumbered Property. |
| **Adequate Protection** | Pursuant to Sections 361, 363(c), 363(e) and 364(d)(1) of the Bankruptcy Code, as protection in respect of (x) the incurrence of the DIP Facilities, (y) the imposition of the automatic stay, and (z) the Debtors' use of the Prepetition Collateral including cash collateral, the Debtors and the DIP Term Lenders agree (and the lenders under the DIP ABL Facility shall agree), subject to Bankruptcy Court approval, to adequate protection packages for the Prepetition ABL Secured Parties, the Prepetition FLTL Secured Parties, and the Prepetition Second Lien Secured Parties, subject to usual terms and customary conditions and to include the following (the "**Adequate Protection**"):

Prepetition ABL Secured Parties: Until the discharge of the obligations under the Prepetition ABL Credit Agreement as set forth in the Final DIP Order:

(a) reasonable and documented prepetition and postpetition fees and expenses of (i) the Prepetition ABL Agent and (ii) Hogan Lovells US LLP as sole counsel (and, if reasonably necessary, applicable local counsel) to the Prepetition ABL Secured Parties;

(b) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**Prepetition ABL Secured Party Adequate Protection Claims**"); |

(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral (other than the Specified Excluded Unencumbered Property) to secure the Prepetition ABL Secured Parties Adequate Protection Claims (the "**Prepetition ABL Secured Party Adequate Protection Liens**"), senior to all other liens on the DIP Collateral except (i) the Carve-Out, (ii) the Permitted Prior Liens, (iii) solely with respect to DIP Collateral that constitutes Term Loan Priority Collateral, the liens of the Prepetition FLTL Secured Parties (including the adequate protection liens granted thereto in accordance with this DIP Term Facility Term Sheet), (iv) the DIP Liens on the Term Loan Priority Collateral securing the DIP Term Facility and (v) the DIP Liens on the ABL Priority Collateral securing the DIP ABL Facility;

(d) financial reporting and other reports and notices delivered by the Company under the DIP ABL Facility, including budgets and any variance reports thereon;

(e) customary stipulations regarding validity, perfection and priority of the liens securing the Prepetition Secured Obligations under the Prepetition ABL Credit Agreement and regarding validity, priority and absence of defenses or counterclaims to Prepetition Secured Obligations under the Prepetition ABL Credit Agreement and customary releases, in each case subject to a customary challenge period;

(f) Bankruptcy Code section 506(c) waiver and waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code; and

(g) customary termination events, stay relief, reservations of rights, and proof of claim provisions.

Prepetition FLTL Secured Parties:

(a) reasonable and documented prepetition and postpetition fees and expenses of (i) the Prepetition First Lien Agent, (ii) Davis Polk & Wardwell LLP (and, if reasonably necessary, applicable local counsel) as counsel to the Ad Hoc Crossholder Lender Group (as defined in the Restructuring Support Agreement) and, if requested, one counsel for the Prepetition First Lien Agent, (iii) Simpson Thacher & Bartlett LLP as counsel to Solus, and (iv) Shearman & Sterling LLP and applicable local counsel as counsel to the Ad Hoc First Lien Lender Group;

(b) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**Prepetition FLTL Secured Party Adequate Protection Claims**");

(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral (other than the Specified Excluded Unencumbered Property) to secure the Prepetition FLTL Secured Parties Adequate Protection Claims (the "**Prepetition FLTL Secured Party Adequate Protection Liens**"), senior to all other liens on such DIP Collateral except (i) the Carve-Out, (ii) the Permitted Prior Liens, (iii) solely with respect to DIP Collateral that constitutes ABL Priority Collateral, the liens of the Prepetition ABL Secured Parties (including the adequate protection liens granted thereto in accordance with this DIP Term Facility Term Sheet), (iv) the DIP Liens

securing the DIP Term Facility and (v) the DIP Liens on the ABL Priority Collateral securing the DIP ABL Facility;

(d) financial reporting and other reports and notices delivered by the Company under the DIP Term Facility, including the Budget, updated Budgets, and any variance reports thereon;

(e) customary stipulations regarding validity, perfection and priority of the liens securing the Prepetition Secured Obligations under the Prepetition First Lien Term Loan Agreement and regarding validity, priority and absence of defenses or counterclaims to Prepetition Secured Obligations under the Prepetition First Lien Term Loan Agreement and customary releases, in each case subject to a customary challenge period;

(f) Bankruptcy Code section 506(c) waiver and waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(g) customary termination events, stay relief, reservations of rights, and proof of claim provisions; and

(h) roll-up of Prepetition First Lien Term Loans on a junior basis in accordance with this DIP Facility Term Sheet.

Prepetition Second Lien Secured Parties:

(a)(i) reasonable and documented prepetition and postpetition fees and expenses of (i) the Prepetition Second Lien Agent, (ii) Davis Polk & Wardwell LLP (and, if reasonably necessary, applicable local counsel) as counsel to the Prepetition Second Lien Secured Parties and (iii) reasonable and documented prepetition and postpetition fees and expenses of Stroock & Stroock & Lavan LLP (and, if reasonably necessary, applicable local counsel) as counsel to the Prepetition Second Lien Agent;

(b) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code (the "**Prepetition Second Lien Secured Party Adequate Protection Claims**");

(c) to the extent of diminution in value of their Prepetition Collateral, as provided in the Bankruptcy Code, replacement liens on the DIP Collateral (other than the Specified Excluded Unencumbered Property) to secure the Second Lien Credit Agreement Secured Party Adequate Protection Claims (the "**Prepetition Second Lien Secured Party Adequate Protection Liens**"), senior to all other liens on such DIP Collateral except (i) the Carve-Out, (ii) the Permitted Prior Liens, (iii) the liens of the Prepetition ABL Secured Parties (including the adequate protection liens granted thereto in accordance with this DIP Facility Term Sheet), (iv) liens of the Prepetition FLTL Secured Parties (including the adequate protection liens granted thereto in accordance with this DIP Term Facility Term Sheet), (v) the DIP Liens securing the DIP Term Facility and (vi) the DIP Liens on the ABL Priority Collateral securing the DIP ABL Facility;

(d) financial reporting and other reports and notices delivered by the Company under the DIP Term Facility, including the Budget, updated Budgets, and any variance reports thereon;

|  | (e) customary stipulations regarding validity, perfection and priority of the liens securing the Prepetition Secured Obligations under the Prepetition Second Lien Term Loan Agreement and regarding validity, priority and absence of defenses or counterclaims to Prepetition Secured Obligations under the Prepetition Second Lien Term Loan Agreement and customary releases, in each subject to the customary challenge period;<br><br>(f) Bankruptcy Code section 506(c) waiver and waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code; and<br><br>(g) customary termination events, stay relief, reservations of rights, and proof of claim provisions. |
|---|---|
| **Milestones** | The DIP Term Documents shall require compliance with the following milestones (the "**Milestones**"):<br><br>• No later than 1 day after the Petition Date, filing of a motion, in form and substance satisfactory to the DIP Term Lenders, seeking approval of the DIP Term Facility.<br><br>• No later than 5 days after the Petition Date, entry of the Interim DIP Order and filing of an Acceptable Disclosure Statement and an Acceptable Plan.<br><br>• No later than 45 days after the Petition Date, entry of the Final DIP Order.<br><br>• No later than 75 days after the Petition Date, approval of an Acceptable Disclosure Statement and approval of the Acceptable Plan (the "**Confirmation Date**").<br><br>• No later than 14 days after the Confirmation Date, effectiveness of the Acceptable Plan.<br><br>The Milestones may be amended, modified or extended, in each case, only by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required DIP Term Lenders. |
| **Events of Default** | Consistent with the DIP Term Facility Documentation Principles. |
| **Conditions Precedent to Closing** | Usual and customary for financings of this type, including, without limitation: (i) execution and delivery of the DIP Term Credit Agreement and the other DIP Term Documents evidencing the DIP Term Facility; (ii) the Petition Date shall have occurred, and the DIP Term Borrower and each Guarantor shall be a debtor and a debtor-in-possession; (iii) the Debtors shall have filed a Plan as defined in the Restructuring Support Agreement consistent with the terms thereof with such changes as are acceptable to the Required DIP Term Lenders (an "**Acceptable Plan**") and a Disclosure Statement as defined in the Restructuring Support Agreement consistent with the terms thereof with such changes as are acceptable to the Required DIP Term Lenders (an "**Acceptable Disclosure Statement**"); (iv) entry of the Interim DIP Order; and (v) delivery of a Budget (as defined below) reasonably acceptable to the Required DIP Term Lenders. |
| **Conditions Precedent to the Funding of each New Money DIP Loan** | Usual and customary for financings of this type, including, without limitation: (i) no default or event of default; (ii) accuracy of representations and warranties in all material respects; (iii) the Interim DIP Order or the Final DIP Order, as applicable, shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the consent of the Required DIP Term Lenders; |

| | |
|---|---|
| | (iv) delivery of a customary notice of borrowing; and (v) with respect to the drawing under the Delayed Draw New Money DIP Commitments, the funding thereunder occurs within one business day after the entry of the Final DIP Order. |
| **Closing Date** | The date on which the conditions specified in the "Conditions Precedent to Closing" section above are satisfied and on which the "Conditions Precedent to the Funding of each New Money DIP Loan" section above with respect to the initial DIP Term Loans are satisfied is referred to herein as the "**Closing Date**". |
| **Covenants** | Consistent with the DIP Term Facility Documentation Principles. |
| **Financial Covenant** | Budget variance covenant, tested weekly against the Approved Budget (as defined below) beginning at the conclusion of the second calendar week after the Petition Date, as follows: <br><br> • actual operating cash receipts shall not vary from projected operating cash receipts, in each case measured on a cumulative basis since the Petition Date, by more than 20%; and <br><br> • actual operating disbursements (excluding professional fees) shall not vary from projected operating disbursements (excluding professional fees), in each case measured on a cumulative basis since the Petition Date, by more than 10%. <br><br> "**Budget**" means, a rolling 13-week cash flow forecast delivered on or prior to the Closing Date and every four weeks after the Petition Date, setting forth the Debtors' projected cash receipts and cash disbursements during such 13-week period (i) initially, covering the period commencing on or about the Closing Date and (ii) thereafter, commencing on the first day of each four-week period thereafter. Any updates to the Budget delivered after the Closing Date shall be reasonably acceptable to the Required DIP Term Lenders, it being understood that (x) no changes shall be made in any such updated Budget with respect to any periods that were included in a previously delivered Budget and (y) if the Required DIP Term Lenders have not objected to an updated Budget within five Business Days after delivery thereof, the updated Budget shall be deemed to be approved (each such approved Budget, the "**Approved Budget**"). |
| **Representations and Warranties** | Consistent with the DIP Term Facility Documentation Principles. |
| **Voting** | Amendments and waivers of the DIP Term Facility will require the approval of DIP Term Lenders holding more than 50% of the outstanding DIP Term Commitments and DIP Term Loans (the "**Required DIP Term Lenders**"), subject to customary exceptions for certain provisions which shall require the consent of each affected DIP Term Lender or all DIP Term Lenders and customary protections for the DIP Term Agent. |
| **Fees and Expenses; Indemnification** | Consistent with the DIP Term Facility Documentation Principles. |
| **Fees** | (a)  *Upfront Fee/Original Issue Discount*: 1.00% of the aggregate principal amount of the New Money DIP Commitments, which shall be due and payable on the applicable funding date thereof to the DIP Term Lenders in cash ratably based on their respective New Money DIP Commitments, which fee may, at the election of the Required DIP Term Lenders, be in the form of original issue discount. |

|  | (b) *Unused Line Fee*: 1.00% per annum on the actual daily amount of the unused Delayed Draw New Money DIP Commitments, which shall be paid on the funding date thereunder to the DIP Term Lenders in cash ratably based on their respective Delayed Draw New Money DIP Commitments.<br><br>(c) *Exit Fee*: 1.00% of the aggregate principal amount of the New Money DIP Loans, which shall be due and payable in cash on the Termination Date or, in the case of New Money DIP Loans prepaid in whole or in part prior to the Termination Date, on the date of such prepayment. |
|---|---|
| **Assignments and Participations** | Consistent with the DIP Term Facility Documentation Principles. |
| **Governing Law** | The laws of the State of New York (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code. |
| **Yield Protection** | Usual and customary for financings of this type. |
| **DIP Term Facility Documentation Principles** | (a) The DIP Term Credit Agreement and the other DIP Term Documents shall be negotiated in good faith and based on the Prepetition First Lien Term Loan Agreement, and shall contain the terms and conditions set forth in this DIP Term Facility Term Sheet, and (b) subject to the following, the DIP Term Documents will be based on the Prepetition First Lien Term Loan Agreement and the related collateral documents, in each case, modified (i) to the extent required to reflect the express terms and conditions set forth in this DIP Term Facility Term Sheet, (ii) to the extent required to reflect the shorter tenor of the DIP Term Facility, (iii) to account for the existence and continuance of the Cases (including customary representations and warranties, covenants and events of default for facilities of this type), the operational needs and requirements of the Debtors between the commencement of the Cases and the Termination Date and to include provisions applicable to debtor-in-possession facilities generally and other customary changes to be mutually agreed including with respect to tighter carve-outs or deleted carve-outs in negative covenants, including a prohibition on any investment by a Loan Party in a Non-Filing Subsidiary on or after the Closing Date, (iv) to reflect changes in law since the date of the Prepetition First Lien Term Facility, (v) to reflect the policies and procedures of the DIP Term Agent in deals where it acts as administrative agent and (vi) as otherwise agreed between the DIP Borrower and the DIP Term Lenders.  Notwithstanding the foregoing or any other provision hereof, certain "thresholds," "baskets," "grace periods," and "cure periods" shall be modified in a customary manner for debtor-in-possession facilities and the DIP Term Borrower and DIP Term Lenders agree to negotiate such modifications in good faith. The provisions of clauses (a) and (b) are collectively referred to as the "**DIP Term Documentation Principles**"). |
| **Counsel to DIP Term Agent** | Davis Polk & Wardwell LLP. |

**Exhibit A**

## Carve-Out

(a)        Carve Out.  As used in this [Final/Interim] Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the [DIP Term Agent or the DIP ABL Agent] of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,000,000 incurred after the first business day following delivery by the [DIP Term Agent or the DIP ABL Agent] of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the [DIP Term Agent or the DIP ABL Agent] to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee (if appointed) with a copy to the Prepetition First Lien Agent (which shall post the same to the Prepetition First Lien Term Lenders), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in, and under, the DIP ABL Credit Agreement or the DIP Term Credit Agreement) and acceleration of the [DIP ABL Obligations] or the [DIP Term Obligations] under the DIP ABL Facility or the DIP Term Facility, as applicable, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)        Fee Estimates.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the [Closing Date], each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); provided, that within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date.  If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Carve Out Reserves (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Budget (as defined in the [DIP ABL Credit Agreement and the DIP Term Credit Agreement], the "Budget") for such period for such Professional Person; provided, that such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor pursuant to paragraph [●](c) below.  Solely as it relates to the DIP ABL Agent, the DIP Term Agent, the [DIP ABL Lenders, the DIP Term Lenders, the Prepetition ABL Agent, and the Prepetition Secured Parties], any deemed draw and

borrowing pursuant to paragraph [●](c)(i)(x) for amounts under paragraph [●](a)(iii) above shall be limited to the greater of (x) the sum of (I) the aggregate unpaid amount of Estimated Fees and Expenses included in such Weekly Statements timely received by the Debtors prior to the Termination Declaration Date *plus*, without duplication, (II) the lesser of (1) the aggregate unpaid amount of Estimated Fees and Expenses included in the Final Statements timely received by the Debtors pertaining to the period through and including the Termination Declaration Date and (2) the Budgeted Cushion Amount (as defined below), and (y) the aggregate unpaid amount of Allowed Professional Fees included in the Budget for the period prior to the Termination Declaration Date (such amount, the "<u>DIP Professional Fee Carve Out Cap</u>").  For the avoidance of doubt, the DIP ABL Agent and the DIP Term Agent shall be entitled to maintain at all times a reserve (the "<u>Carve-Out Reserve</u>") in an amount (the "<u>Carve-Out Reserve Amount</u>") equal to the sum of (i) the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in <u>all</u> Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Budget at the applicable time, *plus* (ii) the Post-Term Credit Trigger Notice Cap, *plus* (iii) the amounts contemplated under paragraph [●](a)(i) and [●](a)(ii) above, *plus* (iv) an amount equal to the amount of Allowed Professional Fees set forth in the Budget for the then current week occurring after the most recent Calculation Date and the two weeks succeeding such current week (such amount set forth in (iv), regardless of whether such reserve is maintained, the "<u>Budgeted Cushion Amount</u>").  Not later than 7:00 p.m. New York time on the fourth business day of each week starting with the first full calendar week following the [Closing Date], the Debtors shall deliver to the DIP ABL Agent and the DIP Term Agent a report setting forth the Carve-Out Reserve Amount as of such time, and, in setting the Carve-Out Reserve, the DIP ABL Agent and the DIP Term Agent shall be entitled to rely upon such reports in accordance with section [●] of the [DIP ABL Credit Agreement and the DIP Term Credit Agreement], respectively.  Prior to the delivery of the first report setting forth the Carve-Out Reserve Amount, the DIP ABL Agent and the DIP Term Agent shall calculate the Carve-Out Reserve Amount by reference to the Budget for subsection (i) of the Carve-Out Reserve Amount.

(c)    <u>Carve Out Reserves.</u>

(i)    On the day on which a Carve Out Trigger Notice is given by [the DIP ABL Agent or the DIP Term Agent] to the Debtors with a copy to counsel to the Creditors' Committee (if appointed) (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (x) be deemed a draw request and notice of borrowing by the Debtors for [Revolving/Delayed Draw Term] Loans under the [Revolving/Delayed Draw Term] Loan Commitment (each, as defined in the [DIP ABL Credit Agreement] or [DIP Terms Loan Credit Agreement], as applicable) (on a pro rata basis based on the then outstanding [Revolving/Delayed Draw Term] Loan Commitments), in an amount equal to the sum of (1) the amounts set forth in paragraphs [●](a)(i) and [●](a)(ii) above, and (2) the lesser of (a) the then unpaid amounts of the Allowed Professional Fees (b) the DIP Professional Fee Carve Out Cap (any such amounts actually advanced shall constitute [Revolving/Delayed Draw Term] Loans) and (y) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of the amounts set forth in paragraphs [●](a)(i)–(iii) above.  The Debtors shall deposit and hold such amounts in a segregated account at the [DIP ABL Agent and the DIP Term Agent] in trust in respect of amounts funded by the [ABL DIP Lenders] and, if applicable, the proceeds of the Term Loan Priority Collateral or the proceeds of the DIP Term Loan exclusively to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.

(ii)    On the Termination Declaration Date, the Carve Out Trigger Notice shall also (x) be deemed a request by the Debtors for [Revolving/Delayed Draw Term] Loans under the [Revolving/Delayed Draw Term] Loan Commitment (on a pro rata basis based on the then outstanding [Revolving/Delayed Draw Term] Loan Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute [Revolving/Delayed Draw Term] Loans) and (y) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such

13

amounts in a segregated account at the [DIP ABL Agent or the DIP Term Agent (as applicable)] in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.

(iii)    On the first business day after the DIP Term Agent or the DIP ABL Agent gives such notice to such [Revolving/Delayed Draw Term] Lenders (as defined in the DIP ABL Credit Agreement), notwithstanding anything in the DIP ABL Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP ABL Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for [DIP ABL] Loans under the [DIP ABL] Facility, any termination of the [DIP ABL] Loan Commitments following an Event of Default, or the occurrence of the Maturity Date, each [DIP ABL] Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the [DIP ABL Agent] such [DIP ABL] Lender's pro rata share with respect to such borrowing in accordance with the [DIP ABL] Facility; *provided* that in no event shall the [DIP ABL Agent] or the [DIP ABL Lenders] be required to extend [DIP ABL] Loans pursuant to a deemed draw and borrowing pursuant to paragraphs [●](c)(i)(x) and [●](c)(ii)(x) in an aggregate amount exceeding the Carve-Out Reserve Amount.

(iv)    All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full.  If the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to clause (iii), below, all remaining funds in (x) the account funded by the DIP ABL Lenders shall be distributed *first* to the DIP ABL Agent on account of the DIP ABL Obligations until indefeasibly paid in full, in cash, all Commitments have been terminated, and all Letters of Credit have been cancelled (or all such Letters of Credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the Issuing Bank (as defined in the DIP ABL Credit Agreement), and *thereafter* for application to the Prepetition ABL Obligations in accordance with the Prepetition ABL Credit Agreement as of the Petition Date and (y) all remaining funds in the account funded by the DIP Term Lenders shall be distributed to the DIP Term Agent which shall apply such funds to the DIP Term Obligations in accordance with the DIP Term Credit Agreement until indefeasibly paid in full, in cash.

(v)    All funds in the Post Carve Out Trigger Notice Reserve, to the extent they exceed the DIP Professional Fee Carve Out Cap, shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post Carve Out Amounts").  If, after such application, the Post Carve Out Trigger Notice Reserve has not been reduced to zero, subject to clause (iii) below, all remaining funds (x) in respect of the account funded by the DIP ABL Lenders, shall be distributed *first* to the DIP ABL Agent on account of the DIP ABL Obligations until indefeasibly paid in full, in cash, all commitments to extend credit under the DIP ABL Facility have been terminated, and all letters of credit have been cancelled (or all such letters of credit have been fully cash collateralized or otherwise back-stopped, in each case to the satisfaction of the Issuing Bank), and *thereafter* for application to the Prepetition ABL Obligations in accordance with the Prepetition ABL Credit Agreement as of the Petition Date and (y) all remaining funds in the account funded by the DIP Term Lenders shall be distributed to the DIP Term Agent, which shall apply such funds to the DIP Term Obligations in accordance with the DIP Term Credit Agreement until indefeasibly paid in full, in cash.

(vi)    Notwithstanding anything to the contrary in the [DIP ABL Documents, the DIP Term Documents], or this [Final/Interim] Order, (x) if either of the Carve Out Reserves required to be funded by the DIP ABL Lenders is not funded in full in the amounts set forth in this paragraph, then any excess funds in one of the Carve Out Reserves held in any account funded by the DIP ABL Lenders following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts (subject to the limits contained in the DIP Professional Fee Carve Out Cap and the Post-Carve Out Trigger Notice Cap, respectively) shall be used to fund the other Carve Out Reserve to the extent of any shortfall in funding by

the DIP ABL Lenders prior to making any payments to the DIP ABL Agent or the Prepetition ABL Secured Parties, as applicable, and (y) if either of the Carve Out Reserves required to be funded with the proceeds of [Term Loan Priority Collateral] is not funded in full in the amounts set forth in this paragraph, then any excess funds in one of the Carve Out Reserves held in any account funded by such cash on hand following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts (subject to the Post-Carve Out Trigger Notice Cap), respectively, shall be used to fund the other Carve Out Reserve to the extent of any shortfall in funding by the cash on hand prior to making any payments to the DIP Term Agent or the Prepetition Secured Parties, as applicable.

(vii)    Notwithstanding anything to the contrary in the [DIP ABL Documents, the DIP Term Documents] or this [Final/Interim] Order, following delivery of a Carve Out Trigger Notice, the [DIP ABL Agent] and the [Prepetition ABL Agent] shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves required to be funded by the DIP ABL Lenders have been fully funded, but the DIP ABL Agent and the Prepetition ABL Agent have a security interest in any residual interest in the Carve Out Reserves held in accounts by the DIP ABL Agent, with any excess paid as provided in paragraphs (i) and (ii) above; and (y) the DIP Term Agent and the [Prepetition First Lien Agent] shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid as provided in paragraphs (ii) and (iii) above.  The security interests of the DIP ABL Agent and the DIP Term Agent on any residual interest in the Carve Out Reserves shall be shared pro rata based on the amount of funds in the Carve Out Reserves funded by (x) the proceeds of [DIP Term Collateral] and (y) the DIP ABL Lenders or the [DIP ABL Collateral].  Further, notwithstanding anything to the contrary in this [Final/Interim] Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute [Loans] (as defined in the [DIP Term Credit Agreement or the DIP ABL Credit Agreement]) or increase or reduce the [DIP Term Obligations] or [the DIP ABL Obligations], (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this [Final/Interim] Order, the DIP Term Facility, the DIP ABL Facility, or in any [Prepetition Credit Agreements], the Carve Out shall be senior to all liens and claims securing the [DIP Term Facility, the DIP ABL Facility], the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the [DIP Term Obligations], [the DIP ABL Obligations] or the [Prepetition Secured Obligations].

(d)    Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)    No Direct Obligation To Pay Allowed Professional Fees.  None of the [DIP Term Agent], [DIP ABL Agent, DIP ABL Lenders,] [DIP Term Lenders], or the [Prepetition Secured Parties] shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this [Interim/Final] Order or otherwise shall be construed to obligate the [DIP Term Agent, DIP ABL Agent, the DIP Term Lenders, or the Prepetition Secured Parties], in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)    Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the [DIP Term Obligations] secured by the

[DIP Collateral] and shall be otherwise entitled to the protections granted under this [Final/Interim] Order, the [DIP Documents], the Bankruptcy Code, and applicable law.

**Exhibit C** **to the Restructuring Support Agreement**

**Corporate Governance Term Sheet**

**BLACKHAWK MINING LLC CHAPTER 11 RESTRUCTURING**
**CORPORATE GOVERNANCE TERM SHEET**

This term sheet ("***Term Sheet***") describes the post-effective corporate governance in connection with the restructuring (the "***Restructuring***") of Blackhawk Mining LLC, a Kentucky limited liability company. This Term Sheet is not binding, is subject to material change and is being distributed for discussion purposes only. This Term Sheet is not a commitment to provide financing or engage in any transaction.

Capitalized terms used in this Term Sheet but not defined herein shall have the meanings set forth in that certain Restructuring Support Agreement to which this Term Sheet is attached as an exhibit (the "***Support Agreement***").

| | |
|---|---|
| **Reorganized Issuer** | An entity of a type to be specified subsequently (the "***Company***" and the constituent governance documents of such Company, the "***organizational documents***") |
| **Classes of Units** | One class of units or other appropriate common equity ("***Units***") |
| **Board of Directors** | Initial Board of Directors (the "***Board***") to provide for five director seats consisting of (i) one director designated by Knighthead (the "***Knighthead Designee***"), (ii) one director designated by Solus (the "***Solus Designee***"), (iii) one director acceptable to Knighthead and Solus, subject to the consent, not to be unreasonably withheld, of the majority of a three-member committee (the "***Advisory Committee***") consisting of members of the Ad Hoc First Lien Lender Group selected by members of the Ad Hoc First Lien Lender Group holding at least 50.01% of the loans held by such group (the "***K&S Designee***"), (iv) one director acceptable to all holders of at least [\_\_\_\_][10] Units (other than Knighthead and Solus) (a "***Group Designee***"), with the consent of Knighthead and Solus not to be unreasonably withheld, and (v) the CEO (the "***CEO Designee***"). <br><br> After the Effective Date: <br><br> • Knighthead will have the right to designate one Knighthead Designee for as long as it holds at least [\_\_\_\_][11] Units. <br> • Solus will have the right to designate one Solus Designee for as long as it holds at least [\_\_\_\_][12] Units. <br> • Knighthead and Solus will each maintain its designation right over the K&S Designee for so long as such entity holds at least [\_\_\_\_][13] Units. |

---

[10] NTD: To be equal to 10% of the Units issued on the Emergence Date.

[11] NTD: To be equal to 15% of the Units issued on the Emergence Date.

[12] NTD: To be equal to 15% of the Units issued on the Emergence Date.

[13] NTD: To be equal to 15% of the Units issued on the Emergence Date.

- Any party (other than Knighthead and Solus) that holds or comes to hold at least [_____][14] Units will join the group with designation right over the Group Designee.
- Simultaneously with ceasing to be CEO of the Company, the CEO Designee shall resign or be removed from the Board, and any individual that becomes the CEO of the Company shall in connection therewith be designated as a member of the Board as the CEO Designee. During the period in which no person is serving as the CEO, the CEO Designee board seat shall be filled by a member of the executive team selected by a majority of the remaining Board members until an individual becomes the CEO of the Company.

Any Group Designee or K&S Designee shall be independent of the Company and any party then having any designation or approval right over any Board seat, and shall have senior executive experience in the coal, mining or related industries.

Board members will serve for one-year periods and will be re-elected (and in the case of the Knighthead Designee, the Solus Designee and the K&S Designee, to the extent such parties retain the right to designate such designees, re-designated by Knighthead and Solus) at an annual meeting of the holders of Units (the "**Holders**" and any holder of Units, a "**Holder**"). At any time that Knighthead or Solus no longer has the right to designate a Knighthead Designee or Solus Designee (as applicable), such party's designee shall offer to resign, which resignation may be accepted by a majority of the other members of the Board (excluding any other designee of such party). Any party or group having designation rights may cause its designee to be removed and replaced at any time; provided that in the case of the K&S Designee and the Group Designee, all parties entitled to designate such director must consent to any removal or replacement of such director. In the case of the K&S Designee, any replacement designee prior to the first annual meeting of the Holders shall be subject to the consent, not to be unreasonably withheld, of the Advisory Committee. If a vacancy on the Board of a designee results in a failure of the Board to have a quorum, then upon 10 days' notice to the person(s) entitled to appoint such designee, a majority of the remaining Board members shall constitute a quorum until such designee is appointed.

In the event that no party or group has designation rights over a Board seat by virtue of such party or all members of such group having less than the applicable threshold number of Units, then such Board seat shall become an at-large seat selected by a plurality of outstanding Units voting in such election; provided that any Board member elected to such at-large seat (whether by the Holders or by the Board) shall be independent of the Company and any party then having a designation or approval right over any Board seat. Any at-large seat that is or becomes vacant may be filled by a majority of the Board until the next annual meeting of the Holders.

---

[14] NTD: To be equal to 10% of the Units issued on the Emergence Date.

| | |
|---|---|
| | Any vacant seat as to which a party or group has the right to designate or approve a director to such seat shall remain open until the party or group with the right to designate such seat has designated a replacement. |
| | The right of Knighthead and Solus to designate the Knighthead Designee, the Solus Designee and the K&S Designee, as applicable, may be transferred so long as (1) the transferor is transferring to the transferee in such transaction at least the number of Units required to meet the designation or approval right threshold (provided that if the transferor transfers less than such threshold number of Units in a transaction solely as a result of the exercise of tag-along rights, the transferor still may transfer such designation rights so long as the transferee purchases at least such threshold number of Units in such transaction, including the Units purchased pursuant to the exercise of tag-along rights) and (2) the transferor elects to make such rights assignment in its sole discretion. |
| | So long as any Holder individually owns at least 15% of the outstanding Units, such Holder shall have the right to designate one Board observer. |
| **Board Action and Consent Rights** | A majority of the total number of directors then in office shall constitute a quorum, and the affirmative vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board. |
| | The following corporate actions will specifically require approval by a majority of the Board: |
| | • changes to organizational documents;<br>• entry into a new line of business;<br>• liquidation or voluntary bankruptcy filing;<br>• merger, sale of all or substantially all assets of the Company or of any subsidiary, or consummation by the Company of another change in control transaction (a "***Sale Transaction***") or entry by the Company into any agreement providing for the same;<br>• any issuances, redemptions or repurchases of the Company's equity, other than pursuant to employee agreements or plans providing for the issuance or repurchase of such equity;<br>• any cash or in-kind dividends or distributions;<br>• change in size of Board;<br>• approval of equity incentive plans;<br>• any registered public offering of the Company's securities;<br>• listing of any Company securities on a national securities exchange or OTC marketplace;<br>• registration of any Company securities under the Securities Exchange Act of 1934 (as amended, the "***Exchange Act***");<br>• appointment or removal of any executive officer;<br>• incurrence of any indebtedness in excess of $5 million in one or a series of transactions (excluding ordinary course trade payables), excluding any indebtedness existing on the effective date of the Restructuring; |

<table>
<tr>
<td></td>
<td>

- any acquisition or disposition (in one transaction or a series of related transactions) of any assets or business of the Company or of any of its subsidiaries in excess of $20 million;
- entry into, or a material amendment or renewal of, any agreement, arrangement or transaction with (i) any affiliate of the Company or (ii) any owner of 5% or more of the Units, or an affiliate of such owner (such persons, "***Related Persons***");
- entry into any partnership, joint venture or other similar agreement or arrangement;
- other than coal sales agreements or similar arrangements entered into or amended in the ordinary course of business consistent with past practices with persons other than Related Persons (excluding, for the avoidance of doubt, third party agency agreements, but including, for the avoidance of doubt, third-party coal brokering activities conducted in the ordinary course of business consistent with past practices), entry into, or material amendment of, any agreement or series of related agreements pursuant to which the Company or any of its subsidiaries are expected to receive or make aggregate payments in excess of $20 million; and
- an annual operating and capital expenditure budget and any material changes or material deviations therefrom.

The Board may act by written consent in lieu of a meeting.
</td>
</tr>
<tr>
<td>

**Equityholder Consent Rights**
</td>
<td>

The consent of the Holders of a majority of the outstanding Units is required for:

- changes to organizational documents (other than any amendments that are immaterial and not adverse to any Holder);
- any redemptions or repurchases of the Company's equity, other than pursuant to employee agreements or plans providing for the repurchase of such equity; provided, non-*pro rata* redemptions or repurchase of, or dividends or distributions on, the Company's equity shall require the consent of each Holder;
- any registered public offering of the Company's securities;
- change in size of Board; and
- the consummation of a Sale Transaction.

Holders may call special meetings and act by written consent.

Notwithstanding the foregoing, no amendment may be made to any organizational document that is disproportionately adverse to one or more Holder relative to the other Holders on its face unless such amendment is approved by such disproportionately affected Holder or Holders.
</td>
</tr>
<tr>
<td>

**Related Party Transactions**
</td>
<td>

The Company shall not, and shall not permit any of its subsidiaries to, enter into, amend or renew an agreement, arrangement or transaction with a Related Person unless such action is approved by (i) the Board in the manner described above and (ii) the Holders of a majority of the Units, other than any Units held by the Related Person, except for (a) customary compensation or benefits arrangements with a
</td>
</tr>
</table>

|  | director, officer or other employee of the Company or any of its subsidiaries in the ordinary course of business and (b) intercompany agreements in the ordinary course of business. |
|---|---|
| **Preemptive Rights** | Each Holder will, collectively with its affiliates (including any funds managed by such Holder or its affiliates), have the right to participate on a *pro rata* basis in any issuance by the Company of any equity or securities exchangeable or exercisable for or convertible into its equity except for customary excluded issuances (e.g., qualified IPO, equity issued upon the exercise of any warrants, equity incentive issuances to eligible recipients, equity issued in an acquisition or joint venture, etc.). |
| **Transfer Restrictions** | The Units will be transferrable without Company consent, subject to the following restrictions and the restrictions described below:<br><br>• the number of Holders shall not exceed the number that would trigger the requirement for the Company to file with the Securities and Exchange Commission under the Exchange Act or be considered a publicly traded partnership;<br>• in the event the Company is taxable as a partnership, customary publicly-traded-partnership related limitations;<br>• no transfers that do not comply with U.S. federal or state securities laws or other applicable securities law;<br>• transfers must comply with the tag-along and other rights described below;<br>• no transfers to certain specified persons or any affiliate thereof (*"**Unpermitted Transferees**"*); and<br>• transferees must become parties to the organizational documents by executing and delivering the appropriate joinders and certificate of transfer.<br><br>The Board may periodically update the list of Unpermitted Transferees by adding current or potential competitors to the Company as determined by the Board in good faith. |
| **Mandatory Offer to Purchase in Connection with a Change-in-Control** | In the event that (i) any person (other than Knighthead and Solus) agrees to acquire any Units and following such acquisition such person would beneficially own more than 50% of the outstanding Units or (ii) if either Knighthead or Solus agrees to acquire any Units and following such acquisition such person would beneficially own more than 60% of the outstanding Units (each of (i) and (ii) above, a "***Triggering Acquisition***"), such person (the "***Prospective Majority Holder***") shall be required, as a condition precedent to the closing of such Triggering Acquisition, to make an offer to purchase (in the same form or option as to form of consideration as contemplated in the agreement for the Triggering Acquisition) 100% of the outstanding Units at a price equal to the greater of (x) the per-Unit consideration proposed to be paid by the Prospective Majority Holder in the Triggering Acquisition, (y) the average per-Unit consideration paid by such Prospective Majority Holder for the most recently purchased 5% of the outstanding Units prior to such proposed Triggering Acquisition (if any) and (z) the average per-Unit consideration paid (or proposed to be paid) by such Prospective Majority Holder for |

5

| | |
|---|---|
| | the aggregate number of Units it purchased in the 12-month period prior to such proposed Triggering Acquisition (if any) and the Units proposed to be purchased in the Triggering Acquisition. For the avoidance of doubt, the receipt of Units pursuant to the Plan shall not be considered to be a purchase for purposes of clauses (y) and (z) of this section.<br><br>Unless and until the closing of such offer to purchase, no Triggering Acquisition shall be recognized by the Company. |
| **Drag-Along Rights** | By written request of a majority of the outstanding Units (the "***Dragging Holders***"), all Holders shall be required to sell their Units in a proposed *bona fide* change-in-control transaction that (whether in one or a series of transactions) would result in a transferee (other than an existing Holder or an affiliate thereof) holding 60% or more of the outstanding Units, on the same terms and the same per-interest consideration as the Dragging Holders and, if a Holder vote is required, vote in favor of such transaction and waive all appraisal or dissenter rights in connection therewith, subject to customary conditions. |
| **Information Rights** | The Company shall post the following information to an electronic data room accessible by all Holders and shall host quarterly earnings calls, in each case, subject to customary confidentiality restrictions:<br><br>• Not later than 90 days after the end of each fiscal year, (i) a report of the business, operations, and finances of the Company during the prior fiscal year that includes audited consolidated financial statements prepared by an auditor, (ii) annual operating results, (iii) environmental reports, and (iv) health and safety reports;<br>• Within 45 days after the end of each quarter (other than the end of each fiscal year), (i) unaudited consolidated financial statements prepared by the Company according to GAAP and (ii) quarterly operating results, environmental reports, and health and safety reports; and<br>• Within fifteen business days after the close of each calendar month, a report of the business and operations of the Company for such calendar month and year to date which shall contain (i) unaudited consolidated financial statements prepared by the Company according to GAAP, including a balance sheet as of the end of such calendar month and statements of the net income or net loss and cash flows of the Company for such calendar month and year to date; (ii) monthly operating results (including year to date information); and (iii) such other information as in the judgment of the Board shall be reasonably necessary for the Holders to be advised of the results of the Company's operations and its financial condition.<br><br>A Holder seeking to transfer their Units may share the information described above with a potential transferee, provided that (1) such potential transferee executes a customary non-disclosure agreement with such Holder, which non-disclosure agreement shall provide that such potential transferee agrees to be bound by the confidentiality provisions applicable to such Holder in its capacity as |

|  | a holder of Units and (2) such potential transferee is not, and warrants to such Holder that it is not, an Unpermitted Transferee.<br><br>In addition, subject to reasonable limitations and requirements set by the Board, a Holder that owns at least 5% of the outstanding Units is entitled to such other financial and operating data of the Company as is reasonably requested from time to time by such Holder. |
| **Registration Rights** | Customary post-IPO registration rights. |
| **Termination** | Upon the closing of an IPO that will raise at least $75 million in gross offering proceeds, the Board designation rights, transfer restrictions, tag rights, drag rights and all special rights provisions in the organizational documents will terminate other than the registration rights provisions. |

**<u>Exhibit D</u> to the Restructuring Support Agreement**

**PCC Note Term Sheet**

**TERM SHEET REGARDING TREATMENT OF**
**UNSECURED NOTE IN FAVOR OF PCC LIQUIDATING TRUST**

*This nonbinding term sheet (this "**Term Sheet**") describes terms of proposed treatment of that certain Unsecured Promissory Note (the "**PCC Note**") dated October 28, 2015, among Black Blackhawk Mining LLC ("**Blackhawk Mining**" or the "**Company**") as Payor and PCC Liquidating Trust (the "**Trust**") as Payee in a restructuring (the "**Restructuring**") of the Company on the terms contemplated herein. This Term Sheet does not include a description of all the relevant terms and conditions of such treatment or the Restructuring and none of the parties shall be required to consummate the Restructuring, whether on the terms set forth herein or otherwise, unless and until the definitive agreements in respect of the restructuring are fully executed and delivered by the parties. This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is intended to be entitled to the protections of Rule 408 of the Federal Rules of Evidence and all other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions.*

| | |
|---|---|
| *Treatment of PCC Note* | Pursuant to a prepackaged chapter 11 plan of reorganization (the "**Plan**") with respect to the Company, the Trust shall receive no later than the effective date of the Plan a distribution of $500,000.00. In addition, the settlement between the Trust and the Company regarding the treatment of the Company's administrative claim in Patriot Coal Corporation's ("**Patriot**") bankruptcy case shall be amended in the limited manner to reflect that no payment of any kind is to be made by the Trust to the Company, including, without limitation, the payment of the $100,000 originally contemplated thereunder. The occurrence of the foregoing events will be in full satisfaction of all claims under the PCC Note, which shall be cancelled in full pursuant to the Plan. |
| *Conditions Precedent* | The terms and conditions of this Term Sheet shall be subject to:<br>• The Trust's receipt and approval of a liquidation analysis of the Company acceptable to the Trust;<br>• The Trust's receipt and approval of an analysis of the inter-company obligations owed by and between the Company and its subsidiaries and affiliates;<br>• The negotiation and execution of a Restructuring Support Agreement by and between the Company, its lenders and the Trust (the, "**Support Agreement**"); and<br>• The confirmation of the Plan no later than September 15, 2019 and the effective date of the plan no later than October 15, 2019. |
| *Support of PCC* | Pursuant to the Support Agreement, the Trust and the trustee thereunder agree to timely vote or cause to be voted the Trust's claims with respect to the PCC Note and any other claims that it holds against the Company |

| | |
|---|---|
| *Liquidating Trust* | to accept a Plan that provides for the treatment of the PCC Note and the Trust that is consistent with the final executed documents in connection with this Term Sheet by delivering a duly executed and completed ballot or ballots on a timely basis. |
| *Mutual Release* | The Plan shall include customary release, discharge, exculpation, and injunctive provisions. The Trust and its affiliates, including the original debtor entities, shall be included as released parties thereunder.<br><br>The Trust and trustee thereunder agree to consent to and, if applicable, not opt out of, the releases set forth in the Plan against each released party thereunder, when voting in favor of the Plan. |

2

**Exhibit E** to the Restructuring Support Agreement

**Form of Transferee Joinder**

**Form of Transferee Joinder**

This joinder (this "<u>Joinder</u>") to the Restructuring Support Agreement (the "<u>Agreement</u>"), dated as of July 15, 2019, by and among:  (i) Blackhawk Mining, LLC together with certain of their direct and indirect subsidiaries (collectively, the "<u>Company</u>"); (ii) the Consenting First Lien Lenders; (iii) the Consenting Second Lien Lenders, and (iv) Potter, is executed and delivered by [_____] (the "<u>Joining Party</u>") as of [_____].  Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Agreement.

1.      <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as <u>Annex 1</u> (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Restructuring Support Parties.

2.      <u>Representations and Warranties</u>.  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the First Lien Claims and/or Second Lien Claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in <u>Section 21</u> of the Agreement to each other Party.

3.      <u>Governing Law</u>.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.      <u>Notice</u>.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

        To the Joining Party at:

        [JOINING PARTY]
        [ADDRESS]
        Attn:
        Facsimile:
        Email:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**


By: _____
Name:
Title:


Principal Amount of First Lien Claims:        $_____

Principal Amount of Second Lien Claims:       $_____


<u>Notice Address</u>:



Fax:
Attention:
Email:

**Annex 1** to the Form of Transferee Joinder

**Exhibit F** to the Restructuring Support Agreement

**DIP Commitments**

## DIP Term Loan Commitment Parties

Knighthead Capital Management, LLC, solely on behalf of certain funds and accounts it manages and/or advises that have signed the Agreement
Redwood Capital Management, LLC, solely on behalf of certain funds and accounts it manages and/or advises that have signed the Agreement
Solus Alternative Asset Management LP, solely on behalf of certain funds and accounts it manages and/or advises that have signed the Agreement
Biwa Fund Limited
Blackstone Alternative Multi Strategy Sub Fund IV L.L.C.
Canyon Capital Advisors LLC (on behalf of its participating funds and/or accounts)
Canyon Partners Real Estate LLC (on behalf of its participating funds and/or accounts)
Caspian Focused Opportunities Fund, L.P.
Caspian HLSC1, LLC
Caspian SC Holdings, L.P.
Caspian Select Credit Master Fund, Ltd.
Caspian Solitude Master Fund, L.P.
CPPIB Canada Inc.
CPPIB Credit Investments Inc.
CQS ACS Fund, a sub-fund of CQS Global Funds ICAV
CQS Aiguille Du Chardonnet MF S.C.A. SICAV-SIF
CQS Credit Multi Asset Fund, a sub-fund of CQS Global Funds (Ireland) Limited
Essex Equity High Income Joint Investment Vehicle, LLC
Essex Equity Joint Investment Vehicle, LLC
Gracechurch Loans Fund, a sub-fund of CQS Global Funds (Ireland) Limited
Gracechurch Opportunities Fund Limited
J.H. Lane Partners Master Fund, LP
Jefferies Leveraged Credit Products, LLC
Mercer Multi-Asset Credit Fund, a sub-fund of Mercer QIF Fund PLC
Richmond Hill Capital Partners, LP
Richmond Hill Investment Co., LP
Richmond Hill Investments, LLC
Super Caspian Cayman Fund Limited
York Global Finance BDH, LLC

**Exhibit D**

**Financial Projections**

KE 60280931

## Financial Projections

In connection with the Disclosure Statement,[1] the Debtors' management team ("Management") prepared financial projections (the "Financial Projections") for Blackhawk Mining LLC and its debtor affiliates (collectively, the "Company" or the "Debtors") for fiscal years 2019 through 2021 (the "Projection Period"). The Financial Projections were prepared by Management with the assistance of the Debtors' advisors and are based upon a number of assumptions made by Management with respect to the future performance of the Debtors' operations. **Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurance that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.**

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of the Plan and for the purposes of determining whether the Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

**These Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. An independent auditor has not examined, compiled or performed any procedures with respect to the prospective financial information contained in this Exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Debtors' independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.**

## Principal Assumptions for the Financial Projections

The Financial Projections are based upon, and assume the successful implementation of, the Debtors' business plan (the "Long Range Plan" or "LRP"). Both the LRP and the Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors or their advisors. In addition, the assumptions do not take into account the uncertainty and disruption of business that may accompany a restructuring pursuant to the Bankruptcy Code.

Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period will likely vary from the projected results. These variations may be material. Accordingly, no definitive representation can be or is being made with respect

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* filed contemporaneously herewith (as may be amended, modified, or supplemented from time to time, the "Plan") or the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (as may be amended, modified, or supplemented from time to time, the "Disclosure Statement"), as applicable.

KE 62942440

to the accuracy of the Financial Projections or the ability of the Debtors to achieve the projected results of operations.  *See* "Risk Factors" described in <u>Article VIII</u> of the Disclosure Statement.

The Debtors anticipate that the Reorganized Blackhawk Board will review post-emergence financial projections and the Reorganized Blackhawk Board and Reorganized Debtors reserve the right to make public any post-emergence projections.  To the extent that the Reorganized Blackhawk Board revisits the post-emergence financial projections, the Debtors anticipate that main drivers of the financial projections that may change are the following:  (i) quality of the coal; (ii) geological and mining conditions; (iii) the percentage of coal ultimately recoverable; (iv) the assumed effects of regulation; (v) assumptions concerning the timing for the development of the reserves; (vi) assumptions concerning physical access to the reserves; and (vii) assumptions concerning equipment and productivity, future coal prices, operating costs, including for critical supplies such as fuel, tires and explosives, capital expenditures and development and reclamation costs.  Any decisions on adopting or revising post-emergence projections are subject to the Reorganized Blackhawk Board's consent.  *See* "Risk Factors" described in <u>Article VIII</u> of the Disclosure Statement.

In deciding whether to vote to accept or reject the Plan, Holders of Claims entitled to vote to accept or reject the Plan must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections.  *See* "Risk Factors" described in <u>Article VIII</u> of the Disclosure Statement.

Moreover, the Financial Projections were prepared solely in connection with the restructuring pursuant to the Plan.

Under Accounting Standards Codification "ASC" 852, "Reorganizations," the Debtors note that the Financial Projections reflect the operational emergence from chapter 11 but not the impact of a detailed application of fresh start accounting that will likely be required upon the occurrence of the Effective Date. Fresh start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value." The Financial Projections account for the reorganization and related transactions pursuant to the Plan. While the Debtors expect that they will be required to implement fresh start accounting upon emergence, they have not yet completed the work required to quantify the detailed effect upon the Financial Projections, which effect could be material.


**Safe Harbor under The Private Securities Litigation Reform Act of 1995**

The Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act.  Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and Management with respect to the timing of, completion of, and scope of the current restructuring, Plan, LRP, bank financing, and debt and equity market conditions and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that the expectations are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

KE 62942440

**Select Risk Factors Related to the Financial Projections**

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control.  Many factors could cause actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements.  A description of the risk factors associated with the Plan, the Disclosure Statement, and the Financial Projections is included in Article VIII of the Disclosure Statement.

|  | 2018 A | 2019 E | 2020 E | 2021 E |
|---|---|---|---|---|
| Met HVA Index | $199.9 | $196.0 | $175.0 | $165.0 |
| Met HVB Index | $157.0 | $162.6 | $145.9 | $137.6 |
| Company Sold Tons | 13.5 | 13.4 | 14.5 | 14.2 |
| Brokered Tons | 0.5 | 0.3 | 0.4 | 0.4 |
| Total Sold Tons | 14.0 | 13.7 | 14.9 | 14.6 |
|  |  |  |  |  |
| Total Revenue | $1,097 | $1,194 | $1,264 | $1,202 |
| $/ton | $80.6 | $89.31 | $87.08 | $84.49 |

**Basis of Presentation (Non-GAAP)**

- The Financial Projections were prepared on a fully consolidated basis, including the operating results, assets and liabilities of both the Debtors and non-Debtors.
- Non-GAAP P&L excludes certain expenses, including income tax expense, interest expense, depreciation and amortization, sponsor/management fees, stock-based compensation, expenses related to restructuring, severance, and other non-recurring or one-time events.
- Balance sheet projections include adjustments for fresh start accounting at a summary level and other emergence sources and uses for illustrative purposes only; projections are non-GAAP and not created in accordance with American Institute of Certified Public Accountants Statement of Position 90-7.
- The capital structure assumed in the Financial Projections is based on the terms set forth in the Plan.

KE 62942440

**Non-GAAP P&L**

| Figures in ($000s) | 2019 Forecast | 2020 Forecast | 2021 Forecast |
|---|---|---|---|
| Coal Revenue | $  1,194,432 | $  1,264,102 | $  1,201,684 |
| **Total Revenue** | **1,194,432** | **1,264,102** | **1,201,684** |
| Total Production Costs | 907,861 | 951,800 | 942,291 |
| Total G&A Costs | 70,500 | 70,907 | 70,600 |
| **Total Cash Costs Costs** | **978,361** | **1,022,707** | **1,012,891** |
| Purchased Coal Margin | 4,871 | 6,000 | 6,000 |
| **Adjusted EBITDA** | **220,942** | **247,395** | **194,793** |
| Other Expense/(Income) | 13,339 | - | - |
| Bankruptcy Related Costs | 43,543 | - | - |
| Cancellation of Debt Income | (696,748) | - | - |
| Depreciation, depletion, and amortization | 182,316 | 158,558 | 156,734 |
| Accretion | 9,374 | 8,561 | 8,793 |
| Interest Expense | 104,856 | 48,462 | 36,729 |
| **Total Other Expense/(Income)** | **(343,319)** | **215,581** | **202,255** |
| **Net Income (Loss)** | **$    564,261** | **$    31,815** | **$    (7,463)** |

- Coal Revenue
  - Consists primarily of revenue generated from the sale of produced coal based on forecasted future pricing for each of the Company's various coal products and coal qualities.  Sales are based upon the Company's contractual sales positions, assumed uncommitted volumes, and forecasted pricing at each mining operation.
- Purchased Coal Margin
  - Relates to an international metallurgical customer that occasionally requires coal blending prior to shipment.  Certain coal qualities required for this blend are not produced by the Company and must be purchased.
- Total Production Costs
  - Primarily include production costs associated with coal mining activities.  These costs include explosives, blasting, equipment repairs, supplies, control for the underground mines, wages and benefits for employees allocated to the production, production taxes, and royalties paid for the mining operations.
- Total G&A Costs
  - Corporate costs include back office support structure, including treasury, legal, information technology, accounting, finance, order management, risk management, common support structure for engineering, chief executive officer, sales and marketing, and supply chain. Additional costs include land management, warehousing operations, and repair shop.
- Bankruptcy Related Costs
  - Professional fees and settlement with the PCC Liquidating Trust with respect to the Patriot Unsecured Note.
- Cancellation of Debt Income
  - Income from forgiveness or settlement of debts on first and second lien term loans and their corresponding accrued interest.

4

## Non-GAAP Balance Sheet

| Figures in ($000s) | 31-Dec-19 | 31-Dec-20 | 31-Dec-21 |
|---|---|---|---|
| | Forecast | Forecast | Forecast |
| Cash | $      5,000 | $      5,000 | $      5,000 |
| Accounts Receivable Trade | 77,530 | 82,068 | 77,882 |
| Coal Inventory | 34,353 | 34,353 | 34,353 |
| Prepaid Expenses | 11,162 | 11,162 | 11,162 |
| **Total Current Assets** | **128,045** | **132,583** | **128,397** |
| Fixed Assets, net | 888,295 | 809,522 | 716,855 |
| Other Assets | 129,928 | 126,338 | 123,016 |
| **Total Assets** | **$1,146,269** | **$1,068,443** | **$  968,268** |
| | | | |
| Accounts Payable | $     79,648 | $     83,995 | $     82,056 |
| Accrued Expenses | 58,468 | 58,468 | 58,468 |
| Short Term Debt | 145,563 | 110,944 | 102,215 |
| **Total Current Liabilities** | **283,678** | **253,407** | **242,740** |
| Long Term Debt | 294,496 | 221,747 | 135,970 |
| Reclamation Liabilities | 144,651 | 153,211 | 162,004 |
| Accrued Severance Tax | 20,242 | 5,060 | - |
| **Total Liabilities** | **743,066** | **633,426** | **540,714** |
| Equity | 403,203 | 435,017 | 427,555 |
| **Total Liabilities and Equity** | **$1,146,269** | **$1,068,443** | **$  968,268** |

- Cash and Cash Equivalents
  - Cash and cash equivalents include all highly liquid, short-term investments with original maturities of three months or less.
- Accounts Receivable
  - Accounts receivable are recorded at the invoiced amount and do not bear interest. The Company evaluates the need for an allowance for doubtful accounts based upon historical write-off experience and the assessment of the financial ability of its customers to pay their obligations.
- Coal Inventory
  - Inventories consist of both raw and sellable stockpiled coal, valued at the lower of average cost or net realizable value. Average cost includes labor, supplies, equipment costs, and operating overhead. Parts and component inventory used in operations are valued at cost, less an allowance for obsolete and surplus items.
- Prepaid Expenses
  - Prepaid royalties represent payments made to lessors under terms of mineral and right of way leases that are generally recoupable against future production. As mining occurs on these leases, the prepaid royalty is offset against earned royalties and is included in the cost of coal sales.
- Fixed Assets
  - Buildings and Land
    - Buildings and improvements reflect the value of all buildings and improvements owned by the Debtors, net of accumulated depreciation. This category primarily consists of mine development locations, owned facilities, land and leasehold and building improvements.
  - Machinery and Equipment
    - Machinery and equipment reflect the value of all other fixed assets owned by the Debtors, net of accumulated depreciation or amortization. This category primarily consists of mining and support equipment, preparation plants, vehicles, power distribution equipment and office equipment. Depreciable lives for mining

5

equipment range from 2 to 7 years.  The gain or loss on the disposition of plant and equipment is recorded at the time of disposition.
  − Mine Development and Mineral Reserves
    ▪ Land and coal interests reflect the value of various leased and owned coal interests, as well as surface land, net of accumulated depletion or amortization.
- Other Assets
  − Includes Restricted Cash for bond reclamation purposes and Other Assets.
- Accounts Payable
  − Amount billed to the Company by its suppliers for goods delivered to or services consumed by the Company in the ordinary course of business.
- Accrued Expenses
  − Recognized expenses that have not been paid for by the Company, including salaries / wages and benefits for employees, and interest payable.
- Short-Term and Long-Term Debt
  − Includes a $90 million asset-based revolving credit facility, a $375 million term loan, capital lease obligations related to mining equipment, and notes payable to vendors.
- Reclamation Liabilities
  − As part of every permit application, the Company must submit a reclamation plan that essentially assures that mined land is restored to its pre-mining capability.
- Accrued Severance Tax
  − Taxes imposed on the removal of coal reserves to operating complexes.

**Non-GAAP Cash Flows**

| Figures in ($000s) | 2019 Forecast | 2020 Forecast | 2021 Forecast |
|---|---|---|---|
| *Net Income / (Loss)* | $    564,261 | $    31,815 | $    (7,463) |
| Adjustments to operating activities: | | | |
| Depreciation, Accretion, Depletion, Amortization | 199,431 | 182,795 | 180,396 |
| Cancellation of Debt Income | (696,748) | - | - |
| Other non-cash | 58,750 | (1,304) | (1,614) |
| Net Working Capital | (23,044) | (190) | 2,247 |
| Others | (20,583) | (11,591) | (1,739) |
| **Net cash from operating activities** | **82,068** | **201,524** | **171,827** |
| Cash flows from investing activities: | | | |
| Capex (PP&E and Mine Development) | (76,609) | (95,462) | (78,936) |
| **Net cash from investing activities** | **(76,609)** | **(95,462)** | **(78,936)** |
| Cash flows from financing activities: | | | |
| Proceeds and Principal Payments | (5,231) | (106,063) | (92,892) |
| **Net cash from financing activities** | **(5,231)** | **(106,063)** | **(92,892)** |
| **Net change in cash** | **228** | **-** | **-** |
| Cash at beginning of period | 4,772 | 5,000 | 5,000 |
| **Cash at end of period** | **$    5,000** | **$    5,000** | **$    5,000** |

- Cash Flows from Operating Activities
  − Cash used for changes in assets and liabilities from operations.  Driven primarily by changes in trade receivables and coal and parts and components inventory, trade payables, prepaid assets and accrued expenses.
- Cash Flows from Investing Activities
  − Net cash flow used in investing activities is comprised of purchases and sales of property, plant, and equipment, and mine development charges.
- Cash Flows from Financing Activities

6

- Net cash provided by financing activities is comprised of net draws on the asset-based lending facility, financing activities for long-term debt, payments to capital lease obligations and various equipment loans.

## Financial Projections General Assumptions

*Figures in ($000s)*

| | 31-Aug-19 Forecast | Debt Settlements | Fees | First Lien Term Loan | Second Lien Term Loan | Fresh start Accounting | 31-Aug-19 Adjusted |
|---|---|---|---|---|---|---|---|
| Cash | $ 16,012 | $ (500) A | $ (250) C (9,312) D (500) E | $ (450) F | $ - | $ - | $ 5,000 |
| Accounts Receivable Trade | 83,192 | - | - | - | - | - | 83,192 |
| Coal Inventory | 36,839 | - | - | - | - | - | 36,839 |
| Prepaid Expenses | 10,969 | - | - | - | - | - | 10,969 |
| **Total Current Assets** | **147,011** | **(500)** | **(10,062)** | **(450)** | **-** | **-** | **135,999** |
| Fixed Assets, net | 544,876 | - | - | - | - | 384,014 I | 928,890 |
| Other Assets | 131,184 | - | - | - | - | - | 131,184 |
| **Total Assets** | **$ 823,071** | **$ (500)** | **$ (10,062)** | **$ (450)** | **$ -** | **$ 384,014** | **$1,196,073** |
| | | | | | | | |
| Accounts Payable | $ 94,743 | $ (8,000) B | $ - | $ - | $ - | $ - | $ 86,743 |
| Accrued Expenses | 58,468 | - | - | - | - | - | 58,468 |
| Short Term Debt | 235,018 | - | - | (37,450) G | (10,830) H | - | 186,738 |
| **Total Current Liabilities** | **388,230** | **(8,000)** | **-** | **(37,450)** | **(10,830)** | **-** | **331,950** |
| Long Term Debt | 938,603 | 8,000 B (16,186) A | - | (313,974) G | (318,307) H | - | 298,136 |
| Reclamation Liabilities | 141,656 | - | - | - | - | - | 141,656 |
| Accrued Severance Tax | 25,302 | - | - | - | - | - | 25,302 |
| **Total Liabilities** | **$1,493,791** | **$ (16,186)** | **$ -** | **$ (351,425)** | **$ (329,137)** | **$ -** | **$ 797,043** |
| Equity | (670,720) | 15,686 A | (250) C (9,312) D (500) E | (450) F 351,425 G | 329,137 H | 384,014 I | 399,029 |
| | | | | | | | |
| **Total Liabilities and Equity** | **$ 823,071** | **$ (500)** | **$ (10,062)** | **$ (450)** | **$ -** | **$ 384,014** | **$1,196,073** |

*Notes to adjusted Pro-Forma Balance Sheet adjustments:*

A. Settle the Patriot Trust Promissory Note for $500,000.
B. Term out $8 million of accounts payable to vendor notes to be repaid over 12 months.
C. Fund the exit financing fee on the $50 million DIP Term Facility.
D. Fund estimated accrued professional fees at emergence.
E. Payment to John Mitchell Potter at emergence.
F. Fund the commitment fee on the $90 million DIP ABL Facility.
G. Conversion of the First Lien Term Loan, and related accrued interest, to 71% of the New Common Stock.
H. Conversion of the Second Lien Term Loan, and related accrued interest, to 29% of the New Common Stock.
I. Adjust the value of fixed assets considering an enterprise value of $903 million.

| | | |
|---|---|---|
| **Enterprise Value** | **$** | **903,000** |
| ABL | | 64,217 |
| 1st Lien Debt | | 375,000 |
| Capital Leases | | 26,088 |
| Vendor Notes | | 13,364 |
| Severance Tax | | 25,302 |
| **Funded Debt** | **$** | **503,971** |
| **Equity** | **$** | **399,029** |

7

**Exhibit E**

**Valuation Analysis**

KE 60280931

# VALUATION ANALYSIS

### A.    Disclaimer[1]

**THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE FOR THE DEBTORS AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE VALUE OF THE NEW COMMON STOCK DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE OF THE REORGANIZED DEBTORS.**

### B.    Valuation Estimate

In connection with developing the Plan, the Debtors directed their investment banker, Centerview Partners LLC ("Centerview"), to estimate the going-concern value of the Reorganized Debtors ("Enterprise Value"). This analysis has been prepared for the Debtors' sole use and is based on information provided to Centerview by the Debtors.

Based on financial projections provided by the Debtors and subject to the disclaimers and the descriptions of Centerview's methodology set forth herein, and solely for purposes of the Plan, Centerview estimates the total Enterprise Value of the Reorganized Debtors will be within the range of approximately $811 million to $995 million on an assumed Effective Date of August 30, 2019, with an estimated midpoint of $903 million.[2] The range of total equity value ("Equity Value"), which takes into account the total Enterprise Value less the estimated net debt outstanding as of the Effective Date, was estimated by Centerview to be between approximately $351 million and $535 million, with an estimated midpoint of $443 million. The implied total Enterprise Value of the Reorganized Debtors should be considered as a whole, and the underlying analyses should not be considered indicative of the values of any individual operation of the Reorganized Debtors.

In preparing the estimated total Enterprise Value for the Reorganized Debtors, Centerview: (1) reviewed certain historical financial information of the Debtors for recent years and interim periods provided by the Debtors; (2) met with certain members of the Debtors' senior management to discuss the Debtors' operations and future prospects; (3) reviewed publicly available financial data and considered the market values of public companies deemed by Centerview to be generally comparable to the operating businesses of the Debtors; (4) considered certain economic and

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* filed contemporaneously herewith (as may be amended, modified, or supplemented from time to time, the "Plan") or the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (as may be amended, modified, or supplemented from time to time, the "Disclosure Statement"), as applicable.

[2]    The endpoints of the range of estimated total Enterprise Value represent the arithmetic means of the endpoints of the ranges from the valuation methodologies utilized by Centerview. In estimating the Enterprise Value, Centerview excluded the potential value of Guffey coal reserves that the Debtors have been marketing, but that currently generate no earnings before interest, taxes, depreciation, and amortization ("EBITDA") and are not projected to generate EBITDA during the Forecast Period. Further, based on the direction of the Debtors' counsel and the likely transaction structure at the time Centerview completed its valuation analysis, Centerview's estimated Enterprise Value assumes that each of the Reorganized Debtors will be a tax-paying entity.

industry information relevant to the Debtors' operating businesses; (5) prepared discounted cash flow analyses based on the financial projections, utilizing various discount rates and assumptions in the calculation of terminal values; (6) considered the value assigned to certain precedent change-of-control transactions for businesses deemed by Centerview to be similar to those of the Debtors; and (7) conducted such other analyses as Centerview deemed appropriate.

Although Centerview conducted a review and analysis of the Debtors' businesses, operating assets and liabilities, and business plans, Centerview relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and by other firms retained by the Debtors, as well as certain publicly available information as to which Centerview does not have independent knowledge.

The financial projections provided by the Debtors to Centerview are for fiscal years 2019 through 2023. Centerview has relied on the Debtors' representation and warranty that the financial projections provided by the Debtors to Centerview (1) have been prepared in good faith, (2) are based on fully disclosed assumptions which, in light of the circumstances under which they were made, are reasonable, (3) reflect the Debtors' best currently available estimates, and (4) reflect the good faith judgments of the Debtors. Centerview does not offer an opinion as to the attainability of the financial projections. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and, consequently, are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the financial projections and, as a result, the actual total Enterprise Value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein.

No independent evaluations or appraisals of the Debtors' assets were sought or obtained in connection with Centerview's valuation. Centerview did not conduct an independent investigation into any of the legal, tax, pension or accounting matters affecting the Debtors and, therefore, makes no representations as to their impact on the Debtors' financial statements.

### C.    **Valuation Considerations**

This valuation is based upon information available to, and analyses undertaken by, Centerview as of July 2, 2019, and reflects, among other factors discussed below, the current financial market conditions and the inherent uncertainty today as to the achievement of the financial projections. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. For purposes of this valuation, Centerview has assumed that no material changes that would affect value will occur between the date of this Disclosure Statement and the assumed Effective Date. Events and conditions subsequent to July 2, 2019, including but not limited to updated projections, as well as other factors, could have a substantial impact upon the Reorganized Debtors' value. Neither Centerview nor the Debtors have any obligation to update, revise, or reaffirm the valuation.

This valuation also reflects a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, achieving the forecasts reflected in the financial projections, the minimum amount of cash required to operate the Debtors' businesses,

market conditions, and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein.  Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the Enterprise Value of the Reorganized Debtors.

Further, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and (iv) other factors that generally influence the prices of securities.  Actual market prices of such securities also may be affected by the Chapter 11 cases or by other factors not possible to predict.  Accordingly, the total Enterprise Value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value of the Reorganized Debtors or their securities.  Such trading value may be materially different from the total Enterprise Value ranges associated with Centerview's valuation analysis.  The Reorganized Debtors are anticipated to be a private Company that will not be obligated to file public reports or disclosures.  There can be no assurance that any trading market will develop for the New Common Stock.  The estimated values for the Reorganized Debtors do not necessarily reflect the values that may be attainable in public or private markets.  Furthermore, in the event that the actual distributions in the Chapter 11 Cases differ from those the Debtors assumed in their recovery analysis, the actual recovery of Holders of Claims in Impaired Classes could be significantly higher or lower than estimated by the Debtors.

The estimate of total Enterprise Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets.  Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of the Debtors' businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.  Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder.  The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Centerview's estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any Holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Plan.  The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the solvency of the Debtors or the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.  Because valuation estimates are inherently subject to uncertainties, neither the Debtors, Centerview, nor any other professional or person assumes responsibility for any differences between the estimated valuation ranges herein and any actual outcome.

**Exhibit F**

**Liquidation Analysis**

## **Blackhawk Mining LLC and its Affiliated Debtors Best Interests Test**

### 1) **Introduction**[1]

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a plan under chapter 11 of the Bankruptcy Code unless each holder of an allowed claim or interest in an impaired class either: (a) accepts the plan; or (b) will receive or retain property on account of such claim or interest of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their restructuring advisors, AlixPartners, have prepared a hypothetical liquidation analysis (this "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and accompanying notes to this Liquidation Analysis. The Liquidation Analysis sets forth an estimated range of computed recoveries for each Class of Claims and Interests that may be realizable upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' estates on an assumed Effective Date of August 30, 2019. As set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs, which are projected to be realized if the Debtors were to be liquidated in accordance with chapter 7 of the Bankruptcy Code and under the assumptions defined herein.

Underlying the Liquidation Analysis are numerous estimates and assumptions regarding asset sale proceeds that, although developed and considered reasonable by the Debtors' management and its advisors, are inherently subject to significant business, economic, regulatory, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Accordingly, there can be no assurance that the computed recoveries reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation, and actual results could materially differ from the results herein. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. Any balances reflected herein are unaudited and presented as such.

#### **Basis of Presentation**

The Liquidation Analysis represents an estimate of computed potential recoveries based upon a hypothetical liquidation of the Debtors' estates if the Debtors' contemplated Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code on or about August 30, 2019 (the "Liquidation Date"). It is assumed that on the Liquidation Date, the Bankruptcy Court

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* filed contemporaneously herewith (as may be amended, modified, or supplemented from time to time, the "Plan") or the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (as may be amended, modified, or supplemented from time to time, the "Disclosure Statement"), as applicable.

would appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the Debtors' estates. In this hypothetical scenario, the Trustee would satisfy claims by selling the Debtors' ten operating mining complexes ("Complexes") by selling the monetizable assets of the Debtors and abandoning assets which cannot be sold. The cash amount (the "Gross Proceeds") that would be available for satisfaction of Allowed Claims and Interests would consist of the net proceeds resulting from the disposition of the assets and properties of the Debtors, augmented by the unrestricted cash held by the Debtors at the time of the commencement of the liquidation activities.

This Liquidation Analysis assumes that the Gross Proceeds would be distributed in accordance with section 726 of the Bankruptcy Code as otherwise required by applicable law. Accordingly, cash amounts would be distributed as follows: (i) *first*, to pay the chapter 7 administrative claims, including liquidation and wind down expenses (together, the "Wind Down Costs"), that are attributable to the realization of secured assets, including all chapter 7 trustee and professional fees related to the liquidation; (ii) *second*, to pay the amounts outstanding under the DIP Facilities; (iii) *third*, to pay the secured portion of the Allowed Secured Claims; (iv) *fourth*, to pay the Administrative Claims, including unpaid expenses incurred during the pendency of the Debtors' Chapter 11 Cases, such as professional fees, accrued post-petition third-party payables, and other expenses; (v) *fifth*, to pay all Priority Claims, including priority tax and wage claims; and (vi) *sixth*, to pay creditors holding General Unsecured Claims, including unsecured deficiency claims that arise to the extent the amount paid for the secured portions of the Allowed Secured Claims is less than the total value of the related collateral. Any remaining net cash would be distributed as equity to Blackhawk Mining LLC ("Blackhawk") to pay claims against the Blackhawk's equity in it's subsidiaries. With respect to Wind Down Costs, this Liquidation Analysis assumes the inclusion of all costs that would be necessary to facilitate the orderly sale and wind down of the Debtors' estates, including employee wages, rent, and other office-related costs during the Liquidation Timeline (defined below).

The Liquidation Analysis is based on recoveries on the book value of assets at each mining facility. The Debtors' management believes that the May 31, 2019 book values of assets and liabilities are reasonable proxies for such book values as of the Liquidation Date, and does not expect any of the values presented to change materially. This Liquidation Analysis assumes mining operations of the Debtors will be sold in an orderly liquidation under a three-month liquidation process (the "Liquidation Timeline") at the direction of the Trustee, utilizing the Debtors' resources and third-party advisors, to allow for the orderly wind down of the Debtors' estates. There can be no assurance that the liquidation of the assets would be completed in a three-month time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally in a distressed process) as is compatible with the best interests of the parties in interest.

The Liquidation Analysis is also based on the assumptions that: (i) the Debtors will, first, utilize cash on hand, cash recovered from assets, and cash generated from operations to fund the sales and marketing costs, as well as the liquidation costs of certain non-operating assets during the anticipated Liquidation Timeline, and (ii) accounting, treasury, information technology, and other management services needed to wind down the estates will continue to be available to the Trustee. The Liquidation Analysis does not include estimates for: (i) any tax consequences that may be triggered upon the liquidation and sale of assets; (ii) recoveries resulting from any potential

preference, fraudulent transfer, or other litigation or avoidance actions; (iii) certain damage claims resulting from the cancellation of, or non-performance against, the Debtors' contracts; or (iv) certain claims that may be entitled to priority under the Bankruptcy Code, including administrative priority claims under sections 503(b) and 507(b) of the Bankruptcy Code. More specific assumptions are detailed in the notes below. The theoretical buyers of the mining complexes will assume all employees, reclamation obligations, surety bonds and related collateral, as well as working capital, including accounts receivable, inventory and accounts payable.

The preparation of analyses, such as the Liquidation Analysis, is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by management as and when made and based on management's current expectations and beliefs, are inherently subject to business, economic and competitive risks, uncertainties and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors or the Trustee. The values stated herein have not been subject to any review, compilation or audit by any independent accounting firm. In addition, various liquidation decisions upon which certain assumptions are based are subject to materially change. As a result, the actual amount of claims against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of claims asserted during the pendency of the hypothetical chapter 7 cases. Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in the Liquidation Analysis. **ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ASSUMPTIONS REPRESENTED HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE, AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.**

## 2)    Liquidation Analysis

The Liquidation Analysis was prepared on a Complex-by-Complex basis for all the Debtors where financial transactions exist. The valuation method applied considers recoveries on book value of assets at each mining facility. This approach was selected due to the nature of the operations at the mining complexes, considering complexes would not further continue operations but rather distribute its assets to potential buyers.

Recovery on assets depends on the asset nature and its likelihood of being recovered in an acquisition, and thus varies significantly among different asset classes. The section below will discuss in detail the rationale for assigning recovery percentages for assets. The asset book values and unsecured claims shown below are as of May 31, 2019, unless otherwise noted.

This valuation method was applied to 10 operating (Blue Diamond, Hampden, Kanawha Eagle, Rockwell, Speed, Spurlock, Winchester, Blue Creek, Pine Branch, and Samples) and 2 non-operating complexes (Triad and Eagle Shield).

**3)**   **Notes to the Liquidation Analysis**

**Costs Allocated to the Mining Complexes**

As noted above, the Debtors operate mining complexes (consisting of mines and related coal washing and loading facilities) are, collectively, allocated most of the Debtors' assets and liabilities.  Operating assets were utilized to estimate total recovery for secured and unsecured creditors.  Two scenarios are presented assuming low and high recovery of assets in a potential liquidation, estimating a range of recovery that is dependent on the assumptions considered.

The assets considered in the Liquidation Analysis are:

1. Cash and cash equivalents, including all highly liquid, short-term investments with original maturities of three months or less.
   a. Recovery in Low End: 100%
   b. Recovery in High End: 100%

2. Accounts Receivable Trade, including invoiced amounts from trade vendors with a corresponding allowance for doubtful accounts based on historical write-offs.
   a. Recovery in Low End: 80%
   b. Recovery in High End: 90%

3. Intercompany receivables and payables offset against intercompany payables with no residual amounts outstanding; no recovery is estimated on these assets in either scenario.

4. Coal Inventory, consisting of both raw and sellable stockpiled coal.  Average cost includes labor, supplies, equipment costs, and operating overhead.
   a. Recovery in Low End: 70%
   b. Recovery in High End: 90%

5. Buildings and land reflect the value of all buildings and improvements owned by the Debtors, net of accumulated depreciation.
   a. Recovery in Low End: 30%
   b. Recovery in High End: 60%

6. Property, Plant & Equipment ("PP&E") primarily consists of mining and support equipment, preparation plants, vehicles, power distribution equipment, and office equipment.  PP&E is classified as either own or capital leased equipment for book recording purposes.  Recoveries are estimated for owned equipment only, under the assumption that capital lease lenders will get back their equipment to offset their corresponding liability.

   PP&E is further split into equipment specifically designed for open pit operations and underground equipment, thus recoveries are analyzed separately.
   a. Recovery based on Net Book Value for open pit equipment:
      i. Recovery in Low End: 90%

      ii.  Recovery in High End: 100%
- b. Recovery based on Net Book Value for underground equipment:
  - i. Recovery in Low End: 10%
  - ii. Recovery in High End: 20%

7. Mine Interest, reflecting the value of various leased and owned coal interests, as well as surface land, net of accumulated depletion or amortization.
   - a. Recovery in Low End: 0%
   - b. Recovery in High End: 10%

The resulting asset value by Complex was further bifurcated between encumbered and unencumbered assets, where applicable. Complexes with material unencumbered assets include: Rockwell, Samples, Speed, Winchester, Blue Creek, and Kanawha Eagle. The breakdown of encumbered and unencumbered leases for these Complexes is:

| Mine/Complex | Encumbered | Unencumbered | |
|---|---|---|---|
| Spurlock | 66.9 | — | 66.9 |
| Pine Branch | 89.6 | — | 89.6 |
| Blue Diamond | 181.5 | — | 181.5 |
| Triad | 19.6 | — | 19.6 |
| Hampden | 98.6 | — | 98.6 |
| Rockwell | 90.1 | 90.4 | 180.6 |
| Samples | 0.4 | 59.8 | 60.2 |
| Winchester | 2.9 | 30.8 | 33.6 |
| Speed | 6.1 | 63.1 | 69.2 |
| Blue Creek | — | 67.8 | 67.8 |
| Kanawha Eagle | 25.3 | 34.2 | 59.5 |
| BLR | 437.6 | 8.4 | 446.0 |
| Highwall M | — | — | — |
| **Total** | **1,018.5** | **354.6** | **1,373.1** |

8. Prepaid royalties and other assets are not estimated; no recovery under either scenario.

Corporate assets, as of May 31, 2019, in the amount of $32.2 million were fully allocated to each Complex based on tons sold. Logistic-related assets, as of May 31, 2019, in the amount of $29.4 million. In some instances, Blackhawk River Logistics ("BRL") purchases coal from various Complexes and transports the coal to terminals, where title is passed to end users who purchase the coal from BRL at a price reflective of the original cost as purchased from the mine, plus an additional "margin" reflecting cost of transportation. For purposes of the Liquidation Analysis, we have allocated these assets to the respective Complexes utilizing total export tons.

**Non-Operating Entities**

**A.**   **Triad**: Triad is an idled mine that has limited operations focused on maintaining statutory compliance with safety regulations. This mine is considered to have no value and is

assumed to be sold to an independent third party who would assume outstanding reclamation liabilities and posted collateral in support of those liabilities.

**B.     Chapter 7 Administrative Expenses**:  Conversion of the Debtors' contemplated Chapter 11 Case to chapter 7 of the Bankruptcy Code would result in significant costs, including compensation of the Trustee, retained counsel, and other professionals.  Further, conversion to a chapter 7 liquidation may also result in other contingent administrative claims that are difficult to estimate or forecast.  The value of these contingent administrative claims has, therefore, not been included in the Liquidation Analysis.

Chapter 7 administrative expenses include the following:

**1.     Chapter 7 Trustee Fees** include all fees that would be paid to the Trustee by the Debtors.  An estimate was made as to the amounts required by the Trustee to handle the hypothetical liquidation over the Liquidation Timeline.  The Debtors estimate payments in respect of chapter 7 Trustee fees to be 1% of the distributed value.

**2.     Investment Banker Fees** contemplate a commission of 2% for the successful marketing, negotiation, and completion of sale transaction(s) related to any asset sale of the Complexes.

**3.     Wind Down Costs** contemplate the orderly liquidation and sale of the Debtors' operations during the Liquidation Timeline.  To maximize recoveries, minimize claims, and generally ensure an orderly liquidation and sale, the Trustee would need to retain certain individuals currently employed by the Debtors.  These individuals would primarily be responsible for operating and maintaining assets, collecting outstanding receivables, facilitating the liquidation and sale of assets, providing historical knowledge and insight to the Trustee regarding the Debtors' businesses, and concluding the administrative wind down of the estates after disposal of the Debtors' assets.  Wind down costs, for the purposes of the Liquidation Analysis, consist of costs associated with the continued employment for key operations, administrative and back-office personnel.  Also included in this estimate are chapter 7 professional fees that include the cost of financial advisors, attorneys, and other professionals retained by the Trustee in connection with the wind down of the Debtors' estates.  Professionals would be engaged in work related to claims reconciliation, asset recovery, and necessary tax and accounting work, among other things.  For purposes of this analysis, the Debtors have used an estimate of $1.9 million.

**C. DIP Claims**:  DIP claims are comprised of the estimated outstanding Claims under the DIP ABL Agreement, as well as the funded $50 million in New Money DIP Loans and the $100 million roll-up from the existing First Lien Term Loan Facility; with proceeds received during the pendency of the Chapter 11 Cases.  Total outstanding Claims as of the Liquidation Date are estimated at $129.9 million, with 100% recovery in both low and high scenarios.

**D. Secured Claims**:   Secured claims are comprised of the First Lien Term Loan and Second Lien Term Loan Facilities.  Total aggregated amounts outstanding are forecasted

to be approximately $957.3 million as of June 30, 2019.   Deficiency amounts are considered General Unsecured Claims.

E. **Chapter 11 Administrative Expenses**:  The Debtors would be liable for payment of unpaid professional fees and other unpaid expenses incurred during the pendency of the Chapter 11 Cases.  Chapter 11 administrative expenses include, and will be treated, as follows (with the assumption that these expenses will be at zero):

1. **Post-Petition Accounts Payable Costs** relate to any unpaid expenses incurred by the Debtors, excluding professional fees, during the pendency of the Chapter 11 Cases.  Under the Liquidation Analysis, the Debtors would assume that any acquirer would satisfy any post-petition amounts due as part of a contemplated transaction, which is assumed to be zero.  This amount excludes any potential claims that may be granted administrative priority status under section 503(b) of the Bankruptcy Code.

2. **Severance** is not expected to be incurred, due to the assumption that both corporate and logistical support will continue to be required by any acquiring entities for the ongoing operations.

3. **Accrued payroll** represents payroll anticipated to be accrued, but unpaid, as of the Liquidation Date.  Under the Liquidation Analysis, the Debtors would assume that any acquirer would satisfy any accrued payroll amounts due as part of a contemplated transaction, which is assumed to be zero.

4. **Accrued professional fees** are assumed to be paid by the carve-out, provided under the DIP Facilities.

F. **Priority Claims**:  Priority Claims are comprised of those expenses and claims set forth in section 507 of the Bankruptcy Code.

G. **General Unsecured Claims**:  The "General Unsecured Claims" line items below include anticipated amounts due to (i) first lien deficiency claims, and (ii) second lien deficiency claims.  Under the Liquidation Analysis, the Debtors would assume that working capital, including accounts payable, are considered as part of any transaction.  Corporate support is also assumed to continue to be required by an acquirer and, thus, any potential wage claims are deemed to be assumed and paid as part of any transaction.  The Debtors have not included any contingent liabilities due to the complex nature of estimating these amounts.

H. **Claims Against Parent Equity in Subsidiaries**:  "Claims Against Parent Equity in Subsidiaries" reflect the unsecured promissory note issued to the PCC Liquidating Trust that was assumed as part of the acquisition of certain Patriot Coal assets.  These claims are at Blackhawk, whose only assets are comprised of the equity in its subsidiaries which derive their value from Complex income.  No individual Debtor is expected to provide a full recovery to its unsecured claims and, thus, no equity value is assumed to be conveyed to the parent as reflected by no recovery for these claims.

**Blackhawk Mining (Updated as of May 31st, 2019)**
## Best Interest Analysis (All: NBV) - Consolidated
*$ Amounts in 000s*

| | | | | | | Low | High |
|---|---|---|---|---|---|---|---|
| Distribution for Secured Creditors | | | | | | | |
| Operating Complexes | | | | | $ | 272,093 | $ 332,840 |
| Non - Operating Complexes | | | | | | 303 | 338 |
| Cash | | | | | | - | - |
| **Total Distribution for Secured Creditors** | | | | | **$** | **272,396** | **$ 333,178** |
| | | | | | | | |
| Distribution for Unsecured Creditors | | | | | | | |
| Unencumbered Assets | | | | | $ | - | $ - |
| **Total Distribution for Unsecured Creditors** | | | | | **$** | **-** | **$ -** |
| | | | | | | | |
| **Net Liquidation Proceeds Available for Distribution** | | | | | **$** | **272,396** | **$ 333,178** |

| | Claim Estimate ($) | | Recovery Estimate (%) | | Recovery Estimate ($) | |
|---|---|---|---|---|---|---|
| | **Low** | **High** | **Low** | **High** | **Low** | **High** |
| **Potential Recovery from Liquidation** | | | | | | |
| 1 **Chapter 7 Administrative Claims** | | | | | | |
| Chapter 7 Trustee Fee | $ 2,724 | $ 3,332 | 100% | 100% | $ 2,724 | $ 3,332 |
| Investment Banker Fee | 5,448 | 6,664 | 100% | 100% | 5,448 | 6,664 |
| Wind-down cost of assets | 1,875 | 1,875 | 100% | 100% | 1,875 | 1,875 |
| **Total Chapter 7 Administrative Claims** | **$ 10,047** | **$ 11,870** | **100%** | **100%** | **$ 10,047** | **$ 11,870** |
| 2 **DIP Claims** | | | | | | |
| DIP - Asset Based Loan | $ 79,895 | $ 79,895 | 100% | 100% | $ 79,895 | $ 79,895 |
| DIP - Term Loan | 50,000 | 50,000 | 100% | 100% | 50,000 | 50,000 |
| **Total DIP Claims** | **$ 129,895** | **$ 129,895** | **100%** | **100%** | **$ 129,895** | **$ 129,895** |
| 3 **Secured Claims** | | | | | | |
| 1st Lien Term Loan | $ 638,974 | $ 638,974 | 21% | 30% | $ 132,454 | $ 191,412 |
| 2nd Lien Term Loan | 318,307 | 318,307 | 0% | 0% | - | - |
| **Total Secured Claims** | **$ 957,282** | **$ 957,282** | **14%** | **20%** | **$ 132,454** | **$ 191,412** |
| Subtotal Secured Claims | **$ 1,097,224** | **$ 1,099,047** | **25%** | **30%** | **$ 272,396** | **$ 333,178** |
| 4 **Priority Claims** | | | | | | |
| Severance Tax | $ 30,363 | $ 30,363 | 0% | 0% | $ - | $ - |
| **Total Priority Claims** | **$ 30,363** | **$ 30,363** | **0%** | **0%** | **$ -** | **$ -** |
| 5 **General Unsecured Claims** | | | | | | |
| 1st Lien Amount - Deficiency Claims | $ 506,521 | $ 447,562 | 0% | 0% | $ - | $ - |
| 2nd Lien Amount - Deficiency Claims | 318,307 | 318,307 | 0% | 0% | - | - |
| Accounts Payable & Accrued Expenses | 214,859 | 214,859 | 0% | 0% | - | - |
| Accrued Royalties | 5,237 | 5,237 | 0% | 0% | - | - |
| Royalties Escrow | 2,132 | 2,132 | 0% | 0% | - | - |
| Reclamation Liabilities | 135,387 | 135,387 | 0% | 0% | - | - |
| Claims from Wage Motion | - | - | 0% | 0% | - | - |
| Corporate Accounts Payable | - | - | 0% | 0% | - | - |
| Lease Rejection Claims | - | - | 0% | 0% | - | - |
| Accounts Payable to Corporate | 135,387 | 135,387 | 0% | 0% | - | - |
| Union Claims | - | - | 0% | 0% | - | - |
| **Total General Unsecured Claims** | **$ 1,317,831** | **$ 1,258,873** | **0%** | **0%** | **$ -** | **$ -** |
| 6 **Claims Against Parent Equity in Subsidiaries** | | | | | | |
| Liquidating Trust Note | $ 16,077 | $ 16,077 | 0% | 0% | $ - | $ - |
| **Total Claims Against Parent Equity in Subs.** | **$ 16,077** | **$ 16,077** | **0%** | **0%** | **$ -** | **$ -** |
| Subtotal Unsecured Claims | **$ 1,364,270** | **$ 1,305,312** | **0%** | **0%** | **$ -** | **$ -** |
| **Total Estimated Claims and Recoveries *** | **$ 1,636,666** | **$ 1,638,490** | **17%** | **20%** | **$ 272,396** | **$ 333,178** |
| * Deficiency Claims included in Secured Claims Balance | | | | | - | - |

**Blackhawk Mining (Updated as of May 31st, 2019)**
**Best Interest Analysis - Blackhawk Mining LLC (Parent Only)**
*$ Amounts in 000s*

| | | Low | | High | |
|---|---|---|---|---|---|
| Distribution for Secured Creditors | | | | | |
| Operating Complexes | | $ | - | $ | - |
| Non - Operating Complexes | | | - | | - |
| Cash | | | - | | - |
| **Total Distribution for Secured Creditors** | | **$** | **-** | **$** | **-** |
| | | | | | |
| Distribution for Unsecured Creditors | | | | | |
| Unencumbered Assets | | $ | - | $ | - |
| **Total Distribution for Unsecured Creditors** | | **$** | **-** | **$** | **-** |
| | | | | | |
| **Net Liquidation Proceeds Available for Distribution** | | **$** | **-** | **$** | **-** |

| | | Claim Estimate ($) | | | Recovery Estimate (%) | | Potential Recovery Recovery Estimate ($) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | | High | Low | High | Low | | High | |
| 1 | **Chapter 7 Administrative Claims** | | | | | | | | | |
| | Chapter 7 Trustee Fee | $ | - | $ | - | 0% | 0% | $ | - | $ | - |
| | Investment Banker Fee | | - | | - | 0% | 0% | | - | | - |
| | Wind-down cost of assets | | - | | - | 0% | 0% | | - | | - |
| | **Total Chapter 7 Administrative Claims** | **$** | **-** | **$** | **-** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| 2 | **DIP Claims** | | | | | | | | | |
| | DIP - Asset Based Loan | $ | - | $ | - | 0% | 0% | $ | - | $ | - |
| | DIP - Term Loan | | - | | - | 0% | 0% | | - | | - |
| | **Total DIP Claims** | **$** | **-** | **$** | **-** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| 3 | **Secured Claims** | | | | | | | | | |
| | 1st Lien Term Loan | $ | 638,974 | $ | 638,974 | 0% | 0% | $ | - | $ | - |
| | 2nd Lien Term Loan | | 297,024 | | 297,024 | 0% | 0% | | - | | - |
| | **Total Secured Claims** | **$** | **935,999** | **$** | **935,999** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| | Subtotal Secured Claims | **$** | **935,999** | **$** | **935,999** | | | **$** | **-** | **$** | **-** |
| 4 | **Priority Claims** | | | | | | | | | |
| | Severance Tax | $ | - | $ | - | 0% | 0% | $ | - | $ | - |
| | **Total Priority Claims** | **$** | **-** | **$** | **-** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| 5 | **General Unsecured Claims** | | | | | | | | | |
| | 1st Lien Amount - Deficiency Claims | $ | 506,521 | $ | 447,562 | 0% | 0% | $ | - | $ | - |
| | 2nd Lien Amount - Deficiency Claims | | 318,307 | | 318,307 | 0% | 0% | | - | | - |
| | Accounts Payable & Accrued Expenses | | - | | - | 0% | 0% | | - | | - |
| | Accrued Royalties | | - | | - | 0% | 0% | | - | | - |
| | Royalties Escrow | | - | | - | 0% | 0% | | - | | - |
| | Reclamation Liabilities | | - | | - | 0% | 0% | | - | | - |
| | Claims from Wage Motion | | - | | - | 0% | 0% | | - | | - |
| | Corporate Accounts Payable | | - | | - | 0% | 0% | | - | | - |
| | Lease Rejection Claims | | - | | - | 0% | 0% | | - | | - |
| | Accounts Payable to Corporate | | - | | - | 0% | 0% | | - | | - |
| | Union Claims | | - | | - | 0% | 0% | | - | | - |
| | **Total General Unsecured Claims** | **$** | **824,828** | **$** | **765,870** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| 6 | **Claims Against Parent Equity in Subsidiaries** | | | | | | | | | |
| | Liquidating Trust Note | $ | 16,077 | $ | 16,077 | 0% | 0% | $ | - | $ | - |
| | **Total Claims Against Parent Equity in Subs.** | **$** | **16,077** | **$** | **16,077** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| | Subtotal Unsecured Claims | **$** | **840,905** | **$** | **781,946** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| | **Total Estimated Claims and Recoveries \*** | **$** | **952,076** | **$** | **952,076** | **0%** | **0%** | **$** | **-** | **$** | **-** |

\* Deficiency Claims included in Secured Claims Balance                    -          -

2

**Blackhawk Mining (Updated as of May 31st, 2019)**
**Best Interest Analysis (All: NBV) - Blue Diamond**
*$ Amounts in 000s*

| | | | | | | | | Low | | High |
|---|---|---|---|---|---|---|---|---|---|---|
| Distribution for Secured Creditors | | | | | | | | | | |
| Operating Complexes | | | | | | | $ | 20,153 | $ | 24,194 |
| Non - Operating Complexes | | | | | | | | - | | - |
| Cash | | | | | | | | - | | |
| **Total Distribution for Secured Creditors** | | | | | | | $ | **20,153** | $ | **24,194** |
| | | | | | | | | | | |
| Distribution for Unsecured Creditors | | | | | | | | | | |
| Unencumbered Assets | | | | | | | $ | - | $ | - |
| **Total Distribution for Unsecured Creditors** | | | | | | | $ | **-** | $ | **-** |
| | | | | | | | | | | |
| **Net Liquidation Proceeds Available for Distribution** | | | | | | | $ | **20,153** | $ | **24,194** |

| | | | | | | | Potential Recovery | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Claim Estimate ($) | | | Recovery Estimate (%) | | | Recovery Estimate ($) | | | |
| | Low | | High | Low | High | | Low | | High | |
| **1 Chapter 7 Administrative Claims** | | | | | | | | | | |
| Chapter 7 Trustee Fee | $ | 2,724 | $ 3,332 | 7% | 7% | $ | 198 | $ | 242 | |
| Investment Banker Fee | | 5,448 | 6,664 | 7% | 7% | | 396 | | 484 | |
| Wind-down cost of assets | | 1,875 | 1,875 | 7% | 7% | | 136 | | 136 | |
| **Total Chapter 7 Administrative Claims** | $ | **10,047** | $ **11,870** | **7%** | **7%** | $ | **730** | $ | **863** | |
| | | | | | | | | | | |
| **2 DIP Claims** | | | | | | | | | | |
| DIP - Asset Based Loan | $ | 79,895 | $ 79,895 | 7% | 7% | $ | 5,808 | $ | 5,808 | |
| DIP - Term Loan | | 50,000 | 50,000 | 7% | 7% | | 3,634 | | 3,634 | |
| **Total DIP Claims** | $ | **129,895** | $ **129,895** | **7%** | **7%** | $ | **9,442** | $ | **9,442** | |
| | | | | | | | | | | |
| **3 Secured Claims** | | | | | | | | | | |
| 1st Lien Term Loan | $ | 638,974 | $ 638,974 | 2% | 2% | $ | 9,981 | $ | 13,889 | |
| 2nd Lien Term Loan | | 297,024 | 297,024 | 0% | 0% | | - | | - | |
| **Total Secured Claims** | $ | **935,999** | $ **935,999** | **1%** | **1%** | $ | **9,981** | $ | **13,889** | |
| | | | | | | | | | | |
| Subtotal Secured Claims | $ | **1,075,941** | $ **1,077,765** | | | $ | **20,153** | $ | **24,194** | |
| | | | | | | | | | | |
| **4 Priority Claims** | | | | | | | | | | |
| Severance Tax | $ | - | $ - | 0% | 0% | $ | - | $ | - | |
| **Total Priority Claims** | $ | **-** | $ **-** | **0%** | **0%** | $ | **-** | $ | **-** | |
| | | | | | | | | | | |
| **5 General Unsecured Claims** | | | | | | | | | | |
| 1st Lien Amount - Deficiency Claims | $ | 506,521 | $ 447,562 | 0% | 0% | $ | - | $ | - | |
| 2nd Lien Amount - Deficiency Claims | | 318,307 | 318,307 | 0% | 0% | | - | | - | |
| Accounts Payable & Accrued Expenses | | 12,743 | 12,743 | 0% | 0% | | - | | - | |
| Accrued Royalties | | 540 | 540 | 0% | 0% | | - | | - | |
| Royalties Escrow | | 611 | 611 | 0% | 0% | | - | | - | |
| Reclamation Liabilities | | 20,944 | 20,944 | 0% | 0% | | - | | - | |
| Claims from Wage Motion | | - | - | 0% | 0% | | - | | - | |
| Corporate Accounts Payable | | - | - | 0% | 0% | | - | | - | |
| Lease Rejection Claims | | - | - | 0% | 0% | | - | | - | |
| Accounts Payable to Corporate | | - | - | 0% | 0% | | - | | - | |
| Union Claims | | - | - | 0% | 0% | | - | | - | |
| **Total General Unsecured Claims** | $ | **859,666** | $ **800,708** | **0%** | **0%** | $ | **-** | $ | **-** | |
| | | | | | | | | | | |
| **6 Claims Against Parent Equity in Subsidiaries** | | | | | | | | | | |
| Liquidating Trust Note | $ | - | $ - | 0% | 0% | $ | - | $ | - | |
| **Total Claims Against Parent Equity in Subs.** | $ | **-** | $ **-** | **0%** | **0%** | $ | **-** | $ | **-** | |
| | | | | | | | | | | |
| Subtotal Unsecured Claims | $ | **859,666** | $ **800,708** | **0%** | **0%** | $ | **-** | $ | **-** | |
| | | | | | | | | | | |
| **Total Estimated Claims and Recoveries *** | $ | **1,110,779** | $ **1,112,603** | **2%** | **2%** | $ | **20,153** | $ | **24,194** | |

\* Deficiency Claims included in Secured Claims Balance                                        -                    -

**Blackhawk Mining (Updated as of May 31st, 2019)**
**Best Interest Analysis (All: NBV) - Hampden**
*$ Amounts in 000s*

|  | Low | High |
|---|---|---|
| Distribution for Secured Creditors | | |
| Operating Complexes | $ 25,429 | $ 31,450 |
| Non - Operating Complexes | - | - |
| Cash | - | |
| **Total Distribution for Secured Creditors** | **$ 25,429** | **$ 31,450** |
| | | |
| Distribution for Unsecured Creditors | | |
| Unencumbered Assets | $ - | $ - |
| **Total Distribution for Unsecured Creditors** | **$ -** | **$ -** |
| | | |
| **Net Liquidation Proceeds Available for Distribution** | **$ 25,429** | **$ 31,450** |

| | Claim Estimate ($) | | Recovery Estimate (%) | | Potential Recovery Recovery Estimate ($) | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| **1 Chapter 7 Administrative Claims** | | | | | | |
| Chapter 7 Trustee Fee | $ 2,724 | $ 3,332 | 9% | 9% | $ 257 | $ 315 |
| Investment Banker Fee | 5,448 | 6,664 | 9% | 9% | 515 | 630 |
| Wind-down cost of assets | 1,875 | 1,875 | 9% | 9% | 177 | 177 |
| **Total Chapter 7 Administrative Claims** | **$ 10,047** | **$ 11,870** | **9%** | **9%** | **$ 949** | **1,122** |
| **2 DIP Claims** | | | | | | |
| DIP - Asset Based Loan | $ 79,895 | $ 79,895 | 9% | 9% | $ 7,549 | $ 7,549 |
| DIP - Term Loan | 50,000 | 50,000 | 9% | 9% | 4,724 | 4,724 |
| **Total DIP Claims** | **$ 129,895** | **$ 129,895** | **9%** | **9%** | **$ 12,274** | **12,274** |
| **3 Secured Claims** | | | | | | |
| 1st Lien Term Loan | $ 638,974 | $ 638,974 | 2% | 3% | $ 12,206 | $ 18,054 |
| 2nd Lien Term Loan | 297,024 | 297,024 | 0% | 0% | - | - |
| **Total Secured Claims** | **$ 935,999** | **$ 935,999** | **1%** | **2%** | **$ 12,206** | **18,054** |
| Subtotal Secured Claims | **$ 1,075,941** | **$ 1,077,765** | | | **$ 25,429** | **$ 31,450** |
| **4 Priority Claims** | | | | | | |
| Severance Tax | $ - | $ - | 0% | 0% | $ - | $ - |
| **Total Priority Claims** | **$ -** | **$ -** | **0%** | **0%** | **$ -** | **$ -** |
| **5 General Unsecured Claims** | | | | | | |
| 1st Lien Amount - Deficiency Claims | $ 506,521 | $ 447,562 | 0% | 0% | $ - | $ - |
| 2nd Lien Amount - Deficiency Claims | 318,307 | 318,307 | 0% | 0% | - | - |
| Accounts Payable & Accrued Expenses | 23,268 | 23,268 | 0% | 0% | - | - |
| Accrued Royalties | 382 | 382 | 0% | 0% | - | - |
| Royalties Escrow | - | - | 0% | 0% | - | - |
| Reclamation Liabilities | 13,427 | 13,427 | 0% | 0% | - | - |
| Claims from Wage Motion | - | - | 0% | 0% | - | - |
| Corporate Accounts Payable | - | - | 0% | 0% | - | - |
| Lease Rejection Claims | - | - | 0% | 0% | - | - |
| Accounts Payable to Corporate | - | - | 0% | 0% | - | - |
| Union Claims | - | - | 0% | 0% | - | - |
| **Total General Unsecured Claims** | **$ 861,905** | **$ 802,947** | **0%** | **0%** | **$ -** | **$ -** |
| **6 Claims Against Parent Equity in Subsidiaries** | | | | | | |
| Liquidating Trust Note | $ - | $ - | 0% | 0% | $ - | $ - |
| **Total Claims Against Parent Equity in Subs.** | **$ -** | **$ -** | **0%** | **0%** | **$ -** | **$ -** |
| Subtotal Unsecured Claims | **$ 861,905** | **$ 802,947** | **0%** | **0%** | **$ -** | **$ -** |
| **Total Estimated Claims and Recoveries *** | **$ 1,113,018** | **$ 1,114,842** | **2%** | **3%** | **$ 25,429** | **$ 31,450** |

\* Deficiency Claims included in Secured Claims Balance                    -              -

**Blackhawk Mining (Updated as of May 31st, 2019)**
**Best Interest Analysis (All: NBV) - Kanawha Eagle**
*$ Amounts in 000s*

| | | Low | | High |
|---|---|---|---|---|
| Distribution for Secured Creditors | | | | |
| Operating Complexes | $ | 37,592 | $ | 47,054 |
| Non - Operating Complexes | | - | | - |
| Cash | | - | | - |
| **Total Distribution for Secured Creditors** | **$** | **37,592** | **$** | **47,054** |
| | | | | |
| Distribution for Unsecured Creditors | | | | |
| Unencumbered Assets | $ | - | $ | - |
| **Total Distribution for Unsecured Creditors** | **$** | **-** | **$** | **-** |
| | | | | |
| **Net Liquidation Proceeds Available for Distribution** | **$** | **37,592** | **$** | **47,054** |

| | | Claim Estimate ($) | | | Recovery Estimate (%) | | Potential Recovery Recovery Estimate ($) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | | High | Low | High | | Low | | High |
| 1 **Chapter 7 Administrative Claims** | | | | | | | | | | |
| Chapter 7 Trustee Fee | $ | 2,724 | $ | 3,332 | 14% | 14% | $ | 385 | $ | 471 |
| Investment Banker Fee | | 5,448 | | 6,664 | 14% | 14% | | 770 | | 942 |
| Wind-down cost of assets | | 1,875 | | 1,875 | 14% | 14% | | 265 | | 265 |
| **Total Chapter 7 Administrative Claims** | **$** | **10,047** | **$** | **11,870** | **14%** | **14%** | **$** | **1,420** | **$** | **1,678** |
| | | | | | | | | | | |
| 2 **DIP Claims** | | | | | | | | | | |
| DIP - Asset Based Loan | $ | 79,895 | $ | 79,895 | 14% | 14% | $ | 11,295 | $ | 11,295 |
| DIP - Term Loan | | 50,000 | | 50,000 | 14% | 14% | | 7,069 | | 7,069 |
| **Total DIP Claims** | **$** | **129,895** | **$** | **129,895** | **14%** | **14%** | **$** | **18,363** | **$** | **18,363** |
| | | | | | | | | | | |
| 3 **Secured Claims** | | | | | | | | | | |
| 1st Lien Term Loan | $ | 638,974 | $ | 638,974 | 3% | 4% | $ | 17,809 | $ | 27,012 |
| 2nd Lien Term Loan | | 297,024 | | 297,024 | 0% | 0% | | - | | - |
| **Total Secured Claims** | **$** | **935,999** | **$** | **935,999** | **2%** | **3%** | **$** | **17,809** | **$** | **27,012** |
| | | | | | | | | | | |
| Subtotal Secured Claims | **$** | **1,075,941** | **$** | **1,077,765** | | | **$** | **37,592** | **$** | **47,054** |
| | | | | | | | | | | |
| 4 **Priority Claims** | | | | | | | | | | |
| Severance Tax | $ | - | $ | - | 0% | 0% | $ | - | $ | - |
| **Total Priority Claims** | **$** | **-** | **$** | **-** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| | | | | | | | | | | |
| 5 **General Unsecured Claims** | | | | | | | | | | |
| 1st Lien Amount - Deficiency Claims | $ | 506,521 | $ | 447,562 | 0% | 0% | $ | - | $ | - |
| 2nd Lien Amount - Deficiency Claims | | 318,307 | | 318,307 | 0% | 0% | | - | | - |
| Accounts Payable & Accrued Expenses | | 31,047 | | 31,047 | 0% | 0% | | - | | - |
| Accrued Royalties | | 1,126 | | 1,126 | 0% | 0% | | - | | - |
| Royalties Escrow | | - | | - | 0% | 0% | | - | | - |
| Reclamation Liabilities | | 4,745 | | 4,745 | 0% | 0% | | - | | - |
| Claims from Wage Motion | | - | | - | 0% | 0% | | - | | - |
| Corporate Accounts Payable | | - | | - | 0% | 0% | | - | | - |
| Lease Rejection Claims | | - | | - | 0% | 0% | | - | | - |
| Accounts Payable to Corporate | | - | | - | 0% | 0% | | - | | - |
| Union Claims | | - | | - | 0% | 0% | | - | | - |
| **Total General Unsecured Claims** | **$** | **861,745** | **$** | **802,787** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| | | | | | | | | | | |
| 6 **Claims Against Parent Equity in Subsidiaries** | | | | | | | | | | |
| Liquidating Trust Note | $ | - | $ | - | 0% | 0% | $ | - | $ | - |
| **Total Claims Against Parent Equity in Subs.** | **$** | **-** | **$** | **-** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| | | | | | | | | | | |
| Subtotal Unsecured Claims | **$** | **861,745** | **$** | **802,787** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| | | | | | | | | | | |
| **Total Estimated Claims and Recoveries *** | **$** | **1,112,859** | **$** | **1,114,682** | **3%** | **4%** | **$** | **37,592** | **$** | **47,054** |

\* Deficiency Claims included in Secured Claims Balance                                                                                                     -                    -

**Blackhawk Mining (Updated as of May 31st, 2019)**
**Best Interest Analysis (All: NBV) - Rockwell**
*$ Amounts in 000s*

| | | Low | High |
|---|---|---|---|
| Distribution for Secured Creditors | | | |
| Operating Complexes | $ | 63,271 | $ 79,348 |
| Non - Operating Complexes | | - | - |
| Cash | | - | |
| **Total Distribution for Secured Creditors** | **$** | **63,271** | **$ 79,348** |
| | | | |
| Distribution for Unsecured Creditors | | | |
| Unencumbered Assets | $ | - | $ - |
| **Total Distribution for Unsecured Creditors** | **$** | **-** | **$ -** |
| | | | |
| **Net Liquidation Proceeds Available for Distribution** | **$** | **63,271** | **$ 79,348** |

| | | Claim Estimate ($) | | Recovery Estimate (%) | | Potential Recovery Recovery Estimate ($) | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| 1 | **Chapter 7 Administrative Claims** | | | | | | |
| | Chapter 7 Trustee Fee | $ 2,724 | $ 3,332 | 24% | 24% | $ 649 | $ 794 |
| | Investment Banker Fee | 5,448 | 6,664 | 24% | 24% | 1,299 | 1,589 |
| | Wind-down cost of assets | 1,875 | 1,875 | 24% | 24% | 447 | 447 |
| | **Total Chapter 7 Administrative Claims** | **$ 10,047** | **$ 11,870** | **24%** | **24%** | **$ 2,395** | **$ 2,830** |
| 2 | **DIP Claims** | | | | | | |
| | DIP - Asset Based Loan | $ 79,895 | $ 79,895 | 24% | 24% | $ 19,047 | $ 19,047 |
| | DIP - Term Loan | 50,000 | 50,000 | 24% | 24% | 11,920 | 11,920 |
| | **Total DIP Claims** | **$ 129,895** | **$ 129,895** | **24%** | **24%** | **$ 30,967** | **$ 30,967** |
| 3 | **Secured Claims** | | | | | | |
| | 1st Lien Term Loan | $ 638,974 | $ 638,974 | 5% | 7% | $ 29,909 | $ 45,552 |
| | 2nd Lien Term Loan | 297,024 | 297,024 | 0% | 0% | - | - |
| | **Total Secured Claims** | **$ 935,999** | **$ 935,999** | **3%** | **5%** | **$ 29,909** | **$ 45,552** |
| | Subtotal Secured Claims | **$ 1,075,941** | **$ 1,077,765** | | | **$ 63,271** | **$ 79,348** |
| 4 | **Priority Claims** | | | | | | |
| | Severance Tax | $ 13,909 | $ 13,909 | 0% | 0% | $ - | $ - |
| | **Total Priority Claims** | **$ 13,909** | **$ 13,909** | **0%** | **0%** | **$ -** | **$ -** |
| 5 | **General Unsecured Claims** | | | | | | |
| | 1st Lien Amount - Deficiency Claims | $ 506,521 | $ 447,562 | 0% | 0% | $ - | $ - |
| | 2nd Lien Amount - Deficiency Claims | 318,307 | 318,307 | 0% | 0% | - | - |
| | Accounts Payable & Accrued Expenses | 49,294 | 49,294 | 0% | 0% | - | - |
| | Accrued Royalties | 301 | 301 | 0% | 0% | - | - |
| | Royalties Escrow | - | - | 0% | 0% | - | - |
| | Reclamation Liabilities | 37,434 | 37,434 | 0% | 0% | - | - |
| | Claims from Wage Motion | - | - | 0% | 0% | - | - |
| | Corporate Accounts Payable | - | - | 0% | 0% | - | - |
| | Lease Rejection Claims | - | - | 0% | 0% | - | - |
| | Accounts Payable to Corporate | 2,116 | 2,116 | 0% | 0% | - | - |
| | Union Claims | - | - | 0% | 0% | - | - |
| | **Total General Unsecured Claims** | **$ 913,973** | **$ 855,015** | **0%** | **0%** | **$ -** | **$ -** |
| 6 | **Claims Against Parent Equity in Subsidiaries** | | | | | | |
| | Liquidating Trust Note | - | - | 0% | 0% | $ - | $ - |
| | **Total Claims Against Parent Equity in Subs.** | **$ -** | **$ -** | **0%** | **0%** | **$ -** | **$ -** |
| | Subtotal Unsecured Claims | **$ 927,882** | **$ 868,924** | **0%** | **0%** | **$ -** | **$ -** |
| | **Total Estimated Claims and Recoveries \*** | **$ 1,178,995** | **$ 1,180,819** | **5%** | **7%** | **$ 63,271** | **$ 79,348** |

\* Deficiency Claims included in Secured Claims Balance                                                    -            -

**Blackhawk Mining (Updated as of May 31st, 2019)**
**Best Interest Analysis (All: NBV) - Speed**
*$ Amounts in 000s*

| | Low | High |
|---|---|---|
| Distribution for Secured Creditors | | |
| Operating Complexes | $ 40,668 | $ 47,484 |
| Non - Operating Complexes | - | - |
| Cash | - | |
| **Total Distribution for Secured Creditors** | **$ 40,668** | **$ 47,484** |
| | | |
| Distribution for Unsecured Creditors | | |
| Unencumbered Assets | $ - | $ - |
| **Total Distribution for Unsecured Creditors** | **$ -** | **$ -** |
| | | |
| **Net Liquidation Proceeds Available for Distribution** | **$ 40,668** | **$ 47,484** |

| | | Claim Estimate ($) | | Recovery Estimate (%) | | Potential Recovery Recovery Estimate ($) | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| 1 | **Chapter 7 Administrative Claims** | | | | | | |
| | Chapter 7 Trustee Fee | $ 2,724 | $ 3,332 | 14% | 14% | $ 389 | $ 475 |
| | Investment Banker Fee | 5,448 | 6,664 | 14% | 14% | 777 | 951 |
| | Wind-down cost of assets | 1,875 | 1,875 | 14% | 14% | 267 | 267 |
| | **Total Chapter 7 Administrative Claims** | **$ 10,047** | **$ 11,870** | **14%** | **14%** | **$ 1,433** | **$ 1,693** |
| 2 | **DIP Claims** | | | | | | |
| | DIP - Asset Based Loan | $ 79,895 | $ 79,895 | 14% | 14% | $ 11,398 | $ 11,398 |
| | DIP - Term Loan | 50,000 | 50,000 | 14% | 14% | 7,133 | 7,133 |
| | **Total DIP Claims** | **$ 129,895** | **$ 129,895** | **14%** | **14%** | **$ 18,531** | **$ 18,531** |
| 3 | **Secured Claims** | | | | | | |
| | 1st Lien Term Loan | $ 638,974 | $ 638,974 | 3% | 4% | $ 20,703 | $ 27,259 |
| | 2nd Lien Term Loan | 297,024 | 297,024 | 0% | 0% | - | - |
| | **Total Secured Claims** | **$ 935,999** | **$ 935,999** | **2%** | **3%** | **$ 20,703** | **$ 27,259** |
| | Subtotal Secured Claims | **$ 1,075,941** | **$ 1,077,765** | | | **$ 40,668** | **$ 47,484** |
| 4 | **Priority Claims** | | | | | | |
| | Severance Tax | $ 6,477 | $ 6,477 | 0% | 0% | $ - | $ - |
| | **Total Priority Claims** | **$ 6,477** | **$ 6,477** | **0%** | **0%** | **$ -** | **$ -** |
| 5 | **General Unsecured Claims** | | | | | | |
| | 1st Lien Amount - Deficiency Claims | $ 506,521 | $ 447,562 | 0% | 0% | $ - | $ - |
| | 2nd Lien Amount - Deficiency Claims | 318,307 | 318,307 | 0% | 0% | - | - |
| | Accounts Payable & Accrued Expenses | 32,698 | 32,698 | 0% | 0% | - | - |
| | Accrued Royalties | 848 | 848 | 0% | 0% | - | - |
| | Royalties Escrow | - | - | 0% | 0% | - | - |
| | Reclamation Liabilities | 2,835 | 2,835 | 0% | 0% | - | - |
| | Claims from Wage Motion | - | - | 0% | 0% | - | - |
| | Corporate Accounts Payable | - | - | 0% | 0% | - | - |
| | Lease Rejection Claims | - | - | 0% | 0% | - | - |
| | Accounts Payable to Corporate | - | - | 0% | 0% | - | - |
| | Union Claims | - | - | 0% | 0% | - | - |
| | **Total General Unsecured Claims** | **$ 861,209** | **$ 802,251** | **0%** | **0%** | **$ -** | **$ -** |
| 6 | **Claims Against Parent Equity in Subsidiaries** | | | | | | |
| | Liquidating Trust Note | $ - | $ - | 0% | 0% | $ - | $ - |
| | **Total Claims Against Parent Equity in Subs.** | **$ -** | **$ -** | **0%** | **0%** | **$ -** | **$ -** |
| | Subtotal Unsecured Claims | **$ 867,686** | **$ 808,728** | **0%** | **0%** | **$ -** | **$ -** |
| | **Total Estimated Claims and Recoveries \*** | **$ 1,118,800** | **$ 1,120,623** | **4%** | **4%** | **$ 40,668** | **$ 47,484** |

\* Deficiency Claims included in Secured Claims Balance

7

**Blackhawk Mining (Updated as of May 31st, 2019)**
**Best Interest Analysis (All: NBV) - Spurlock**
*$ Amounts in 000s*

| | | Low | | High |
|---|---|---:|---|---:|
| Distribution for Secured Creditors | | | | |
| Operating Complexes | $ | 15,302 | $ | 18,714 |
| Non - Operating Complexes | | - | | - |
| Cash | | - | | - |
| **Total Distribution for Secured Creditors** | **$** | **15,302** | **$** | **18,714** |
| | | | | |
| Distribution for Unsecured Creditors | | | | |
| Unencumbered Assets | $ | - | $ | - |
| **Total Distribution for Unsecured Creditors** | **$** | **-** | **$** | **-** |
| | | | | |
| **Net Liquidation Proceeds Available for Distribution** | **$** | **15,302** | **$** | **18,714** |

| | | Claim Estimate ($) | | | Recovery Estimate (%) | | Potential Recovery Recovery Estimate ($) | | | |
|---|---|---:|---|---:|---:|---:|---|---:|---|---:|
| | | Low | | High | Low | High | | Low | | High |
| 1 | **Chapter 7 Administrative Claims** | | | | | | | | | |
| | Chapter 7 Trustee Fee | $ | 2,724 | $ | 3,332 | 6% | 6% | $ | 153 | $ | 187 |
| | Investment Banker Fee | | 5,448 | | 6,664 | 6% | 6% | | 306 | | 375 |
| | Wind-down cost of assets | | 1,875 | | 1,875 | 6% | 6% | | 105 | | 105 |
| | **Total Chapter 7 Administrative Claims** | **$** | **10,047** | **$** | **11,870** | **6%** | **6%** | **$** | **565** | **$** | **667** |
| 2 | **DIP Claims** | | | | | | | | | |
| | DIP - Asset Based Loan | $ | 79,895 | $ | 79,895 | 6% | 6% | $ | 4,492 | $ | 4,492 |
| | DIP - Term Loan | | 50,000 | | 50,000 | 6% | 6% | | 2,811 | | 2,811 |
| | **Total DIP Claims** | **$** | **129,895** | **$** | **129,895** | **6%** | **6%** | **$** | **7,304** | **$** | **7,304** |
| 3 | **Secured Claims** | | | | | | | | | |
| | 1st Lien Term Loan | $ | 638,974 | $ | 638,974 | 1% | 2% | $ | 7,434 | $ | 10,743 |
| | 2nd Lien Term Loan | | 297,024 | | 297,024 | 0% | 0% | | - | | - |
| | **Total Secured Claims** | **$** | **935,999** | **$** | **935,999** | **1%** | **1%** | **$** | **7,434** | **$** | **10,743** |
| | Subtotal Secured Claims | **$** | **1,075,941** | **$** | **1,077,765** | | | **$** | **15,302** | **$** | **18,714** |
| 4 | **Priority Claims** | | | | | | | | | |
| | Severance Tax | $ | - | $ | - | 0% | 0% | $ | - | $ | - |
| | **Total Priority Claims** | **$** | **-** | **$** | **-** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| 5 | **General Unsecured Claims** | | | | | | | | | |
| | 1st Lien Amount - Deficiency Claims | $ | 506,521 | $ | 447,562 | 0% | 0% | $ | - | $ | - |
| | 2nd Lien Amount - Deficiency Claims | | 318,307 | | 318,307 | 0% | 0% | | - | | - |
| | Accounts Payable & Accrued Expenses | | 7,054 | | 7,054 | 0% | 0% | | - | | - |
| | Accrued Royalties | | 522 | | 522 | 0% | 0% | | - | | - |
| | Royalties Escrow | | 550 | | 550 | 0% | 0% | | - | | - |
| | Reclamation Liabilities | | 12,514 | | 12,514 | 0% | 0% | | - | | - |
| | Claims from Wage Motion | | - | | - | 0% | 0% | | - | | - |
| | Corporate Accounts Payable | | - | | - | 0% | 0% | | - | | - |
| | Lease Rejection Claims | | - | | - | 0% | 0% | | - | | - |
| | Accounts Payable to Corporate | | - | | - | 0% | 0% | | - | | - |
| | Union Claims | | - | | - | 0% | 0% | | - | | - |
| | **Total General Unsecured Claims** | **$** | **845,469** | **$** | **786,511** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| 6 | **Claims Against Parent Equity in Subsidiaries** | | | | | | | | | |
| | Liquidating Trust Note | $ | - | $ | - | 0% | 0% | $ | - | $ | - |
| | **Total Claims Against Parent Equity in Subs.** | **$** | **-** | **$** | **-** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| | Subtotal Unsecured Claims | **$** | **845,469** | **$** | **786,511** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| | **Total Estimated Claims and Recoveries *** | **$** | **1,096,582** | **$** | **1,098,406** | **1%** | **2%** | **$** | **15,302** | **$** | **18,714** |

* Deficiency Claims included in Secured Claims Balance                                    -                -

**Blackhawk Mining (Updated as of May 31st, 2019)**
**Best Interest Analysis (All: NBV) - Winchester**
*$ Amounts in 000s*

| | Low | | High | |
|---|---|---|---|---|
| Distribution for Secured Creditors | | | | |
| Operating Complexes | $ | 19,795 | $ | 23,353 |
| Non - Operating Complexes | | - | | - |
| Cash | | - | | |
| **Total Distribution for Secured Creditors** | **$** | **19,795** | **$** | **23,353** |
| | | | | |
| Distribution for Unsecured Creditors | | | | |
| Unencumbered Assets | $ | - | $ | - |
| **Total Distribution for Unsecured Creditors** | **$** | **-** | **$** | **-** |
| | | | | |
| **Net Liquidation Proceeds Available for Distribution** | **$** | **19,795** | **$** | **23,353** |

| | | Claim Estimate ($) | | | Recovery Estimate (%) | | Potential Recovery Recovery Estimate ($) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Low | | High | Low | High | Low | | High | |
| 1 | **Chapter 7 Administrative Claims** | | | | | | | | | |
| | Chapter 7 Trustee Fee | $ | 2,724 | $ 3,332 | 7% | 7% | $ | 191 | $ | 234 |
| | Investment Banker Fee | | 5,448 | 6,664 | 7% | 7% | | 382 | | 468 |
| | Wind-down cost of assets | | 1,875 | 1,875 | 7% | 7% | | 132 | | 132 |
| | **Total Chapter 7 Administrative Claims** | **$** | **10,047** | **$ 11,870** | **7%** | **7%** | **$** | **705** | **$** | **833** |
| 2 | **DIP Claims** | | | | | | | | | |
| | DIP - Asset Based Loan | $ | 79,895 | $ 79,895 | 7% | 7% | $ | 5,606 | $ | 5,606 |
| | DIP - Term Loan | | 50,000 | 50,000 | 7% | 7% | | 3,508 | | 3,508 |
| | **Total DIP Claims** | **$** | **129,895** | **$ 129,895** | **7%** | **7%** | **$** | **9,114** | **$** | **9,114** |
| 3 | **Secured Claims** | | | | | | | | | |
| | 1st Lien Term Loan | $ | 638,974 | $ 638,974 | 2% | 2% | $ | 9,976 | $ | 13,406 |
| | 2nd Lien Term Loan | | 297,024 | 297,024 | 0% | 0% | | - | | - |
| | **Total Secured Claims** | **$** | **935,999** | **$ 935,999** | **1%** | **1%** | **$** | **9,976** | **$** | **13,406** |
| | Subtotal Secured Claims | **$** | **1,075,941** | **$ 1,077,765** | | | **$** | **19,795** | **$** | **23,353** |
| 4 | **Priority Claims** | | | | | | | | | |
| | Severance Tax | $ | - | $ - | 0% | 0% | $ | - | $ | - |
| | **Total Priority Claims** | **$** | **-** | **$ -** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| 5 | **General Unsecured Claims** | | | | | | | | | |
| | 1st Lien Amount - Deficiency Claims | $ | 506,521 | $ 447,562 | 0% | 0% | $ | - | $ | - |
| | 2nd Lien Amount - Deficiency Claims | | 318,307 | 318,307 | 0% | 0% | | - | | - |
| | Accounts Payable & Accrued Expenses | | 14,059 | 14,059 | 0% | 0% | | - | | - |
| | Accrued Royalties | | 116 | 116 | 0% | 0% | | - | | - |
| | Royalties Escrow | | - | - | 0% | 0% | | - | | - |
| | Reclamation Liabilities | | 2,552 | 2,552 | 0% | 0% | | - | | - |
| | Claims from Wage Motion | | - | - | 0% | 0% | | - | | - |
| | Corporate Accounts Payable | | - | - | 0% | 0% | | - | | - |
| | Lease Rejection Claims | | - | - | 0% | 0% | | - | | - |
| | Accounts Payable to Corporate | | - | - | 0% | 0% | | - | | - |
| | Union Claims | | - | - | 0% | 0% | | - | | - |
| | **Total General Unsecured Claims** | **$** | **841,554** | **$ 782,596** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| 6 | **Claims Against Parent Equity in Subsidiaries** | | | | | | | | | |
| | Liquidating Trust Note | $ | - | $ - | 0% | 0% | $ | - | $ | - |
| | **Total Claims Against Parent Equity in Subs.** | **$** | **-** | **$ -** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| | Subtotal Unsecured Claims | **$** | **841,554** | **$ 782,596** | **0%** | **0%** | **$** | **-** | **$** | **-** |
| | **Total Estimated Claims and Recoveries \*** | **$** | **1,092,667** | **$ 1,094,491** | **2%** | **2%** | **$** | **19,795** | **$** | **23,353** |

\* Deficiency Claims included in Secured Claims Balance                                                    -                    -

9

**Blackhawk Mining (Updated as of May 31st, 2019)**
**Best Interest Analysis (All: NBV) - Blue Creek**
*$ Amounts in 000s*

| | | Low | High |
|---|---|---|---|
| Distribution for Secured Creditors | | | |
| Operating Complexes | | $ 19,589 | $ 23,353 |
| Non - Operating Complexes | | - | - |
| Cash | | - | |
| **Total Distribution for Secured Creditors** | | **$ 19,589** | **$ 23,353** |
| | | | |
| Distribution for Unsecured Creditors | | | |
| Unencumbered Assets | | $ - | $ - |
| **Total Distribution for Unsecured Creditors** | | **$ -** | **$ -** |
| | | | |
| **Net Liquidation Proceeds Available for Distribution** | | **$ 19,589** | **$ 23,353** |

| | | Claim Estimate ($) | | Recovery Estimate (%) | | Potential Recovery Recovery Estimate ($) | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| 1 | **Chapter 7 Administrative Claims** | | | | | | |
| | Chapter 7 Trustee Fee | $ 2,724 | $ 3,332 | 7% | 7% | $ 191 | $ 234 |
| | Investment Banker Fee | 5,448 | 6,664 | 7% | 7% | 382 | 468 |
| | Wind-down cost of assets | 1,875 | 1,875 | 7% | 7% | 132 | 132 |
| | **Total Chapter 7 Administrative Claims** | **$ 10,047** | **$ 11,870** | **7%** | **7%** | **$ 705** | **$ 833** |
| 2 | **DIP Claims** | | | | | | |
| | DIP - Asset Based Loan | $ 79,895 | $ 79,895 | 7% | 7% | $ 5,606 | $ 5,606 |
| | DIP - Term Loan | 50,000 | 50,000 | 7% | 7% | 3,508 | 3,508 |
| | **Total DIP Claims** | **$ 129,895** | **$ 129,895** | **7%** | **7%** | **$ 9,114** | **$ 9,114** |
| 3 | **Secured Claims** | | | | | | |
| | 1st Lien Term Loan | $ 638,974 | $ 638,974 | 2% | 2% | $ 9,770 | $ 13,406 |
| | 2nd Lien Term Loan | 297,024 | 297,024 | 0% | 0% | - | - |
| | **Total Secured Claims** | **$ 935,999** | **$ 935,999** | **1%** | **1%** | **$ 9,770** | **$ 13,406** |
| | Subtotal Secured Claims | **$ 1,075,941** | **$ 1,077,765** | | | **$ 19,589** | **$ 23,353** |
| 4 | **Priority Claims** | | | | | | |
| | Severance Tax | $ 4,008 | $ 4,008 | 0% | 0% | $ - | $ - |
| | **Total Priority Claims** | **$ 4,008** | **$ 4,008** | **0%** | **0%** | **$ -** | **$ -** |
| 5 | **General Unsecured Claims** | | | | | | |
| | 1st Lien Amount - Deficiency Claims | $ 506,521 | $ 447,562 | 0% | 0% | $ - | $ - |
| | 2nd Lien Amount - Deficiency Claims | 318,307 | 318,307 | 0% | 0% | - | - |
| | Accounts Payable & Accrued Expenses | 17,493 | 17,493 | 0% | 0% | - | - |
| | Accrued Royalties | 443 | 443 | 0% | 0% | - | - |
| | Royalties Escrow | - | - | 0% | 0% | - | - |
| | Reclamation Liabilities | 2,081 | 2,081 | 0% | 0% | - | - |
| | Claims from Wage Motion | - | - | 0% | 0% | - | - |
| | Corporate Accounts Payable | - | - | 0% | 0% | - | - |
| | Lease Rejection Claims | - | - | 0% | 0% | - | - |
| | Accounts Payable to Corporate | - | - | 0% | 0% | - | - |
| | Union Claims | - | - | 0% | 0% | - | - |
| | **Total General Unsecured Claims** | **$ 844,845** | **$ 785,887** | **0%** | **0%** | **$ -** | **$ -** |
| 6 | **Claims Against Parent Equity in Subsidiaries** | | | | | | |
| | Liquidating Trust Note | $ - | $ - | 0% | 0% | $ - | $ - |
| | **Total Claims Against Parent Equity in Subs.** | **$ -** | **$ -** | **0%** | **0%** | **$ -** | **$ -** |
| | Subtotal Unsecured Claims | **$ 848,853** | **$ 789,894** | **0%** | **0%** | **$ -** | **$ -** |
| | **Total Estimated Claims and Recoveries *** | **$ 1,099,966** | **$ 1,101,789** | **2%** | **2%** | **$ 19,589** | **$ 23,353** |
| | * Deficiency Claims included in Secured Claims Balance | | | | | - | - |

**Blackhawk Mining (Updated as of May 31st, 2019)**
**Best Interest Analysis (All: NBV) - Pine Branch**
*$ Amounts in 000s*

| | Low | High |
|---|---|---|
| Distribution for Secured Creditors | | |
| Operating Complexes | $ 10,761 | $ 15,170 |
| Non - Operating Complexes | - | - |
| Cash | - | |
| **Total Distribution for Secured Creditors** | **$ 10,761** | **$ 15,170** |
| | | |
| Distribution for Unsecured Creditors | | |
| Unencumbered Assets | $ - | $ - |
| **Total Distribution for Unsecured Creditors** | **$ -** | **$ -** |
| | | |
| **Net Liquidation Proceeds Available for Distribution** | **$ 10,761** | **$ 15,170** |

| | Claim Estimate ($) | | Recovery Estimate (%) | | Potential Recovery Recovery Estimate ($) | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| **1 Chapter 7 Administrative Claims** | | | | | | |
| Chapter 7 Trustee Fee | $ 2,724 | $ 3,332 | 5% | 5% | $ 124 | $ 152 |
| Investment Banker Fee | 5,448 | 6,664 | 5% | 5% | 248 | 304 |
| Wind-down cost of assets | 1,875 | 1,875 | 5% | 5% | 85 | 85 |
| **Total Chapter 7 Administrative Claims** | **$ 10,047** | **$ 11,870** | **5%** | **5%** | **$ 458** | **541** |
| | | | | | | |
| **2 DIP Claims** | | | | | | |
| DIP - Asset Based Loan | $ 79,895 | $ 79,895 | 5% | 5% | $ 3,641 | 3,641 |
| DIP - Term Loan | 50,000 | 50,000 | 5% | 5% | 2,279 | 2,279 |
| **Total DIP Claims** | **$ 129,895** | **$ 129,895** | **5%** | **5%** | **$ 5,920** | **5,920** |
| | | | | | | |
| **3 Secured Claims** | | | | | | |
| 1st Lien Term Loan | $ 638,974 | $ 638,974 | 1% | 1% | $ 4,382 | $ 8,709 |
| 2nd Lien Term Loan | 297,024 | 297,024 | 0% | 0% | - | - |
| **Total Secured Claims** | **$ 935,999** | **$ 935,999** | **0%** | **1%** | **$ 4,382** | **8,709** |
| | | | | | | |
| Subtotal Secured Claims | **$ 1,075,941** | **$ 1,077,765** | | | **$ 10,761** | **$ 15,170** |
| | | | | | | |
| **4 Priority Claims** | | | | | | |
| Severance Tax | $ - | $ - | 0% | 0% | $ - | $ - |
| **Total Priority Claims** | **$ -** | **$ -** | **0%** | **0%** | **$ -** | **$ -** |
| | | | | | | |
| **5 General Unsecured Claims** | | | | | | |
| 1st Lien Amount - Deficiency Claims | $ 506,521 | $ 447,562 | 0% | 0% | $ - | $ - |
| 2nd Lien Amount - Deficiency Claims | 318,307 | 318,307 | 0% | 0% | - | - |
| Accounts Payable & Accrued Expenses | 9,330 | 9,330 | 0% | 0% | - | - |
| Accrued Royalties | 223 | 223 | 0% | 0% | - | - |
| Royalties Escrow | 950 | 950 | 0% | 0% | - | - |
| Reclamation Liabilities | 26,933 | 26,933 | 0% | 0% | - | - |
| Claims from Wage Motion | - | - | 0% | 0% | - | - |
| Corporate Accounts Payable | | | 0% | 0% | - | - |
| Lease Rejection Claims | | | 0% | 0% | - | - |
| Accounts Payable to Corporate | - | | 0% | 0% | - | - |
| Union Claims | - | - | 0% | 0% | - | - |
| **Total General Unsecured Claims** | **$ 862,263** | **$ 803,304** | **0%** | **0%** | **$ -** | **$ -** |
| | | | | | | |
| **6 Claims Against Parent Equity in Subsidiaries** | | | | | | |
| Liquidating Trust Note | $ - | $ - | 0% | 0% | $ - | $ - |
| **Total Claims Against Parent Equity in Subs.** | **$ -** | **$ -** | **0%** | **0%** | **$ -** | **$ -** |
| | | | | | | |
| Subtotal Unsecured Claims | **$ 862,263** | **$ 803,304** | **0%** | **0%** | **$ -** | **$ -** |
| | | | | | | |
| **Total Estimated Claims and Recoveries \*** | **$ 1,113,376** | **$ 1,115,199** | **1%** | **1%** | **$ 10,761** | **$ 15,170** |
| | | | | | | |
| * Deficiency Claims included in Secured Claims Balance | | | | | - | - |

**Blackhawk Mining (Updated as of May 31st, 2019)**
**Best Interest Analysis (All: NBV) - Samples**
*$ Amounts in 000s*

| | Low | High |
|---|---|---|
| Distribution for Secured Creditors | | |
| Operating Complexes | $ 19,532 | $ 22,719 |
| Non - Operating Complexes | - | - |
| Cash | - | - |
| **Total Distribution for Secured Creditors** | **$ 19,532** | **$ 22,719** |
| | | |
| Distribution for Unsecured Creditors | | |
| Unencumbered Assets | $ - | $ - |
| **Total Distribution for Unsecured Creditors** | **$ -** | **$ -** |
| | | |
| **Net Liquidation Proceeds Available for Distribution** | **$ 19,532** | **$ 22,719** |

| | | Claim Estimate ($) | | Recovery Estimate (%) | | Potential Recovery Recovery Estimate ($) | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| 1 | **Chapter 7 Administrative Claims** | | | | | | |
| | Chapter 7 Trustee Fee | $ 2,724 | $ 3,332 | 7% | 7% | $ 186 | $ 227 |
| | Investment Banker Fee | 5,448 | 6,664 | 7% | 7% | 372 | 455 |
| | Wind-down cost of assets | 1,875 | 1,875 | 7% | 7% | 128 | 128 |
| | **Total Chapter 7 Administrative Claims** | **$ 10,047** | **$ 11,870** | **7%** | **7%** | **$ 686** | **$ 810** |
| 2 | **DIP Claims** | | | | | | |
| | DIP - Asset Based Loan | $ 79,895 | $ 79,895 | 7% | 7% | $ 5,454 | $ 5,454 |
| | DIP - Term Loan | 50,000 | 50,000 | 7% | 7% | 3,413 | 3,413 |
| | **Total DIP Claims** | **$ 129,895** | **$ 129,895** | **7%** | **7%** | **$ 8,866** | **$ 8,866** |
| 3 | **Secured Claims** | | | | | | |
| | 1st Lien Term Loan | $ 638,974 | $ 638,974 | 2% | 2% | $ 9,980 | $ 13,042 |
| | 2nd Lien Term Loan | 297,024 | 297,024 | 0% | 0% | - | - |
| | **Total Secured Claims** | **$ 935,999** | **$ 935,999** | **1%** | **1%** | **$ 9,980** | **$ 13,042** |
| | Subtotal Secured Claims | **$ 1,075,941** | **$ 1,077,765** | | | **$ 19,532** | **$ 22,719** |
| 4 | **Priority Claims** | | | | | | |
| | Severance Tax | $ 5,968 | $ 5,968 | 0% | 0% | $ - | $ - |
| | **Total Priority Claims** | **$ 5,968** | **$ 5,968** | **0%** | **0%** | **$ -** | **$ -** |
| 5 | **General Unsecured Claims** | | | | | | |
| | 1st Lien Amount - Deficiency Claims | $ 506,521 | $ 447,562 | 0% | 0% | $ - | $ - |
| | 2nd Lien Amount - Deficiency Claims | 318,307 | 318,307 | 0% | 0% | - | - |
| | Accounts Payable & Accrued Expenses | 16,853 | 16,853 | 0% | 0% | - | - |
| | Accrued Royalties | 675 | 675 | 0% | 0% | - | - |
| | Royalties Escrow | - | - | 0% | 0% | - | - |
| | Reclamation Liabilities | 2,983 | 2,983 | 0% | 0% | - | - |
| | Claims from Wage Motion | - | - | 0% | 0% | - | - |
| | Corporate Accounts Payable | - | - | 0% | 0% | - | - |
| | Lease Rejection Claims | - | - | 0% | 0% | - | - |
| | Accounts Payable to Corporate | 3,921 | 3,921 | 0% | 0% | - | - |
| | Union Claims | - | - | 0% | 0% | - | - |
| | **Total General Unsecured Claims** | **$ 849,260** | **$ 790,302** | **0%** | **0%** | **$ -** | **$ -** |
| 6 | **Claims Against Parent Equity in Subsidiaries** | | | | | | |
| | Liquidating Trust Note | - | - | 0% | 0% | $ - | $ - |
| | **Total Claims Against Parent Equity in Subs.** | **$ -** | **$ -** | **0%** | **0%** | **$ -** | **$ -** |
| | Subtotal Unsecured Claims | **$ 855,229** | **$ 796,270** | **0%** | **0%** | **$ -** | **$ -** |
| | **Total Estimated Claims and Recoveries *** | **$ 1,106,342** | **$ 1,108,165** | **2%** | **2%** | **$ 19,532** | **$ 22,719** |
| | * Deficiency Claims included in Secured Claims Balance | | | | | - | - |

**Blackhawk Mining (Updated as of May 31st, 2019)**
## Best Interest Analysis (All: NBV) - Non Operating Complexes
*$ Amounts in 000s*

| | Low | | High | |
|---|---|---|---|---|
| Distribution for Secured Creditors | | | | |
| Operating Complexes | $ | - | $ | - |
| Non - Operating Complexes | | 303 | | 338 |
| Cash | | - | | - |
| **Total Distribution for Secured Creditors** | **$** | **303** | **$** | **338** |
| | | | | |
| Distribution for Unsecured Creditors | | | | |
| Unencumbered Assets | $ | - | $ | - |
| **Total Distribution for Unsecured Creditors** | **$** | **-** | **$** | **-** |
| | | | | |
| **Net Liquidation Proceeds Available for Distribution** | **$** | **303** | **$** | **338** |

| | | Claim Estimate ($) | | Recovery Estimate (%) | | Potential Recovery Recovery Estimate ($) | |
|---|---|---|---|---|---|---|---|
| | Low | High | | Low | High | Low | High |
| 1 **Chapter 7 Administrative Claims** | | | | | | | |
| Chapter 7 Trustee Fee | $ - | $ - | | 0% | 0% | $ - | $ - |
| Investment Banker Fee | - | - | | 0% | 0% | - | - |
| Wind-down cost of assets | - | - | | 0% | 0% | - | - |
| **Total Chapter 7 Administrative Claims** | **$ -** | **$ -** | | **0%** | **0%** | **$ -** | **$ -** |
| 2 **DIP Claims** | | | | | | | |
| DIP - Asset Based Loan | $ - | $ - | | 0% | 0% | $ - | $ - |
| DIP - Term Loan | - | - | | 0% | 0% | - | - |
| **Total DIP Claims** | **$ -** | **$ -** | | **0%** | **0%** | **$ -** | **$ -** |
| 3 **Secured Claims** | | | | | | | |
| 1st Lien Term Loan | $ 638,974 | $ 638,974 | | 0% | 0% | $ 303 | $ 338 |
| 2nd Lien Term Loan | 297,024 | 297,024 | | 0% | 0% | - | - |
| **Total Secured Claims** | **$ 935,999** | **$ 935,999** | | **0%** | **0%** | **$ 303** | **$ 338** |
| Subtotal Secured Claims | **$ 935,999** | **$ 935,999** | | | | **$ 303** | **$ 338** |
| 4 **Priority Claims** | | | | | | | |
| Severance Tax | $ - | $ - | | 0% | 0% | $ - | $ - |
| **Total Priority Claims** | **$ -** | **$ -** | | **0%** | **0%** | **$ -** | **$ -** |
| 5 **General Unsecured Claims** | | | | | | | |
| 1st Lien Amount - Deficiency Claims | $ 506,521 | $ 447,562 | | 0% | 0% | $ - | $ - |
| 2nd Lien Amount - Deficiency Claims | 318,307 | 318,307 | | 0% | 0% | - | - |
| Accounts Payable & Accrued Expenses | 1,019 | 1,019 | | 0% | 0% | - | - |
| Accrued Royalties | 63 | 63 | | 0% | 0% | - | - |
| Royalties Escrow | 21 | 21 | | 0% | 0% | - | - |
| Reclamation Liabilities | 8,940 | 8,940 | | 0% | 0% | - | - |
| Claims from Wage Motion | - | - | | 0% | 0% | - | - |
| Corporate Accounts Payable | - | - | | 0% | 0% | - | - |
| Lease Rejection Claims | - | - | | 0% | 0% | - | - |
| Accounts Payable to Corporate | - | - | | 0% | 0% | - | - |
| Union Claims | - | - | | 0% | 0% | - | - |
| **Total General Unsecured Claims** | **$ 834,870** | **$ 775,912** | | **0%** | **0%** | **$ -** | **$ -** |
| 6 **Claims Against Parent Equity in Subsidiaries** | | | | | | | |
| Liquidating Trust Note | $ - | $ - | | 0% | 0% | $ - | $ - |
| **Total Claims Against Parent Equity in Subs.** | **$ -** | **$ -** | | **0%** | **0%** | **$ -** | **$ -** |
| Subtotal Unsecured Claims | **$ 834,870** | **$ 775,912** | | **0%** | **0%** | **$ -** | **$ -** |
| **Total Estimated Claims and Recoveries *** | **$ 946,041** | **$ 946,041** | | **0%** | **0%** | **$ 303** | **$ 338** |

\* Deficiency Claims included in Secured Claims Balance