## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BLACKHAWK MINING LLC, *et al.*,[1] | Case No. 19-11595 (LSS) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors"),[2] respectfully submit this motion[3] for the relief set forth herein. In support of this motion, the Debtors respectfully submit the First Day Declaration and the declaration of Marc Puntus (the "Puntus Declaration"), filed contemporaneously herewith. In further support of this motion, the Debtors respectfully state the following:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Blackhawk Mining LLC (5600); Blackhawk Coal Sales, LLC (9456); Blackhawk Land and Resources, LLC (7839); Blackhawk River Logistics, LLC (3388); Blue Creek Mining, LLC (2427); Blue Diamond Mining, LLC (3488); Eagle Shield, LLC (6721); FCDC Coal, Inc. (6188); Guyandotte Mining, LLC (4882); Hampden Coal, LLC (8241); Kanawha Eagle Mining, LLC (0586); Logan & Kanawha, LLC (3178); Panther Creek Mining, LLC (0627); Pine Branch Land, LLC (9758); Pine Branch Mining, LLC (9681); Pine Branch Resources, LLC (9758); Redhawk Mining, LLC (0852); Rockwell Mining, LLC (3874); Spruce Pine Land Company (2254); Spurlock Mining, LLC (2899); Triad Mining, LLC (7713); and Triad Trucking, LLC (6112). The location of the Debtors' service address in these chapter 11 cases is 3228 Summit Square Place, Suite 180, Lexington, Kentucky 40509.

[2] Capitalized terms used but not defined in this section shall have the meanings ascribed to such terms further below, in the First Day Declaration (as defined herein), this motion, the DIP Loan Agreement, or in the Interim Order, as applicable.

[3] The facts and circumstances supporting this motion are set forth in the *Declaration of Jesse M. Parrish, Chief Financial Officer of Blackhawk Mining LLC, in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously with this motion and incorporated by reference herein.

**Introduction**

1.       The Debtors are in urgent need of additional liquidity.  As described in the First Day Declaration, the Debtors have only approximately $500,000 in cash on hand as of the Petition Date.  First Day Decl. ¶ 48.  To execute the value-maximizing restructuring contemplated by the Debtors' restructuring support agreement ("RSA") and to fund these chapter 11 cases, the Debtors require debtor-in-possession ("DIP") financing in the form of continued access to an asset-based lending ("ABL") facility and additional new money financing in the form of a term DIP facility. Moreover, access to the proposed DIP Facilities (as defined below) will send a clear signal to the market that the Debtors' operations can and will continue on a business-as-usual basis.  Indeed, the coupling of the DIP Facilities with the Debtors' RSA sends a strong message that the Debtors will have the liquidity necessary to emerge a stronger, well-capitalized company.

2.       Accordingly, the Debtors seek approval of the proposed $240 million DIP Facilities.  The proposed DIP Facilities consist of (a) a $90.0 million DIP ABL facility, which will primarily refinance the Debtors' prepetition ABL credit facility and provide $5.0 million of incremental liquidity (the "DIP ABL Facility"), and (b) a $150.0 million Term DIP Loan, including $50.0 million in new-money financing and the roll up of $100.0 million of the Debtors' prepetition first lien term loans (the "Term DIP Facility," and together with the DIP ABL Facility, the "DIP Facilities").

3.       The DIP Facilities will provide the Debtors with ample liquidity to fund the Debtors' business operations and administrative expenses during the contemplated time period of these chapter 11 cases.  If approved, the Debtors will use the proceeds of the DIP Facilities to, among other things, honor employee wages and benefits, procure goods and services, fund general and corporate operating needs and the administration of these chapter 11 cases, in each case in

2

accordance with a budget agreed to by the Debtors and the DIP Lenders (the "Budget") attached hereto as **Schedule 1** to **Exhibit A**.

4.      As set forth in the First Day Declaration, the Debtors and their estates would suffer immediate and irreparable harm if the Debtors were denied the financing needed to sustain on-going business operations during the critical first weeks of these cases.  The DIP Facilities ensure that the Debtors (a) have sufficient funding to consummate the chapter 11 plan contemplated by the RSA, and (b) can continue to operate uninterrupted in these chapter 11 cases.  Further, as set forth in the Puntus Declaration, the terms of the DIP Facilities are reasonable under the circumstances, and were the product of good faith, arm's length negotiations.

5.      Thus, for the reasons set forth herein, in the Puntus Declaration, and in the First Day Declaration, the Debtors believe that approval of the DIP Facilities will maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders and is an exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve the relief requested herein, and enter an interim order substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders").

### Jurisdiction and Venue

6.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent

of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Rules 2002-1(b), 4001-2, and 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>").

### **Relief Requested**

8.      By this motion, the Debtors seek entry of the Interim Order and the Final Order:

a.      authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis in the form of the DIP ABL Facility, consisting of an asset-based revolving credit facility in the aggregate principal amount of $90 million, pursuant to the terms and conditions of that certain *Senior Secured Super-Priority Debtor-in-Possession ABL Credit Agreement* (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "<u>DIP ABL Credit Agreement</u>"), by and among Blackhawk Mining LLC, as borrower, the other borrowers party thereto and MidCap Funding IV Trust, as administrative agent (in such capacity, the "<u>DIP ABL Agent</u>") and Midcap Financial Trust, and the financial institutions or other entities from time to time parties thereto ("<u>MidCap</u>" or the "<u>DIP ABL Lenders</u>") substantially in the form attached hereto as **<u>Exhibit B</u>**;

b.      authorizing the Debtors to obtain superpriority postpetition financing in the form of a multiple-draw term loan credit facility in an aggregate principal amount of up to $150 million in the form of the Term DIP Facility (all amounts extended under the Term DIP Facility, the "<u>Term DIP Loans</u>") consisting of:  (i) new money term loans (the "<u>New Money Term DIP Loans</u>") including (A) an initial draw in the aggregate principal amount of $35 million available upon entry of the Interim Order and (B) a delayed draw of up to $15 million within one business day after entry of the Final Order; and (ii) the roll-up of $100 million of the prepetition first lien term loans (the "<u>Term DIP Roll-Up Loans</u>"), which shall be secured on a junior basis to the New Money Term DIP Loans pursuant to the terms and conditions of that certain *Secured Debtor-in-Possession Term Loan Credit Agreement* (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "<u>Term DIP Credit Agreement</u>," and together with the DIP ABL Credit Agreement, the "<u>DIP Credit</u>

4

Agreements"), by and among Blackhawk Mining LLC, as borrower, Cantor Fitzgerald Securities as administrative agent and collateral agent (in such capacities, the "Term DIP Agent," and, together with the DIP ABL Agent, the "DIP Agents"), and certain of the Prepetition First Lien Term Loan Lenders (the "Term DIP Lenders" and together with the DIP ABL Lenders, the "DIP Lenders") substantially in the form of **Exhibit C**, attached hereto;

c.    authorizing the Debtors to execute and deliver the DIP ABL Credit Agreement, and any other agreements, instruments, pledge agreements, guarantees, control agreements and other documents related thereto (as each of the foregoing may be amended, restated, supplemented, waived, and/or modified from time to time in accordance with the terms hereof and thereof, and collectively with the DIP ABL Credit Agreement, the "DIP ABL Financing Documents") and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP ABL Financing Documents;

d.    authorizing the Debtors to execute and deliver the Term DIP Credit Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements, and other documents related thereto (as amended, restated, supplemented, waived, and/or modified from time to time, collectively, with the Term DIP Credit Agreement, the "Term DIP Documents," and together the DIP ABL Financing Documents, the "DIP Documents") and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the Term DIP Documents;

e.    granting the DIP ABL Facility and all obligations owing thereunder and under, or secured by, the DIP ABL Financing Documents to the DIP ABL Agent and the DIP ABL Lenders (collectively, and including all obligations as described in the DIP ABL Credit Agreement, the "DIP ABL Obligations") allowed superpriority administrative expense claim status in each of the Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases");

f.    granting the Term DIP Facility and all obligations owing thereunder and under, or secured by the Term DIP Documents to the Term DIP Agent and Term DIP Lenders (collectively, and including all Obligations as described in the Term DIP Credit Agreement, the "Term DIP Obligations," and together with the DIP ABL Obligations, the "DIP Obligations") allowed superpriority administrative expense claims status in each of the Cases and any Successor Cases;

g.     granting to each of (i) the DIP ABL Agent and the DIP ABL Lenders under the applicable DIP Documents, and (ii) the Term DIP Agent, for the benefit of itself and the Term DIP Lenders and each other Secured Party (as defined in the Term DIP Credit Agreement) under the applicable DIP Documents, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall be subject to the priorities set forth in the Interim Order;

h.     authorizing the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including letter of credit fees (including issuance and other related charges), continuing commitment fees, closing fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, administrative agent's fees, and the reasonable fees and disbursements of the DIP Agents' attorneys, advisors, accountants, and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

i.     authorizing the Debtors to use the Prepetition Collateral (as defined herein), including the Cash Collateral of the Prepetition ABL Lender under the Prepetition ABL Credit Agreement and the First Lien Lenders under the Prepetition First Lien Term Loan Agreement (each as defined in the Plan), and providing adequate protection to the DIP ABL Lender and Prepetition First Lien Lenders for any diminution in value of their respective interests in Prepetition Collateral, including the Cash Collateral, resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of Prepetition Collateral, including Cash Collateral and/or the priming of their respective interests in Prepetition Collateral, including the Cash Collateral (including by the Carve Out (as defined in the Interim Order));

j.     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

k.     scheduling a final hearing (the "Final Hearing") within approximately 21 days of the Petition Date to consider the relief requested herein and approving the form of notice with respect to the Final Hearing; and

l.     granting related relief.

## Concise Statement Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2

### I.    Concise Statement regarding the DIP ABL Facility.

9.    The below chart contains a summary of the material terms of the proposed DIP ABL Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.[4]

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Blackhawk Mining LLC<br>Blue Diamond Mining, LLC<br>Triad Mining, LLC<br>Triad Trucking, LLC<br>Hampden Coal, LLC<br>Logan & Kanawha, LLC<br>Spurlock Mining, LLC<br>Redhawk Mining, LLC<br>Spruce Pine Land Company<br>Pine Branch Mining, LLC<br>Pine Branch Resources, LLC<br>Pine Branch Land, LLC<br>FCDC Coal, Inc.<br>Eagle Shield, LLC<br>Blackhawk Coal Sales, LLC<br>Blackhawk Land and Resources, LLC<br>Blue Creek Mining, LLC<br>Panther Creek Mining, LLC<br>Rockwell Mining, LLC<br>Guyandotte Mining, LLC<br>Kanawha Eagle Mining, LLC<br>Blackhawk River Logistics, LLC<br><br>*See* DIP ABL Credit Agreement, Recitals and Annex B |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Not applicable to the DIP ABL Facility. |

---

[4]    The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **DIP ABL Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | MidCap Funding IV Trust<br><br>*See* DIP ABL Credit Agreement, Recitals. |
| **DIP ABL Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | MidCap Financial Trust<br><br>*See* DIP ABL Credit Agreement, Recitals. |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP ABL Facility includes standard and customary conditions that require the Borrower to provide periodic reports to the DIP ABL Lenders and their respective professionals regarding the Approved Budget, the status of these chapter 11 cases, and certain other matters. The failure of the Borrowers to comply with such reporting obligations will cause an Event of Default that may permit the DIP Agents to exercise remedies against the Borrowers, including terminating the DIP Facilities.<br><br>*See* DIP ABL Credit Agreement, Article 6 |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The earliest to occur of (a) 90 days after the Petition Date, (b) the date on which any DIP ABL Termination Event occurs, (c) the date on which DIP ABL Agent accelerates the maturity of the Loans pursuant to Section 10.2 of the DIP ABL Credit Agreement, or (d) the termination date stated in any notice of termination of the DIP ABL Credit Agreement provided by Borrowers in accordance with Section 2.12(b) thereof.<br><br>*See* DIP ABL Credit Agreement, Article 1. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | From the Closing Date through entry of the Final DIP Order, the sum of (1) the amount of the Prepetition ABL Obligations that have been paid pursuant to Section 2.11 of the DIP ABL Credit Agreement plus (2) $5,000,000.<br><br>Upon entry of the Final DIP Order: $90,000,000.<br><br>*See* DIP ABL Credit Agreement, Annex A |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | *Conditions to Closing*.  The DIP Documents include conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type.<br><br>*See* DIP ABL Credit Agreement § 7.1<br><br>*Conditions to Each Loan*.  The DIP Documents include conditions to all credit extensions that are customary and appropriate for similar debtor-in-possession financings of this type.<br><br>*See* DIP ABL Credit Agreement § 7.2 |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Loans shall bear interest at the sum of the LIBOR Rate *plus* 6.00%.<br><br><u>Default Rate</u>: 2.0% per annum in excess of the otherwise applicable rate.<br><br>*See* DIP ABL Credit Agreement §§ 2.2; 10.6 |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Use of DIP Financing Facility and Cash Collateral** **Bankruptcy Rule** 4001(b)(l)(B)(ii) Local Rule 4001-2(a)(ii) | Subject to the terms and conditions contained in the Interim Order and the DIP ABL Credit Agreement, the Debtors shall, in each case only in compliance with the Approved Budget and in compliance with the terms and conditions in the Interim Order and the DIP Documents, use the proceeds of the DIP ABL Facility: <br><br> • for working capital; <br> • other general corporate purposes and costs of administration of the Chapter 11 Cases claims or amounts approved by the Bankruptcy Court as set forth in the Approved Budget; <br> • to pay adequate protection as set forth in the DIP Orders; <br> • to pay interest, fees, and expenses in accordance with the Interim Order and DIP ABL Credit Agreement; and <br> • to roll-up and refinance the Prepetition ABL Credit Facility. <br><br> *See* DIP ABL Credit Agreement § 4.11 |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | *ABL Indemnification Liens and Adequate Protection of Prepetition ABL Secured Parties*. The Prepetition ABL Secured Parties are entitled to (a) the ABL Indemnification Liens and (b) pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, adequate protection of their interests in all Prepetition Collateral, including Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition ABL Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the DIP Loan Parties (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition ABL Liens by the DIP Liens pursuant to the DIP Documents and the Interim Order and/or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Prepetition ABL Adequate Protection Claim"). In consideration of the foregoing, upon entry of the Interim Order, the Prepetition ABL Secured Parties will be granted the following, in each case, subject to the Carve-Out (collectively, the "Prepetition ABL Secured Parties Adequate Protection Obligations"): <br><br> *ABL Indemnification Liens and Prepetition ABL Adequate Protection Liens.* Upon entry of the Interim Order, the Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders) will be granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), (i) to secure payment of any and all Prepetition ABL Indemnification Claims and the ABL Indemnification Liens and (ii) to secure payment of any and all of the Prepetition ABL Adequate Protection Claims, a valid, perfected replacement security interest in and lien (the "Prepetition ABL Adequate Protection Liens") (subject to the limitations set forth above) upon the Collateral, except for the Specified Excluded Unencumbered Property, in accordance with the priorities shown in **Exhibit A** to the Interim Order and in each case subject to the Carve-Out. <br><br> *Prepetition ABL Section 507(b) Claim.* Upon entry of the Interim Order, the Prepetition ABL Secured Parties will be granted against each of the DIP Loan Parties on a joint and several basis an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition ABL Adequate Protection Claim with, except as set forth in the Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code. The Prepetition ABL 507(b) Claim shall be subject and subordinate only to the Carve-Out and the DIP Superpriority Claims granted in respect of the DIP Obligations and shall be *pari passu* with the Prepetition First Lien |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | Term Loan 507(b) Claim and senior in all respects to the Prepetition Second Lien Term Loan 507(b) Claim.  Except to the extent expressly set forth in the Interim Order or the DIP Credit Agreements, the Prepetition ABL Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition ABL 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been Paid in Full and the DIP Commitments have been terminated.  For purposes of the Interim Order, the terms "Paid in Full," "Repaid in Full," "Repay in Full," and "Payment in Full" shall mean, with respect to any referenced DIP Obligations and/or Prepetition Debt, (i) the indefeasible payment in full in cash of such obligations, (ii) the termination or cash collateralization, in accordance with the DIP Documents and/or Prepetition Documents, as applicable, of all undrawn letters of credit and Banking Services Obligations outstanding thereunder, and (iii) the termination of all commitments under the DIP Documents and/or the Prepetition Debt Documents, as applicable. |
|  | *Prepetition ABL Agent Fees and Expenses.*  The Prepetition ABL Agent shall receive from the DIP Loan Parties, for the benefit of the Prepetition ABL Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses with respect to Prepetition ABL Debt under the Prepetition ABL Financing Documents, including, but not limited to, the reasonable and documented fees and expenses of counsel for the Prepetition ABL Agent (including Hogan Lovells US LLP as primary counsel to the Prepetition ABL Agent, Morris, Nichols, Arsht & Tunnell LLP as bankruptcy and Delaware counsel to the Prepetition ABL Agent, one local counsel to the Prepetition ABL Agent in each other applicable jurisdiction) promptly upon receipt of invoices therefor.  The DIP Loan Parties shall be authorized to pay the prepetition reasonable and documented fees and expenses described in the DIP ABL Credit Agreement immediately upon entry of the Interim Order. |
|  | *Prepetition ABL Secured Parties' Cash Payments.*  Subject to reallocation or recharacterization as payment of principal under sections 506(a) and (b) of the Bankruptcy Code, the Prepetition ABL Secured Parties shall receive current cash payments in the amount of interest on the outstanding principal at the non-default rate under the Prepetition ABL Credit Agreement prior to the ABL Discharge. |
|  | *Information Rights.*  Until the occurrence of the ABL Discharge, the Debtors shall promptly provide the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, with all required written financial reporting and other periodic reporting that is delivered by any of the DIP Loan Parties under the DIP Documents.  In addition, the Debtors shall upon reasonable advance notice, permit the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, to conduct field audits, collateral examinations, liquidation valuations, and inventory appraisals at reasonable times in respect of any or all of the Collateral in accordance with the terms and conditions set forth in the Prepetition ABL Financing Documents.<br><br>*See* Interim Order ¶ 20 |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Roll-Up**<br>Local Rule 4001-2(a)(i)(E) | Upon entry of the Interim Order, the DIP Loan Parties are authorized to (x) perform the transactions and undertakings contemplated thereby, which are thereby approved in all respects, (y) to remit the Debtors' prepetition and postpetition accounts receivable and all other proceeds of the DIP ABL Priority Collateral for application to the outstanding principal balance of the Prepetition ABL Debt (the "Interim ABL Roll-Up"), thereby creating a dollar-for-dollar increase in the DIP Revolving Loan Availability (as defined in the DIP ABL Credit Agreement) and, upon entry of the Final Order, to use the proceeds of the DIP ABL Financing to roll-up and refinance the remainder of the Prepetition ABL Debt, including interest and fees through the date of repayment (at the non-default contract rate) (the "Final ABL Roll-Up," and together with the Interim ABL Roll-Up, the "ABL Roll-Up", and the amounts so rolled-up and refinanced, the "ABL Roll-Up Loans"), which roll-up and refinancing shall be indefeasible upon the occurrence of the ABL Discharge and shall be entitled to all the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations under the Interim Order, the Final Order and the DIP Loan Documents, and (z) use the proceeds of the DIP ABL Financing to pay any fees, charges or expenses incurred by the Prepetition ABL Agent prior to the Petition Date, but which are posted after the payoff of the Prepetition ABL Debt.<br><br>*See* Interim Order ¶ 10 |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The initial Budget, which shall be delivered to DIP ABL Agent and DIP ABL Lenders on or prior to the Closing Date (as defined in the DIP ABL Credit Agreement), and each subsequent Budget shall be prepared in good faith based upon assumptions the Borrowers believed to be reasonable assumptions on the date of delivery of such Budget.<br><br>*See* DIP ABL Credit Agreement § 3.25 |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | Subsequent Budgets must be approved in accordance with section 6.1 of the DIP ABl Credit Agreement before becoming an "Approved Budget" as defined therein.<br><br>*See* DIP ABl Credit Agreement § 6.1<br><br>Beginning with the delivery of the initial Budget Variance Report, as of the last day of each applicable Budget Test Period, (i) the negative variance (as compared to the Approved Budget) of the actual operating cash receipts of the Debtors shall not exceed 20% and (ii) the positive variance (as compared to the Approved Budget) of the aggregate operating disbursements (excluding professional fees and expenses) made by the Debtors shall not exceed 10%.<br><br>*See* DIP ABL Credit Agreement § 6.3 |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | Usual and customary for financings of this type, including failure to obtain entry of the Interim Order.<br><br>*See* DIP ABL Credit Agreement § 10.1 |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Documents and Interim Order contain indemnification provisions ordinary and customary for DIP financings of this type by the Borrower and each Guarantor in favor of the DIP Agents, each of the DIP Lenders, and each of their respective affiliates and the respective officers, directors, employees, agents, advisors, attorneys and representatives of each of them subject to customary carve-outs.<br><br>*See* DIP ABL Credit Agreement § 12.14. |

11

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | As of the Petition Date, the following secured parties have an interest in Cash Collateral (subject to the priorities set forth in the Prepetition Intercreditor Agreements, the DIP Intercreditor Agreement and the DIP Orders):<br><br>• DIP ABL Secured Parties<br><br>• Prepetition ABL Secured Parties<br><br>• Term DIP Secured Parties<br><br>• Prepetition First Lien Term Loan Secured Parties<br><br>• Prepetition Second Lien Term Loan Secured Parties<br><br>*See* DIP ABL Credit Agreement, Article 1; Term DIP Credit Agreement, Article 1; Interim Order ¶ 6(k). |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(F) | The Interim Order provides a "Carve Out" of certain statutory fees, allowed professional fees of the Debtors, and any official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code appointed in the chapter 11 cases pursuant to section 1103 of the Bankruptcy Code, including a Post-Carve Out Trigger Notice Cap, all as detailed in the Interim Order.<br><br>*See* Interim Order ¶ 12 |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | • <u>Unused Line Fee</u>.  0.5% per annum on the average daily balance of unused DIP Revolving Loan Commitments.  Such fee is to be paid monthly in arrears on the first day of each month.<br><br>• <u>Exit Fee</u>. The Borrowers agree to pay to DIP ABL Agent for the ratable account of DIP ABL Lenders, payable upon the occurrence of any DIP ABL Termination Date, a fully earned, non-refundable exit fee in an amount equal to 1.5% of the DIP Revolving Loan Commitment Amount *plus* all or any portion of the Revised Prepetition Deferred Revolving Loan Origination Fee (a fee in an amount equal to one and 1.5% of the "Revolving Loan Commitment" (as defined in the Prepetition ABL Credit Agreement) payable in lieu of the 3% Deferred Revolving Loan Origination Fee that would otherwise be thereunder) that was not paid upon termination or roll up, as the case may be, of the obligations under the Prepetition ABL Credit Agreement and the other Prepetition ABL Financing Documents.<br><br>*See* DIP ABL Credit Agreement § 2.2 |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x)<br><br>Local Rule 4001-2(a)(i)(C)<br><br><br>**Section 552(b)**<br>Bankruptcy Rule 4001(c)(l)(B) | *Limitation on Charging Expenses Against Collateral*.  Subject to entry of the Final Order, and subject to the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior express written consent of each of the DIP Agents, the Prepetition Agents (in the case of the Prepetition ABL Agent, prior to the ABL Discharge) and the Prepetition Lenders, as the case may be, that holds a lien on the relevant asset, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agents, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders, and nothing contained in the Interim Order shall be deemed to be a consent by the DIP Agents, the DIP Lenders or the Prepetition |

12

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(i)(H) | Secured Parties to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.<br><br>*Payments Free and Clear.* Any and all payments or proceeds remitted to the DIP Agents by, through or on behalf of the DIP Lenders pursuant to the provisions of the Interim Order, the Final Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code (subject to entry of the Final Order approving the waiver of the Debtors' rights under sections 506(c) and 552(b) of the Bankruptcy Code), whether asserted or assessed by through or on behalf of the Debtors.<br><br>*See* Interim Order ¶¶ 17 & 18 |
| **Liens on Avoidance Actions**<br>Local Rule 4001-2(a)(i)(D) | Avoidance Proceeds shall be subject to liens upon entry of the Final Order<br><br>*See* Interim Order ¶ 14 |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(B) | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity and extent of the Prepetition ABL Lenders and Prepetition Term Loan Lenders' claims and liens.<br><br>*See* Interim Order ¶ 6 |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(4) | As security for the DIP ABL Obligations, effective and perfected upon the date of the Interim Order and without the necessity of the execution, recordation or filing by the DIP ABL Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, any notation of certificates of title for a titled good or the possession or control by the DIP ABL Agent of, or over, any DIP Collateral (including for the avoidance of doubt any DIP ABL Collateral as defined in the DIP ABL Credit Agreement), security interests and liens are granted by the Interim DIP Order (with priority as set forth on **Exhibit A** to the Interim Order) to the DIP ABL Agent for its own benefit and the benefit of the DIP ABL Secured Parties.<br><br>*See* Interim Order ¶ 14 |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The Borrowers shall comply with the following milestones in connection with the Chapter 11 Cases:<br><br>• no later than one day after the Petition Date, filing of a motion, in form and substance satisfactory to the Required DIP ABL Lenders, seeking entry of the Interim DIP Order, including approval of the DIP ABL Credit Agreement and the other DIP ABL Financing Documents.<br><br>• no later than five days after the Petition Date, entry of the Interim DIP Order and filing of an Acceptable Disclosure Statement and an Acceptable Chapter 11 Plan;<br><br>• no later than forty-five days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order; |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | • no later than seventy-five days after the Petition Date, the Chapter 11 Confirmation Date shall have occurred; and<br><br>• no later than fourteen days after the Chapter 11 Confirmation Date, the Chapter 11 Plan Effective Date shall have occurred.<br><br>*See* DIP ABL Credit Agreement § 4.21 |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(i)(B) | *Challenge Period.*  (i) the earlier of (x) five (5) Business Days prior to the commencement of the hearing to confirm a chapter 11 plan, (y) 75 calendar days after entry of the Interim Order and (z) 60 calendar days after the appointment of any Committee or (ii) any such later date as has been agreed to, in writing, by the Prepetition Agents (with the consent of the DIP Lenders) as applicable.<br><br><br>*See* Interim Order ¶ 30 |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed under section 362(a) of the Bankruptcy Code is vacated and modified by the Interim Order to permit the DIP Loan Parties to grant the liens and security interests to the DIP Agents, the other DIP Secured Parties and the Prepetition Secured Parties, in any such case, contemplated by the Interim Order and the other DIP Documents, and such liens and security interests are hereby automatically granted, attached and perfected by the Interim Order.<br><br>*See* Interim Order ¶ 14(d)<br><br><br>The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified by the Interim Order to the extent necessary to permit the DIP Secured Parties in respect of any DIP Facility to enforce all of their rights under the applicable DIP Documents and take any or all of the following actions, at the same or different time, in each case without further order or application of the Court: (i) immediately upon the occurrence of an Event of Default, declare (A) the termination, reduction or restriction of any further DIP Commitment to the extent any such DIP Commitment remains, (B) all DIP Obligations to be immediately due, owing and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the DIP Loan Parties; notwithstanding anything herein or in any DIP Document to the contrary, (ii) the termination of the applicable DIP Documents as to any future liability or obligation of the applicable DIP Agent and the applicable DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations), (iii) whether or not the maturity of any of the DIP Obligations shall have been accelerated, proceed to protect, enforce and exercise all rights and remedies of the DIP Secured Parties under the DIP Documents for such DIP Facility or applicable law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in any such DIP Document or any instrument pursuant to which such DIP Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of any of such DIP Secured Parties, and (iv) unless this Court orders otherwise during the Remedies Notice Period (as defined below) after a hearing, upon the occurrence of an Event of Default and the giving of five business days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) (the "Remedies Notice Period") via email to counsel to the Debtors and the office of the United States Trustee |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | for the District of Delaware (the "U.S. Trustee") to (A) withdraw consent to the DIP Loan Parties' continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in the DIP Documents and under applicable law with respect to the DIP Collateral; provided, that no such notice shall be required for any exercise of rights or remedies (A) to block or limit withdrawals from any bank accounts that are a part of the Collateral (including, without limitation, by sending any control activation notices to depositary banks pursuant to any control agreement) or (B) in the event of DIP Obligations that have not been Paid in Full (other than contingent indemnification obligations as to which no claim has been asserted) on the applicable termination of the respective DIP Document.<br><br>During the Remedies Notice Period, the DIP Loan Parties shall be permitted to use Cash Collateral solely to (A) pay payroll and other critical administrative expenses to keep the business of the DIP Loan Parties operating, strictly in accordance with the Approved Budget and (B) fund the Carve-Out. During the Remedies Notice Period, the Debtors, the Committee (if appointed) and/or any party in interest shall be entitled to seek an emergency hearing with the Court within the Remedies Notice Period for the purpose of contesting whether, in fact, an Event of Default has occurred and is continuing. Except as set forth in the Interim Order, the Debtors have irrevocably waived their right to seek relief under the Bankruptcy Code, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights or remedies of the DIP Secured Parties set forth in the Interim Order or the DIP Documents.<br><br>*See* Interim Order ¶¶ 15(f) & (g).<br><br>The automatic stay is modified to the extent necessary to validate or perfect liens and security interests.<br><br>*See* Interim Order ¶¶ 24(a) & (b)<br><br>The automatic stay provisions pursuant to section 362 of the Bankruptcy Code are vacated and modified to the extent necessary so as to permit the Prepetition Agents and the Prepetition Secured Parties to exercise any of their rights with respect to Real Property Leases<br><br>*See* Interim Order ¶ 27 |

KE 60285454

## II.    Concise Statement regarding the Term DIP Facility.

10.    The below chart contains a summary of the material terms of the proposed Term DIP Loan, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.[5]

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Blackhawk Mining LLC<br><br>*See* Term DIP Credit Agreement, Intro |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Blue Diamond Mining, LLC<br>Triad Mining, LLC<br>Triad Trucking, LLC<br>Hampden Coal, LLC<br>Logan & Kanawha, LLC<br>Spurlock Mining, LLC<br>Redhawk Mining, LLC<br>Spruce Pine Land Company<br>Pine Branch Mining, LLC<br>Pine Branch Resources, LLC<br>Pine Branch Land, LLC<br>FCDC Coal, Inc.<br>Eagle Shield, LLC<br>Blackhawk Coal Sales, LLC<br>Blackhawk Land and Resources, LLC<br>Blue Creek Mining, LLC<br>Panther Creek Mining, LLC<br>Rockwell Mining, LLC<br>Guyandotte Mining, LLC<br>Kanawha Eagle Mining, LLC<br>Blackhawk River Logistics, LLC<br><br>*See* Term DIP Credit Agreement, § 1.01 (*def'n* of Guarantor) |
| **Term DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Knighthead Capital Management, LLC, solely on behalf of certain funds and accounts it manages and/or advises that have signed the RSA<br>Redwood Capital Management, LLC, solely on behalf of certain funds and accounts it manages and/or advises that have signed the RSA<br>Solus Alternative Asset Management LP, solely on behalf of certain funds and accounts it manages and/or advises that have signed the RSA<br>BIWA Fund Limited<br>Blackstone Alternative Multi Strategy Sub Fund IV L.L.C .<br>Canyon Capital Advisors LLC (on behalf of its participating funds and/or accounts)<br>Canyon Partners Real Estate LLC (on behalf of its participating funds and/or accounts)<br>Caspian Focused Opportunities Fund, LP. |

---

[5]    Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

KE 60285454

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Caspian HLSC1, LLC<br>Caspian SC Holdings, L.P.<br>Caspian Select Credit Master Fund, Ltd. Caspian Solitude Master Fund, L.P. CPPIB Canada Inc.<br>CPPIB Credit Investments Inc. CQS ACS Fund<br>CQS Aiguille Du Chardonnet MF S.C.A. SICAV-SIF CQS Credit Multi Asset Fund CQS Global Funds (Ireland) Limited CQS Global Funds ICAV<br>Essex Equity High Income Joint Investment Vehicle, LLC Essex Equity Joint Investment Vehicle, LLC<br>GraceChurch Loans Fund<br>GraceChurch Opportunities Fund Limited<br>J.H. Lane Partners Master Fund, LP<br>Jefferies Leveraged Credit Products, LLC<br>Mercer Multi-Asset Credit Fund, A Sub-Fund of Mercer QIF Fund PLC Richmond Hill Capital Partners, LP<br>Richmond Hill Investment Co., LP Richmond Hill Investments, LLC<br>Super Caspian Cayman Fund Limited York Global Finance BDH, LLC<br>Other Prepetition First Lien Term Loan Lenders that, prior to the date of the entry of the Interim DIP Order, elect to provide New Money DIP Commitments up to its pro rata share of the Prepetition First Lien Term Loans by either (i) submitting a signature page to the RSA indicating its New Money DIP Commitment or (ii) entering into a written agreement evidencing its New Money DIP Commitment.<br><br>*See* RSA, Exhibit B; Exhibit F |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | <u>Termination Date</u>.  The earliest of (a) the Maturity Date, (b) the effective date of the Acceptable Plan of Reorganization   or any other Reorganization Plan, (c) the consummation of a sale or other disposition of all or substantially all assets of the Debtors under section 363 of the Bankruptcy Code, (d) the date of acceleration of the Loans and the termination of the Commitments with respect to the DIP Term Facility upon and during the continuance of an Event of Default and (e) the date that is 45 days after the entry of the Interim Order (or such later date as may be agreed by the Required Lenders), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date.<br><br><u>Maturity Date</u>.  To be the date that is six (6) months after the commencement of the Cases.<br><br><u>Delayed Draw Commitment Termination Date</u>.  The earlier to occur of (a) the Delayed Draw Borrowing Date (within one Business Day of entry of the Final DIP Order) and (b) the Termination Date.<br><br>*See* Term DIP Credit Agreement, § 1.01 |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | <u>Commitment</u>.  The aggregate principal amount of $150 million.<br><br><u>New Money Term DIP Loans</u>.  $50 million in the aggregate consisting of $35 million available upon the entry of the Interim Order and $15 million upon the entry of the Final Order.<br><br><u>Term DIP Roll-Up Loans</u>.  $100 million of prepetition first lien term loans will roll up into the Term DIP Facility.<br><br>*See* Term DIP Credit Agreement § 1.01, 2.01 |

17

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | <u>Conditions Precedent to the Closing Date and the making of the Initial Loans</u>. The DIP Documents include conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type. <br><br> <u>Conditions Precedent to the Delayed Draw Borrowing</u>. The DIP Documents include conditions to the delayed draw borrowings that are customary and appropriate for similar debtor-in-possession financings of this type. <br><br> *See* Term DIP Credit Agreement § 5.01, 5.02 |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The Term DIP Loans will bear interest of LIBOR + 9.50% per annum, with a LIBOR floor of 2.00%. <br><br> <u>Default Interest</u>: 2.00% above then-applicable interest rate. <br><br> *See* Term DIP Credit Agreement, § 1.01, 2.06(b) |
| **Use of DIP Financing Facility and Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(ii) Local Rule 4001-2(a)(ii) | Proceeds will be used by the Borrower (i) for the general corporate purposes of the Borrower and its Restricted Subsidiaries, (ii) to pay the fees, costs and expenses of the Administrative Agent and the Lenders, (iii) to pay fees and expenses of professionals associated with the Cases, (iv) to effect the Roll-Up and (v) to provide certain adequate protection payments permitted by the Orders. <br><br> *See* Term DIP Credit Agreement § 6.08 |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | *Prepetition Term Loan Adequate Protection Liens*. The Prepetition First Lien Term Loan Agent, on behalf of the Prepetition First Lien Term Loan Secured Parties, and the Prepetition Second Lien Term Loan Agent, on behalf of the Prepetition Second Lien Term Loan Secured Parties, will be granted (effective and perfected upon entry of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the applicable Prepetition Term Loan Parties Adequate Protection Claim held by such Prepetition Term Loan Secured Parties, a replacement security interest in and lien (the "<u>Prepetition Term Loan Adequate Protection Liens</u>" and, together with the Prepetition ABL Adequate Protection Liens, the "<u>Adequate Protection Liens</u>") (subject to the limitations set forth in the Interim Order) upon the Collateral, except for the Specified Excluded Unencumbered Property, in accordance with the priorities shown in **Exhibit A** to the Interim Order and in each case subject to the Carve-Out. <br><br> *Prepetition Term Loan Secured Parties Section 507(b) Claim*. The Prepetition First Lien Term Loan Secured Parties will be granted, subject to the Carve-Out, allowed superpriority claims as provided for in section 507(b) of the Bankruptcy Code, junior to the DIP Superpriority Claims (the "<u>Prepetition First Lien Term Loan 507(b) Claim</u>"). The Prepetition Second Lien Term Loan Secured Parties will be granted, subject to the Carve-Out, allowed superpriority claims as provided for in section 507(b) of the Bankruptcy Code, junior to the DIP Superpriority Claims, the Prepetition ABL 507(b) Claim and the Prepetition First Lien Term Loan 507(b) Claim (the "<u>Prepetition Second Lien Term Loan 507(b) Claim</u>" and, together with the Prepetition First Lien Term Loan 507(b) Claim, the "<u>Prepetition Term Loan 507(b) Claims</u>," and the Prepetition Term Loan 507(b) Claims together with the Prepetition ABL 507(b) Claim, the "<u>507(b) Claims</u>"). If the Prepetition First Lien Term Loan Secured Parties holding 66.67% of the Prepetition First Lien Term Loan Debt waive the requirement that their Prepetition Term Loan 507(b) Claims be paid in full in cash, then the Prepetition Second Lien Term Loan Secured Parties will also be |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | deemed to waive such requirement.  The Prepetition First Lien Term Loan 507(b) Claim shall be subject and subordinate to only the Carve-Out and the DIP Superpriority Claims granted in respect of the DIP Obligations and shall be *pari passu* with the Prepetition ABL 507(b) Claim.  The Prepetition Second Lien Term Loan 507(b) Claim shall be subject and subordinate to only the Carve-Out, the Prepetition First Lien Term Loan 507(b) Claim, the Prepetition ABL 507(b) Claim and the DIP Superpriority Claims granted in respect of the DIP Obligations.  Except to the extent expressly set forth in the Interim Order or the DIP Credit Agreements, the Prepetition Term Loan Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition Term Loan 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been Paid in Full and the DIP Commitments have been terminated.<br><br>*Prepetition Term Loan Secured Parties' Fees and Expenses.*  The Prepetition Term Loan Agents shall receive from the DIP Loan Parties, for the benefit of the Prepetition Term Loan Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses of the Prepetition Term Loan Agents under the Prepetition Term Loan Documents, including, but not limited to, the reasonable and documented fees and disbursements of one counsel and one local counsel in each applicable jurisdiction for each of the Prepetition Term Loan Agents.  The DIP Loan Parties shall also pay all reasonable and documented prepetition and postpetition fees and expenses of:  (i) the Crossover Group, to the extent not already paid, including the reasonable and documented fees and expenses of Davis Polk & Wardwell LLP, as counsel to the Crossover Group, Simpson Thacher & Bartlett LLP, as counsel to Solus Alternative Asset Management LP (a member of the Crossover Group), one local counsel to the Crossover Group in each applicable jurisdiction, if retained; and (ii) the First Lien Group, to the extent not already paid, including the reasonable and documented fees and expenses of Shearman & Sterling LLP, as counsel, one local counsel to the First Lien Group in each applicable jurisdiction, if retained.<br><br>*Information Rights.*  The Debtors shall promptly provide the Prepetition Term Loan Agents, on behalf of itself and the Prepetition Term Loan Lenders, with all required written financial reporting and other periodic reporting that is delivered by any of the DIP Loan Parties under the DIP Documents, including the Approved Budget and any related variance reporting.  In addition, the Debtors shall provide the Prepetition Term Loan Agents, on behalf of itself and the Prepetition Term Loan Lenders, with reasonable access to the Debtors' officers, management, books and records, premises and properties in accordance with the terms and conditions set forth in the Prepetition Term Loan Financing Documents.<br><br>*See* Interim Order ¶ 21 |
| **Repayment Features**<br>Local Rule 4001-2(a)(i)(E) | *Voluntary Prepayments.*  Borrowers may prepay the principal of any of the Loans at any time in whole or in party without premium or penalty.<br><br>*Mandatory Repayments.*<br><br>• <u>Indebtedness</u>.  On each date upon which the Borrower or any of its Restricted Subsidiaries receives any Net Cash Proceeds from any issuance or incurrence by the Borrower or any of its Restricted Subsidiaries of Indebtedness (other than Indebtedness permitted to be incurred pursuant to Section 8.04 of the Term DIP Credit Agreement), an amount equal to 100% of the Net Cash Proceeds of the respective incurrence of Indebtedness shall be applied on such date as a mandatory |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | repayment in accordance with the requirements of Section 4.02(g) of the Term DIP Credit Agreement☐. <br><br> • Asset Sales.  If the Borrower or any Restricted Subsidiary receives any Net Sale Proceeds from an Asset Sale (other than any Permitted Asset Sale), on the fifth Business Day following the receipt of such Net Sale Proceeds, the Borrower shall, subject to Section 4.02(h) of the Term DIP Credit Agreement, apply an amount equal to 100% of the Net Sale Proceeds therefrom on such date as a mandatory repayment in accordance with the requirements of Section 4.02(g) of the Term DIP Credit Agreement. <br><br> • Recovery Events.  If the Borrower or any Restricted Subsidiary receives any Net Cash Proceeds from a Recovery Event, on the fifth Business Day following the receipt of such Net Cash Proceeds, the Borrower shall, subject to Section 4.02(h) of the Term DIP Credit Agreement, apply an amount equal to 100% of the Net Cash Proceeds therefrom on such date as a mandatory repayment in accordance with the requirements of Section 4.02(g) of the Term DIP Credit Agreement. <br><br> • Application.  Subject to the Orders and the DIP ABL Intercreditor Agreement, each amount required to be applied pursuant to clauses (c), (d), or (e) of Section 4.02 of the Term DIP Credit Agreement in accordance with Section 4.02(g) of the Term DIP Credit Agreement shall be applied pro rata among (i) the New Money Loans then outstanding until such New Money Loans are repaid in full and (ii) thereafter, the Roll-Up Loans then outstanding until such Roll-Up Loans are repaid in full. <br><br> In addition to any other mandatory repayments pursuant to Section 4.02 of the Term DIP Credit Agreement, for the avoidance of doubt all then outstanding Term Loans shall be repaid in full on the Termination Date. <br><br> *See* Term DIP Credit Agreement § 4.01-4.02 <br><br> Roll-Up.  On the date of each borrowing of New Money Term DIP Loans under the Term DIP Credit Agreement, the Prepetition First Lien Term Loan Debt held by the Term DIP Lenders (or if a Term DIP Lender is a designee of a Prepetition First Lien Term Loan Lender, the Prepetition First Lien Term Loan Debt held by such designating Prepetition First Lien Term Loan Lender) shall immediately, automatically and irrevocably be deemed to have been converted into Term DIP Roll-Up Loans in an amount equal to $2.00 for each $1.00 of the New Money Term DIP Loans funded on such date (the "Term Loan Roll-Up"), which Term DIP Roll-Up Loans shall be entitled to all the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations under the Interim Order, the Final Order and the DIP Loan Documents, in each case subject to the terms and conditions set forth in the Interim Order, the Final Order, the DIP Documents and the reservation of rights of parties in interest in paragraph 30 of the Interim Order. <br><br> *See* Interim Order ¶ 11 |
| **Budget** <br> Bankruptcy Rule 4001 (c)(1)(B) <br><br> Local Rule 4001-2(a)(ii) | *Approved Budget*.  The Approved Budget is attached as **Schedule 1** to **Exhibit A**. <br><br> *Variance Covenant*.  Beginning with the delivery of the initial Budget Variance Report, as of the last day of each applicable Test Period, (a) the negative variance (as compared to the Approved Budget) of the actual operating cash receipts of the Debtors shall not exceed 20% and (b) the positive variance (as compared to the Approved Budget) of the aggregate |

KE 60285454

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | operating disbursements (excluding professional fees and expenses) made by the Debtors shall not exceed 10%.<br><br>*See* Term DIP Credit Agreement § 8.16 |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | *Events of Default.* Usual and customary for financings of this type, including failure to obtain entry of the Interim Order.<br><br>*See* Term DIP Credit Agreement, Article IX |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | *Indemnification.* The DIP Documents and Interim Order contain indemnification provisions ordinary and customary for DIP financings of this type by the Borrower and each Guarantor in favor of the DIP Agents, each of the DIP Lenders, and each of their respective affiliates and the respective officers, directors, employees, agents, advisors, attorneys and representatives of each of them subject to customary carve-outs.<br><br>*See* Term DIP Credit Agreement § 11.01 |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The following secured parties have an interest in Cash Collateral:<br><br>• DIP ABL Secured Parties<br><br>• Prepetition ABL Secured Parties<br><br>• Term DIP Secured Parties<br><br>• Prepetition First Lien Term Loan Secured Parties<br><br>• Prepetition Second Lien Term Loan Secured Parties<br><br>*See* Term DIP Credit Agreement, Article 1; DIP ABL Credit Agreement, Article 1; Interim Order ¶ 6(k) |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(f) | The Interim Order provides a "Carve Out" of certain statutory fees, allowed professional fees of the Debtors, and say official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code appointed in the chapter 11 cases pursuant to section 1103 of the Bankruptcy Code, including a Post-Carve Out Trigger Notice Cap, all as detailed in the Interim Order<br><br>*See* Interim Order ¶ 12 |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | *Fees.* The Borrower agrees to pay to the Administrative Agent and any Lender such fees as may be agreed to in writing from time to time by the Borrower and the Administrative Agent and any Lender, including the following fees:<br><br>• The Borrower agrees to pay to the Administrative Agent for the account of each Lender according to its pro rata share of the Delayed Draw Commitments a nonrefundable commitment fee (the "Unused Commitment Fee") for each day from and including the Closing Date until but excluding the Delayed Draw Commitment Termination Date equal to the Unused Commitment Fee Rate (computed on the basis |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | of a year of 365 or 366 days, as the case may be, and actual days elapsed) multiplied by the average daily amount of unused Delayed Draw Commitments. All Unused Commitment Fees shall be payable in arrears for each month (x) on the last Business Day of such month ending after the Closing Date and (y) on the Delayed Draw Borrowing Date; <br><br> •   The Borrower agrees to pay to the Administrative Agent for the account of each Lender, an upfront fee in an amount equal to 1.00% of (i) the principal amount of each such Lender's aggregate Initial Commitment on the Closing Date, payable on the Closing Date upon the funding of the Initial Loan and (ii) the principal amount of each such Lender's aggregate Delayed Draw Commitment on the Delayed Draw Borrowing Date, payable on the Delayed Draw Borrowing Date upon the funding of the Delayed Draw Loans, in each case, which may, at the option of the Required Lenders, be in the form of original issue discount; <br><br> •   The Borrower agrees to pay to the Lenders an exit fee in an aggregate amount equal to 1.00% of the aggregate principal amount of the New Money Loans, which shall be payable in cash on the Plan Effective Date or, in the case of New Money Loans prepaid in whole or in part prior to the Plan Effective Date, if any, shall be payable in cash on the date of such prepayment; and <br><br> •   The Borrower shall pay to the Agents such other fees as shall have been separately agreed upon in writing for its own account fees in the amounts and at the times so specified, including the fees specified in the Agent Fee Letter, attached to this Motion as **Exhibit D**. <br><br> *See* Term DIP Credit Agreement § 3.01 |
| **506(c) Waiver** <br> Bankruptcy Rule 4001(c)(l)(B)(x) <br><br> Local Rule 4001-2(a)(i)(C) <br><br><br> **Section 552(b)** <br> Bankruptcy Rule 4001(c)(l)(B) <br><br> Local Rule 4001-2(a)(i)(h) | *Limitation on Charging Expenses Against Collateral.*  Subject to entry of the Final Order, and subject to the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior express written consent of each of the DIP Agents, the Prepetition Agents (in the case of the Prepetition ABL Agent, prior to the ABL Discharge) and the Prepetition Lenders, as the case may be, that holds a lien on the relevant asset, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agents, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agents, the DIP Lenders or the Prepetition Secured Parties to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise. <br><br> *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Agents by, through or on behalf of the DIP Lenders pursuant to the provisions of the Interim Order, the Final Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code (subject to entry of the Final Order approving the waiver of the Debtors' rights under sections 506(c) and 552(b) of the Bankruptcy Code), whether asserted or assessed by through or on behalf of the Debtors. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | *See* Interim Order ¶ 17-18 |
| **Liens on Avoidance Actions**<br>Local Rule 4001-2(a)(i)(D) | *Liens on Unencumbered Property.* Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected (A) first priority senior security interest in and lien upon all tangible and intangible pre- and postpetition property (including mineral rights) of the Term DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, of the same nature, scope and type as the Prepetition Term Loan Priority Collateral, and the proceeds, products, rents and profits thereof, which, subject to and upon entry of the Final Order, shall include any Avoidance Proceeds related to the forgoing ("DIP Term Loan Proirity Collateral," which for the avoidance of doubt shall include Prepetition Term Loan Priority Collateral) and (B) junior security interest in and lien upon all tangible and intangible pre- and postpetition property of the Term DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, of the same nature, scope and type as the Prepetition ABL Priority Collateral, and the proceeds, products, rents and profits thereof, in each case that, on or as of the Petition Date are not subject to either (x) a valid, perfected and non-avoidable lien, or (y) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, in each case, other than the Avoidance Actions (but including Avoidance Proceeds subject to entry of the Final Order), but in each case subject to the Carve-Out, provided that, with respect to the Term DIP Roll-Up Loans, the security interests and liens granted pursuant to this paragraph shall not include liens on the Specified Excluded Unencumbered Property;<br><br>*See* Interim Order ¶ 14 |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(B) | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity and extent of the Prepetition ABL Lenders and Prepetition Term Loan Lenders' claims and liens.<br><br>*See* Interim Order ¶ 6 |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(4) | As security for the Term DIP Obligations, effective and perfected upon the date of the Interim Order and without the necessity of the execution, recordation or filing by the Term DIP Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Term DIP Agent of, or over, any DIP Collateral, security interests and liens are granted by the Interim Order (with priority as set forth on **Exhibit A** to the Interim Order) to the Term DIP Agent for its own benefit and the benefit of the Term DIP Lenders.<br><br>*See* Interim Order ¶ 14 |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The Credit Parties shall ensure the satisfaction of the following milestones, unless waived or extended with the consent of the Required Lenders or the Administrative Agent (with the consent of the Required Lenders):<br><br>• No later than one day after the Petition Date, filing of a motion, in form and substance satisfactory to the Required Lenders, seeking approval of the DIP Term Facility;<br><br>• No later than five days after the Petition Date, entry of the Interim Order and filing of an Acceptable Disclosure Statement and an Acceptable Plan of Reorganization; |

KE 60285454

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | • No later than 45 days after the Petition Date, entry of the Final Order; <br><br> • No later than 75 days after the Petition Date, approval of an Acceptable Disclosure Statement and approval of the Acceptable Plan of Reorganization (the "Confirmation Date"); and <br><br> • No later than 14 days after the Confirmation Date, effectiveness of the Acceptable Plan of Reorganization. <br><br> The Milestones may be amended, modified or extended, in each case, only by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required Lenders. <br><br> *See* Term DIP Credit Agreement § 7.16 |
| **Challenge Period** <br><br> Bankruptcy Rule 4001(c)(l)(B) <br><br> Local Rule 4001-2(a)(i)(B) | *Challenge Period.* (i) the earlier of (x) five (5) Business Days prior to the commencement of the hearing to confirm a chapter 11 plan, (y) 75 calendar days after entry of the Interim Order and (z) 60 calendar days after the appointment of any Committee or (ii) any such later date as has been agreed to, in writing, by the Prepetition Agents (with the consent of the DIP Lenders) as applicable. <br><br> *See* Interim Order ¶ 30 |
| **Waiver/Modification of the Automatic Stay** <br><br> Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified by the Interim Order to the extent necessary to permit the DIP Secured Parties in respect of any DIP Facility to enforce all of their rights under the applicable DIP Documents and take any or all of the following actions, at the same or different time, in each case without further order or application of the Court: (i) immediately upon the occurrence of an Event of Default, declare (A) the termination, reduction or restriction of any further DIP Commitment to the extent any such DIP Commitment remains, (B) all DIP Obligations to be immediately due, owing and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the DIP Loan Parties; notwithstanding anything herein or in any DIP Document to the contrary, (ii) the termination of the applicable DIP Documents as to any future liability or obligation of the applicable DIP Agent and the applicable DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations), (iii) whether or not the maturity of any of the DIP Obligations shall have been accelerated, proceed to protect, enforce and exercise all rights and remedies of the DIP Secured Parties under the DIP Documents for such DIP Facility or applicable law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in any such DIP Document or any instrument pursuant to which such DIP Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of any of such DIP Secured Parties, and (iv) unless this Court orders otherwise during the Remedies Notice Period (as defined below) after a hearing, upon the occurrence of an Event of Default and the giving of five business days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) (the "Remedies Notice Period") via email to counsel to the Debtors and the office of the United States Trustee for the District of Delaware (the "U.S. Trustee") to (A) withdraw consent to the DIP Loan Parties' continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in the DIP Documents and under applicable law with respect to the DIP Collateral; *provided*, that no such notice shall be required for any exercise of rights or remedies (A) to block or limit |

24

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | withdrawals from any bank accounts that are a part of the Collateral (including, without limitation, by sending any control activation notices to depositary banks pursuant to any control agreement) or (B) in the event of DIP Obligations that have not been Paid in Full (other than contingent indemnification obligations as to which no claim has been asserted) on the applicable termination of the respective DIP Document.<br><br>*See* Interim Order ¶ 15(f) |

### The Debtors' Prepetition Capital Structure

11. The following table summarizes the Debtors prepetition capital structure:

| Funded Debt | Maturity[6] | Outstanding Principal Amount as of July 19, 2019 |
|---|---|---|
| Secured Debt | | |
| Prepetition ABL Facility | September 6, 2022 | $82 million |
| First Lien Term Loan Facility | February 17, 2022 | $639 million |
| Second Lien Term Loan Facility | April 27, 2021 | $318 million |
| Equipment Leases | Varies | $28 million |
| Total Secured Debt | | $1.07 billion |
| Unsecured Debt | | |
| Patriot Unsecured Note | October 28, 2021 | $16 million |
| Total Funded Debt | | $1.09 billion |

## I.    Secured Debt.

### A.    ABL Credit Facility.

12. On September 6, 2017, the Debtors entered into the Prepetition ABL Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "ABL Credit Agreement"), which governs an asset-based revolving credit facility among the Debtors, as borrowers and/or guarantors, MidCap as agent and lender, and additional lenders from time to time party thereto.  The Prepetition ABL Credit Facility matures on September 6, 2022.  Availability of funds under the Prepetition ABL Facility is capped by the

---

[6]    Subject to certain springing maturities, as provided for in the applicable credit agreements.

KE 60285454

lesser of (a) a borrowing base calculated as the sum of certain percentages of value of the Debtors' eligible inventory and eligible accounts receivable and (b) a commitment equal to $85 million.[7] The obligations arising under the Prepetition ABL Credit Agreement are secured by (a) senior, first priority security interests in, and liens upon, substantially all of the Debtors' receivables, inventory, as-extracted collateral, deposit securities, and commodities accounts, items related to each of the foregoing, and the proceeds thereof (collectively, the "ABL Priority Collateral"); and (b) senior, second priority security interests in, and liens upon, the First Lien Priority Collateral (as defined below) (collectively, the "ABL Collateral").    As of the Petition Date, there is approximately $82 million in aggregate principal amount outstanding under the Prepetition ABL Credit Facility.

### B.    Prepetition First Lien Term Loan Credit Facility.

13.    On February 17, 2017, Blackhawk entered into the Prepetition First Lien Term Loan Credit Agreement, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "First Lien Term Loan Agreement"), which governs the $660 million prepetition first lien term loan credit facility (the lenders thereunder, the "First Lien Lenders").  Blackhawk's obligations under the Prepetition First Lien Term Loan Credit Agreement are guaranteed by the other Debtors.   On December 15, 2017, Blackhawk entered into an amendment to the Prepetition First Lien Term Loan Credit Agreement to, among other things, (a) defer the requirement for Blackhawk to make scheduled term loan repayments to certain Prepetition First Lien Term Loan Lenders (the "Initial First Lien B-1 Lenders," and the loans in respect thereof, the "Initial First Lien B-1 Loans"), (b) increase the applicable margin with respect

---

[7]    The Prepetition ABL Credit Agreement originally contemplated a maximum loan amount of $50 million, which was ultimately increased to $85 million pursuant to an amendment dated October 10, 2018.

26

to the Initial First Lien B-1 Loans, and (c) provide for the payment of interest-in-kind to the Initial First Lien B-1 Lenders via the deemed borrowing of $35.5 million from the Initial First Lien B-1 Lenders (resulting in additional principal of $35.5 million due at maturity). The Prepetition First Lien Term Loan Credit Facility matures on February 17, 2022. The obligations arising under the Prepetition First Lien Term Loan Agreement are secured by (i) senior, first priority security interests in, and liens upon, a substantial portion of the Debtors' equipment, real property, equity interests, intellectual property, intercompany indebtedness, and all other assets and property other than the ABL Priority Collateral (collectively, the "First Lien Priority Collateral") and (ii) senior, second priority security interests in, and liens upon, the ABL Priority Collateral. As of the Petition Date, there is approximately $639 million outstanding under the Prepetition First Lien Term Loan Credit Facility.

### C. Prepetition Second Lien Term Loan Credit Facility.

14. On October 28, 2015, Blackhawk entered into the Prepetition Second Lien Term Loan Credit Agreement (as amended restated, amended and restated, supplemented, or otherwise modified from time to time, the "Second Lien Term Loan Agreement"), which governs the $229.2 million Prepetition Second Lien Term Loan Credit Facility (the lenders thereunder, the "Second Lien Lenders" and together with the First Lien Lenders, the "Prepetition Term Loan Lenders"). Blackhawk's obligations under the Prepetition Second Lien Term Loan Credit Agreement are guaranteed by the other Debtors. On December 15, 2017, Blackhawk entered into the Fourth Amendment to the Prepetition Second Lien Term Loan Credit Agreement to, among other things, permit Blackhawk to capitalize, compound, and otherwise add to the unpaid principal amount of certain loans under the Prepetition Second Lien Term Loan Credit Agreement, held by certain Prepetition Second Lien Term Loan Lenders, the interest that otherwise would be payable in cash thereon. The Prepetition Second Lien Term Loan Credit Facility matures on April 27, 2021. The

27

obligations arising under the Prepetition Second Lien Term Loan Credit Agreement are secured by senior, third priority security interests in, and liens upon (a) the First Lien Priority Collateral, subject to the rights of the Prepetition ABL Credit Facility, and (b) the ABL Priority Collateral. As of the Petition Date, there is approximately $318 million outstanding under the Prepetition Second Lien Term Loan Credit Facility.

> **D.     Other Secured Debt.**

15.     Certain of the Debtors entered into equipment financing agreements with Caterpillar Financial Services Corporation, 1st Trust Bank, Inc., NEFPASS LLC, Komatsu Financial Limited Partnership, and Mitsubishi UFJ Lease & Finance (U.S.A.) Inc.  Certain of the Debtors are required to make payments monthly at varying rates described in the equipment financing agreements.  The equipment financing obligations are payable at interest rates between 3.9% and 11.4% with maturity dates ranging from October 2019 through November 2022.  As of the Petition Date, there is approximately $28 million outstanding under the equipment financing agreements.

## II.     Unsecured Note.

16.     On October 28, 2015, Blackhawk issued the Patriot Unsecured Note to PCC Liquidating Trust.  The Patriot Unsecured Note matures on October 28, 2021, and has an aggregate principal amount of approximately $15 million.  Interest on the Patriot Unsecured Note accrues at a rate of 2.00% per year, which is capitalized and added to the principal amount outstanding on the last business day of March, June, September, and December of each year, and is payable in cash upon maturity.  As of the Petition Date, there is approximately $16 million outstanding under the Patriot Unsecured Note.  Blackhawk the only Debtor entity obligated under the Patriot Unsecured Note.  The Debtors and PCC Liquidating Trust have reached a settlement of the Patriot Unsecured Note, which is discussed further in the First Day Declaration.

### III.    Unencumbered Assets.

17.    Due to certain restrictions in certain of the Debtors' mineral leases, as much as approximately 26% of their mineral reserve assets are unencumbered.

<strong><u>The DIP Facilities</u></strong>

### I.    The Debtors' Need for Access to Financing and Use of Cash Collateral.

18.    As described in the First Day Declaration, the Debtors require immediate access to liquidity to ensure that they are able to continue operating during these chapter 11 cases and preserve the value of their estates for the benefit of all parties in interest.  As of the Petition Date, the Debtors' total cash balance was approximately $500,000, which is insufficient to operate their enterprise and continue paying their obligations as they come due.  *See* First Day Decl. ¶ 48. Without immediate postpetition financing and access to Cash Collateral, the Debtors will be unable to pay wages to their employees, pay vendors for equipment and services, meet working capital and business operating needs, preserve and maximize the value of their estates, and administer these chapter 11 cases, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.  *See* First Day Decl. ¶ 11.  Moreover, sufficient post-petition financing is necessary to send a strong market signal that these chapter 11 cases are well-funded. Otherwise customers may seek alternative products and services, and vendors and suppliers may refuse to do business with the Debtors.

19.    The Debtors undertook an analysis of how much postpetition financing would be required to operate the Debtors' business and pay administrative costs during the chapter 11 process.  This analysis included, among other things, assessing the potential acceleration of demands on available liquidity following the commencement of these chapter 11 cases including potential working capital contraction.  Based on this analysis, the Debtors determined that they would require incremental liquidity of approximately $55 million and continued access to an asset-

29

based revolving loan facility to operate smoothly postpetition, and satisfy all administrative costs and expenses. Therefore, the Debtors believe the DIP Facilities are essential to preserve and maximize the value of their estates, and responsibly administer these chapter 11 cases.

## A. Alternative Sources of Financing Are Not Available on Better Terms.

20. The Debtors, with the assistance of their advisors, solicited interest for a $90 million DIP asset-based revolver to primarily refinance the $82 million Prepetition ABL Credit Facility; and a $50 million new money term loan to fund incremental liquidity needs.

21. In April 2019, Centerview solicited interest from seven third-party financial institutions to determine the extent to which third-parties would be willing to provide postpetition financing to the Debtors. *See* Puntus Decl. ¶ 7. The potential third-party lenders contacted by the Debtors included various institutions that routinely provide asset-based debtor-in-possession financing, including both well-known commercial banks and specialty lenders. *See* Puntus Decl. ¶ 7. Of these lenders, six executed confidentiality agreements and received access to non-public information. None of these lenders indicated a willingness to provide the Debtors with DIP financing on an unsecured, junior-lien, or *pari passu* basis. *See* Puntus Decl. ¶ 7. The Debtors received no third-party new money term loan proposals. Regarding a DIP ABL Facility, two third-party lenders submitted proposals with indicative terms, both of which were subject to material due diligence. *See* Puntus Decl. ¶ 7.

22. In addition to third-party lenders, Centerview solicited a DIP asset-based revolver proposal from MidCap, and a new money term loan proposal backstopped by funds managed or advised by Knighthead Capital Management, LLC, Solus Alternative Asset Management LP, and Redwood Capital Management, LLC (collectively, the "Crossover Group"), the primary parties with which the Debtors were negotiating a global restructuring transaction. *See* Puntus Decl. ¶ 8. Over the course of multiple weeks, the Debtors and their advisors engaged in various conversations

30

and extensive negotiations with MidCap, the Crossover Group, and a group of lenders representing approximately 39% of the Debtors' first lien term loan debt (the "First Lien Group") to achieve the best possible terms for the DIP ABL Facility and Term DIP Facility. *See* Puntus Decl. ¶ 9. Following these arm's-length negotiations, the Debtors were able to secure the proposed $240 million DIP Facilities. The negotiations resulted in material concessions being made by MidCap and the Crossover Group, including with respect to interest rates, fees, and other material terms. Significantly, the DIP Facilities were the Debtors' only viable source of postpetition funding and no other, better alternative was reasonably attainable. *See* Puntus Decl. ¶ 9.

### B. The DIP ABL Facility Proposal.

23. MidCap worked constructively with the Debtors through the prepetition process, indicating that it would be willing to provide the DIP ABL Facility under economic terms more favorable than the Prepetition ABL Credit Facility. The Debtors and their advisors negotiated over a number of weeks regarding the structure and economic costs of a proposed DIP ABL Facility. *See* Puntus Decl. ¶ 10. Ultimately, the Debtors' and MidCap agreed to a set of terms that provided the Debtors with necessary access to liquidity during the pendency of these chapter 11 cases on economic terms superior to the terms proposed by competing financing providers. *See* Puntus Decl. ¶ 10. Additionally, by not replacing the Debtors' incumbent lender group and agent with a completely new facility, the Debtors are able to continue to use their existing cash management system (to the extent approved by the Court), rather than having to transition to a completely different commercial banking platform. The Debtors could also leverage the existing Credit Documents to reduce negotiating time and costs.

24. Pending entry of the Final Order, obligations under the Prepetition ABL Credit Facility will roll-up on a "creeping basis." Upon entry of the Final Order, any obligations remaining under the Prepetition ABL Credit Facility will be refinanced by and rolled up into the

DIP ABL Facility. The roll-up of the Prepetition ABL Credit Facility is required by MidCap as a condition to provide postpetition financing. *See* Puntus Decl. ¶ 10. Refinancing these obligations into the DIP ABL Facility will allow the Debtors to continue to make critical investments in their business at an interest rate that is lower that the Prepetition ABL Credit Facility interest rate. *See* Puntus Decl. ¶ 11. Importantly, MidCap reduced fees owed under the Prepetition ABL Credit Facility and DIP ABL Facility (including the Prepetition ABL Credit Facility delayed origination fee) to an amount well below the fees proposed by potential third-party lenders. *See* Puntus Decl. ¶ 11. Therefore, based on the DIP ABL Facility terms and related benefits, the Debtors believe that entry into the DIP ABL Facility with MidCap is in the best interests of the Debtors and their estates.

**C.    The Term DIP Facility Proposal.**

25.    Simultaneously with the DIP ABL Facility negotiations, the Debtors and the Crossover Group engaged in arm's-length negotiations regarding a chapter 11 plan of reorganization and a DIP term loan to fund the plan process. In March 2019, the Crossover Group proposed a $50 million DIP term loan credit facility to be provided by Prepetition First Lien Term Loan Lenders and backstopped by the Crossover Group in connection with a restructuring transaction that would leave the reorganized company with significantly more leverage than would the restructuring ultimately agreed to pursuant to the RSA. *See* Puntus Decl. ¶ 13. Following continued negotiations, the Debtors, the Crossover Group, and the First Lien Group were only willing to move forward with a more comprehensive restructuring that would include the equitization of a significant portion of the Prepetition First Lien Term Loan. *See* Puntus Decl. ¶ 13. As part of the more comprehensive restructuring, the Crossover Group and the First Lien Group were only willing to provide the $50 million New Money Term DIP Loans if the DIP Term Loan also included the roll up of $100 million of Prepetition First Lien Term Loan claims.

*See* Puntus Decl. ¶ 10.  Notably, the Debtors' Prepetition First Lien Term Loan Lenders agreed that upon confirmation of the Debtors' proposed prepackaged Plan, the Term DIP Loans will convert into exit term loans, ensuring that the Debtors will not need to solicit additional sources of capital to fund the Debtors' emergence.  *See* Puntus Decl. ¶ 13.  Importantly, the New Money Term DIP Loan is an integral part of the Debtors' RSA and all of the proposed Term DIP Lenders also signed the RSA documenting their support for the Debtors' proposed plan and solidifying support for a prepackaged, value-maximizing restructuring.

26.    The Term DIP Loans are critical to the Debtors' ability to pay the administrative costs of these chapter 11 cases, and provides the Debtors with sufficient liquidity to operate their business without creating a value-destructive "priming" or valuation dispute at the outset of these chapter 11 cases.  In tandem with the RSA and the DIP ABL Facility, the Term DIP Facility provides a path to emergence that is important to reassure customers and vendors, protect operations, and maximize value for creditors.

**Basis for Relief**

**I.     The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

**A.     Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

27.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facilities, and continue using Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Trans*

33

*World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

28.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

29.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into

34

"hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. ***Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*** This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

30.    The Debtors' determination to move forward with the DIP Facilities is an exercise of their sound business judgment following an arm's length process and careful evaluation of available alternatives. Specifically, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support their operational and chapter 11 activities. The DIP Facilities will allow the Debtors to: (a) fund capital expenditures that are essential to the Debtors' continuation as a going concern; (b) provide the liquidity necessary to continue favorable trade terms with vendors and to reassure other stakeholders; (c) fund payroll obligations; (d) fund the administrative cost of these chapter 11 cases; and (e) provide a path to emergence by allowing the Debtors to implement the restructuring contemplated by the RSA and the Plan. The Debtors negotiated the DIP Facilities and other DIP Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available under the circumstances.

35

Accordingly, the Court should authorize the Debtors' entry into the DIP Credit Agreement, as it is a reasonable exercise of the Debtors' business judgment.

**B.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

31.    The Debtors propose to obtain financing under the DIP Facilities by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders postpetition security interest in and liens on the DIP Collateral (as defined in the Interim Order) and Prepetition Collateral that are valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order.

32.    The above-described liens on encumbered and unencumbered assets are common features of postpetition financing facilities, and as set forth in greater detail in the Puntus Declaration, were a necessary feature here to provide security for the proposed financings.  Indeed, postpetition financing facilities approved in this Circuit and elsewhere routinely are secured by the proceeds of a debtor's unencumbered assets such as leaseholds that are subject to leases that prohibit the impositions of liens thereon.  *See, e.g.*, *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law); *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (same); *In re Am. Apparel, LLC*, No. 16-12551 (Bankr. D. Del. Dec. 12, 2016) (same); *In re Vestis Retail Grp., LLC*, No. 16-10971 (Bankr. D. Del. Jun. 1, 2016) (same); *In re Quicksilver, Inc.*, No. 15-11880 (Bankr. D. Del. Oct. 28, 2015) (same).

33.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)

KE 60285454

of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.   the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.   the credit transaction is necessary to preserve the assets of the estate; and

c.   the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

34.   As described above and as set forth in the Puntus Declaration, due to the high amount of the Debtors' existing secured debt obligations, each third-party lender indicated it would be unwilling to provide postpetition DIP financing on an unsecured, *pari passu*, or junior-lien basis to the Prepetition Secured Parties. *See* Puntus Decl. ¶ 7. Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders. The Debtors, however, also negotiated with their creditors and surveyed certain potential lending sources for actionable alternative proposals—but determined that the DIP Facilities provided the best collective opportunity available to the Debtors under the circumstances to fund these chapter 11 cases. *See* Puntus Decl. ¶ 9.

35.   Absent the DIP Facilities, which will provide assurances that the Debtors will have sufficient liquidity to administer these chapter 11 cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. *See* First Day Decl. ¶¶ 48–49. Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise, continue paying

their debts as they come due, and cover the projected costs of these chapter 11 cases.  *See* First Day Decl. ¶¶ 48–49.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facilities, as set forth in the DIP Documents, are reasonable as more fully set forth above and in the Puntus Declaration.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

36.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien."  As described above, the Debtors are unable to obtain unsecured credit.  Therefore, approving a superpriority claim in favor of the DIP Lenders is reasonable and appropriate.

37.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  The Debtors may incur "priming" liens under the DIP Facilities if either (a) the Prepetition Lenders have consented or (b) Prepetition Lenders' interest in collateral are adequately protected.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the

38

DIP Facilities if either (a) their Prepetition Lenders have consented or (b) Prepetition Lenders' interests in collateral are adequately protected.

38.    Here, MidCap and the substantial majority of the Prepetition Term Loan Lenders have affirmatively consented to the DIP Facilities and actively participated in facilitating the proposed DIP Facilities, and the Second Lien Lenders are deemed to have consented pursuant to the Prepetition Intercreditor Agreements.  Moreover, as set forth more fully in the Interim Order, the Debtors propose to provide a variety of adequate protection to protect the interests of the Prepetition Secured Parties.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

### C.    No Comparable Alternative to the DIP Facilities Are Reasonably Available on More Favorable Overall Terms.

39.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that

section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show

that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

40.    As noted above, the Debtors do not believe that a more favorable alternative DIP

financing is reasonably available given the realities imposed by the Debtors' existing capital

structure and the Debtors' solicitation of alternative financing proposals.    Additionally, the

Debtors' overall restructuring is closely tied to the successful transaction described in the RSA.

Thus, the Debtors have determined that the DIP Facilities provide the most favorable terms

whereby the DIP ABL Facility provided by MidCap offers the most efficient transaction costs

while reducing execution risks, and the Term DIP Loan provided by the Term DIP Lenders is an

integral piece of the debt reduction included in the RSA and is provided on reasonable terms under

the circumstances.    Simply put, the DIP Facilities provide the Debtors with the liquidity they need

at the lowest cost available while simultaneously placing the Debtors on an optimal path for a

successful restructuring.    Therefore, the Debtors submit that the requirement of section 364 of the

Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is

satisfied.

### D.    The Repayment Features of the DIP Facilities Are Appropriate.

41.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease

property, other than in the ordinary course of business, with court approval.    It is well settled in

the Third Circuit that such transactions should be approved when they are supported by a sound

business purpose.    *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the

Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b)

of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business

justification for the proposed transaction).    The business judgment rule shields a debtor's

management from judicial second-guessing.    *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16

(Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

42.    Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor in possession financing arrangements.  Courts in this jurisdiction have approved similar DIP features, including on the first day of the case.  *See, e.g.*, *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an approximately $1,230 million DIP, including a full roll-up of the prepetition ABL outstanding principal of $639 million and an additional $250 million in additional liquidity, pursuant to interim order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338 million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of $114 million, pursuant to interim order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim order); *In re Real Indus. Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Nov. 20, 2017) (authorizing approximately $365 million DIP that included a creeping roll-up pursuant to interim order and a full roll-up pursuant to final order of approximately $266 million prepetition debt); *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (authorizing approximately $90 million DIP that included a full ABL roll-up of approximately $22 million prepetition debt pursuant to interim order).[8]

43.    The DIP ABL Facility will roll up the full amount outstanding under the Prepetition ABL Credit Agreement in addition to providing the Debtors with additional liquidity.  In addition,

---

[8]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

KE 60285454

the Term DIP Facility will roll up $100 million of the Debtors' Prepetition First Lien Term Loans in addition to providing $50 million in new money financing.

44.     The roll up of funds is a sound exercise of the Debtors' business judgment, is a material component of the DIP Facilities, and is required by the DIP ABL Lenders and the Term DIP Lenders as a condition to their commitments to provide postpetition financing.  *See* Puntus Decl. ¶ 11, 13.  The Debtors were unable to obtain DIP financing on similar terms that did not provide for the repayment of prepetition amounts.  *See* Puntus Decl. ¶ 11, 13.

45.     In addition, refinancing the DIP ABL Obligations into the DIP ABL Facility will allow the Debtors to continue to make critical investments in their business at an interest rate that is lower than the prepetition interest rate including default interest.  Moreover, MidCap reduced the fees owed under the Prepetition ABL Credit Facility and the DIP ABL Facility (including the Prepetition ABL Credit Facility's delayed origination fee) to amounts well below the fees proposed by potential third-party providers.  *See* Puntus Decl. ¶ 11.  Therefore, it is favorable to the Debtors and to all stakeholders that the Debtors enter into the DIP ABL Credit Agreement as soon as possible.

46.     Likewise, the Term DIP Lenders were only willing to provide the $50 million New Money Term DIP Loan if it included the $100 million Term DIP Roll-Up Loan.  The Term DIP Loans are a critical part of a comprehensive restructuring that includes each Term DIP Lender's signature to the Debtors' RSA.  *See* Puntus Decl. ¶ 14.  The Term DIP Loans are also critical to the Debtors' ability to pay the administrative costs of the chapter 11 cases.  *See* Puntus Decl. ¶ 14.

47.     The roll up of the prepetition amounts owed under the Prepetition ABL Facility merely accelerates the satisfaction of the obligations owed under the Prepetition ABL Credit Facility without affecting recovery to other creditors because the Debtors believe that these

obligations are fully secured by perfected, first priority liens with respect to, among other things, inventory and receivables, with a value in excess of outstanding borrowings.

48.     Absent support from MidCap and the Crossover Group, the Debtors' chapter 11 cases would likely devolve into a costly priming fight.  The roll up of the Prepetition ABL Loans merely affects the timing, not the amount or certainty, of MidCap's recovery—the secured claims arising on account of the Prepetition ABL Loans are required by section 1129 of the Bankruptcy Code to be satisfied in full before recoveries to junior creditors may be provided, absent consent of such secured parties (which consent the Debtors do not have here).  Given these circumstances, repayment of the Prepetition ABL Loans is reasonable, and a sound exercise of the Debtors' business judgment.

## II.    The Debtors Should Be Authorized to Use the Cash Collateral.

49.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use Cash Collateral with the consent of the secured party.  Here, the DIP Lenders and the Prepetition Lenders consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

50.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses Cash Collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made

43

on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6

(Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS),

2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will

dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992

WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("what interest is entitled to adequate protection

and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re*

*Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy

¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms

and "must be determined based upon equitable considerations arising from the particular facts of

each proceeding")).

### A.    Adequate Protection Provided to the Prepetition ABL Lender.

51.    As set forth in the Interim Order, the Debtors propose to provide the Prepetition

Secured Parties with a variety of adequate protection to protect against the postpetition diminution

in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the

Debtors and the imposition of the automatic stay (collectively, the "ABL Adequate Protection

Obligations"), including:

> a.    the reasonable professional fees and expenses of the Prepetition ABL Agent and Prepetition ABL Lenders;
>
> b.    the roll-up of the Prepetition ABL Obligations into DIP ABl Obligations in accordance with the DIP ABL Credit Agreement and DIP Orders;
>
> c.    payment of post-petition interest at the non-default rate under the Prepetition ABL Credit Agreement;
>
> d.    valid and perfected replacement security interests in and liens on the Collateral (subject to the Carve Out and the priorities set out In the Interim Order);

44

      e.     allowed, superpriority administrative claims under sections 503(b) and 507(b) of the Bankruptcy Code (subject to the Carve Out and the priorities set out in the Interim Order); and

      f.     financial reporting and other reports and notices delivered by the Company under the DIP ABL Facility.

**B.    Adequate Protection Provided to the Prepetition First Lien Term Loan Lenders.**

52.    As described more fully below, and as set forth in the Interim Order, the Debtors propose to provide the Prepetition Term Loan Lenders with a variety of adequate protection to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the "First Lien Adequate Protection Obligations"):

      a.     the reasonable professional fees and expenses of certain of the Prepetition First Lien Secured Parties;

      b.     valid and perfected replacement security interests in and liens on the Collateral (subject to the Carve Out and the liens priorities set forth in the Interim Order);

      c.     allowed, superpriority administrative claims under section 507(b) of the Bankruptcy Code (subject to the Carve Out and the priorities set out in the Interim Order); and

      d.     financial reporting and other reports and notices delivered by the Company under the Term DIP Facility.

**C.    Adequate Protection Provided to the Prepetition Second Lien Term Loan Lenders.**

53.    As described more fully below, and as set forth in the Interim Order, the Debtors propose to provide the Prepetition Second Lien Term Loan Lenders with adequate protection to protect against the postpetition diminution in value of relevant collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the "Second Lien Adequate Protection Obligations" and together with the ABL

Adequate Protection Obligations and the First Lien Adequate Protection Obligations, the "Adequate Protection Obligations"):

      a.      the reasonable professional fees and expenses of certain of the Prepetition Second Lien Term Loan Lenders;

      b.      allowed, superpriority administrative claims under section 507(b) of the Bankruptcy Code (subject to the Carve Out and the priorities set out in the Interim Order);

      c.      valid and perfected replacement security interests in and liens on the Collateral (subject to the Carve Out and the priorities set out in the Interim Order); and

      d.      financial reporting and other reports and notices delivered by the Company under the Term DIP Facility.

54.      The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from any potential diminution in value to the Cash Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition Secured Parties agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate.  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders Under the DIP Documents.**

55.      Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agents and the DIP Lenders.  In particular, as noted above, the Debtors have agreed to pay the following fees:

      a.      to the DIP ABL Agent for the benefit of the DIP ABL Lenders:

        (i).     an unused line fee of 0.50% of the average daily balance of the unused portion of the DIP Revolving Loan Commitment (as defined in the DIP ABL Credit Agreement), payable monthly in arrears; and

        (ii).     an exit fee of 1.50% of the DIP Revolving Loan Commitment Amount (as defined in the DIP ABL Credit Agreement).

    b.     to the Term DIP Lenders:

        (i).     an up-front fee of 1.00% of the aggregate principal amount of the New Money Term DIP Loans;

        (ii).     an unused line fee of 1.00% per annum on the actual daily amount of the unused delayed draw New Money Term DIP Loans; and

        (iii).     an exit fee of 1.00% of the aggregate principal amount of the New Money Term DIP Loans.

56.    Courts in this district and others have approved similar aggregates in fees in large chapter 11 cases. *See In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (approving a cash fee approximately 2.0 percent of the overall DIP facility); *In re PES Holdings LLC*, No. 18-10122 (KG) (Bankr. D. Del. Jan. 22, 2018) (same); *In re Toys "R" US, Inc.,* No. 17-34665 (KLP) (Bankr. E.D.Va. Sept. 19, 2017) (approving aggregate fees that were just less than 3.0 percent of the overall DIP facility).

57.    It is understood and agreed by all parties, that these fees are an integral component of the overall terms of the DIP Facilities, and were required by the DIP Lenders as consideration for the extension of postpetition financing. *See* Puntus Decl. ¶ 18. Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

## IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).

58.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

59.     As explained herein, in the Puntus Declaration, and in the First Day Declaration, the DIP Documents are the result of:  (a) the Debtors' reasonable and informed determination that the DIP Lenders provided the best postpetition financing alternative available under the circumstances and (b) extended arm's length, good-faith negotiations between the Debtors and the DIP Lenders.  The Debtors submit that the terms and conditions of the DIP Documents are reasonable under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## V.    The Automatic Stay Should Be Modified on a Limited Basis.

60.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The proposed Interim Order further provides that the automatic stay is modified as

KE 60285454

necessary to permit the Debtors to grant liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of a DIP Event of Default or Event of Default (as defined in the DIP Credit Agreements) and an appropriate opportunity for the Debtors to obtain appropriate relief from the Court, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agents to exercise all rights and remedies in accordance with the DIP Documents, or applicable law.

61.    Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (modifying automatic stay as necessary to effectuate the terms of the order); *ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (same); *In re In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (same); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event).

## VI.    Failure to Obtain Immediate Interim Access to the DIP Facilities and Cash Collateral Would Cause Immediate and Irreparable Harm.

62.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

KE 60285454

63.     For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral, and access the liquidity provided by the DIP Facilities.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash.  The Debtors will use cash, among other things, to fund the operation of their business, including to ensure that vendors continue to manufacture and ship inventory, and to fund the administration of these chapter 11 cases.  Substantially all of the Debtors' available cash constitutes the Cash Collateral of the Prepetition ABL Lenders and the Prepetition First Lien Term Loan Lenders and Prepetition Second Lien Term Loan Lenders.  The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 cases without access to Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest. *See* First Day Declaration ¶¶ 48–49.  In short, the Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

64.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facilities.  The Debtors require the initial funding under the DIP Facilities prior to the Final Hearing and entry of the Final Order to continue operating, pay their administrative expenses, and to implement the relief requested in the Debtors' other "first day" motions.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## **Request for Final Hearing**

65.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after 25 days

after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

66.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

67.    The Debtors have provided notice of this motion to the following parties or their respective counsel:  (a) the office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' prepetition asset-based revolving credit facility; (d) the administrative agent under the Debtors' Prepetition First Lien Term Loan Credit Facility; (e) the administrative agent under the Debtors' prepetition second lien term loan facility; (f) counsel to the Crossover Group; (g) counsel to the First Lien Group; (h) the administrative agent under the Debtors' proposed debtor in possession term loan financing facility; (i) the administrative agent under the Debtors' proposed debtor in possession asset-based revolving financing facility; (j) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors operate; (k) the office of the attorneys general for the states in which the Debtors operate; (l) the United States Attorney's Office for the District of Delaware; (m) the Internal Revenue Service; (n) the Term DIP Lenders; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

KE 60285454

## No Prior Request

68.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally blank]*

KE 60285454

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  July 19, 2019
Wilmington, Delaware

/s/ *L. Katherine Good*

Christopher M. Samis (DE 4909)
L. Katherine Good (DE 5101)
**POTTER ANDERSON CORROON LLP**
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, Delaware 19801-6108
Telephone:    (302) 984-6000
Facsimile:    (302) 658-1192
Email:    csamis@potteranderson.com
          kgood@potteranderson.com

*Proposed Counsel to the Debtors and Debtors in Possession*

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
Joseph M. Graham (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
          ross.kwasteniet@kirkland.com
          joe.graham@kirkland.com

- and -

Stephen E. Hessler, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    stephen.hessler@kirkland.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| BLACKHAWK MINING LLC, *et al.*,[1] | ) | Case No. 19-11595 (LSS) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of Blackhawk Mining LLC (the "**Company**"), and its affiliated debtors, each as a debtor and debtor in possession (collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**") pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  Blackhawk Mining LLC (5600); Blackhawk Coal Sales, LLC (9456); Blackhawk Land and Resources, LLC (7839); Blackhawk River Logistics, LLC (3388); Blue Creek Mining, LLC (2427); Blue Diamond Mining, LLC (3488); Eagle Shield, LLC (6721); FCDC Coal, Inc. (6188); Guyandotte Mining, LLC (4882); Hampden Coal, LLC (8241); Kanawha Eagle Mining, LLC (0586); Logan & Kanawha, LLC (3178); Panther Creek Mining, LLC (0627); Pine Branch Land, LLC (9661); Pine Branch Mining, LLC (9681); Pine Branch Resources, LLC (9758); Redhawk Mining, LLC (0852); Rockwell Mining, LLC (3874); Spruce Pine Land Company (2254); Spurlock Mining, LLC (2899); Triad Mining, LLC (7713); and Triad Trucking, LLC (6112).  The location of the Debtors' service address in these chapter 11 cases is 3228 Summit Square Place, Suite 180, Lexington, Kentucky 40509.

[2]    Capitalized terms used herein and not herein defined have the meaning ascribed to such terms in the Motion.

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "**Local Bankruptcy Rules**") seeking, among other things:

(i)  authorization for (x) the Company and certain of its subsidiaries party to the DIP ABL Credit Agreement (as defined below) as borrowers (collectively, the "**DIP ABL Borrowers**") to obtain postpetition financing as set forth in the DIP ABL Financing Documents (as defined below) (the "**DIP ABL Financing**"), and for the DIP ABL Guarantors[3] (together with the DIP ABL Borrowers, the "**DIP ABL Loan Parties**") to guaranty the obligations (the "**DIP ABL Obligations**") of the DIP ABL Borrowers in connection with the DIP ABL Financing; and (y) the Company to obtain postpetition financing as set forth in the Term DIP Documents (as defined below) (the "**Term DIP Financing**" and, together with the DIP ABL Financing, the "**DIP Financing**"), and for the Term DIP Guarantors[4] (together with the Company, the "**Term DIP Loan Parties**"; the Term DIP Loan Parties and the DIP ABL Loan Parties are collectively referred to herein as the "**DIP Loan Parties**") to guaranty the obligations (the "**Term DIP Obligations**" and, together with the DIP ABL Obligations, the "**DIP Obligations**") of the Company in connection with the Term DIP Financing; the DIP Financing consisting of:

(I)  a superpriority debtor-in-possession asset-based revolving credit facility made available to the DIP ABL Borrowers in an aggregate principal amount of up to $90,000,000 (the "**DIP ABL Facility**"), pursuant to the terms and conditions of that certain Senior Secured Superpriority Debtor in Possession ABL Credit Agreement (as may be amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP ABL Credit Agreement**"), among the DIP ABL Borrowers, the DIP ABL Guarantors and MidCap Funding IV Trust, as administrative agent (in such capacity, the "**DIP ABL Agent**"), the lenders party thereto, including their respective successors and assigns (the "**DIP ABL Lenders**" and, together with the DIP ABL Agent, the "**DIP ABL Secured Parties**"), substantially in the form attached to the Motion as **<u>Exhibit B</u>**; and

(II)  a superpriority debtor-in-possession term loan credit facility made available to the Company in an aggregate principal amount of up to $150,000,000 (the "**Term DIP Facility**" and, together with the

---

[3]  The "**DIP ABL Guarantors**" shall mean, collectively, the "Guarantors" (as defined in the DIP ABL Credit Agreement).

[4]  The "**Term DIP Guarantors**" shall mean, collectively, the "Guarantors" (as defined in the Term DIP Credit Agreement).

DIP ABL Facility, the "**DIP Facilities**") to be provided by certain of the Prepetition First Lien Term Loan Lenders (as defined below) or their designees (in their capacity as lenders under the Term DIP Facility, the "**Term DIP Lenders**") in the form of (X) new money term loans (the "**New Money Term DIP Loans**") in an aggregate principal amount of up to $50 million and (Y) roll-up term loans (the "**Term DIP Roll-Up Loans**" and, together with the New Money Term DIP Loans, the "**Term DIP Loans**"), which shall be secured on a junior basis to the New Money Term DIP Loans, to convert Prepetition First Lien Term Loans (as defined below) held by the Term DIP Lenders in the aggregate principal amount of up to $100 million, in each case pursuant to the terms and conditions of that certain Senior Secured Debtor-in-Possession Term Loan Credit Agreement (as may be amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**Term DIP Credit Agreement**" and, together with the DIP ABL Credit Agreement, the "**DIP Credit Agreements**"), among the Company, the Term DIP Guarantors, the Term DIP Lenders and Cantor Fitzgerald Securities ("**Cantor**"), as administrative agent and collateral agent (in such capacities, the "**Term DIP Agent**" and, together with the DIP ABL Agent, the "**DIP Agents**"; the Term DIP Lenders together with the Term DIP Agent, the "**Term DIP Secured Parties**"; the Term DIP Secured Parties, together with the DIP ABL Secured Parties are collectively referred to herein as the "**DIP Secured Parties**"), substantially in the form attached to the Motion as **Exhibit C**;

(ii)     authorization for:

(I)      the DIP ABL Borrowers and the DIP ABL Guarantors to execute and enter into the DIP ABL Credit Agreement, the Security Agreement (as defined in the DIP ABL Credit Agreement) and any other agreements, instruments, pledge agreements, guarantees, security agreements, intellectual property security agreements, control agreements, notes and other DIP ABL Financing Documents (as defined in the DIP ABL Credit Agreement) and documents related thereto, including, without limitation, the "Fee Letter" (as defined in the DIP ABL Credit Agreement), and the DIP ICA (as defined below) (as each of the foregoing may be amended, restated, supplemented, waived, and/or modified from time to time in accordance with the terms hereof and thereof, and collectively with the DIP ABL Credit Agreement, the "**DIP ABL Financing Documents**") and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP ABL Financing Documents;

3

(II)  the Company and the Term DIP Guarantors to execute and enter into the Term DIP Credit Agreement, Security Agreement (as defined in the Term DIP Credit Agreement)and any other agreements, instruments, pledge agreements, guarantees, security agreements, intellectual property security agreements, control agreements, notes and other Credit Documents (as defined in the Term DIP Credit Agreement) and documents related thereto, including, without limitation, the DIP ICA (as each of the foregoing may be amended, restated, supplemented, waived, and/or modified from time to time in accordance with the terms hereof and thereof, and collectively with the Term DIP Credit Agreement, the "**Term DIP Documents**"; the Term DIP Documents together with the DIP ABL Financing Documents, are collectively referred to herein as the "**DIP Documents**") and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the Term DIP Documents;

(iii)  the DIP Loan Parties to apply the Debtors' prepetition and postpetition accounts receivable to the outstanding principal balance of the Prepetition ABL Debt (as defined below) and, upon entry of the Final Order (as defined below) use the proceeds of the DIP ABL Financing to refinance the remainder of the Prepetition ABL Debt, including interest and fees through the date of repayment (at the non-default contract rate), which refinancing shall be indefeasible upon the occurrence of the ABL Discharge;[5]

(iv)  until the occurrence of the ABL Discharge, the granting of Postpetition liens to the Prepetition ABL Agent (as defined below) and the Prepetition ABL Lenders (as defined below) in connection with the Prepetition ABL Credit Agreement (as defined below);

(v)  authorization to convert $2.00 of Prepetition First Lien Term Loan Debt (up to an aggregate principal amount of $100 million) held by the Term

---

[5]  "**ABL Discharge**" means the indefeasible payment of the Prepetition ABL Debt (as defined below) in full in cash, including interest and fees through the date of repayment (at the non-default contract rate), which shall be deemed to have occurred if no adversary proceeding or contested matter is timely and properly asserted in accordance with this Interim Order and the Final Order (as defined below) with respect to the Prepetition ABL Debt or against any Prepetition ABL Secured Party (as defined below), or if such an adversary proceeding or contested matter is timely and properly asserted in accordance with this Interim Order and the Final Order, upon the final disposition of such adversary proceeding or contested matter in favor of the applicable Prepetition ABL Secured Party or Parties by order of a court of competent jurisdiction; *provided* that, for the avoidance of doubt, interest shall cease to accrue on the Prepetition ABL Debt upon the repayment in full in cash, including interest and fees through the date of repayment, of the Prepetition ABL Debt upon the entry of the Final Order unless the Prepetition ABL Debt is reinstated.

DIP Lenders into Term DIP Roll-Up Loans for each $1.00 of New Money Term DIP Loans funded by the Term DIP Lenders;

(vi)    authorization for the DIP Loan Parties to grant adequate protection to the Prepetition Secured Parties (as defined below) under, or in connection with, or according to the priorities of, the following agreements, as applicable:

(I)    that certain Credit Agreement, dated as of September 6, 2017 (as amended, supplemented, restated or otherwise modified prior to the Petition Date (as defined below), the "**Prepetition ABL Credit Agreement**" and, the facility thereunder, the "**Prepetition ABL Credit Facility**"), among the DIP ABL Borrowers, the guarantors party thereto (the "**Prepetition ABL Guarantors**"), MidCap Funding IV Trust, as successor agent (the "**Prepetition ABL Agent**"), the lenders party thereto (the "**Prepetition ABL Lenders**" and, together with the Prepetition ABL Agent and any other "Secured Creditor" as defined in the Prepetition ABL Credit Agreement, the "**Prepetition ABL Secured Parties**"), and those certain Security Documents (as defined in the Prepetition ABL Credit Agreement and, collectively with the Prepetition ABL Credit Agreement, and all other documentation executed in connection therewith, the "**Prepetition ABL Financing Documents**");

(II)    First Lien Term Loan Agreement, dated as of February 17, 2017 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "**Prepetition First Lien Term Loan Credit Agreement**," the facility thereunder, the "**Prepetition First Lien Term Loan Credit Facility**," and the loans extended thereunder, the "**Prepetition First Lien Term Loans**"), among the Company, as borrower, the guarantors party thereto (the "**Prepetition First Lien Term Loan Guarantors**"), Cantor, as successor administrative agent and collateral agent (the "**Prepetition First Lien Term Loan Agent**"), and the lenders party thereto (the "**Prepetition First Lien Term Loan Lenders**" and, together with the Prepetition First Lien Term Agent, the "**Prepetition First Lien Term Loan Secured Parties**"), and those certain Credit Documents (as defined in the Prepetition First Lien Term Loan Credit Agreement and, collectively with the Prepetition First Lien Tern Loan Credit Agreement, and all other documentation executed in connection therewith, the "**Prepetition First Lien Term Loan Documents**");

(III)    Second Lien Term Loan Agreement, dated as of October 28, 2015 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "**Prepetition Second Lien Term Loan**

5

Credit Agreement"[6] and, the facility thereunder, the "**Prepetition Second Lien Term Loan Credit Facility**"[7]), among the Company, as borrower, the guarantors party thereto (the "**Prepetition Second Lien Term Loan Guarantors**"), Cortland Capital Market Services, LLC, as administrative agent and collateral agent (the "**Prepetition Second Lien Term Loan Agent**" and together with the Prepetition First Lien Term Loan Agent and Prepetition ABL Agent, the "**Prepetition Agents**"), and the lenders party thereto (the "**Prepetition Second Lien Term Loan Lenders**[8]" and, together with the Prepetition Second Lien Term Loan Agent, the "**Prepetition Second Lien Term Loan Secured Parties**"[9]), and those certain Credit Documents (as defined in the Prepetition Second Lien Credit Agreement and, collectively with the Prepetition Second Lien Credit Agreement, and all other documentation executed in connection therewith, the "**Prepetition Second Lien Term Loan Documents**" and together with the Prepetition First Lien Term Loan Documents and Prepetition ABL Financing Documents, the "**Prepetition Documents**"));

(IV)    ABL Intercreditor Agreement, dated as of September 6, 2017 (as amended, restated or otherwise modified from time to time, the "**Prepetition ABL Intercreditor Agreement**") entered into between the Prepetition ABL Agent, the Prepetition First Lien Term Loan Agent, and one or more of the Debtors;

(V)    Amended and Restated Junior Priority Intercreditor Agreement, dated as of February 17, 2017 (as amended, restated or otherwise modified from time to time, the "**Prepetition Junior Lien Intercreditor Agreement**" and, together with the Prepetition ABL Intercreditor Agreement, the "**Prepetition Intercreditor Agreements**") entered into between the Prepetition ABL Agent,

---

[6]    The Prepetition ABL Credit Agreement, the Prepetition First Lien Term Loan Credit Agreement and the Prepetition Second Lien Term Loan Credit Agreement are collectively referred to as the "**Prepetition Credit Agreements**."

[7]    The Prepetition ABL Credit Facility, the Prepetition First Lien Term Loan Credit Facility and the Prepetition Second Lien Term Loan Credit Facility are collectively referred to as the "**Prepetition Credit Facilities**."

[8]    The Prepetition First Lien Term Loan Lenders and the Prepetition Second Lien Term Loan Lenders are collectively referred to as the "**Prepetition Term Loan Lenders**", and, together with the Prepetition ABL Lenders, the "**Prepetition Lenders**."

[9]    The Prepetition First Lien Term Loan Secured Parties and the Prepetition Second Lien Term Loan Secured Parties are collectively referred to as the "**Prepetition Term Loan Secured Parties**", and, together with the Prepetition ABL Secured Parties, the "**Prepetition Secured Parties**".

the Prepetition First Lien Term Loan Agent, the Prepetition Second Lien Term Loan Agent and one or more of the Debtors;

(vii)    subject to the restrictions set forth in the DIP Documents and this Interim Order (the "**Interim Order**"), authorization for the DIP Loan Parties to continue to use Cash Collateral (as defined below) and all other Prepetition Collateral (as defined below) in which any of the Prepetition Secured Parties has an interest, and to grant adequate protection to the Prepetition Secured Parties with respect to, *inter alia*, such use of Cash Collateral and other Prepetition Collateral;

(viii)    authorization for the DIP Loan Parties to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable, including, but not limited to, unused line commitment fees, upfront fees, structuring fees, backstop fee, closing fees, exit fees, prepayment fee, audit fees, appraisal fees, valuation fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agents' and DIP Lenders' attorneys, advisors, accountants, appraisers, bankers, and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(ix)    approval of certain stipulations by the Debtors with respect to the Prepetition Documents and the liens, claims, and security interests arising therefrom;

(x)    the granting to the DIP Secured Parties of allowed superpriority claims, subject to the Carve-Out (as defined below), pursuant to section 364(c)(1) of the Bankruptcy Code payable from and having recourse to all assets of the DIP Loan Parties;

(xi)    the granting to the DIP Secured Parties of liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the DIP Loan Parties' estates and all proceeds thereof, including, subject only to and effective upon entry of the Final Order, any Avoidance Proceeds (as defined below), in each case subject to the Carve-Out and with the relative priorities set forth in this Interim Order and on **Exhibit A** hereto;

(xii)    subject to entry of the Final Order, a waiver of (a) the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral (as defined below) (together, the "**Collateral**") pursuant to section 506(c) of the Bankruptcy Code, and (b) any right of the Debtors under the "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xiii)    modification of the automatic stay to the extent set forth herein and in the DIP Documents;

(xiv)    the scheduling of an interim hearing (the "**Interim Hearing**") on the Motion to be held before this Court to consider entry of the Interim Order; and;

(xv)    the scheduling of a final hearing (the "**Final Hearing**") to be held within 30 days of the entry of the Interim Order to consider final approval of the DIP Facilities and use of Cash Collateral pursuant to a proposed final order (the "**Final Order**"), as set forth in the Motion and the DIP Documents filed with this Court;

and due and appropriate notice of the Motion and the Interim Hearing having been served by the Debtors on the parties identified in the Motion, and it appearing that no other or further notice need be provided; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and the Court having reviewed the Motion; and pursuant to Bankruptcy Rule 4001, the Interim Hearing on the Motion having been held by this Court on [July __, 2019]; and the relief requested in the Motion being in the best interests of the Debtors, their creditors and their estates and all other parties in interest in these Chapter 11 Cases; and the Court having determined that the relief requested in the Motion is necessary to avoid immediate and irreparable harm; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the record made by the Debtors in the Motion, the *Declaration of Marc D. Puntus in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**Puntus Declaration**"), the *Declaration of Jesse M. Parrish, Chief Financial Officer of Blackhawk Mining LLC, in Support of the Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"), the DIP Documents, and in the evidence submitted and arguments

made by the Debtors at the Interim Hearing, and after due deliberation and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Disposition.*  The relief requested in the Motion is GRANTED ON AN INTERIM BASIS in accordance with the terms of this Interim Order.  Any and all objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, settled, or resolved and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

2.    *Petition Date*.  On July 19, 2019 (the "**Petition Date**"), each Debtor filed a voluntary petition (each, a "**Petition**") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

3.    *Jurisdiction.*  This Court has core jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.    *Committee Formation*.  As of the date hereof, no official committee of unsecured creditors under section 1102 of the Bankruptcy Code (the "**Committee**") or any other statutory committee has been appointed in the Chapter 11 Cases.

5.    *Notice*.  Appropriate notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.  No other or

further notice of this Interim Order shall be required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

6.    *Debtors' Stipulations*.  Without prejudice to the rights of any other party in interest and subject to the limitations thereon contained in paragraphs 26 and 28 below, the Debtors admit, stipulate and agree that:

(a)    (i) as of the Petition Date: (A) the DIP ABL Borrowers and the Prepetition ABL Guarantors were justly and lawfully indebted and liable to the Prepetition ABL Secured Parties, without defense, counterclaim, recoupment or offset of any kind, in the aggregate principal amount of not less than $85,000,000 in respect of loans made to the DIP ABL Borrowers, plus accrued and unpaid interest thereon and fees, expenses (including, without limitation, any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition ABL Financing Documents), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition ABL Financing Documents (the "**Prepetition ABL Debt**"), which Prepetition ABL Debt has been guaranteed on a joint and several basis by all of the Prepetition ABL Guarantors; (B) the Company and the Prepetition First Lien Term Loan Guarantors were justly and lawfully indebted and liable to the Prepetition First Lien Term Loan Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than approximately $538,974,437 in respect of loans made by the Prepetition First Lien Term Loan Lenders pursuant to, and in accordance with the terms of, the Prepetition First Lien Term Loan Documents, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial

advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition First Lien Term Loan Documents), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition First Lien Term Loan Documents (collectively, the "**Prepetition First Lien Term Loan Debt**"), which Prepetition First Lien Term Loan Debt has been guaranteed on a joint and several basis by all of the Prepetition First Lien Term Loan Guarantors and (C) the Company and the Prepetition Second Lien Term Loan Guarantors were justly and lawfully indebted and liable to the Prepetition Second Lien Term Loan Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than approximately $318,307,228 in respect of loans made by the Prepetition Second Lien Term Loan Lenders pursuant to, and in accordance with the terms of, the Prepetition Second Lien Term Loan Documents, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Second Lien Term Loan Documents), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Second Lien Term Loan Documents (collectively, the "**Prepetition Second Lien Term Loan Debt**" and, together with the Prepetition ABL Debt and Prepetition First Lien Term Loan Debt, the "**Prepetition Debt**"), which Prepetition Second Lien Term Loan Debt has been guaranteed on a joint and several basis by all of the Prepetition Second Lien Term Loan Guarantors; (ii) the Prepetition Debt constitutes the legal, valid, binding, and non-avoidable obligations of the applicable Prepetition Borrowers[10] and the applicable Prepetition Guarantors,[11]

---

[10]    "**Prepetition Borrowers**" shall mean, in the case of the Prepetition First Lien Term Loan Debt and the Prepetition Second Lien Term Loan Debt, the Company and, in the case of the Prepetition ABL Debt, the DIP ABL Borrowers.

enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (iii) no portion of the Prepetition Debt or any payment made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Prepetition Documents prior to the Petition Date is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law;

(b)    as of the Petition Date, the liens and security interests granted to the Prepetition ABL Secured Parties (the "**Prepetition ABL Liens**") pursuant to and in connection with the Prepetition ABL Financing Documents are: (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the Prepetition ABL Priority Collateral;[12] (ii) valid, binding, perfected, enforceable, second-priority liens and security interests in the Prepetition Term Loan Priority Collateral[13] (together with the Prepetition ABL Priority Collateral, the "**Prepetition Collateral**"); (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, counterclaim, crossclaim, offset, recoupment, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, subject and subordinate only to (A) in the case of the Prepetition Term Loan Priority Collateral, (1) the liens and security interests in favor of the Prepetition First Lien Term Loan Secured Parties and (2) certain other liens permitted by the Prepetition Documents, solely to the extent any such

---

[11]    "**Prepetition Guarantors**" shall mean, collectively, the Prepetition ABL Guarantors, the Prepetition First Lien Term Loan Guarantors and the Prepetition Second Lien Term Loan Guarantors.

[12]    "**Prepetition ABL Priority Collateral**" means "ABL Priority Collateral" as defined in the Prepetition ABL Intercreditor Agreement (as defined below).

[13]    "**Prepetition Term Loan Priority Collateral**" means "Term Loan Priority Collateral" as defined in the Prepetition ABL Intercreditor Agreement.

permitted liens were valid, properly perfected, non-avoidable and *pari passu* or senior in priority to Prepetition First Lien Term Liens (as defined below) and (B) in the case of the Prepetition ABL Priority Collateral, certain other liens permitted by the Prepetition Documents, solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and *pari passu* or senior in priority to the Prepetition ABL Liens;

(c)     as of the date of the Petition Date, the liens and security interests granted to the Prepetition First Lien Term Loan Secured Parties (the "**Prepetition First Lien Term Liens**") pursuant to and in connection with the Prepetition First Lien Term Loan Documents are: (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the Prepetition Term Loan Priority Collateral; (ii) valid, binding, perfected, enforceable, second-priority liens and security interests in the Prepetition ABL Priority Collateral; (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, crossclaim, offset, recoupment, defense or claim (as such term is used in the Bankruptcy Code, "**Claim**") under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, subject and subordinate only to (A) in the case of the Prepetition ABL Priority Collateral, (1) the liens and security interests in favor of the Prepetition ABL Secured Parties and (2) certain other liens permitted by the Prepetition Documents, solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and *pari passu* or senior in priority to the Prepetition ABL Liens and (B) in the case of the Prepetition Term Loan Priority Collateral, certain other liens permitted by the Prepetition Documents, solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and *pari passu* or senior in priority to Prepetition First Lien Term Liens;

(d)      as of the Petition Date, the liens and security interests granted to the Prepetition Second Lien Term Loan Secured Parties (the "**Prepetition Second Lien Term Liens**" and, together with the Prepetition First Lien Term Liens, the "**Prepetition Term Liens**" and together with the Prepetition ABL Liens, the "**Prepetition Liens**") pursuant to and in connection with the Prepetition Second Lien Term Loan Agreements are: (i) valid, binding, perfected, enforceable, third-priority liens and security interests in the Prepetition Term Loan Priority Collateral; (ii) valid, binding, perfected, enforceable, third-priority liens and security interests in the Prepetition ABL Priority Collateral; (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, counterclaim, crossclaim, offset, recoupment, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, subject and subordinate only to (A) in the case of the Prepetition ABL Priority Collateral, (1) the liens and security interests in favor of the Prepetition ABL Secured Parties and the Prepetition First Lien Term Loan Secured Parties and (2) certain other liens permitted by the Prepetition Documents, solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and *pari passu* or senior in priority to the Prepetition First Lien Term Liens and (B) in the case of the Prepetition Term Loan Priority Collateral, (1) the Prepetition First Lien Term Liens and Prepetition ABL Liens and (2) certain other liens permitted by the Prepetition Documents, solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and *pari passu* or senior in priority to Prepetition First Lien Term Liens;

(e)      the aggregate value of the Prepetition ABL Priority Collateral exceeds the aggregate amount of the Prepetition ABL Debt;

(f)        as of the Petition Date, other than as expressly permitted under the Prepetition Documents, there were no liens on or security interests in the Prepetition Collateral other than the Prepetition Liens;

(g)        none of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Documents;

(h)        no claims, counterclaims, objections, defenses, set-off rights, challenges or causes of action exist against, or with respect to, the Prepetition Secured Parties or any of their respective affiliates, agents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, or other equitable relief that might otherwise impair the aforementioned parties or their interest in the Prepetition Collateral, subordination, avoidance or other claims, including any claims or causes of action arising under or pursuant to sections 105, 502(d), 510, 542 through 553(b) or 724(a) of the Bankruptcy Code), in connection with or arising under any Prepetition Documents or the transactions contemplated thereunder or the Prepetition Debt or Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery; and the Debtors and their estates hereby release and discharge any and all such claims, counterclaims, objections, defenses, set-off rights, challenges and causes of actions;

(i)        subject to entry of the Final Order, the Debtors hereby absolutely and unconditionally release and forever discharge and acquit the Prepetition Secured Parties and their

15

respective Representatives (as defined below) each solely in their capacity as such (collectively, the "**Released Parties**") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date (collectively, the "**Released Claims**") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or otherwise, arising out of or related to (as applicable) the Prepetition Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order, whether such Released Claims are matured, contingent, liquidated, unliquidated, unmatured, known, unknown or otherwise;

(j)      that the (A) Prepetition Intercreditor Agreements govern, among other things, the relative priorities of the Prepetition Liens in respect of the applicable Prepetition Collateral, (B) the Prepetition Intercreditor Agreements are binding and enforceable against the Prepetition Borrowers, the Prepetition Guarantors and the Prepetition Secured Parties in accordance with their terms, and (C) the Prepetition Borrowers, the Prepetition Guarantors and the Prepetition Secured Parties are not entitled to take any action that would be contrary to the provisions thereof; and

(k)      all cash, securities or other property of the DIP Loan Parties (and the proceeds therefrom), in each case, constituting Prepetition Collateral, as of the Petition Date,

including, without limitation, all cash, securities or other property (and the proceeds therefrom) and other amounts on deposit or maintained by the DIP Loan Parties in any account or accounts (collectively, the "**Depository Institutions**"), in each case, constituting Prepetition Collateral were subject to rights of set-off under the Prepetition Documents and applicable law, for the benefit of the Prepetition Secured Parties, subject to the priorities set forth in the Prepetition Intercreditor Agreements.  All proceeds of the Prepetition Collateral (including cash on deposit at the Depository Institutions as of the Petition Date, securities or other property, whether subject to control agreements or otherwise, in each case that constitutes Prepetition Collateral) are "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**"), subject to the priorities set forth in the Prepetition Intercreditor Agreements.

7.      *Findings Regarding the DIP Financing and Use of Cash Collateral.*

(a)      Good and sufficient cause has been shown for the entry of this Interim Order and authorization for the DIP Loan Parties to obtain financing pursuant to the DIP Facilities.

(b)      The DIP Loan Parties have an immediate need to obtain the DIP Financing and continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things, (i) permit the orderly continuation of the operation of their businesses, (ii) maintain business relationships with customers, vendors and suppliers, (iii) pay for the necessary services and materials to maintain compliance with permitting and environmental regulatory requirements, (iv) pay for use of the mining equipment leased from third parties, (v) make payroll, (vi) satisfy other working capital and operational needs, (vii) repay a portion of the Prepetition First Lien Term Loan Debt pursuant to the Term Loan Roll-Up (as defined below),

(viii) repay the Prepetition ABL Debt pursuant to the Interim ABL Roll-Up (as defined below) and, subject to entry of the Final Order, Repay in Full any remaining Prepetition ABL Debt.  The access by the DIP Loan Parties to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the DIP Loan Parties and to a successful reorganization of the DIP Loan Parties.  The terms of the proposed financing are fair and reasonable, reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The adequate protection provided in this Interim Order and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code.

(c)      The Prepetition ABL Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens (to the extent set forth on **Exhibit A** hereto), and the DIP ABL Agent and the DIP ABL Lenders would not be willing to provide the DIP ABL Facility or extend credit to the Debtors thereunder without the inclusion of the ABL Roll-Up.  Moreover, the conversion and roll-up of all outstanding Prepetition ABL Obligations into the DIP ABL Obligations will create availability under the DIP ABL Facility.

(d)      The Prepetition First Lien Term Loan Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens (to the extent set forth on **Exhibit A** hereto), and the Term DIP Lenders would not be willing to provide the Term DIP Facility or extend credit to the Debtors thereunder without the inclusion of the Term Loan Roll-Up.

(e)　　　The DIP Loan Parties are unable to obtain financing on more favorable terms from sources other than the DIP Lenders[14] under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The DIP Loan Parties are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the DIP Loan Parties granting to the DIP Secured Parties, subject to the Carve-Out, the DIP Liens and the DIP Superpriority Claims (as defined below) and, subject to the Carve-Out, incurring the Adequate Protection Obligations (as defined below), in each case, under the terms and conditions set forth in this Interim Order and in the DIP Documents.

(f)　　　Based on the Motion, the Puntus Declaration, the First Day Declaration and the record presented to the Court at the Interim Hearing, (i) the terms of the DIP Financing, (ii) the terms of the adequate protection granted to the Prepetition Secured Parties as provided in paragraphs 20 and 21 of this Interim Order (the "**Adequate Protection**") and (iii) the terms on which the DIP Loan Parties may continue to use the Prepetition Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the DIP Documents, are in each case fair and reasonable, reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and represent the best financing presently available.

(g)　　　To the extent such consent is required, the Prepetition Secured Parties have consented or are deemed under the Prepetition Intercreditor Agreements to have consented to the DIP Loan Parties' use of Cash Collateral and the other Prepetition Collateral, and the DIP

---

[14]　　　**"DIP Lenders"** means, collectively, the DIP ABL Lenders and the Term DIP Lenders.

Loan Parties' entry into the DIP Documents, in accordance with and subject to the terms and conditions set forth in this Interim Order and the DIP Documents.

(h)      The DIP Financing, the Adequate Protection and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the DIP Loan Parties, the DIP Agents and the DIP Lenders, and all of the DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation: (i) all loans made to and guarantees issued by the DIP Loan Parties pursuant to the DIP Documents (the "**DIP Loans**") and any "**Obligations**" and "**DIP ABL Obligations**" (as defined in the DIP Credit Agreements) shall be deemed to have been extended by the DIP Agents and the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agents and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise. The Prepetition Secured Parties have acted in good faith regarding the DIP Financing and the DIP Loan Parties' continued use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the DIP Loan Parties' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined below)), in accordance with the terms hereof, and the Prepetition Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(i)    The Prepetition Secured Parties are entitled to the Adequate Protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion, the Puntus Declaration, the First Day Declaration and the record presented to the Court, the terms of the proposed Adequate Protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the DIP Loan Parties' prudent exercise of business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral (including Cash Collateral); *provided* that nothing in this Interim Order or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the Prepetition Intercreditor Agreements, to seek new, different or additional adequate protection or assert the interests of any of the Prepetition Secured Parties.

(j)    Payment of the Prepetition ABL Debt and a portion of the Prepetition First Lien Term Loan Debt pursuant to the ABL Roll-Up and Term Loan Roll-Up, respectively, reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties.

(k)    The Debtors have prepared and delivered to DIP Agents and the DIP Lenders an initial budget (the "**Initial Budget**"), a copy of which is attached to the Motion as **Schedule 1** to **Exhibit A**.  The Initial Budget reflects the Debtors' anticipated cash receipts

21

and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date (the Initial Budget and each subsequent budget approved pursuant to the DIP Documents (an "**Approved Budget**")).  The Debtors believe that the Initial Budget is reasonable under the facts and circumstances.  The DIP Agents and the DIP Lenders are relying, in part, upon the Debtors' covenants in the DIP Credit Agreements with respect to the Approved Budget, the other DIP Documents, and this Interim Order in determining to enter into the postpetition financing arrangements provided for in this Interim Order.

(l)     The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules and good cause has been shown for the immediate entry of this Interim Order.  For the reasons set forth in the Motion, the Puntus Declaration and the First Day Declaration, absent granting the relief set forth in this Interim Order, the DIP Loan Parties' estates would face significant business disruption resulting in immediate and irreparable harm.  Consummation of the DIP Financing and the use of Prepetition Collateral (including Cash Collateral), in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the DIP Loan Parties, their estates and their creditors.  The terms of this Interim Order and the DIP Facilities are fair and reasonable under the circumstances, reflect the DIP Loan Parties' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

8.     *Authorization of the DIP Financing and the DIP Documents.*

(a)     The DIP Loan Parties are hereby authorized to execute, enter into and perform all obligations under the DIP Documents.  The DIP ABL Borrowers are hereby

authorized to forthwith borrow money pursuant to the DIP ABL Credit Agreement, and the DIP

ABL Guarantors are hereby authorized to guaranty DIP ABL Obligations, in each case up to an

aggregate principal or face amount equal to $90 million under the DIP ABL Facility, together

with applicable interest, protective advances, expenses, fees and other charges payable in

connection with the DIP ABL Facility, subject in each case to any limitations on borrowing

under the DIP ABL Financing Documents, which shall be used for all purposes permitted under

the DIP Documents, including, without limitation, to roll-up and refinance the Prepetition ABL

Debt as provided herein, to provide working capital for the DIP Loan Parties and to pay interest,

fees and expenses in accordance with this Interim Order and the DIP Documents (including any

indemnification obligations).  The DIP Loan Parties are hereby authorized to forthwith borrow

money pursuant to the Term DIP Credit Agreement, and the Term DIP Guarantors are hereby

authorized to guaranty the DIP Loan Parties' Term DIP Obligations with respect to such

borrowings, in each case up to an aggregate principal amount equal to $35 million of New

Money Term DIP Loans and $70 million of Term DIP Roll-Up Loans on an interim basis,

together with applicable interest, protective advances, expenses, fees and other charges payable

in connection with the Term DIP Facility and, subject to entry of the Final Order, an additional

$15 million of New Money Term DIP Loans and $30 million of Term DIP Roll-Up Loans,

together with applicable interest, protective advances, expenses, fees and other charges payable

in connection with the Term DIP Facility, subject to any limitations on borrowing under the

Term DIP Documents, which shall be used for purposes permitted under the DIP Documents,

including, without limitation, to roll-up and refinance a portion of the Prepetition First Lien Term

Loan Debt as provided herein and to pay interest, fees and expenses in accordance with this

Interim Order and the DIP Documents (including any indemnification obligations).

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, deeds of trust and financing statements), and to pay all fees that may be reasonably required or necessary for the DIP Loan Parties to implement the terms of, performance of their obligations under or effectuate the purposes of and transactions contemplated by this Interim Order or the DIP Financing, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)     the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Loan Parties, the DIP Agents, the Required DIP ABL Lenders (as defined in the DIP ABL Credit Agreement, the "**Required DIP ABL Lenders**") and the Required Lenders (as defined in the Term DIP Credit Agreement, the "**Required Term DIP Lenders**," and together with the Required DIP ABL Lenders, the "**Required DIP Lenders**"), as applicable, may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees and other expenses (including any attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder;

(iii)     the non-refundable payment to the DIP Agents and/or the DIP Lenders, as the case may be, of all fees, including, without limitation, any closing fee, backstop

fee, unused line commitment fee, structuring fee, upfront fee, exit fee, prepayment fee or agency

fee (which fees, in each case, shall be, and shall be deemed to have been, approved upon entry of

this Interim Order, and which fees shall not be subject to any contest, attack, rejection,

recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization,

avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy

Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may

become due) in respect of the indemnification obligations, in each case referred to in the DIP

Credit Agreements (and in any separate letter agreements between any or all DIP Loan Parties,

on the one hand, and any of the DIP Agents and/or DIP Lenders, on the other, in connection with

the DIP Financing) and the costs and expenses as may be due from time to time, including,

without limitation, fees and expenses of the professionals retained by any of the DIP Agents or

DIP Lenders, including, without limitation, the reasonable and documented fees and expenses of

(i) Hogan Lovells US LLP as primary counsel to the DIP ABL Agent, Morris, Nichols, Arsht &

Tunnell LLP as bankruptcy and Delaware counsel to the DIP ABL Agent, and a single local

counsel to the DIP ABL Agent in each other applicable jurisdiction, (ii) Herrick Feinstein LLP as

primary counsel to the Term DIP Agent and Prepetition First Lien Term Loan Agent and a single

local counsel to the Term DIP Agent and Prepetition First Lien Term Loan Agent in each

applicable jurisdiction, (iii) Stroock & Stroock & Lavan LLP as primary counsel to the

Prepetition Second Lien Term Loan Agent and a single local counsel to the Prepetition Second

Lien Term Loan Agent in each applicable jurisdiction, (iv) Davis Polk & Wardwell LLP as

primary counsel to an ad hoc group of Term DIP Lenders, Prepetition First Lien Term Loan

Lenders and Prepetition Second Lien Term Loan Lenders (the "**Crossover Group**"), a single

local counsel to the Crossover Group in each applicable jurisdiction, and (v) Shearman &

Sterling LLP as primary counsel to certain of the Prepetition First Lien Term Loan Lenders (the "**First Lien Group**"), and a single local counsel to the First Lien Group, in each case, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party, but subject to the provisions of this Interim Order regarding the submission of fee statements and the related objection period; and

(iv)    the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens and DIP Superpriority Claims and perfection of the DIP Liens and DIP Superpriority Claims as permitted herein and therein.

(c)    Upon execution and delivery of the DIP Documents, each of the DIP Documents shall constitute valid, binding and non-avoidable obligations of the DIP Loan Parties, fully enforceable against each DIP Loan Party in accordance with the terms of the DIP Documents and this Interim Order.  No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order to the DIP Agents (including their Representatives) and/or the DIP Lenders (including their Representatives) shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, 548 or 549 of the Bankruptcy Code, any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or other similar state statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim or counterclaim.

(d)    No DIP Lender or DIP Agent shall have any obligation or responsibility to monitor any DIP Loan Party's use of the DIP Financing, and each DIP Lender or DIP Agent may rely upon each DIP Loan Party's representations that the amount of DIP Financing requested at

any time and the use thereof, are in accordance with the requirements of this Interim Order, the

DIP Documents, and Bankruptcy Rule 4001(c)(2).

(e)    The Debtors and the financial institutions where the Debtors' Cash

Collection Accounts (as defined below) are maintained (including those accounts identified in

any Cash Management Order), are authorized and directed to remit, without offset or deduction,

funds in such Cash Collection Accounts upon receipt of any direction to that effect from the DIP

ABL Agent.  For the avoidance of doubt, except to the extent expressly set forth in the DIP ABL

Financing Documents, all prepetition practices and procedures for the payment and collection of

proceeds of the Prepetition ABL Priority Collateral, the turnover of cash, the delivery of property

to the Prepetition ABL Agent and the Prepetition ABL Lenders, including any control

agreements and any other similar lockbox or blocked depository bank account arrangements, are

hereby approved and shall continue without interruption and shall apply to the DIP ABL Facility.

Without limiting the general applicability of the immediately preceding sentence, and

notwithstanding anything contrary in this Interim Order, from and after the date of the entry of

this Interim Order, all collections and proceeds of any Prepetition ABL Priority Collateral and

other DIP ABL Priority Collateral and all Cash Collateral (other than identifiable net proceeds of

DIP Term Loan Priority Collateral and except as otherwise set forth in the DIP ABL Credit

Agreement) that shall at any time come into the possession, custody, or control of any Debtor, or

to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in

the same lock-box and/or deposit accounts into which the collections and proceeds of the

Prepetition ABL Priority Collateral were deposited under the Prepetition ABL Financing

Documents (or in such other accounts as are designated by the DIP ABL Agent from time to

time) (collectively, the "**Cash Collection Accounts**") for application in accordance with this

Interim Order, which accounts (except as otherwise set forth in the DIP ABL Credit Agreement) shall be subject to the sole dominion and control of the DIP ABL Agent until the discharge of the DIP ABL Facility.  Unless otherwise agreed to in writing by the DIP ABL Agents and the Prepetition ABL Agents, or otherwise provided for herein, the Debtors shall maintain no accounts except those identified in this Interim Order or in any cash management order entered by the Court (a "**Cash Management Order**").

9.      *DIP Intercreditor Agreement*.  The DIP Loan Parties are hereby authorized and directed to execute, enter into and perform under the intercreditor agreement among the DIP Loan Parties, the DIP ABL Agent and the Term DIP Agent, substantially in the form attached to the DIP Credit Agreements (the "**DIP ICA**").  For the avoidance of doubt the DIP ICA shall be deemed a DIP Document hereunder.

10.     *Payment of the Prepetition ABL Debt*.  The DIP Loan Parties are hereby authorized to (x) perform the transactions and undertakings contemplated hereby, which are hereby approved in all respects, (y) to remit the Debtors' prepetition and postpetition accounts receivable and all other proceeds of the DIP ABL Priority Collateral for application to the outstanding principal balance of the Prepetition ABL Debt (the "**Interim ABL Roll-Up**"), thereby creating a dollar-for-dollar increase in the DIP Revolving Loan Availability (as defined in the DIP ABL Credit Agreement), and, upon entry of the Final Order, to use the proceeds of the DIP ABL Financing to roll-up and refinance the remainder of the Prepetition ABL Debt, including interest and fees through the date of repayment (at the non-default contract rate) (the "**Final ABL Roll-Up**," and together with the Interim ABL Roll-Up, the "**ABL Roll-Up**"), and the amounts so rolled-up and refinanced, the "**ABL Roll-Up Loans**"), which roll-up and refinancing shall be indefeasible upon the occurrence of the ABL Discharge and shall be entitled

to all the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations under this Interim Order, the Final Order and the DIP Loan Documents, and (z) use the proceeds of the DIP ABL Financing to pay any fees, charges or expenses incurred by the Prepetition ABL Agent prior to the Petition Date, but which are posted after the payoff of the Prepetition ABL Debt.  The foregoing transactions in respect of the Prepetition ABL Debt shall be indefeasible upon the ABL Discharge.  Subject to the terms and conditions contained in this Interim Order (including, without limitation, the DIP Liens (as defined below) granted hereunder and the Carve-Out (as defined below)), any and all prepetition or postpetition liens and security interests (including, without limitation, any adequate protection replacement liens at any time granted to the Prepetition ABL Secured Parties by this Court) that the Prepetition ABL Secured Parties have or may have in the Collateral shall (a) continue to secure the unpaid portion of any Prepetition ABL Debt (including, without limitation, any Prepetition ABL Debt subsequently reinstated after the repayment thereof) and (b) be junior and subordinate in all respects to the Carve-Out and otherwise have the priorities set forth on **Exhibit A** attached hereto (such liens and security interests of the Prepetition ABL Secured Parties are hereinafter referred to as the "**ABL Indemnification Liens,**" and any such unpaid or reinstated Prepetition ABL Debt described in clause (a) of this sentence is hereinafter referred to as the "**Prepetition ABL Indemnification Obligations**").  Any surviving obligations as set forth in any DIP Document, Prepetition Documents, any payoff letter related to the Prepetition ABL Debt and/or any documents related to the foregoing, including, without limitation, any indemnification of the Prepetition ABL Secured Parties and the ABL Indemnification Liens, shall continue and survive the ABL Discharge and the other transactions described in this paragraph and shall not be

discharged pursuant to a chapter 11 plan or any discharge under section 1141 of the Bankruptcy Code.

11.    *Payment of the Prepetition First Lien Term Loan Debt.*  On the date of each borrowing of New Money Term DIP Loans under the Term DIP Credit Agreement, the Prepetition First Lien Term Loan Debt held by the Term DIP Lenders (or if a Term DIP Lender is a designee of a Prepetition First Lien Term Loan Lender, the Prepetition First Lien Term Loan Debt held by such designating Prepetition First Lien Term Loan Lender) shall immediately, automatically and irrevocably be deemed to have been converted into Term DIP Roll-Up Loans in an amount equal to $2.00 for each $1.00 of the New Money Term DIP Loans funded on such date (the "**Term Loan Roll-Up**"), which Term DIP Roll-Up Loans shall be entitled to all the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations under this Interim Order, the Final Order and the DIP Loan Documents, in each case subject to the terms and conditions set forth in this Interim Order, the Final Order, the DIP Documents and the reservation of rights of parties in interest in paragraph 30 below.

12.    *Carve-Out*

(a)    As used in this Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the

Bankruptcy Code (the "Debtor Professionals") and the official committee of unsecured creditors

(the "Creditors' Committee") (if appointed) pursuant to section 328 or 1103 of the Bankruptcy

Code (the "Committee Professionals" and, together with the Debtor Professionals, the

"Professional Persons") at any time before or on the first business day following delivery by the

Term DIP Agent or the DIP ABL Agent of a Carve Out Trigger Notice (as defined below),

whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv)

Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed

$2,000,000 incurred after the first business day following delivery by the Term DIP Agent or the

DIP ABL Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by

interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the

"Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger

Notice" shall mean a written notice delivered by email (or other electronic means) by the Term

DIP Agent or the DIP ABL Agent to the Debtors, their lead restructuring counsel, the U.S.

Trustee, and counsel to the Creditors' Committee (if appointed) with a copy to the Prepetition

First Lien Term Loan Agent (which shall post the same to the Prepetition First Lien Term Loan

Lenders), the Prepetition ABL Agent (which shall post the same to the Prepetition ABL

Lenders), and the DIP Agent not delivering such notice, which notice may be delivered

following the occurrence and during the continuation of an Event of Default (as defined in this

Interim Order) and acceleration of the DIP ABL Obligations or the Term DIP Obligations under

the DIP ABL Facility or the Term DIP Facility, as applicable, stating that the Post-Carve Out

Trigger Notice Cap has been invoked.

      (b)    Fee Estimates. Not later than 7:00 p.m. New York time on the third

business day of each week starting with the first full calendar week following the Closing Date,

each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); *provided*, *that* within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date. If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Carve Out Reserves (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person; *provided*, *that* such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor pursuant to paragraph 12(c) below. Solely as it relates to the DIP ABL Agent, the Term DIP Agent, the DIP

32

ABL Lenders, the Term DIP Lenders, the Prepetition ABL Agent, and the Prepetition Secured

Parties, any deemed draw and borrowing pursuant to paragraph 12(c)(i)(x) for amounts under

paragraph 12(a)(iii) above shall be limited to the greater of (x) the sum of (I) the aggregate

unpaid amount of Estimated Fees and Expenses included in such Weekly Statements timely

received by the Debtors prior to the Termination Declaration Date *plus*, without duplication, (II)

the lesser of (1) the aggregate unpaid amount of Estimated Fees and Expenses included in the

Final Statements timely received by the Debtors pertaining to the period through and including

the Termination Declaration Date and (2) the Budgeted Cushion Amount (as defined below), and

(y) the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget

for the period prior to the Termination Declaration Date (such amount, the "DIP Professional Fee

Carve Out Cap"). For the avoidance of doubt, at all times, the DIP ABL Agent and the Term DIP

Agent shall be entitled to maintain reserves (the "Carve-Out Reserve"), including, without

limitation, a reserve in an amount (the "Carve-Out Reserve Amount")[15] equal to the sum of (i)

the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in all

Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed

Professional Fees contemplated to be unpaid in the Approved Budget at the applicable time, *plus*

(ii) the Post-Carve Out Trigger Notice Cap, *plus* (iii) the amounts contemplated under paragraph

12(a)(i) and 12(a)(ii) above, *plus* (iv) an amount equal to the amount of Allowed Professional

Fees set forth in the Approved Budget for the then current week occurring after the most recent

Calculation Date and the two weeks succeeding such current week (such amount set forth in (iv),

regardless of whether such reserve is maintained, the "Budgeted Cushion Amount"). Not later

than 7:00 p.m. New York time on the fourth business day of each week starting with the first full

---

[15] For the avoidance of doubt, the Carve-Out Reserve and the Carve-Out Reserve Amount shall in no way limit the "Reserves" as defined in the DIP ABL Credit Agreement.

calendar week following the Closing Date, the Debtors shall deliver to the DIP ABL Agent and

the Term DIP Agent a report setting forth the Carve-Out Reserve Amount as of such time, and,

in setting the Carve-Out Reserve, the DIP ABL Agent and the Term DIP Agent shall be entitled

to rely upon such reports in accordance with the DIP ABL Credit Agreement and section 8.16

the Term DIP Credit Agreement, respectively. Prior to the delivery of the first report setting forth

the Carve-Out Reserve Amount, the DIP ABL Agent and the Term DIP Agent shall calculate the

Carve-Out Reserve Amount by reference to the Approved Budget for subsection (i) of the Carve-

Out Reserve Amount and for the portion of the Carve-Out Reserve Amount attributable to

section 12(a)(i).

       (c)    <u>Carve Out Reserves</u>

       (i)    On the day on which a Carve Out Trigger Notice is given by the

DIP ABL Agent or the Term DIP Agent to the Debtors with a copy to counsel to the Creditors'

Committee (if appointed) (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice

shall (x) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under

the DIP ABL Credit Agreement or the Term DIP Credit Agreement, as applicable (on a pro rata

basis based on the then outstanding DIP Commitments), in an amount equal to the sum of (1) the

amounts set forth in paragraphs 12(a)(i) and 12(a)(ii) above, and (2) the lesser of (a) the then

unpaid amounts of the Allowed Professional Fees (b) the DIP Professional Fee Carve Out Cap

(any such amounts actually advanced shall constitute DIP ABL Loans or Term DIP Loans, as

applicable) and (y) also constitute a demand to the Debtors to utilize all cash on hand as of such

date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to

the sum of the amounts set forth in paragraphs 12(a)(i)–(iii) above. The Debtors shall deposit and

hold such amounts in trust in a segregated third-party bank account (in respect of amounts

funded by the DIP ABL Lenders or from the DIP ABL Priority Collateral) and the Term DIP

Agent in trust (in respect of proceeds of the Term Loan Priority Collateral or the proceeds of the

Term DIP Loans) exclusively to pay such then unpaid Allowed Professional Fees (the "Pre-

Carve Out Trigger Notice Reserve") prior to any and all other claims.

(ii)      On the Termination Declaration Date, the Carve Out Trigger

Notice shall also (x) be deemed a request by the Debtors for DIP ABL Loans under the DIP ABL

Credit Agreement or Term DIP Loans under the Term DIP Credit Agreement, as applicable (on a

pro rata basis based on the then outstanding DIP Commitments), in an amount equal to the Post-

Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP ABL

Loans or Term DIP Loans, as applicable) and (y) constitute a demand to the Debtors to utilize all

cash on hand as of such date and any available cash thereafter held by any Debtor, after funding

the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-

Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in trust in a

segregated third-party account with the DIP ABL Agent or the Term DIP Agent (as applicable)

to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap

(the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger

Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.

(iii)      On the first business day after the Term DIP Agent or the DIP

ABL Agent gives such notice to such DIP ABL Lenders (as defined in the DIP ABL Credit

Agreement), notwithstanding anything in the DIP ABL Credit Agreement to the contrary,

including with respect to the existence of a Default (as defined in the DIP ABL Credit

Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions

precedent for DIP ABL Loans under the DIP ABL Facility, any termination of the DIP

Commitments following an Event of Default, or the occurrence of the Maturity Date, each DIP ABL Lender with an outstanding DIP Revolving Loan Commitment (on a pro rata basis based on the then outstanding DIP Revolving Loan Commitments) shall make available to the DIP ABL Agent such DIP ABL Lender's pro rata share with respect to such borrowing in accordance with the DIP ABL Facility; *provided* that in no event shall the DIP ABL Agent or the DIP ABL Lenders be required to extend DIP ABL Loans pursuant to a deemed draw and borrowing pursuant to paragraphs 12(c)(i)(x) and 12(c)(ii)(x) in an aggregate amount exceeding the Carve-Out Reserve Amount.

(iv)     All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full. If the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to clause (vi), below, all remaining funds in (x) the account funded by the DIP ABL Lenders shall be distributed *first* to the DIP ABL Agent on account of the DIP ABL Obligations until indefeasibly Paid in Full, and *thereafter* for application to the Prepetition ABL Obligations in accordance with the Prepetition ABL Credit Agreement and (y) all remaining funds in the account funded by the Term DIP Lenders shall be distributed to the Term DIP Agent which shall apply such funds to the Term DIP Obligations in accordance with the Term DIP Credit Agreement until indefeasibly Paid in Full.

(v)     All funds in the Post Carve Out Trigger Notice Reserve, to the extent they exceed the DIP Professional Fee Carve Out Cap, shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"). If, after such application, the Post Carve Out Trigger Notice Reserve has not

been reduced to zero, subject to clause (vi) below, all remaining funds (x) in respect of the account funded by the DIP ABL Lenders, shall be distributed *first* to the DIP ABL Agent on account of the DIP ABL Obligations until indefeasibly Paid in Full, and *thereafter* for application to the Prepetition ABL Obligations in accordance with the Prepetition ABL Credit Agreement and (y) all remaining funds in the account funded by the Term DIP Lenders shall be distributed to the Term DIP Agent, which shall apply such funds to the Term DIP Obligations in accordance with the Term DIP Credit Agreement until indefeasibly Paid in Full.

(vi)    Notwithstanding anything to the contrary in the DIP ABL Documents, the Term DIP Documents, or this Interim Order, (x) if either of the Carve Out Reserves required to be funded by the DIP ABL Lenders is not funded in full in the amounts set forth in this paragraph, then any excess funds in one of the Carve Out Reserves held in any account funded by the DIP ABL Lenders following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts (subject to the limits contained in the DIP Professional Fee Carve Out Cap and the Post-Carve Out Trigger Notice Cap, respectively) shall be used to fund the other Carve Out Reserve to the extent of any shortfall in funding by the DIP ABL Lenders prior to making any payments to the DIP ABL Agent or the Prepetition ABL Secured Parties, as applicable, and (y) if either of the Carve Out Reserves required to be funded with the proceeds of Prepetition Term Loan Priority Collateral is not funded in full in the amounts set forth in this paragraph, then any excess funds in one of the Carve Out Reserves held in any account funded by such cash on hand following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts (subject to the Post-Carve Out Trigger Notice Cap), respectively, shall be used to fund the other Carve Out Reserve to the extent of any shortfall in funding by the cash on hand prior to making any payments to the Term DIP Agent or the Prepetition Secured Parties, as applicable.

(vii)     Notwithstanding anything to the contrary in the DIP ABL

Documents, the Term DIP Documents or this Interim Order, following delivery of a Carve Out

Trigger Notice, the DIP ABL Agent and the Prepetition ABL Agent shall not sweep or foreclose

on cash (including cash received as a result of the sale or other disposition of any assets) of the

Debtors until the Carve Out Reserves required to be funded by the DIP ABL Lenders have been

fully funded, but the DIP ABL Agent and the Prepetition ABL Agent have a security interest in

any residual interest in the Carve Out Reserves held in accounts by the DIP ABL Agent, with

any excess paid as provided in paragraphs (iv) and (v) above; and (y) the Term DIP Agent and

the Prepetition First Lien Term Loan Agent shall not sweep or foreclose on cash (including cash

received as a result of the sale or other disposition of any assets) of the Debtors until the Carve

Out Reserves have been fully funded, but shall have a security interest in any residual interest in

the Carve Out Reserves, with any excess paid as provided in paragraphs (iv) and (v) above. The

security interests of the DIP ABL Agent and the Term DIP Agent on any residual interest in the

Carve Out Reserves shall be shared pro rata based on the amount of funds in the Carve Out

Reserves funded by (x) the proceeds of Term DIP Priority Collateral and (y) the DIP ABL

Lenders or the DIP ABL Collateral. Further, notwithstanding anything to the contrary in this

Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute

DIP Loans or increase or reduce the Term DIP Obligations or the DIP ABL Obligations, (ii) the

failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect

the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Approved Budget,

Carve Out, Post- Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be

construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable

by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this

Interim Order, the Term DIP Facility, the DIP ABL Facility, or in any Prepetition Credit

Agreement, the Carve Out shall be senior to all liens and claims securing the Term DIP Facility,

the DIP ABL Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all

other forms of adequate protection, liens, or claims securing the Term DIP Obligations, the DIP

ABL Obligations, or the Prepetition Secured Obligations.

(d)    Payment of Allowed Professional Fees Prior to the Termination

Declaration Date. Any payment or reimbursement made prior to the occurrence of the

Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the

Carve Out.

(e)    No Direct Obligation To Pay Allowed Professional Fees. None of the

Term DIP Agent, DIP ABL Agent, DIP ABL Lenders, Term DIP Lenders, or the Prepetition

Secured Parties shall be responsible for the payment or reimbursement of any fees or

disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or

any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or

otherwise shall be construed to obligate the Term DIP Agent, DIP ABL Agent, the Term DIP

Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse

expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to

pay such compensation or reimbursement.

(f)    Payment of Carve Out On or After the Termination Declaration Date. Any

payment or reimbursement made on or after the occurrence of the Termination Declaration Date

in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-

for-dollar basis. Any funding of the Carve Out by the Term DIP Lenders shall be added to, and

made a part of, the Term DIP Obligations secured by the DIP Collateral and shall be otherwise

entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.  Any funding of the Carve Out by the DIP ABL Lenders shall be added to, and made a part of, the DIP ABL Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

13.     *DIP Superpriority Claims.*  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other section of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the DIP Loan Parties and all proceeds thereof in accordance with the DIP Credit Agreements and this Interim Order, subject only to the liens on such property and the Carve-Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed

or modified, on appeal or otherwise.  The DIP Superpriority Claims in respect of the DIP ABL

Obligations and the Term DIP Obligations shall, without otherwise impairing the lien priorities

as set forth herein, be *pari passu* in right of payment with one another and senior to the Adequate

Protection Claims; *provided* that the DIP Superpriority Claims in respect of the Term DIP Roll-

Up Loans shall be subject and subordinate to the DIP Superpriority Claims in respect of the New

Money Term DIP Loans.

14.    *DIP Liens.*

(a)    *DIP ABL Liens.*  As security for the DIP ABL Obligations, effective and

perfected upon the date of this Interim Order and without the necessity of the execution,

recordation or filing by the DIP ABL Loan Parties of mortgages, security agreements, control

agreements, pledge agreements, financing statements or other similar documents, any notation of

certificates of title for a titled good or the possession or control by the DIP ABL Agent of, or

over, any DIP Collateral (including for the avoidance of doubt any DIP ABL Collateral as

defined in the DIP ABL Credit Agreement), the following security interests and liens are hereby

granted to the DIP ABL Agent for its own benefit and the benefit of the DIP ABL Secured

Parties (all property identified in clauses (i)-(iii) below being collectively referred to as the "**DIP**

**ABL Collateral**"), subject only to the payment of the Carve-Out and in each case in accordance

with the priorities set forth in **Exhibit A** hereto (all such liens and security interests granted to

the DIP ABL Agent, for its benefit and for the benefit of the DIP ABL Lenders, pursuant to this

Interim Order and the DIP ABL Financing Documents, the "**DIP ABL Liens**"):[16]

(i)    Liens on Unencumbered Property.  Pursuant to section 364(c)(2) of the

Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected (A) first priority

---

[16] For the avoidance of doubt, DIP ABL Liens include the New Money DIP ABL Liens and all security
interests and liens in respect of the ABL Roll-Up Loans.

senior security interest in and lien upon all tangible and intangible pre- and postpetition property (including mineral rights) of the DIP ABL Loan Parties, whether existing on the Petition Date or thereafter acquired, of the same nature, scope and type as the Prepetition ABL Priority Collateral and the proceeds, products, rents and profits thereof, which, subject to and upon entry of the Final Order, shall include any Avoidance Proceeds related to the forgoing ("**DIP ABL Priority Collateral**," which for the avoidance of doubt shall include Prepetition ABL Priority Collateral), and (B) junior security interest in (to the extent set forth on **Exhibit A** hereto) and lien upon all tangible and intangible pre- and postpetition property of the DIP ABL Loan Parties, whether existing on the Petition Date or thereafter acquired, of the same nature, scope and type as the Prepetition Term Loan Priority Collateral, and the proceeds, products, rents and profits thereof, in each case that, on or as of the Petition Date are not subject to either (x) a valid, perfected and non-avoidable lien, or (y) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and in each case other than the Avoidance Actions[17] (but including Avoidance Proceeds[18] subject to entry of the Final Order), but in each case subject to the Carve-Out, provided that, solely with respect to the ABL Roll-Up Loans, the security interests and liens granted pursuant to this clause (i) shall not include liens on any real property lease that, as of the Petition Date, was not subject to a valid and perfected lien securing the Prepetition First Lien Term Loans in accordance with the Prepetition First Lien Term Loan Credit Agreement because the consent of the applicable lessor to the creation of a security interest in favor of the Prepetition First Lien

---

[17] "**Avoidance Actions**" means, collectively, claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code.

[18] "**Avoidance Proceeds**" means any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise.

Term Lenders was required pursuant to the terms of the applicable real property lease and such consent was not obtained (the "**Specified Excluded Unencumbered Property**");

        (ii)    <u>Liens Priming Certain Prepetition Secured Parties' Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code: (A) a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and lien upon all pre- and postpetition property (including mineral rights) of the DIP Loan Parties of the same nature, scope and type as the Prepetition ABL Priority Collateral, regardless of where located, that are subject to (1) valid, perfected and non-avoidable liens as of the Petition Date or (2) valid and non-avoidable liens as of the Petition Date and that are perfected after the Petition Date to the extent provided by section 546(b) of the Bankruptcy Code, regardless of whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected, which security interest and lien shall prime the Prepetition ABL Liens and the Prepetition Term Liens (the "**DIP ABL Priority Collateral Priming Liens**"), and (B) a valid, binding, continuing, enforceable, fully-perfected priming security interest in and lien upon (with priority as set forth on **<u>Exhibit A</u>** hereto) all pre- and postpetition property of the DIP Loan Parties that  are subject to (1) valid, perfected and non-avoidable liens as of the Petition Date or (2) valid and non-avoidable liens as of the Petition Date and that are perfected after the Petition Date to the extent provided by section 546(b) of the Bankruptcy Code, of the same nature, scope and type as the Prepetition Term Loan Priority Collateral (as defined below), regardless of where located, regardless of whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected, which security interest and lien shall prime the Prepetition ABL Liens and Prepetition Second Lien Term Liens (the "**DIP ABL Term Loan Priority Collateral Priming Liens**," and together with the DIP ABL Priority Collateral Priming Liens, the "**DIP ABL Priming Liens**").  Notwithstanding anything

herein to the contrary, but subject to the relative priorities set forth in paragraph 14(c) herein, the DIP ABL Priming Liens shall be (A) subject and junior to the Carve-Out in all respects, (B) junior to (1) valid, perfected and non-avoidable liens, if any, to which the Prepetition ABL Liens are subject to, and (2) valid and non-avoidable liens to which the Prepetition ABL Liens are subject to and that are perfected after the Petition Date to the extent provided by section 546(b) of the Bankruptcy Code, in each case unless such liens are themselves Prepetition ABL Liens, and (C) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code; and

> (iii)    _Liens Junior to Certain Other Liens._  Pursuant to section 364(c)(3) of the

Bankruptcy Code, and subject to the Carve-Out, a valid, binding, continuing, enforceable, fully-perfected junior security interest (to the extent set forth on **Exhibit A** hereto) in and lien upon (A) all pre- and postpetition property of the Term DIP Loan Parties of the same nature, scope and type as the Prepetition Term Loan Priority Collateral and (B) all pre- and postpetition property of the ABL DIP Loan Parties of the same nature, scope and type as the Prepetition ABL Priority Collateral that, on or as of the Petition Date, is subject to valid, perfected and non-avoidable senior liens or valid and non-avoidable senior permitted liens in existence immediately prior to the Petition Date or that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, in each case other than the Prepetition ABL Liens.

> (b)    _Term DIP Liens._  As security for the Term DIP Obligations, effective and

perfected upon the date of this Interim Order and without the necessity of the execution, recordation or filing by the Term DIP Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the

possession or control by the Term DIP Agent of, or over, any DIP Collateral, the following security interests and liens are hereby granted to the Term DIP Agent for its own benefit and the benefit of the Term DIP Lenders (all property identified in clauses (i)-(iii) below being collectively referred to as the "**Term DIP Collateral**" and, collectively with DIP ABL Collateral, the "**DIP Collateral**"), subject only to the payment of the Carve-Out and in each case in accordance with the priorities set forth in **Exhibit A** hereto (all such liens and security interests granted to the Term DIP Agent, for its benefit and for the benefit of the Term DIP Lenders, pursuant to this Interim Order and the Term DIP Documents, the "**Term DIP Liens**" and together with the DIP ABL Liens, the "**DIP Liens**"):

(i)     Liens on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected (A) first priority senior security interest in and lien upon all tangible and intangible pre- and postpetition property (including mineral rights) of the Term DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, of the same nature, scope and type as the Prepetition Term Loan Priority Collateral, and the proceeds, products, rents and profits thereof, which, subject to and upon entry of the Final Order, shall include any Avoidance Proceeds related to the forgoing ("**DIP Term Loan Priority Collateral**," which for the avoidance of doubt shall include Prepetition Term Loan Priority Collateral) and (B) junior security interest in and lien upon all tangible and intangible pre- and postpetition property of the Term DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, of the same nature, scope and type as the Prepetition ABL Priority Collateral, and the proceeds, products, rents and profits thereof, in each case that, on or as of the Petition Date are not subject to either (x) a valid, perfected and non-avoidable lien, or (y) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent

to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and in each case, other than the Avoidance Actions (but including Avoidance Proceeds subject to entry of the Final Order), but in each case subject to the Carve-Out, provided that, with respect to the Term DIP Roll-Up Loans, the security interests and liens granted pursuant to this clause (i) shall not include liens on the Specified Excluded Unencumbered Property;

(ii)    <u>Liens Priming Certain Prepetition Secured Parties' Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code: (A) a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and lien upon all pre- and postpetition property (including mineral rights) of the DIP Loan Parties that are subject to (1) valid, perfected and nonavoidable liens as of the Petition Date or (2) valid and non-avoidable liens as of the Petition Date and that are perfected after the Petition Date to the extent provided by section 546(b) of the Bankruptcy Code, of the same nature, scope and type as the Prepetition Term Loan Priority Collateral, regardless of where located, regardless of whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected, which security interest and lien shall prime the Prepetition ABL Liens and the Prepetition Term Liens (the "**Term DIP Term Loan Priority Collateral Priming Liens**"), and (B) a valid, binding, continuing, enforceable, fully-perfected priming security interest in and lien upon (with priority as set forth on **<u>Exhibit A</u>** hereto) all pre- and postpetition property of the DIP Loan Parties that are subject to (1) valid, perfected and nonavoidable liens as of the Petition Date or (2) valid and non-avoidable liens as of the Petition Date and that are perfected after the Petition Date to the extent provided by section 546(b) of the Bankruptcy Code, of the same nature, scope and type as the Prepetition ABL Priority Collateral, regardless of where located, regardless of whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected, which security interest and lien shall prime the

Prepetition First Lien Term Liens and Prepetition Second Lien Term Liens (the "**Term DIP ABL Priority Collateral Priming Liens**", and together with the Term DIP Term Loan Priority Collateral Priming Liens, the "**Term DIP Priming Liens**").  Notwithstanding anything herein to the contrary, but subject to the relative priorities set forth in paragraph 14(c) herein, the Term DIP Priming Liens shall be (A) subject and junior to the Carve-Out in all respects, (B)  junior to (1) valid, perfected and non-avoidable liens, if any, to which the Prepetition Term Liens are subject to and (2) valid and non-avoidable liens to which the Prepetition Term Liens are subject to and that are perfected after the Petition Date to the extent provided by section 546(b) of the Bankruptcy Code, in each case unless such liens are themselves Prepetition Term Liens, and (C) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code; and

(iii)    <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien upon (A) all pre- and postpetition property of the DIP ABL Loan Parties of the same nature, scope and type as the Prepetition ABL Priority Collateral and (B) all pre- and postpetition property of the Term DIP Loan Parties of the same nature, scope and type as the Prepetition Term Loan Priority Collateral that, on or as of the Petition Date, is subject to valid, perfected and non-avoidable senior liens or valid and non-avoidable senior permitted liens in existence immediately prior to the Petition Date or that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, in each case other than the Prepetition Term Liens;

(c)    *Relative Priority of Liens*.  Notwithstanding anything to the contrary herein, (i) in respect of the Term DIP Collateral, the DIP Liens in respect of the Term DIP Roll-

Up Loans (the "**Term DIP Roll-Up Liens**") shall be subject and subordinate to the DIP Liens in respect of the New Money Term DIP Loans (the "**New Money Term DIP Liens**"), and (ii) in respect of the Specified Excluded Unencumbered Property, the DIP Liens in respect of the new money portion of the DIP ABL Facility (the "**New Money DIP ABL Liens**") shall be subject to and subordinate to the New Money Term DIP Liens.  Notwithstanding anything to the contrary in, the preceding sentence, this Interim Order or in the DIP Documents, the relative priority of each DIP Lien granted in this paragraph 14 shall be as set forth in **Exhibit A** attached hereto and the relative priority of the Prepetition ABL Liens, the ABL Indemnification Liens, the Prepetition ABL Adequate Protection Liens, Prepetition Term Liens and the Prepetition Term Loan Adequate Protection Liens shall be as set forth in **Exhibit A** attached hereto; *provided* that, for the avoidance of doubt, each such lien shall be subject and subordinate to the Carve-Out.

(d)     *Automatic Effectiveness of Liens*.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby vacated and modified to permit the DIP Loan Parties to grant the liens and security interests to the DIP Agents, the other DIP Secured Parties and the Prepetition Secured Parties, in any such case, contemplated by this Interim Order and the other DIP Documents, and such liens and security interests are hereby automatically granted, attached and perfected.

15.     *Protection of DIP Lenders' Rights.*

(a)     So long as (1) there are any Term DIP Obligations outstanding or the Term DIP Lenders have any outstanding "Commitments" (as defined, and used, in the Term DIP Credit Agreement) (the "**Term DIP Commitments**") under the Term DIP Credit Agreement, or (2) there is any Prepetition First Lien Term Loan Debt outstanding under the Prepetition First Lien Term Loan Credit Agreement, the Prepetition ABL Secured Parties shall:  (i) with respect

to the DIP Term Loan Priority Collateral and Prepetition Term Loan Priority Collateral, have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted pursuant to the Prepetition Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Term Loan Priority Collateral and Prepetition Term Loan Priority Collateral, including in connection with the ABL Indemnification Liens, the Prepetition ABL Liens or the Prepetition ABL Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, such DIP Term Loan Priority Collateral and Prepetition Term Loan Priority Collateral  (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the Term DIP Obligations and termination of the Term DIP Commitments and payment in cash in full of the Prepetition First Lien Term Loan Debt), to the extent such transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in such DIP Term Loan Priority Collateral and Prepetition Term Loan Priority Collateral unless, solely as to this clause (iii), the DIP Agents or the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and non-avoidable liens or security interests as of the Petition Date and (iv) at the request of the Term DIP Agent, deliver or cause to be delivered, at the Term DIP Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the Term DIP Agents or the Term DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of such DIP Term Loan Priority Collateral subject to any sale or disposition

permitted by the DIP Documents and this Interim Order or in connection with the ABL

Discharge.

(b)      So long as (1) there are any DIP ABL Obligations outstanding or the DIP

ABL Lenders have any outstanding "DIP Revolving Loan Commitment" (as defined, and used,

in the DIP ABL Credit Agreement) (the "**DIP ABL Commitments**," and together with the Term

DIP Commitments, the "**DIP Commitments**") under the DIP ABL Credit Agreement or (2)

there is any Prepetition ABL Debt outstanding (including any Prepetition ABL Indemnification

Obligations) under the Prepetition ABL Credit Agreement, the Prepetition Term Loan Secured

Parties shall: (i) with respect to the Prepetition ABL Priority Collateral and DIP ABL Priority

Collateral, have no right to and shall take no action to foreclose upon, or recover in connection

with, the liens granted pursuant to the Prepetition Documents or this Interim Order, or otherwise

seek to exercise or enforce any rights or remedies against such Prepetition ABL Priority

Collateral and DIP ABL Priority Collateral, including in connection with the Prepetition Term

Liens or the Prepetition Term Loan Adequate Protection Liens; (ii) be deemed to have consented

to any transfer, disposition or sale of, or release of liens on, such Prepetition ABL Priority

Collateral or DIP ABL Priority Collateral (but not any proceeds of such transfer, disposition or

sale to the extent remaining after payment in cash in full of the DIP ABL Obligations and

Prepetition ABL Debt and termination of the DIP ABL Commitments and "Commitments" as

defined under the Prepetition ABL Credit Agreement), to the extent such transfer, disposition,

sale or release is authorized under the DIP Documents; (iii) not file any further financing

statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments,

or otherwise take any action to perfect their security interests in such Prepetition ABL Priority

Collateral or DIP ABL Priority Collateral unless, solely as to this clause (b), the DIP Agents or

the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and non-avoidable liens or security interests as of the Petition Date and (iv) at the request of the DIP ABL Agent or Prepetition ABL Agent, deliver or cause to be delivered, at the DIP ABL Loan Parties' or Prepetition ABL Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP ABL Agents or Prepetition ABL Agents or the DIP ABL Lenders or Prepetition ABL Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of such Prepetition ABL Priority Collateral or DIP ABL Priority Collateral subject to any sale or disposition permitted by the DIP Documents and this Interim Order or in connection with the ABL Discharge.

(c)     To the extent any Prepetition ABL Secured Party has possession of any Prepetition ABL Priority Collateral or DIP ABL Priority Collateral or has control with respect to any Prepetition ABL Priority Collateral or DIP ABL Priority Collateral, or has been noted as a secured party on any certificate of title for a titled good constituting Prepetition ABL Priority Collateral or DIP ABL Priority Collateral, then such Prepetition ABL Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agents and the DIP Lenders (subject to the priorities set forth in **Exhibit A** hereto), and it shall comply with the instructions of the DIP ABL Agent with respect to the exercise of such control.

(d)     To the extent any Prepetition Term Loan Secured Party has possession of any Prepetition Term Loan Priority Collateral or DIP Term Loan Priority Collateral or has control with respect to any Prepetition Term Loan Priority Collateral or DIP Term Loan Priority

Collateral, or has been noted as a secured party on any certificate of title for a titled good

constituting Prepetition Term Loan Priority Collateral or DIP Term Loan Priority Collateral, then

such Prepetition Term Loan Secured Party shall be deemed to maintain such possession or

notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for

the benefit of the DIP Agents and the DIP Lenders (subject to the priorities set forth in **Exhibit A**

hereto), and it shall comply with the instructions of the Term DIP Agent with respect to the

exercise of such control.

(e)        Any proceeds of Prepetition Collateral received by any Prepetition

Secured Party in connection with the exercise of any right or remedy (including setoff) relating

to the Prepetition Collateral or otherwise received by any Prepetition Secured Party shall be

segregated and held in trust for the benefit of and forthwith paid over to the applicable DIP

Agents for the benefit of the applicable DIP Secured Parties (subject to the priorities set forth in

**Exhibit A** hereto) in the same form as received, with any necessary endorsements, or as a court

of competent jurisdiction may otherwise direct.  The DIP Agents are hereby authorized to make

any such endorsements as agent for any such Prepetition Secured Party.  This authorization is

coupled with an interest and is irrevocable.

(f)        The automatic stay provisions of section 362 of the Bankruptcy Code are

hereby vacated and modified to the extent necessary to permit the DIP Secured Parties in respect

of any DIP Facility to enforce all of their rights under the applicable DIP Documents and take

any or all of the following actions, at the same or different time, in each case without further

order or application of the Court: (i) immediately upon the occurrence of an Event of Default,

declare (A) the termination, reduction or restriction of any further DIP Commitment to the extent

any such DIP Commitment remains, (B) all DIP Obligations to be immediately due, owing and

payable, without presentment, demand, protest, or other notice of any kind, all of which are

expressly waived by the DIP Loan Parties; notwithstanding anything herein or in any DIP

Document to the contrary, (ii) the termination of the applicable DIP Documents as to any future

liability or obligation of the applicable DIP Agent and the applicable DIP Lenders (but, for the

avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations), (iii) whether

or not the maturity of any of the DIP Obligations shall have been accelerated, proceed to protect,

enforce and exercise all rights and remedies of the DIP Secured Parties under the DIP

Documents for such DIP Facility or applicable law, including, but not limited to, by suit in

equity, action at law or other appropriate proceeding, whether for the specific performance of

any covenant or agreement contained in any such DIP Document or any instrument pursuant to

which such DIP Obligations are evidenced, and, if such amount shall have become due, by

declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable

right of any of such DIP Secured Parties, and (iv) unless this Court orders otherwise during the

Remedies Notice Period (as defined below) after a hearing, upon the occurrence of an Event of

Default and the giving of five business days' prior written notice (which shall run concurrently

with any notice required to be provided under the DIP Documents) (the "**Remedies Notice**

**Period**") via email to counsel to the Debtors and the office of the United States Trustee for the

District of Delaware (the "**U.S. Trustee**") to (A) withdraw consent to the DIP Loan Parties'

continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in

the DIP Documents and under applicable law with respect to the DIP Collateral; *provided*, that

no such notice shall be required for any exercise of rights or remedies (A) to block or limit

withdrawals from any bank accounts that are a part of the Collateral (including, without

limitation, by sending any control activation notices to depositary banks pursuant to any control

agreement) or (B) in the event of DIP Obligations that have not been Paid in Full (other than

contingent indemnification obligations as to which no claim has been asserted) on the applicable

termination of the respective DIP Document.

(g)    During the Remedies Notice Period, the DIP Loan Parties shall be

permitted to use Cash Collateral solely to (A) pay payroll and other critical administrative

expenses to keep the business of the DIP Loan Parties operating, strictly in accordance with the

Approved Budget and (B) fund the Carve-Out.  During the Remedies Notice Period, the Debtors,

the Committee (if appointed) and/or any party in interest shall be entitled to seek an emergency

hearing with the Court within the Remedies Notice Period for the purpose of contesting whether,

in fact, an Event of Default has occurred and is continuing. Except as set forth in this Interim

Order, the Debtors have irrevocably waived their right to seek relief under the Bankruptcy Code,

including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such

relief would in any way impair or restrict the rights or remedies of the DIP Secured Parties set

forth in this Interim Order or the DIP Documents.

(h)    In no event shall the DIP Agents, the DIP Lenders or the Prepetition

Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with

respect to the DIP Collateral.  Further, subject to entry of the Final Order, in no event shall the

"equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured

claims of the Prepetition Secured Parties.

(i)    No rights, protections or remedies of the DIP Agents or the DIP Lenders

granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified

or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to

the DIP Loan Parties' authority to continue to use Cash Collateral; (ii) any actual or purported

termination of the DIP Loan Parties' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the DIP Loan Parties' continued use of Cash Collateral or the provision of adequate protection to any party.

(j)     Except to the extent the DIP Lenders are required to fund the Carve Out as set forth in this Interim Order, the DIP Agents and DIP Lenders shall have no obligation to make any loan or advance under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived in writing by the applicable DIP Agent and in accordance with the terms of the applicable DIP Documents.

16.     *Proceeds of Subsequent Financing*.  Without limiting the provisions and protections of Paragraph 14 above, but subject in all respects to the Carve-Out, if at any time prior to the Repayment in Full in accordance with the DIP Documents of all the DIP Obligations (including subsequent to the confirmation of any chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of this Interim Order or the DIP Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Agents for application to the DIP Obligations, in accordance with the priorities set forth herein, until such DIP Obligations are Paid in Full.

17.     *Limitation on Charging Expenses Against Collateral*.  Subject to entry of the Final Order, and subject to the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy

or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior express written consent of each of the DIP Agents, the Prepetition Agents (in the case of the Prepetition ABL Agent, prior to the ABL Discharge) and the Prepetition Lenders, as the case may be, that holds a lien on the relevant asset, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agents, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agents, the DIP Lenders or the Prepetition Secured Parties to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

18.      *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Agents by, through or on behalf of the DIP Lenders pursuant to the provisions of the Interim Order, the Final Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code (subject to entry of the Final Order approving the waiver of the Debtors' rights under sections 506(c) and 552(b) of the Bankruptcy Code), whether asserted or assessed by through or on behalf of the Debtors.

19.      *Use of Cash Collateral.*  The DIP Loan Parties are hereby authorized, subject to the terms and conditions of this Interim Order, to use Cash Collateral; *provided* that (a) the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth and (b) except on the terms and conditions of this Interim Order, the DIP Loan Parties shall be

enjoined and prohibited from at any time using the Cash Collateral absent further order of the Court.

20.     *ABL Indemnification Liens and Adequate Protection of Prepetition ABL Secured Parties*.  The Prepetition ABL Secured Parties are entitled to (a) the ABL Indemnification Liens and (b) pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, adequate protection of their interests in all Prepetition Collateral, including Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition ABL Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the DIP Loan Parties (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition ABL Liens by the DIP Liens pursuant to the DIP Documents and this Interim Order and/or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "**Prepetition ABL Adequate Protection Claim**").  In consideration of the foregoing, the Prepetition ABL Secured Parties are hereby granted the following, in each case, subject to the Carve-Out (collectively, the "**Prepetition ABL Secured Parties Adequate Protection Obligations**"):

(a)     ABL Indemnification Liens and Prepetition ABL Adequate Protection Liens.  The Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), (i) to secure payment of any and all Prepetition ABL Indemnification Claims and the ABL Indemnification Liens and (ii) to secure payment of any and all of the Prepetition ABL Adequate Protection Claims, a valid, perfected replacement

security interest in and lien (the "**Prepetition ABL Adequate Protection Liens**") (subject to the limitations set forth above) upon the Collateral, except for the Specified Excluded Unencumbered Property, in accordance with the priorities shown in **Exhibit A** and in each case subject to the Carve-Out.

(b)    Prepetition ABL Section 507(b) Claim.  The Prepetition ABL Secured Parties are hereby granted against each of the DIP Loan Parties on a joint and several basis an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition ABL Adequate Protection Claim with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Prepetition ABL 507(b) Claim**").  The Prepetition ABL 507(b) Claim shall be subject and subordinate only to the Carve-Out and the DIP Superpriority Claims granted in respect of the DIP Obligations and shall be *pari passu* with the Prepetition First Lien Term Loan 507(b) Claim (as defined below) and senior in all respects to the Prepetition Second Lien Term Loan 507(b) Claim (as defined below).  Except to the extent expressly set forth in this Interim Order or the DIP Credit Agreements, the Prepetition ABL Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition ABL 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been Paid in Full and the DIP Commitments have been terminated.  For purposes of this Interim Order, the terms "Paid in Full," "Repaid in Full," "Repay in Full," and "Payment in Full" shall mean, with respect to any referenced DIP Obligations and/or Prepetition Debt, (i) the indefeasible payment in full in cash of such

obligations, (ii) the termination or cash collateralization, in accordance with the DIP Documents and/or Prepetition Documents, as applicable, of all undrawn letters of credit and Banking Services Obligations outstanding thereunder, and (iii) the termination of all commitments under the DIP Documents and/or the Prepetition Debt Documents, as applicable.

(c)    Prepetition ABL Agent Fees and Expenses.  The Prepetition ABL Agent shall receive from the DIP Loan Parties, for the benefit of the Prepetition ABL Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses with respect to Prepetition ABL Debt under the Prepetition ABL Financing Documents, including, but not limited to, the reasonable and documented fees and expenses of counsel for the Prepetition ABL Agent (including Hogan Lovells US LLP as primary counsel to the Prepetition ABL Agent, Morris, Nichols, Arsht & Tunnell LLP as bankruptcy and Delaware counsel to the Prepetition ABL Agent, one local counsel to the Prepetition ABL Agent in each other applicable jurisdiction) promptly upon receipt of invoices therefor.  The DIP Loan Parties are authorized to pay the prepetition reasonable and documented fees and expenses described in this subsection (c) immediately upon entry of this Interim Order.  Postpetition, the Prepetition ABL Agent shall provide summary form fee and expense statements (i.e., without any detail) to the DIP Loan Parties, the U.S. Trustee, and any Committee, which may be redacted for privileged information. If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the date that is ten (10) business days after delivery of such invoice to the Debtors, the U.S. Trustee, and any Committee, the DIP Loan Parties shall promptly pay such invoices.  If an objection to a professional's invoice is timely received, the DIP Loan Parties shall promptly pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  The Prepetition ABL

Agent (and each of its professionals) shall not be required to comply with U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, the Court for the payment of any of their out-of-pocket costs, fees, expenses, disbursements and other charges.  Payments of any amounts set forth in this paragraph are not subject to recharacterization, avoidance, subordination or disgorgement.

(d)    Prepetition ABL Secured Parties' Cash Payments.  Subject to reallocation or recharacterization as payment of principal under sections 506(a) and (b) of the Bankruptcy Code, the Prepetition ABL Secured Parties shall receive current cash payments in the amount of interest on the outstanding principal at the non-default rate under the Prepetition ABL Credit Agreement prior to the ABL Discharge.

(e)    Information Rights.  Until the occurrence of the ABL Discharge, the Debtors shall promptly provide the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, with all required written financial reporting and other periodic reporting that is delivered by any of the DIP Loan Parties under the DIP Documents.  In addition, the Debtors shall upon reasonable advance notice, permit the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, to conduct field audits, collateral examinations, liquidation valuations, and inventory appraisals at reasonable times in respect of any or all of the Collateral in accordance with the terms and conditions set forth in the Prepetition ABL Financing Documents.

21.    *Adequate Protection of Prepetition Term Loan Secured Parties.*  The Prepetition Term Loan Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, for and equal in amount to the aggregate diminution in the value of the Prepetition Term Loan

Secured Parties' interests in the Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the DIP Loan Parties (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition Term Liens by the DIP Liens pursuant to the DIP Documents and this Interim Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, (the "**Prepetition Term Loan Parties Adequate Protection Claim**" and, together with the Prepetition ABL Adequate Protection Claim, the "**Adequate Protection Claims**"); *provided*, that the avoidance of any Prepetition Term Loan Secured Parties' interests in Prepetition Collateral shall not constitute diminution in the value of such Prepetition Term Loan Secured Party's interests in Prepetition Collateral.  As adequate protection of the Prepetition Term Loan Parties Adequate Protection Claim, the Prepetition Term Loan Secured Parties are hereby granted the following, in each case subject to the Carve-Out (collectively, the "**Prepetition Term Loan Adequate Protection Obligations**" and, together with the Prepetition ABL Secured Parties Adequate Protection Obligations, the "**Adequate Protection Obligations**"):

(a)      Prepetition Term Loan Adequate Protection Liens.  The Prepetition First Lien Term Loan Agent, on behalf of the Prepetition First Lien Term Loan Secured Parties, and the Prepetition Second Lien Term Loan Agent, on behalf of the Prepetition Second Lien Term Loan Secured Parties, are each hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the applicable Prepetition Term Loan Parties Adequate Protection Claim held by such Prepetition Term Loan Secured Parties, a replacement security interest in and lien (the "**Prepetition Term Loan Adequate Protection Liens**" and, together with the Prepetition ABL Adequate Protection Liens,

the "**Adequate Protection Liens**") (subject to the limitations set forth above) upon the

Collateral, except for the Specified Excluded Unencumbered Property, in accordance with the

priorities shown in **Exhibit A** and in each case subject to the Carve-Out.

(b)        Prepetition Term Loan Secured Parties Section 507(b) Claim.  The

Prepetition First Lien Term Loan Secured Parties are hereby granted, subject to the Carve-Out,

allowed superpriority claims as provided for in section 507(b) of the Bankruptcy Code, junior to

the DIP Superpriority Claims (the "**Prepetition First Lien Term Loan 507(b) Claim**").  The

Prepetition Second Lien Term Loan Secured Parties are hereby granted, subject to the Carve-

Out, allowed superpriority claims as provided for in section 507(b) of the Bankruptcy Code,

junior to the DIP Superpriority Claims, the Prepetition ABL 507(b) Claim and the Prepetition

First Lien Term Loan 507(b) Claim (the "**Prepetition Second Lien Term Loan 507(b) Claim**"

and, together with the Prepetition First Lien Term Loan 507(b) Claim, the "**Prepetition Term**

**Loan 507(b) Claims**," and the Prepetition Term Loan 507(b) Claims together with the

Prepetition ABL 507(b) Claim, the "**507(b) Claims**").  If the Prepetition First Lien Term Loan

Secured Parties holding 66.67% of the Prepetition First Lien Term Loan Debt waive the

requirement that their Prepetition Term Loan 507(b) Claims be paid in full in cash, then the

Prepetition Second Lien Term Loan Secured Parties will also be deemed to waive such

requirement.  The Prepetition First Lien Term Loan 507(b) Claim shall be subject and

subordinate to only the Carve-Out and the DIP Superpriority Claims granted in respect of the

DIP Obligations and shall be *pari passu* with the Prepetition ABL 507(b) Claim.  The Prepetition

Second Lien Term Loan 507(b) Claim shall be subject and subordinate to only the Carve-Out,

the Prepetition First Lien Term Loan 507(b) Claim, the Prepetition ABL 507(b) Claim and the

DIP Superpriority Claims granted in respect of the DIP Obligations.  Except to the extent

expressly set forth in this Interim Order or the DIP Credit Agreements, the Prepetition Term

Loan Secured Parties shall not receive or retain any payments, property or other amounts in

respect of the Prepetition Term Loan 507(b) Claim unless and until the DIP Obligations (other

than contingent indemnification obligations as to which no claim has been asserted) and any

claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have

indefeasibly been Paid in Full and the DIP Commitments have been terminated.

(c)     Prepetition Term Loan Secured Parties' Fees and Expenses.  The

Prepetition Term Loan Agents shall receive from the DIP Loan Parties, for the benefit of the

Prepetition Term Loan Lenders, current cash payments of the reasonable and documented

prepetition and postpetition fees and expenses of the Prepetition Term Loan Agents under the

Prepetition Term Loan Documents, including, but not limited to, the reasonable and documented

fees and disbursements of one counsel and one local counsel in each applicable jurisdiction for

each of the Prepetition Term Loan Agents.  The DIP Loan Parties shall also pay all reasonable

and documented prepetition and postpetition fees and expenses of:  (i) the Crossover Group, to

the extent not already paid, including the reasonable and documented fees and expenses of Davis

Polk & Wardwell LLP, as counsel to the Crossover Group, Simpson Thacher & Bartlett LLP, as

counsel to Solus Alternative Asset Management LP (a member of the Crossover Group), one

local counsel to the Crossover Group in each applicable jurisdiction, if retained; and (ii) the First

Lien Group, to the extent not already paid, including the reasonable and documented fees and

expenses of Shearman & Sterling LLP, as counsel, one local counsel to the First Lien Group in

each applicable jurisdiction, if retained.  The DIP Loan Parties are authorized to pay the

reasonable and documented prepetition fees and expenses described in this subsection (c)

immediately upon entry of this Interim Order.  Postpetition, the Prepetition Term Loan Agents,

the Crossover Group, and the First Lien Group shall provide summary form fee and expense statements (i.e., without any detail) to the DIP Loan Parties, the U.S. Trustee, and any Committee, which may be redacted for privileged information.  If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the date that is ten (10) business days after delivery of such invoice to the Debtors, the U.S. Trustee, and any Committee, the DIP Loan Parties shall promptly pay such invoices.  If an objection to a professional's invoice is timely received, the DIP Loan Parties shall promptly pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  The Prepetition Term Loan Agents, the Crossover Group, and the First Lien Group (and each of their professionals) shall not be required to comply with U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, the Court for the payment of any of their out-of-pocket costs, fees, expenses, disbursements and other charges.  Payments of any amounts set forth in this paragraph are not subject to recharacterization, avoidance, subordination or disgorgement.

(e)    Information Rights.  The Debtors shall promptly provide the Prepetition Term Loan Agents, on behalf of itself and the Prepetition Term Loan Lenders, with all required written financial reporting and other periodic reporting that is delivered by any of the DIP Loan Parties under the DIP Documents, including the Approved Budget and any related variance reporting. In addition, the Debtors shall provide the Prepetition Term Loan Agents, on behalf of itself and the Prepetition Term Loan Lenders, with reasonable access to the Debtors' officers, management, books and records, premises and properties in accordance with the terms and conditions set forth in the Prepetition Term Loan Financing Documents.

22.     *Adequate Protection Liens and Prepetition Intercreditor Agreements.*
Notwithstanding anything to the contrary herein, the Adequate Protection Liens shall retain the same priority between and among the Prepetition Secured Parties as the liens such parties held prior to the Petition Date pursuant to and as governed by the Prepetition Intercreditor Agreements, and the Prepetition Intercreditor Agreements shall continue in full force and effect and nothing herein shall be construed as modifying, amending, waiving or in any way impacting the effectiveness and enforceability thereof.  The Prepetition ABL Lenders and the Prepetition First Lien Term Loan Lenders each consent to the priming of their respective Prepetition Liens by the DIP Liens and the Adequate Protection Liens, and the Prepetition Second Lien Term Loan Lenders are deemed to consent to the priming of their Prepetition Second Lien Term Liens by the DIP Liens and the Adequate Protection Liens pursuant to the terms of the Prepetition Intercreditor Agreements, in each case where and to the extent set forth on **Exhibit A** hereto.

23.     *Reservation of Rights of Prepetition Secured Parties.*  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including, subject to the entry of the Final Order, section 506(c) of the Bankruptcy Code, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties; *provided* that, subject to the terms of the Prepetition Intercreditor Agreements, any of the Prepetition Secured Parties may request further or different adequate protection.

24.      *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     The DIP Agents, the DIP Lenders and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the DIP Loan Parties, as their true and lawful attorneys, with full power of substitution, to the maximum extent

permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities or other property, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agents (on behalf of the DIP Lenders) or the Prepetition Secured Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities or other property, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order), at the time and on the date of entry of this Interim Order or thereafter.  Upon the request of a DIP Agent, each of the Prepetition Secured Parties and the DIP Loan Parties, without any further consent of any party, is authorized to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the applicable DIP Agent to further validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and/or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agents to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

(c)    To the extent that any Prepetition Secured Party is the secured party under any account control agreements, real property mortgages or as-extracted collateral filings, listed as loss payee or additional insured under any of the DIP Loan Parties' insurance policies or is the secured party under any other agreement, each of (i) the DIP ABL Agent, on behalf of the DIP ABL Secured Parties, and (ii) the Term DIP Agent, on behalf of the Term DIP Secured Parties, are also deemed to be the secured party under such account control agreements, real property mortgages or as-extracted collateral filings, loss payee or additional insured under the Prepetition Secured Parties' insurance policies and the secured party under each such agreement (in any such case with the same priority of liens and claims thereunder relative to the priority of (x) the Prepetition Liens and Adequate Protection Liens and (y) the DIP Liens, as set forth herein), and shall have all rights and powers in each case attendant to that position (including, without limitation, rights of enforcement, but subject in all respects to the terms of this Interim Order), and shall, subject to the terms of this Interim Order, act in that capacity and distribute any proceeds recovered or received in respect of any of the foregoing pursuant to the priorities set forth in **Exhibit A** hereto.  In accordance with the terms of this Interim Order and the other DIP Documents, the Prepetition First Lien Term Loan Agent, the Prepetition Second Lien Term Loan Agent, or the Prepetition ABL Agent, as applicable, shall serve as agent for the applicable DIP Agent for purposes of perfecting such DIP Agent's security interests in and liens on all Collateral that is of a type such that perfection of a security interest therein may be accomplished only by possession or control by a secured party.

25.    *Preservation of Rights Granted Under This Interim Order.*

(a)    The relative priority of the liens expressly granted by this Interim Order shall be as set forth in **Exhibit A**.

(b)    Other than the Carve-Out and other claims and liens expressly granted by this Interim Order, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Agents and the DIP Lenders or the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in paragraph 12 of this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the DIP Loan Parties' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the DIP Loan Parties.

(c)    It shall constitute an Event of Default (as defined below) (giving each DIP Agent the right to terminate the DIP Loan Parties' use of Cash Collateral, the right to terminate the applicable DIP Commitments and/or the right to accelerate the applicable DIP Obligations) if any of the DIP Loan Parties, without the prior written consent of the Required DIP Lenders, as applicable, seeks, proposes or supports (whether by way of motion or other pleadings filed with the Court or any other writing executed by any DIP Loan Party or by oral argument), or if there is entered or confirmed (in each case, as applicable), or if there occurs:

(i)    a failure of the Debtors to make any payment under this Interim Order to any of the Prepetition Secured Parties when due;

(ii)    a failure of the Debtors to (x) observe or perform any of the material terms or provisions contained in this Interim Order or (y)

comply with any covenant or agreement in this Interim Order in any material respect;

(iii)  a failure of the Debtors to observe or perform any of the material terms or provisions contained in the RSA (as defined in the Term DIP Credit Agreement), subject to any applicable cure period set forth therein;

(iv)  any modifications, amendments, or reversal of this Interim Order, and no such consent shall be implied by any other action, inaction or acquiescence by any party;

or

(v)  any "Event of Default" or "DIP Event of Default" as defined in the DIP Credit Agreements.

Except as otherwise provided in this Interim Order, any material violation of any of the terms of this Interim Order or any occurrence of an "Event of Default" or "DIP Event of Default" under and as defined in the DIP Credit Agreements shall constitute an event of default under this Interim Order (each an "**Event of Default**") and upon any such Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Credit Agreements.  Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered: (A) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Claims shall have been Paid in Full (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (B) the other rights granted by this Interim Order shall not be affected; and (C) this Court shall retain jurisdiction, notwithstanding such

dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(d)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Claims incurred prior to the actual receipt of written notice by the DIP Agents or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacation or stay; or (ii) the validity, priority or enforceability of the DIP Liens, the Adequate Protection Liens, the ABL Indemnification Liens, the Prepetition ABL Indemnification Obligations, the Prepetition Liens or the Prepetition Debt.  Notwithstanding any such reversal, modification, vacation or stay of any use of Cash Collateral or Collateral, any DIP Obligations, DIP Liens, Adequate Protection or Adequate Protection Liens incurred by the DIP Loan Parties to the DIP Agents, the DIP Lenders or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agents or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agents, the DIP Lenders and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code (including, without limitation, in respect of any payments received in connection with the discharge of the Prepetition ABL Debt), this Interim Order and the DIP Documents with respect to all uses of Cash Collateral, the DIP Obligations and Adequate Protection.

(e)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the

ABL Indemnification Liens, the Prepetition ABL Indemnification Obligations, the Prepetition

Liens, the Prepetition Debt, Adequate Protection Claims and the Adequate Protection and all

other rights and remedies of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties

granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall

not be modified, impaired or discharged by: (i) the entry of an order converting any of the

Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases,

substantively consolidating any of the cases with another case, terminating the joint

administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an

order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy

Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order

confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4)

of the Bankruptcy Code, the DIP Loan Parties have waived any discharge as to any remaining

DIP Obligations or Adequate Protection Obligations and with respect to the Prepetition Debt and

the Prepetition ABL Indemnification Obligations (to the extent the ABL Discharge has not

occurred).  The terms and provisions of this Interim Order and the DIP Documents shall continue

in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly

administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP

Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Prepetition ABL

Indemnification Claims, the ABL Indemnification Liens, the Prepetition Debt, the Prepetition

Liens and the Adequate Protection Claims and all other rights and remedies of the DIP Agents,

the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim

Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are

Paid in Full, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated.

26.     *Limitation on Use of DIP Financing Proceeds and Collateral*.  Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Cash Collateral, Prepetition Collateral or any portion of the Carve-Out, or any proceeds of the foregoing, may be used directly or indirectly by any Debtor, any Guarantor, any official committee appointed in the Chapter 11 Cases, or any trustee appointed in the Chapter 11 Cases or any successor case, including any chapter 7 case, or any other person, party or entity (i) in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (a) against any of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the Prepetition Debt, liens on the Prepetition Collateral, DIP Obligations, DIP Liens, DIP Superpriority Claims and/or the adequate protection, adequate protection liens and superpriority claims granted to the Prepetition Secured Parties under the Interim Order or the Final Order, as applicable, or (b) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to, the Prepetition Debt, the DIP Obligations and/or the liens, claims, rights, or security interests granted under this Interim Order, the Final Order, the DIP Documents or the Prepetition Credit Agreements including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (ii) to prevent, hinder, or otherwise delay the Prepetition Secured Parties', the DIP Agent's or the DIP Lenders', as applicable, enforcement or realization on the Prepetition Debt, Prepetition Collateral, DIP

Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under this Interim Order or the Final Order, each in accordance with the DIP Documents, the Prepetition Credit Agreements or this Interim Order; (iii) to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties, the DIP Agents or the DIP Lenders under this Interim Order, the Prepetition Credit Agreements or the DIP Documents, as applicable; (iv) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, adequate protection liens and superpriority claims and liens granted to the Prepetition Secured Parties, unless all DIP Obligations, Prepetition Debt, adequate protection, and claims granted to the DIP Agents, DIP Lenders or Prepetition Secured Parties under this Interim Order, have been refinanced or Paid in Full or otherwise agreed to in writing by the DIP Lenders; or (v) to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are agreed to in writing by the DIP Lenders in or are otherwise included in the "**Approved Budget**".

27.    *Real Property Leases*.  As a requirement and precondition to the DIP Lenders' willingness to lend and in furtherance of the DIP Superpriority Claims provided for in this Interim Order and pursuant to the DIP Documents, which are payable from and have recourse to all of the Debtors' pre- and post-petition property including, among other things, each Mining Lease, Real Property Lease or other Contractual Obligation (each as defined in the DIP Credit Agreements) to which a Debtor is a counterparty (each, a "**Real Property Lease**"), the DIP Lenders shall have the following protections with respect to the Debtors' Real Property Leases, regardless of whether any particular Real Property Lease or group of Real Property Leases

constitutes Collateral, which protections shall be enforced by the DIP Agents or DIP Lenders as authorized, approved, and granted pursuant to the provisions of this Interim Order and in accordance with the terms of the DIP Credit Agreements (and, after the indefeasible payment in full of the DIP Obligations, (i) the rights of the DIP Agents and the DIP Lenders shall automatically transfer and be available to the Prepetition Agents and the Prepetition Secured Parties, subject to the terms of the Prepetition Intercreditor Agreements, (ii) defined terms used in this Paragraph 27 relating to the DIP Facilities shall be deemed to be references to corresponding defined terms relating to the Prepetition Credit Facilities, (iii) any notice herein required to be delivered pursuant to this Paragraph 27 to the DIP Agents shall instead be required to be delivered to each of the Prepetition Agents, and (iv) the automatic stay provisions pursuant to section 362 of the Bankruptcy Code are vacated and modified to the extent necessary so as to permit the Prepetition Agents and the Prepetition Secured Parties to exercise any of their rights with respect to Real Property Leases under this Paragraph 27):

(a)    Remedies Upon an Event of Default.  If an Event of Default shall have occurred and be continuing, the Term DIP Agent for the benefit of the Term DIP Lenders shall, with respect to any Real Property Lease or group of Real Property Leases to which any of the Debtors are party that constitute DIP Term Loan Priority Collateral, and the DIP ABL Agent for the benefit of the DIP ABL Lenders shall, with respect to any Real Property Lease or group of Real Property Leases to which any of the Debtors are party that constitute DIP ABL Priority Collateral, be permitted, and are hereby authorized, approved, and granted the following rights and remedies:

(i)    to exercise the Debtors' rights pursuant to section 365(f) of the Bankruptcy Code with respect to any such Real Property Lease(s) and, subject to this Court's approval after notice and hearing, assign any such Real Property Lease(s) in accordance with section 365 of the Bankruptcy

Code notwithstanding any language to the contrary in any of the applicable lease documents or executory contracts;

(ii)    to require any Debtor to complete promptly, pursuant to section 363 of the Bankruptcy Code, subject to the rights of the applicable DIP Agent, applicable DIP Lenders or applicable Prepetition Secured Parties (if applicable) to credit bid, an Asset Sale[19] of any such Real Property Lease(s) in one or more parcels at public or private sales, at the applicable DIP Agent's offices or elsewhere, for cash, at such time or times and at such price or prices and upon such other terms as the applicable DIP Agent or applicable DIP Lenders may deem commercially reasonable;

(iii)    to access the leasehold interests of the Debtors or debtors in possession in any such Real Property Lease(s) for the purpose of (A) marketing such property or properties for sale and (B) removing any Collateral thereon or arranging for the Asset Sale of any such Collateral except to the extent prohibited by the terms of the Real Property Lease (unless the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code); provided that the foregoing shall not preclude any counterparty to a Real Property Lease from an opportunity to be heard in this Court on notice with respect to the foregoing, and provided, further, that, regardless of whether any such Real Property Lease or proceeds thereof constitute DIP ABL Priority Collateral, DIP ABL Agent for the benefit of the DIP ABL Lenders shall be entitled to enter or otherwise access the leasehold interests of the Debtors or debtors in possession in any such Real Property Lease(s), for the purpose of removing any Collateral that constitutes DIP ABL Priority Collateral, or arranging such Collateral for disposition, or to take possession of the Debtors' books and records or obtain access to the Debtors' data processing equipment, computer hardware and software relating to the DIP ABL Priority Collateral;

(iv)    (A) to find an acceptable (in the applicable DIP Agent's or applicable Required DIP Lenders' good faith and reasonable discretion) replacement lessee, which may include the applicable DIP Agent, applicable DIP Lenders or any of their affiliates, to whom such Real Property Lease(s) may be assigned, (B) to hold, and manage all aspects of, an auction or other bidding process to find such acceptable replacement lessee, (C) in connection with any such auction, agree, on behalf of the Debtors, to reimburse reasonable fees and expenses of any stalking horse bidder, if

---

[19]    **"Asset Sale"** shall mean (a) the sale, lease, transfer, assignment, conveyance or other disposition (including any sale and lease back transaction) of any assets or rights by the Company or any of its Restricted Subsidiaries (as defined in the DIP Credit Agreements); or (b) the issuance or sale of equity interests by any Restricted Subsidiary or the sale by the Company or any of its Restricted Subsidiaries of equity interests in any Restricted Subsidiary.

necessary, and/or (D) to notify the Debtors of the selection of any replacement lessee pursuant to this Paragraph 27, upon receipt of which the Debtors shall promptly (1) file a motion seeking, on an expedited basis, approval of the Debtors' assumption and assignment of such Real Property Lease(s) to such proposed assignee, and (2) cure any defaults, if any, that have occurred and are continuing under such Real Property Lease(s) to the extent required by the Court (subject to the applicable DIP Lenders' right to cure defaults as set forth in Paragraph 27(e) of this Interim Order); or

(v)     to direct the Debtors to (A) assign any such Real Property Lease(s) to the applicable DIP Agent or applicable DIP Lenders as Collateral securing the applicable DIP Obligations, subject to clause (B), if applicable, (B) seek this Court's approval of the assumption of any such Real Property Lease(s) to the extent that this Court determines pursuant to a final order that an assumption is required in order to assign such lease or leases as Collateral, and (C) promptly cure any default that has occurred and is continuing under such Real Property Lease(s) to the extent required by the Court; provided that any assignment of any such Real Property Lease(s) as Collateral securing the applicable DIP Obligations shall not impair the Debtors' ability to subsequently assume (if not already assumed) and assign such Real Property Lease(s) pursuant to section 365 of the Bankruptcy Code or to enjoy the protections of section 365(f) of the Bankruptcy Code with respect to any such assignment.

(b)     Right to Credit Bid.  Prior to any assignment of any Real Property Lease or group of Real Property Leases, the Debtors shall first provide at least five (5) business days' prior written notice (the "**Initial Notice Period**") to the Term DIP Agent and Term DIP Lenders, with respect to DIP Term Loan Priority Collateral, and the DIP ABL Agent and DIP ABL Lenders, with respect to DIP ABL Priority Collateral, unless such notice provision is waived by the applicable DIP Agent and applicable Required DIP Lenders, which Initial Notice Period may be extended up to a further twenty-five (25) days by the applicable DIP Agent or applicable Required DIP Lenders in each of their sole discretion by delivering written notice of such extension to the Debtors prior to expiration of the Initial Notice Period, and by any further period as is mutually agreeable between the applicable DIP Agent or applicable Required DIP Lenders and the Company (such notice period being the "**Aggregate Notice Period**").   During such

notice period, the applicable DIP Agent shall be permitted to credit bid forgiveness of some or all of the outstanding applicable DIP Obligations (in an amount equal to at least the consideration offered by any other party in respect of such assignment) outstanding under the applicable DIP Facility as consideration in exchange for any such Real Property Lease(s) provided that to the extent the Company is entitled to retain a portion of the total consideration paid in respect of such assignment in accordance with the DIP Credit Agreements, the applicable portion of the consideration to be retained by Company shall be paid in cash (provided that such proceeds shall constitute DIP Collateral and Cash Collateral). In addition, in connection with the exercise of any of the applicable DIP Agent's or applicable Required DIP Lenders' rights pursuant to the applicable DIP Credit Agreement or this Interim Order to direct or compel a sale or other Asset Sale of any Real Property Lease(s), the applicable DIP Agent, on behalf of the applicable DIP Lenders, shall be permitted to credit bid forgiveness of some or all of the outstanding applicable DIP Obligations (in an amount equal to at least the consideration offered by any other party in respect of such sale or other Asset Sale) as consideration in exchange for such Real Property Lease(s). Pursuant to section 364(e) of the Bankruptcy Code, absent a stay pending appeal, the applicable DIP Lenders' right to credit bid shall not be affected by the reversal or modification on appeal of the Debtors' authorization pursuant to this Interim Order to obtain credit and incur debt as and in accordance with the terms set forth herein.

(c)    Right of First Refusal with Respect to Proposed Assignments and Rejections of Real Property Leases. Unless all DIP Obligations shall have indefeasibly been satisfied pursuant to the DIP Credit Agreements, the Debtors shall not seek, and it shall constitute, an Event of Default and terminate the right of the Debtors under the DIP Credit Agreements and this Interim Order if any of the Debtors seeks, the sale or other Asset Sale of, or the rejection or other

termination of, or if there is entered an order pursuant to section 365 of the Bankruptcy Code assigning or rejecting, any Real Property Lease or group of Real Property Leases, or if any Real Property Lease or group of Real Property Leases is deemed rejected due to the expiration of the assumption period provided for in section 365(d)(4) (the "**Statutory Rejection Date**"), without the Debtors' first providing thirty (30) days' prior written notice to the DIP Agents and DIP Lenders, or if such notice is given more than thirty (30) days in advance of the Statutory Rejection Date, prior written notice at least equal to the Aggregate Notice Period; provided, however, that the right of first refusal of the DIP Agents as set forth in this Paragraph 27(c) shall not apply to (x) any assignment or sale of a Real Property Lease or group of Real Property Leases to a winning bidder at an auction authorized by this Court, and (y) so long as no Event of Default has occurred and is ongoing, or to the extent such action would result in an Event of Default, any assignment or sale of a Real Property Lease or group of Real Property Leases that are not Material Leases generating cash proceeds (net of reasonable costs, expenses, and any applicable taxes) up to $2,500,000 in the aggregate value for all such sales or assignments. During such notice period, the Term DIP Agent, with respect to DIP Term Loan Priority Collateral, and the DIP ABL Agent, with respect to DIP ABL Priority Collateral, shall be permitted to:

> (i)     (A) notify the Debtors that it elects to take action pursuant to this Paragraph, upon receipt of which the Debtors shall promptly withdraw any previously filed rejection motion, (B) find an acceptable (in the applicable DIP Agents' or applicable Required DIP Lenders' good faith and reasonable discretion) replacement lessee, which may include the applicable DIP Agent, applicable DIP Lenders or any of their affiliates, to whom any such any Real Property Lease or group of Real Property Leases may be assigned (subject to Court approval), (C) hold, and manage all aspects of, an auction or other bidding process to find such acceptable replacement lessee, (D) in connection with any such auction, agree, on behalf of the Debtors (and subject to Court approval) to reimburse the reasonable fees and expenses of any stalking horse bidder, if necessary,

and (E) notify the Debtors of the selection of any replacement lessee pursuant to this Paragraph, upon receipt of which the Debtors shall (1) not seek to reject any such Real Property Lease(s), (2) promptly withdraw any pending motion to reject any such Real Property Lease(s), (3) promptly file a motion seeking, on an expedited basis, approval of the Debtors' assumption and assignment of such Real Property Lease(s) to the applicable DIP Agent or applicable Required DIP Lenders' proposed assignee, and (4) promptly cure any defaults that have occurred and are continuing under such Real Property Lease(s) to the extent authorized by the Court; or

(ii)     direct the Debtors to (A) assign any Real Property Lease or group of Real Property Leases as Collateral securing the applicable DIP Obligations (subject to Court approval), (B) seek the Court's approval of the assumption of any such Real Property Lease(s) if it is determined pursuant to a final order of this Court that an assumption is required in order to assign such lease(s) as Collateral, and (C) promptly cure any defaults that have occurred and are continuing under such Real Property Lease(s) (subject to the applicable DIP Lenders' right to cure defaults as set forth in Paragraph 27(e) of this Interim Order) to the extent authorized by the Court; provided that any assignment of any Real Property Lease(s) as Collateral securing the applicable DIP Obligations shall not impair the Debtors' ability to subsequently assume (if not already assumed) and assign any such Real Property Lease(s) pursuant to section 365 of the Bankruptcy Code or to enjoy the protections of section 365(f) of the Bankruptcy Code with respect to any such assignment.

(iii)    Notwithstanding anything to the contrary herein, the foregoing rights of the DIP Agents set forth in this Paragraph shall not apply to Real Property Leases that are rejected, terminated, sold, or assigned on the effective date of any plan of reorganization in any of the Chapter 11 Cases that, among other things, indefeasibly repays the DIP Obligations in full on the effective date thereof.  For the avoidance of doubt, on or prior to the thirtieth (30) day prior to the Statutory Rejection Date (as provided in section 365(d)(4) of the Bankruptcy Code), the Debtors shall have delivered written notice to the DIP Agents of each outstanding Real Property Lease that they intend to reject (including, without limitation, through statutory rejection on the Statutory Rejection Date) from and after the date of such notice (or, if applicable, notice that the Debtors have obtained the applicable landlord's consent to extension of the Statutory Rejection Date); provided that if the Debtors fail to deliver any such notice to the DIP Agents prior to such date with respect to any such Real Property Lease(s) (or a notice indicating that no such Real Property Lease(s) shall be rejected), the Debtors shall be deemed, for all purposes hereunder, to have delivered notice to the DIP Agents as of such date that they intend to reject all outstanding Real Property Leases.

79

(d)    <u>Assumption Orders</u>.  Any order of this Court approving the assumption of any Real Property Lease shall specifically provide that the applicable Debtor shall be authorized to assign such Real Property Lease pursuant to, and to enjoy the protections of, section 365(f) of the Bankruptcy Code subsequent to the date of such assumption.  To the extent that such provision is for any reason not included in any order of the Court approving the assumption of any Real Property Lease, then such Real Property Lease may not be assumed by the applicable Debtor unless the order approving the assumption provides for the assignment of such Real Property Lease, on the date of such order, to an acceptable (in the applicable DIP Agents' or applicable Required DIP Lenders' good faith and reasonable discretion) replacement lessee (which may include the applicable DIP Agents, applicable DIP Lenders, or their respective affiliates).

(e)    <u>DIP Lenders' Right to Cure Defaults</u>.  If any of the Debtors are required to cure any monetary defaults under any Real Property Lease pursuant to any order of this Court or otherwise in connection with any assumption or assumption and assignment of any such Real Property Lease pursuant to section 365(f) of the Bankruptcy Code, and such monetary default is not, within five (5) business days of the receipt by such Debtor of notice from the applicable DIP Agent pursuant to the applicable provision(s) of the applicable DIP Credit Agreement or any other notice from the applicable DIP Agent requesting the cure of such monetary default, cured in accordance with the provisions of such applicable court order as arranged by the applicable DIP Agent, the applicable DIP Agent may cure any such monetary defaults on behalf of the applicable Debtor(s).

(f)    <u>Priorities</u>.  For the avoidance of doubt, nothing set forth in this Paragraph 27 shall affect the relative priorities of liens and claims set forth herein and on **<u>Exhibit A</u>** hereto.

Unless and until Payment in Full  of the (A) DIP ABL Obligations and the Prepetition ABL Obligations, nothing set forth in this Paragraph 27 shall permit the Term DIP Agent or the Term DIP Lenders, or any of their designees or agents, to exercise any rights or remedies with respect to DIP ABL Priority Collateral or Prepetition ABL Priority Collateral and (B) DIP Term Loan Obligations and the Prepetition Term Loan Debt, nothing set forth in this Paragraph 27 shall permit the DIP ABL Agent or the DIP ABL Lenders, or any of their designees or agents, to exercise any rights or remedies with respect to DIP Term Loan Priority Collateral or Prepetition Term Loan Priority Collateral.

28.    *Approved Budget*.  The Approved Budget is approved on an interim basis. Proceeds of the DIP Facilities and Cash Collateral under this Interim Order shall only be used by the Loan Parties in accordance with the DIP Credit Agreements, this Interim Order, and the Approved Budget or as otherwise agreed by the DIP Agents.  None of the DIP Secured Parties' consent (if any) to, or acknowledgment of, the Approved Budget shall be construed as consent to use of the proceeds of the DIP Facilities or Cash Collateral beyond the respective maturity dates set forth in the DIP Credit Agreements, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

29.    *Limits to Lender Liability*.  Subject to entry of the Final Order, nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents or any DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.  The DIP Agents and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto

occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value

thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or

other person and all risk of loss, damage or destruction of the Collateral shall be borne by the

DIP Loan Parties.

      30.    *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions,

agreements and releases contained in this Interim Order, including, without limitation, in

paragraph 6 of this Interim Order, shall be binding upon the Debtors and any successor thereto

(including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or

elected for any of the Debtors) in all circumstances and for all purposes.  The Debtors'

stipulations, admissions, agreements and releases contained in this Interim Order, including,

without limitation, in paragraph 6 of this Interim Order, shall be binding upon all other parties in

interest, including, without limitation, any statutory or non-statutory committees appointed or

formed in the Chapter 11 Cases, if any (a "**Committee**") and any other person or entity acting or

seeking to act on behalf of the Debtors' estates unless: (a) such Committee, or any other party in

interest, in each case with requisite standing (subject in all respects to any agreement or

applicable law that may limit or affect such entity's right or ability to do so), has timely filed an

adversary proceeding or contested matter (subject to the limitations contained herein, including,

*inter alia*, in this paragraph) by no later than (i) the earlier of (x) five (5) Business Days prior to

the commencement of the hearing to confirm a chapter 11 plan, (y) 75 calendar days after entry

of this Interim Order and (z) 60 calendar days after the appointment of any Committee or (ii) any

such later date as has been agreed to, in writing, by the Prepetition Agents (with the consent of

the DIP Lenders) as applicable (the time period established by the foregoing clauses (i) and (ii),

the "**Challenge Period**"), (A) objecting to or challenging the amount, validity, perfection,

enforceability, priority or extent of the Prepetition Debt or the Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Challenges**") against the Prepetition Secured Parties or their respective affiliates and each of their respective former, current or future officers, partners, directors, managers, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to the Prepetition Credit Agreements, the Prepetition Debt, the Prepetition Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; provided, however, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (a) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, those contained in paragraph 6 of this Interim Order, shall be binding on all parties in interest; (b) the obligations of the DIP Loan Parties under the Prepetition Credit Agreements, including the Prepetition Debt, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7

case(s); (c) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense; and (d) the Prepetition Debt and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by any Committee, or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by any Committee, if any, or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Credit Agreements shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, those contained in paragraph 6 of this Interim Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any Committee, if any, and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Committee, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation,

Challenges with respect to the Prepetition Credit Agreements, the Prepetition Debt or the Prepetition Liens.  For the avoidance of doubt, none of the foregoing challenge provisions set forth in this paragraph shall apply to any DIP Secured Party, in their capacities as such, and in no event shall the DIP Facilities, DIP Obligations or DIP Liens be subject to challenge pursuant to this paragraph on avoidance or any other grounds by any party.

31.    *Postpetition Release*.  In addition, subject to the entry of the Final Order, notwithstanding anything to the contrary set forth herein, upon the repayment of all DIP Obligations (as defined in the DIP Credit Agreements) owed to the DIP Agents and the DIP Lenders by Debtors and termination of the rights and obligations arising under the DIP Documents (which payment and termination shall be on terms and conditions acceptable to DIP Agents), DIP Agents and the DIP Lenders shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring, on or prior to the date of such repayment and termination, in connection with or related to the DIP Documents, or the Interim Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve-Out on terms and conditions acceptable to the DIP Agents).

32.    *Landlord Agreements; Access.*  (a) All collateral access agreements to which the Prepetition ABL Agent or any of the Prepetition Agents is a party shall hereby continue to be deemed to be amended to include the relevant DIP Agent as a beneficiary thereunder, and such agreements shall thereafter be additionally enforceable by the relevant DIP Agent against, and binding upon, each landlord party thereto.  Subject to the entry of the Final Order, any title, landlord's lien, right of distraint or levy, security interest or other interest that any landlord or

mortgagee may have in any DIP Collateral or Prepetition Collateral of the Debtors located on such leased premises, to the extent the same is not avoidable under sections 544, 545, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise, is hereby expressly subordinated to the liens of the DIP Lenders and the Prepetition Lenders.

(b) Without limiting any other rights or remedies of the DIP Agents or the other DIP Secured Parties set forth in this Interim Order, the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents, upon three (3) business days' written notice to counsel to the Debtors and any landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property, after the expiration of the Remedies Notice Period, that an Event of Default has occurred and is continuing, the DIP Agents, (i) may, unless otherwise expressly provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agents, enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon, and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their businesses, without unreasonable interference from landlords, lienholders, or licensors thereunder; provided, however, that the DIP Agents (on behalf of the applicable DIP Lenders) shall pay only rent and additional rent, fees, royalties, or other monetary obligations of the Debtors that first arise after the written notice referenced above from the DIP Agents and that accrue during the period of such occupancy or use by DIP Agents calculated on a per diem basis.  For the avoidance of doubt, (A) all of the Debtors' obligations under any applicable lease or license shall not be affected, limited, or

otherwise modified by the rights granted to the DIP Agents pursuant to this paragraph and (B) any affected landlords, lienholders, and/or licensors shall retain all remedies available under applicable non-bankruptcy law.  Nothing herein shall require the Debtors, the DIP Agents or the other DIP Secured Parties, to assume any lease or license under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the DIP Agents and the other DIP Secured Parties herein.

33.     *Interim Order Governs.*  In the event of any inconsistency between the provisions of this Interim Order, the DIP Documents or any other order entered by this Court (other than the Final Order), the provisions of this Interim Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to, or authorization contained in, any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Documents, including, without limitation, the Approved Budget.

34.     *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, any Committee, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* that the DIP Agents, the DIP Lenders and the

Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

35.     *Exculpation*.  Nothing in this Interim Order, the DIP Documents, the existing agreements or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party or any Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Credit Parties or Loan Parties (as defined in the respective DIP Credit Agreements) in the operation of their businesses, or in connection with their restructuring efforts.  In addition, (a) the DIP Secured Parties and the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by the DIP Loan Parties.

36.     *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Credit Agreements, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, none of the DIP Agents, the DIP Lenders or the Prepetition Secured Parties shall (i) be deemed to be in "control" of the operations or participating in the management of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United

States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

37.     *Master Proof of Claim*.  The Prepetition Agents shall not be required to file proofs of claim in the Chapter 11 Cases or any successor case in order to assert claims on behalf of itself and the Prepetition Secured Parties for payment of the Prepetition Debt arising under the Prepetition Documents, nor shall any other Prepetition Secured Party be required to file any proofs of claim in the Chapter 11 Cases or any successor case in order to assert claims on behalf of itself for payment of the Prepetition Debt arising under the Prepetition Credit Agreements. The statements of claim in respect of the Prepetition Debt set forth in this Interim Order, together with any evidence accompanying the Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status. However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each Prepetition Agent and/or other Prepetition Secured Party is authorized to file in the Debtors' lead chapter 11 case *In re Blackhawk Mining LLC*, *et. al.*, Case No. 19-_____, a single, master proof of claim on behalf of the relevant Prepetition Secured Parties on account of any and all of their respective claims arising under the applicable Prepetition Documents and hereunder (each, a "**Master Proof of Claim**") against each of the Debtors.  Upon the filing of a Master Proof of Claim against each of the Debtors, the Prepetition Agents and the Prepetition Secured Parties, and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Prepetition Credit Agreements, and the claim of each Prepetition Secured Party (and each of its respective successors and assigns), named in a

Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph 37 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Agent.

38.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules, or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

39.     *Modification of DIP Documents and Approved Budget*.  The DIP Loan Parties are hereby authorized, without further order of this Court, to enter into agreements with the DIP Secured Parties providing for any consensual non-material modifications to the Approved

Budget or the DIP Documents, or of any other modifications to the DIP Documents necessary to conform the terms of the DIP Documents to this Interim Order, in each case consistent with the amendment provisions of the DIP Document.  Notwithstanding the foregoing, updates and supplements to the Approved Budget required to be delivered by the DIP Loan Parties under the DIP Documents shall not be considered material amendments or modifications to the Approved Budget or the DIP Documents.

40.    *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

41.    *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to Payment in Full of all DIP Obligations under the DIP Documents and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of Collateral in trust for the benefit of the DIP Agents and the DIP Lenders (as applicable based on the specific asset at issue) and shall immediately turn over such proceeds to the applicable DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

42.    *Credit Bidding*.  (a) Each of the DIP Agents shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the applicable DIP Obligations in any sale of the DIP Collateral, subject in all respects to the DIP ICA and the relative lien priorities set forth in **Exhibit A**; and (b) the Prepetition Secured Parties shall have the right to credit bid up to the full amount of their Prepetition Debt in any sale of the Prepetition Collateral,

subject in all respects to the Prepetition Intercreditor Agreements, as applicable, and the relative lien priorities set forth in **Exhibit A**, in each case of (a) and (b), as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

43.    *No Third Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

44.    *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

45.    *Necessary Action*.  The Debtors are authorized to take any and all such actions as are necessary or appropriate to implement the terms of this Interim Order.

46.    *Retention of Jurisdiction*.  The Court shall retain jurisdiction to implement, interpret and enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

47.    *Final Hearing*.  The Final Hearing is scheduled for _____, 2019 at ____:____ __ prevailing Eastern Time before this Court.

48.    *Objections*.  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon:

(a)     counsel to the Debtors, (i) Kirkland & Ellis LLP, 300 North LaSalle, Chicago, IL 60654 (attn.: Ross M. Kwasteniet, P.C. (rkwasteniet@kirkland.com), Joseph M. Graham (joe.graham@kirkland.com)); 601 Lexington Ave, New York, NY 10022 (attn.: Stephen E. Hessler (stephen.hessler@kirkland)) and (ii) Potter Anderson & Corroon LLP, 1313 N. Market St., 6th Floor, Wilmington, DE 19801 (attn.: Katherine L. Good (kgood@potteranderson.com));

(b)     counsel to the DIP ABL Agent, (i) Hogan Lovells US LLP, 390 Madison Avenue, New York, NY 10017 (attn.: Deborah Staudinger (deborah.staudinger@hoganlovells.com), Alex Sher (alex.sher@hoganlovells.com)) and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, P.O. Box 1347, Wilmington, DE 19899-1347 (attn.: Matthew B. Harvey (mharvey@mnat.com), Eric D. Schwartz (eschwartz@mnat.com));

(c)     counsel to the Term DIP Agent and Prepetition First Lien Term Loan Agent, Herrick Feinstein LLP, Two Park Ave, New York, NY 10016 (attn.: Eric A. Stabler (EStabler@herrick.com), Steven Smith (ssmith@herrick.com));;

(d)     Counsel to the Prepetition Second Lien Term Loan Agent, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038 (attn..: Elizabeth A. Loonam (eloonam@stroock.com), Alex Cota (acota@stroock.com), Gabriel Sasson (gsasson@stroock.com); and

(e)     Counsel to the Crossover Group, (i) Davis Polk & Wardwell LLP, 450 Lexington Ave, New York, NY 10017 (attn.: Brian Resnick (brian.resnick@davispolk.com), Dylan Consla (dylan.consla@davispolk.com) and Daniel Meyer (daniel.meyer@davispolk.com)); and (ii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801 (attn.: Mark D. Collins (collins@rlf.com) and Paul N. Heath (heath@rlf.com));

(f)     Counsel to the First Lien Group, Shearman & Sterling LLP, 599 Lexington Avenue, New York, NY 10022 (attn.: Fredric Sosnick (fsosnick@shearman.com), and Ned S. Schodek (ned.schodek@sheaman.com));

(g)     the U.S. Trustee; and

(h)     any other party that has filed a request for notices with this Court,

by the foregoing no later than _____, 2019 at ____:____ __ prevailing Eastern Time.

49.    The Debtors shall within two (2) business days of its entry serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights

under sections 506(c) and 552(b) of the Bankruptcy Code) to the parties having been given

notice of the Interim Hearing, to any party that has filed a request for notices with this Court.

Dated: _____, 2019

Wilmington, Delaware

_____
THE HONORABLE _____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**

**Lien Priority Schedule**

| | Prepetition ABL Priority Collateral | Prepetition Term Loan Priority Collateral | Unencumbered Property of the Same Nature, Scope and Type as the Prepetition ABL Priority Collateral | Unencumbered Property of the Same Nature, Scope and Type as the Prepetition Term Loan Priority Collateral Other Than The Specified Excluded Unencumbered Property | Specified Excluded Unencumbered Property |
|---|---|---|---|---|---|
| 1 | DIP ABL Liens | New Money Term DIP Liens | DIP ABL Liens | New Money Term DIP Liens | New Money Term DIP Liens |
| 2 | Prepetition ABL Adequate Protection Liens and ABL Indemnification Liens | Term DIP Roll-Up Liens | Prepetition ABL Adequate Protection Liens and ABL Indemnification Liens | Term DIP Roll-Up Liens | New Money DIP ABL Liens |
| 3 | Prepetition ABL Liens | Prepetition First Lien Term Loan Adequate Protection Liens | New Money Term DIP Liens | Prepetition First Lien Term Loan Adequate Protection Liens | |
| 4 | New Money Term DIP Liens | Prepetition First Lien Term Liens | Term DIP Roll-Up Liens | DIP ABL Liens | |
| 5 | Term DIP Roll-Up Liens | DIP ABL Liens | Prepetition First Lien Term Loan Adequate Protection Liens | Prepetition ABL Adequate Protection Liens and ABL Indemnification Liens | |

| | | | | |
|---|---|---|---|---|
| 6 | Prepetition First Lien Term Loan Adequate Protection Liens | Prepetition ABL Adequate Protection Liens and ABL Indemnification Liens | Prepetition Second Lien Term Loan Adequate Protection Liens | Prepetition Second Lien Term Loan Adequate Protection Liens | |
| 7 | Prepetition First Lien Term Liens | Prepetition ABL Liens | | | |
| 8 | Prepetition Second Lien Term Loan Adequate Protection Liens | Prepetition Second Lien Term Loan Adequate Protection Liens | | | |
| 9 | Prepetition Second Lien Term Liens | Prepetition Second Lien Term Liens | | | |

**<u>Schedule 1 to Exhibit A</u>**

**Budget**

**Blackhawk Mining, LLC**

Cash Flow Forecast

$ in Millions

| Forecast Week<br>Week Ended (Friday) | 1<br>7/19/19<br>Forecast | 2<br>7/26/19<br>Forecast | 3<br>8/2/19<br>Forecast | 4<br>8/9/19<br>Forecast | 5<br>8/16/19<br>Forecast | 6<br>8/23/19<br>Forecast | 7<br>8/30/19<br>Forecast | 8<br>9/6/19<br>Forecast | 9<br>9/13/19<br>Forecast | 10<br>9/20/19<br>Forecast | 11<br>9/27/19<br>Forecast | 12<br>10/4/19<br>Forecast | 13<br>10/11/19<br>Forecast | Cumulative<br>07/19 thru 10/11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Receipts | 27.3 | 10.7 | 11.5 | 25.5 | 43.1 | 25.5 | 22.9 | 22.3 | 22.8 | 36.7 | 23.2 | 22.8 | 26.6 | 320.9 |
| Total Disbursements | (14.9) | (32.2) | (23.7) | (23.6) | (18.6) | (24.0) | (27.0) | (20.0) | (20.3) | (24.0) | (23.1) | (19.8) | (19.8) | (290.9) |
| **Net operating cash flow** | $  12.4 | $  (21.5) | $  (12.2) | $  1.9 | $  24.5 | $  1.5 | $  (4.1) | $  2.3 | $  2.5 | $  12.7 | $  0.1 | $  3.0 | $  6.8 | $  30.0 |
| Other Cash Flows | (4.0) | 33.0 | (4.2) | 7.9 | (2.8) | (1.8) | (4.4) | (0.9) | - | (2.7) | - | (1.8) | - | 18.2 |
| Restructuring Expenses | (4.5) | - | - | - | - | - | (9.8) | - | - | - | (0.3) | - | - | (14.6) |
| **Net cash receipts/(disbursements)** | $  3.9 | $  11.5 | $  (16.4) | $  9.8 | $  21.7 | $  (0.3) | $  (18.3) | $  1.4 | $  2.5 | $  10.0 | $  (0.2) | $  1.3 | $  6.8 | $  33.6 |
| Beginning cash balance | 1.4 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 1.4 |
| Net cash receipts / (disbursements) | 3.9 | 11.5 | (16.4) | 9.8 | 21.7 | (0.3) | (18.3) | 1.4 | 2.5 | 10.0 | (0.2) | 1.3 | 6.8 | 33.6 |
| ABL draws / (repayments) | (0.3) | (11.5) | 16.4 | (9.8) | (21.7) | 0.3 | 18.3 | (1.4) | (2.5) | (10.0) | 0.2 | (1.3) | (6.8) | (30.0) |
| **Ending cash balance** | **5.0** | **5.0** | **5.0** | **5.0** | **5.0** | **5.0** | **5.0** | **5.0** | **5.0** | **5.0** | **5.0** | **5.0** | **5.0** | **5.0** |
| ABL Beginning Balance | 85.0 | 84.7 | 73.2 | 89.6 | 79.8 | 58.1 | 58.4 | 76.8 | 75.4 | 72.9 | 62.9 | 63.1 | 61.8 | 85.0 |
| ABL draws / (repayments) | (0.3) | (11.5) | 16.4 | (9.8) | (21.7) | 0.3 | 18.3 | (1.4) | (2.5) | (10.0) | 0.2 | (1.3) | (6.8) | (30.0) |
| **ABL Ending Balance** | **84.7** | **73.2** | **89.6** | **79.8** | **58.1** | **58.4** | **76.8** | **75.4** | **72.9** | **62.9** | **63.1** | **61.8** | **55.0** | **55.0** |
| ABL Availability | 0.3 | 16.8 | 0.4 | 10.2 | 31.9 | 31.6 | 13.2 | 14.6 | 17.1 | 27.1 | 26.9 | 28.2 | 35.0 | 35.0 |
| ABL commitment | 85.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 | 90.0 |
| Cash | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| less:  Revolver Outstandings | (84.7) | (73.2) | (89.6) | (79.8) | (58.1) | (58.4) | (76.8) | (75.4) | (72.9) | (62.9) | (63.1) | (61.8) | (55.0) | (55.0) |
| Projected Availability Prior to Float: | 5.3 | 21.8 | 5.4 | 15.2 | 36.9 | 36.6 | 18.2 | 19.6 | 22.1 | 32.1 | 31.9 | 33.2 | 40.0 | 40.0 |
| **Liquidity (Book)** | $  5.3 | $  21.8 | $  5.4 | $  15.2 | $  36.9 | $  36.6 | $  18.2 | $  19.6 | $  22.1 | $  32.1 | $  31.9 | $  33.2 | $  40.0 | $  40.0 |
| Float | 5.8 | 6.5 | 6.1 | 6.3 | 6.2 | 6.3 | 6.2 | 6.2 | 6.2 | 6.2 | 6.2 | 6.2 | 6.2 | 6.2 |
| **Adjusted Liquidity (Bank)** | $  11.1 | $  28.3 | $  11.5 | $  21.5 | $  43.1 | $  42.9 | $  24.4 | $  25.9 | $  28.4 | $  38.3 | $  38.2 | $  39.4 | $  46.3 | $  46.3 |

**Exhibit B**

**DIP ABL Credit Agreement**

KE 60285454

Execution Version

**SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION
ABL CREDIT AGREEMENT**

**dated as of July __, 2019**

**by and among**

**BLACKHAWK MINING LLC and**

**ITS SUBSIDIARIES FROM TIME TO TIME PARTY HERETO,**

**each as a Borrower, and collectively as Borrowers,**

**and**

**MIDCAP FUNDING IV TRUST,**

**as DIP ABL Agent**

**MIDCAP FINANCIAL TRUST,**

**as a DIP ABL Lender,**

**and**

**THE ADDITIONAL LENDERS**

**FROM TIME TO TIME PARTY HERETO**



# TABLE OF CONTENTS

**Page**

**ARTICLE 1 -** DEFINITIONS .......................................................................... 3

    **Section 1.1**    Certain Defined Terms.............................................................. 3

    **Section 1.2**    Accounting Terms and Determinations ............................... 41

    **Section 1.3**    Other Definitional and Interpretive Provisions.................. 42

    **Section 1.4**    Time is of the Essence ............................................................ 42

    **Section 1.5**    LLC Division ........................................................................... 42

    **Section 1.6**    Covenants ................................................................................. 42

**ARTICLE 2 -** LOANS................................................................................... 42

    **Section 2.1**    Loans......................................................................................... 42

    **Section 2.2**    Interest, Interest Calculations and Certain Fees................. 44

    **Section 2.3**    Notes ......................................................................................... 45

    **Section 2.4**    [Reserved]................................................................................. 45

    **Section 2.5**    [Reserved]................................................................................. 45

    **Section 2.6**    General Provisions Regarding Payment; Loan Account ................. 46

    **Section 2.7**    Maximum Interest................................................................... 46

    **Section 2.8**    Taxes ........................................................................................ 47

    **Section 2.9**    Appointment of Borrower Representative ........................... 50

    **Section 2.10**    Joint and Several Liability; Rights of Contribution; Subordination and Subrogation........................................... 51

    **Section 2.11**    Collections and Lockbox Account...................................... 53

    **Section 2.12**    Termination; Restriction on Termination ......................... 55

    **Section 2.13**    Increased Costs ...................................................................... 55

    **Section 2.14**    Illegality .................................................................................. 56

    **Section 2.15**    Inability to Determine Rates ............................................... 57

    **Section 2.16**    No Discharge .......................................................................... 57

**ARTICLE 3 -** REPRESENTATIONS AND WARRANTIES ................................ 57

    **Section 3.1**    Company Status ..................................................................... 57

    **Section 3.2**    Power and Authority; Enforceability ................................. 58

    **Section 3.3**    No Violation; No Default....................................................... 58

    **Section 3.4**    Approvals................................................................................. 59

i

| | | |
|---|---|---|
| **Section 3.5** | Financial Statements; Financial Condition; Undisclosed Liabilities; Projections | 59 |
| **Section 3.6** | Litigation | 59 |
| **Section 3.7** | True and Complete Disclosure | 59 |
| **Section 3.8** | Margin Regulations | 60 |
| **Section 3.9** | Tax Returns and Payments | 60 |
| **Section 3.10** | Compliance with ERISA | 60 |
| **Section 3.11** | Security Documents | 61 |
| **Section 3.12** | Properties | 63 |
| **Section 3.13** | Subsidiaries | 64 |
| **Section 3.14** | Compliance with Laws, etc. | 64 |
| **Section 3.15** | Investment Company Act | 64 |
| **Section 3.16** | Insurance | 64 |
| **Section 3.17** | Environmental Matters | 64 |
| **Section 3.18** | Employment and Labor Relations | 65 |
| **Section 3.19** | Intellectual Property, etc. | 65 |
| **Section 3.20** | Anti-Terrorism Laws; Sanctions | 66 |
| **Section 3.21** | Flood Zone | 66 |
| **Section 3.22** | [Reserved]. | 67 |
| **Section 3.23** | Senior Indebtedness | 67 |
| **Section 3.24** | Brokers | 67 |
| **Section 3.25** | Budget | 67 |
| **Section 3.26** | Chapter 11 Cases; Orders | 67 |
| **ARTICLE 4 - AFFIRMATIVE COVENANTS** | | 68 |
| **Section 4.1** | Information Covenants | 68 |
| **Section 4.2** | Books, Records and Inspections; Quarterly Conference Calls | 71 |
| **Section 4.3** | Payment and Performance of DIP ABL Obligations | 72 |
| **Section 4.4** | Existence; Franchises | 73 |
| **Section 4.5** | Compliance with Laws, etc. | 73 |
| **Section 4.6** | Compliance with Environmental Laws | 73 |
| **Section 4.7** | ERISA | 74 |
| **Section 4.8** | End of Fiscal Years; Fiscal Quarters | 75 |
| **Section 4.9** | Performance of DIP ABL Obligations | 75 |

ii

| | | |
|---|---|---|
| **Section 4.10** | Payment of Taxes | 75 |
| **Section 4.11** | Use of Proceeds | 75 |
| **Section 4.12** | Additional Borrowers, Guarantees and Security; Further Assurances; etc. | 76 |
| **Section 4.13** | Certain Long Term Liabilities and Environmental Reserves | 78 |
| **Section 4.14** | Designation of Subsidiaries | 79 |
| **Section 4.15** | Estoppel Certificates | 79 |
| **Section 4.16** | Power of Attorney | 79 |
| **Section 4.17** | Borrowing Base DIP ABL Collateral Administration | 80 |
| **Section 4.18** | Payroll Accounts, Etc. | 80 |
| **Section 4.19** | Contest Motions | 80 |
| **Section 4.20** | Bankruptcy Related Matters | 80 |
| **Section 4.21** | Chapter 11 Milestones | 82 |
| **Section 4.22** | Other Bankruptcy Related Matters | 82 |
| **ARTICLE 5 -** | NEGATIVE COVENANTS | 82 |
| **Section 5.1** | Liens | 82 |
| **Section 5.2** | Asset Sales | 85 |
| **Section 5.3** | Restricted Payments | 86 |
| **Section 5.4** | Indebtedness | 86 |
| **Section 5.5** | Merger, Consolidation or Sale of Assets | 88 |
| **Section 5.6** | Transactions with Affiliates | 88 |
| **Section 5.7** | Limitation on Certain Restrictions on Subsidiaries; Negative Pledge | 89 |
| **Section 5.8** | Business Activities | 91 |
| **Section 5.9** | Amendments, etc. of Organizational Documents and Prepetition Term Loan Documents | 91 |
| **Section 5.10** | [Reserved] | 91 |
| **Section 5.11** | Investments | 91 |
| **Section 5.12** | [Reserved]. | 91 |
| **Section 5.13** | Prepayments, Etc. of Indebtedness | 91 |
| **Section 5.14** | Accounting Changes | 92 |
| **Section 5.15** | Agreements Regarding Receivables | 92 |
| **Section 5.16** | Bankruptcy Case Prohibitions | 92 |

iii

**ARTICLE 6 -** BUDGET .................................................................................. 92

    **Section 6.1**        Budget. ........................................................................ 92

    **Section 6.2**        Budget Variance Report ............................................... 92

    **Section 6.3**        Variance Covenant ....................................................... 93

**ARTICLE 7 -** CONDITIONS ........................................................................ 93

    **Section 7.1**        Conditions to Closing .................................................. 93

    **Section 7.2**        Conditions to Each Loan .............................................. 94

    **Section 7.3**        Searches ....................................................................... 95

    **Section 7.4**        Post Closing Requirements .......................................... 95

**ARTICLE 8 -** REAL PROPERTY LEASES ................................................... 96

    **Section 8.1**        Special Rights with Respect to Real Property Leases ...................... 96

**ARTICLE 9 -** [RESERVED] ........................................................................ 98

**ARTICLE 10 -** DIP EVENTS OF DEFAULT ................................................ 98

    **Section 10.1**      DIP Events of Default .................................................. 98

    **Section 10.2**      Acceleration and Suspension or Termination of DIP Revolving
                             Loan Commitment ..................................................... 104

    **Section 10.3**      UCC Remedies ........................................................... 104

    **Section 10.4**      Credit Bid. .................................................................. 106

    **Section 10.5**      Default Rate of Interest .............................................. 107

    **Section 10.6**      Setoff Rights .............................................................. 107

    **Section 10.7**      Application of Proceeds .............................................. 107

    **Section 10.8**      Waivers ...................................................................... 108

    **Section 10.9**      Injunctive Relief. ....................................................... 110

    **Section 10.10**     Marshalling; Payments Set Aside .............................. 110

**ARTICLE 11 -** AGENT ................................................................................. 111

    **Section 11.1**      Appointment and Authorization ................................. 111

    **Section 11.2**      DIP ABL Agent and Affiliates .................................. 111

    **Section 11.3**      Action by DIP ABL Agent ......................................... 111

    **Section 11.4**      Consultation with Experts .......................................... 111

    **Section 11.5**      Liability of DIP ABL Agent ...................................... 111

    **Section 11.6**      Indemnification .......................................................... 112

    **Section 11.7**      Right to Request and Act on Instructions ................... 112

    **Section 11.8**      Credit Decision .......................................................... 112

**Section 11.9**      DIP ABL Collateral Matters ................................................ 113

**Section 11.10**    Agency for Perfection ....................................................... 113

**Section 11.11**    Notice of Default............................................................. 113

**Section 11.12**    Assignment by DIP ABL Agent; Resignation of DIP ABL
Agent; Successor DIP ABL Agent ................................. 113

**Section 11.13**    Payment and Sharing of Payment ................................... 114

**Section 11.14**    Right to Perform, Preserve and Protect........................... 117

**Section 11.15**    Additional Titled DIP ABL Agents ................................ 117

**Section 11.16**    Amendments and Waivers ............................................... 118

**Section 11.17**    Assignments and Participations ..................................... 119

**Section 11.18**    Buy-Out Upon Refinancing ........................................... 122

**ARTICLE 12 -** MISCELLANEOUS ........................................................... 122

**Section 12.1**      Survival .......................................................................... 122

**Section 12.2**      No Waivers ..................................................................... 123

**Section 12.3**      Notices ........................................................................... 123

**Section 12.4**      Severability .................................................................... 123

**Section 12.5**      Headings ......................................................................... 124

**Section 12.6**      Confidentiality ............................................................... 124

**Section 12.7**      Other Damages................................................................ 125

**Section 12.8**      GOVERNING LAW; SUBMISSION TO JURISDICTION ........... 125

**Section 12.9**      WAIVER OF JURY TRIAL ............................................. 125

**Section 12.10**    Publication; Advertisement ........................................... 125

**Section 12.11**    Counterparts; Integration ............................................... 126

**Section 12.12**    No Strict Construction ................................................... 126

**Section 12.13**    DIP ABL Lender Approvals ........................................... 126

**Section 12.14**    Expenses; Indemnity...................................................... 126

**Section 12.15**    Reserved.......................................................................... 128

**Section 12.16**    Reinstatement.................................................................. 128

**Section 12.17**    Successors and Assigns................................................... 129

**Section 12.18**    USA PATRIOT Act Notification, Beneficial Ownership
Certificate...................................................................... 129

**Section 12.19**    Acknowledgement and Consent to Bail-In of EEA Financial
Institutions..................................................................... 129

v

**Section 12.20**    Modification of Prepetition ABL Financing Documents................. 130

**Section 12.21**    Incorporation of DIP Orders by Reference ...................................... 130

MidCap / Blackhawk / DIP ABL Credit Agreement
\\DC - 036639/000053 - 13939780

## SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION
## ABL CREDIT AGREEMENT

This **SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION ABL CREDIT AGREEMENT,** (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "**Agreement**") is dated as of July ___, 2019 by and among **BLACKHAWK MINING LLC,** a Kentucky limited liability company ("**Blackhawk Parent**"), certain subsidiaries of Blackhawk Parent set forth on Annex B hereto and any additional borrower that may hereafter be added to this Agreement (each individually as a "**Borrower**", and collectively as "**Borrowers**"), **MIDCAP FUNDING IV TRUST**, a Delaware statutory trust, as DIP ABL Agent, and **MIDCAP FINANCIAL TRUST**, a Delaware statutory trust, and the financial institutions or other entities from time to time parties hereto, each as a DIP ABL Lender.

### RECITALS

**WHEREAS**, on July ___, 2019 (the "**Petition Date**"), each Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (each a "**Chapter 11 Case**," and collectively, the "**Chapter 11 Cases**"; debtors and debtors-in-possession thereunder, the "**Debtors**" and each a "**Debtor**") in the United States Bankruptcy Court for the District of Delaware and is continuing to operate its business and manage its properties as a debtor and a debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.

**WHEREAS**, Borrowers are party to (i) that certain Credit Agreement, dated as of September 6, 2017, by and among Blackhawk Parent, the other Borrowers, the financial institutions and other entities from time to time party thereto as lenders (the "**Prepetition ABL Lenders**") and MidCap Funding IV Trust as successor agent for the Prepetition ABL Lenders (the "**Prepetition ABL Agent**"), as amended by that certain Amendment No. 1 to Credit Agreement, dated as of February 27, 2018, and that certain Amendment No. 2 to Credit Agreement, dated as of October 10, 2018 (as so amended and as it may have been further amended, restated or otherwise modified from time to time, the "**Prepetition ABL Credit Agreement**"); (ii) that certain Security Agreement, dated as of September 6, 2017, by and among Blackhawk Parent, the other Borrowers and Prepetition ABL Agent (as each may have been further amended, restated or otherwise modified from time to time, and together with the Prepetition ABL Credit Agreement and each other security agreement, pledge agreement, subordination agreement, fee letter, note, guarantee, reservation of rights letter and protective advance letter, and each other agreement, document and instrument executed in connection with the obligations under the Prepetition ABL Credit Agreement, including the "Financing Documents" as defined therein, each as amended, restated or otherwise modified from time to time, collectively, the "**Prepetition ABL Financing Documents**"), pursuant to which, among other things, the Prepetition ABL Lenders have made certain loans and other financial accommodations to Borrowers (the "**Prepetition ABL Loans**"), and each of the Borrowers granted to Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, a security interest in and lien upon substantially all of its assets.

**WHEREAS**, one or more of the Borrowers are party to that certain First Lien Term Loan Credit Agreement, dated as of February 17, 2017, by and among Blackhawk Parent, as borrower, the financial institutions or other entities from time to time party thereto as lenders and Cantor Fitzgerald Securities ("**Cantor**"), as successor agent for such lenders (the "**Prepetition First Lien Term Loan Agent**") (together with each other security agreement, subordination agreement, fee letter, note, guarantee, reservation of rights letter and protective advance letter, and each other agreement, document and instrument executed in connection with the obligations thereunder, including the "Credit Documents" as defined therein, each as amended, restated or

1

otherwise modified from time to time, collectively, the "**Prepetition First Lien Term Loan Documents**"), pursuant to which, among other things, such lenders have made certain loans and other financial accommodations to Blackhawk Parent, and each of the Borrowers granted to Prepetition First Lien Term Loan Agent, for the benefit of itself and such lenders, a security interest in and lien upon substantially all of its assets.

WHEREAS, one or more of the Borrowers are party to that certain Second Lien Term Loan Credit Agreement, dated as of October 28, 2015, by and among Blackhawk Parent, as borrower, the financial institutions or other entities from time to time party thereto as lenders and Cortland, as agent for such lenders (the "**Prepetition Second Lien Term Loan Agent**") (together with each other security agreement, subordination agreement, fee letter, note, guarantee, reservation of rights letter and protective advance letter, and each other agreement, document and instrument executed in connection therewith, including the "Credit Documents" as defined therein, each as amended, restated or otherwise modified from time to time, collectively, the "**Prepetition Second Lien Term Loan Documents**"), pursuant to which, among other things, such lenders have made certain loans and other financial accommodations to Blackhawk Parent, and each of the Borrowers granted to Prepetition Second Lien Term Loan Agent, for the benefit of itself and such lenders, a security interest in and lien upon substantially all of its assets.

WHEREAS, the Prepetition ABL Agent, the Prepetition First Lien Term Loan Agent, and Blackhawk Parent and certain of its subsidiaries are parties to that certain ABL Intercreditor Agreement, dated as of September 6, 2017 (as amended, restated or otherwise modified from time to time, the "**Prepetition ABL Intercreditor Agreement**"), and the Prepetition ABL Agent, the Prepetition First Lien Term Loan Agent, and the Prepetition Second Lien Term Loan Agent, and Blackhawk Parent and certain of its subsidiaries are parties to that certain Amended and Restated Junior Priority Intercreditor Agreement, dated as of February 17, 2017 (as amended, restated or otherwise modified from time to time, the "**Prepetition Junior Lien Intercreditor Agreement**" and together with the Prepetition ABL Intercreditor Agreement, collectively, the "**Prepetition Intercreditor Agreements**"), pursuant to which, among other things, the Prepetition ABL Agent, the Prepetition First Lien Term Loan Agent, the Prepetition Second Lien Term Loan Agent set forth their agreements with respect to the relative priority of their respective Liens on the "Collateral" (as defined in the Prepetition Intercreditor Agreements) and certain other rights, priorities and interests.

WHEREAS, on the date hereof, one or more of the Borrowers will execute and deliver that certain DIP Term Loan Credit Agreement, by and among Blackhawk Parent, as borrower, and certain of its subsidiaries, as guarantors, the financial institutions or other entities from time to time party thereto as lenders (the "**DIP Term Loan Lenders**") and Cantor, as agent for such lenders (the "**DIP Term Loan Agent**") (as amended, restated, extend, supplemented or otherwise modified from time to time, the "**DIP Term Loan Agreement**" and together with each security agreement, subordination agreement, fee letter, note, guarantee, reservation of rights letter and protective advance letter, and each other agreement, document and instrument executed in connection with the obligations under the DIP Term Loan Agreement, including the "Credit Documents" as defined therein, each as amended, restated or otherwise modified from time to time (collectively, the "**DIP Term Loan Documents**"), pursuant to which, among other things, such lenders will make certain loans and other financial accommodations to Blackhawk Parent, the new money portion of which will be available to Blackhawk Parent in the principal amount of $35,000,000 upon entry of the Interim DIP Order and additional principal in the amount of $15,000,000 upon entry of the Final DIP Order, and each of the Borrowers granted to DIP Term Loan Agent, for the benefit of itself and such lenders, a security interest in and lien upon substantially all of its assets.

WHEREAS, Borrowers have requested that DIP ABL Lenders enter into this Agreement to provide Borrower with a senior secured super-priority debtor in possession revolving credit facility in the

principal amount of up to $90,000,000, pursuant to which, among other things, each Credit Party will grant to DIP ABL Agent, for the benefit of DIP ABL Lenders, Liens on substantially all of its assets and super-priority claims, the relative priority of which Liens and Indebtedness will be set forth in the Interim DIP Order and the Final DIP Order (each as defined below), as applicable, and DIP ABL Lenders have agreed to provide such debtor in possession credit facility subject to, and on the terms and conditions of, (i) this Agreement, (ii) the DIP Orders (as defined below), when entered, and (iii) sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code.

**WHEREAS**, the business of each Credit Party is a mutual and collective enterprise and the Borrowers and the Guarantors believe that the loans and other financial accommodations to the Borrowers under this Agreement will enhance the aggregate borrowing powers of the Borrowers and facilitate the administration of the Chapter 11 Cases and their loan relationship with the DIP ABL Agent and the DIP ABL Lenders, all to the mutual advantage of the Credit Parties.

**WHEREAS**, each Credit Party acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrowers as provided in the Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, Borrowers, DIP ABL Lenders and DIP ABL Agent agree as follows:

## ARTICLE 1 - DEFINITIONS

**Section 1.1**     Certain Defined Terms.  The following terms have the following meanings:

"ABL Roll-up Loans" has the meaning set forth in the DIP Orders.

"**Acceleration Event**" means the occurrence of any DIP Event of Default (a) in respect of which DIP ABL Agent has declared all or any portion of the DIP ABL Obligations to be immediately due and payable pursuant to Section 10.2, (b) pursuant to Section 10.1(a), and in respect of which DIP ABL Agent has suspended or terminated the DIP Revolving Loan Commitment pursuant to Section 10.2, and/or (c) pursuant to Section 10.1(e).

"**Acceptable Chapter 11 Plan**" means a joint chapter 11 plan of the Borrowers, in form and substance reasonably acceptable to the DIP ABL Agent and Required DIP ABL Lenders and that, among other things, (i) contains a release in favor of DIP ABL Agent, DIP ABL Lenders, Prepetition ABL Agent and Prepetition ABL Lenders and their respective employees, affiliates and advisors, (ii) provides for the indefeasible payment in full in cash and full discharge of the DIP ABL Obligations at emergence, but excluding payment of contingent indemnity obligations, which shall survive confirmation of such a plan, (iii) contains the termination of the unused commitments hereunder, (iv) provides for Exit Financing on the terms of the Exit Credit Agreement and the other "Financing Documents" (as defined therein), including all commitment fees, expenses and obligations related to the Exit Financing, with such changes thereto as are reasonably acceptable to DIP ABL Agent, (iv) contains such other terms as DIP ABL Agent and DIP ABL Lenders may reasonably require.

"**Acceptable Disclosure Statement**" means the disclosure statement relating to the Acceptable Chapter 11 Plan in form and substance reasonably acceptable to the DIP ABL Agent and Required DIP ABL Lenders.

"**Account Debtor**" means "account debtor", as defined in Article 9 of the UCC, and any other obligor in respect of an Account.

"**Accounts**" means, collectively, (a) any "account" (as defined in the UCC), any accounts receivable (whether in the form of payments for services rendered or goods sold, rents, license fees or otherwise), (b) all accounts, "general intangibles" (as defined in the UCC), rights, remedies, Guarantees, "supporting obligations" (as defined in the UCC), "letter-of-credit rights" (as defined in the UCC) and security interests in respect of the foregoing, all rights of enforcement and collection, all books and records evidencing or related to the foregoing, and all rights under the DIP ABL Financing Documents in respect of the foregoing, (c) all information and data compiled or derived by any Borrower or to which any Borrower is entitled in respect of or related to the foregoing, and (d) all proceeds of any of the foregoing.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that Beneficial Ownership of 10% or more of the Voting Stock of a Person will be deemed to be control.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.  No DIP ABL Lender as of the Closing Date or any of their respective Affiliates shall be considered an Affiliate of any Borrower or any Subsidiary thereof.

"**Affiliate Transaction**" has the meaning provided in Section 5.6.

"**Anti-Terrorism Laws**" means any Requirement of Law related to terrorism financing, economic sanctions or money laundering including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("***USA PATRIOT Act***") of 2001 (Title III of Pub. L. 107-56), The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) and Executive Order 13224 (effective September 24, 2001), the International Emergency Economic Powers Act and Executive Orders issued thereunder.

"**Applicable Margin**" means six percent (6.00%).

"**Applicable Subsidiary**" shall have the meaning provided in Section 10.1(e).

"**Approved Budget**" has the meaning set forth in Section 6.1(a).

"**Approved Fund**" means any (a) investment company, fund, trust, securitization vehicle or conduit that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business, or (b) any Person (other than a natural person) which temporarily warehouses loans for any DIP ABL Lender or any entity described in the preceding clause (a) and that, with respect to each of the preceding clauses (a) and (b), is administered or managed by (i) a DIP ABL Lender, (ii) an Affiliate of a DIP ABL Lender, or (iii) a Person (other than a natural person) or an Affiliate of a Person (other than a natural person) that administers or manages a DIP ABL Lender.

"**As-Extracted Collateral**" means "as-extracted collateral" (as such term is defined in Article 9 of the UCC).

"**As-Extracted Collateral Filing**" means a completed UCC-1 financing statement with respect to as-extracted collateral which lies upon owned or leased Real Property of Blackhawk Parent or any of its Restricted Subsidiaries.

"**Asset Sale**" means:

(a)     the sale, lease, transfer, assignment, conveyance or other disposition (including any license or sale and lease back transaction) of any assets or rights by Blackhawk Parent or any of its Restricted Subsidiaries; other than the sale, lease, conveyance or other disposition of all or substantially all of the assets of Blackhawk Parent and its Restricted Subsidiaries taken as a whole, which sale is subject to the requirements of Section 5.5; and

(b)     the issuance or sale of Equity Interests by any Restricted Subsidiary or the sale by Blackhawk Parent or any of its Restricted Subsidiaries of Equity Interests in any Restricted Subsidiary.

"**Assignment Agreement**" means an assignment agreement in form and substance acceptable to DIP ABL Agent.

"**Attributable Indebtedness**" means, on any date, in respect of any Capital Lease Obligations of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Automatic Rejection Date**" shall mean, with respect to any particular lease, the last day of the assumption period for the Credit Parties in the Chapter 11 Cases provided for in Section 365(d)(4) of the Bankruptcy Code, to the extent applicable (including as may have been extended in accordance with Section 365(d)(4)).

"**Avoidance Actions**" has the meaning assigned in the Interim DIP Order and the Final DIP Order, as applicable.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" means the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, or any United States bankruptcy court or district court having venue and jurisdiction over the Chapter 11 Cases pursuant to a transfer of venue or withdrawal of the reference.

"**Base LIBOR Rate**" means, for each Interest Period, the rate per annum, determined by DIP ABL Agent in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate (rounded upwards, if necessary, to the next 1/100%), to be the rate at which Dollar deposits (for delivery on the first day of such Interest Period or, if such day is not a Business

Day on the preceding Business Day) in the amount of $1,000,000 are offered to major banks in the London interbank market on or about 11:00 a.m. (London time) two (2) Business Days prior to the commencement of such Interest Period, for a term comparable to such Interest Period, which determination shall be conclusive in the absence of manifest error (or, if DIP ABL Agent cannot determine such rate following a planned discontinuation of London interbank market rate, such other successor or alternative index rate as designated by DIP ABL Agent from time to time in consultation with Blackhawk Parent, which shall be consistent with successor or alternative index rates used for similar facilities).

"**Base Rate**" means the per annum rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate," with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate; *provided, however,* that DIP ABL Agent may, upon prior written notice to Borrower, choose a reasonably comparable index or source to use as the basis for the Base Rate.

"**Beneficial Owner**" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time.  The terms "*Beneficially Owns*", "*Beneficially Owned*" and "*Beneficial Ownership*" have a corresponding meaning.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230, as amended, or any successor thereto.

"**Benefit Plan**" means, other than a Multiemployer Plan, an "employee benefit plan" (as defined in ERISA) that is subject to Title I or Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA with respect to which any Borrower or any of its Subsidiaries has any liability (including on account of an ERISA Affiliate).

"**Blackhawk Parent**" has the meaning set forth in the Recitals.

"**Board of Directors**" means:

(a)    with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(b)    with respect to a partnership, the board of directors of the general partner of the partnership;

(c)    with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(d)    with respect to any other Person, the board or committee of such Person serving a similar function.

6

"**Borrower**" and "**Borrowers**" means the entity(ies) described in the first paragraph of this Agreement and each of their successors and permitted assigns, including any trustee, responsible officer, examiner with expanded powers, or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such entity whether under any Chapter 11 Case or any Chapter 7 Case and its successor upon conclusion of such case.

"**Borrower Representative**" means Blackhawk Parent, in its capacity as Borrower Representative pursuant to the provisions of Section 2.9, or any successor Borrower Representative selected by Borrowers and approved by DIP ABL Agent (such approval not to be unreasonably withheld, conditioned or delayed).

"**Borrowing Base**" means:

(a)    the product of (i) eighty-five percent (85%) *multiplied by* (ii) the aggregate net amount at such time of the Eligible Accounts, less the amount, if any, of the Dilution Reserve; *provided* that the Borrowing Base will be automatically adjusted down, if necessary, such that the aggregate availability from Foreign Accounts that are assured by a credit insurance policy as set forth in clause (s) of the definition of "Eligible Accounts" shall never exceed an amount equal to $25,000,000; *plus*

(b)    the lesser of (i) the product of (A) sixty-five percent (65%) *multiplied by* (B) (1) the Orderly Liquidation Value of the Eligible Inventory *minus* (ii) the Rent Reserve and the Royalty Reserve, and (iii) the product of (A) sixty-five percent (65%) *multiplied by* (B)(1) the net realizable value of the Eligible Inventory as determined in accordance with the cost accounting methods employed by Borrower as of the Closing Date and consistent with GAAP *minus* the Rent Reserve and the Royalty Reserve; *provided* that the Borrowing Base will be automatically adjusted down, if necessary, such that the aggregate availability from Eligible Inventory (after giving effect to Reserves established pursuant to clause (c) above with respect to such Inventory) shall never exceed the Borrowing Base Inventory Limit; *minus*

(c)    the amount of all other Reserves.

"**Borrowing Base Certificate**" means a certificate, duly executed by a Responsible Officer of Borrower Representative, appropriately completed and substantially in the form of <u>Exhibit C</u> hereto.

"**Borrowing Base Inventory Limit**" means, as of any date of determination, an amount equal to twenty-five percent (25%) of the Borrowing Base; provided that, upon written request of Borrower Representative (such requests not to be more frequent than once per calendar month) and written consent of DIP ABL Agent (such consent to be given or withheld in DIP ABL Agent's sole discretion), such limit may be increased to an amount equal to thirty-three percent (33%) of the Borrowing Base for a period of seven (7) or fewer consecutive days during such calendar month.

"**Budget**" means (i) the initial budget projecting operations for the ensuing thirteen (13) week period, including cash flow, forecasts of receipts, and disbursements (including Carve Out estimates), attached hereto as <u>Exhibit H</u>, and together with backup information previously provided to the DIP ABL Agent and (ii) each subsequent thirteen (13) week cash flow forecast of receipts and disbursements (in substantially the same format as the prior monthly cash flow forecast of receipts and disbursements, including backup information), provided pursuant to Article 6 hereof and in form and substance acceptable to the DIP ABL Lenders, setting forth the Debtors' projected cash receipts and cash disbursements during such 13-week period.

"**Budget Variance Report**" means a variance report setting forth in each case (x) for the one-week period ended on the immediately preceding Friday prior to the delivery thereof (a "**Weekly Period**") and (y) for the period commencing on the Petition Date and ending on the immediately preceding Friday prior to the delivery thereof (a "**Budget Test Period**") (1) the negative variance (as compared to the Approved Budget) of the aggregate operating cash receipts of the Debtors, (2) the positive variance (as compared to the Approved Budget) of the aggregate operating disbursements (excluding professional fees) made by the Debtors and (3) an explanation, in reasonable detail, for any material variance, certified by an authorized officer of Blackhawk Parent.

"**Business Day**" means any day except a Saturday, Sunday or other day on which either the New York Stock Exchange is closed, or on which commercial banks in Washington, DC and New York City are authorized by law to close and, in the case of a Business Day which relates to a Loan bearing interest at a rate based on the LIBOR Rate, a day on which dealings are carried on in the London interbank eurodollar market.

"**Cantor**" has the meaning set forth in the Recitals.

"**Capital Lease Obligation**" means, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with GAAP, and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty

"**Capital Stock**" means:

        (a)      in the case of a corporation, corporate stock;

        (b)      in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

        (c)      in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

        (d)      any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"**Carve Out**" has the meaning given to the term "Carve Out" as set forth in the Interim DIP Order or the Final DIP Order, as applicable.

"**Cash Collateral**" means all "cash collateral" as defined in section 363(a) of the Bankruptcy Code; all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of Borrowers in which the Prepetition ABL Agent, Prepetition ABL Lenders, Prepetition Term Loan Agents or Prepetition Term Loan Lenders assert security interests, liens or mortgages, regardless of whether such security interests, liens, or mortgages existed as of the Petition Date or arose thereafter pursuant to the DIP Orders, and whether the property converted to cash existed as of the Petition Date or arose thereafter.

8

"**Cash Equivalents**" means:

(a)      Dollars;

(b)      securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (***provided*** that the full faith and credit of the United States is pledged in support of those securities) having maturities of not more than twelve months from the date of acquisition;

(c)      certificates of deposit and eurodollar time deposits with maturities of six months or less from the date of acquisition, bankers' acceptances with maturities not exceeding twelve months and overnight bank deposits, in each case, with any domestic commercial bank having capital and surplus in excess of $500,000,000 and a Thomson Bank Watch Rating of "B" or better;

(d)      repurchase obligations with a term of not more than seven days for underlying securities of the types described in **clauses (b)** and **(c)** above entered into with any financial institution meeting the qualifications specified in **clause (c)** above;

(e)      commercial paper having one of the two highest ratings obtainable from Moody's or S&P and, in each case, maturing within six months after the date of acquisition; and

(f)      money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in **clauses (a)** through **(e)** of this definition.

"**Cash Management Obligations**" means obligations in respect of cash management services (including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements), including obligations for the payment of fees, interest, charges, expenses and disbursements in connection therewith to the extent provided for in the documents evidencing such cash management services

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"**Change of Control**" means the occurrence of any of the following:

(a)      the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger, amalgamation or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Blackhawk Parent and its Subsidiaries taken as a whole to any Person (including any "person" or "group" (as such terms are used in Sections 13(d)(3) and 14(d), respectively, of the Exchange Act)); or

9

(b)    the consummation of any transaction (including, without limitation, any merger, amalgamation or consolidation), the result of which is that the Permitted Holders cease to Beneficially Own, directly or indirectly, in the aggregate, a majority of the Voting Stock of Blackhawk Parent; or

(c)    any "Change of Control" (or comparable term) in any DIP Term Loan Document.

"**Chapter 7 Case**" means a case with respect to one or more Borrowers commenced (by way of petition or conversion) or conducted under Chapter 7 of the Bankruptcy Code.

"**Chapter 11 Case**" shall have the meaning given to such term in the recitals.

 "**Chapter 11 Confirmation Date**" means the date on which the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP ABL Agent, confirming the Acceptable Chapter 11 Plan

"**Chapter 11 Plan Effective Date**" means the date on which the Acceptable Chapter 11 Plan shall take effect, which shall be a date on which: (a) no stay of the Bankruptcy Court's order confirming the Acceptable Chapter 11 Plan is in effect; and (b) all conditions precedent to the effectiveness of the Acceptable Chapter 11 Plan have been satisfied, or, if capable of being waived in accordance with the terms therein, waived, but only to the extent that any such waiver does not alter DIP ABL Agent and DIP ABL Lenders' satisfaction, in their sole discretion, with the form and substance of the Acceptable Chapter 11 Plan. The Chapter 11 Plan Effective Date shall be specified in a notice filed with the Bankruptcy Court in the Chapter 11 Cases.

"**Chattel Paper**" means "chattel paper" (as such term is defined in Article 9 of the UCC).

"**Closing Date**" means the date of this Agreement.

"**Coal**" means all types of solid naturally occurring hydrocarbons (other than oil shale or Gilsonite), including without limitation, bituminous and sub-bituminous coal, and lignite.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time (unless otherwise specified herein), and the regulations promulgated and rulings issued thereunder.

"**Commitment Annex**" means Annex A to this Agreement.

"**Commitment Expiry Date**" means October __[1], 2019.

"**Company**" means any corporation, limited liability company, partnership or other business entity (or the adjectival form thereof, where appropriate).

"**Compliance Certificate**" means a certificate, duly executed by a Responsible Officer of Borrower Representative, appropriately completed and substantially in the form of Exhibit B hereto.

"**Consolidated Subsidiary**" means, at any date, any Subsidiary the accounts of which would be consolidated with those of Blackhawk Parent (or any other Person, as the context may require hereunder) in its consolidated financial statements if such statements were prepared as of such date.

---

[1] NTD: 90 days after commencement of the Chapter 11 Cases

10

"**continuing**", "**continue(s)**", "**continuance**", or derivations of the foregoing mean, with respect to any Default or DIP Event of Default, that such Default or DIP Event of Default has not been cured or waived.

"**Contract**" means, with respect to any Account, any and all contracts, instruments, agreements, leases, invoices, notes or other writings pursuant to which such Account arises or that evidence such Account or under which an obligor becomes or is obligated to make payment in respect of such Account.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Cortland**" means Cortland Capital Market Services LLC, in its individual capacity, and any successor corporation thereto by merger, consolidation or otherwise.

"**Credit Party**" means each Borrower and each Guarantor.

"**Default**" means any event, act or condition which with notice or lapse of time, or both, would constitute a DIP Event of Default.

"**Defaulted DIP ABL Lender**" means, so long as such failure shall remain in existence and uncured, any DIP ABL Lender which shall have failed to make any Loan or other credit accommodation, disbursement, settlement or reimbursement required pursuant to the terms of any DIP ABL Financing Document.

"**Deposit Account**" has the meaning set forth in the Security Agreement.

"**Deposit Account Control Agreement**" means an agreement, in form and substance satisfactory to DIP ABL Agent, among DIP ABL Agent, any Borrower and the applicable financial institution in which such Borrower maintains a Deposit Account (other than Excluded Accounts), which agreement provides that (a) such financial institution shall comply with instructions originated by DIP ABL Agent directing disposition of the funds in such Deposit Account without further consent by the applicable Borrower, and (b) such financial institution shall agree that it shall subordinate any Lien on, or right of setoff or recoupment against, such Deposit Account or the contents thereof, other than in respect of usual and customary service fees and returned items for which DIP ABL Agent has been given value, in each such case expressly consented to by DIP ABL Agent, and containing such other terms and conditions as DIP ABL Agent may reasonably require, including as to any such agreement pertaining to any Lockbox Account, providing that such financial institution shall wire, or otherwise transfer, in immediately available funds, on a daily basis to the Payment Account all funds received or deposited into such Lockbox or Lockbox Account. For the avoidance of doubt, Excluded Accounts shall not be subject to any Deposit Account Control Agreements and it being understood that the Deposit Account Control Agreements with respect to the Lockbox Accounts and other Deposit Accounts entered into on the Closing Date satisfy the requirements of this definition.

"**Dilution**" means, as of any date of determination, a percentage, based upon the experience during any prior period selected from time to time by DIP ABL Agent in its sole discretion, that is the result of dividing the Dollar amount of (a) bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items with respect to Borrowers' Accounts during such period, by (b) Borrowers' billings with respect to Accounts during such period, in each case, other than Accounts owed by Xcoal to a Borrower that are, or would be, ineligible as a result of clause (c) of the definition of "Eligible Accounts".

"**Dilution Reserve**" means, as of any date of determination, an amount sufficient to reduce the advance rate against Eligible Accounts by one (1) percentage point for each percentage point by which Dilution is in excess of five (5%) percent.

"**DIP ABL Agent**" means MFT, in its capacity as administrative agent for itself and for DIP ABL Lenders hereunder, as such capacity is established in, and subject to the provisions of, Article 11, and the successors and assigns of MFT in such capacity.

"**DIP ABL Collateral**" shall have the meaning set forth in the DIP Orders and shall, in any event, include all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document and/or any DIP Order, including, without limitation, all Security Agreement Collateral, all Mortgaged Properties and all cash and Cash Equivalents described in or delivered as collateral pursuant to the DIP ABL Financing Documents and/or DIP Orders.

"**DIP ABL Financing Documents**" means this Agreement, each Fee Letter, each Note, the Security Documents, the DIP Orders, any subordination or intercreditor agreement pursuant to which any Indebtedness and/or any Liens securing such Indebtedness is subordinated to all or any portion of the DIP ABL Obligations and all other documents, instruments and agreements (other than any Swap Contract) related to the DIP ABL Obligations and heretofore executed, executed concurrently herewith or executed at any time and from time to time hereafter, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

"**DIP ABL Intercreditor Agreement**" means that certain Debtor-in-Possession ABL Intercreditor Agreement, dated as of the date hereof, among one or more of the Borrowers, the other Credit Parties party thereto, the DIP ABL Agent and the DIP Term Loan Agent, as the same may be amended, modified and/or supplemented from time to time in accordance with the terms thereof.

"**DIP ABL Lender**" means each of (a) MFT, in its capacity as a lender hereunder, (b) each other Person party hereto in its capacity as a lender hereunder, (c) each other Person that becomes a party hereto as DIP ABL Lender pursuant to Section 11.17, and (d) the respective successors of all of the foregoing, and "**DIP ABL Lenders**" means all of the foregoing.

"**DIP ABL Obligations**" means all obligations, liabilities and indebtedness (monetary (including, without limitation, the payment of interest and other amounts arising after the commencement of any case with respect to any Credit Party under the Bankruptcy Code or any similar statute which would accrue and become due but for the commencement of such case, whether or not such amounts are allowed or allowable in whole or in part in such case) or otherwise) of each Credit Party under this Agreement or any other DIP ABL Financing Document, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"**DIP ABL Priority Collateral**" means all of the assets of the Borrowers constituting "DIP ABL Priority Collateral" under the DIP ABL Intercreditor Agreement, including without limitation, (a) all cash, accounts receivable, inventory, and accounts receivable-related and inventory-related items and proceeds and products thereof, and (b) all assets of the same kind or nature as such "DIP ABL Priority Collateral" acquired by any of the Borrowers after the commencement of the Chapter 11 Cases and all proceeds and products thereof, and (c) all proceeds of Avoidance Actions.

"**DIP ABL Termination Date**" means the earliest to occur of (a) the Commitment Expiry Date, (b) the date on which any DIP ABL Termination Event occurs, (c) the date on which DIP ABL Agent

accelerates the maturity of the Loans pursuant to Section 10.2, or (d) the termination date stated in any notice of termination of this Agreement provided by Borrowers in accordance with Section 2.12(b).

"**DIP ABL Termination Event**" means any one of the following events:

(a)    the indefeasible payment in full of the DIP ABL Obligations;

(b)    the entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a Chapter 7 Case, or any Credit Party files a motion or other pleading seeking entry of such an order or supports or fails to promptly oppose such dismissal or conversion;

(c)    the appointment in one or more of the Chapter 11 Cases of a trustee, responsible officer, or an examiner having expanded powers under section 1104 of the Bankruptcy Code (other than a fee examiner), or any Credit Party applies for, consents to, supports, acquiesces in or fails to promptly oppose, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of DIP ABL Agent and DIP ABL Lenders;

(d)    the failure of Borrowers to file with the Bankruptcy Court, on or before the date that is five (5) days after the Petition Date, (i) a motion requesting that the Bankruptcy Court enter the Interim DIP Order and (ii) a proposed Acceptable Chapter 11 Plan (together with the Acceptable Disclosure Statement);

(e)    the failure of the Final DIP Order Entry Date to occur on or before the date is forty-five (45) days after the Petition Date (or such later date as may be agreed by DIP ABL Agent);

(f)    the failure the Chapter 11 Confirmation Date to occur on or before the date that is seventy-five (75) days after the Petition Date  (or such later date as may be agreed by DIP ABL Agent);

(g)    the failure of the Chapter 11 Plan Effective Date to occur on a date that is on or before the date that is fourteen (14) days following the Chapter 11 Confirmation Date  (or such later date as may be agreed by DIP ABL Agent); and

(h)    the occurrence of the Chapter 11 Plan Effective Date.

"**DIP Credit Exposure**" means, at any time, any portion of the DIP Revolving Loan Commitment that remains outstanding or other DIP ABL Obligation that remains unpaid; *provided, however,* that no DIP Credit Exposure shall be deemed to exist solely due to the existence of contingent indemnification liability, absent the assertion of a claim, or the known existence of a claim reasonably likely to be asserted, with respect thereto.

"**DIP Event of Default**" has the meaning set forth in Section 10.1.

"**DIP Orders**" means, collectively, the Interim DIP Order and, once entered by the Bankruptcy Court, the Final DIP Order, as the same may be amended, modified or otherwise supplemented from time to time in compliance with this Agreement.

"**DIP Revolving Loan Availability**" means, at any time, the DIP Revolving Loan Limit *minus* the DIP Revolving Loan Outstandings.

"**DIP Revolving Loan Borrowing**" means a borrowing of a DIP Revolving Loan.

"**DIP Revolving Loan Commitment**" means, as of any date of determination, the aggregate DIP Revolving Loan Commitment Amounts of all DIP ABL Lenders as of such date; provided that DIP Revolving Loan Commitment may not be in excess of the maximum amount of credit under this Agreement allowable under the Interim DIP Order or the Final DIP Order, as applicable.

"**DIP Revolving Loan Commitment Amount**" means, as to any DIP ABL Lender, the dollar amount set forth opposite such DIP ABL Lender's name on the Commitment Annex under the column "DIP Revolving Loan Commitment Amount" (if such DIP ABL Lender's name is not so set forth thereon, then the dollar amount on the Commitment Annex for the DIP Revolving Loan Commitment Amount for such DIP ABL Lender shall be deemed to be $0), as such amount may be adjusted from time to time by any amounts assigned (with respect to such DIP ABL Lender's portion of DIP Revolving Loans outstanding and its commitment to make DIP Revolving Loans) pursuant to the terms of any and all effective assignment agreements to which such DIP ABL Lender is a party.  For the avoidance of doubt, the aggregate DIP Revolving Loan Commitment Amount of all DIP ABL Lenders (a) for the period commencing on the Closing Date through the Final DIP Order Entry Date shall be the sum of (i) the amount of the Prepetition ABL Obligations that have been paid pursuant to Section 2.11 *plus* (ii) $5,000,000, and (b) on the Final DIP Order Entry Date, the aggregate DIP Revolving Loan Commitment Amount of all DIP ABL Lenders shall be increased automatically, without notice or any other action, to $90,000,000.

"**DIP Revolving Loan Commitment Percentage**" means, as to any DIP ABL Lender, (a) on the Closing Date, the percentage set forth opposite such DIP ABL Lender's name on the Commitment Annex under the column "DIP Revolving Loan Commitment Percentage" (if such DIP ABL Lender's name is not so set forth thereon, then, on the Closing Date, such percentage for such DIP ABL Lender shall be deemed to be zero), and (b) on any date following the Closing Date, the percentage equal to the DIP Revolving Loan Commitment Amount of such DIP ABL Lender on such date *divided by* the DIP Revolving Loan Commitment on such date.

"**DIP Revolving Loan Exposure**" means, with respect to any DIP ABL Lender on any date of determination, the percentage equal to the amount of such DIP ABL Lender's DIP Revolving Loan Outstandings on such date *divided by* the aggregate DIP Revolving Loan Outstandings of all DIP ABL Lenders on such date.

"**DIP Revolving Loan Limit**" means, at any time, the lesser of (a) the DIP Revolving Loan Commitment and (b) the Borrowing Base.

"**DIP Revolving Loan Outstandings**" means, at any time of calculation, (a) the then existing aggregate outstanding principal amount of DIP Revolving Loans, which, for the avoidance of doubt, will include amounts outstanding under the Prepetition ABL Credit Agreement and the other Prepetition ABL Financing Documents upon "roll-up" of such amounts (whether such "roll-up" is accomplished pursuant to Section 10.7 or upon the entry of the Final DIP Order), and (b) when used with reference to any single DIP ABL Lender, the then existing outstanding principal amount of DIP Revolving Loans advanced by such DIP ABL Lender.

"**DIP Revolving Loans**" has the meaning set forth in Section 2.1(b).

"**DIP Term Loan Agent**" has the meaning set forth in the Recitals.

"**DIP Term Loan Agreement**" has the meaning set forth in the Recitals.

"**DIP Term Loan Documents**" has the meaning set forth in the Recitals.

14

"**DIP Term Loan Lenders**" has the meaning set forth in the Recitals.

"**DIP Term Loan Priority Collateral**" means all of the assets of the Borrowers constituting "DIP Term Loan Priority Collateral" under the DIP ABL Intercreditor Agreement.

"**Disqualified Stock**" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is ninety-one (91) days after the Commitment Expiry Date. Notwithstanding the preceding sentence, any Capital Stock that would constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the issuer thereof to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale will not constitute Disqualified Stock if the terms of such Capital Stock provide that the issuer thereof may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such repurchase or redemption complies with Section 5.3. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that Blackhawk Parent and its Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"**Dollars**" and the sign "**$**" each mean freely transferable lawful money of the United States.

"**Domestic Subsidiary**" of any Person means any Subsidiary of such Person incorporated or organized under the laws of the United States, any State thereof or the District of Columbia.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution

"**Eligible Account**" means, subject to the criteria below, an Account of a Borrower, which was generated in the ordinary course of business, which was generated originally in the name of a Borrower and not acquired via assignment or otherwise (unless by assignment from another Credit Party to the extent such assignment is made in accordance with applicable law and the terms of any applicable agreement, instrument or document relating to such Account), and which DIP ABL Agent determines to be an Eligible Account based on the application of the eligibility criteria set forth in this definition. The net amount of an Eligible Account at any time shall be the face amount of such Eligible Account as originally billed *minus*, without duplication of any Reserves or the eligibility criteria, all cash collections and other proceeds of such Account received from or on behalf of the Account Debtor thereunder as of such date and any and all returns, rebates, discounts, credits, allowances or excise taxes of any nature at any time issued, owing, granted, outstanding or payable in connection with such Accounts at such time. Without limiting the generality of the foregoing, no Account shall be an Eligible Account if:

15

(a)      the Account remains unpaid more than ninety (90) days past the claim or invoice date (but in no event more than one hundred and twenty (120) days after the applicable goods or services have been rendered or delivered);

(b)      the Account is subject to any defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment of any kind (but only to the extent of such defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment (without duplication of clause (c) below)), or the applicable Borrower is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process;

(c)      the Account Debtor in respect of such Account is Xcoal Energy & Resources or any of its affiliates (collectively with Xcoal Energy & Resources, "**XCoal**") and Borrower or any of its Subsidiaries is obligated to repurchase (or has otherwise notified XCoal of its intention to repurchase) the Inventory sold to XCoal that originally generated such Account (but, in each case, only to the extent of such repurchase);

(d)      if the Account arises from the sale of goods, any part of any goods the sale of which has given rise to the Account has been returned, rejected, lost, or damaged (but only to the extent that such goods have been so returned, rejected, lost or damaged);

(e)      if the Account arises from the sale of goods, the sale was not an absolute, bona fide sale, or the sale was made on consignment or on approval or on a sale-or-return or bill-and-hold or progress billing basis, or the sale was made subject to any other repurchase or return agreement, or the goods have not been shipped to the Account Debtor or its designee or the sale was not made in compliance with applicable Requirements of Law;

(f)      if the Account arises from the performance of services, the services have not actually been performed or the services were undertaken in violation of any Requirement of Law or the Account represents a progress billing for which services have not been fully and completely rendered;

(g)      (i) the Account is subject to a Lien other than a Permitted Lien, (ii) DIP ABL Agent does not have a first priority, perfected Lien on such Account (but only to the extent the obligations secured by a Lien that primes the otherwise first priority Lien in favor of DIP ABL Agent, as determined by DIP ABL Agent), or (iii) such Account constitutes As-Extracted Collateral and the Bankruptcy Court has not entered an order granting Super-priority Claim status and Liens to DIP ABL Agent, for the benefit of DIP ABL Lenders on such Account or DIP ABL Agent has not received a completed As-Extracted Collateral Filing, in form and substance reasonably satisfactory to DIP ABL Agent, with respect to such As-Extracted Collateral together with evidence that counterparts of such As-Extracted Collateral Filings have been delivered to DIP ABL Agent or its designee for recording in the applicable jurisdiction;

(h)      the Account is evidenced by Chattel Paper or an Instrument of any kind, or has been reduced to judgment, unless (i)(A) such tangible Chattel Paper or Instrument has been delivered to DIP ABL Agent and (B) no third party has been granted control with respect to such intangible Chattel Paper and (ii) in each case, DIP ABL Agent has a first priority perfected security interest in such Chattel Paper or Instrument;

(i)      the Account Debtor in respect of such Account is an Affiliate or Subsidiary of a Credit Party or a Restricted Subsidiary;

(j)    the Account Debtor holds any Indebtedness for borrowed money of a Credit Party or a Restricted Subsidiary;

(k)    more than fifty percent (50%) of the aggregate balance of all Accounts owing from the Account Debtor obligated on the Account are ineligible under clause (a) above (in which case all Accounts from such Account Debtor shall be ineligible);

(l)    without limiting the provisions of clause (k) above, fifty percent (50%) or more of the aggregate unpaid Accounts from the Account Debtor obligated on the Account are not deemed Eligible Accounts under this Agreement for any reason (other than solely because of clause (m) or (s) hereof);

(m)    the total unpaid Accounts of the Account Debtor obligated on the Account exceed twenty percent (20%) (or, in the event that such unpaid Accounts are assured by a credit insurance policy that has been assigned and delivered to DIP ABL Agent and is satisfactory to DIP ABL Agent as to form, amount and issuer (it being understood that, without duplication of any reserves or the application of any other eligibility criteria, any deductible thereunder shall reduce the amount of such Account that is otherwise eligible by virtue of this parenthetical up to the amount of such deductible), thirty-five percent (35%)) of the net amount of all Eligible Accounts owing from all Account Debtors; provided that only the amount of the Accounts of such Account Debtor exceeding such twenty percent (20%) or thirty-five percent (35%) limitation, as applicable, shall be considered ineligible;

(n)    any covenant, representation or warranty contained in the DIP ABL Financing Documents with respect to such Account has been breached in any material respect;

(o)    the Account is unbilled or the Account has not been invoiced to the Account Debtor in accordance with the procedures and requirements of the applicable Account Debtor; *provided, however,* that unbilled or uninvoiced Accounts in an aggregate amount with respect to all such Accounts of up to the lesser of (i) $20,000,000 and (ii) an amount equal thirty-three and one third percent (33.33%) of the net amount of all billed Eligible Accounts owing from all Account Debtors will not be ineligible solely due to this clause (o) if such unbilled or uninvoiced Accounts (x) are not more than fifteen (15) days past the dates on which applicable goods or services have been rendered or delivered and (y) are, in any event, properly recorded on Borrowers' accounting systems in the ordinary course of business and billed or invoiced to the applicable Account Debtor in Borrower's ordinary course of business;

(p)    the Account has not been invoiced to the Account Debtor in accordance with the procedures and requirements of the applicable Account Debtor;

(q)    the Account is an obligation of an Account Debtor that is the federal, state or local government or any political subdivision thereof, unless DIP ABL Agent has agreed to the contrary in writing and, in the case of any such U.S. Account Debtor, DIP ABL Agent has received from the Account Debtor the acknowledgement of DIP ABL Agent's notice of assignment of such obligation pursuant to this Agreement (for the avoidance of doubt, the Accounts of the Tennessee Valley Authority (or any subsidiary (or similar entity) or other instrumentality thereof) shall not be ineligible as a result of this clause (q));

(r)    the Account is an obligation of an Account Debtor that has suspended business, made a general assignment for the benefit of creditors, is unable to pay its debts as they become due or as to which a petition has been filed (whether voluntary or involuntary) under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or the Account is an Account as to which any facts, events or occurrences exist which could reasonably be expected to impair the validity,

17

enforceability or collectability of such Account or reduce the amount payable or delay payment thereunder;

(s)     the Account Debtor has its principal place of business or executive office outside the United States *unless* (i) payment of the Account (each a "**Foreign Account**") is assured by (x) a letter of credit that is confirmed by a U.S. depository institution and is otherwise satisfactory to DIP ABL Agent as to form, amount, issuer and confirmer and, in all cases, Borrower has either (A) arranged for the issuer and any confirmer of such letter of credit to consent to an assignment to DIP ABL Agent of the proceeds of any drawing under the letter of credit or (B) arranged for DIP ABL Agent to become the transferee beneficiary of such letter of credit, or (y) a credit insurance policy that has been assigned and delivered to DIP ABL Agent and is satisfactory to DIP ABL Agent as to form, amount and issuer and (ii) DIP ABL Agent, in each case, has approved such Account Debtor in writing (such approval not to be unreasonably withheld, conditioned or delayed);

(t)     the Account is payable in a currency other than United States dollars;

(u)     the Account Debtor is an individual;

(v)     Blackhawk Parent has not certified that the applicable Account Debtor has been directed that such Account be paid to a Lockbox Account;

(w)     the Account includes late charges or finance charges (but only such portion of the Account shall be ineligible); or

(x)     the Account arises out of the sale of any Inventory upon which (following such sale) any other Person holds a Lien (other than a Permitted Lien).

"**Eligible Assignee**" means (a) a DIP ABL Lender, (b) an Affiliate of a DIP ABL Lender, (c) an Approved Fund, and (d) an Eligible Transferee; *provided, however*, (x) "**Eligible Assignee**" shall not include any Borrower, any Guarantor or any Affiliate or Subsidiary of any Borrower or Guarantor, and (y) no proposed assignee intending to assume all or any portion of the DIP Revolving Loan Commitment shall be an Eligible Assignee unless such proposed assignee either already holds a portion of such DIP Revolving Loan Commitment, or has been approved as an Eligible Assignee by DIP ABL Agent.

"**Eligible Inventory**" means Inventory owned by a Borrower and acquired and dispensed by such Borrower in the ordinary course of business that DIP ABL Agent determines to be Eligible Inventory based on the application of the eligibility criteria set forth in this definition.  Without limiting the generality of the foregoing, no Inventory shall be Eligible Inventory if:

(a)     such Inventory is not owned by a Borrower free and clear of all Liens and rights of any other Person (including the rights of a purchaser that has made progress payments and the rights of a surety that has issued a bond to assure such Borrower's performance with respect to that Inventory) (other than Permitted Liens);

(b)     such Inventory is placed on consignment;

(c)     such Inventory is in transit; *provided*, that such Inventory will be Eligible Inventory if such Inventory is in transit between (i) locations owned by one more Credit Parties, (ii) within the United States and is under control of one or more Credit Parties and, in the case of this clause (ii), with respect to which Reserves reasonably satisfactory to DIP ABL Agent have been established with respect thereto or (iii) locations described in clause (i), (ii) and, subject to the proviso thereof, clause (l)

18

below; *provided* further that, the amount of Eligible Inventory under the preceding provision shall not exceed an amount equal to the lesser of (x) five percent (5%) of the total aggregate amount of Inventory and (y) $7,500,000;

(d)      such Inventory is covered by a negotiable document of title, unless such document has been delivered to DIP ABL Agent with all necessary endorsements, free and clear of all Liens except those in favor of DIP ABL Agent;

(e)      such Inventory is obsolete, unsalable, unfit for sale, unfit for further processing or is not of good and merchantable quality;

(f)      such Inventory consists of marketing materials, display items or packing or shipping materials, manufacturing supplies or Work-In-Process;

(g)      such Inventory is not subject to a first priority Lien in favor of DIP ABL Agent (but only to the extent of the obligations secured by a Lien that primes the otherwise first priority Lien in favor of DIP ABL Agent, as determined by DIP ABL Agent);

(h)      such Inventory consists of goods that can be transported or sold only with licenses that are not readily available or of any substances defined or designated as hazardous or toxic waste, hazardous or toxic material, hazardous or toxic substance, or similar term, by any Environmental Law or any Governmental Authority applicable to Borrowers or their business, operations or assets;

(i)      such Inventory constitutes As-Extracted Collateral and the Bankruptcy Court has not entered an order granting Super-priority Claim status and Liens in favor of DIP ABL Agent, for the benefit of DIP ABL Lenders, or DIP ABL Agent has not received a completed As-Extracted Collateral Filing, in form and substance reasonably satisfactory to DIP ABL Agent, with respect to such As-Extracted Collateral together with evidence that counterparts of such As-Extracted Collateral Filings have been delivered to DIP ABL Agent or its designee for recording in the applicable jurisdiction;

(j)      any covenant, representation or warranty contained in the DIP ABL Financing Documents with respect to such Inventory has been breached in any material respect;

(k)      such Inventory is located (i) outside of the continental United States or (ii) on premises where the aggregate amount of all Inventory (valued at cost) of Borrowers located thereon is less than $10,000;

(l)      such Inventory is located on premises leased or rented by a Credit Party or with a bailee or warehouseman at a location with respect to which DIP ABL Agent has not received a landlord, warehouseman, bailee or mortgagee letter acceptable in form and substance to DIP ABL Agent unless (i) such Inventory is located on a Mining Lease, in which case, unless DIP ABL Agent has established a Royalty Reserves reasonably satisfactory to DIP ABL Agent with respect thereto or (ii)  if not located on a Mining Lease, DIP ABL Agent has established a Rent Reserve with respect thereto;

(m)      [Reserved];

(n)      such Inventory is not (i) clean goods, (ii) raw to wash goods; or (iii) direct shipment goods;

(o)      such Inventory does not meet all standards imposed by any Governmental Authority, including with respect to its production, acquisition or importation (as the case may be);

(p)    [Reserved];

(q)    [Reserved];

(r)    [Reserved]; or

(s)    such Inventory is subject to any intellectual property licensing, patent, intellectual property royalty, trademark, trade name or copyright agreement with any third parties, which agreement restricts the ability of DIP ABL Agent or any DIP ABL Lender to sell or otherwise dispose of such Inventory.

Subject to Section 4.2, DIP ABL Agent and Borrowers agree that Inventory shall be subject to periodic appraisal by DIP ABL Agent and that valuation of Inventory shall be subject to adjustment pursuant to the results of such appraisal. Notwithstanding the foregoing, the valuation of Inventory shall be subject to any legal limitations on sale and transfer of such Inventory that would have a material adverse effect on the ability of DIP ABL Agent to realize a recovery in full through an orderly liquidation with respect to Loans advanced with respect to such Inventory.

"**Eligible Transferee**" means and includes a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), but in any event excluding the Borrowers, the Guarantors, and each Affiliate or Subsidiary of any Borrower or Guarantor.

"**Embargoed Person**" means any party that (a) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the U.S. Treasury Department's Office of Foreign Assets Control ("*OFAC*") or resides, is organized or chartered, or has a place of business in a country or territory subject to OFAC sanctions or embargo programs or (b) is otherwise as prohibited from doing business with the United States under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any other Requirement of Law.

"**Employee Benefit Plan**" means any employee benefit plan (within the meaning of Section 3(3) of ERISA, other than a Multiemployer Plan) established or maintained by any Borrower or any of its Restricted Subsidiaries or, with respect to any such plan subject to Section 412 of the Code or Title IV of ERISA, an ERISA Affiliate.

"**Environmental Claims**" means any and all actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance or violation, by or from any Person relating in any way to any noncompliance with, or liability arising under, Environmental Law.

"**Environmental Law**" means any applicable Federal, state, local or foreign law (including to the extent related, Mining Laws and principles of common law), rule, regulation, ordinance, code, directive, judgment, order or agreement, now or hereafter in effect and in each case as amended, relating to the protection of the environment, or of human health (as it relates to the exposure to environmental hazards) or to Hazardous Materials.

"**Equity Holder**" means the direct or indirect holders of the Equity Interests of Blackhawk Parent.

"**Equity Interests**" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

20

"**ERISA**" means the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"**ERISA Affiliate**" means any Person that for purposes of Title I or Title IV of ERISA or Section 412 of the Code would be deemed at any relevant time to be a single employer or otherwise aggregated with any Borrower or any of its Subsidiaries under Section 414(b), (c) or (m) of the Code or Section 4001 of ERISA.

"**ERISA Event**" means any one or more of the following:

(a)    any Reportable Event;

(b)    the filing of a notice of intent to terminate any Benefit Plan under Section 4041(b) of ERISA, if such termination would require material additional contributions in order to be considered a standard termination, the filing under Section 4041(c) of ERISA of a notice of intent to terminate any Benefit Plan or the termination of any Benefit Plan under Section 4041(c) of ERISA;

(c)    the institution of proceedings, or the occurrence of an event or condition which would reasonably be expected to constitute grounds for the institution of proceedings, by the PBGC under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Benefit Plan;

(d)    the failure to make a required contribution to any Benefit Plan that would result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a lien or encumbrance; the failure by any Benefit Plan to satisfy the minimum funding standard under Section 430 of the Code or Section 303 of ERISA, whether or not waived; the filing of any request for or receipt of a minimum funding waiver under Section 412 of the Code with respect to any Benefit Plan, or that such filing may be made; or the determination that any Benefit Plan is, or is expected to be, in "at-risk" status within the meaning of Section 430 of the Code or Section 303 of ERISA;

(e)    a withdrawal by any Borrower, any Subsidiary, or any ERISA Affiliate from a Benefit Plan subject to Section 4063 of ERISA during a Benefit Plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA;

(f)    engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA with respect to any Benefit Plan;

(g)    the complete or partial withdrawal of any Borrower, any of its Subsidiaries or any ERISA Affiliate from a Multiemployer Plan, the insolvency under Title IV of ERISA of any Multiemployer Plan; or the receipt by any Borrower or any of its Subsidiaries or any ERISA Affiliate, of any notice, that a Multiemployer Plan is insolvent within the meaning of Section 4245 of ERISA or in endangered or critical status under Section 305 of ERISA; or

(h)    any Borrower, any of its Subsidiaries or an ERISA Affiliate incurring any liability under Title IV of ERISA with respect to any Benefit Plan (other than premiums due and not delinquent under Section 4007 of ERISA).

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time

21

"**Excess Availability**" means, at a particular date, an amount equal to the DIP Revolving Loan Availability minus all amounts due and owing to any Borrower's trade creditors which are outstanding sixty (60) days or more past their due date (after giving effect to trade credit and trade terms extended by vendors).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Excluded Accounts**" means "Excluded Accounts" as defined in the Security Agreement.

"**Excluded Assets**" means each of the following:

(a)    any lease, license, contract, property right or agreement to which any Borrower or any Guarantor is a party or by which any Borrower or any Guarantor is bound or any right or interest of any Borrower or any Guarantor under any such lease, license, contract, property right or agreement, if and only for so long as the grant of a Lien under the Security Documents will constitute or result in a breach, termination or default under any such lease, license, contract, property right or agreement or require any consent thereunder (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC of any relevant jurisdiction, the DIP Orders, or any other applicable law or principles of equity); *provided* that such lease, license, contract, property right or agreement will be an Excluded Asset only to the extent and for so long as the consequences specified above will result; *provided further*, unless such term has been rendered ineffective pursuant to the applicable DIP Order, (i) the Credit Parties are using or have used commercially reasonable efforts (in each case, for a period of up to sixty (60) days from the Closing Date) to obtain such consent or waiver as may be necessary to grant such a Lien except in the case of any lease, license, contract, property right or agreement which, when considered in the aggregate with all such other items requiring such consent or waiver, would not be material (provided that the obligation of the Borrowers and other Credit Parties to use commercially reasonable efforts shall not require the Borrowers or any other Credit Party to request any consent or waiver with respect to a restriction on assignment in any agreement which is imposed by any legal requirement or which the Borrowers or such other Credit Party reasonably determines would have a material adverse effect on such agreement or on the Borrower's or other Credit Party's relationship with the other party or parties to such agreement; *provided*, *further*, that the use of commercially reasonable efforts shall not require any payment or other consideration from the Borrowers or other Credit Parties) and (ii) such lease, license, contract, property right or agreement will cease to be an Excluded Asset and will become subject to the Lien granted under the Security Documents, immediately and automatically, at such time as such consent or waiver is obtained or such consequences will no longer result;

(b)    [Reserved];

(c)    any of the outstanding Voting Stock (within the meaning of Section 956 of the Code and the regulations promulgated thereunder) of a first tier Foreign Subsidiary or first tier FSHCO in excess of 65% of such Voting Stock;

(d)    any application for a registration of a trademark filed in the United States Patent and Trademark Office on an intent-to-use basis, but only to the extent that the grant of a security interest in any such trademark application would adversely affect the validity or enforceability or result in a cancellation of such trademark application;

(e)    [Reserved];

(f)      property subject to Liens permitted under clause (h) of Section 5.1, to the extent the terms of the Indebtedness secured by such Liens prohibit any other Lien on such property;

(g)      cash, certificates of deposit or similar instruments that are subject to Liens permitted under clause (g) of Section 5.1;

(h)      cash securing reimbursement obligations with respect to letters of credit issued under or pursuant to the Prepetition LC Facility Agreement that are subject to Liens permitted under clause (f) of Section 5.1;

(i)      [Reserved];

(j)      [Reserved];

(k)      [Reserved];

(l)      Margin Stock to the extent a security interest therein would violate the provisions of the regulations of the Board of Governors (including Regulation T, Regulation U or Regulation X) and Equity Interests in any Person other than wholly owned Restricted Subsidiaries, which Equity Interests cannot be pledged without the consent of unaffiliated third parties;

(m)      any property or assets to the extent the creation or perfection of pledges thereof or security interests therein, could reasonably be expected to result in material adverse tax consequences or material adverse regulatory consequences to Blackhawk Parent, any of its Subsidiaries or any Parent Company or other direct or indirect equity owner(s) of Borrower, as reasonably determined by the Borrower Representative in consultation with DIP ABL Agent;

(n)      particular assets if and for so long as, if reasonably agreed by DIP ABL Agent and the Borrower Representative, the cost (including, without prejudice to clause (m) of this definition of Excluded Assets, any adverse tax consequences) of creating a pledge or security interest in such assets exceed the practical benefits to be obtained by DIP ABL Lenders therefrom;

(o)      any "building" or "mobile home" (each as defined in Regulation H as promulgated by the Federal Reserve Board under the Flood Insurance Laws) presently or hereafter located on any land comprising part of any Real Property located in a flood zone, until the DIP ABL Agent has received the Flood Documentation in form and substance reasonably satisfactory to the DIP ABL Agent; and

(p)      any assets specifically excluded from the DIP ABL Collateral in the DIP Orders;

*provided*, *however*, (x) at any time any property described in clauses (f), (g) or (h) of this definition of Excluded Assets is not subject to a Lien permitted by the applicable clause of Section 5.1, such property shall be deemed at all times from and after such time to constitute DIP ABL Collateral and (y) that Excluded Assets shall not include any proceeds (as defined in the UCC), substitutions or replacements of any Excluded Assets referred to in any of clauses (a)-(p) (unless such proceeds, substitutions or replacements would constitute Excluded Assets referred to in any of clauses (a)-(p)); *provided*, that clauses (a)-(p) shall only be Excluded Asset to the extent that such assets do not constitute collateral with respect to Indebtedness under the Prepetition ABL Financing Documents or the DIP Term Loan Agreement.  For avoidance of doubt, while Specified Excluded Unencumbered Property (as defined in the DIP Orders) shall not be "Excluded Assets" and shall secure the DIP ABL Obligations, such Specified

Excluded Unencumbered Property will secure the DIP ABL Obligations only to the extent such DIP ABL Obligations do not constitute the ABL Roll-up Loans.

"**Excluded Subsidiary**" means each of BHM-WV, LLC, Fanco Plant Loadout, LLC, Campbell's Creek Mining, LLC, Black Oak Mining, LLC, Wells Prep Plant, LLC, Rock Lick Prep Plant, LLC and Gateway Eagle Mining, LLC so long as such Subsidiary does not (i) guarantee or provide a pledge of assets securing any Indebtedness, including any Indebtedness under the DIP Term Loan Documents, the Prepetition Term Loan Documents, or the Prepetition ABL Financing Documents, (ii) hold any material assets or (iii) become a debtor or debtor-in-possession under Chapter 11 of the Bankruptcy Code.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to DIP ABL Agent, any DIP ABL Lender or any other recipient of any payment to be made by or on behalf of any obligation of Credit Parties hereunder or the DIP ABL Obligations or required to be withheld or deducted from a payment to DIP ABL Agent, such DIP ABL Lender or such recipient:

(a)    Taxes imposed on or measured by net income (however denominated), branch profits Taxes, and franchise Taxes and similar Taxes, in each case, (i) imposed by the jurisdiction (or any political subdivision thereof) under which DIP ABL Agent, such DIP ABL Lender or such recipient is organized, has its principal office or in the case of any DIP ABL Lender, its lending office, or conducts business with respect to entering into any of the DIP ABL Financing Documents or taking any action thereunder or (ii) that are Other Connection Taxes;

(b)    in the case of a DIP ABL Lender, United States withholding Taxes imposed on amounts payable to or for the account of such DIP ABL Lender with respect to an applicable interest in the Loans or DIP Revolving Loan Commitment pursuant to a law in effect on the date on which (i) such DIP ABL Lender becomes a party to this Agreement other than as a result of an assignment requested by a Credit Party under the terms of Section 11.17(c) hereof or (ii) such DIP ABL Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.8, amounts with respect to such Taxes were payable either to such DIP ABL Lender's assignor immediately before such DIP ABL Lender acquired the applicable interest in a Loan or DIP Revolving Loan Commitment or to such DIP ABL Lender immediately before it changed its lending office;

(c)    Taxes attributable to such DIP ABL Lender's or DIP ABL Agent's failure to comply with Section 2.8(c) or Section 2.8(g), as applicable; and

(d)    any withholding Taxes imposed under FATCA.

"**Existing Indebtedness**" has the meaning provided in Section 5.4(a).

"**Exit Credit Agreement**" means that certain draft Senior Secured ABL Credit Agreement, to be dated as of the Chapter 11 Plan Effective Date, among MidCap Funding IV Trust, as agent for the lenders, the lenders identified therein, Blackhawk Parent and the other borrowers identified therein, evidencing, the terms of the proposed Exit Financing, which terms shall include (a) a commitment of not less than $90,000,000, (b) a term of not less than 3-years, (c) an annual rate of reserve-adjusted interest equal to 90-day LIBOR (reset monthly), subject to a 0.25% floor, plus 600 basis points, and (d) no origination fee.

"**Exit Financing**" means, an asset-based revolving credit facility to be provided to Blackhawk Parent and the other obligors identified in the definitive documents evidencing such facility upon the Chapter 11 Plan Effective Date by MidCap Financial Trust (or a to be designated affiliate thereof) and the

other the financial institutions and other entities, if any, identified therein as lenders and MidCap Funding IV Trust, as agent for such lenders.

"**Fair Market Value**" means the value (which, for the avoidance of doubt, will take into account any liabilities associated with related assets) that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the Borrower Representative.

"**FASB ASC**" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"**FATCA**" means Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty, or convention among Governmental Authorities and implementing such Sections of the Code.

"**FCPA**" has the meaning provided in Section 3.14.

"**Federal Funds Rate**" means, for any day, the rate of interest per annum (rounded upwards, if necessary, to the nearest whole multiple of 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, *provided, however*, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day, and (b) if no such rate is so published on such next preceding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to DIP ABL Agent on such day on such transactions as determined by DIP ABL Agent.

"**Fee Letter**" means each agreement between DIP ABL Agent and Borrower relating to fees payable to DIP ABL Agent in connection with the execution of this Agreement, or any amendment, restatement, or other modification thereto.

"**Final DIP Order**" means an order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the Loans (including the full roll-up of any and all remaining Prepetition ABL Obligations) and the Transactions contemplated by this Agreement in the form of the Interim DIP Order (with only such modifications thereto as are necessary to convert the Interim DIP Order to a final order, including to grant on a final basis the interim relief set forth in the Interim DIP Order, grant any and all relief in the Interim DIP Order that is subject to entry of the Final DIP Order, along with such other modifications as are satisfactory to the DIP ABL Agent and Required DIP ABL Lenders in their sole discretion) (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the DIP ABL Agent and Required DIP ABL Lenders in their sole discretion) as to which no stay has been entered.

"**Final DIP Order Entry Date**" means the date on which the Bankruptcy Court enters the Final DIP Order.

"**First Day Motions**" means those motions listed on Exhibit A, attached hereto.

"**First Day Orders**" means orders of the Bankruptcy Court granting the First Day Motions, including interim and/or final orders entered in respect of the First Day Motions at the "first day" or "second day" hearings held in the Chapter 11 Cases.

"**Fiscal Quarter**" means, for any Fiscal Year,

(a)     the fiscal period commencing on January 1 of such Fiscal Year and ending on March 31 of such Fiscal Year,

(b)     the fiscal period commencing on April 1 of such Fiscal Year and ending on June 30 of such Fiscal Year

(c)     the fiscal period commencing on July 1 of such Fiscal Year and ending on September 30 of such Fiscal Year and

(d)     the fiscal period commencing on October 1 of such Fiscal Year and ending on December 31 of such Fiscal Year.

"**Fiscal Year**" means the fiscal year of Borrower and its Subsidiaries ending on December 31 of each calendar year.

"**Flood Documentation**" means, with respect to any fee interest in any real property improved by a "building" or a "mobile home" (each as defined in Regulation H as promulgated by the Federal Reserve Board under the Flood Insurance Laws) located in the United States or any territory thereof of any Credit Party, a completed "life-of-loan" Federal Emergency Management Agency Standard Flood Hazard Determination, and if such real property is located in a special flood hazard area, (1) a notice about special flood hazard area status and flood disaster assistance duly executed by Blackhawk Parent and each Credit Party relating thereto and (2) a copy of, or a certificate as to coverage under, and a declaration page relating to, the flood insurance policies required under the Prepetition Term Loan Documents or the DIP Term Loan Documents, which shall (A) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable endorsement (as applicable); (B) name DIP ABL Agent, on behalf of the Secured Creditors, as additional insured and loss payee/mortgagee (as applicable); and (C) (I) identify the addresses of each property located in a special flood hazard area, (II) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto and (III) provide that the insurer will endeavor to give DIP ABL Agent forty-five (45) days' written notice of cancellation or non-renewal and (IV) otherwise be in form and substance satisfactory to the DIP ABL Agent.

"**Flood Insurance Laws**" means, collectively,

(a)     National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto,

(b)     the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and

(c)     the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"**Foreign DIP ABL Lender**" has the meaning set forth in Section 2.8(c)(i).

26

"**Foreign Pension Plan**" means any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States by any Borrower or any one or more of its Restricted Subsidiaries primarily for the benefit of the employees residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"**Foreign Subsidiary**" of any Person shall mean any Subsidiary of such Person that is not a Domestic Subsidiary.

"**FSHCO**" means any Subsidiary that has, directly or indirectly through Subsidiaries, no material assets other than the Equity Interests (or Equity Interests and debt securities) of one or more Foreign Subsidiaries that are controlled foreign corporations within the meaning of Section 957 of the Code.

"**GAAP**" means generally accepted accounting principles in the United States as in effect from time to time.

"**Governmental Authority**" means the government of the United States of America, any other nation or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Guarantee**" means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"**Guaranteed DIP ABL Obligations**" means the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the principal and interest of the DIP ABL Obligations, and all Loans made to, the Borrowers under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), indebtedness and liabilities (including, without limitation, indemnities, fees and interest (including all interest, fees, and other amounts accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest, fees and other amounts are allowed or allowable in any such proceeding) thereon) of Borrowers to DIP ABL Lenders and DIP ABL Agent now existing or hereafter incurred under, arising out of or in connection with this Agreement and each other DIP ABL Financing Document to which a Borrower is a party and the due performance and compliance by Borrowers with all the terms, conditions and agreements contained in this Agreement and in each such other DIP ABL Financing Document.

"**Guarantor**" means any Credit Party that has executed or delivered, or shall in the future execute or deliver, any Guarantee of any portion of the DIP ABL Obligations.

"**Hazardous Materials**" means any chemicals, materials, wastes, mining wastes, pollutants, contaminants or substances in any form that is prohibited, limited or regulated pursuant to any Environmental Law by virtue of their toxic or otherwise deleterious characteristics, including without limitation petroleum or petroleum products and by-products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls, and radon gas.

27

"**Hedging Obligations**" means, with respect to any specified Person, the obligations of such Person under any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement.

"**Indebtedness**" means, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables):

        (a)      in respect of borrowed money;

        (b)      evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof), including, without limitation, Mining Financial Assurances;

        (c)      in respect of banker's acceptances;

        (d)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

        (e)      representing Capital Lease Obligations;

        (f)      Disqualified Stock;

        (g)      representing the balance deferred and unpaid of the purchase price of any property or services due more than six months after such property is acquired or such services are completed; or

        (h)      representing any Hedging Obligations,

if and to the extent any of the preceding items (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person in accordance with GAAP.  In addition, the term "Indebtedness" includes all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) and, to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person. Indebtedness shall be calculated without giving effect to the effects of FASB ASC 825 and FASB ASC 470-20 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.  The amount of any Capital Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date. The loans under the DIP Term Loan Agreement, the Prepetition Term Loan Documents, the Prepetition ABL Financing Documents and the Prepetition LC Facility Agreement, shall always be considered "Indebtedness" hereunder, whether or not such loans are treated as indebtedness for U.S. federal income tax purposes.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrowers or any other Credit Party under any DIP ABL Financing Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Independent Auditors**" shall have the meaning provided in Section 4.1(b).

"**Instrument**" means "instrument" as defined in Article 9 of the UCC.

"**Intellectual Property**" has the meaning provided in Section 3.19.

"**Interest Period**" means any period commencing on the first day of a calendar month and ending on the date that is ninety (90) days thereafter.

"**Interim DIP Order**" means an order of the Bankruptcy Court, in the form set forth in Exhibit I, authorizing on an interim basis, among other things, the Loans (including the "creeping" roll-up of the Prepetition ABL Obligations) and the Transactions contemplated by this Agreement, with only such modifications as are satisfactory to Blackhawk Parent and the DIP ABL Agent in its sole discretion.

"**Interim DIP Order Entry Date**" shall mean the date on which the Interim DIP Order is entered by the Bankruptcy Court.

"**Inventory**" means "inventory" as defined in Article 9 of the UCC.

"**Investments**" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.  The acquisition by Blackhawk Parent or any Restricted Subsidiary of a Person that holds an Investment in a third Person will be deemed to be an Investment by Blackhawk Parent or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value as of the date of such acquisition of the Investments held by the acquired Person in such third Person.  Except as otherwise provided in this Agreement, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value and net of any dividends, distributions, repayments or redemptions in cash received in respect of such Investment.

"**IRS**" has the meaning set forth in Section 2.8(c)(i).

"**Leaseholds**" of any Person means all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"**LIBOR Rate**" means, for each Loan, a per annum rate of interest equal to the greater of (a) one quarter of one percent (0.25%) and (b) the rate determined by DIP ABL Agent (rounded upwards, if necessary, to the next 1/100th%) by *dividing* (i) the Base LIBOR Rate for the Interest Period, *by* (ii) the sum of one *minus* the daily average during such Interest Period of the aggregate maximum reserve requirement (expressed as a decimal) then imposed under Regulation D of the Board of Governors of the Federal Reserve System (or any successor thereto) for "Eurocurrency Liabilities" (as defined therein).

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or

29

nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"**LLC Division**" means the statutory division of any limited liability company into two or more limited liability companies pursuant to Section 18-217 of the Delaware Limited Liability Company Act, or a comparable provision of a different jurisdiction's laws, as applicable.

"**Loan(s)**" means the DIP Revolving Loans.

"**Loan Account**" has the meaning set forth in Section 2.6(b).

"**Lockbox**" has the meaning set forth in Section 2.11.

"**Lockbox Account**" means an account or accounts maintained at the Lockbox Bank into which collections of Accounts are paid, which account or accounts shall be, if requested by DIP ABL Agent, opened in the name of DIP ABL Agent (or a nominee of DIP ABL Agent).

"**Lockbox Bank**" has the meaning set forth in Section 2.11.

"**Margin Stock**" has the meaning provided in Regulation U.

"**Material Adverse Effect**" means (a) a material adverse effect on the business, operations, property, assets or financial condition of the Borrowers and their Subsidiaries taken as a whole; *provided* that the mere filing or continuation of the Chapter 11 Cases or the events and conditions existing prior to the Petition Date related to, as a result of and/or leading up to such filing or continuation of the Chapter 11 Cases shall not be deemed to have caused a Material Adverse Effect in and of themselves, or (b) a material adverse effect (i) on the rights or remedies of DIP ABL Lenders and/or DIP ABL Agent hereunder or under any other DIP ABL Financing Document, (ii) on the ability of any Credit Party to perform its obligations to DIP ABL Lenders and/or DIP ABL Agent hereunder or under any other DIP ABL Financing Document.

"**Material Lease**" shall mean any Real Property Lease or other contractual obligations in respect of Material Leased Real Property.

"**Material Leased Real Property**" shall mean any Material Real Property subject to a Real Property Lease with a Credit Party, as lessee.

"**Material Real Property**" means (a) any Real Property with a Fair Market Value in excess of $2,500,000, which determination shall include the Fair Market Value of any improvements located on such owned or leased Real Property; (b) all of the owned or leased Real Property identified on Schedule 7.4(a) of the Prepetition ABL Credit Agreement; (c) in the case of any Real Property with coal reserves, any owned or leased Real Property which (i) contains more than 7,500,000 recoverable tons of coal, and (ii) is within Borrower's five-year mine plan and (d) any Material Real Property or similar term (as defined in the DIP Term Loan Agreement or the Prepetition ABL Documents).

"**Maximum Lawful Rate**" has the meaning set forth in Section 2.7.

"**MFT**" means MidCap Financial Trust, a Delaware statutory trust, and its successors and assigns.

"**Mine**" means any excavation or opening into the earth now and hereafter made from which Coal or other minerals are or can be extracted on or from any of the Real Properties in which any Credit Party holds an ownership, leasehold or other interest.

"**Mining Financial Assurances**" means performance bonds for reclamation or otherwise, surety bonds or escrow agreements and any payment or prepayment made with respect to, or certificates of deposit or other sums or assets required to be posted by Blackhawk Parent or any Subsidiary under Mining Laws for reclamation or otherwise.

"**Mining Laws**" means any and all applicable current or future foreign or domestic, Federal, state or local statutes, ordinances, orders, rules, regulations, judgments, governmental authorizations, or any other requirements of governmental authorities relating to surface or subsurface mining operations, activities, and reclamation including, but not limited to, the Federal Coal Leasing Amendments Act; the Surface Mining Control and Reclamation Act; all other applicable land reclamation and use statutes and regulations; the Federal Mine Safety Act of 1977; the Black Lung Act; and the Coal Act; each as amended, and any comparable state and local laws or regulations.

"**Mining Lease**" means a lease, license or other use agreement held on the Closing Date or thereafter acquired which provides Blackhawk Parent or any Restricted Subsidiary the real property and water rights, other interests in land, including Coal, mining and surface rights, easements, rights of way and options, and rights to timber and natural gas (including coalbed methane and gob gas) necessary to recover Coal from any Mine (a) currently operated by Blackhawk Parent or any Restricted Subsidiary or (b) part of any of Blackhawk Parent's mine plans.  Leases which provide Blackhawk Parent or any Restricted Subsidiary the right to construct and operate a preparation plant and related facilities on the surface of the Real Property containing such reserves shall also be deemed a Mining Lease.

"**Mining Permits**" means any and all permits, licenses, registrations, notifications, exemptions and any other authorization required under any applicable Mining Law or otherwise necessary to recover Coal from any Mine being operated by Blackhawk Parent or any Restricted Subsidiary

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means a mortgage, leasehold mortgage, deed of trust, leasehold deed of trust, deed to secure debt, leasehold deed to secure debt, debenture or similar security instrument.

"**Mortgaged Property**" means any Real Property owned or leased by Blackhawk Parent or any of its Subsidiaries which is encumbered (or required to be encumbered) by the Interim DIP Order or the Final DIP Order, as applicable, and/or a Mortgage pursuant to the terms hereof.

"**Multiemployer Plan**" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is an obligation to contribute of) any Borrower or any of its Subsidiaries or with respect to which any Borrower or any of its Subsidiaries has any liability (including on account of an ERISA Affiliate).

"**Notes**" has the meaning set forth in Section 2.3.

"**Notice of Borrowing**" means a notice of a Responsible Officer of Borrower Representative, appropriately completed and substantially in the form of Exhibit D hereto.

"**OFAC**" has the meaning provided in the definition of "Embargoed Person."

"**Orderly Liquidation Value**" means the net amount (after all costs of sale), expressed in terms of money, which an unaffiliated valuation company reasonably acceptable to DIP ABL Agent after performance of an inventory valuation conducted in accordance with Section 4.2(a), estimates can be realized from a sale, as of a specific date, given a reasonable period to find a purchaser(s), with the seller being compelled to sell on an as-is/where-is basis.

"**Organizational Documents**" means, with respect to any Person, the charter, articles or certificate of organization or incorporation and by-laws or other organizational or governing documents of such Person (including any limited liability company or operating agreement)

"**Other Connection Taxes**" means Taxes imposed as a result of a present or former connection between DIP ABL Agent,  any DIP ABL Lender, or any other recipient of any payment to be made by or on behalf of any obligation of Credit Parties hereunder and the jurisdiction imposing such Tax (other than connections arising from DIP ABL Agent, such DIP ABL Lender, or such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, engaged in any other transaction pursuant to or enforced any DIP ABL Financing Document, or sold or assigned an interest in any Loans or any DIP ABL Financing Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any DIP ABL Financing Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 11.17(c)).

"**Parent Company**" means, with respect to any Person, any direct or indirect parent thereof who owns, directly or indirectly, 100% of the Equity Interests of such Person.

"**Patriot Trust RSA**" means that certain Restructuring Support Agreement, dated as of July __, 2019, among Blackhawk Parent and the trustee of the PCC Liquidating Trust established in connection with the jointly administered chapter 11 cases captioned *In re Patriot Coal Corporation*, Case No. 15-32450 (KLP), in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.

"**Payment Account**" means the account specified on the signature pages hereof into which all payments by or on behalf of each Borrower to DIP ABL Agent under the DIP ABL Financing Documents shall be made, or such other account as DIP ABL Agent shall from time to time specify by notice to Borrower Representative.

"**PBGC**" means the U.S. Pension Benefit Guaranty Corporation or any successor agency, referred to and defined in ERISA.

"**Perfection Certificate**" means a certificate in a form approved by DIP ABL Agent, as the same shall be supplemented from time to time.

"**Perfection Certificate Supplement**" means a certificate in a form approved by DIP ABL Agent.

"**Permitted Asset Sale**" has the meaning set forth in Section 5.2.

"**Permitted Business**" means any business that is the same as, or reasonably related, ancillary or complementary to, or a reasonable extension of, any of the businesses in which Blackhawk Parent and its Restricted Subsidiaries are engaged on the Closing Date.

"**Permitted Encumbrance**" means, with respect to any Mortgaged Property, (a) those items described in Section 5.1(l) hereof and (b) such other exceptions to title not described in Section 5.1(l) hereof as are set forth in the mortgage policy delivered to Prepetition First Lien Term Loan Agent.

"**Permitted Holder**" means John Mitchell Potter, Thomas A. Potter, Nicholas Glancy, Jeffrey Sands, Daniel Moon and their respective Affiliates (including their successors, assigns, executors, administrators, personal representatives, heirs and legatees).

"**Permitted Investments**" means:

(a)     any Investment in a Borrower or a Guarantor;

(b)     any Investment in Cash Equivalents;

(c)     [Reserved];

(d)     any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 5.2;

(e)     any Investments received in compromise or resolution of (i) obligations of trade creditors or customers that were incurred in the ordinary course of business of Blackhawk Parent or any of its Restricted Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (ii) litigation, arbitration or other disputes;

(f)     Investments represented by Hedging Obligations permitted hereunder;

(g)     [Reserved];

(h)     loans or advances to employees, including advances to employees for moving and travel expenses and similar expenditures, made in the ordinary course of business of Blackhawk Parent or any Restricted Subsidiary in an aggregate principal amount not to exceed $500,000 at any one time outstanding in the aggregate;

(i)     any Guarantee of Indebtedness to the extent such Guarantee is permitted to be incurred by Section 5.4, other than a Guarantee of Indebtedness of an Affiliate of Blackhawk Parent that is not a Restricted Subsidiary;

(j)     letters of credit issued to support reclamation liabilities of Unrestricted Subsidiaries to the extent permitted by Section 5.4;

(k)     to the extent constituting Investments, purchases and acquisitions of inventory, real property, equipment or supplies in the ordinary course of business; and

(l)     (i) Investments in effect on the Closing Date and any Investment consisting of an extension, modification or renewal of any such Investment existing on the Closing Date in an amount not to exceed the amount of such Investment on the Closing Date and (ii) so long as no DIP Event of Default

33

is continuing at the time of such Investment, additional Investments after the date of this Agreement in an aggregate amount not to exceed, when taken together with all other Investments made pursuant to this clause (1), $1,000,000.

"**Permitted Liens**" has the meaning set forth in Section 5.1.

"**Person**" means any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any Governmental Authority.

"**Petition Date**" shall have the meaning given to such term in the recitals.

"**Pledge Agreement**" means that certain Pledge Agreement, dated as of the Closing Date, by and among JMP Coal Holdings, LLC and JMP Blackhawk, LLC and DIP ABL Agent, as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof.

"**Prepetition ABL Adequate Protection Liens**" shall have the meaning given to such term in the DIP Orders.

"**Prepetition ABL Agent**" shall have the meaning given to such term in the recitals to this Agreement.

"**Prepetition ABL Collateral**" means, collectively, all "Collateral" (as defined in the Prepetition ABL Credit Agreement).

"**Prepetition ABL Credit Agreement**" shall have the meaning given to such term in the recitals to this Agreement.

"**Prepetition ABL Financing Documents**" has the meaning given to such term in the recitals to this Agreement.

"**Prepetition ABL Intercreditor Agreement**" has the meaning given to such term in the recitals to this Agreement.

"**Prepetition ABL Lenders**" shall have the meaning given to such term in the recitals to this Agreement.

"**Prepetition ABL Liens**" means the Liens securing the Prepetition ABL Obligations.

"**Prepetition ABL Loans**" shall have the meaning given to such term in the recitals to this Agreement.

"**Prepetition ABL Obligations**" means the Prepetition ABL Loans and all other obligations under the Prepetition ABL Financing Documents.

"**Prepetition First Lien Term Loan Agent**" shall have the meaning given to such term in the recitals to this Agreement.

"**Prepetition First Lien Term Loan Documents**" shall have the meaning given to such term in the recitals to this Agreement.

"**Prepetition Intercreditor Agreements**" has the meaning given to such term in the recitals to this Agreement.

"**Prepetition Junior Lien Intercreditor Agreement**" has the meaning given to such term in the recitals to this Agreement.

"**Prepetition LC Facility Agreement**" means that certain Letter of Credit and Reimbursement Agreement, dated as of February 17, 2017, by and between Blackhawk Parent and Jefferies Group LLC, as the same may be amended, amended and restated, modified and/or supplemented from time to time in accordance with the terms thereof.

"**Prepetition Second Lien Term Loan Agent**" shall have the meaning given to such term in the recitals to this Agreement.

"**Prepetition Second Lien Term Loan Documents**" shall have the meaning given to such term in the recitals to this Agreement.

"**Prepetition Term Loan Agents**" means the Prepetition First Lien Term Loan Agent and the Prepetition Second Lien Term Loan Agent.

"**Prepetition Term Loan Documents**" means the Prepetition First Lien Term Loan Documents and the Prepetition Second Lien Term Loan Documents.

"**Prepetition Term Loan Lenders**" means, collectively, the "Lenders" as defined in each of the Prepetition Term Loan Documents.

"**Prepetition Term Loan Obligations**" means the obligations under the Prepetition Term Loan Documents.

"**Pro Rata Share**" means (a) with respect to a DIP ABL Lender's obligation to make DIP Revolving Loans, such DIP ABL Lender's right to receive the unused line fee described in Section 2.2(b), (b) the DIP Revolving Loan Commitment Percentage of such DIP ABL Lender, (c) with respect to a DIP ABL Lender's right to receive payments of principal and interest with respect to DIP Revolving Loans, such DIP ABL Lender's DIP Revolving Loan Exposure with respect thereto; and (d) for all other purposes (including, without limitation, the indemnification obligations arising under Section 11.6) with respect to any DIP ABL Lender, the percentage obtained by *dividing* (i) the DIP Revolving Loan Commitment Amount of such DIP ABL Lender (or, in the event the DIP Revolving Loan Commitment shall have been terminated, such DIP ABL Lender's then existing DIP Revolving Loan Outstandings), *by* (ii) the sum of the DIP Revolving Loan Commitment (or, in the event the DIP Revolving Loan Commitment shall have been terminated, the then existing DIP Revolving Loan Outstandings) of all DIP ABL Lenders.

"**Professionals**" means professional retained by Borrowers and any official committee of unsecured creditors or equityholders appointed in the Chapter 11 Cases, other than ordinary course professionals.

"**Real Property**" of any Person means all the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"**Real Property Lease**" shall mean any lease, license, letting, concession, occupancy agreement, sublease, farm-in, farm-out, joint operating agreement, easement or right of way to which such Person is a

party and is granted a possessory interest in or a right to use or occupy all or any portion of the Real Property (including, without limitation, the right to extract Coal, minerals oil, natural gas and other hydrocarbons and their constituents from any portion of Real Property not owned in fee by such Person) and every amendment or modification thereof, including with respect to the Credit Parties, without limitation, the leases with respect to Real Property and any contractual obligation with respect to any of the foregoing.

"**Recipient**" means (a) DIP ABL Agent and (b), any DIP ABL Lender, as applicable.

"**Recovery Event**" means any event that gives rise to the receipt by any Borrower or any of its Restricted Subsidiaries of any cash insurance proceeds or condemnation awards payable (a) by reason of theft, loss, physical destruction, damage, taking or any other similar event with respect to any property or assets of Blackhawk Parent or any of its Restricted Subsidiaries and (b) under any policy of insurance required to be maintained under Section 4.3.

"**Regulation D**" means Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"**Regulation T**" means Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Regulation X**" means Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Release**" means disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, or migrating into, through or upon any land or water or air, or otherwise entering into the outdoor or indoor environment.

"**Rent Reserve**" means a reserve established by DIP ABL Agent in respect of rent payments (not to exceed three months' rent) made by a Credit Party for each location at which Inventory of a Credit Party is located that is not subject to a satisfactory landlord waiver or bailee letter or is a Mining Lease, as applicable (as reported to DIP ABL Agent by Blackhawk Parent from time to time as requested by DIP ABL Agent), as adjusted from time to time by DIP ABL Agent.

"**Reorganization Plan**" means a plan of reorganization or liquidation in any or all of the Chapter 11 Cases.

"**Reportable Event**" means an event described in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Benefit Plan that is subject to Title IV of ERISA other than those events as to which the 30-day notice period is waived under applicable regulations.

"**Required DIP ABL Lenders**" means at any time DIP ABL Lenders holding (a) fifty-one percent (51%) more of the DIP Revolving Loan Commitment, or (b) if the DIP Revolving Loan Commitment has been terminated, fifty-one percent (51%) or more of the then aggregate outstanding principal balance of the Loans.

"**Requirements of Law**" means, collectively, any and all applicable requirements of any Governmental Authority including any and all laws, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes, case law or treaties.

"**Reserves**" means reserves, if any, established by DIP ABL Agent from time to time hereunder against the Borrowing Base, including without limitation, (a) sums that the Credit Parties are or will be required to pay (such as taxes, assessments royalties, and insurance premiums) and have not yet paid, (b) amounts owing by any Credit Party to any Person to the extent secured by a Lien on, or trust over, any DIP ABL Collateral (c) such other events, conditions or contingencies as to which DIP ABL Agent, determines reserves should be established from time to time hereunder, and (d) reserves for the estimated amount in respect of the Carve Out, senior liens and/or claims in or against the DIP ABL Priority Collateral that have priority over the liens and claims of DIP ABL Agent; *provided*, *however*, that (i) any Reserves shall have a reasonable relationship to the circumstances, conditions, events or contingencies which are the basis of such Reserve and (ii) such Reserves shall not duplicate any items that are otherwise expressly deducted or excluded through eligibility criteria in the definition of "Eligible Accounts" or "Eligible Inventory".

"**Responsible Officer**" means, with respect to (a) delivering Notices of Borrowing and similar notices, any person or persons that has or have been authorized by the Board of Directors of any Borrower to deliver such notices pursuant to this Agreement, (b) delivering financial information and officer's certificates pursuant to this Agreement, the chief financial officer, the treasurer or the principal accounting officer of Blackhawk Parent and (c) any other matter in connection with this Agreement or any other DIP ABL Financing Document, any officer (or a person or persons so designated by any two officers) of the applicable Borrower.

"**Restricted Payments**" means

(a)     the declaration or payment of any dividend or making of any other payment or distribution (whether in cash, securities or other property) on account of any Borrower or any Restricted Subsidiary's Equity Interests (including, without limitation, any payment in connection with any merger, amalgamation or consolidation involving any Borrower or any of their Restricted Subsidiaries) or to the direct or indirect holders of any Borrower or any Restricted Subsidiary's Equity Interests in their capacity as such,

(b)     the purchase, redemption, acquisition, retirement for value, acquisition, cancellation or termination (including, without limitation, in connection with any merger, amalgamation or consolidation involving any Borrower) of any Borrower or any Restricted Subsidiary's Equity Interests, or

(c)     any payment or distribution (whether in cash, securities or other property) on account of any return of capital to any Borrower's or any Restricted Subsidiary's stockholders, partners or members (or the equivalent Person thereof).

"**Restricted Subsidiary**" of a Person means any Subsidiary of a Borrower that is not an Unrestricted Subsidiary.

"**Returns**" has the meaning set forth in Section 3.9.

"**Revised Prepetition Deferred Revolving Loan Origination Fee**" means a fee in an amount equal to one and one half percent (1.5%) of the "Revolving Loan Commitment" (as defined in the Prepetition ABL Credit Agreement) payable in lieu of the three percent (3%) Deferred Revolving Loan

Origination Fee that would otherwise be due pursuant to Section 2.2(g) of the Prepetition ABL Credit Agreement.

"**Revolving DIP ABL Lender**" means each DIP ABL Lender having a DIP Revolving Loan Commitment Amount in excess of $0 (or, in the event the DIP Revolving Loan Commitment shall have been terminated at any time, each DIP ABL Lender at such time having DIP Revolving Loan Outstandings in excess of $0).

"**Royalty Reserve**" means a reserve established by DIP ABL Agent in accordance with clause (l) of the definition of Eligible Inventory in an amount equal to the accrued royalty payments as of the end of the previous full fiscal month by a Borrower for each Mining Lease that is not subject to a satisfactory landlord waiver or bailee letter.

"**RSA**" means that that certain Restructuring Support Agreement, dated as of July 15, 2019 by and among the Borrowers, the Consenting First Lien Lenders (as defined therein), the Consenting Second Lien Lenders (as defined therein) and the creditor parties party thereto, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"**S&P**" means Standard & Poor's Ratings Services, a division of McGraw-Hill Financial, Inc.

"**SEC**" has the meaning set forth in Section 4.1(g).

"**Secured Creditors**" means DIP ABL Agent and each DIP ABL Lender and their respective successors and assigns.

"**Securities Account**" means a "securities account" (as defined in Article 9 of the UCC).

"**Securities Account Control Agreement**" means an agreement, in form and substance satisfactory to DIP ABL Agent, among DIP ABL Agent, any applicable Borrower and the applicable securities intermediary in which such Borrower maintains a Securities Account pursuant to which DIP ABL Agent shall obtain "control" (as defined in Article 9 of the UCC) over such Securities Account.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Security Agreement**" means that certain Security Agreement, dated as of the Closing Date, among the Credit Parties and DIP ABL Agent in the form attached hereto as <u>Exhibit E</u>, as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms hereof.

"**Security Agreement Collateral**" means all "Pledged Collateral" as defined in the Security Agreement.

"**Security Document**" means the Subsidiaries Guaranty, the Security Agreement, the Pledge Agreement, each Mortgage, the DIP ABL Intercreditor Agreement and any other agreement, document or instrument executed concurrently herewith or at any time hereafter pursuant to which one or more Credit Parties or any other Person either (a) Guarantees payment or performance of all or any portion of the DIP ABL Obligations, and/or (b) provides, as security for all or any portion of the DIP ABL Obligations, a Lien on any of its assets in favor of DIP ABL Agent for its own benefit and the benefit of DIP ABL Lenders, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time. The Security Documents shall supplement, and shall not limit, the security interests granted pursuant to the DIP Orders; *provided, however*, in the event of any conflict between the security interests

38

granted pursuant to the DIP Orders and the security interest granted pursuant to the Security Documents, the DIP Orders shall govern.

"**Stated Maturity**" means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the documentation governing such Indebtedness, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"**Subordinated Indebtedness**" means any Existing Indebtedness owed by the Borrower to any Equity Holder that is unsecured and subordinated to the DIP ABL Obligations on terms reasonably acceptable to the Required DIP ABL Lenders.

"**Subsidiaries Guaranty**" means that certain Subsidiaries Guaranty Agreement, entered into on or after the Closing Date, among DIP ABL Agent and certain Restricted Subsidiaries as guarantors, as the same is amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof.

"**Subsidiary**" means, with respect to any specified Person:

(a)    any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(b)    any partnership or limited liability company of which (i) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (ii) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"**Super-priority Claim**" means a claim against any Borrower in the Chapter 11 Cases that is expressly granted pursuant to this Agreement, the Interim DIP Order and/or Final DIP Order that is a allowed super-priority, administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code and which has priority, unless otherwise expressly indicated in this Agreement or the DIP Orders, over any or all administrative expenses, adequate protection claims and other claims against Borrowers (or any other debtors) in the Chapter 11 Cases, now existing or hereinafter arising, of any kind whatsoever, whether asserted or unasserted, including without limitation, all administrative expenses of the kind specified in section 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under any sections of the Bankruptcy Code (including sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(d) 726, 1113, 1114, and, upon entry of the Final DIP Order, section 506(c) of the Bankruptcy Code) whether or not such expenses or claims become secured by a judgment lien or other non-consensual lien, levy , or attachment, and that is subject only to the Carve Out and relative priorities of such claims as expressly set forth herein and in the DIP Orders.

"**Swap Contract**" means any "swap agreement", as defined in Section 101 of the Bankruptcy Code, that is obtained by Borrower to provide protection against fluctuations in interest or currency

39

exchange rates, but only if DIP ABL Agent provides its prior written consent to the entry into such "swap agreement".

"**Tax Distributions**" means, (a) any payment made by Blackhawk Parent to the holders of its Equity Interests, for any Fiscal Year (or portion thereof) ending after the Closing Date for which Blackhawk Parent is treated as a partnership (or disregarded as an entity separate from a partnership) for U.S. federal income tax purposes, in an aggregate amount with respect to any such Fiscal Year not to exceed the maximum combined marginal U.S. federal, state and local income tax rate (after taking into account applicable limitations on the deductibility of items and the character of income in question (i.e., long term capital gain, qualified dividend income, etc.)) applicable to any direct (or, where the direct equity holder is a pass-through entity, indirect) Equity Holder of Blackhawk Parent multiplied by the amount of Blackhawk Parent's net taxable income for the relevant Fiscal Year (taking into account any audit adjustment made after the Closing Date (with respect to any Fiscal Year) but, for the avoidance of doubt, without regard to any adjustments pursuant to Section 734 or 743 of the Code), reduced by any net taxable loss with respect to all Fiscal Years (or portion thereof) beginning after the Closing Date to the extent such net taxable loss was not previously taken into account in calculating the Tax Distribution and is of a character that would permit such loss to be deducted against the income of the Fiscal Year (or portions thereof) in question, or (b) for any Fiscal Year (or portion thereof) ending after the Closing Date for which Blackhawk Parent is disregarded as an entity separate from a corporate parent (a "**Corporate Parent**") for U.S. federal income tax purposes, or is treated as a corporation for U.S. federal income tax purposes and is a member of a consolidated, combined, unitary or similar income tax group of which a direct or indirect parent of Blackhawk Parent is the common parent (a "**Tax Group**"), in each case, distributions to such Corporate Parent (or other parent of the Blackhawk Parent), to pay the portion of the U.S. federal, state or local income Taxes of such Corporate Parent (or such Tax Group) that are attributable to the income of Blackhawk Parent and/or its Subsidiaries, in an aggregate amount not to exceed the amount of such Taxes that Blackhawk Parent and/or its applicable Subsidiaries would have paid had Blackhawk Parent and/or such Subsidiaries, as applicable, been a stand-alone corporate taxpayer (or a stand-alone corporate group); *provided*, that Tax Distributions in respect of any Fiscal Year may be paid throughout the Fiscal Year to cover estimated tax payments as reasonably determined by Blackhawk Parent; *provided*, *further*, that, to the extent the aggregate amount of estimated payments in respect of any Fiscal Year exceeds the actual amount of permitted Tax Distributions for such Fiscal Year, such excess shall reduce dollar for dollar the permitted Tax Distributions in respect of succeeding Fiscal Years (including, without duplication, any estimated payments); *provided, further,* that no Tax Distributions may be paid by any Borrower in respect of Taxes paid directly by any Borrower or any Subsidiary.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Transactions**" shall mean, collectively,

　　　　　(a)　　the execution, delivery and performance by each Credit Party of the DIP ABL Financing Documents to which it is a party,

　　　　　(b)　　the execution, delivery and performance by each Credit Party of the DIP Term Loan Documents, the incurrence loans thereunder and the use of the proceeds thereof, and

　　　　　(c)　　the payment of all fees and expenses in connection with the foregoing.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided*, *however*, that, at any time, if by reason of mandatory provisions of law, any or all of the

perfection or priority of any Secured Creditor's security interest in any item or portion of the DIP ABL Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" means the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"**Unfunded Pension Liability**" of any Benefit Plan means the amount, if any, by which the value of the accumulated plan benefits under the Benefit Plan determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all plan assets (excluding any accrued but unpaid contributions).

"**United States**" and "**U.S.**" each means the United States of America.

"**Unrestricted Subsidiary**" means any Subsidiary of a Borrower that is designated by the Board of Directors of Blackhawk Parent as an Unrestricted Subsidiary and approved by DIP ABL Agent.

"**USA PATRIOT Act**" has the meaning set forth in the definition of "Anti-Terrorism Laws."

"**Voting Stock**" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"**Withholding Agent**" means any Borrower or DIP ABL Agent.

"**Work-In-Process**" means Inventory that is not a product that is finished and approved by a Borrower in accordance with applicable Requirements of Law and such Borrower's normal business practices for release and delivery to customers; *provided, however,* that in no event shall (i) clean goods, (ii) raw to wash goods; or (iii) direct shipment goods constitute Work-In-Process.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"**XCoal**" has the meaning set forth in clause (c) of the definition of "Eligible Account".

**Section 1.2**    Accounting Terms and Determinations.  Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder (including, without limitation, determinations made pursuant to the exhibits hereto) shall be made, and all financial statements required to be delivered hereunder shall be prepared on a consolidated basis in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of each Borrower and its Consolidated Subsidiaries delivered to DIP ABL Agent and each of DIP ABL Lenders on or prior to the Closing Date.  If at any time any change in GAAP would affect the computation of any financial ratio or financial requirement set forth in any DIP ABL Financing Document, and either Borrowers or the Required DIP ABL Lenders shall so request, DIP ABL Agent, DIP ABL Lenders and Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required DIP ABL Lenders); *provided*, *however*, that until so amended, (a) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (b) Borrowers shall provide to DIP ABL Agent and DIP ABL Lenders financial statements and other documents required under this Agreement which include a reconciliation between calculations of such ratio or

requirement made before and after giving effect to such change in GAAP.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value", as defined therein.

**Section 1.3**      Other Definitional and Interpretive Provisions.  References in this Agreement to "Articles", "Sections", "Annexes", "Exhibits", or "Schedules" shall be to Articles, Sections, Annexes, Exhibits or Schedules of or to this Agreement unless otherwise specifically provided.  Any term defined herein may be used in the singular or plural.  "Include", "includes" and "including" shall be deemed to be followed by "without limitation".  Except as otherwise specified or limited herein, references to any Person include the successors and assigns of such Person.  References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including", respectively.  Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds.  References to any statute or act shall include all related current regulations and all amendments and any successor statutes, acts and regulations.  All amounts used for purposes of financial calculations required to be made herein shall be without duplication.  References to any statute or act, without additional reference, shall be deemed to refer to federal statutes and acts of the United States.  References to any agreement, instrument or document shall include all schedules, exhibits, annexes and other attachments thereto.  As used in this Agreement, the meaning of the term "material" or the phrase "in all material respects" is intended to refer to an act, omission, violation or condition which reflects or could reasonably be expected to result in a Material Adverse Effect. References to capitalized terms that are not defined herein, but are defined in the UCC, shall have the meanings given them in the UCC.  All references herein to times of day shall be references to daylight or standard time, as applicable.

**Section 1.4**      Time is of the Essence.  Time is of the essence in Borrower's and each other Credit Party's performance under this Agreement and all other DIP ABL Financing Documents.

**Section 1.5**      LLC Division. For all purposes under the DIP ABL Financing Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws, as applicable): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

**Section 1.6**      Covenants.  For purposes of any calculation under Sections 5.1 and 5.4, if the Borrower Representative elects to give pro forma effect in such calculation to the entire committed amount of any proposed Indebtedness, whether or not then drawn, such committed amount may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with Section 5.1 or 5.4, but for so long as such commitment or Indebtedness is outstanding or in effect, the entire committed amount of such Indebtedness then in effect shall be deemed drawn and outstanding for all purposes hereunder.

## ARTICLE 2 - LOANS

**Section 2.1**      Loans.

(a)      [Reserved].

42

(b)        DIP Revolving Loans.

(i)        <u>DIP Revolving Loans and Borrowings</u>.  On the terms and subject to the conditions set forth herein, the Interim DIP Order, the Final DIP Order and the Approved Budget, as applicable, each DIP ABL Lender severally agrees to make loans to Borrowers from time to time as set forth herein (each a "**DIP Revolving Loan**", and collectively, "**DIP Revolving Loans**") equal to such DIP ABL Lender's DIP Revolving Loan Commitment Percentage of DIP Revolving Loans requested by Borrowers hereunder, *provided*, *however*, that (i) after giving effect thereto, the DIP Revolving Loan Outstandings shall not exceed the DIP Revolving Loan Limit and (ii) Borrowers shall not have available cash, including Cash Collateral, in excess of $10,000,000 on either of (A) the date on which any Notice of Borrowing is delivered and/or (B) the date of the proposed borrowing.  Borrowers shall deliver to DIP ABL Agent a Notice of Borrowing with respect to each proposed DIP Revolving Loan Borrowing, such Notice of Borrowing to be delivered before 11:00 a.m. (Eastern time) on the date of such proposed borrowing. Each Borrower and each Revolving DIP ABL Lender hereby authorizes DIP ABL Agent to make DIP Revolving Loans on behalf of Revolving DIP ABL Lenders, at any time in its sole discretion, to pay principal owing in respect of the Loans and interest, fees, expenses and other charges payable by any Credit Party from time to time arising under this Agreement or any other DIP ABL Financing Document.  The Borrowing Base shall be determined by DIP ABL Agent based on (A) the most recent Borrowing Base Certificate and such other information as is delivered to DIP ABL Agent pursuant to Section 4.1(c) or otherwise provided to DIP ABL Agent in accordance with this Agreement and (B) in connection with any Dilution Reserves, Royalty Reserves, Rent Reserves or other Reserves, such other applicable information as may be available to DIP ABL Agent.

(ii)        Mandatory DIP Revolving Loan Repayments and Prepayments.

(A)        The DIP Revolving Loan Commitment shall terminate on the DIP ABL Termination Date.  On such DIP ABL Termination Date, there shall become due, and Borrowers shall pay, the entire outstanding principal amount of each DIP Revolving Loan, together with accrued and unpaid DIP ABL Obligations pertaining thereto incurred to, but excluding the DIP ABL Termination Date; *provided, however*, that such payment is made not later than 12:00 Noon (Eastern time) on the DIP ABL Termination Date.

(B)        If at any time the DIP Revolving Loan Outstandings exceed the DIP Revolving Loan Limit, then, on the next succeeding Business Day, Borrowers shall repay the DIP Revolving Loans in an aggregate amount equal to such excess.

(C)        Principal payable on account of DIP Revolving Loans shall be payable by Borrowers to DIP ABL Agent (I) immediately upon the receipt by any Borrower or DIP ABL Agent of any payments on or proceeds from any of the Accounts, to the extent of such payments or proceeds, as further described in Section 2.11 below, and (II) in full on the DIP ABL Termination Date.

(iii)        <u>Optional Prepayments</u>.  Borrowers may from time to time prepay the DIP Revolving Loans in whole or in part; *provided*, *however*, that any such partial prepayment shall be in an amount equal to $100,000 or a higher integral multiple of

43

$25,000.  For the avoidance of doubt, nothing in this clause shall permit termination of the DIP Revolving Loan Commitment by Borrower other than in accordance with Section 2.12.

      (iv)     <u>LIBOR Rate</u>.

      (A)     Except as provided in Section 2.14 or 2.15, DIP Revolving Loans shall accrue interest at the LIBOR Rate *plus* the Applicable Margin.

      (B)     Anything to the contrary contained herein notwithstanding, neither DIP ABL Agent nor any DIP ABL Lender is required actually to acquire eurodollar deposits to fund or otherwise match fund any DIP ABL Obligation as to which interest accrues based on the LIBOR Rate.

      (v)     <u>Confirmation, Conversion or Dismissal.</u> No confirmation, conversion or dismissal order entered in the Chapter 11 Cases shall discharge or otherwise affect in any way any of the DIP ABL Obligations of any Borrower to DIP ABL Agent and DIP ABL Lenders hereunder or under any other DIP ABL Financing Document, other than (A) after indefeasible payment in full in cash to DIP ABL Lenders and DIP ABL Agent of all DIP ABL Obligations on or before Chapter 11 Plan Effective Date or entry of any conversion or dismissal order and (B) the termination of the DIP Revolving Loan Commitment.

**Section 2.2**      <u>Interest, Interest Calculations and Certain Fees</u>.

      (a)     <u>Interest</u>.  From and following the Closing Date, except as expressly set forth in this Agreement, Loans and the other DIP ABL Obligations shall bear interest at the sum of the LIBOR Rate *plus* the Applicable Margin.  Interest on the Loans shall be paid in arrears on the first (1st) day of each month and on the maturity of such Loans, whether by acceleration or otherwise.  Interest on all other DIP ABL Obligations shall be payable upon demand.

      (b)     <u>Unused Line Fee</u>.  From and following the Closing Date, Borrowers shall pay DIP ABL Agent, for the benefit of all DIP ABL Lenders committed to make DIP Revolving Loans (other than any DIP ABL Lender that is a Defaulted DIP ABL Lender), in accordance with their respective Pro Rata Shares, a fee in an amount equal to (i) (A) the DIP Revolving Loan Commitment *minus* (B) the average daily balance of the sum of the DIP Revolving Loan Outstandings during the preceding month, *multiplied by* (ii) one half of one percent (0.5%) per annum.  Such fee is to be paid monthly in arrears on the first day of each month.

      (c)     [Reserved].

      (d)     <u>Exit Fee</u>. The Borrowers agree to pay to DIP ABL Agent for the ratable account of DIP ABL Lenders under this Agreement, payable upon the occurrence of any DIP ABL Termination Date, a fully earned, non-refundable exit fee in an amount equal to one and one half percent (1.5%) of the DIP Revolving Loan Commitment Amount *plus* all or any portion of the Revised Prepetition Deferred Revolving Loan Origination Fee that was not paid upon termination or roll up, as the case may be, of the obligations under the Prepetition ABL Credit Agreement and the other Prepetition ABL Financing Documents.

      (e)     [Reserved].

(f)     [Reserved].

(g)     [Reserved].

(h)     [Reserved].

(i)     [Reserved].

(j)     <u>Audit Fees</u>.  Subject to the limitations set forth in Section 4.2, Borrowers shall pay to DIP ABL Agent, for its own account and not for the benefit of any other DIP ABL Lenders, all reasonable fees and expenses in connection with audits and inspections of Borrowers' books and records, audits, valuations or appraisals of the DIP ABL Collateral, audits of Borrowers' compliance with applicable laws and such other matters as DIP ABL Agent shall deem appropriate, which shall be due and payable within seven (7) days after the date of issuance by DIP ABL Agent of a written request for payment thereof to Borrowers.

(k)     <u>Wire Fees</u>.  Borrowers shall pay to DIP ABL Agent, for its own account and not for the account of any other DIP ABL Lenders, on written demand, fees for incoming and outgoing wires made for the account of Borrowers; *provided* that such fees shall not in any event exceed $10 per wire.

(l)     <u>Late Charges</u>.  If payments of principal (other than a final installment of principal upon the DIP ABL Termination Date), interest due on the DIP ABL Obligations, or any other amounts due hereunder or under the other DIP ABL Financing Documents are not timely made or remain overdue for a period of five (5) days, Borrowers, without notice or demand by DIP ABL Agent, shall pay to DIP ABL Agent, for its own account and not for the benefit of any other DIP ABL Lenders, as additional compensation to DIP ABL Agent in administering the DIP ABL Obligations, an amount equal to two percent of each delinquent payment.  Any amount paid under this Section 2.2(l) shall be offset by any default interest required to be paid under Section 10.5.

(m)     <u>Computation of Interest and Related Fees</u>.  All interest and fees under each DIP ABL Financing Document shall be calculated on the basis of a 360-day year for the actual number of days elapsed.  The date of funding of a Loan shall be included in the calculation of interest. The date of payment of a Loan shall be excluded from the calculation of interest.  If a Loan is repaid on the same day that it is made, one (1) day's interest shall be charged.  Collections of cash pursuant to Section 2.11 shall be credited to the Prepetition ABL Obligations or the DIP ABL Obligations, as applicable, on a daily basis, subject in all cases to one (1) Business Day clearance and all interest accruing on such funds during such clearance period shall accrue for the benefit of DIP ABL Agent (and not for the benefit of DIP ABL Lenders).

**Section 2.3**     <u>Notes</u>.  The portion of the Loans made by each DIP ABL Lender shall be evidenced, if so requested by such DIP ABL Lender, by one or more promissory notes executed by Borrowers on a joint and several basis (each, a "**Note**") in an original principal amount equal to such DIP ABL Lender's DIP Revolving Loan Commitment Amount.

**Section 2.4**     [Reserved].

**Section 2.5**     [Reserved].

**Section 2.6**        General Provisions Regarding Payment; Loan Account.

(a)        All payments to be made by each Borrower under any DIP ABL Financing Document, including payments of principal and interest made hereunder and pursuant to any other DIP ABL Financing Document, and all fees, expenses, indemnities and reimbursements, shall be made without set-off, recoupment or counterclaim.  If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension (it being understood and agreed that, solely for purposes of calculating financial covenants and computations contained herein and determining compliance therewith, if payment is made, in full, on any such extended due date, such payment shall be deemed to have been paid on the original due date without giving effect to any extension thereto).  Any payments received in the Payment Account before 12:00 Noon (Eastern time) on any date shall be deemed received by DIP ABL Agent on such date, and any payments received in the Payment Account at or after 12:00 Noon (Eastern time) on any date shall be deemed received by DIP ABL Agent on the next succeeding Business Day.

(b)        DIP ABL Agent shall maintain a loan account (the "**Loan Account**") on its books to record Loans and other extensions of credit made by DIP ABL Lenders hereunder or under any other DIP ABL Financing Document, and all payments thereon made by each Borrower.  All entries in the Loan Account shall be made in accordance with DIP ABL Agent's customary accounting practices as in effect from time to time.  The balance in the Loan Account, as recorded in DIP ABL Agent's books and records at any time shall be conclusive and binding evidence of the amounts due and owing to DIP ABL Agent by each Borrower absent manifest error; *provided*, *however*, that any failure to so record or any error in so recording shall not limit or otherwise affect any Borrower's duty to pay all amounts owing hereunder or under any other DIP ABL Financing Document.  DIP ABL Agent shall endeavor to provide Borrowers with a monthly statement regarding the Loan Account (but neither DIP ABL Agent nor any DIP ABL Lender shall have any liability if DIP ABL Agent shall fail to provide any such statement).  Unless any Borrower notifies DIP ABL Agent of any objection to any such statement (specifically describing the basis for such objection) within thirty (30) days after the date of receipt thereof, it shall be deemed final, binding and conclusive upon Borrowers in all respects as to all matters reflected therein.

**Section 2.7**        Maximum Interest.  In no event shall the interest charged with respect to the Loans or any other DIP ABL Obligations of any Borrower under any DIP ABL Financing Document exceed the maximum amount permitted under the laws of the State of New York or of any other applicable jurisdiction.  Notwithstanding anything to the contrary herein or elsewhere, if at any time the rate of interest payable hereunder or under any Note or other DIP ABL Financing Document (the "**Stated Rate**") would exceed the highest rate of interest permitted under any applicable law to be charged (the "**Maximum Lawful Rate**"), then for so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable shall be equal to the Maximum Lawful Rate; *provided*, *however*, that if at any time thereafter the Stated Rate is less than the Maximum Lawful Rate, each Borrower shall, to the extent permitted by law, continue to pay interest at the Maximum Lawful Rate until such time as the total interest received is equal to the total interest which would have been received had the Stated Rate been (but for the operation of this provision) the interest rate payable.  Thereafter, the interest rate payable shall be the Stated Rate unless and until the Stated Rate again would exceed the Maximum Lawful Rate, in which event this provision shall again apply.  In no event shall the total interest received by any DIP ABL Lender exceed the amount which it could lawfully have received had the interest been calculated for the full term hereof at the Maximum Lawful Rate. If, notwithstanding the prior sentence, any DIP ABL Lender has received interest hereunder in excess of the Maximum Lawful Rate, such excess amount shall be applied to the reduction of the principal balance of the Loans or to other amounts (other than interest) payable hereunder, and if no such principal or other amounts are then outstanding, such excess or part thereof remaining shall be paid to Borrowers.  In computing interest payable with reference to the

46

Maximum Lawful Rate applicable to any DIP ABL Lender, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate *divided by* the number of days in the year in which such calculation is made.

**Section 2.8**        Taxes.

(a)        All payments by or on account of the Borrowers of principal and interest on the Loans and all other amounts payable hereunder by or on account of the Borrowers shall be made free and clear of and without deduction for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law, and if any such Tax is an Indemnified Tax, then the Borrowers shall pay such additional amount or amounts as is necessary to ensure that the  amount received by DIP ABL Agent and/or any applicable DIP ABL Lender, as applicable, will equal the full amount DIP ABL Agent and/or such DIP ABL Lender would have received had no such withholding or deduction been required (including, without limitation, such withholdings and deductions applicable to additional sums payable under this Section 2.8).  After payment of any Tax by a Borrower to a Governmental Authority pursuant to this Section 2.8, such Borrower shall promptly forward to DIP ABL Agent the original or a certified copy of an official receipt, a copy of the return reporting such payment, or other documentation reasonably satisfactory to DIP ABL Agent evidencing such payment to such authority. Borrowers shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of DIP ABL Agent timely reimburse it for the payment of, any Other Taxes.

(b)        The Borrowers shall indemnify DIP ABL Agent and DIP ABL Lenders, within ten (10) days after demand thereof, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.8) payable or paid by DIP ABL Agent or any DIP ABL Lender or required to be withheld or deducted from a payment to DIP ABL Agent or any DIP ABL Lender and all expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate in reasonable detail as to the amount of such payment or liability delivered to Borrowers by a DIP ABL Lender (with a copy to DIP ABL Agent), or by DIP ABL Agent on its own behalf or on behalf of a DIP ABL Lender, shall be conclusive absent manifest error.

(c)        Any DIP ABL Lender that is entitled to an exemption from or reduction of withholding tax with respect to payments made under any DIP ABL Financing Document shall deliver to Borrower Representative and DIP ABL Agent, at the time or times prescribed by applicable law or reasonably requested by Borrower Representative or DIP ABL Agent, such properly completed and executed documentation reasonably requested by Borrower Representative or DIP ABL Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any DIP ABL Lender, if reasonably requested by Borrower Representative or DIP ABL Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrowers or DIP ABL Agent as will enable Borrowers or DIP ABL Agent to determine whether or not such DIP ABL Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 2.8(c)(i), 2.8(c)(ii) and 2.8(e) below) shall not be required if in such DIP ABL Lender's reasonable judgment such completion, execution or submission would subject such DIP ABL Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such DIP ABL Lender.

(i)        Each DIP ABL Lender that is not a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes and is a party hereto on the Closing Date or purports to become a DIP ABL Lender after the Closing Date (each such DIP ABL Lender a "**Foreign DIP ABL Lender**") shall, to the extent permitted by applicable law, execute and deliver to Borrower Representative and DIP ABL Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign DIP ABL Lender becomes a DIP ABL Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or DIP ABL Agent) whichever of the following is applicable:  (A) in the case of a Foreign DIP ABL Lender claiming the benefits of an income tax treaty to which the United States is a party, (x) with respect to payments of interest under any DIP ABL Financing Document, two (2) properly completed and executed copies of United States Internal Revenue Service ("**IRS**") Forms W-8BEN or W-8BEN-E (or successor form) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any DIP ABL Financing Documents, two (2) properly completed and executed copies of IRS Forms W-8BEN or W-8BEN-E (or successor form) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty; (B) two (2) properly completed and executed copies of Form W-8ECI (or successor form); (C) in the case of a Foreign DIP ABL Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of <u>Exhibit G-1</u> to the effect that such Foreign DIP ABL Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) two (2) properly completed and executed copies of IRS Forms W-8BEN or W-8BEN-E (or successor form); (D) to the extent a Foreign DIP ABL Lender is not the beneficial owner, two (2) properly completed and executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E (or successor form), a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit G-2</u> or <u>Exhibit G-3</u>, IRS Form W-9 (or successor form), and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Foreign DIP ABL Lender is a partnership and one or more direct or indirect partners of such Foreign DIP ABL Lender are claiming the portfolio interest exemption, such Foreign DIP ABL Lender may provide a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit G-4</u> on behalf of each such direct and indirect partner; or (E) other applicable forms, certificates or documents prescribed by the IRS.   Each DIP ABL Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower Representative and DIP ABL Agent in writing of its legal inability to do so.  In addition, to the extent permitted by applicable law, such forms shall be delivered by each Foreign DIP ABL Lender upon the obsolescence or invalidity of any form previously delivered by such Foreign DIP ABL Lender.  Each Foreign DIP ABL Lender shall promptly notify Borrower Representative at any time it determines that it is no longer in a position to provide any previously delivered certificate to Borrower Representative (or any other form of certification adopted by the U.S. taxing authorities for such purpose).

(ii)        Each DIP ABL Lender that is a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes and is a party hereto on the Closing Date or purports to become a DIP ABL Lender after the Closing Date shall, to the extent permitted by law, provide to Borrower Representative and DIP ABL Agent on or prior to the date on which such DIP ABL Lender becomes a DIP ABL Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower

48

Representative or DIP ABL Agent), a properly completed and executed IRS Form W-9 or any successor form certifying as to such DIP ABL Lender's entitlement to an exemption from U.S. backup withholding and other applicable forms, certificates or documents prescribed by the IRS or reasonably requested by Borrower Representative or DIP ABL Agent. Each DIP ABL Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower Representative and DIP ABL Agent in writing of its legal inability to do so.

(iii)     Any Foreign DIP ABL Lender shall, to the extent it is legally entitled to do so, deliver to Borrower Representative and DIP ABL Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign DIP ABL Lender becomes a DIP ABL Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or DIP ABL Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrowers or DIP ABL Agent to determine the withholding or deduction required to be made.

(d)     If any DIP ABL Lender or DIP ABL Agent determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Taxes as to which it has been indemnified by any Borrower pursuant to this Section 2.8 (including by the payment of additional amounts pursuant to this Section 2.8), then it shall promptly pay an amount equal to such refund to Borrowers, net of all reasonable out-of-pocket expenses of such DIP ABL Lender or of DIP ABL Agent with respect thereto, including any Taxes; *provided*, *however*, that Borrowers, upon the written request of such DIP ABL Lender or DIP ABL Agent, agree to repay any amount paid over to Borrowers to such DIP ABL Lender or to DIP ABL Agent (plus any related penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such DIP ABL Lender or DIP ABL Agent is required, for any reason, to disgorge or otherwise repay such refund. Notwithstanding anything to the contrary in this Section 2.8, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.8(d) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 2.8 shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(e)     If a payment made to a DIP ABL Lender under any DIP ABL Financing Document would be subject to U.S. federal withholding tax imposed by FATCA if such DIP ABL Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such DIP ABL Lender shall deliver to Borrower Representative and DIP ABL Agent at the time or times prescribed by any Requirements of Law and at such time or times reasonably requested by Borrower Representative or DIP ABL Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower Representative or DIP ABL Agent as may be necessary for Borrowers and DIP ABL Agent to comply with their obligations under FATCA and to determine that such DIP ABL Lender has complied with such DIP ABL Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement. For purposes of this Section 2.8, the term "applicable law" includes FATCA.

(f)        Each DIP ABL Lender shall severally indemnify DIP ABL Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such DIP ABL Lender (but only to the extent that any Credit Party has not already indemnified DIP ABL Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such DIP ABL Lender's failure to comply with the provisions of Section 11.17(b) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such DIP ABL Lender, in each case, that are payable or paid by DIP ABL Agent in connection with any DIP ABL Financing Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any DIP ABL Lender by DIP ABL Agent shall be conclusive absent manifest error.  Each DIP ABL Lender hereby authorizes DIP ABL Agent to set off and apply any and all amounts at any time owing to such DIP ABL Lender under any DIP ABL Financing Document or otherwise payable by DIP ABL Agent to such DIP ABL Lender from any other source against any amount due to DIP ABL Agent under this paragraph (f).

(g)        On or before the date DIP ABL Agent becomes a party to the Agreement, DIP ABL Agent shall provide to the Borrower Representative two duly executed copies of either (i) IRS Form W-9 (or any subsequent versions thereof or successor thereto) or (ii) IRS Form W-8ECI and a U.S. branch withholding certificate on IRS Form W-8IMY (in each case, or any subsequent versions thereof or successor thereto) evidencing its agreement with the Borrower Representative to be treated as a U.S. person, as applicable;  *provided* that no DIP ABL Agent shall be required to provide any documentation pursuant to this Section 2.8(g) that DIP ABL Agent is unable to deliver as a result of a Change in Law after such DIP ABL Agent becomes DIP ABL Agent under this Agreement.

(h)        Each party's obligations under Section 2.8(a) through (g) shall survive the resignation or replacement of DIP ABL Agent or any assignment of rights by, or the replacement of, a DIP ABL Lender, and the repayment, satisfaction or discharge of all DIP ABL Obligations hereunder.

**Section 2.9**        Appointment of Borrower Representative.

(a)        Each Borrower hereby irrevocably appoints and constitutes Borrower Representative as its agent and attorney-in-fact to request and receive Loans in the name or on behalf of such Borrower and any other Borrowers, deliver Notices of Borrowing and Borrowing Base Certificates, give instructions with respect to the disbursement of the proceeds of the Loans, giving and receiving all other notices and consents hereunder or under any of the other DIP ABL Financing Documents and taking all other actions (including in respect of compliance with covenants) in the name or on behalf of any Borrower or Borrowers pursuant to this Agreement and the other DIP ABL Financing Documents.  DIP ABL Agent and DIP ABL Lenders may disburse the Loans to such bank account of Borrower Representative or a Borrower or otherwise make such Loans to a Borrower, in each case as Borrower Representative may designate or direct, without notice to any other Borrower.  Notwithstanding anything to the contrary contained herein, DIP ABL Agent may at any time and from time to time require that Loans to or for the account of any Borrower be disbursed directly to an operating account of such Borrower.

(b)        Borrower Representative hereby accepts the appointment by Borrowers to act as the agent and attorney-in-fact of Borrowers pursuant to this Section 2.9.  Borrower Representative shall ensure that the disbursement of any Loans that are at any time requested by or to be remitted to or for the account of a Borrower, shall be remitted or issued to or for the account of such Borrower.

(c)        Each Borrower hereby irrevocably appoints and constitutes Borrower Representative as its agent to receive statements on account and all other notices from DIP ABL Agent,

50

DIP ABL Lenders with respect to the DIP ABL Obligations or otherwise under or in connection with this Agreement and the other DIP ABL Financing Documents.

(d)     Any notice, election, representation, warranty, agreement or undertaking made or delivered by or on behalf of any Borrower by Borrower Representative shall be deemed for all purposes to have been made or delivered by such Borrower, as the case may be, and shall be binding upon and enforceable against such Borrower to the same extent as if made or delivered directly by such Borrower.

(e)     No resignation by or termination of the appointment of Borrower Representative as agent and attorney-in-fact as aforesaid shall be effective, except after ten (10) Business Days' prior written notice to DIP ABL Agent.  If the Borrower Representative resigns under this Agreement, Borrowers shall be entitled to appoint a successor Borrower Representative (which shall be a Borrower and shall be reasonably acceptable to DIP ABL Agent as such successor).  Upon the acceptance of its appointment as successor Borrower Representative hereunder, such successor Borrower Representative shall succeed to all the rights, powers and duties of the retiring Borrower Representative and the term "Borrower Representative" means such successor Borrower Representative for all purposes of this Agreement and the other DIP ABL Financing Documents, and the retiring or terminated Borrower Representative's appointment, powers and duties as Borrower Representative shall be thereupon terminated.

**Section 2.10**     Joint and Several Liability; Rights of Contribution; Subordination and Subrogation.

(a)     Borrowers are defined collectively to include all Persons named as one of the Borrowers herein; *provided*, *however*, that any references herein to "any Borrower", "each Borrower" or similar references, shall be construed as a reference to each individual Person named as one of the Borrowers herein.  Each Person so named shall be jointly and severally liable for all of the obligations of Borrowers under this Agreement.  Each Borrower, individually, expressly understands, agrees and acknowledges, that the credit facilities would not be made available on the terms herein in the absence of the collective credit of all of the Persons named as the Borrowers herein, the joint and several liability of all such Persons, and the cross-collateralization of the collateral of all such Persons.  Accordingly, each Borrower individually acknowledges that the benefit to each of the Persons named as one of the Borrowers as a whole constitutes reasonably equivalent value, regardless of the amount of the credit facilities actually borrowed by, advanced to, or the amount of collateral provided by, any individual Borrower.  In addition, each entity named as one of the Borrowers herein hereby acknowledges and agrees that all of the representations, warranties, covenants, obligations, conditions, agreements and other terms contained in this Agreement shall be applicable to and shall be binding upon and measured and enforceable individually against each Person named as one of the Borrowers herein as well as all such Persons when taken together.  By way of illustration, but without limiting the generality of the foregoing, the terms of Section 10.1 of this Agreement are to be applied to each individual Person named as one of the Borrowers herein (as well as to all such Persons taken as a whole), such that the occurrence of any of the events described in Section 10.1 of this Agreement as to any Person named as one of the Borrowers herein shall constitute a DIP Event of Default even if such event has not occurred as to any other Persons named as the Borrowers or as to all such Persons taken as a whole.

(b)     Notwithstanding any provisions of this Agreement to the contrary, it is intended that the joint and several nature of the liability of each Borrower for the DIP ABL Obligations and the Liens granted by Borrowers to secure the DIP ABL Obligations, not constitute a Fraudulent Conveyance (as defined below).  Consequently, DIP ABL Agent, DIP ABL Lenders and each Borrower agree that if the liability of a Borrower for the DIP ABL Obligations, or any Liens granted by such Borrower securing the DIP ABL Obligations would, but for the application of this sentence, constitute a Fraudulent

51

Conveyance, the liability of such Borrower and the Liens securing such liability shall be valid and enforceable only to the maximum extent that would not cause such liability or such Lien to constitute a Fraudulent Conveyance, and the liability of such Borrower and this Agreement shall automatically be deemed to have been amended accordingly.  For purposes hereof, the term "Fraudulent Conveyance" means a fraudulent conveyance under Section 548 of the Bankruptcy Code or a fraudulent conveyance or fraudulent transfer under the applicable provisions of any fraudulent conveyance or fraudulent transfer law or similar law of any state, nation or other governmental unit, as in effect from time to time.

(c)    DIP ABL Agent is hereby authorized, without notice or demand (except as otherwise specifically required under this Agreement) and without affecting the liability of any Borrower hereunder, at any time and from time to time, to (i) renew, extend or otherwise increase the time for payment of the DIP ABL Obligations; (ii) with the written agreement of any Borrower, and Bankruptcy Court approval obtained by the Borrowers if required, change the terms relating to the DIP ABL Obligations or otherwise modify, amend or change the terms of any Note or other agreement, document or instrument now or hereafter executed by any Borrower and delivered to DIP ABL Agent for any DIP ABL Lender; (iii) accept partial payments of the DIP ABL Obligations; (iv) take and hold any DIP ABL Collateral for the payment of the DIP ABL Obligations or for the payment of any guaranties of the DIP ABL Obligations and exchange, enforce, waive and release any such DIP ABL Collateral; (v) apply any such DIP ABL Collateral, as permitted under the Bankruptcy Code, and direct the order or manner of sale thereof as DIP ABL Agent, in its sole discretion, may determine; and (vi) settle, release, compromise, collect or otherwise liquidate the DIP ABL Obligations and any DIP ABL Collateral therefor, as permitted under the Bankruptcy Code, in any manner, all guarantor and surety defenses being hereby waived by each Borrower.  Without limitations of the foregoing, with respect to the DIP ABL Obligations, each Borrower hereby makes and adopts each of the agreements and waivers set forth in each Guarantee, the same being incorporated hereby by reference.  Except as specifically provided in this Agreement or any of the other DIP ABL Financing Documents, DIP ABL Agent shall have the exclusive right to determine the time and manner of application of any payments or credits, whether received from any Borrower or any other source, and such determination shall be binding on all Borrowers.  All such payments and credits may be applied, reversed and reapplied, in whole or in part, to any of the DIP ABL Obligations that DIP ABL Agent shall determine, in its sole discretion, without affecting the validity or enforceability of the DIP ABL Obligations of the other Borrower.

(d)    Each Borrower hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (i) the absence of any attempt to collect the DIP ABL Obligations from any obligor or other action to enforce the same; (ii) the waiver or consent by DIP ABL Agent with respect to any provision of any instrument evidencing the DIP ABL Obligations, or any part thereof, or any other agreement heretofore, now or hereafter executed by a Borrower and delivered to DIP ABL Agent; (iii) failure by DIP ABL Agent to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the DIP ABL Obligations; (iv) the institution of any proceeding (or conversion of one proceeding to another) under the Bankruptcy Code or DIP ABL Agent's election in any such proceeding of the application of Section 1111(b)(2) of the Bankruptcy Code; (v) any additional borrowing or grant of a security interest by a Borrower as debtor in possession, under Section 364 of the Bankruptcy Code; (vi) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of DIP ABL Agent's claim(s) for repayment of any of the DIP ABL Obligations; or (vii) any other circumstance other than indefeasible payment in full of the DIP ABL Obligations which might otherwise constitute a legal or equitable discharge or defense of a guarantor or surety.

(e)    The Borrowers hereby agree, as between themselves, that to the extent that DIP ABL Agent, on behalf of DIP ABL Lenders, shall have received from any Borrower any Recovery Amount (as defined below), then the paying Borrower shall have a right of contribution against each other Borrower in an amount equal to such other Borrower's contributive share of such Recovery Amount;

52

*provided*, *however*, that in the event any Borrower suffers a Deficiency Amount (as defined below), then the Borrower suffering the Deficiency Amount shall be entitled to seek and receive contribution from and against the other Borrowers in an amount equal to the Deficiency Amount; and *provided*, *further*, that in no event shall the aggregate amounts so reimbursed by reason of the contribution of any Borrower equal or exceed an amount that would, if paid, constitute or result in Fraudulent Conveyance. Until all DIP ABL Obligations have been paid and satisfied in full, no payment made by or for the account of a Borrower including, without limitation, (i) a payment made by such Borrower on behalf of the liabilities of any other Borrower, or (ii) a payment made by any other Guarantor under any Guarantee, shall entitle such Borrower, by subrogation or otherwise, to any payment from such other Borrower or from or out of such other Borrower's property. The right of each Borrower to receive any contribution under this Section 2.10(e) or by subrogation or otherwise from any other Borrower shall be subordinate in right of payment to the DIP ABL Obligations and such Borrower shall not exercise any right or remedy against such other Borrower or any property of such other Borrower by reason of any performance of such Borrower of its joint and several obligations hereunder, until the DIP ABL Obligations have been indefeasibly paid and satisfied in full, and no Borrower shall exercise any right or remedy with respect to this Section 2.10(e) until the DIP ABL Obligations have been indefeasibly paid and satisfied in full. As used in this Section 2.10(e), the term "Recovery Amount" means the amount of proceeds received by or credited to DIP ABL Agent from the exercise of any remedy of DIP ABL Lenders under this Agreement or the other DIP ABL Financing Documents, including, without limitation, the sale of any DIP ABL Collateral. As used in this Section 2.10(e), the term "Deficiency Amount" means any amount that is less than the entire amount a Borrower is entitled to receive by way of contribution or subrogation from, but that has not been paid by, the other Borrowers in respect of any Recovery Amount attributable to the Borrower entitled to contribution, until the Deficiency Amount has been reduced to $0 through contributions and reimbursements made under the terms of this Section 2.10(e) or otherwise.

   **Section 2.11**    Collections and Lockbox Account.

       (a)    Borrowers shall maintain a lockbox or lockboxes (the "**Lockbox**") with a United States depository institution or institutions designated from time to time by DIP ABL Agent (the "**Lockbox Bank**"), subject to the provisions of this Agreement, and shall execute with the Lockbox Bank a Deposit Account Control Agreement and such other agreements related to such Lockbox as DIP ABL Agent may reasonably require, it being understood and agreed that the cash management provisions set forth in Section 2.11 of the Prepetition ABL Credit Agreement shall satisfy the foregoing requirements of this Section 2.11(a). Borrowers shall ensure that all collections of Accounts that are owed by a customer Account Debtor or that otherwise constitute Eligible Accounts are paid directly from such Account Debtors (i) into the Lockbox for deposit into the Lockbox Account and/or (ii) directly into the Lockbox Account; *provided, however*, unless DIP ABL Agent shall otherwise direct by written notice to Borrowers, Borrowers shall be permitted to cause Account Debtors who are individuals to pay Accounts directly to Borrowers, which Borrowers shall then administer and apply in the manner required below. All funds deposited into a Lockbox Account shall be transferred into the Payment Account by the close of each Business Day.

       (b)    [Reserved].

       (c)    Notwithstanding anything in any lockbox agreement or Deposit Account Control Agreement to the contrary, Borrowers agree that they shall be liable for any fees and charges in effect from time to time and charged by the Lockbox Bank in connection with the Lockbox, the Lockbox Account, and that DIP ABL Agent shall have no liability therefor, except to the extent such fees and charges arise from DIP ABL Agent's gross negligence or willful misconduct. Subject to the limitations set forth in Section 12.14, Borrowers hereby indemnify and agree to hold DIP ABL Agent harmless from any and all liabilities, claims, losses and demands whatsoever, including reasonable attorneys' fees and

53

expenses, arising from or relating to actions of DIP ABL Agent or the Lockbox Bank pursuant to this Section or any lockbox agreement or Deposit Account Control Agreement or similar agreement, except to the extent of such losses arising solely from DIP ABL Agent's gross negligence or willful misconduct.

(d)    DIP ABL Agent shall apply, on a daily basis, all funds transferred into the Payment Account pursuant to this Section 2.11:

(i)    from the Closing Date until the earlier to occur of (A) the Final DIP Order Entry Date (at which time, for the avoidance of doubt, all of the Prepetition ABL Obligations shall have been "rolled-up" and converted into the DIP ABL Obligations) and (B) satisfaction in full of the Prepetition ABL Obligations, to reduce the Prepetition ABL Obligations in accordance with Section 10.7(b) of the Prepetition ABL Credit Agreement; and

(ii)    thereafter, to reduce the outstanding DIP Revolving Loans in such order of application as DIP ABL Agent shall elect.

If as the result of collections of Accounts pursuant to the terms and conditions of this Section 2.11, a credit balance exists with respect to the Loan Account, DIP ABL Agent shall, so long as (i) DIP Revolving Loan Outstandings, after giving effect to the application of funds pursuant to the first sentence of this Section 2.11(d), are zero, (ii) all other DIP ABL Obligations then due and owing have been paid in full, and (iii) no Default or DIP Event of Default exists under Section 10.1(a), transfer such funds representing a credit balance that have been received by DIP ABL Agent by 12:00 p.m. (Eastern time) on any Business Day into an account designated by Borrower Representative on the next Business Day thereafter; *provided* that in no event shall any such credit balance accrue interest in favor of Borrowers.

(e)    To the extent that any collections of Accounts that are owed by a customer Account Debtor or that otherwise constitute Eligible Accounts or proceeds of Inventory are not sent directly to the Lockbox or Lockbox Account but are received by any Borrower, such collections shall be held in trust for the benefit of DIP ABL Agent pursuant to an express trust created hereby and immediately remitted, in the form received, to the applicable Lockbox or Lockbox Account.  No such funds received by any Borrower shall be commingled with other funds of the Borrowers unless remitted to a Borrower pursuant to Section 2.11.  If any funds received by any Borrower are commingled with other funds of the Borrowers, or are required to be deposited to a Lockbox or Lockbox Account and are not so deposited within two (2) Business Days, then Borrowers shall pay to DIP ABL Agent, for its own account and not for the account of any other DIP ABL Lenders, a compliance fee equal to $500 for each day that any such conditions exist.

(f)    Borrowers acknowledge and agree that compliance with the terms of this Section 2.11 is essential, and that DIP ABL Agent and DIP ABL Lenders will suffer immediate and irreparable injury and have no adequate remedy at law, if any Borrower, through acts or omissions, causes or permits customer or other third-party Account Debtors to send payments other than to the Lockbox or Lockbox Accounts or if any Borrower fails to promptly deposit collections of such Accounts or proceeds of Inventory in the Lockbox Account as herein required.  Accordingly, in addition to all other rights and remedies of DIP ABL Agent and DIP ABL Lenders hereunder, DIP ABL Agent shall have the right, during the continuation of a DIP Event of Default, to seek specific performance of the Borrowers' obligations under this Section 2.11, and any other equitable relief as DIP ABL Agent may deem necessary or appropriate, and Borrowers waive any requirement for the posting of a bond in connection with such equitable relief.

(g)    Borrowers shall not, and Borrowers shall not suffer or permit any Credit Party to, (i) withdraw any amounts from any Lockbox Account, (ii) without the consent of DIP ABL Agent (such consent not to be unreasonably withheld, conditioned or delayed), change the procedures or sweep instructions under the agreements governing any Lockbox Accounts, or (iii) send to or deposit in any Lockbox Account any funds other than payments made with respect to and proceeds of DIP Priority Collateral.  Borrowers shall, and shall cause each Credit Party to, cooperate with DIP ABL Agent in the reasonable identification and reconciliation on a month-end basis of all material amounts received in or required to be deposited into the Lockbox Accounts.  If any such amount cannot be identified or reconciled to the reasonable satisfaction of DIP ABL Agent, DIP ABL Agent may utilize its own staff or, if it deems necessary, engage an outside auditor at Borrowers' expense, to make such examination and report as may be necessary to identify and reconcile such amount.

**Section 2.12**    Termination; Restriction on Termination.

(a)    Termination by DIP ABL Lenders.  In addition to the rights set forth in Section 10.2, DIP ABL Agent may, and at the direction of Required DIP ABL Lenders shall, terminate this Agreement without notice during a continuing DIP Event of Default.

(b)    Termination by Borrowers.  Upon at least five (5) Business Days' prior written notice to DIP ABL Agent and DIP ABL Lenders, Borrowers may, at its option, terminate this Agreement; *provided, however,* that no such termination shall be effective until Borrowers have paid or collateralized to DIP ABL Agent's satisfaction all of the DIP ABL Obligations in immediately available funds.  Any notice of termination given by Borrowers shall be irrevocable unless all DIP ABL Lenders otherwise agree in writing; *provided* that, the Borrowers' notice may state that such notice is conditioned upon (i) a transaction in connection with the refinancing in full of the Loans, or (ii) a transaction resulting in a Change of Control, to the extent such transaction is not consummated, in which case such notice may be revoked by the Borrowers (by notice to DIP ABL Agent on or prior to the specified effective date) if such condition is not satisfied.  Borrowers may elect to terminate this Agreement in its entirety only.  No section of this Agreement or type of Loan available hereunder may be terminated singly.

(c)    Effectiveness of Termination.  All of the DIP ABL Obligations shall be immediately due and payable upon the DIP ABL Termination Date.  All undertakings, agreements, covenants, warranties and representations of Borrowers contained in the DIP ABL Financing Documents shall survive any such termination and DIP ABL Agent shall retain its Liens in the DIP ABL Collateral and DIP ABL Agent and each DIP ABL Lender shall retain all of its rights and remedies under the DIP ABL Financing Documents notwithstanding such termination until all DIP ABL Obligations have been discharged or paid, in full, in immediately available funds, including, without limitation, the requirements of each fee letter.  Notwithstanding the foregoing or the payment in full of the DIP ABL Obligations, DIP ABL Agent shall not be required to terminate its Liens in the DIP ABL Collateral unless, with respect to any loss or damage DIP ABL Agent may incur as a result of dishonored checks or other items of payment received by DIP ABL Agent from Borrower or any Account Debtor and applied to the DIP ABL Obligations, DIP ABL Agent shall, upon its request, have received cash collateral from Borrower in a minimum amount of $50,000 to protect DIP ABL Agent and each DIP ABL Lender from any such loss or damage for period of at least 90 days after the payment in full of the DIP ABL Obligations.

**Section 2.13**    Increased Costs.

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account

of, or credit extended or participated in by, any DIP ABL Lender (except any reserve requirement reflected in the LIBOR Rate);

(ii)    subject any Recipient to any additional Taxes (other than Indemnified Taxes and any Excluded Taxes) on its loans, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any DIP ABL Lender any other condition, cost or expense (other than with respect to Taxes) affecting this Agreement or DIP Revolving Loans made by such DIP ABL Lender;

and the result of any of the foregoing shall be to increase the cost to such DIP ABL Lender of making, converting to, continuing or maintaining any DIP Revolving Loan, or of maintaining its obligation to make any such DIP Revolving Loan, or to reduce the amount of any sum received or receivable by such DIP ABL Lender hereunder (whether of principal, interest or any other amount), then, upon request of such DIP ABL Lender, the Borrowers will pay to such DIP ABL Lender such additional amount or amounts as will compensate such DIP ABL Lender for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any DIP ABL Lender determines that any Change in Law affecting such DIP ABL Lender or any lending office of such DIP ABL Lender or such DIP ABL Lender's parent company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such DIP ABL Lender's capital or on the capital of such DIP ABL Lender's parent company, if any, as a consequence of this Agreement, the DIP Revolving Loan Commitments of such DIP ABL Lender or the DIP Revolving Loans made by such DIP ABL Lender to a level below that which such DIP ABL Lender or such DIP ABL Lender's parent company could have achieved but for such Change in Law (taking into consideration such DIP ABL Lender's policies and the policies of such DIP ABL Lender's parent company with respect to capital adequacy), then from time to time the Borrowers will pay to such DIP ABL Lender such additional amount or amounts as will compensate such DIP ABL Lender or such DIP ABL Lender's parent company for any such reduction suffered.

(c)    Certificates for Reimbursement.  Any DIP ABL Lender requesting compensation under this Section 2.13 shall deliver to the Borrowers a certificate setting forth, in reasonable detail, the amount or amounts necessary to compensate such DIP ABL Lender or its parent company, as the case may be, as specified in subsection (a) or (b) of this Section 2.13 and the basis for calculating such amounts, which certificate shall be conclusive absent manifest error.  The Borrowers shall pay such DIP ABL Lender the amount shown as due on any such certificate promptly after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any DIP ABL Lender to demand compensation pursuant to the foregoing provisions of this Section 2.13 shall not constitute a waiver of such DIP ABL Lender's right to demand such compensation, *provided* that the Borrowers shall not be required to compensate a DIP ABL Lender pursuant to the foregoing provisions of this Section 2.13 for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such DIP ABL Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such DIP ABL Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**Section 2.14**    Illegality.  If any DIP ABL Lender determines that any Requirement of Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any DIP

ABL Lender or its applicable lending office to perform any of its obligations hereunder or make, maintain or fund, continue or charge interest with respect to any Loan or to determine or charge interest rates based upon the LIBOR Rate, or any Governmental Authority has imposed material restrictions on the authority of such DIP ABL Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such DIP ABL Lender to the Borrowers through DIP ABL Agent, any obligation of such DIP ABL Lender to issue, make, maintain, fund, continue or charge interest with respect to any such Loan shall be suspended until such DIP ABL Lender notifies DIP ABL Agent and the Borrowers that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrowers shall, upon demand from such DIP ABL Lender (with a copy to DIP ABL Agent), (a) prepay all Loans based on the LIBOR Rate of such DIP ABL Lender immediately or (b) (x) all Loans based on the LIBOR Rate of such DIP ABL Lender, the date specified in such DIP ABL Lender's notice shall be deemed to be the last day of the Interest Period of such Loans, and interest upon such DIP ABL Lender's Loans thereafter shall accrue interest at Base Rate plus the Applicable Margin, and (y) all such Loans shall continue to accrue interest at Base Rate plus the Applicable Margin until such DIP ABL Lender determines that it would no longer be unlawful or impractical to maintain such Loans at the LIBOR Rate. Upon any such prepayment as set forth in clause (a) above, the Borrowers shall also pay accrued interest on the amount so prepaid.

**Section 2.15** <u>Inability to Determine Rates</u>. If in connection with any request for a Loan based on the LIBOR Rate or continuation thereof, (a) DIP ABL Agent determines (which determination shall be deemed conclusive absent manifest error) that (i) Dollar deposits are not being offered to banks in the London interbank market for the applicable amount and Interest Period of such Loan based on the LIBOR Rate, or (ii) adequate and reasonable means do not exist for determining the LIBOR Rate for the Interest Period with respect to a proposed Loan based on the LIBOR Rate, or (b) DIP ABL Agent or the Required DIP ABL Lenders determine (which determination shall be deemed conclusive absent manifest error) that for any reason the LIBOR Rate for the Interest Period with respect to a proposed Loan based on the LIBOR Rate does not adequately and fairly reflect the cost to such DIP ABL Lenders of funding such Loan, DIP ABL Agent will as promptly as practicable so notify the Borrower Representative and each DIP ABL Lender, and until DIP ABL Agent provides notice to the Borrower Representative and DIP ABL Lenders that the circumstances giving rise to such notice no longer exist, (x) any pending request for a continuation of Loans based on the LIBOR Rate shall be ineffective and (y) any requested borrowing of Loans based on the LIBOR Rate shall instead be made as a Loan based on the Base Rate, and shall accrue interest at the Base Rate plus the Applicable Margin.

**Section 2.16** <u>No Discharge</u>. Each of the Credit Parties agrees that to the extent that its DIP ABL Obligations have not been satisfied in full in cash (or as otherwise agreed by the Credit Parties, the DIP ABL Agent, and the DIP ABL Lenders), (i) its obligations under the DIP ABL Financing Documents shall not be discharged by any chapter 11 plan or any order confirming a chapter 11 plan (and each of the Credit Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) as to the DIP ABL Obligations and (ii) the Superpriority Claim granted to the DIP ABL Agent and the DIP ABL Lenders pursuant to the DIP Orders and the Liens granted to them pursuant to the DIP Orders shall not be affected in any manner by any such plan or order.

**ARTICLE 3 -** REPRESENTATIONS AND WARRANTIES

To induce DIP ABL Agent and DIP ABL Lenders to enter into this Agreement and to make the Loans and other credit accommodations contemplated hereby, each Borrower hereby represents and warrants to DIP ABL Agent and each DIP ABL Lender that:

**Section 3.1** <u>Company Status</u>. Each of the Borrowers and each of their Restricted Subsidiaries (a) is a duly organized and validly existing Company in good standing under the laws of the

57

jurisdiction of its organization, (b) has the Company power and authority, and all necessary material authorizations and consents, to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (c) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except for failures to (x) be so qualified or authorized, (y) be in good standing or (z) obtain authorizations and consents which, either individually or in the aggregate for clauses (x) through (z), could not reasonably be expected to have a Material Adverse Effect.

**Section 3.2**    <u>Power and Authority; Enforceability</u>.  Subject to entry of the Interim DIP Order or the Final DIP Order, as applicable, (a) each Credit Party has the Company power and authority to execute, deliver and perform the terms and provisions of each of the DIP ABL Financing Documents to which it is party and to consummate the other Transactions and has taken all necessary Company action to authorize the execution, delivery and performance by it of each of such DIP ABL Financing Documents and consummation of the other Transactions, and (b) each Credit Party has duly executed and delivered each of the DIP ABL Financing Documents to which it is party, and each of such DIP ABL Financing Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

**Section 3.3**    <u>No Violation; No Default</u>.  (a) Giving effect to the applicable DIP Orders, neither the execution, delivery or performance by any Credit Party of the DIP ABL Financing Documents to which it is a party, nor compliance by it with the terms and provisions thereof,

      (i)    will materially contravene any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or Governmental Authority (including, without limitation, any Mining Law), other than violations arising as a result of the commencement of the Chapter 11 Cases and except as otherwise excused by the Bankruptcy Court,

      (ii)    will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the property or assets of any Credit Party or any of its Restricted Subsidiaries pursuant to the terms of any Contractual Obligation (including, without limitation, any Mining Lease), to which any Credit Party or any of its Restricted Subsidiaries is a party or by which it or any its property or assets is bound or to which it may be subject, except for any such conflict, breach or default which, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, other than violations arising as a result of the commencement of the Chapter 11 Cases and except as otherwise excused by the Bankruptcy Court, or

      (iii)    will violate any provision of any Organizational Document of any Credit Party or any of its Restricted Subsidiaries.

      (b)    Other than violations arising as a result of the commencement of the Chapter 11 Cases and except as otherwise excused by the Bankruptcy Court, no Borrower or any of its Restricted Subsidiaries is in default in any manner under any provision of any Contractual Obligation, where such default could reasonably be expected to result in a Material Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default.

(c)        No Default or DIP Event of Default has occurred and is continuing.

**Section 3.4**        <u>Approvals</u>.  Subject to the Interim DIP Order and the Final DIP Order, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for those that have otherwise been obtained or made on or prior to the Closing Date), or exemption by, any Governmental Authority is required to be obtained or made by, or on behalf of, any Credit Party to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party in connection with, (a) the execution, delivery and performance of any DIP ABL Financing Document, or (b) the legality, validity, binding effect or enforceability of any such DIP ABL Financing Document.

**Section 3.5**        <u>Financial     Statements;     Financial     Condition;     Undisclosed     Liabilities;</u> <u>Projections</u>.

(a)        The audited consolidated balance sheets of Blackhawk Parent at December 31, 2016 and 2017 and the related consolidated statements of income and cash flows and changes in shareholders' equity of Blackhawk Parent for the years ended on such dates, in each case furnished to DIP ABL Lenders prior to the Closing Date, present fairly in all material respects the consolidated financial position of the Borrowers at the date of said financial statements and the results for the respective periods covered thereby and the unaudited consolidated balance sheet of Blackhawk Parent at March 31, 2019, and the related consolidated statements of income and cash flows and changes in shareholders' equity of Blackhawk Parent for the three months ended on such date, furnished to DIP ABL Lenders prior to the Closing Date, present fairly in all material respects the consolidated financial condition of the Borrowers at the date of said financial statements and the results for the period covered thereby, subject to normal year-end adjustments.  All such financial statements have been prepared in accordance with GAAP consistently applied except to the extent provided in the notes to said financial statements and subject, in the case of the unaudited financial statements, to normal year-end audit adjustments and the absence of footnotes.

(b)        All projections, including the Budget, delivered to DIP ABL Agent and DIP ABL Lenders on or prior to the Closing Date have been prepared in good faith and are based on reasonable assumptions, and there are no statements or conclusions in such projections which are based upon or include information known to Borrowers to be misleading in any material respect or which fail to take into account material information known to Borrowers regarding the matters reported therein.

(c)        Since December 31, 2018, nothing has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect.

(d)        The calculation by the Borrowers of the Borrowing Base as set forth in each Borrowing Base Certificate and the valuation thereunder is complete and accurate in all material respects

**Section 3.6**        <u>Litigation</u>.  Other than the Chapter 11 Cases, there are no actions, suits or proceedings pending or, to the knowledge of Borrowers, threatened (i) with respect to any DIP ABL Financing Document, Prepetition ABL Financing Document, DIP Term Loan Document, Prepetition First Lien Term Loan Document, or Prepetition Second Lien Term Loan Document, or (ii) that have had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**Section 3.7**        <u>True and Complete Disclosure</u>.  All factual information (taken as a whole) furnished by or on behalf of any Borrower or any of its Subsidiaries in writing to DIP ABL Agent or any DIP ABL Lender for purposes of or in connection with this Agreement, the other DIP ABL Financing Documents or any transaction contemplated herein or therein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of any Borrower or any of its Subsidiaries in

59

writing to DIP ABL Agent or any DIP ABL Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided, it being understood and agreed that for purposes of this Section 3.7, such factual information shall not include any projections or any pro forma financial information or information of a general economic or industry specific nature.

Section 3.8    Margin Regulations.  No part of any borrowing of the Loans (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the making of any DIP Revolving Loan nor the use of the proceeds thereof nor the occurrence of any other borrowing under this Agreement will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.  Not more than 25% of the value of the assets of the Borrowers and their Restricted Subsidiaries taken as a whole is represented by Margin Stock.

Section 3.9    Tax Returns and Payments.  Each Borrower and each of its Restricted Subsidiaries (a) has timely filed or caused to be timely filed with the appropriate taxing authority all returns, statements, forms and reports for Taxes (the "**Returns**") required to be filed by them, including with respect to the income, properties or operations of, each Borrower and/or any of its Restricted Subsidiaries and (b) has timely paid all Taxes payable by it which have become due, other than those that are being contested in good faith and provided for on the financial statements of each Borrower and its Restricted Subsidiaries to the extent required in accordance with GAAP, except, in the case of clauses (a) and (b), (x) for where the failure to file any such Returns or pay such Taxes would not reasonably be expected to have a Material Adverse Effect, or (y) to the extent otherwise excused or prohibited by the Bankruptcy Code and for which payment has not otherwise been required by the Bankruptcy Court.

Section 3.10    Compliance with ERISA.

(a)    Each Employee Benefit Plan is in compliance in form and operation with its terms and with ERISA and the Code (including without limitation the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations, except where any failure to comply would not reasonably be expected to have a Material Adverse Effect. Except as would not have a Material Adverse Effect: each Employee Benefit Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code covering all applicable tax law changes or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and to the knowledge of any Borrower or any of their Restricted Subsidiaries, nothing has occurred since the date of such determination that would reasonably be expected to adversely affect such determination (or, in the case of an Employee Benefit Plan with no determination, to the knowledge of any Borrower or any of their Restricted Subsidiaries, nothing has occurred that would reasonably be expected to materially adversely affect the issuance of a favorable determination letter or otherwise materially adversely affect such qualification).  No ERISA Event has occurred or is reasonably expected to occur other than as would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    There exists no Unfunded Pension Liability with respect to any Benefit Plan that would have a Material Adverse Effect.

(c)    None of the Borrowers or any of their Restricted Subsidiaries or any ERISA Affiliate has incurred a complete or partial withdrawal from any Multiemployer Plan, and, if one or more of the Borrowers, their Restricted Subsidiaries or their ERISA Affiliates were to withdraw in a complete

60

withdrawal as of the date this assurance is given or deemed given, the aggregate withdrawal liability that would be incurred would not reasonably be expected to result in a Material Adverse Effect.

(d)    There are no actions, suits or claims pending against or involving an Employee Benefit Plan (other than routine claims for benefits) or, to the knowledge of any Borrower or any of its Restricted Subsidiaries, threatened, which would reasonably be expected to be asserted successfully against any Employee Benefit Plan and, if so asserted successfully, would reasonably be expected either singly or in the aggregate to have a Material Adverse Effect.

(e)    Each Borrower, its Restricted Subsidiaries and any ERISA Affiliate have made all material contributions to or under each Benefit Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, the terms of such Benefit Plan or Multiemployer Plan, respectively, or any contract or agreement requiring contributions to a Benefit Plan or Multiemployer Plan save where any failure to comply, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(f)    Except as would not, individually or in the aggregate, have a Material Adverse Effect, (i) each Borrower, its Restricted Subsidiaries and each ERISA Affiliate have not ceased operations at a facility so as to become subject to the provisions of Section 4062(e) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions to any Benefit Plan subject to Section 4064 of ERISA to which it made contributions, (ii) no lien imposed under the Code or ERISA on the assets of any Borrower, its Restricted Subsidiaries or any ERISA Affiliate exists or is likely to arise on account of any Benefit Plan and (iii) none of the Borrowers, their Restricted Subsidiaries or any ERISA Affiliate has any liability under Section 4069 or 4212(c) of ERISA.

(g)    Except as would not individually or in the aggregate, have a Material Adverse Effect, (i) each Foreign Pension Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities, (ii) all contributions required to be made with respect to a Foreign Pension Plan have been timely made, (iii) no Borrower or any of their Restricted Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan and (iv) the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Pension Plan, determined as of the end of each Borrower's most recently ended Fiscal Year on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Pension Plan allocable to such benefit liabilities.

**Section 3.11**    <u>Security Documents</u>.

(a)    Subject to, and upon the entry of the DIP Orders, the DIP Orders and the Security Agreement are effective to create in favor of DIP ABL Agent for the benefit of the Secured Creditors a legal, valid and enforceable security interest in all right, title and interest of the Credit Parties in the Security Agreement Collateral.  Subject to, and upon the entry of the DIP Orders, the DIP Orders, DIP ABL Agent, for the benefit of the Secured Creditors, has a fully perfected security interest in all right, title and interest in all of the Security Agreement Collateral and the other assets of the Borrowers described in the Interim DIP Order and, upon entry, the Final DIP Order, subject to no other Liens other than Permitted Liens.

(b)    Subject to, and upon the entry of the DIP Orders, the DIP Orders are sufficient to create, as security for the obligations purported to be secured thereby, a valid and enforceable perfected

61

security interest in the Real Property constituting DIP ABL Collateral in favor of DIP ABL Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, superior and prior to the rights of all third Persons (except that the security interest created on such Real Property may be subject to the Permitted Encumbrances related thereto) and subject to no other Liens (other than Permitted Encumbrances related thereto).

(c)     Irrespective of anything to the contrary in any Security Document, the Liens securing the DIP ABL Obligations shall be effective and perfected automatically and without further action by DIP ABL Agent, DIP ABL Lenders or any Borrower pursuant to and upon entry of the Interim DIP Order (prior to the Final DIP Order Entry Date) and the Final DIP Order (on and after the Final DIP Order Entry Date). No filing or registration of any kind shall be required in order to perfect the Liens granted herein or in any other Security Document. Nevertheless, DIP ABL Agent or the Required DIP ABL Lenders may elect in their sole discretion, and Borrower hereby authorizes DIP ABL Agent, to file or record financing statements, mortgages, deeds of trust, deeds to secure debt, pledge agreements, affidavits, security agreements (including intellectual property security agreements), fixture filings, assignments, memoranda or other documents, instruments or evidences of perfection with respect to the DIP ABL Collateral as DIP ABL Agent or the Required DIP ABL Lenders may deem appropriate. Such financing statements may be filed without the signature of such Borrower and may list DIP ABL Agent as the "secured party" and such Borrower as the "debtor" and may describe and indicate the collateral covered thereby as all or any part of the DIP ABL Collateral under the DIP ABL Financing Documents (including an indication of the collateral covered by any such financing statement as "all assets" of such Borrower now owned or hereafter acquired), in such jurisdictions as DIP ABL Agent from time to time determines are appropriate, and to file without the signature of such Borrower any continuations of or corrective amendments to any such financing statements, in any such case in order for DIP ABL Agent to perfect, preserve or protect the Liens, rights and remedies of DIP ABL Agent with respect to the DIP ABL Collateral. Each Borrower also ratifies its authorization for DIP ABL Agent to have filed in any jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof. Any financing statement may include a notice that any disposition of the DIP ABL Collateral in contravention of this Agreement, by either Borrower or any other Person, shall be deemed to violate the rights of DIP ABL Agent and DIP ABL Lenders under the Bankruptcy Code. The Credit Parties acknowledge and agree that no such filing or recording, or lack thereof, shall in any manner alter, diminish or otherwise limit the automatic perfection of all Liens granted to DIP ABL Agent and DIP ABL Lenders under the DIP Orders.

**Section 3.12**        Properties.

(a)        All Real Property owned or leased by Blackhawk Parent or any of its Restricted Subsidiaries as of the Closing Date, and the nature of the interest therein, is correctly set forth in Schedule 5(a) to the Perfection Certificate.  Each Borrower and each of its Restricted Subsidiaries has good and indefeasible title to all material Real Property (and to all buildings, fixtures and improvements located thereon) owned by it, including all material property reflected in the most recent historical balance sheets referred to in Section 3.5(a) (except as sold or otherwise disposed of since the date of such balance sheet in the ordinary course of business or as permitted by the terms of this Agreement), free and clear of all Liens, other than Permitted Liens.  Each Borrower and each of its Restricted Subsidiaries has a valid leasehold interest in the material properties leased by it free and clear of all Liens other than Permitted Liens.  Blackhawk Parent and the Restricted Subsidiaries have maintained or caused to be maintained, in all respects and in accordance with normal mining industry practice, all of the machinery, equipment, vehicles, preparation plants or other Coal processing facilities, loadout and other transportation facilities and other tangible personal property now owned or leased by Borrowers and the Restricted Subsidiaries that is necessary to conduct their business as it is now conducted at such properties, except where the failure to maintain would not reasonably be expected to have a Material Adverse Effect.

(b)        All leases (including, without limitation, Mining Leases) to which any Borrower or any of its Restricted Subsidiaries is a party are in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect.  Each of Blackhawk Parent and the Restricted Subsidiaries enjoys peaceful and undisturbed possession under all such leases, in each case other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)        As of the Closing Date, except as set forth on Schedule 3.12(c), no Borrower nor any of the Restricted Subsidiaries has received written or, to the knowledge of Blackhawk Parent and the Restricted Subsidiaries, other notice of claims that any Borrower or any Restricted Subsidiary has mined any Coal that it did not have the right to mine on any Mortgaged Property or mined any Coal in such a manner as to give rise to any claims for loss, waste or trespass on any Mortgaged Property, and, to the knowledge of Blackhawk Parent and the Restricted Subsidiaries, no facts exist upon which such a claim could be based other than claims that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)        As of the Closing Date, no Borrower nor any Restricted Subsidiary has received any written or, to the knowledge of Borrowers, other notice of any pending or contemplated condemnation proceeding affecting any of the Mortgaged Properties or any sale or disposition thereof in lieu of condemnation that remains unresolved as of the Closing Date, except where such condemnation proceeding would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)        No Borrower nor any Restricted Subsidiary is obligated on the Closing Date under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Mortgaged Property or any interest therein, other than customary buy-back provisions following the termination of mining operations, satisfaction of reclamation obligations and release of applicable Mining Permits with respect to a Mortgaged Property, except where such right of first refusal, option or other contractual right would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(f)     With respect to each Mortgaged Property on which significant surface improvements are located, including, without limitation, surface Mines, refuse areas and haulroads, there are no rights or claims of parties in possession not shown by the public records, encroachments, overlaps, boundary line disputes or other matters which would be disclosed by an accurate survey or inspection of the premises except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.13     Subsidiaries.     On and as of the Closing Date, Blackhawk Parent has no Subsidiaries other than those Subsidiaries listed on Schedule 6(a) to the Perfection Certificate. Schedule 6(a) to the Perfection Certificate sets forth, as of the Closing Date, the percentage ownership (direct and indirect) of Blackhawk Parent in each class of Capital Stock or other Equity Interests of each of its Subsidiaries and also identifies the direct owner thereof.  All outstanding shares of Equity Interests of each Borrower and each Restricted Subsidiary have been duly and validly issued, are fully paid and non-assessable and have been issued free of preemptive rights.  No Restricted Subsidiary has outstanding any securities convertible into or exchangeable for its Equity Interests or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its Equity Interests or any stock appreciation or similar rights.  There are no Unrestricted Subsidiaries as of the Closing Date.

Section 3.14     Compliance with Laws, etc.     Each Borrower and each of its Restricted Subsidiaries is in compliance with all applicable Requirements of Law, statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property, including all applicable laws administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury and the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations promulgated thereunder ("**FCPA**"), except such non-compliances as (i) could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (ii) is excused by the Bankruptcy Court.  No Borrower nor any Restricted Subsidiary has been notified in writing, or, to the knowledge of any Borrower or Restricted Subsidiary, otherwise notified, by the Federal Office of Surface Mining, the Environmental Protection Agency, the U.S. Army Corps of Engineers or the agency of any state administering the Surface Mining Control and Reclamation Act of 1977, as amended, or any comparable state statute or any other Mining Law that it is (a) ineligible to receive additional surface mining permits; or (b) under investigation to determine whether their eligibility to receive any Mining Permit should be revoked (e.g., "permit blocked"), not transferred to any Credit Party or not renewed; and to the knowledge of the Borrower Representative, no facts exist that presently or upon the giving of notice or the lapse of time or otherwise would render any Borrower or any Restricted Subsidiary ineligible for the receipt or renewal of any Mining Permit.

Section 3.15     Investment Company Act.  No Borrower or any of their Restricted Subsidiaries is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

Section 3.16     Insurance.  Each Borrower and its Restricted Subsidiaries is insured against such losses and risks and in such amount as are prudent and customary in the businesses in which it is engaged.

Section 3.17     Environmental Matters.  In each case, except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect,

(a)    each Borrower and each of its Restricted Subsidiaries is in compliance with all Environmental Laws and has obtained and is in compliance with the terms of any permits required under such Environmental Laws to conduct their respective operations as currently conducted;

(b)    there are no Environmental Claims pending against any Borrower or any of its Restricted Subsidiaries and, to the knowledge of any Borrower, no such Environmental Claims are either threatened or are reasonably expected to result from any pending investigation or proceeding;

(c)    no Lien, other than a Permitted Lien, has been recorded, or to the knowledge of any Borrower, threatened under any Environmental Law with respect to any Real Property owned or operated by any Borrower or any Restricted Subsidiary;

(d)    no Borrower nor any of its Restricted Subsidiaries has agreed to assume or accept responsibility, for any liability of any other Person under any Environmental Law;

(e)    there are no existing facts, circumstances, conditions or occurrences with respect to the business, operations, properties or facilities of any Borrower or any of its Restricted Subsidiaries, or, to the knowledge of any Borrower, any of their respective predecessors, that could reasonably be expected to give rise to any Environmental Claim; and

(f)    there are no current, or reasonably anticipated future, requirements under Environmental Law (including without limitation, permit requirements, operational restrictions, clean-up or reclamation costs) that would result in expenditures other than expenditures for which there is a current financial reserve or other appropriate allocation in any Borrower's or its Restricted Subsidiaries' operating or capital expenditure budgets.

**Section 3.18**    Employment and Labor Relations.    No Borrower or any of their Restricted Subsidiaries is engaged in any unfair labor practice that would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  There is

(a)    no unfair labor practice complaint pending against any Borrower or Restricted Subsidiary or, to the knowledge of any Borrower, threatened against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against any Borrower or Restricted Subsidiary or, to the knowledge of any Borrower, threatened against any of them,

(b)    on the Closing Date, no strike, labor dispute, slowdown or stoppage pending against any Borrower or Restricted Subsidiary or, to the knowledge of any Borrower, threatened against any Borrower or Restricted Subsidiary,

(c)    no equal employment opportunity charges or other claims of employment discrimination are pending or, to any Borrower's knowledge, threatened against any Borrower or Restricted Subsidiary, and

(d)    no wage and hour department investigation has been made of any Borrower or Restricted Subsidiary, except (with respect to any matter specified in clauses (a) through (d) above, either individually or in the aggregate) such as would not reasonably be expected to have a Material Adverse Effect.

**Section 3.19**    Intellectual Property, etc.    Each Borrower and each of its Restricted Subsidiaries owns or has the right to use all the patents, trademarks, permits, domain names, service

marks, trade names, copyrights, licenses, franchises, inventions, trade secrets, technology, data, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases) and formulas, or rights with respect to the foregoing (collectively, "**Intellectual Property**"), and has obtained assignments of all leases, licenses and other rights of whatever nature, necessary for the present conduct of its business, without any known conflict with the rights of others which, or the failure to own or have which, as the case may be, could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  The conduct of each Borrower's and each of its Restricted Subsidiaries' respective businesses does not infringe, violate or other conflict with, in any material respect, the proprietary rights of any third party.  No Borrower nor any Restricted Subsidiaries has received any notice, or is otherwise aware, of any infringement or violation of or conflict with the proprietary rights of any third party, which infringement, violation or conflict, if the subject of an unfavorable decision, would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or materially interfere with the operation of their respective businesses by any Borrower or its Restricted Subsidiaries.

**Section 3.20**    Anti-Terrorism Laws; Sanctions.

(a)    No Credit Party, none of its Restricted Subsidiaries and, to the knowledge of each Credit Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Credit Party, such Restricted Subsidiary or Affiliate (i) has violated or is in violation of Anti-Terrorism Laws or (ii) has engaged or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in the "Forty Recommendations" and "Nine Special Recommendations" published by the Organisation for Economic Cooperation and Development's Financial Action Task Force on Money Laundering.

(b)    No Credit Party, none of its Restricted Subsidiaries and, to the knowledge of each Credit Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Credit Party, such Restricted Subsidiary or such Affiliate that is acting or benefiting in any capacity in connection with the DIP Revolving Loans is an Embargoed Person.

(c)    No Credit Party, none of its Restricted Subsidiaries and, to the knowledge of each Credit Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Credit Party, such Restricted Subsidiary or such Affiliate acting or benefiting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Embargoed Person, (ii) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(d)    Neither the use of the DIP Revolving Loans or any other proceeds by any Borrower and its Subsidiaries, nor any other transaction contemplated by this Agreement, will violate the FCPA or Anti-Terrorism Laws.

(e)    As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

**Section 3.21**    Flood Zone.  No Mortgage encumbers improved Real Property that is located in an area that has been identified by the Federal Emergency Management Agency (or any successor agency) as an area having special flood hazards within the meaning of the Flood Insurance Laws unless

66

flood insurance available under such Flood Insurance Laws has been obtained in accordance with Section 4.3(b).

Section 3.22    [Reserved].

Section 3.23    Senior Indebtedness. The DIP ABL Obligations constitute "Senior Obligations" (or such other term of comparable meaning) of the Borrowers under and as defined in the Prepetition Junior Lien Intercreditor Agreement.

Section 3.24    Brokers. Except for fees payable to DIP ABL Agent, DIP ABL Lenders, Prepetition ABL Agent, Prepetition ABL Lenders and Cantor, no broker, finder or other intermediary has brought about the obtaining, making or closing of the transactions contemplated by the DIP ABL Financing Documents, and no Credit Party has or will have any obligation to any Person in respect of any finder's or brokerage fees, commissions or other expenses in connection herewith or therewith.

Section 3.25    Budget. The initial Budget, which was delivered to DIP ABL Agent and DIP ABL Lenders on or prior to the Closing Date, and each subsequent Budget was prepared in good faith based upon assumptions the Borrowers believed to be reasonable assumptions on the date of delivery of such Budget.

Section 3.26    Chapter 11 Cases; Orders.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable laws and proper notice thereof was given for (i) the motion seeking approval of the DIP ABL Financing Documents and the DIP Orders, (ii) the hearing for the entry of the Interim DIP Order and (iii) the hearing for the entry of the Final DIP Order (provided that notice of the final hearing will be given as soon as reasonably practicable after such hearing has been scheduled). The Borrowers shall give, on a timely basis as specified in the Interim DIP Order or Final DIP Order, as applicable, all notices required to be given to all parties specified in the Interim DIP Order or Final DIP Order, as applicable.

(b)    After the entry of the Interim DIP Order, and pursuant to and to the extent permitted in the DIP Orders, the DIP ABL Obligations will constitute allowed Super-priority Claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Borrowers now existing or hereafter arising, of any kind whatsoever, whether asserted or unasserted, including all administrative expense claims of the kind specified in sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject only to (i) the Carve Out and (ii) the priorities set forth in the DIP Orders, as applicable.

(c)    After the entry of the Interim DIP Order and pursuant to and to the extent provided in the DIP Orders, the DIP ABL Obligations will be secured by a valid and perfected Lien on all of the DIP ABL Collateral (except with respect to Liens on proceeds of Avoidance Actions, which shall be subject to entry of the Final DIP Order), and, as to priority, subject only to the Carve Out or as otherwise set forth in the DIP Orders.

(d)    The Interim DIP Order (with respect to the period on and after entry of the Interim DIP Order and prior to entry of the Final DIP Order) or the Final DIP Order (with respect to the period on and after entry of the Final DIP Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the DIP ABL Agent's and Required DIP ABL Lenders' consent, modified or amended. The Borrowers are in compliance in all material respects with the DIP Orders.

67

(e)       Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim DIP Order and the Final DIP Order, as the case may be, upon the DIP ABL Termination Date (whether by acceleration or otherwise) of any of the DIP ABL Obligations, DIP ABL Agent and DIP ABL Lenders shall be entitled to immediate payment of such DIP ABL Obligations and to enforce the remedies provided for hereunder or under applicable laws, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

## ARTICLE 4 - AFFIRMATIVE COVENANTS

Each Borrower agrees that, so long as any DIP Credit Exposure exists:

**Section 4.1**       Information Covenants.  Borrowers shall furnish to DIP ABL Agent, on behalf of each DIP ABL Lender:

(a)       Monthly and Quarterly Financial Statements.

(i)       Within thirty-five (35) days after the end of the first two calendar months of each Fiscal Quarter in each Fiscal Year of Blackhawk Parent, the consolidated balance sheet of Blackhawk Parent and its Subsidiaries as at the end of such monthly accounting period and the related consolidated statements of income and retained earnings and statement of cash flows (together with a detailed reconciliation, reflecting such financial information for Borrowers and their Restricted Subsidiaries, on the one hand, and Borrowers' Unrestricted Subsidiaries, on the other hand) for such monthly accounting period and for the elapsed portion of the Fiscal Year ended with the last day of such monthly accounting period, in each case setting forth comparative figures for the corresponding monthly accounting period in the prior Fiscal Year and comparable budgeted figures for such monthly accounting period as set forth in the respective budget delivered pursuant to Section 4.1(d), all of which shall be certified by an Responsible Officer of the Blackhawk Parent that they fairly present in all material respects in accordance with GAAP the financial condition of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes.

(ii)       Within 45 days after the close of each of the first three Fiscal Quarters in each Fiscal Year of Blackhawk Parent, (x) the consolidated balance sheet of Blackhawk Parent and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of income and retained earnings and statement of cash flows (together with a detailed reconciliation, reflecting such financial information for Borrowers and their Restricted Subsidiaries, on the one hand, and Borrowers' Unrestricted Subsidiaries, on the other hand) for such quarterly accounting period and for the elapsed portion of the Fiscal Year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior Fiscal Year and comparable budgeted figures for such quarterly accounting period as set forth in the respective budget delivered pursuant to Section 4.1(d), all of which shall be certified by an Responsible Officer of the Blackhawk Parent that they fairly present in all material respects in accordance with GAAP the financial condition of Blackhawk Parent and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes, and (y) management's discussion and analysis of the consolidated financial condition of the Borrowers and their

Subsidiaries and important operational and financial developments during such quarterly accounting period.

(b)     Annual Financial Statements.  Within 90 days after the close of each Fiscal Year of Blackhawk Parent, (i) the consolidated balance sheet of Blackhawk Parent and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income and retained earnings, and statement of cash flows (together with a detailed reconciliation, reflecting such financial information for Borrowers and their Restricted Subsidiaries, on the one hand, and the Borrowers' Unrestricted Subsidiaries, on the other hand) for such Fiscal Year setting forth comparative figures for the preceding Fiscal Year and certified by KPMG LLP or other independent certified public accountants of recognized national standing reasonably acceptable to DIP ABL Agent (the "**Independent Auditors**"), accompanied by a report of such accounting firm (which report shall be without a "going concern" or like qualification or exception and without any qualification or exception as to scope of audit other than a "going concern" qualification resulting solely from (i) an upcoming maturity under this Agreement or the Prepetition ABL Credit Agreement or the DIP Term Loan Agreement or (ii) an anticipated breach of any financial covenant the Prepetition ABL Credit Agreement or the DIP Term Loan Agreement or any refinancing thereof) stating that in the course of its regular audit of the financial statements of the Borrowers and their Subsidiaries, which audit was conducted in accordance with generally accepted auditing standards, such accounting firm obtained no knowledge of any Default or a DIP Event of Default relating to financial or accounting matters which has occurred and is continuing or, if in the opinion of such accounting firm such a Default or a DIP Event of Default has occurred and is continuing, a statement as to the nature thereof, and (ii) management's discussion and analysis of the consolidated financial condition of the Borrowers and their Subsidiaries and important operational and financial developments during such Fiscal Year.

(c)     Borrowing Base Certificates.  Within fifteen (15) days after the last day of each month, a duly completed Borrowing Base Certificate signed by a Responsible Officer, with aged listings of accounts receivable and accounts payable (by invoice date) and such other supporting information as may be reasonably requested from time to time by DIP ABL Agent.  Borrowers shall, concurrent with the delivery of financial statements pursuant to Section 4.1(a)(ii) or (b) deliver to DIP ABL Agent a schedule of Eligible Accounts denoting, for the thirty (30) largest Account Debtors during the quarter for which such financial statements are provided or, in the case of financial statements provided pursuant to Section 4.1(b), the last fiscal quarter of the applicable fiscal year.

(d)     Budgets.  In addition to the Budgets and Budget Variance Reports required under Article 6, no later than 60 days following the first day of each Fiscal Year of the Blackhawk Parent, a budget in form reasonably satisfactory to the DIP ABL Agent for each such Fiscal Year prepared in detail and which shall include (i) budgeted statements of income, sources and uses of cash and balance sheets for the Blackhawk Parent and its Subsidiaries on a consolidated basis (with a reasonably detailed breakdown by mining complex) and (ii) a description in reasonable detail of the principal assumptions upon which such budget is based.

(e)     Compliance Certificates.  At the time of the delivery of the financial statements provided for in Sections 4.1(a) and (b), a Compliance Certificate from a Responsible Officer certifying on behalf of Borrowers that, to such officer's knowledge after due inquiry, no Default or DIP Event of Default has occurred and is continuing or, if any Default or DIP Event of Default has occurred and is continuing, specifying the nature and extent thereof, which certificate shall, if delivered with the financial statements required by Section 4.1(b), certify that there have been no changes to the Perfection Certificate since the Closing Date or, if later, since the date of the most recent certificate delivered pursuant to this Section 4.1(e), or if there have been any such changes, include a Perfection Certificate Supplement and

69

certify whether the Credit Parties have otherwise taken all actions required to be taken by them pursuant to the Security Documents in connections with any such changes.

(f)    <u>Notice of Default, Litigation, Material Adverse Effect and Returns and Recoveries</u>.

(i)    Promptly, and in any event within five (5) Business Days after any Responsible Officer of any Borrower or any of its Restricted Subsidiaries obtains actual knowledge thereof, notice of

(A)    the occurrence of any event which constitutes a Default or a DIP Event of Default.

(B)    any litigation or governmental investigation or proceeding pending against any Borrower or any of its Restricted Subsidiaries (x) which, either individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect or (y) with respect to any DIP ABL Financing Document,

(C)    any other event, change or circumstance that has had, or could reasonably be expected to have, a Material Adverse Effect, or

(D)    of any disputes and claims that involve Accounts owed by customer Account Debtors or other Accounts that are Eligible Accounts, in each case, in excess of $5,000,000.

(ii)    Borrower Representative shall deliver to DIP ABL Agent, DIP ABL Lenders, and their respective counsel any and all information and developments in connection with any proposed transaction or Change of Control and any other event or condition which is reasonably likely to have a Material Adverse Effect with respect to Borrowers, the rights and obligations under this Agreement and the other DIP ABL Financing Documents or the Chapter 11 Cases, including the progress of any proposed or confirmed chapter 11 plan and/or disclosure statement, including the Acceptable Chapter 11 Plan and the Acceptable Disclosure Statement. Notwithstanding anything to the contrary in this Agreement, all accounts that constitute DIP ABL Collateral shall be opened and maintained in accordance with the DIP Orders and all cash management and similar orders entered by the Bankruptcy Court in the Chapter 11 Cases (all such orders to be in form and substance acceptable to DIP ABL Agent and DIP ABL Lenders).

(g)    <u>Other Reports and Filings.</u>  Promptly after the filing or delivery thereof, copies of all financial information, proxy materials, registration statements and reports, if any, which any Borrower or any of its Subsidiaries shall publicly file with the Securities and Exchange Commission or any successor thereto (the "**SEC**") or deliver to holders (or any trustee, agent or other representative therefor) of any of its material Indebtedness pursuant to the terms of the documentation governing the same.

(h)    <u>Environmental Matters</u>. Promptly after any Responsible Officer of any Borrower or any of its Restricted Subsidiaries obtains actual knowledge thereof, notice of the following environmental matters to the extent that such environmental matters, either individually or aggregated with all other such environmental matters, could reasonably be expected to have a Material Adverse Effect:

70

(i)       any pending or threatened Environmental Claim against any Borrower or any of its Restricted Subsidiaries;

(ii)      any condition or occurrence on or arising from any Real Property owned, leased or operated by any Borrower or any of its Restricted Subsidiaries that (A) results in noncompliance by any Borrower or any of its Restricted Subsidiaries with any Environmental Law or (B) could reasonably be expected to form the basis of an Environmental Claim against any Borrower or any of its Restricted Subsidiaries or any such Real Property;

(iii)     any condition or occurrence on any Real Property owned, leased or operated by any Borrower or any of its Restricted Subsidiaries that could reasonably be expected to cause such Real Property to be subject to any restrictions on the ownership, lease, occupancy, use or transferability by any Borrower or any of its Restricted Subsidiaries of such Real Property under any Environmental Law;

(iv)     the taking of any removal or remedial action to the extent required by any Environmental Law or any Governmental Authority in response to the Release or threatened Release of any Hazardous Material on any Real Property owned, leased or operated by any Borrower or any of its Restricted Subsidiaries; or

(v)      any material delay, or material conditions imposed, in connection with the issuance, transfer or renewal of any mining permit or other governmental authorization.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and such Borrower's or such Restricted Subsidiary's response thereto.

(i)       <u>Insurance</u>.  By the last day of each Fiscal Year (commencing with the Fiscal Year ending December 31, 2019), a certificate from Blackhawk Parent's insurance broker(s) as to Blackhawk Parent's satisfaction of the requirements of Section 4.3 as of the date of such certificate.

(j)       <u>Payroll</u>.  Together with the delivery of each Compliance Certificate, evidence of payment and satisfaction of all material payroll, withholding and similar taxes due and owing by the Borrowers with respect to the payroll period(s) occurring during the applicable Fiscal Quarters (it being understood that reports from a Borrower's payroll service provider shall be deemed to satisfactory evidence).

(k)       <u>Other Information</u>.  From time to time, such other business, financial or corporate information or documents with respect to any Borrower or any of its Subsidiaries as DIP ABL Agent or any DIP ABL Lender (through DIP ABL Agent) may reasonably request.

**Section 4.2**       <u>Books, Records and Inspections; Quarterly Conference Calls</u>.

(a)       Each Borrower will keep, and will cause each Subsidiary to keep, proper books of record substantially in accordance with GAAP in which full, true and correct entries shall be made consistent with existing business practices; and will permit, and will cause each Subsidiary to permit, at the sole cost of the applicable Borrower or any Restricted Subsidiary, representatives of DIP ABL Agent and of any DIP ABL Lender (i) (A) to visit and inspect any of their respective properties, to examine any of their respective books and records and (B) to conduct a collateral audit and analysis of their respective

71

operations and the DIP ABL Collateral; (ii) to verify the amount and age of the Accounts of a customer Account Debtors, the identity and credit of such respective Account Debtors, to review the billing practices of Borrowers, (iii) to reasonably discuss their respective affairs, finances, cash and liquidity management, restructuring activities and accounts with their respective officers and senior employees and, so long as an officer or other senior employee is afforded an opportunity to be present during such discussions, their independent public accountants, in each case, during normal business hours and as often as may reasonably be desired and (iv) to conduct an Inventory appraisal.  Notwithstanding anything to the contrary in this Section 4.2 or Section 4.12, none of the Borrowers or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discuss, any document, information or other matter that (x) constitutes non-financial trade secrets or non-financial propriety information, (y) in respect of which disclosure to DIP ABL Agent or DIP ABL Lender (or their respective representatives) is prohibited or restricted by applicable law or, to extent not entered into contemplation of this Agreement, binding agreements or obligations or (z) is subject to attorney-client or similar privilege or constitutes attorney work product; *provided*, the Borrowers shall use commercially reasonable efforts (to the extent permitted) to disclose the requested information without disclosing the information described in the foregoing clauses (x) through (z).

(b)     At the request of DIP ABL Agent, Blackhawk Parent will within ten (10) days (or such later time as may be agreed by DIP ABL Agent) after the date of the delivery (or, if later, required delivery) of the quarterly and annual financial information pursuant to Sections 4.1(a)(ii) and (b), hold a conference call or teleconference, at a time selected by Blackhawk Parent and reasonably acceptable to DIP ABL Agent, with all of DIP ABL Lenders that choose to participate, to review the financial results of the previous Fiscal Quarter or Fiscal Year, as the case may be, and the financial condition of Blackhawk Parent and its Subsidiaries and the budgets presented for the current Fiscal Year of Blackhawk Parent and its Subsidiaries.

**Section 4.3**      <u>Payment and Performance of DIP ABL Obligations</u>.

(a)     Each Borrower will, and will cause each of its Restricted Subsidiaries to,

(i)     keep all property necessary to the business of each Borrower and its Restricted Subsidiaries in good working order and condition, ordinary wear and tear excepted and subject to the occurrence of casualty events,

(ii)     maintain with financially sound and reputable insurance companies insurance on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as  such Borrower and its Restricted Subsidiaries, and

(iii)     furnish to DIP ABL Agent, upon its request therefor, full information as to the insurance carried.

Such insurance shall include physical damage insurance on all real and personal property (whether now owned or hereafter acquired) on an all risk basis (subject to customary exceptions) and business interruption insurance on coal preparation plants and rail load-outs (subject to customary exceptions). The provisions of this Section 4.3 shall be deemed supplemental to, but not duplicative of, the provisions of any Security Documents that require the maintenance of insurance.

(b)     If any "building" or "mobile home" (each as defined in Regulation H as promulgated by the Federal Reserve Board under the Flood Insurance Laws) constituting DIP ABL

Collateral is at any time located on Real Property in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the Flood Insurance Laws, then Borrowers shall, or shall cause each Credit Party to

>> (i)    maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and

>> (ii)    deliver to DIP ABL Agent executed borrower notices as required by the Flood Insurance Laws and  evidence of such compliance both in form and substance reasonably acceptable to DIP ABL Agent.

> (c)    All policies or certificates (or certified copies thereof) with respect to the insurance required by Sections 4.3(a) and (b) (and any other insurance maintained by such Borrower and/or such Restricted Subsidiaries) (i) shall be endorsed (solely to the extent such policies permit endorsement) to DIP ABL Agent's satisfaction for the benefit of DIP ABL Agent (including, without limitation, by naming DIP ABL Agent as loss payee and/or additional insured (solely to the extent such policies permit such designation)), and (ii) shall state that the respective insurer shall use commercially reasonable efforts to provide DIP ABL Agent with at least thirty (30) days' prior written notice of cancellation thereof.

> (d)    If any Borrower or any Restricted Subsidiary shall fail to maintain insurance in accordance with this Section 4.3, or if any Borrower or any Restricted Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, DIP ABL Agent shall have the right (but shall be under no obligation) to procure such insurance and the Borrowers agree to reimburse DIP ABL Agent for all costs and expenses of procuring such insurance.

Section 4.4    Existence; Franchises.  Each Borrower will, and will cause each of its Restricted Subsidiaries to, do or cause to be done, all things necessary to preserve and keep in full force and effect its existence and its material rights, franchises, licenses, permits and Intellectual Property, necessary to its business; *provided*, *however*, that nothing in this Section 4.4 shall prevent (i) sales of assets and other transactions by Blackhawk Parent or any of its Restricted Subsidiaries in accordance with Section 5.2 or 5.5 or (ii) the withdrawal by Blackhawk Parent or any of its Restricted Subsidiaries of its qualification as a foreign Company in any jurisdiction if such withdrawal could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 4.5    Compliance with Laws, etc..  Except as otherwise excused or prohibited by the Bankruptcy Code, and subject to any required approval by the Bankruptcy Court, each Borrower will, and will cause each of its Restricted Subsidiaries to, comply with all applicable Requirements of Law, statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property (owned or leased) (including all Mining Laws, Mining Permits, applicable statutes, regulations and orders), except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 4.6    Compliance with Environmental Laws.

> (a)    Subject to any required approval by the Bankruptcy Court, each Borrower will comply, and will cause each of its Restricted Subsidiaries to comply, with all Environmental Laws and

73

permits applicable to or required in respect of the conduct of its business or operations or by the ownership, lease or use of any Real Property now or hereafter owned, leased or operated by a Borrower or any of its Restricted Subsidiaries, except for such noncompliance as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, and will keep or cause to be kept all such Real Property free and clear of any Liens imposed pursuant to Environmental Laws.

(b)      (i) After the receipt by DIP ABL Agent or any DIP ABL Lender of any notice of the type described in Section 4.1(h), (ii) at any time that any Borrower or any of its Restricted Subsidiaries is not in compliance with Section 4.6(a) or (iii) in the event that DIP ABL Agent or DIP ABL Lenders have exercised any of the remedies pursuant to the last paragraph of Section 10.2, the Borrowers will (in each case) provide, at the sole expense of such Borrower and at the request of DIP ABL Agent, an environmental report concerning any relevant Real Property owned, leased or operated by any Borrower or any of its Restricted Subsidiaries, prepared by an environmental consulting firm reasonably approved by DIP ABL Agent, evaluating the identified noncompliance or potential liability and indicating, if relevant, the presence or absence of Hazardous Materials and the estimated cost of any removal or remedial action in connection with such Hazardous Materials on such Real Property.  If any Borrower fails to take diligent efforts to commence preparation of such report or fails to provide the same within a reasonable time (not to exceed sixty (60) days, unless a longer time is required to complete the required investigations or assessments) after such request was made, DIP ABL Agent may after written notice to such Borrower, retain an environmental consulting firm to prepare such report, the cost of which shall be borne by such Borrower, and such Borrower shall and hereby does grant to DIP ABL Agent and DIP ABL Lenders and their respective agents access to such Real Property, and specifically grants DIP ABL Agent and DIP ABL Lenders an irrevocable non-exclusive license, subject to the rights of tenants, to undertake such an assessment at any reasonable time upon reasonable notice to such Borrower, all at the sole expense of such Borrower; *provided*, *however*, that such environmental assessment shall not include the taking of soil, groundwater, surface water, air, or building material samples or other invasive testing unless such Borrower has provided its prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

**Section 4.7**      ERISA.  Borrowers shall supply to DIP ABL Agent (in sufficient copies for all DIP ABL Lenders, if DIP ABL Agent so requests):

(a)      promptly and in any event within 15 days after receiving a request from DIP ABL Agent a copy of IRS Form 5500 (including the Schedule S) with respect to a Benefit Plan;

(b)      promptly and in any event within thirty (30) days after  any Borrower, any Restricted Subsidiary or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred that would reasonably be expected to result in a Material Adverse Effect, a certificate of an Responsible Officer of the Borrower Representative describing such ERISA Event and the action, if any, proposed to be taken with respect to such ERISA Event and a copy of any notice filed with the PBGC or the IRS pertaining to such ERISA Event and any notices received by any Borrower, any Restricted Subsidiary or any ERISA Affiliate from the PBGC or any other Governmental Authority with respect thereto; provided that, in the case of ERISA Events under paragraph (d) of the definition thereof, the 30-day period set forth above shall be a 10-day period, and, in the case of ERISA Events under paragraph (b) of the definition thereof, in no event shall notice be given later than ten (10) days after the occurrence of the ERISA Event; and

(c)      to the extent it is reasonably expected to result in a Material Adverse Effect, promptly, and in any event within thirty (30) days, after becoming aware that there has been

(i)      an increase in Unfunded Pension Liabilities (taking into account only Benefit Plans with positive Unfunded Pension Liabilities),

(ii)     an increase since the date the representations hereunder are given or deemed given, or from any prior notice, as applicable, in potential withdrawal liability under Section 4201 of ERISA, if any Borrower, any Subsidiary and/or any ERISA Affiliate were to withdraw completely from any and all Multiemployer Plans, or

(iii)    the adoption of any amendment to a Benefit Plan which results in an increase in contribution obligations of any Borrower or any Subsidiary, a detailed written description thereof from a Responsible Officer of Borrower Representative.

**Section 4.8**      End of Fiscal Years; Fiscal Quarters.  Each Borrower will cause (i) its fiscal year to end on December 31 of each calendar year and (ii) its fiscal quarters to end on the last day of each period described in the definition of "Fiscal Quarter."

**Section 4.9**      Performance of DIP ABL Obligations.  Each Borrower will, and will cause each of its Restricted Subsidiaries to, perform all of its obligations under the terms of each mortgage, indenture, security agreement, loan agreement or credit agreement and each other Contractual Obligation by which it is bound (including all Mining Leases), except such non-performances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 4.10**     Payment of Taxes.  Each Borrower will pay and discharge, and will cause each of its Restricted Subsidiaries to pay and discharge, all Taxes required to be paid by them, prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, might become a Lien or charge upon any properties of the Borrower or any of its Restricted Subsidiaries not otherwise permitted under Section 5.1(j); *provided* that neither the Borrower nor any of its Restricted Subsidiaries shall be required to pay any such Tax (i) which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP, (ii) the nonpayment of which could not reasonably be expected to cause a Material Adverse Effect, or (iii) to the extent otherwise excused or prohibited by the Bankruptcy Code and for which payment has not otherwise been required by the Bankruptcy Court.

**Section 4.11**     Use of Proceeds.

(a)      Borrowers shall use the proceeds of DIP Revolving Loans solely in accordance with the terms of the DIP Orders and the Approved Budget, including: (i) to pay (1) all reasonable fees due to DIP ABL Lenders and DIP ABL Agent, (2) all professional fees and expenses (including reasonable fees and expenses of attorneys (including counsel for Borrowers, Kirkland & Ellis LLP, and counsel to DIP ABL Agent and DIP ABL Lenders, Hogan Lovells US LLP and their bankruptcy counsel Morris, Nichols, Arsht & Tunnell LLP), local counsel to DIP ABL Agent and DIP ABL Lenders, and financial advisors) incurred by DIP ABL Lenders and DIP ABL Agent, including those incurred in connection with the preparation, negotiation, documentation and Bankruptcy Court approval of the rights and obligations under this Agreement and the other DIP ABL Financing Documents, and (3) adequate protection payments as set forth in DIP Orders, and (ii) to provide working capital, and for other general corporate purposes of Borrowers and their Subsidiaries, and to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court as set forth in the Approved Budget. Notwithstanding the foregoing, DIP ABL Lenders agree that any amounts needed to fund the Carve Out may be applied for such purpose on terms set forth herein and in the DIP Orders.  No portion of the proceeds of the Loans will be used for family, personal, agricultural or household use or otherwise not in accordance with Section 3.8.

(b)      Notwithstanding the foregoing, no portion of Borrowers' Cash Collateral, if any, the DIP Revolving Loans, the DIP ABL Collateral, the Prepetition ABL Loans, the Prepetition ABL Collateral, or the Carve Out may be used for any purpose that is prohibited under the Bankruptcy Code or a DIP Order

**Section 4.12**      Additional Borrowers, Guarantees and Security; Further Assurances; etc.

(a)      If any Borrower or any Restricted Subsidiaries acquires or creates another Subsidiary (other than an Excluded Subsidiary) on or after the Closing Date or if a Subsidiary ceases to be an Excluded Subsidiary, then Borrowers shall cause:

(i)      the Capital Stock or other Equity Interests of such Subsidiary to be pledged pursuant to, and to the extent required by, this Agreement and the Security Documents and the certificates, if any, representing such stock or other Equity Interests, together with stock or other appropriate powers duly executed in blank, to be delivered to DIP ABL Agent (or the bailee for the Agent pursuant to the DIP ABL Intercreditor Agreement) within thirty (30) Business Days (or such later date as determined by DIP ABL Agent in its sole discretion) of the date on which such Subsidiary was acquired or created,

(ii)      each such Subsidiary to become a Debtor and a Borrower hereunder and under all other applicable DIP ABL Financing Documents such that such Subsidiary is jointly and severally liable for all obligations of Borrowers hereunder and under the other DIP ABL Financing Documents pursuant to a joinder agreement or other similar agreement in form and substance reasonably satisfactory to DIP ABL Agent or (if DIP ABL Agent shall so elect, in its reasonable discretion) to become a Guarantor of the obligations of Borrowers hereunder and under the other DIP ABL Financing Documents pursuant to the Subsidiaries Guaranty and, in each case, to execute a counterpart to the Security Agreement within 30 Business Days (or such later date as determined by DIP ABL Agent in its sole discretion) of the date on which such Subsidiary was acquired or created, and

(iii)      each such Subsidiary, to the extent reasonably requested by DIP ABL Agent or the Required DIP ABL Lenders, to take all actions required pursuant to the other provisions of this Section 4.12 within the time periods set forth in such other provisions of this Section 4.12.

In addition, each such Subsidiary that is required to execute any DIP ABL Financing Document shall, if requested by DIP ABL Agent, execute and deliver, or cause to be executed and delivered, all other relevant documentation (including opinions of counsel) of the type described in Section 7.1 as such Subsidiary would have had to deliver if such Subsidiary were a Credit Party on the Closing Date.

(b)      The Borrowers will, and will cause each other Credit Party to, grant to DIP ABL Agent for the benefit of the Secured Creditors security interests in any after-acquired assets (other than (i) Real Property, which is addressed in subsection (c) below, and (ii) Excluded Assets) of any Borrower and such other Credit Party that are not covered by the Security Documents then in effect or that cease to be Excluded Assets (or as otherwise required at such time pursuant to any applicable intercreditor or similar agreement or any DIP Order, as the case may be), in each case, within sixty (60) days (or such later date as determined by DIP ABL Agent in its sole discretion) after the close of the fiscal quarter of Blackhawk Parent in which the relevant acquisition occurred or the relevant asset ceased to be an Excluded Asset.  All such security interests shall be granted pursuant to documentation (collectively, the

76

"**Additional Security Documents**") in substantially the same form as the original Security Documents and shall constitute valid and enforceable perfected security interests superior to and, subject to the any applicable intercreditor or similar agreement or the Interim DIP Order or the Final DIP Order (as applicable), as the case may be, prior to the rights of all third Persons and enforceable against third parties and subject to no other Liens except for Permitted Liens and subject to the DIP Orders.  Within thirty (30) days after the grant of any such security interest (or such later date as determined by DIP ABL Agent in its sole discretion), the Additional Security Documents or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of DIP ABL Agent required to be granted pursuant to the Additional Security Documents and all taxes, fees and other charges payable in connection therewith shall be paid in full.

        (c)      Within sixty (60) days (or such later date as determined by DIP ABL Agent in its sole discretion) after (x) the close of the fiscal quarter of Borrower in which any Material Real Property (other than Excluded Assets) is acquired or ceases to be an Excluded Asset (collectively, "**After-Acquired Real Property**"), and (y) the reasonable request of the DIP ABL Agent with respect to any Material Real Property existing on the Closing Date (together with the After-Acquired Real Property, collectively, the "**Applicable Real Property**"), in each case if reasonably requested by DIP ABL Agent, DIP ABL Agent shall have received:

        (i)      fully executed counterparts of Mortgages and corresponding UCC fixture filings and As-Extracted Collateral Filings, in substantially the same form as the applicable security documents under the Prepetition ABL Loan Documents, which Mortgages, UCC fixture filings and As-Extracted Collateral Filings, shall cover each Applicable Real Property, together with evidence that counterparts of such Mortgages, UCC fixture filings and As-Extracted Collateral Filings have been delivered to DIP ABL Agent or its designee for recording;

        (ii)      subject to subsection (d) below, such material consents and approvals as shall be reasonably deemed necessary by DIP ABL Agent in order for the owner or holder of the fee or leasehold interest constituting such Applicable Real Property to grant the Lien contemplated by the Mortgage with respect to the Applicable Real Property;

        (iii)      to the extent requested by DIP ABL Agent, copies of all leases in which any Borrower or any of its Subsidiaries holds the lessor's interest or other agreements relating to possessory interests, if any; *provided* that, to the extent any of the foregoing affect such Applicable Real Property, to the extent requested by DIP ABL Agent, such agreements shall be subordinate to the Lien of the Mortgage to be recorded against such Applicable Real Property, either expressly by its terms or pursuant to a subordination, non-disturbance and attornment agreement (with any such agreement being reasonably acceptable to DIP ABL Agent);

        (iv)      with respect to each After-Acquired Real Property improved by a "building" or "mobile home" (each as defined in Regulation H as promulgated by the Federal Reserve Board under the Flood Insurance Laws), to the extent such building or mobile home is required to be included in the DIP ABL Collateral, Flood Documentation reasonably satisfactory in form and substance to the DIP ABL Agent; and

        (v)      from local counsel in each state in which Applicable Real Property is located, an opinion in form and substance reasonably satisfactory to the DIP ABL Agent.

(d)     Each Borrower will, and will cause each other Credit Party to, at the request of DIP ABL Agent, use commercially reasonable efforts to obtain the consent or waiver of any Person necessary to permit each Borrower and other Credit Parties to grant to DIP ABL Agent, for the benefit of the Secured Creditors, security interests and Mortgages in such assets and Real Property (whether owned or leased on the date hereof or subsequently acquired by such Borrower or the other Credit Parties) as would otherwise constitute Excluded Assets under this Agreement; *provided* that the obligation of such Borrower and other Credit Parties to use commercially reasonable efforts shall not require such Borrower or any other Credit Party to request any consent or waiver with respect to a restriction on assignment in any agreement which is imposed by any legal requirement or which such Borrower or such other Credit Party reasonably determines would have a material adverse effect on such agreement or on such Borrower's or other Credit Party's relationship with the other party or parties to such agreement; *provided*, *further*, that the use of commercially reasonable efforts shall not require any payment or other consideration from such Borrower or other Credit Parties; *provided*, *further*, that any such use of commercially reasonable efforts with respect to any such assets may be terminated by Borrowers sixty (60) days after the commencement of such commercially reasonable efforts.  When negotiating the terms of any lease or other agreement entered into after the date of this Agreement, each Borrower will, and will cause each other Credit Party to, use commercially reasonable efforts (as described above) to eliminate any restriction on the assignment and/or granting of a Lien in such lease or other agreement.

(e)     Subject to the terms of the Security Documents and the DIP Orders, Borrowers will, and will cause each other Credit Party to, execute any and all further documents, financing statements, agreements, and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust, and other documents) that may be required under any applicable law, or that DIP ABL Agent or Required DIP ABL Lenders may reasonably request, in order to grant, preserve, protect, and perfect the validity and priority of the security interests created or intended to be created by the applicable Security Documents, all at the expense of Borrowers and the Restricted Subsidiaries.

(f)     Upon the request of DIP ABL Agent, Borrowers shall (i) obtain a landlord's agreement or mortgagee agreement, as applicable, from the lessor of each leased property or mortgagee of owned property where the records relating to DIP ABL Collateral and/or software and equipment relating to such records or DIP ABL Collateral is stored or located, (ii) use commercially reasonable efforts to obtain a landlord's agreement or mortgage agreement, as applicable, from the lessor of each other leased property or mortgagee of other owned property with respect to any business location where any portion of the DIP ABL Collateral included in or proposed to be included in the Borrowing Base is stored or located, which agreement or letter, in each case, shall be reasonably satisfactory in form and substance to DIP ABL Agent; *provided* that, the requirement set forth in clause (ii) above shall only apply to the extent such DIP ABL Collateral has a value in excess of $500,000, and (iii) upon DIP ABL Agent's request, use commercially reasonable efforts to deliver to DIP ABL Agent warehouse receipts, consignment agreements or bailee lien waivers (as applicable) reasonably satisfactory to DIP ABL Agent with respect to Inventory or other DIP ABL Collateral upon which the Borrowing Base is calculated in the possession or control of any warehouse, consignee, bailee or any of Borrowers' agents or processors; *provided* that, the requirement set forth in clause (ii) above shall only apply to the extent such DIP ABL Collateral has a value in excess of $500,000.

**Section 4.13**     Certain Long Term Liabilities and Environmental Reserves.  To the extent required by GAAP, Borrowers will, and will cause each of their Restricted Subsidiaries to, maintain adequate reserves for (a) future costs associated with any lung disease claim alleging pneumoconiosis or silicosis or arising out of exposure or alleged exposure to coal dust or the coal mining environment, (b) future costs associated with retiree and health care benefits, (c) future costs associated with reclamation of

78

disturbed acreage, removal of facilities and other closing costs in connection with its mining operations and (d) future costs associated with other potential environmental liabilities.

Section 4.14    Designation of Subsidiaries.

(a)    The Board of Directors of Blackhawk Parent with the consent of the DIP ABL Agent and Required DIP ABL Lenders may designate a Subsidiary of a Borrower as an Unrestricted Subsidiary; *provided* that (i) in no event will Blackhawk Parent or any Subsidiary of Blackhawk Parent that is a "Restricted Subsidiary" (or similar term as defined in the Prepetition ABL Credit Agreement and/or the DIP Term Loan Agreement) be designated as an Unrestricted Subsidiary, and (ii) the requirements set forth in the definition of "Unrestricted Subsidiary", as defined in the Prepetition ABL Credit Agreement, shall be satisfied for each such entity.  As of the Closing Date, there are no Unrestricted Subsidiaries.

(b)    On and after the Closing Date, Borrower may not designate any entity that is a Restricted Subsidiary as an Unrestricted Subsidiary without the consent, in its sole discretion, of DIP ABL Agent and Required DIP ABL Lenders.  If, at any time, any Unrestricted Subsidiary would fail to meet the requirements of clause (a) above as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Agreement and any Indebtedness, Liens or Investments of such Subsidiary will be deemed to be incurred by a Restricted Subsidiary of a Borrower as of such date and, if such Indebtedness, Liens or Investments is not permitted to be incurred as of such date under the terms of this Agreement, Borrowers will be in default of such covenant.

(c)    Blackhawk Parent may at any time, with the consent of the DIP ABL Agent, designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that such designation will be deemed to be an incurrence of Indebtedness, Liens and Investments by a Restricted Subsidiary of the outstanding Indebtedness, Liens and Investments, as the case may be, of such Unrestricted Subsidiary, and such designation will only be permitted if (x) such Indebtedness, Liens and Investments are permitted under the terms of this Agreement, calculated on a pro forma basis as if such designation had occurred at the beginning of the most recent four consecutive fiscal quarters of Blackhawk Parent then last ended for which financial statements have been delivered or were required to have been delivered pursuant to Section 4.1(a)-(c); and (y) no Default or DIP Event of Default would be in existence following such designation.

Section 4.15    Estoppel Certificates.  After written request by DIP ABL Agent which, so long as no DIP Event of Default has occurred and is continuing, shall be limited to one (1) such request per Fiscal Year, Borrowers, within fifteen (15) Business Days' of such request and at their expense, will furnish DIP ABL Agent with a statement, duly acknowledged and certified, setting forth (a) the amount of the original principal amount of the Notes, and the unpaid principal amount of the Notes, (b) the rate of interest of the Notes, (c) the date payments of interest and/or principal were last paid, (d) that the Notes and this Agreement have not been modified or if modified, giving particulars of such modification by the Credit Parties, and (e) that there has occurred and is then continuing no Default or if such Default exists, the nature thereof, the period of time it has existed, and the action being taken to remedy such Default; *provided* that DIP ABL Agent shall have provide the above information to Borrower concurrent with such request and the Borrowers may rely on such information and no Default or DIP Event of Default shall arise to the extent any Borrower so relies on such information provided by DIP ABL Agent.

Section 4.16    Power of Attorney.  Each of the authorized representatives of DIP ABL Agent is hereby irrevocably made, constituted and appointed the true and lawful attorney for each Borrower (without requiring any of them to act as such) with full power of substitution to do the following during the continuance of a DIP Event of Default:  (a) endorse the name of such Borrower upon any and all

79

checks, drafts, money orders, and other instruments for the payment of money that are payable to such Borrower and constitute collections on such Borrower's Accounts; (b) perform the same and such Borrower has failed to take such action, execute in the name of such Borrower any schedules, assignments, instruments, documents, and statements that the Borrowers are obligated to give DIP ABL Agent under this Agreement; (c) take any action the Borrowers are required to take under this Agreement; (d) do such other and further acts and deeds in the name of such Borrower that DIP ABL Agent may deem necessary or desirable to enforce any Account or other DIP ABL Collateral or perfect DIP ABL Agent's security interest or Lien in any DIP ABL Collateral; and (e) do such other and further acts and deeds in the name of the Borrowers that DIP ABL Agent may deem necessary or desirable to enforce its rights with regard to any Account or other DIP ABL Collateral.  So long any DIP Credit Exposure exists, this power of attorney shall be irrevocable and coupled with an interest and shall automatically terminate upon the termination of this Agreement in accordance with Section 2.12.

Section 4.17    Borrowing Base DIP ABL Collateral Administration.

(a)    All data and other information relating to Accounts from third-party Account Debtors or other intangible DIP ABL Collateral shall at all times be kept by Borrowers, at their respective principal offices and shall not be moved from such locations without (i) providing prior written notice to DIP ABL Agent, and (ii) obtaining the prior written consent of DIP ABL Agent, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)    Each Borrower will use commercially reasonable efforts to at all times keep its Eligible Inventory in good and marketable condition.

(c)    Borrowers will conduct inventory surveys once per Fiscal Quarter in the ordinary course of business and consistent with Borrower's practices as of the Closing Date, and Borrowers shall provide to DIP ABL Agent such inventory survey.

Section 4.18    Payroll Accounts, Etc.  At all times that any DIP ABL Obligations remain outstanding, Borrowers shall maintain one or more separate Deposit Accounts to hold any and all amounts to be used for payroll, payroll taxes and other employee wage and benefit payments, and shall not commingle any monies allocated for such purposes with funds in any other Deposit Account.

Section 4.19    Contest Motions. Upon the request of DIP ABL Agent, Borrowers will contest, using their best efforts, any motion or other application or proceeding seeking entry of an order or other relief that is materially adverse to the interests of DIP ABL Agent, DIP ABL Lenders, the Prepetition ABL Agent and/or the Prepetition ABL Lenders and/or their material rights and remedies under this Agreement or any other DIP ABL Financing Documents in any of the Chapter 11 Cases.

Section 4.20    Bankruptcy Related Matters. Without limiting Borrowers' other obligations under the DIP ABL Financing Documents, Borrowers shall:

(a)    cause all proposed (i) First Day Motions, (ii) First Day Orders, (iii) orders related to or affecting the DIP ABL Agent, DIP ABL Lenders, DIP Revolving Loans, DIP ABL Collateral, the Liens securing the DIP ABL Obligations, the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition ABL Collateral, the Prepetition ABL Liens or the Prepetition ABL Obligations, any other financing or use of Cash Collateral, any sale or other disposition of DIP ABL Collateral outside the ordinary course, or adequate protection, (iv) any chapter 11 plan and/or any disclosure statement related thereto, (v) orders concerning the financial condition of any Borrower, and (vi) orders establishing procedures for administering Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court (collectively, the "**Chapter 11 Documents**"), in each case, proposed by the Borrowers

80

to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to DIP ABL Agent and DIP ABL Lenders (other than (A) the Interim DIP Order, which shall be in the form set forth in Exhibit I with only such modifications as are satisfactory to Blackhawk Parent and the DIP ABL Agent in its sole discretion, and (B) the Final DIP Order, which shall be in the form of the Interim DIP Order with only such modifications thereto as are necessary to convert the Interim DIP Order to a final order, including to grant on a final basis the interim relief set forth in the Interim DIP Order, grant any and all relief in the Interim DIP Order that is subject to entry of the Final DIP Order, along with such other modifications as are satisfactory to the DIP ABL Agent and Required DIP ABL Lenders in their sole discretion);

(b)        provide at least five (5) Business Days' (or such shorter notice acceptable to DIP ABL Agent in its sole discretion) prior written notice to DIP ABL Agent and its advisors prior to any assumption or rejection of any Credit Party's material contracts or material nonresidential real property leases pursuant to section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected, if such assumption or rejection adversely impacts the DIP ABL Collateral, the Prepetition ABL Collateral, any Liens on the foregoing or any Super-priority Claims payable from the foregoing (including, without limitation, any sale or other disposition of DIP ABL Collateral or Prepetition ABL Collateral or the priority of any Liens or Super-priority Claims), if the DIP ABL Agent informs Borrowers in writing within three (3) Business Days of receipt of the notice from the Borrowers referenced above that it objects to such assumption or rejection, as applicable;

(c)        deliver to the DIP ABL Agent (for distribution to the DIP ABL Lenders) and to counsel to DIP ABL Agent by no later than two (2) Business Days prior to filing, or soon as reasonably practicable thereafter based on the circumstances, copies of all material proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of Borrowers with the Bankruptcy Court in the Chapter 11 Cases, or distributed by or on behalf of Borrowers to any official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest, and shall consult in good faith with the DIP ABL Agent and its advisors regarding the form and substance of any such document.  DIP ABL Agent will, promptly and without unreasonable delay in light of the deadlines included in this Agreement or set by the Bankruptcy Court, provide comments to or acceptance of such Chapter 11 Documents;

(d)        if not otherwise provided through the Bankruptcy Court's electronic docketing system or by any noticing agent appointed by the Bankruptcy Court noticing agent, deliver to DIP ABL Agent (for distribution to the DIP ABL Lenders) and to counsel to DIP ABL Agent and DIP ABL Lenders promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents filed by or on behalf of Borrowers with the Bankruptcy Court in the Chapter 11 Cases, or distributed by or on behalf of Borrowers to any official or unofficial committee appointed or appearing in the Chapter 11 Cases; and

(e)        deliver to DIP ABL Agent, DIP ABL Lenders, and their respective counsel, promptly after the same is available, copies of any paper filed or threatened to be filed (of which Borrowers become aware) in the Chapter 11 Cases by any party other than a Borrower that (i) if filed or granted, may materially and adversely affect the DIP ABL Agent, DIP ABL Lenders, DIP Revolving Loans, DIP ABL Collateral, the Liens securing the DIP ABL Obligations, the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition ABL Collateral, the Prepetition ABL Liens or the Prepetition ABL Obligations, or (ii) relates or pertains to any other financing or use of Cash Collateral, any sale or other disposition of DIP ABL Collateral outside the ordinary course, or adequate protection.

Section 4.21    Chapter 11 Milestones.  The Borrowers shall comply with the following milestones in connection with the Chapter 11 Cases (collectively, the "**Chapter 11 Milestones**"), unless waived or extended with the consent of the Required DIP ABL Lenders and the DIP ABL Agent:

(a)    no later than one (1) day after the Petition Date, filing of a motion, in form and substance satisfactory to the Required DIP ABL Lenders, seeking entry of the Interim DIP Order, including approval of the DIP ABL Credit Agreement and the other DIP ABL Financing Documents.

(b)    no later than five (5) days after the Petition Date, entry of the Interim DIP Order and filing of an Acceptable Disclosure Statement and an Acceptable Chapter 11 Plan;

(c)    no later than forty-five (45) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(d)    no later than seventy-five (75) days after the Petition Date, the Chapter 11 Confirmation Date shall have occurred; and

(e)    no later than fourteen (14) days after the Chapter 11 Confirmation Date, the Chapter 11 Plan Effective Date shall have occurred.

Section 4.22    Other Bankruptcy Related Matters.  The Borrowers will and will cause each Restricted Subsidiary to:

(a)    comply in all material respects with the DIP Orders; and

(b)    comply in all material respects with each chapter 11 order in connection with the Chapter 11 Cases (other than the DIP Orders).

## ARTICLE 5 - NEGATIVE COVENANTS

Each Borrower agrees that, so long as any DIP Credit Exposure exists:

Section 5.1    Liens.  The Borrowers will not, and will not permit any of their Restricted Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind securing Indebtedness or trade payables on any asset now owned or hereafter acquired, except Permitted Liens.  For purposes of this Agreement, "**Permitted Liens**" means:

(a)    Liens on DIP ABL Collateral held by the Prepetition ABL Agent securing Prepetition ABL Obligations; *provided* that in the case of any such Liens held by the Prepetition ABL Agent on any DIP ABL Collateral, such Liens shall be junior in priority to the Liens on such DIP ABL Collateral that secure the DIP ABL Obligations;

(b)    Liens on DIP ABL Collateral held by the Prepetition First Lien Term Loan Agent securing obligations under the Prepetition First Lien Term Loan Documents incurred pursuant to Section 5.4(c); *provided* that in the case of any such Liens held by the Prepetition First Lien Term Loan Agent (i) on any DIP ABL Priority Collateral, such Liens shall be junior in priority to the Liens on such DIP ABL Priority Collateral that secure (A) the DIP ABL Obligations; and (B) the Prepetition ABL Obligations; and (ii) on any DIP ABL Collateral other than DIP ABL Priority Collateral, such Liens may be senior in priority to the Liens that secure (A) the DIP ABL Obligations and (B) Prepetition ABL Obligations, in each case, only to the extent such Liens would have been senior to the Liens securing the Prepetition ABL Obligations pursuant to the terms of the Prepetition Intercreditor Agreements;

82

(c)　　　Liens on DIP ABL Collateral held by the Prepetition Second Lien Term Loan Agent securing obligations under the Prepetition Second Lien Loan Documents incurred pursuant to Section 5.4(a); *provided* that such Liens shall be junior in priority to the Liens on such DIP ABL Collateral that secure (i) the DIP ABL Obligations and (ii) the Prepetition ABL Obligations; to the extent such Liens would have been senior to the Liens securing the Prepetition ABL Obligations pursuant to the terms of the Prepetition Intercreditor Agreements;

(d)　　　Liens on DIP ABL Collateral held by the DIP Term Loan Agent securing obligations under the DIP Term Loan Documents incurred pursuant to Section 5.4(c); *provided* that in the case of any such Liens held by the DIP Term Loan Agent (i) on any DIP ABL Priority Collateral, such Liens shall be junior in priority to the Liens on such DIP ABL Priority Collateral that secure (A) the DIP ABL Obligations; and (B) the Prepetition ABL Obligations; and (ii) on any DIP ABL Collateral other than DIP ABL Priority Collateral, such Liens may be senior in priority to the Liens that secure (A) the DIP ABL Obligations, but only to the extent such Liens would have been senior to the Liens securing the DIP ABL Obligations pursuant to the terms of the DIP ABL Intercreditor Agreement and (B) Prepetition ABL Obligations, but only to the extent such Liens would have been senior to the Liens securing the Prepetition ABL Obligations pursuant to the terms of the Prepetition Intercreditor Agreements;

(e)　　　Liens held by DIP ABL Agent, on behalf of DIP ABL Lenders, securing the DIP ABL Obligations;

(f)　　　Liens on cash and Cash Equivalents securing Indebtedness under the Prepetition LC Facility Agreement and in an amount not to exceed 105% of the aggregate Letter of Credit Exposure (as defined in the Prepetition LC Facility Agreement on the Closing Date) at any time;

(g)　　　Liens to secure the performance of Mining Financial Assurances, statutory obligations, insurance, performance obligations under coal sales agreements (which performance obligations may only be secured by Liens on cash and deposit accounts, either directly or by securing letters of credit or performance bonds permitted under this Agreement issued to assure such performance obligations), return of money bonds, surety or appeal bonds (including surety bonds obtained as required in connection with federal coal leases), workers compensation obligations, unemployment insurance and other types of social security and deposits securing liability to insurance carriers under insurance or self-insurance arrangements, performance bonds or other obligations of a like nature (*provided* that to the extent such obligations constitute Indebtedness, they are permitted under Section 5.4) incurred in the ordinary course of business and consistent with past practices (including Liens to secure letters of credit permitted under this Agreement issued to assure payment of such obligations); *provided*, in each case, that such secured performance obligations shall not constitute prepaid amounts or other advances of cash or other value for future delivery of coal; *provided, further,* that no such Liens shall encumber any DIP ABL Priority Collateral except for Liens on cash and Cash Equivalents that are held in segregated Deposit Accounts or Securities Account (other than, for the avoidance of doubt, any Lockbox Account), which contain only such cash and Cash Equivalents as are reasonably required secure the obligations of Borrower set forth in this Section 5.1(g).

(h)　　　Liens to secure Indebtedness (including but not limited to Capital Lease Obligations) permitted by Section 5.4(d), *provided* that such Liens do not at any time encumber any property other than the property acquired with or financed by such Indebtedness;

(i)　　　Liens existing on the Closing Date and set forth on <u>Schedule 5.1</u>;

(j)　　　Liens for Taxes that are not yet delinquent or that are being contested in good faith by appropriate proceedings diligently pursued; *provided* that, any reserve as is required in

conformity with GAAP or other appropriate provision therefor under an Acceptable Chapter 11 Plan has been made, or that are attributable to Taxes the nonpayment of which is required pursuant to the Bankruptcy Code;

(k)    Liens imposed by law, such as carriers', warehousemen's, landlord's and mechanics' Liens (including Liens imposed by law in favor of lessors of coal reserves (which shall only be on assets located on or under the leased premises covered by the applicable lease) securing payment of unpaid royalties, and similar liens imposed by contract), in each case, incurred in the ordinary course of business;

(l)    survey exceptions, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(m)    Liens on insurance policies and proceeds thereof, or other deposits, to secure insurance premium financings;

(n)    notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(o)    Liens on specific items of inventory or other goods (and the proceeds thereof) of any Person securing such Person's obligations in respect of bankers' acceptances issued or created in the ordinary course of business for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods; *provided*, that such inventory shall not constitute Eligible Inventory to the extent subject to such Liens;

(p)    (x) licenses to mine on behalf of Borrowers or their Restricted Subsidiaries granted under contract mining agreements and (y) leases granted to third parties, in each case, in the ordinary course of business and consistent with past practices and that do not interfere with the ordinary conduct of business of Borrowers or their Restricted Subsidiaries;

(q)    the Carve Out;

(r)    Liens securing judgments for the payment of money not constituting a DIP Event of Default, so long as such Liens are adequately bonded;

(s)    Liens arising from protective filings of UCC financing statements (or the equivalent) regarding operating leases entered into by Borrowers and their Restricted Subsidiaries in the ordinary course of business;

(t)    Liens in favor of banking institutions arising as a matter of law or contract encumbering deposits (including the right of set-off) which are within the general parameters customary in the banking industry and, as applicable, subject to customary restrictions set forth in any required Deposit Account Control Agreement or Securities Account Control Agreement;

(u)    subject to the terms of any applicable Deposit Account Control Agreement (if any), Liens on cash and deposit accounts to secure Cash Management Obligations;

(v)    additional Liens to secured Indebtedness permitted pursuant to Section 5.4 in an aggregate principal amount not to exceed $500,000 at any one time outstanding; and

(w)    Liens on the DIP ABL Collateral granted to provide adequate protection pursuant to the Interim DIP Order or the Final DIP Order, if applicable.

**Section 5.2**    Asset Sales.    The Borrowers will not, and will not permit any of their Restricted Subsidiaries to, consummate an Asset Sale, except for the following (collectively, "**Permitted Assets Sales**"):

(a)    Asset Sales of used, worn out, obsolete or surplus property by any Borrower or any of their Restricted Subsidiaries in the ordinary course of business or the abandonment in the ordinary course of business that is, in the reasonable judgment of Blackhawk Parent, no longer economically practicable to maintain or useful in the conduct of the Borrowers and their Restricted Subsidiaries in their respective businesses taken as a whole;

(b)    Asset Sales of inventory in the ordinary course of business;

(c)    Asset Sales of equipment or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Asset Sale are reasonably promptly (but in no event later than 60 days after the Asset Sale) applied to the purchase price of such replacement property;

(d)    Asset Sales of property by any Restricted Subsidiary or any Borrower to another Borrower or to a wholly-owned Restricted Subsidiary; *provided*, that if the transferor of such property is a Credit Party, the transferee thereof must either be a Borrower or another Credit Party and, to the extent such property is DIP ABL Collateral, such property shall remain DIP ABL Collateral (for the avoidance of doubt, for the benefit of all Secured Creditors) after giving effect to such Asset Sale;

(e)    Asset Sales permitted by Section 5.5 and Restricted Payments permitted by Section 5.3;

(f)    [Reserved];

(g)    so long as no Default or DIP Event of Default shall occur and be continuing, the grant of any option or other right to purchase any asset in a transaction that would be permitted under the provisions of this Section 5.2;

(h)    leases (including operating and capital leases), subleases, assignments, licenses, sublicenses of real or personal property in the ordinary course of business and in accordance with the applicable Security Documents (excluding, for the avoidance of doubt, sale-leaseback agreements);

(i)    sales or discounts (without recourse) of accounts receivable (other than accounts receivable owing from an Affiliate of the Borrower) in the ordinary course of business in connection with the collection thereof;

(j)    transfers of property subject to casualty or condemnation events upon receipt of net cash proceeds from a Recovery Event in respect thereof;

(k)    to the extent constituting an Asset Sale, the granting of Permitted Liens under Section 5.1 (but not the sale or other Asset Sale of the property subject to such Permitted Liens);

85

(l)    dispositions in the ordinary course of business of cash and Cash Equivalents in transactions not otherwise prohibited by any DIP ABL Financing Document

Provided that if the aggregate Fair Market Value of all such Permitted Asset Sales (other than clauses (b), (c) (but solely with respect to equipment) and (d) above) since the Closing Date exceeds $1,000,000, such Permitted Asset Sales shall require the consent of the Required DIP ABL Lenders.

Section 5.3    Restricted Payments.  The Borrowers will not, and will not permit any of their Restricted Subsidiaries to, declare or make, directly or indirectly, any Restricted Payment, except the following, in each case, in accordance with the Approved Budget:

(a)    dividends or distributions payable to any Borrower or any Credit Party; and;

(b)    payments of Tax Distributions;

The amount of all Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by such Borrower or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment.

Section 5.4    Indebtedness.  The Borrowers will not, and will not permit any of their Restricted Subsidiaries to create, incur, assume or suffer to exist any Indebtedness, except for the following:

(a)    the incurrence by any Borrower and their Restricted Subsidiaries of (i) Indebtedness existing as of the Closing Date as set forth on Schedule 5.4(a) ("**Existing Indebtedness**") and (ii) outstanding on the Petition Date under the Prepetition ABL Credit Agreement, the Prepetition Term Loan Documents or Prepetition LC Facility Agreement; *provided* that any such Existing Indebtedness owed to any Equity Holder shall be Subordinated Indebtedness;

(b)    the incurrence by any Borrower and any Guarantor of Indebtedness under the DIP ABL Financing Documents;

(c)    the incurrence by the Borrowers and any Guarantor of Indebtedness under the DIP Term Loan Documents in an aggregate principal amount not to exceed $150,000,000 consisting of $50,000,000 of new money loans and $100,000,000 of Prepetition Term Loan Obligations;

(d)    the incurrence by any Borrower or any of their Restricted Subsidiaries of Indebtedness represented by Capital Lease Obligations, mortgage financings or purchase money obligations or other Indebtedness, in each case, incurred for the purpose of financing all or any part of the purchase price or cost of design, construction, installation or improvement of property (real or personal), plant or equipment used in the business of any Borrower or any of their Restricted Subsidiaries, in an aggregate principal amount not to exceed $500,000 at any time outstanding;

(e)    [Reserved];

(f)    Indebtedness of (x) any Borrower or any Guarantor to any other Credit Party or any Restricted Subsidiary that is a non-Credit Party and (y) any Restricted Subsidiary that is a non-Credit Party to any other Restricted Subsidiary that is a non-Credit Party; *provided* that, any Indebtedness incurred under sub-clause (x) that is owed to a non-Credit Party must be unsecured and expressly subordinated to the prior indefeasible payment in full in cash of all DIP ABL Obligations, in the case of

any Borrower, or all Guaranteed DIP ABL Obligations, in the case of a Guarantor, in each case, on terms reasonably acceptable to DIP ABL Agent;

(g)      the incurrence by any Borrower or any of their Restricted Subsidiaries of Indebtedness in respect of Mining Financial Assurances, reclamation liabilities, water treatment, workers' compensation claims, payment obligations in connection with health or social security benefits, unemployment or other insurance obligations, statutory obligations, bankers' acceptances, performance under coal sales agreements (which Indebtedness shall be in the form of letters of credit or performance bonds), letters of credit, or completion or performance guarantees (including, without limitation, performance guarantees pursuant to coal supply agreements or equipment leases) and surety bonds in the ordinary course of business; *provided*, Indebtedness in respect of performance obligations shall not constitute prepaid amounts or other advances of cash or other value for future delivery of coal;

(h)      the incurrence by any Borrower or any of their Restricted Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Indebtedness is covered within five (5) Business Days;

(i)      Indebtedness of any Borrower or any of their Restricted Subsidiaries incurred prior to the Petition Date in connection with agreements providing for indemnification, adjustment of purchase price or similar obligations incurred in connection with any disposition of any business, assets or Restricted Subsidiary of any Borrower, so long as the principal amount does not exceed the gross proceeds actually received by such Borrower or any of the Guarantors in connection with such disposition;

(j)      [Reserved];

(k)      Indebtedness incurred by any Borrower or any of their Restricted Subsidiaries in respect of netting services, overdraft protections and otherwise in respect of deposit accounts;

(l)      any Guarantee of Indebtedness of any Borrower or a Restricted Subsidiary to the extent that the guaranteed Indebtedness was permitted to be incurred by another provision of this Section 5.4; *provided* that if the Indebtedness being guaranteed is subordinated to or *pari passu* with the DIP ABL Obligations or Guaranteed DIP ABL Obligations, then the Guarantee must be subordinated or *pari passu*, as applicable, to the same extent as the Indebtedness guaranteed;

(m)      Indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

(n)      guarantees in the ordinary course of business of the obligations of suppliers and licensees (other than suppliers and licensees that are Affiliates of any Borrower) of the Borrowers and their Restricted Subsidiaries;

(o)      the incurrence by any Borrower or any Guarantor of additional Indebtedness in an aggregate principal amount not to exceed $500,000 at any time outstanding; and

(p)      the incurrence by any Borrower or any of their Restricted Subsidiaries of Hedging Obligations in the ordinary course of business and on a non-speculative basis.

The Borrowers will not incur, and will not permit any Guarantor to incur, any Indebtedness that is contractually subordinated in right of payment to any other Indebtedness of such Borrower or such

87

Guarantor unless such Indebtedness is also contractually subordinated in right of payment to the DIP ABL Obligations and the applicable Subsidiaries Guaranty on substantially identical terms; *provided*, *however*, that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of any Borrower or any Guarantor solely by virtue of being unsecured or by virtue of being secured on a junior priority basis.

Section 5.5    Merger, Consolidation or Sale of Assets.    Borrowers will not, and will not permit any of their Restricted Subsidiaries to, directly or indirectly, merge, dissolve, liquidate, consolidate with or into another Person, or sell, assign, lease, transfer, convey or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of their assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default or DIP Event of Default exists or would result therefrom:

(a)    any Restricted Subsidiary may merge with (i) any Borrower, *provided* that such Borrower shall be the continuing or surviving Person, or (ii) any one or more other Restricted Subsidiaries, *provided* that when any Restricted Subsidiary that is a Credit Party is merging with another Restricted Subsidiary, the Credit Party shall be the continuing or surviving Person;

(b)    any Restricted Subsidiary may sell, assign, lease, transfer, convey or otherwise dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to any Borrower or to another Restricted Subsidiary that is a Debtor; *provided* that, if the transferor in such a transaction is a Credit Party, then the transferee must either be a Borrower or another Credit Party that is a Debtor; and

(c)    any Borrower and any Restricted Subsidiaries may consummate any transaction that would be permitted as an Investment under Section 5.11.

Section 5.6    Transactions with Affiliates.    No Borrower will, nor will it permit any of its Restricted Subsidiaries to, make any payment to or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate (each, an "**Affiliate Transaction**"), unless the Affiliate Transaction is (i) not prohibited by this Agreement and (ii) on terms that are not materially less favorable to such Borrower or the relevant Restricted Subsidiary than those that would have been obtained in a comparable arm's length transaction by such Borrower or such Restricted Subsidiary with a Person other than an Affiliate (or if, in the good faith judgment of Blackhawk Parent's Board of Directors, no comparable transaction is available with which to compare any such transaction, such transaction is otherwise fair to such Borrower or the relevant Restricted Subsidiary from a financial point of view).    The foregoing restrictions shall not apply to the following:

(a)    transactions between or among the Borrowers or among the Borrowers and their Restricted Subsidiaries;

(b)    [Reserved];

(c)    [Reserved];

(d)    combined insurance programs and 401(k) plans with JMP Coal Holdings, LLC, in each case, consistent with past practice;

(e)    Restricted Payments that do not violate the provisions of Section 5.3 (Restricted Payments) or "Permitted Investments";

88

(f) transactions (including payments and performance) pursuant to agreements or arrangements in effect on the date of this Agreement and set forth on <u>Schedule 5.6</u> or any amendment, replacement, extension or renewal thereof (so long as such agreement or arrangement as so amended, replaced, extended or renewed is not materially less advantageous, taken as a whole, to DIP ABL Lenders than the original agreement or arrangement as in effect on the date of this Agreement); and

(g) the execution of the Transactions, the performance of the obligations under the DIP ABL Financing Documents, entry into the RSA, the transactions specifically contemplated by the RSA, the Acceptable Disclosure Statement and the Acceptable Chapter 11 Plan, the payment of all fees and expenses related to the Transactions, and any other transaction approved by the Bankruptcy Court pursuant to an order in form and substance reasonably satisfactory to the DIP ABL Agent.

**Section 5.7** <u>Limitation on Certain Restrictions on Subsidiaries; Negative Pledge</u>. The Borrowers will not, and will not permit any of their Restricted Subsidiaries to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Borrower or any Restricted Subsidiary to:

(a) pay dividends or make any other distributions on its Capital Stock to any Borrower or any of their Restricted Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any indebtedness owed to any Borrower or any of its Restricted Subsidiaries;

(b) make loans or advances to any Borrower or any of their Restricted Subsidiaries; or

(c) sell, lease or transfer any of its properties or assets to any Borrower or any of their Restricted Subsidiaries.

(d) clause (a) above will not apply to encumbrances or restrictions existing under or by reason of:

(i) Existing Indebtedness, the Prepetition Term Loan Documents, the Prepetition ABL Financing Documents and the Prepetition LC Facility Agreement as in effect on the Closing Date;

(ii) this Agreement and the other DIP ABL Financing Documents and the DIP Term Loan and the other DIP Term Loan Documents;

(iii) agreements governing other Indebtedness permitted to be incurred or issued under Section 5.4; *provided* that the restrictions therein are (x) customary for instruments of such type and (y) will not materially adversely impact the ability of the Borrowers to make any payments required to be made under this Agreement;

(iv) applicable Requirements of Law;

(v) any instrument governing Indebtedness or Capital Stock of a Person acquired by any Borrower or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness or Capital Stock was incurred in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other

than the Person, or the property or assets of the Person, so acquired; *provided* that, in the case of Indebtedness, such Indebtedness was permitted by this Agreement;

(vi)    customary non-assignment provisions in contracts, leases, sub-leases and licenses entered into in the ordinary course of business;

(vii)    (x) purchase money obligations for property acquired in the ordinary course of business and Capital Lease Obligations that impose restrictions on the property purchased or leased of the nature described in clause (e)(iii) above;

(viii)    Liens, including real property mortgages, permitted to be incurred under Section 5.1 that limit the right of the debtor to dispose of the assets subject to such Liens;

(ix)    customary provisions limiting the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements entered into in the ordinary course of business and permitted to be entered into pursuant to this Agreement, which limitation is applicable only to the assets that are the subject of such agreements;

(x)    customary restrictions and conditions contained in agreements relating to the sale of a Restricted Subsidiary or assets pending such sale; *provided* that such restrictions and conditions apply only to such Restricted Subsidiary or such assets that are to be sold and such sale is permitted hereunder; and

(xi)    restrictions on cash or other deposits or net worth imposed by customers (other than customers that are Affiliates of the Borrowers) under contracts entered into in the ordinary course of business;

(e)    In addition, no Borrower will, nor will it permit any of its Restricted Subsidiaries to, enter into any Contractual Obligation which prohibits or limits the ability of any Credit Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following:

(i)    this Agreement, the other DIP ABL Financing Documents, the DIP Term Loan Documents, the Prepetition LC Facility Agreement, the Prepetition Term Loan Documents and the Prepetition ABL Financing Documents;

(ii)    covenants in documents creating Liens permitted by Section 5.1 to the extent such covenants relate solely to the assets (and any proceeds in respect thereof) which are the subject of such Liens;

(iii)    any other agreement that does not restrict in any manner (directly or indirectly) Liens created pursuant to the DIP ABL Financing Documents on any DIP ABL Collateral securing the DIP ABL Obligations and does not require the direct or indirect granting of any Lien securing any Indebtedness or other obligation by virtue of the granting of Liens on or pledge of property of any Credit Party to secure the DIP ABL Obligations; and

(iv)    any prohibition or limitation that

(A)      exists pursuant to applicable Requirements of Law,

(B)      consists of customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 5.2 pending the consummation of such sale,

(C)      restricts subletting, assignment or other transfer of interests contained in any lease, license or similar agreement of any Borrower or any of its Restricted Subsidiaries,

(D)      exists in any agreement in effect at the time such Restricted Subsidiary becomes a Restricted Subsidiary of any Borrower, so long as such agreement was not entered into in contemplation of such person becoming a Restricted Subsidiary or

(E)      is imposed by any amendments or refinancings that are otherwise permitted by the DIP ABL Financing Documents of the contracts, instruments or obligations referred to in clause (iv)(D); *provided* that such amendments and refinancings are no more restrictive with respect to such prohibitions and limitations in any material respect than those prior to such amendment or refinancing.

**Section 5.8**      <u>Business Activities</u>.  Borrowers will not, and will not permit any of their Restricted Subsidiaries to, engage directly or indirectly in any business other than Permitted Businesses.

**Section 5.9**      <u>Amendments, etc. of Organizational Documents and Prepetition Term Loan Documents</u>. Borrowers will not, and will not permit any of their Restricted Subsidiaries to, (a) terminate, amend, waive or otherwise modify any of its Organizational Documents in a manner materially adverse to any Credit Party or to DIP ABL Lenders (in their capacity as DIP ABL Lenders), (b) amend or otherwise modify any term or condition or give any consent, waiver or approval of or waive any default under or any breach of any term or condition of (i) any Prepetition Term Loan Document or (ii) any DIP Term Loan Document, in each case, without the consent of the Required DIP ABL Lenders, except to the extent such amendment, modification or waiver would not be materially adverse to DIP ABL Lenders.

**Section 5.10**      [Reserved].

**Section 5.11**      <u>Investments</u>.  Borrowers will not, and will not permit any of their Restricted Subsidiaries to, make or hold any Investments, except for Permitted Investments.

**Section 5.12**      [Reserved].

**Section 5.13**      <u>Prepayments, Etc. of Indebtedness</u>.  Borrowers will not, and will not permit any Guarantor or Restricted Subsidiary to, directly or indirectly, make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value (a) any Indebtedness of any Credit Party that is contractually subordinated (or required to be subordinated) to the DIP ABL Obligations or Prepetition ABL Obligations, (b) any Indebtedness of any Borrower or any Guarantor (other than the obligations under the DIP Term Loan Documents) that is secured by Liens on all or any portion of the DIP ABL Collateral that are junior (or are required to be junior) to the Liens on the DIP ABL Collateral securing the DIP ABL Obligations (including Indebtedness under the Prepetition Term Loan Documents) or (c) any other unsecured Indebtedness for borrowed money of any Borrower or any Restricted Subsidiary, including Borrowers' obligations under the Patriot Trust RSA, other than (x) adequate protection payments thereof pursuant to the DIP Orders and (y) Indebtedness owed to any Borrower.

Notwithstanding the foregoing, this Section 5.13 shall not prohibit the Term Loan Roll-Up (as defined in the DIP Orders).

**Section 5.14**    Accounting Changes.  Blackhawk Parent will not change its federal tax identification number without providing at least fifteen (15) days' prior written notice to DIP ABL Agent.

**Section 5.15**    Agreements Regarding Receivables.  No Borrower may backdate, postdate or redate any of its invoices.

**Section 5.16**    Bankruptcy Case Prohibitions.  Notwithstanding anything else herein to the contrary, no Credit Party shall, without the reasonable consent of the DIP ABL Agent, (a) file with the Bankruptcy Court a motion to approve or otherwise seek approval of or pay any incentive or retention plan outside of the ordinary course of business of Blackhawk Parent or its Restricted Subsidiaries or (b) file with the Bankruptcy Court a motion to approve or otherwise seek to assume, assign or reject any material executory contract.

## ARTICLE 6 - BUDGET

**Section 6.1**    Budget.

(a)    Budget and Approvals.  Attached hereto as Exhibit H is the initial Budget, which shall have been approved by the DIP ABL Agent.  Commencing on the last Wednesday following every four-week anniversary (commencing with the fourth Wednesday following the Petition Date) (or, to the extent such Wednesday is not a Business Day, the next Business Day thereafter), Blackhawk Parent shall deliver to the DIP ABL Agent a Budget.  Each Budget shall be acceptable to the DIP ABL Agent and the Required DIP ABL Lenders and no such Budget shall be effective until so approved; *provided* that the DIP ABL Agent and the Required DIP ABL Lenders shall be deemed to have approved a Budget delivered after the Closing Date pursuant to this Section 6.1(a) unless DIP ABL Agent and DIP ABL Lenders constituting the Required Lenders shall have objected to such Budget within five (5) Business Days after delivery thereof. To the extent any such updated Budget is approved pursuant to this Section 6.1(a), the line item amounts set forth therein shall only be used to calculate the projected line items commencing with the week in which such updated Budget is approved by the DIP ABL Agent and Required DIP ABL Lenders and for subsequent weeks set forth therein, and any prior weeks tested as part of any then applicable cumulative period shall be calculated using the projected line items set forth in the previously Approved Budget in which such prior weeks were first forecasted.  Upon such approval or deemed approval by the Required Lenders pursuant to this Section 6.1(a), a Budget delivered pursuant to this Section 6.1(a) shall constitute an "**Approved Budget**".Payment of Allowed Professional Fees Prior to the DIP ABL Termination Date.  Any payment or reimbursement made prior to the occurrence of the DIP ABL Termination Date in respect of any allowed Professionals' fees shall not reduce the Carve Out.Payment of Carve Out on or After the DIP ABL Termination Date.  Any payment made on or after the occurrence of the DIP ABL Termination Date in respect of any allowed fees and expenses of Professionals shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of the DIP ABL Obligations secured by the DIP ABL Collateral and shall be otherwise entitled to the protections granted under the DIP Orders, the DIP ABL Financing Documents, the Bankruptcy Code, and applicable laws.

**Section 6.2**    Budget Variance Report.  No later than 5:00 p.m. on the Wednesday of every week (commencing with the second Wednesday following the Petition Date) (or, to the extent such Wednesday is not a Business Day, the next Business Day thereafter), a Budget Variance Report for the immediately preceding Weekly Period and the cumulative Budget Test Period.  Each such report shall be

92

certified by an authorized officer of the Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein.

**Section 6.3** <u>Variance Covenant</u>. Beginning with the delivery of the initial Budget Variance Report, as of the last day of each applicable Budget Test Period, (i) the negative variance (as compared to the Approved Budget) of the actual operating cash receipts of the Debtors shall not exceed 20% and (ii) the positive variance (as compared to the Approved Budget) of the aggregate operating disbursements (excluding professional fees and expenses) made by the Debtors shall not exceed 10%.

## ARTICLE 7 - CONDITIONS

**Section 7.1** <u>Conditions to Closing</u>. The obligation of each DIP ABL Lender to make the initial Loans on the Closing Date shall be subject to the receipt (or written waiver) by DIP ABL Agent of each agreement, document and instrument set forth below and on the closing checklist attached hereto as <u>Exhibit F</u>, each in form and substance reasonably satisfactory to DIP ABL Agent, and such other closing deliverables reasonably requested by DIP ABL Agent and DIP ABL Lenders, and to the satisfaction (or waiver) of the following conditions precedent, each to the reasonable satisfaction of DIP ABL Agent and DIP ABL Lenders and their respective counsel:

(a) the receipt by DIP ABL Agent of executed counterparts of this Agreement, the DIP ABL Intercreditor Agreement and the other DIP ABL Financing Documents;

(b) the payment of all fees, expenses and other amounts due and payable on or prior to the Closing Date (including the fees and disbursements of Hogan Lovells US LLP and Morris, Nichols, Arsht & Tunnell LLP, both as counsel to DIP ABL Agent and DIP ABL Lenders), including reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid under any DIP ABL Financing Document;

(c) the payment of any amounts owed to the Prepetition ABL Agent payable under the Prepetition ABL Financing Documents;

(d) since December 31, 2018, the absence of any material adverse change in any aspect of the business, operations, properties, prospects or condition (financial or otherwise) of any Credit Party or any seller of any assets or business to be purchased by any Borrower contemporaneous with the Closing Date, or any event or condition which could reasonably be expected to result in such a material adverse change;

(e) the receipt of the initial Borrowing Base Certificate, prepared as of the Closing Date;

(f) Evidence that Borrowers have Excess Availability *plus* cash and Cash Equivalents that are (i) owned by any Borrower and (ii) subject to a first priority perfected Lien in favor of DIP ABL Agent, of at least $5,000,000 on the Closing Date;

(g) On or prior to the Closing Date, all governmental (domestic and foreign) and material third party approvals and/or consents, including, without limitation, the consents listed on <u>Schedule 7.1(g)</u>, in each case that are necessary in connection with the DIP ABL Financing Documents, the other transactions contemplated hereby and the granting of Liens under the DIP Financing Documents shall have been obtained and remain in effect, and all applicable waiting periods with respect thereto shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the transactions contemplated by the DIP ABL

Financing Documents or otherwise referred to herein or therein. On the Closing Date, there shall not exist any judgment, order, injunction or other restraint issued or filed or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon the transactions contemplated by the DIP ABL Financing Documents or otherwise referred to herein or therein;

(h)    On, prior to or substantially simultaneously with the closing hereunder the Credit Parties shall have entered into the DIP Term Loan Agreement and the other DIP Term Loan Documents on terms and conditions consistent in all material respects the term sheet therefor (as previously delivered to the DIP ABL Agent) and evidence reasonably satisfactory to DIP ABL Agent that Borrowers have received the proceeds thereof;

(i)    [Reserved];

(j)    DIP ABL Agent shall have received and shall be satisfied with (i) a legal opinion issued by Kirkland & Ellis LLP, the Credit Parties' counsel, dated as of the Closing Date, covering such matters incident to the transactions contemplated herein as the DIP ABL Agent may reasonably request, and (ii) a legal opinions issued by Frost Brown Todd LLC, special Kentucky and Indiana counsel to the Credit Parties, in form and substance reasonably satisfactory to the DIP ABL Agent, addressed to the DIP ABL Agent and each of the DIP ABL Lenders and dated the Closing Date covering such matters incident to the transactions contemplated herein as the DIP ABL Agent may reasonably request;

(k)    the Chapter 11 Cases shall have been commenced in the Bankruptcy Court, the Interim DIP Order shall have been entered by the Bankruptcy Court in a manner consistent with the DIP ABL Financing Documents and in a form and substance satisfactory to DIP ABL Agent and DIP ABL Lenders in their sole discretion and all First Day Motions shall have been filed and First Day Orders intended to be entered on or prior to the Interim DIP Order Entry Date entered;

(l)    DIP ABL Agent shall have received the first Budget in compliance with Article 6 and such Budget shall be satisfactory to the DIP ABL Agent and DIP ABL Lenders in their sole discretion; and

(m)    DIP ABL Agent shall have received a copy of the Interim DIP Order as entered by the Bankruptcy Court.

Each DIP ABL Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each DIP ABL Financing Document, and each other document, agreement and/or instrument required to be approved by DIP ABL Agent, Required DIP ABL Lenders or DIP ABL Lenders, as applicable, on the Closing Date.

**Section 7.2**    Conditions to Each Loan.  The obligation of DIP ABL Lenders to make a Loan or an advance in respect of any Loan, is subject to the satisfaction (or written waiver) of the following conditions:

(a)    receipt by Agent of a Notice of Borrowing (or telephonic notice if permitted by this Agreement) together with an updated Borrowing Base Certificate reflecting the Borrowing Base as of borrowing date or any date that is not more than five (5) Business Days prior to such borrowing date;

(b)    immediately after such borrowing and after application of the proceeds thereof or after such issuance, the DIP Revolving Loan Outstandings will not exceed the DIP Revolving Loan Limit;

MidCap / Blackhawk / DIP ABL Credit Agreement

(c)    immediately before and after such advance or issuance, no Default or DIP Event of Default shall have occurred and be continuing;

(d)    the representations and warranties of each Credit Party contained in the DIP ABL Financing Documents shall be true and correct on and as of the date of such borrowing or issuance, except to the extent that any such representation or warranty relates to a specific date in which case such representation or warranty shall be true and correct as of such earlier date; *provided* that any representation and warranty that is qualified by "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects;

(e)    no material adverse change in the condition (financial or otherwise), properties, business, prospects, or operations of Borrowers or any other Credit Party shall have occurred and be continuing with respect to Borrowers or any Credit Party since the date of this Agreement; and

(f)    no Borrower nor any of its Restricted Subsidiaries is in default in any manner under any provision of any Contractual Obligation, where such default could reasonably be expected to result in a Material Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default (other than with respect to any default (i) arising on account of the mere filing of the Chapter 11 Cases or (ii) under any coal lease agreement and/or any equipment lease or finance agreements).

Each giving of a Notice of Borrowing hereunder and each acceptance by any Borrower of the proceeds of any Loan made hereunder shall be deemed to be (y) a representation and warranty by each Borrower on the date of such notice or acceptance as to the facts specified in this Section, and (z) a restatement by each Borrower that each and every one of the representations made by it in any of the DIP ABL Financing Documents is true and correct as of such date (except to the extent that such representations and warranties expressly relate solely to an earlier date).

**Section 7.3**    Searches.  Following the Closing Date (as and when determined by DIP ABL Agent in its reasonable discretion), DIP ABL Agent shall have the right to perform, all at Borrowers' reasonable expense, the searches described in clauses (a), (b), and (c) below against Borrowers and any other Credit Party, the results of which shall reveal no Liens or judgments on any of the assets of the Credit Parties, except for Permitted Liens or Liens and judgments to be terminated on the Closing Date pursuant to documentation reasonably satisfactory to DIP ABL Agent:  (a) UCC searches with the Secretary of State of the jurisdiction in which the applicable Person is organized; (b) judgment, pending litigation, federal tax lien, personal property tax lien, and corporate and partnership tax lien searches, in each jurisdiction searched under clause (a) above; and (c) searches of applicable corporate, limited liability company, partnership and related records to confirm the continued existence, organization and good standing of the applicable Person and the exact legal name under which such Person is organized. Notwithstanding the foregoing in the absence of the occurrence and continuation of a DIP Event of Default if DIP ABL Agent undertakes such searched more than once in any 12 month period, then such additional searched shall be at DIP ABL Agent's expense (*provided* that such limitation shall not apply with respect to the searches to reflect the As-Extracted Collateral Filings until after the initial search to confirm such filings have been completed).

**Section 7.4**    Post Closing Requirements.  Borrowers shall complete each of the post-closing obligations and/or provide to DIP ABL Agent each of the documents, instruments, agreements and information listed on Schedule 7.4 attached hereto on or before the date set forth for each such item thereon (or such later date as DIP ABL Agent may agree), each of which shall be completed or provided in form and substance reasonably satisfactory to DIP ABL Agent.

95

## ARTICLE 8 - REAL PROPERTY LEASES

**Section 8.1**        Special Rights with Respect to Real Property Leases

(a)        No Credit Party shall, nor shall it permit any of its Subsidiaries to, pursuant to Section 365 of the Bankruptcy Code, reject or otherwise terminate (including, without limitation, as a result of the expiration of the assumption period provided for in Section 365(d)(4) of the Bankruptcy Code to the extent applicable) (x) a Material Lease or (y) during the continuance of a DIP Event of Default, a Real Property Lease, in each case, without first providing 30 days' prior written notice to the DIP ABL Agent (or such shorter time to which DIP ABL Agent may agree) during which time, subject to the rights of the DIP Term Loan Agent and DIP Term Loan Lenders under Article 12 of the DIP Term Loan Documents, the DIP ABL Agent shall be permitted to find, in good faith and acting in its reasonable discretion, an acceptable replacement lessee (which may include the DIP ABL Agent, any DIP ABL Lender or their respective Affiliates) to whom such lease may be assigned.  If a prospective assignee is not found within such 30-day notice period, the Credit Parties may proceed to reject such lease.  If such a prospective assignee is timely found, the Credit Parties shall (i) not seek to reject such lease, (ii) promptly withdraw any previously filed rejection motion, (iii) promptly file a motion seeking expedited relief and a hearing on the earliest court date available for purposes of assuming such lease and assigning it to such prospective assignee and (iv) cure any defaults that have occurred and are continuing under such lease unless the Borrowers and the DIP ABL Agent agree that any such cure obligation is overly burdensome on the cash position of the Debtors with such agreement not to be unreasonably withheld; provided that this Section 8.1(a) shall not apply to Real Property Leases that are rejected on the effective date of an Acceptable Chapter 11 Plan.  For the avoidance of doubt, it is understood and agreed that on or prior to the 30th day prior to the Automatic Rejection Date, the Credit Parties shall have delivered (and hereby agree to deliver) written notice to the DIP ABL Agent of each outstanding Real Property Lease that they intend to reject (including, without limitation, through automatic rejection on the Automatic Rejection Date, to the extent applicable) from and after the date of such notice (or, if applicable, notice that the Credit Parties will seek to extend the Automatic Rejection Date as provided in Section 365(d)(4) of the Bankruptcy Code); provided that if the Credit Parties fail to deliver any such notice to the DIP ABL Agent prior to such date with respect to any such Real Property Lease (or a notice indicating that no such Real Property Leases shall be rejected), the Credit Parties shall be deemed, for all purposes hereunder, to have delivered notice to the DIP ABL Agent as of such date that it intends to reject all outstanding Real Property Leases.

(b)        If a DIP Event of Default shall have occurred and be continuing, subject to the rights of the DIP Term Loan Agent and the Lenders under Article 12 of the DIP Term Loan Agreement, the DIP ABL Agent may exercise any Debtor's rights pursuant to section 365(f) of the Bankruptcy Code with respect to any Real Property Lease or group of Real Property Leases and, subject to the Bankruptcy Court's approval after notice and hearing, assign any such Real Property Lease in accordance with section 365 of the Bankruptcy Code notwithstanding any language to the contrary in any of the applicable lease documents or executory contracts. In connection with the exercise of such rights, the DIP ABL Agent may (w) access the leasehold interests of the Credit Parties in any such Real Property Lease(s) for the purposes of marketing such property or properties for sale, (x) find an acceptable (in the DIP ABL Agent's good faith and reasonable discretion (with the consent of the Required DIP ABL Lenders)) replacement lessee (which may include the DIP ABL Agent or its designee, any DIP ABL Lender or their respective Affiliates) to whom a Real Property Lease may be assigned, (y) hold, and manage all aspects of, an auction or other bidding process to find such reasonably acceptable replacement lessee, and (z) in connection with any such auction, agree, on behalf of the Credit Parties and subject to Bankruptcy Court approval, to a break-up fee or to reimburse fees and expenses of any stalking horse bidder up to an amount not to exceed 3.00% of the purchase price of such Real Property Lease and may make any such payments on behalf of such Credit Party and any amount used by the DIP ABL Agent to make such

96

payments shall, at the election of the DIP ABL Agent, be deemed a borrowing of DIP Revolving Loans hereunder. Upon receipt of notice that the DIP ABL Agent elects to exercise its rights under this Section 8.1(b), the Credit Parties shall promptly file a motion seeking expedited relief and a hearing on the earliest court date available for purposes of assuming such Real Property Lease and assigning it to such assignee and cure any defaults that have occurred and are continuing under such Real Property Lease. Notwithstanding the foregoing, this Section 8.1(b) shall not apply to Real Property Leases that are rejected on the effective date of an Acceptable Chapter 11 Plan.

(c)     If a DIP Event of Default shall have occurred and be continuing, subject to the rights of the DIP Term Loan Agent and DIP Term Loan Lenders under Article 12 of the DIP Term Loan Documents, the DIP ABL Agent shall have the right to direct any Debtor that is a lessee under a Real Property Lease to assign such Real Property Lease to the DIP ABL Agent or its designee, on behalf of the DIP ABL Agent and the DIP ABL Lenders, as collateral for the DIP ABL Obligations and to direct such Debtor lessee to assume such Real Property Lease to the extent assumption is required under the Bankruptcy Code as a prerequisite to such assignment. Upon receipt of notice that the DIP ABL Agent elects to exercise its rights under this Section 8.1(c), the Credit Parties shall (i) promptly file a motion seeking expedited relief and a hearing on the earliest court date available for purposes of, if necessary, assuming such Real Property Lease and assigning it to the DIP ABL Agent and (ii) cure any defaults that have occurred and are continuing under such Real Property Lease. Notwithstanding the foregoing, this Section 8.1(c) shall not apply to Real Property Leases that are rejected on the effective date of an Acceptable Chapter 11 Plan.

(d)     Any order of the Bankruptcy Court approving the assumption (but not the assignment) of any Real Property Lease shall specifically provide that the applicable Debtor shall be authorized to assign such Real Property Lease pursuant to section 365(f) of the Bankruptcy Code subsequent to the date of such assumption designated by the DIP ABL Agent.

(e)     No Credit Party shall, nor shall it permit any of its Subsidiaries to, pursuant to section 365 of the Bankruptcy Code, sell or assign a Real Property Lease without first providing fifteen (15) days' prior written notice to the DIP ABL Agent (or such shorter period to which DIP ABL Agent may agree) of any hearing in the Bankruptcy Court seeking approval of a sale or assignment, and the DIP ABL Agent, on behalf of the DIP ABL Agent and the DIP ABL Lenders, subject to the rights of the DIP Term Loan Agent and DIP Term Loan Lenders under Article 12 of the DIP Term Loan Documents, shall be permitted to credit bid forgiveness of some or all of the outstanding DIP ABL Obligations (in an amount equal to at least the consideration offered by any other party in respect of such assignment) as consideration in exchange for any such Real Property Lease. In connection with the exercise of any of the DIP ABL Agent's rights under Sections 8.1(b) and 8.1(c) to direct or compel a sale or assignment of any Real Property Lease, the DIP ABL Agent, on behalf of the DIP ABL Agent and the DIP ABL Lenders, shall be permitted to credit bid forgiveness of a portion of the Indebtedness (in an amount equal to at least the consideration offered by any other party in respect of such sale or assignment) outstanding under the DIP Revolving Loans in exchange for such Real Property Lease.

If any Credit Party is required to cure any monetary default under any Real Property Lease under this Section 8.1, or otherwise in connection with any assumption of such Real Property Lease pursuant to section 365 of the Bankruptcy Code, and such monetary default is not cured within five (5) Business Days of the receipt by such Credit Party of notice from the DIP ABL Agent under Section 8.1(a), (b) or (c) or any other notice from the DIP ABL Agent requesting the cure of such monetary default, then the DIP ABL Agent may, but shall not be obligated to, cure any such monetary default on behalf of such Credit Party and any such payments shall, at the election of the DIP ABL Agent, be deemed a borrowing of DIP Revolving Loans hereunder.

## ARTICLE 9 - [RESERVED]

## ARTICLE 10 - DIP EVENTS OF DEFAULT

**Section 10.1**     DIP Events of Default.  For purposes of the DIP ABL Financing Documents, the occurrence of any of the following conditions and/or events, whether voluntary or involuntary, by operation of law or otherwise, shall constitute a "**DIP Event of Default**":

(a)     Payments.  Any Borrower or other Credit Party shall fail to pay (i) any principal of any Loan when due or (ii) any interest, premium or fee under any DIP ABL Financing Document or any other amount payable under any DIP ABL Financing Document within three (3) Business Days after any such interest or other amount becomes due; or

(b)     Covenants.  Any Borrower or any Restricted Subsidiaries shall (i) default in the due performance or observance by it of any term, covenant or agreement contained in Section 2.11, Section 4.1(f)(i), Section 4.4 (with respect to the existence of the Borrowers and their Restricted Subsidiaries), Section 4.8, Section 4.11, Section 4.19, Section 4.20, Section 4.21, Section 4.22, Article 5, Article 6 or Section 7.4 or (ii) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement (other than those set forth in this Section 10.1) or any other DIP ABL Financing Document and, in the case of this clause (ii), such default shall continue unremedied for a period of thirty (30) days after the date on which written notice thereof is given to the defaulting party by DIP ABL Agent or the Required DIP ABL Lenders; or

(c)     Representations, etc.  Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other DIP ABL Financing Document or in any certificate delivered to DIP ABL Agent or any DIP ABL Lender pursuant hereto or thereto shall prove to be untrue in any material respect (or, in the case of any such representation, warranty or statement that is qualified as to "materiality," "Material Adverse Effect" or similar language, shall prove to be untrue in any respect) on the date as of which made or deemed made; or

(d)     Default Under Other Agreements.

(i)     Any Borrower or any of its Subsidiaries shall (x) default in any payment of Indebtedness (other than the DIP ABL Obligations and any Indebtedness of any Debtor that was incurred prior to the Petition Date) (including, without limitation, any Indebtedness under the DIP Term Loan Documents and/or Indebtedness incurred prior to the Petition Date that is required to be paid under the Bankruptcy Code or by an order of the Bankruptcy Court) beyond the period of grace, if any, provided in an instrument or agreement under which such Indebtedness was created (or, in respect of Indebtedness required to be paid by Bankruptcy Court order, the period set forth in such order) or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the DIP ABL Obligations and any Indebtedness of any Debtor that was incurred prior to the Petition Date) (including, without limitation, any Indebtedness under the DIP Term Loan Documents and/or any agreement or condition relating to any Indebtedness incurred prior to the Petition Date that is required to be observed or performed under the Bankruptcy Code or by an order of the Bankruptcy Court) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, in the case of this clause (y), the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to

cause (determined without regard to whether any notice is required), any such Indebtedness to become due prior to its Stated Maturity, or

(ii)    any Indebtedness (other than the DIP ABL Obligations and any Indebtedness of any Debtor that was incurred prior to the Petition Date (or, if later, the date on which such Person became a Debtor)) of the Borrower or any of its Subsidiaries shall be declared to be (or shall become) due and payable, or required to be prepaid other than by a regularly scheduled required prepayment, prior to the Stated Maturity thereof;

*provided* that it shall not be a Default or a DIP Event of Default under clauses (i) or (ii) of this Section 10.1(d) unless the aggregate principal amount of all Indebtedness to which a circumstance described in such clauses applies is at least $10,000,000; or

(e)    Bankruptcy, etc.  Any Restricted Subsidiary that is not a Debtor (any such Restricted Subsidiary, an "**Applicable Subsidiary**") shall commence a voluntary case concerning itself under the Bankruptcy Code and such Applicable Subsidiary shall fail to become a Guarantor pursuant to Section 4.12 within ten (10) Business Days; or an involuntary case is commenced against an Applicable Subsidiary, and the petition is not controverted within ten (10) days, or is not dismissed within forty-five (45) days after the filing thereof, *provided, however,* that during the pendency of such period, each DIP ABL Lender shall be relieved of its obligation to extend credit hereunder; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of an Applicable Subsidiary, to operate all or any substantial portion of the business of an Applicable Subsidiary, commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to an Applicable Subsidiary, or there is commenced against an Applicable Subsidiary any such proceeding which remains undismissed for a period of forty-five (45) days after the filing thereof, or an Applicable Subsidiary is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or an Applicable Subsidiary makes a general assignment for the benefit of creditors; or any Company action is taken by an Applicable Subsidiary for the purpose of effecting any of the foregoing; or

(f)    ERISA.  One or more ERISA Events shall have occurred and the liability of any or all of the Borrower, any Subsidiary of any Borrower or any ERISA Affiliate contemplated by the foregoing either individually or in the aggregate, has had or would be reasonably expected to have, a Material Adverse Effect; or

(g)    Security Documents.

(i)    Any of the Security Documents that extend to assets constituting a material portion of the DIP ABL Collateral or any of the DIP Orders shall cease to be in full force and effect (other than in accordance with its terms), or shall cease to give  DIP ABL Agent for the benefit of the Secured Creditors the Liens, Super-priority Claims, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest in, and Lien on, any material portion of the DIP ABL Collateral, in favor of DIP ABL Agent, superior to and prior to the rights of all third Persons (except as permitted by Section 5.1 and, with respect to perfection, except as otherwise expressly provided in the applicable Security Document)); or

(ii)    Any Borrower or any other Credit Party, or any Person acting for or on behalf of such Credit Party, shall deny or disaffirm in writing such Credit Party's obligations under any Security Document to which it is a party or otherwise; or

99

(h)     Guaranties.  The Subsidiaries Guaranty (if any is in effect) or any provision thereof shall cease to be in full force or effect as to any Guarantor (except as a result of a release of any Guarantor in accordance with the terms thereof), or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm in writing such Guarantor's obligations under the Subsidiaries Guaranty to which it is a party; or

(i)     Judgments.  One or more (i) judgments or decrees shall be entered against any Borrower or any Restricted Subsidiary of a Borrower (which, in the case of the Debtors only, arose after the Petition Date) involving in the aggregate for Borrowers and their Restricted Subsidiaries a liability (not paid or to the extent not covered by a reputable and solvent insurance company) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 30 consecutive days, and the aggregate amount of all such judgments equals or exceeds $10,000,000 or (ii) judgments or orders shall have been rendered against any Restricted Subsidiary of the Borrower (which, in the case of the Debtors only, arose following the Petition Date), and such judgment or order shall not have been stayed (including as a result of the automatic stay of the Chapter 11 Cases), and which shall cause or could reasonably be expected to cause a Material Adverse Effect, and in each case, such action shall not be effectively stayed (including as a result of the automatic stay under the Chapter 11 Cases).

(j)     Change of Control.  Any Change of Control shall have occurred; or

(k)     DIP ABL Intercreditor Agreement.  The DIP ABL Intercreditor Agreement or any provision thereof shall, as a result of any act or omission of any Credit Party, cease to be in full force and effect other than in accordance with its terms, or any Lien securing or purporting to secure Indebtedness or other obligations owing under the DIP Term Loan Documents shall cease to be subordinated (to the extent required to be subordinated under the DIP ABL Intercreditor Agreement, the Security Documents or the DIP Orders) to all Liens created under the Security Documents and the DIP Orders securing the DIP ABL Obligations; or

(l)     Inability to Pay Debts.  Any Restricted Subsidiary (other than a Debtor) becomes unable or admits in writing its inability or fails generally to pay its debts as they become due; or

(m)     Chapter 11 Case Defaults

(i)     Dismissal or Conversion of Chapter 11 Cases; Appointment of Trustee or Examiner; Cash Collateral Use:

(A)     Any of the Chapter 11 Cases of any of the Credit Parties shall be dismissed or converted to a Chapter 7 Case;

(B)     a trustee or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) (other than a fee examiner) is appointed or elected in the any of the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment;

(C)     an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the Credit Parties and the Credit Parties shall have not obtained use of Cash Collateral pursuant to an order consented to by, and in form and substance reasonably acceptable to, the Required DIP ABL Lenders;

(D)     any Credit Party shall file a motion or other pleading seeking, or otherwise consenting to, any of the matters set forth in clauses (A) through (C) above or the granting of any other relief that if granted would give rise to an DIP Event of Default except to the extent that such motion, proceeding or consent shall have been withdrawn; or

(E)     any Credit Party or any of its Subsidiaries, or any person claiming by or through any Credit Party or any of its Subsidiaries, with any Credit Party's or any Subsidiary's consent, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against (A) the DIP ABL Agent or any of the DIP ABL Lenders relating to the DIP ABL Facility (as defined in the DIP Orders), or (B) the Prepetition ABL Agent or any of the Prepetition ABL Lenders related to any of the Prepetition ABL Financing Documents;

(ii)     the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing (i) any claims or charges, other than in respect of the DIP Facilities (as defined in the DIP Orders) and the Carve Out or as otherwise permitted under the applicable DIP ABL Financing Documents or the DIP Orders, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code that are *pari passu* with or senior to the claims of the DIP ABL Agent and the DIP ABL Lenders under the DIP ABL Facility (as defined in the DIP Orders), or there shall arise or be granted by the Bankruptcy Court any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve Out), or (ii) any Lien on the DIP ABL Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein, except, in each case, as expressly provided in the DIP ABL Financing Documents or in the DIP Orders then in effect (but only in the event specifically consented to by the Required DIP ABL Lenders (or the DIP ABL Agent with the consent of the Required DIP ABL Lenders)), whichever is in effect;

(iii)     the Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Credit Parties which have a value in excess of $3,000,000 in the aggregate or to permit any other action or actions that would result in a Material Adverse Effect with respect to any Credit Party or its estate;

(iv)     Certain Orders:

(A)     an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim DIP Order or the Final DIP Order, without the prior written consent of the Required DIP ABL Lenders, or a Credit Party shall apply for the authority to do so except to the extent such application shall have been withdrawn or shall support or fail to promptly oppose any other party's application for entry of such an order;

(B)     the Interim DIP Order (prior to the Final DIP Order Entry Date) or the Final DIP Order (on and after the Final DIP Order Entry Date) shall cease

101

to create a valid and perfected Lien on the DIP ABL Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Required DIP ABL Lenders (or the DIP ABL Agent with the consent of the Required DIP ABL Lenders);

(C)    an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the DIP ABL Agent or any DIP ABL Lender of any amounts received in respect of the DIP ABL Obligations or by the Prepetition ABL Agent or any Prepetition ABL Lender in respect of Prepetition ABL Obligations;

(D)    any of the Credit Parties shall fail to comply with any material provision of the Interim DIP Order (prior to the Final DIP Order Entry Date) or the Final DIP Order (on and after the Final DIP Order Entry Date); or

(E)    an order in the Chapter 11 Cases shall be entered charging any of the DIP ABL Collateral under section 506(c) of the Bankruptcy Code against the DIP ABL Lenders or the commencement of other action that is materially adverse to DIP ABL Agent, the DIP ABL Lenders or their respective rights and remedies under the DIP ABL Facility (as defined in the DIP Orders) in any of the Chapter 11 Cases or inconsistent with any of the DIP ABL Financing Documents;

(v)    a Reorganization Plan that is not an Acceptable Chapter 11 Plan shall be filed, solicited, or confirmed in any of the Chapter 11 Cases of the Credit Parties, or any order shall be entered which dismisses any of the Chapter 11 Cases of the Credit Parties and which order does not provide for payment in full in cash of the DIP ABL Obligations (other than contingent indemnification obligations not yet due and payable), or any of the Credit Parties and their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such Reorganization Plan or entry of any such order;

(vi)    failure to satisfy any of the Milestones in accordance with the terms relating to such Milestone (unless waived or extended with the consent of the Required DIP ABL Lenders (or the DIP ABL Agent with the consent of the Required DIP ABL Lenders));

(vii)    any Credit Party or any Subsidiary thereof shall take any action in support of any matter set forth in clauses xii through xvii (inclusive) of this Section 10.1(m) or any other Person shall do so and such application is not contested in good faith by the Credit Parties and the relief requested is granted in an order that is not stayed pending appeal;

(viii)    any Credit Party or any Subsidiary thereof shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination or other challenging of the Super-priority Claims and Liens granted to secure the DIP ABL Obligations or the Prepetition ABL Obligations or any other rights granted to the DIP ABL Agent, the DIP ABL Lenders, the Prepetition ABL Agent or Prepetition ABL Lenders in the DIP Orders or this Agreement or (ii) any

relief under section 506(c) of the Bankruptcy Code with respect to any DIP ABL Collateral or Prepetition ABL Collateral;

(ix)     any Credit Party shall file a pleading in support of a challenge of any payments made to the DIP ABL Agent or any DIP ABL Lender with respect to the DIP ABL Obligations or the Prepetition ABL Agent or any Prepetition ABL Lender with respect to the Prepetition ABL Obligations, other than to challenge the occurrence of a Default or DIP Event of Default;

(x)     without the consent of the Required DIP ABL Lenders, the filing of any motion by the Credit Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any prepetition agent or lender that is inconsistent with the Interim DIP Order (prior to the Final DIP Order Entry Date) or the Final DIP Order (on and after the Final DIP Order Entry Date);

(xi)     without the Required DIP ABL Lenders' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Credit Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the DIP Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any Cash Collateral or cash proceeds of any of the DIP ABL Collateral without the DIP ABL Agent's and the Required DIP ABL Lenders' consent or to obtain any financing under section 364 of the Bankruptcy Code other than the DIP Facilities (as defined in the DIP Orders) unless such motion or order contemplates payment in full in cash of the DIP ABL Obligations and the Prepetition ABL Obligations (if any) immediately upon consummation of the transactions contemplated thereby;

(xii)     if any Credit Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any part of the business affairs of the Credit Parties and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect; *provided*, that the Credit Parties shall have ten (10) Business Days after the entry of such an order to obtain a court order vacating, staying or otherwise obtaining relief from the Bankruptcy Court or another court to address any such court order;

(xiii)     any Credit Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition Indebtedness or payables other than as otherwise not prohibited under this Agreement and to the extent authorized by one or more First Day Orders, the Interim DIP Order or the Final DIP Order and consistent with the Approved Budget;

(xiv)     if, unless otherwise approved by the DIP ABL Agent and the Required DIP ABL Lenders, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Chapter 11 Cases and such order shall not be reversed or vacated within ten (10) days;

(xv)     without the Required DIP ABL Lenders' consent, any Credit Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking the, or the Bankruptcy Court shall enter an order, (i) granting or imposing, under section 364 of the Bankruptcy Code or otherwise, liens or security interests in any DIP ABL Collateral, whether senior, equal or subordinate to the DIP ABL Agent's liens and

103

security interests except to the extent permitted by this Agreement; (ii) permitting the use, or seeking the use, of Cash Collateral; or (iii) modifying or affecting any of the rights of the DIP ABL Agent, or the DIP ABL Lenders under the DIP Orders or the DIP ABL Financing Documents, by any Reorganization Plan confirmed in the Chapter 11 Cases or subsequent order entered in the Chapter 11 Cases;

(xvi)    the RSA shall cease to be in full force and effect,

(xvii)    without the Required DIP ABL Lenders' consent, an order shall have been entered by the Bankruptcy Court terminating the exclusive right of any Credit Party or any Subsidiary thereof to file a chapter 11 plan or solicit a disclosure statement,

(xviii)    without the Required DIP ABL Lenders' consent, any Credit Party or any Subsidiary thereof shall move or otherwise apply in the Chapter 11 Cases for authority to (i) sell all or substantially all of the assets or equity of any Credit Party or any Subsidiary thereof pursuant to section 363 of the Bankruptcy Code or otherwise, or (ii) consummate a sale of assets or equity of any Credit Party or any Subsidiary thereof or DIP ABL Collateral having a value in excess of $500,000 outside of the ordinary course of business and not otherwise permitted hereunder.

All cure periods provided for in this Section 10.1 shall run concurrently with any cure period provided for in Section 10.2 or any applicable DIP ABL Financing Documents under which the default occurred.

**Section 10.2**    <u>Acceleration and Suspension or Termination of DIP Revolving Loan Commitment</u>.

(a)    Upon the occurrence and during the continuance of a DIP Event of Default, DIP ABL Agent may, and shall if requested by Required DIP ABL Lenders, (a) by notice to Borrower Representative suspend or terminate the DIP Revolving Loan Commitment and the obligations of DIP ABL Agent and DIP ABL Lenders with respect thereto, in whole or in part (and, if in part, each DIP ABL Lender's DIP Revolving Loan Commitment shall be reduced in accordance with its Pro Rata Share), and/or (b) by notice to Borrower Representative declare all or any portion of the DIP ABL Obligations to be, and the DIP ABL Obligations shall thereupon become, immediately due and payable, with accrued interest thereon, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and Borrowers will pay the same; *provided*, *however*, that in the case of any of the DIP Events of Default specified in Section 10.1(e) above, without any notice to any Borrower or any other act by DIP ABL Agent or the DIP ABL Lenders, the DIP Revolving Loan Commitment and the obligations of DIP ABL Agent and the DIP ABL Lenders with respect thereto shall thereupon immediately and automatically terminate and all of the DIP ABL Obligations shall become immediately and automatically due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and Borrowers will pay the same.

(b)    Following the occurrence of a DIP Event of Default, DIP ABL Agent and DIP ABL Lenders may enforce any or all of their rights and remedies set forth in the DIP Orders, this Agreement and the other DIP ABL Financing Documents in accordance with the DIP Orders.

**Section 10.3**    <u>UCC Remedies</u>.

(a)    Upon the occurrence of and during the continuance of a DIP Event of Default under this Agreement or the other DIP ABL Financing Documents, DIP ABL Agent, in addition to all other rights, options, and remedies granted to DIP ABL Agent under this Agreement or at law or in

104

equity, may exercise, either directly or through one or more assignees or designees, all rights and remedies granted to it under all DIP ABL Financing Documents, the DIP Orders, the UCC in effect in the applicable jurisdiction(s) and any other applicable law; including, without limitation:

> (i)       the right to take possession of, send notices regarding, and collect directly the DIP ABL Collateral, with or without judicial process;

> (ii)      the right to (by its own means or with judicial assistance) enter any of Borrowers' premises and take possession of the DIP ABL Collateral, or render it unusable, or to render it usable or saleable, or dispose of the DIP ABL Collateral on such premises in compliance with subsection (iii) below and to take possession of Borrowers' original books and records, to obtain access to Borrowers' data processing equipment, computer hardware and software relating to the DIP ABL Collateral and to use all of the foregoing and the information contained therein in any manner DIP ABL Agent deems appropriate, without any liability for rent, storage, utilities, or other sums, and Borrowers shall not resist or interfere with such action (if Borrowers' books and records are prepared or maintained by an accounting service, contractor or other third party agent, Borrowers hereby irrevocably authorize such service, contractor or other agent, upon notice by DIP ABL Agent to such Person that a DIP Event of Default has occurred and is continuing, to deliver to DIP ABL Agent or its designees such books and records, and to follow DIP ABL Agent's instructions with respect to further services to be rendered);

> (iii)     the right to require Borrowers at Borrowers' expense to assemble all or any part of the DIP ABL Collateral and make it available to DIP ABL Agent at any place designated by DIP ABL Lender;

> (iv)      the right to notify postal authorities to change the address for delivery of Borrowers' mail to an address designated by DIP ABL Agent and to receive, open and dispose of all mail addressed to any Borrower; and/or

> (v)       the right to enforce Borrowers' rights against Account Debtors and other obligors, including, without limitation, (i) the right to collect Accounts directly in DIP ABL Agent's own name (as agent for DIP ABL Lenders) and to charge the collection costs and expenses, including attorneys' fees, to Borrowers, and (ii) the right, in the name of DIP ABL Agent or any designee of DIP ABL Agent or Borrowers, to verify the validity, amount or any other matter relating to any Accounts by mail, telephone, telegraph or otherwise, including, without limitation, verification of Borrowers' compliance with applicable Requirements of Law.  Borrowers shall cooperate fully with DIP ABL Agent in an effort to facilitate and promptly conclude such verification process. Such verification may include contacts between DIP ABL Agent and applicable federal, state and local regulatory authorities having jurisdiction over the Borrowers' affairs, all of which contacts Borrowers hereby irrevocably authorize.

> (b)       Each Borrower agrees that a notice received by it at least ten (10) days before the time of any intended public sale, or the time after which any private sale or other disposition of the DIP ABL Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition.  If permitted by applicable law, any perishable DIP ABL Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by DIP ABL Agent without prior notice to Borrowers.  At any sale or disposition of DIP ABL Collateral, DIP ABL Agent may (to the extent permitted by applicable law) purchase all or any part of the DIP ABL Collateral, free from any right of redemption by Borrowers, which right is hereby waived and released.  Each Borrower covenants

105

and agrees not to interfere with or impose any obstacle to DIP ABL Agent's exercise of its rights and remedies with respect to the DIP ABL Collateral. DIP ABL Agent shall have no obligation to clean-up or otherwise prepare the DIP ABL Collateral for sale. DIP ABL Agent may comply with any applicable state or federal law requirements in connection with a disposition of the DIP ABL Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the DIP ABL Collateral. DIP ABL Agent may sell the DIP ABL Collateral without giving any warranties as to the DIP ABL Collateral. DIP ABL Agent may specifically disclaim any warranties of title or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the DIP ABL Collateral. If DIP ABL Agent sells any of the DIP ABL Collateral upon credit, Borrowers will be credited only with payments actually made by the purchaser, received by DIP ABL Agent and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the DIP ABL Collateral, DIP ABL Agent may resell the DIP ABL Collateral and Borrowers shall be credited with the proceeds of the sale. Borrowers shall remain liable for any deficiency if the proceeds of any sale or disposition of the DIP ABL Collateral are insufficient to pay all DIP ABL Obligations.

(c)       Without restricting the generality of the foregoing and for the purposes aforesaid, each Borrower hereby appoints and constitutes DIP ABL Agent its lawful attorney-in-fact with full power of substitution in the DIP ABL Collateral, upon the occurrence and during the continuance of a DIP Event of Default, to (i) use unadvanced funds remaining under this Agreement or which may be reserved, escrowed or set aside for any purposes hereunder at any time, or to advance funds in excess of the face amount of the Notes, (ii) pay, settle or compromise all existing bills and claims, which may be Liens or security interests, or to avoid such bills and claims becoming Liens against the DIP ABL Collateral, (iii) execute all applications and certificates in the name of such Borrower and to prosecute and defend all actions or proceedings in connection with the DIP ABL Collateral, and (iv) do any and every act required under the terms of the DIP ABL Financing Documents which such Borrower might do in its own behalf; it being understood and agreed that this power of attorney in this subsection (c) shall be a power coupled with an interest and cannot be revoked.

(d)       DIP ABL Agent and each DIP ABL Lender are each hereby granted a non-exclusive, royalty-free license or other right to use, without charge, Borrowers' labels, mask works, rights of use of any name, any other Intellectual Property and advertising matter, and any similar property as it pertains to the DIP ABL Collateral, in completing production of, advertising for sale, and selling any DIP ABL Collateral and, in connection with DIP ABL Agent's exercise of its rights under this Article, Borrowers' rights under all licenses (whether as licensor or licensee) and all franchise agreements inure to DIP ABL Agent's and each DIP ABL Lender's benefit.

**Section 10.4**       Credit Bid.

Borrowers and DIP ABL Lenders hereby irrevocably authorize DIP ABL Agent, upon the direction of the Required DIP ABL Lenders, to (a) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the DIP ABL Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including under section 363 of the Bankruptcy Code or any similar laws in any other jurisdictions to which Borrower is subject, or (b) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the DIP ABL Collateral at any other sale or foreclosure conducted by DIP ABL Agent (whether by judicial action or otherwise) in accordance with applicable Requirements of Law. In connection with any such credit bid and purchase, the DIP ABL Obligations owed to DIP ABL Lenders shall be entitled to be, and shall be, credit bid on a ratable basis (with DIP ABL Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of DIP ABL Agent to credit bid and purchase at such sale or other disposition of the DIP ABL Collateral and, if such claims cannot be estimated without unduly delaying

the ability of DIP ABL Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and DIP ABL Lenders whose DIP ABL Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their DIP ABL Obligations credit bid in relation to the aggregate amount of DIP ABL Obligations so credit bid) in the asset or assets so purchased (or in the Capital Stock of the acquisition vehicle or vehicles that are used to consummate such purchase).

**Section 10.5**    Default Rate of Interest.  At the election of DIP ABL Agent or Required DIP ABL Lenders, after the occurrence of a DIP Event of Default and for so long as it continues, the Loans and other DIP ABL Obligations shall bear interest at rates that are two percent (2.0%) per annum in excess of the rates otherwise payable under this Agreement; *provided, however*, that in the case of any DIP Event of Default specified in Section 10.1(e) above, such default rates shall apply immediately and automatically without the need for any election or action of any kind on the part of DIP ABL Agent or any DIP ABL Lender.

**Section 10.6**    Setoff Rights.  During the continuance of any DIP Event of Default, each DIP ABL Lender is hereby authorized by each Borrower at any time or from time to time, with reasonably prompt subsequent notice to such Borrower to set off and to appropriate and to apply any and all (a) balances held by such DIP ABL Lender or any of such DIP ABL Lender's Affiliates at any of its offices for the account of such Borrower or any of its Subsidiaries (regardless of whether such balances are then due to such Borrower or its Subsidiaries), and (b) other property at any time held or owing by such DIP ABL Lender to or for the credit or for the account of such Borrower or any of its Subsidiaries, against and on account of any of the DIP ABL Obligations; except that no DIP ABL Lender shall exercise any such right without the prior written consent of DIP ABL Agent.  Any DIP ABL Lender exercising a right to set off shall purchase for cash (and the other DIP ABL Lenders shall sell) interests in each of such other DIP ABL Lender's Pro Rata Share of the DIP ABL Obligations as would be necessary to cause all DIP ABL Lenders to share the amount so set off with each other DIP ABL Lender in accordance with their respective Pro Rata Share of the DIP ABL Obligations.  Each Borrower agrees, to the fullest extent permitted by law, that any DIP ABL Lender and any of such DIP ABL Lender's Affiliates may exercise its right to set off with respect to the DIP ABL Obligations as provided in this Section 10.6.

**Section 10.7**    Application of Proceeds.

(a)    Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of a DIP Event of Default, each Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by DIP ABL Agent from or on behalf of such Borrower or any Guarantor of all or any part of the DIP ABL Obligations, and, as between Borrowers on the one hand and DIP ABL Agent and DIP ABL Lenders on the other, DIP ABL Agent shall have the continuing and exclusive right to apply and to reapply any and all payments received against the DIP ABL Obligations in such manner as DIP ABL Agent may deem advisable notwithstanding any previous application by DIP ABL Agent.

(b)    Notwithstanding anything to the contrary contained in this Agreement,

(i)    Prior to the Final DIP Order Entry Date, and so long as no DIP Event of Default has occurred and is continuing, DIP ABL Agent shall apply any and all payments received by DIP ABL Agent in respect of the DIP ABL Obligations, and any and all proceeds of DIP ABL Collateral received by DIP ABL Agent, in the following order: _first_, to the outstanding Prepetition ABL Obligations; _second_, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to DIP ABL Agent with respect to this Agreement, the other DIP ABL Financing Documents or the DIP

107

ABL Collateral; _third_, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to any DIP ABL Lender with respect to this Agreement, the other DIP ABL Financing Documents or the DIP ABL Collateral; _fourth_, to accrued and unpaid interest on the DIP ABL Obligations (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts); _fifth_, to any other indebtedness or obligations of Borrowers owing to DIP ABL Agent or any DIP ABL Lender under the DIP ABL Financing Documents. Any balance remaining shall be delivered to the Borrowers or to whomever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct. In carrying out the foregoing, (y) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category, and (z) each of the Persons entitled to receive a payment in any particular category shall receive an amount equal to its Pro Rata Share of amounts available to be applied pursuant thereto for such category.

(ii)     Upon and after the Final DIP Order Entry Date or any occurrence and continuance of a DIP Event of Default, but absent the occurrence and continuance of an Acceleration Event, DIP ABL Agent shall apply any and all payments received by DIP ABL Agent in respect of the DIP ABL Obligations, and any and all proceeds of DIP ABL Collateral received by DIP ABL Agent, in such order as DIP ABL Agent may from time to time elect.

(iii)    Upon and after the occurrence of an Acceleration Event, and so long as it continues, DIP ABL Agent shall apply any and all payments received by DIP ABL Agent in respect of the DIP ABL Obligations, and any and all proceeds of DIP ABL Collateral received by DIP ABL Agent, in the following order: _first_, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to DIP ABL Agent with respect to this Agreement, the other DIP ABL Financing Documents or the DIP ABL Collateral; _second_, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to any DIP ABL Lender with respect to this Agreement, the other DIP ABL Financing Documents or the DIP ABL Collateral; _third_, to accrued and unpaid interest on the DIP ABL Obligations (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts); _fourth_ to any other indebtedness or obligations of Borrowers owing to DIP ABL Agent or any DIP ABL Lender under the DIP ABL Financing Documents; _fifth_ to the outstanding Prepetition ABL Obligations and Prepetition Term Loan Obligations in a manner consistent with the priorities agreed under the Prepetition Intercreditor Agreements. Any balance remaining shall be delivered to the Borrowers or to whomever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct. In carrying out the foregoing, (y) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category, and (z) each of the Persons entitled to receive a payment in any particular category shall receive an amount equal to its Pro Rata Share of amounts available to be applied pursuant thereto for such category.

**Section 10.8**     <u>Waivers</u>.

(a)     Except as otherwise provided for in this Agreement and to the fullest extent permitted by applicable law, each Borrower waives:  (i) presentment, demand and protest, and notice of presentment, dishonor, intent to accelerate, acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all DIP ABL Financing Documents, the Notes or any other notes, commercial paper, accounts, contracts, documents, Instruments, Chattel Paper and

108

Guarantees at any time owed to DIP ABL Lenders on which any Borrower may in any way be liable; (ii) all rights to notice and a hearing prior to DIP ABL Agent's or any DIP ABL Lender's taking possession or control of, or to DIP ABL Agent's or any DIP ABL Lender's replevy, attachment or levy upon, any DIP ABL Collateral or any bond or security which might be required by any court prior to allowing DIP ABL Agent or any DIP ABL Lender to exercise any of its remedies; and (iii) the benefit of all valuation, appraisal and exemption laws.   Each Borrower acknowledges that it has been advised by counsel of its choices and decisions with respect to this Agreement, the other DIP ABL Financing Documents and the transactions evidenced hereby and thereby.

(b)     Each Borrower for itself and all its successors and assigns, (i) agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by DIP ABL Lender; (ii) consents to any indulgences and all extensions of time, renewals, waivers, or modifications that may be granted by DIP ABL Agent or any DIP ABL Lender with respect to the payment or other provisions of the DIP ABL Financing Documents, and to any substitution, exchange or release of the DIP ABL Collateral, or any part thereof, with or without substitution, and agrees to the addition or release of any Borrower, endorsers, guarantors, or sureties, or whether primarily or secondarily liable, without notice to any other Borrower and without affecting its liability hereunder; (iii) agrees that its liability shall be unconditional and without regard to the liability of any other Borrower, DIP ABL Agent or any DIP ABL Lender for any tax on the indebtedness; and (iv) to the fullest extent permitted by law, expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing.

(c)     To the extent that DIP ABL Agent or any DIP ABL Lender may have acquiesced in any noncompliance with any requirements or conditions precedent to the closing of the Loans or to any subsequent disbursement of Loan proceeds, such acquiescence shall not be deemed to constitute a waiver by DIP ABL Agent or any DIP ABL Lender of such requirements with respect to any future disbursements of Loan proceeds and DIP ABL Agent may at any time after such acquiescence require Borrowers to comply with all such requirements.  Any forbearance by DIP ABL Agent or DIP ABL Lender in exercising any right or remedy under any of the DIP ABL Financing Documents, or otherwise afforded by applicable law, including any failure to accelerate the maturity date of the Loans, shall not be a waiver of or preclude the exercise of any right or remedy nor shall it serve as a novation of the Notes or as a reinstatement of the Loans or a waiver of such right of acceleration or the right to insist upon strict compliance of the terms of the DIP ABL Financing Documents.  DIP ABL Agent's or any DIP ABL Lender's acceptance of payment of any sum secured by any of the DIP ABL Financing Documents after the due date of such payment shall not be a waiver of DIP ABL Agent's and such DIP ABL Lender's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment.  The procurement of insurance or the payment of taxes or other Liens or charges by DIP ABL Agent as the result of a DIP Event of Default shall not be a waiver of DIP ABL Agent's right to accelerate the maturity of the Loans, nor shall DIP ABL Agent's receipt of any condemnation awards, insurance proceeds, or damages under this Agreement operate to cure or waive any Credit Party's default in payment of sums secured by any of the DIP ABL Financing Documents.

(d)     Without limiting the generality of anything contained in this Agreement or the other DIP ABL Financing Documents, to the fullest extent permitted by applicable law, each Borrower agrees that if a DIP Event of Default is continuing (i) DIP ABL Agent and DIP ABL Lenders shall not be subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to DIP ABL Agent or DIP ABL Lenders shall remain in full force and effect until DIP ABL Agent or DIP ABL Lenders have exhausted all remedies against the DIP ABL Collateral and any other properties owned by Borrowers and the DIP ABL Financing Documents and

other security instruments or agreements securing the Loans have been foreclosed, sold and/or otherwise realized upon in satisfaction of Borrowers' obligations under the DIP ABL Financing Documents.

(e)     Nothing contained herein or in any other DIP ABL Financing Document shall be construed as requiring DIP ABL Agent or any DIP ABL Lender to resort to any part of the DIP ABL Collateral for the satisfaction of any of Borrowers' obligations under the DIP ABL Financing Documents in preference or priority to any other DIP ABL Collateral, and DIP ABL Agent may seek satisfaction out of all of the DIP ABL Collateral or any part thereof, in its absolute discretion in respect of Borrowers' obligations under the DIP ABL Financing Documents.  In addition, DIP ABL Agent shall have the right from time to time to partially foreclose upon any DIP ABL Collateral in any manner and for any amounts secured by the DIP ABL Financing Documents then due and payable as determined by DIP ABL Agent in its sole discretion, including, without limitation, the following circumstances:  (i) in the event any Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and/or interest, DIP ABL Agent may foreclose upon all or any part of the DIP ABL Collateral to recover such delinquent payments, or (ii) in the event DIP ABL Agent elects to accelerate less than the entire outstanding principal balance of the Loans, DIP ABL Agent may foreclose all or any part of the DIP ABL Collateral to recover so much of the principal balance of the Loans as DIP ABL Lender may accelerate and such other sums secured by one or more of the DIP ABL Financing Documents as DIP ABL Agent may elect.  Notwithstanding one or more partial foreclosures, any unforeclosed DIP ABL Collateral shall remain subject to the DIP ABL Financing Documents to secure payment of sums secured by the DIP ABL Financing Documents and not previously recovered.

(f)     To the fullest extent permitted by law, each Borrower, for itself and its successors and assigns, waives in the event of foreclosure of any or all of the DIP ABL Collateral any equitable right otherwise available to any Credit Party which would require the separate sale of any of the DIP ABL Collateral or require DIP ABL Agent or DIP ABL Lenders to exhaust their remedies against any part of the DIP ABL Collateral before proceeding against any other part of the DIP ABL Collateral; and further in the event of such foreclosure each Borrower does hereby expressly consent to and authorize, at the option of DIP ABL Agent, the foreclosure and sale either separately or together of each part of the DIP ABL Collateral.

**Section 10.9**     Injunctive Relief.  The parties acknowledge and agree that, in the event of a breach or threatened breach of any Credit Party's obligations under any DIP ABL Financing Documents, DIP ABL Agent and DIP ABL Lenders may have no adequate remedy in money damages and, accordingly, shall be entitled to an injunction (including, without limitation, a temporary restraining order, preliminary injunction, writ of attachment, or order compelling an audit) against such breach or threatened breach, including, without limitation, maintaining any cash management and collection procedure described herein.  However, no specification in this Agreement of a specific legal or equitable remedy shall be construed as a waiver or prohibition against any other legal or equitable remedies in the event of a breach or threatened breach of any provision of this Agreement.  Each Credit Party waives, to the fullest extent permitted by law, the requirement of the posting of any bond in connection with such injunctive relief.  By joining in the DIP ABL Financing Documents as a Credit Party, each Credit Party specifically joins in this Section as if this Section were a part of each DIP ABL Financing Document executed by such Credit Party.

**Section 10.10**     Marshalling; Payments Set Aside.  Neither DIP ABL Agent nor any DIP ABL Lender shall be under any obligation to marshal any assets in payment of any or all of the DIP ABL Obligations.  To the extent that Borrower makes any payment or DIP ABL Agent enforces its Liens or DIP ABL Agent or any DIP ABL Lender exercises its right of set-off, and such payment or the proceeds of such enforcement or set-off is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by anyone, then to the extent of such recovery, the DIP ABL Obligations or

110

part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or set-off had not occurred.

## ARTICLE 11 - AGENT

Section 11.1    Appointment and Authorization.    Each DIP ABL Lender hereby irrevocably appoints and authorizes DIP ABL Agent to enter into each of the DIP ABL Financing Documents to which it is a party (other than this Agreement) on its behalf and to take such actions as DIP ABL Agent on its behalf and to exercise such powers under the DIP ABL Financing Documents as are delegated to DIP ABL Agent by the terms thereof, together with all such powers as are reasonably incidental thereto. Subject to the terms of Section 11.16 and to the terms of the other DIP ABL Financing Documents, DIP ABL Agent is authorized and empowered to amend, modify, or waive any provisions of this Agreement or the other DIP ABL Financing Documents on behalf of DIP ABL Lenders.  The provisions of this Article 11 are solely for the benefit of DIP ABL Agent and DIP ABL Lenders and neither any Borrower nor any other Credit Party shall have any rights as a third party beneficiary of any of the provisions hereof (other than as expressly provided herein).  In performing its functions and duties under this Agreement, DIP ABL Agent shall act solely as agent of DIP ABL Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Borrower or any other Credit Party.  DIP ABL Agent may perform any of its duties hereunder, or under the DIP ABL Financing Documents, by or through its agents, servicers, trustees, investment managers or employees.

Section 11.2    DIP ABL Agent and Affiliates.    DIP ABL Agent shall have the same rights and powers under the DIP ABL Financing Documents as any other DIP ABL Lender and may exercise or refrain from exercising the same as though it were not DIP ABL Agent, and DIP ABL Agent and its Affiliates may lend money to, invest in and generally engage in any kind of business with each Credit Party or Affiliate of any Credit Party as if it were not DIP ABL Agent hereunder.

Section 11.3    Action by DIP ABL Agent.    The duties of DIP ABL Agent shall be mechanical and administrative in nature.  DIP ABL Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any DIP ABL Lender.  Nothing in this Agreement or any of the DIP ABL Financing Documents is intended to or shall be construed to impose upon DIP ABL Agent any obligations in respect of this Agreement or any of the DIP ABL Financing Documents except as expressly set forth herein or therein.

Section 11.4    Consultation with Experts.    DIP ABL Agent may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

Section 11.5    Liability of DIP ABL Agent.    Neither DIP ABL Agent nor any of its directors, officers, agents, trustees, investment managers, servicers or employees shall be liable to any DIP ABL Lender for any action taken or not taken by it in connection with the DIP ABL Financing Documents, except that DIP ABL Agent shall be liable with respect to its specific duties set forth hereunder but only to the extent of its own gross negligence or willful misconduct in the discharge thereof as determined by a final non-appealable judgment of a court of competent jurisdiction.  Neither DIP ABL Agent nor any of its directors, officers, agents, trustees, investment managers, servicers or employees shall be responsible for or have any duty to ascertain, inquire into or verify (a) any statement, warranty or representation made in connection with any DIP ABL Financing Document or any borrowing hereunder; (b) the performance or observance of any of the covenants or agreements specified in any DIP ABL Financing Document;

111

(c) the satisfaction of any condition specified in any DIP ABL Financing Document; (d) the validity, effectiveness, sufficiency or genuineness of any DIP ABL Financing Document, any Lien purported to be created or perfected thereby or any other instrument or writing furnished in connection therewith; (e) the existence or non-existence of any Default or DIP Event of Default; or (f) the financial condition of any Credit Party.  DIP ABL Agent shall not incur any liability by acting in reliance upon any notice, consent, certificate, statement, or other writing (which may be a bank wire, facsimile or electronic transmission or similar writing) believed by it to be genuine or to be signed by the proper party or parties.  DIP ABL Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any DIP ABL Lender to whom payment was due but not made, shall be to recover from other DIP ABL Lenders any payment in excess of the amount to which they are determined to be entitled (and such other DIP ABL Lenders hereby agree to return to such DIP ABL Lender any such erroneous payments received by them). Notwithstanding anything to the contrary contained herein or otherwise, it is hereby acknowledged and agreed by each of the parties hereto that DIP ABL Agent shall not (i) be deemed to be a party to any Prepetition ABL Financing Documents or Prepetition Term Loan Documents or have any duties, responsibilities or obligations thereunder or in respect thereof and (ii) shall not be deemed to be an agent or other fiduciary for any Prepetition ABL Lender, Prepetition Term Loan Lender or other Person in respect of the Prepetition ABL Financing Documents or Prepetition Term Loan Documents or the Indebtedness and other obligations owing thereunder.

**Section 11.6**      Indemnification.  Each DIP ABL Lender shall, in accordance with its Pro Rata Share, indemnify DIP ABL Agent (to the extent not reimbursed by Borrowers) upon demand against any cost, expense (including counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from DIP ABL Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction) that DIP ABL Agent may suffer or incur in connection with the DIP ABL Financing Documents or any action taken or omitted by DIP ABL Agent hereunder or thereunder.  If any indemnity furnished to DIP ABL Agent for any purpose shall, in the opinion of DIP ABL Agent, be insufficient or become impaired, DIP ABL Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against even if so directed by Required DIP ABL Lenders until such additional indemnity is furnished.

**Section 11.7**      Right to Request and Act on Instructions.  DIP ABL Agent may at any time request instructions from DIP ABL Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the DIP ABL Financing Documents DIP ABL Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, DIP ABL Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Person for refraining from any action or withholding any approval under any of the DIP ABL Financing Documents until it shall have received such instructions from Required DIP ABL Lenders or all or such other portion of DIP ABL Lenders as shall be prescribed by this Agreement.  Without limiting the foregoing, no DIP ABL Lender shall have any right of action whatsoever against DIP ABL Agent as a result of DIP ABL Agent acting or refraining from acting under this Agreement or any of the other DIP ABL Financing Documents in accordance with the instructions of Required DIP ABL Lenders (or all or such other portion of DIP ABL Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions of Required DIP ABL Lenders (or such other applicable portion of DIP ABL Lenders), DIP ABL Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate applicable law or exposes DIP ABL Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of Section 11.6.

**Section 11.8**      Credit Decision.  Each DIP ABL Lender acknowledges that it has, independently and without reliance upon DIP ABL Agent or any other DIP ABL Lender, and based on

112

such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each DIP ABL Lender also acknowledges that it will, independently and without reliance upon DIP ABL Agent or any other DIP ABL Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the DIP ABL Financing Documents.

Section 11.9    DIP ABL Collateral Matters.  DIP ABL Lenders irrevocably authorize DIP ABL Agent, at its option and in its discretion, to (a) release any Lien granted to or held by DIP ABL Agent under any Security Document (i) upon termination of the DIP Revolving Loan Commitment and indefeasible payment in full of all DIP ABL Obligations, and, to the extent required by DIP ABL Agent in its sole discretion, the expiration, termination or cash collateralization (to the satisfaction of DIP ABL Agent) of all Swap Contracts secured, in whole or in part, by any DIP ABL Collateral; or (ii) constituting property sold or disposed of as part of or in connection with any disposition permitted under any DIP ABL Financing Document (it being understood and agreed that DIP ABL Agent may conclusively rely without further inquiry on a certificate of a Responsible Officer as to the sale or other disposition of property being made in full compliance with the provisions of the DIP ABL Financing Documents); and (b) subordinate any Lien granted to or held by DIP ABL Agent under any Security Document to a Permitted Lien that is allowed to have priority over the Liens granted to or held by DIP ABL Agent pursuant to the definition of "Permitted Liens".  Upon request by DIP ABL Agent at any time, DIP ABL Lenders will confirm DIP ABL Agent's authority to release and/or subordinate particular types or items of DIP ABL Collateral pursuant to this Section 11.9.

Section 11.10    Agency for Perfection.  DIP ABL Agent and each DIP ABL Lender hereby appoint each other DIP ABL Lender as agent for the purpose of perfecting DIP ABL Agent's security interest in assets which, in accordance with the Uniform Commercial Code in any applicable jurisdiction, can be perfected by possession or control.  Should any DIP ABL Lender (other than DIP ABL Agent) obtain possession or control of any such assets, such DIP ABL Lender shall notify DIP ABL Agent thereof, and, promptly upon DIP ABL Agent's request therefor, shall deliver such assets to DIP ABL Agent or in accordance with DIP ABL Agent's instructions or transfer control to DIP ABL Agent in accordance with DIP ABL Agent's instructions.  Each DIP ABL Lender agrees that it will not have any right individually to enforce or seek to enforce any Security Document or to realize upon any DIP ABL Collateral for the Loan unless instructed to do so by DIP ABL Agent (or consented to by DIP ABL Agent), it being understood and agreed that such rights and remedies may be exercised only by DIP ABL Agent.

Section 11.11    Notice of Default.  DIP ABL Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or DIP Event of Default except with respect to defaults in the payment of principal, interest and fees required to be paid to DIP ABL Agent for the account of DIP ABL Lenders, unless DIP ABL Agent shall have received written notice from a DIP ABL Lender or a Borrower referring to this Agreement, describing such Default or DIP Event of Default and stating that such notice is a "notice of default".  DIP ABL Agent will notify each DIP ABL Lender of its receipt of any such notice.  DIP ABL Agent shall take such action with respect to such Default or DIP Event of Default as may be requested by Required DIP ABL Lenders (or all or such other portion of DIP ABL Lenders as shall be prescribed by this Agreement) in accordance with the terms hereof.  Unless and until DIP ABL Agent has received any such request, DIP ABL Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or DIP Event of Default as it shall deem advisable or in the best interests of DIP ABL Lenders.

Section 11.12    Assignment by DIP ABL Agent; Resignation of DIP ABL Agent; Successor DIP ABL Agent.

(a)      DIP ABL Agent may, upon ten (10) days' written notice to DIP ABL Lenders and Borrowers (or, in the case of an assignment to an Affiliate, contemporaneous notice), at any time assign its rights, powers, privileges and duties hereunder to (i) another DIP ABL Lender, or (ii) any Person to whom DIP ABL Agent, in its capacity as a DIP ABL Lender, has assigned (or will assign, in conjunction with such assignment of agency rights hereunder) 50% or more of its Loan, in each case without the consent of DIP ABL Lenders or Borrowers.  An assignment by DIP ABL Agent pursuant to this subsection (a) shall not be deemed a resignation by DIP ABL Agent for purposes of subsection (b) below.

(b)      Without limiting the rights of DIP ABL Agent to designate an assignee pursuant to subsection (a) above, DIP ABL Agent may at any time give notice of its resignation to DIP ABL Lenders and Borrowers.  Upon receipt of any such notice of resignation, Required DIP ABL Lenders shall have the right to appoint a successor DIP ABL Agent.  If no such successor shall have been so appointed by Required DIP ABL Lenders and shall have accepted such appointment within ten (10) Business Days after the retiring DIP ABL Agent gives notice of its resignation, then the retiring DIP ABL Agent may on behalf of DIP ABL Lenders, appoint a successor DIP ABL Agent; *provided, however,* that if DIP ABL Agent shall notify Borrowers and DIP ABL Lenders that no Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice from DIP ABL Agent that no Person has accepted such appointment and, from and following delivery of such notice, (i) the retiring DIP ABL Agent shall be discharged from its duties and obligations hereunder and under the other DIP ABL Financing Documents, and (ii) all payments, communications and determinations provided to be made by, to or through DIP ABL Agent shall instead be made by or to each DIP ABL Lender directly, until such time as Required DIP ABL Lenders appoint a successor DIP ABL Agent as provided for above in this paragraph.

(c)      Upon (i) an assignment permitted by subsection (a) above, or (ii) the acceptance of a successor's appointment as DIP ABL Agent pursuant to subsection (b) above, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) DIP ABL Agent, and the retiring DIP ABL Agent shall be discharged from all of its duties and obligations hereunder and under the other DIP ABL Financing Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by Borrowers to a successor DIP ABL Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrowers and such successor.  After the retiring DIP ABL Agent's resignation hereunder and under the other DIP ABL Financing Documents, the provisions of this Article 11 and this Section 11.12 shall continue in effect for the benefit of such retiring DIP ABL Agent and its sub-agents in respect of any actions taken or omitted to be taken by any of them while the retiring DIP ABL Agent was acting or was continuing to act as DIP ABL Agent.

**Section 11.13**    Payment and Sharing of Payment.

(a)      DIP Revolving Loan Advances, Payments and Settlements; Interest and Fee Payments.

(i)      DIP ABL Agent shall have the right, on behalf of Revolving DIP ABL Lenders to disburse funds to Borrowers for all DIP Revolving Loans requested or deemed requested by Borrowers pursuant to the terms of this Agreement.  DIP ABL Agent shall be conclusively entitled to assume, for purposes of the preceding sentence, that each Revolving DIP ABL Lender will fund its Pro Rata Share of all DIP Revolving Loans requested by Borrowers.  Each Revolving DIP ABL Lender shall reimburse DIP ABL Agent on demand, in accordance with the provisions of the immediately following paragraph, for all funds disbursed on its behalf by DIP ABL Agent pursuant to the first

114

sentence of this clause (i), or if DIP ABL Agent so requests, each Revolving DIP ABL Lender will remit to DIP ABL Agent its Pro Rata Share of any DIP Revolving Loan before DIP ABL Agent disburses the same to a Borrower. If DIP ABL Agent elects to require that each Revolving DIP ABL Lender make funds available to DIP ABL Agent, prior to a disbursement by DIP ABL Agent to a Borrower, DIP ABL Agent shall advise each Revolving DIP ABL Lender by telephone, facsimile or e-mail of the amount of such Revolving DIP ABL Lender's Pro Rata Share of the DIP Revolving Loan requested by such Borrower no later than noon (Eastern time) on the date of funding of such DIP Revolving Loan, and each such Revolving DIP ABL Lender shall pay DIP ABL Agent on such date such Revolving DIP ABL Lender's Pro Rata Share of such requested DIP Revolving Loan, in same day funds, by wire transfer to the Payment Account, or such other account as may be identified by DIP ABL Agent to Revolving DIP ABL Lenders from time to time. If any DIP ABL Lender fails to pay the amount of its Pro Rata Share of any funds advanced by DIP ABL Agent pursuant to the first sentence of this clause (i) within one (1) Business Day after DIP ABL Agent's demand, DIP ABL Agent shall promptly notify Borrower Representative, and Borrowers shall immediately repay such amount to DIP ABL Agent. Any repayment required by Borrowers pursuant to this Section 11.13 shall be accompanied by accrued interest thereon from and including the date such amount is made available to a Borrower to but excluding the date of payment at the rate of interest then applicable to DIP Revolving Loans. Nothing in this Section 11.13 or elsewhere in this Agreement or the other DIP ABL Financing Documents shall be deemed to require DIP ABL Agent to advance funds on behalf of any DIP ABL Lender or to relieve any DIP ABL Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that DIP ABL Agent or any Borrower may have against any DIP ABL Lender as a result of any default by such DIP ABL Lender hereunder.

(ii)    On a Business Day of each week as selected from time to time by DIP ABL Agent, or more frequently (including daily), if DIP ABL Agent so elects (each such day being a "**Settlement Date**"), DIP ABL Agent will advise each Revolving DIP ABL Lender by telephone, facsimile or e-mail of the amount of each such Revolving DIP ABL Lender's percentage interest of the DIP Revolving Loan balance as of the close of business of the Business Day immediately preceding the Settlement Date. In the event that payments are necessary to adjust the amount of such Revolving DIP ABL Lender's actual percentage interest of the DIP Revolving Loans to such DIP ABL Lender's required percentage interest of the DIP Revolving Loan balance as of any Settlement Date, the Revolving DIP ABL Lender from which such payment is due shall pay DIP ABL Agent, without setoff or discount, to the Payment Account before 1:00 p.m. (Eastern time) on the Business Day following the Settlement Date the full amount necessary to make such adjustment. Any obligation arising pursuant to the immediately preceding sentence shall be absolute and unconditional and shall not be affected by any circumstance whatsoever. In the event settlement shall not have occurred by the date and time specified in the second preceding sentence, interest shall accrue on the unsettled amount at the rate of interest then applicable to DIP Revolving Loans.

(iii)    On each Settlement Date, DIP ABL Agent shall advise each Revolving DIP ABL Lender by telephone, facsimile or e-mail of the amount of such Revolving DIP ABL Lender's percentage interest of principal, interest and fees paid for the benefit of Revolving DIP ABL Lenders with respect to each applicable DIP Revolving Loan, to the extent of such Revolving DIP ABL Lender's DIP Revolving Loan Exposure with respect thereto, and shall make payment to such Revolving DIP ABL Lender before 1:00 p.m.

115

(Eastern time) on the Business Day following the Settlement Date of such amounts in accordance with wire instructions delivered by such Revolving DIP ABL Lender to DIP ABL Agent, as the same may be modified from time to time by written notice to DIP ABL Agent; *provided, however,* that, in the case such Revolving DIP ABL Lender is a Defaulted DIP ABL Lender, DIP ABL Agent shall be entitled to set off the funding short-fall against that Defaulted DIP ABL Lender's respective share of all payments received from any Borrower.

(iv)    On the Closing Date, DIP ABL Agent, on behalf of DIP ABL Lenders, may elect to advance to Borrowers the full amount of the initial Loans to be made on the Closing Date prior to receiving funds from DIP ABL Lenders, in reliance upon each DIP ABL Lender's commitment to make its Pro Rata Share of such Loans to Borrowers in a timely manner on such date. If DIP ABL Agent elects to advance the initial Loans to Borrower in such manner, DIP ABL Agent shall be entitled to receive all interest that accrues on the Closing Date on each DIP ABL Lender's Pro Rata Share of such Loans unless DIP ABL Agent receives such DIP ABL Lender's Pro Rata Share of such Loans before 3:00 p.m. (Eastern time) on the Closing Date.

(v)    It is understood that for purposes of advances to Borrowers made pursuant to this Section 11.13, DIP ABL Agent will be using the funds of DIP ABL Agent, and pending settlement, (A) all funds transferred from the Payment Account to the outstanding DIP Revolving Loans shall be applied first to advances made by DIP ABL Agent to Borrowers pursuant to this Section 11.13, and (B) all interest accruing on such advances shall be payable to DIP ABL Agent.

(vi)    The provisions of this Section 11.13(a) shall be deemed to be binding upon DIP ABL Agent and DIP ABL Lenders notwithstanding the occurrence of any Default or DIP Event of Default, or any insolvency or bankruptcy proceeding pertaining to any Borrower or any other Credit Party.

(b)    [Reserved].

(c)    Return of Payments.

(i)    If DIP ABL Agent pays an amount to a DIP ABL Lender under this Agreement in the belief or expectation that a related payment has been or will be received by DIP ABL Agent from a Borrower and such related payment is not received by DIP ABL Agent, then DIP ABL Agent will be entitled to recover such amount from such DIP ABL Lender on demand without setoff, counterclaim or deduction of any kind, together with interest accruing on a daily basis at the Federal Funds Rate.

(ii)    If DIP ABL Agent determines at any time that any amount received by DIP ABL Agent under this Agreement must be returned to any Borrower or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other DIP ABL Financing Document, DIP ABL Agent will not be required to distribute any portion thereof to any DIP ABL Lender. In addition, each DIP ABL Lender will repay to DIP ABL Agent on demand any portion of such amount that DIP ABL Agent has distributed to such DIP ABL Lender, together with interest at such rate, if any, as DIP ABL Agent is required to pay to any Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(d)     Defaulted DIP ABL Lenders.  The failure of any Defaulted DIP ABL Lender to make any payment required by it hereunder shall not relieve any other DIP ABL Lender of its obligations to make payment, but neither any other DIP ABL Lender nor DIP ABL Agent shall be responsible for the failure of any Defaulted DIP ABL Lender to make any payment required hereunder.  Notwithstanding anything set forth herein to the contrary, a Defaulted DIP ABL Lender shall not have any voting or consent rights under or with respect to any DIP ABL Financing Document or constitute a "DIP ABL Lender" (or be included in the calculation of "Required DIP ABL Lenders" hereunder) for any voting or consent rights under or with respect to any DIP ABL Financing Document.

(e)     Sharing of Payments.  If any DIP ABL Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan (other than pursuant to the terms of Section 2.8(d)) in excess of its Pro Rata Share of payments entitled pursuant to the other provisions of this Section 11.13, such DIP ABL Lender shall purchase from the other DIP ABL Lenders such participations in extensions of credit made by such other DIP ABL Lenders (without recourse, representation or warranty) as shall be necessary to cause such purchasing DIP ABL Lender to share the excess payment or other recovery ratably with each of them; *provided, however,* that if all or any portion of the excess payment or other recovery is thereafter required to be returned or otherwise recovered from such purchasing DIP ABL Lender, such portion of such purchase shall be rescinded and each DIP ABL Lender which has sold a participation to the purchasing DIP ABL Lender shall repay to the purchasing DIP ABL Lender the purchase price to the ratable extent of such return or recovery, without interest.  Each Borrower agrees that any DIP ABL Lender so purchasing a participation from another DIP ABL Lender pursuant to this clause (e) may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to Section 10.6) with respect to such participation as fully as if such DIP ABL Lender were the direct creditor of Borrowers in the amount of such participation).  If under any applicable bankruptcy, insolvency or other similar law, any DIP ABL Lender receives a secured claim in lieu of a setoff to which this clause (e) applies, such DIP ABL Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of DIP ABL Lenders entitled under this clause (e) to share in the benefits of any recovery on such secured claim.

**Section 11.14**     Right to Perform, Preserve and Protect.  If any Credit Party fails to perform any obligation hereunder or under any other DIP ABL Financing Document, DIP ABL Agent itself may, during the continuance of a DIP Event of Default, but shall not be obligated to, cause such obligation to be performed at Borrowers' expense subject to limitations set forth in Section 12.14.  During the continuance of a DIP Event of Default, DIP ABL Agent is further authorized by Borrowers and DIP ABL Lenders to make expenditures from time to time which DIP ABL Agent, in its reasonable business judgment, deems necessary or desirable to (a) preserve or protect the business conducted by Borrowers, the DIP ABL Collateral, or any portion thereof, and/or (b) enhance the likelihood of, or maximize the amount of, repayment of the Loan and other DIP ABL Obligations.  Subject to the limitations set forth in Section 12.14, each Borrower hereby agrees to reimburse DIP ABL Agent on demand for any and all costs, liabilities and obligations incurred by DIP ABL Agent pursuant to this Section 11.14.  Each DIP ABL Lender hereby agrees to indemnify DIP ABL Agent upon demand for any and all costs, liabilities and obligations incurred by DIP ABL Agent pursuant to this Section 11.14, in accordance with the provisions of Section 11.6.

**Section 11.15**     Additional Titled DIP ABL Agents.  Except for rights and powers, if any, expressly reserved under this Agreement to any bookrunner, arranger or to any titled agent named on the cover page of this Agreement, other than DIP ABL Agent (collectively, the "Additional Titled DIP ABL Agents"), and except for obligations, liabilities, duties and responsibilities, if any, expressly assumed under this Agreement by any Additional Titled DIP ABL Agent, no Additional Titled DIP ABL Agent, in such capacity, has any rights, powers, liabilities, duties or responsibilities hereunder or under any of the

117

other DIP ABL Financing Documents.  Without limiting the foregoing, no Additional Titled DIP ABL Agent shall have nor be deemed to have a fiduciary relationship with any DIP ABL Lender.  At any time that any DIP ABL Lender serving as an Additional Titled DIP ABL Agent shall have transferred to any other Person (other than any Affiliates) all of its interests in the Loan, such DIP ABL Lender shall be deemed to have concurrently resigned as such Additional Titled DIP ABL Agent.

**Section 11.16**    Amendments and Waivers.

(a)    No provision of this Agreement or any other DIP ABL Financing Document may be materially amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by Borrowers, the Required DIP ABL Lenders and any other DIP ABL Lender to the extent required under Section 11.16(b); *provided*, *however*, that (i) DIP ABL Agent shall be entitled, in its sole and absolute discretion, to provide its written consent to a proposed Swap Contract, in each case without the consent of any other DIP ABL Lender and (ii) any Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.

(b)    In addition to the required signatures under Section 11.16(a), no provision of this Agreement or any other DIP ABL Financing Document may be amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by the following Persons:

(i)    if any amendment, waiver or other modification would increase a DIP ABL Lender's funding obligations in respect of any Loan, by such DIP ABL Lender; and/or

(ii)    if the rights or duties of DIP ABL Agent are affected thereby, by DIP ABL Agent;

*provided, however*, that, in each of (i) and (ii) above, no such amendment, waiver or other modification shall, unless signed or otherwise approved in writing by all DIP ABL Lenders directly affected thereby, (A) reduce the principal of, rate of interest on or any fees with respect to any Loan or forgive any principal, interest (other than default interest) or fees (other than late charges) with respect to any Loan; (B) postpone the date fixed for, or waive, any payment (other than any mandatory prepayment pursuant to Section 2.1(b)(ii)) of principal of any Loan, or of interest on any Loan (other than default interest) or any fees provided for hereunder (other than late charges) or postpone the date of termination of any commitment of any DIP ABL Lender hereunder; (C) change the definition of the term Required DIP ABL Lenders or the percentage of DIP ABL Lenders which shall be required for DIP ABL Lenders to take any action hereunder; (D) release all or substantially all of the DIP ABL Collateral, authorize any Borrower to sell or otherwise dispose of all or substantially all of the DIP ABL Collateral or release any Guarantor of all or any portion of the DIP ABL Obligations or its Guarantee obligations with respect thereto, except, in each case with respect to this clause (D), as otherwise may be provided in this Agreement or the other DIP ABL Financing Documents (including in connection with any disposition permitted hereunder); (E) amend, waive or otherwise modify this Section 11.16(b) or the definitions of the terms used in this Section 11.16(b) insofar as the definitions affect the substance of this Section 11.16(b); (F) consent to the assignment, delegation or other transfer by any Credit Party of any of its rights and obligations under any DIP ABL Financing Document or release any Borrower of its payment obligations under any DIP ABL Financing Document, except, in each case with respect to this clause (F), pursuant to a merger or consolidation permitted pursuant to this Agreement; or (G) amend any of the provisions of Section 10.7 or amend any of the definitions Pro Rata Share, DIP Revolving Loan Commitment, DIP Revolving Loan Commitment Amount, DIP Revolving Loan Commitment Percentage, or that provide for DIP ABL

118

Lenders to receive their Pro Rata Shares of any fees, payments, setoffs, increased costs or proceeds of DIP ABL Collateral hereunder.  It is hereby understood and agreed that all DIP ABL Lenders shall be deemed directly affected by an amendment, waiver or other modification of the type described in the preceding clauses (C), (D), (E), (F) and (G) of the preceding sentence.

**Section 11.17**    Assignments and Participations.

(a)    Assignments.

(i)    Any DIP ABL Lender may at any time assign to one or more Eligible Assignees all or any portion of such DIP ABL Lender's Loan together with all related obligations of such DIP ABL Lender hereunder.  Except as DIP ABL Agent may otherwise agree, the amount of any such assignment (determined as of the date of the applicable Assignment Agreement or, if a "**Trade Date**" is specified in such Assignment Agreement, as of such Trade Date) shall be in a minimum aggregate amount equal to $1,000,000 or, if less, the assignor's entire interests in the outstanding Loan; *provided, however,* that, in connection with simultaneous assignments to two or more related Approved Funds, such assignments shall be treated as one assignee for purposes of determining compliance with the minimum assignment size referred to above.  Borrowers and DIP ABL Agent shall be entitled to continue to deal solely and directly with such DIP ABL Lender in connection with the interests so assigned to an Eligible Assignee until DIP ABL Agent shall have received and accepted an effective Assignment Agreement executed, delivered and fully completed by the applicable parties thereto and a processing fee of $3,500 to be paid by the assigning DIP ABL Lender; *provided, however,* that only one processing fee shall be payable in connection with simultaneous assignments to two or more related Approved Funds.  Substantially concurrent with any assignment, DIP ABL Agent shall provide notice of such assignment to the Borrower Representative.  Without limiting the foregoing, on or prior to the date on which any assignee becomes a DIP ABL Lender under this Agreement, such assignee shall have provided all documentation to Borrower Representative as is required to be delivered by it pursuant to Section 2.8(c) and/or 2.8(e).

(ii)    From and after the date on which the conditions described above have been met, (A) such Eligible Assignee shall be deemed automatically to have become a party hereto and, to the extent of the interests assigned to such Eligible Assignee pursuant to such Assignment Agreement, shall have the rights and obligations of a DIP ABL Lender hereunder, and (B) the assigning DIP ABL Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, shall be released from its rights and obligations hereunder (other than those that survive termination pursuant to Section 12.1).  Upon the request of the Eligible Assignee (and, as applicable, the assigning DIP ABL Lender) pursuant to an effective Assignment Agreement, each Borrower shall execute and deliver to DIP ABL Agent for delivery to the Eligible Assignee (and, as applicable, the assigning DIP ABL Lender) Notes in the aggregate principal amount of the Eligible Assignee's Loan (and, as applicable, Notes in the principal amount of that portion of the principal amount of the Loan retained by the assigning DIP ABL Lender).  Upon receipt by the assigning DIP ABL Lender of such Note, the assigning DIP ABL Lender shall return to Borrower Representative any prior Note held by it.

(iii)    DIP ABL Agent, acting solely for this purpose as an agent of Borrower, shall maintain at the office of its servicer located in Bethesda, Maryland a copy of each

119

Assignment Agreement delivered to it and a register for the recordation of the names and addresses of each DIP ABL Lender, and the commitments of, and principal amount (and stated interest) of the Loan owing to, such DIP ABL Lender pursuant to the terms hereof from time to time. The entries in such register shall be conclusive, and Borrower, DIP ABL Agent and DIP ABL Lenders may treat each Person whose name is recorded therein pursuant to the terms hereof as a DIP ABL Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. Such register shall be available for inspection by Borrower and any DIP ABL Lender, at any reasonable time upon reasonable prior notice to DIP ABL Agent. No assignment of a Loan or commitment will be effective unless and until it is recorded in such register.

        (iv)     Notwithstanding the foregoing provisions of this Section 11.17(a) or any other provision of this Agreement, any DIP ABL Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such DIP ABL Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided, however,* that no such pledge or assignment shall release such DIP ABL Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such DIP ABL Lender as a party hereto.

        (v)     Notwithstanding the foregoing provisions of this Section 11.17(a) or any other provision of this Agreement, DIP ABL Agent has the right, but not the obligation, to effectuate assignments of Loan via an electronic settlement system acceptable to DIP ABL Agent as designated in writing from time to time to DIP ABL Lenders by DIP ABL Agent (the "**Settlement Service**"). At any time when DIP ABL Agent elects, in its sole discretion, to implement such Settlement Service, each such assignment shall be effected by the assigning DIP ABL Lender and proposed assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be consistent with the other provisions of this Section 11.17(a), including the registration requirement of Section 11.17(a)(iv). Each assigning DIP ABL Lender and proposed Eligible Assignee shall comply with the requirements of the Settlement Service in connection with effecting any assignment of Loan pursuant to the Settlement Service. With the prior written approval of DIP ABL Agent, DIP ABL Agent's approval of such Eligible Assignee shall be deemed to have been automatically granted with respect to any transfer effected through the Settlement Service. Assignments and assumptions of the Loan shall be effected by the provisions otherwise set forth herein until DIP ABL Agent notifies DIP ABL Lenders of the Settlement Service as set forth herein.

(b)     <u>Participations</u>.

        (i)     Any DIP ABL Lender may at any time, without the consent of, or notice to, any Borrower or DIP ABL Agent, sell to one or more Persons (other than any Borrower or any Borrower's Affiliates) participating interests in its Loan, commitments or other interests hereunder (any such Person, a "**Participant**"). In the event of a sale by a DIP ABL Lender of a participating interest to a Participant, (i) such DIP ABL Lender's obligations hereunder shall remain unchanged for all purposes, (ii) Borrowers and DIP ABL Agent shall continue to deal solely and directly with such DIP ABL Lender in connection with such DIP ABL Lender's rights and obligations hereunder, and (iii) all amounts payable by each Borrower shall be determined as if such DIP ABL Lender had not sold such participation and shall be paid directly to such DIP ABL Lender. Each Borrower agrees that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the

120

right of set-off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a DIP ABL Lender under this Agreement; *provided, however*, that such right of set-off shall be subject to the obligation of each Participant to share with DIP ABL Lenders, and DIP ABL Lenders agree to share with each Participant, as provided in Section 11.13.

(ii)     Any agreement or instrument pursuant to which a DIP ABL Lender sells a participation shall provide that such DIP ABL Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such DIP ABL Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the proviso to Section 11.16(b) that affects such Participant. The Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.8 and 2.13 (it being understood that the documentation required under Section 2.8(c) or 2.8(e) shall be delivered to the participating DIP ABL Lender) to the same extent as if it were a DIP ABL Lender and had acquired its interest by assignment pursuant to Section 11.17(a); *provided* that such Participant (A) agrees to be subject to the provisions of Section 11.17(c) as if it were an assignee under Section 11.17(a), subject to the requirements and limitations therein; and (B) shall not be entitled to receive any greater payment under Sections 2.8 and 2.13 with respect to any participation than its participating DIP ABL Lender would have been entitled to receive. Each DIP ABL Lender that sells participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 11.17(c) with respect to any Participant.  Each DIP ABL Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the DIP ABL Financing Documents (the "**Participant Register**"); provided that no DIP ABL Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, or its other obligations under any DIP ABL Financing Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such DIP ABL Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt DIP ABL Agent (in its capacity as DIP ABL Agent) shall have no responsibility for maintaining a Participant Register.

(c)     Replacement of DIP ABL Lenders.  Within thirty (30) days after: (i) receipt by DIP ABL Agent of notice and demand from any DIP ABL Lender for payment of additional costs as provided in Sections 2.8 and 2.13, which demand shall not have been revoked, (ii) any Borrower is required to pay any additional amount to any DIP ABL Lender or any Governmental Authority for the account of any DIP ABL Lender pursuant to Section 2.8(a) through (g), (iii) any DIP ABL Lender is a Defaulted DIP ABL Lender, and the circumstances causing such status shall not have been cured or waived; or (iv) any failure by any DIP ABL Lender to consent to a requested amendment, waiver or modification to any DIP ABL Financing Document in which Required DIP ABL Lenders have already consented to such amendment, waiver or modification but the consent of each DIP ABL Lender, or each

121

DIP ABL Lender affected thereby, is required with respect thereto (each relevant DIP ABL Lender in the foregoing clauses (i) through (iv) being an "**Affected DIP ABL Lender**") each of Borrower Representative and DIP ABL Agent may, at its option, notify such Affected DIP ABL Lender and, in the case of Borrowers' election, DIP ABL Agent, of such Person's intention to obtain, at Borrowers' expense, a replacement DIP ABL Lender ("**Replacement DIP ABL Lender**") for such DIP ABL Lender, which Replacement DIP ABL Lender shall be an Eligible Assignee and, in the event the Replacement DIP ABL Lender is to replace an Affected DIP ABL Lender described in the preceding clause (iv), such Replacement DIP ABL Lender consents to the requested amendment, waiver or modification making the replaced DIP ABL Lender an Affected DIP ABL Lender.  In the event Borrowers or DIP ABL Agent, as applicable, obtains a Replacement DIP ABL Lender within ninety (90) days following notice of its intention to do so, the Affected DIP ABL Lender shall sell, at par, and assign all of its Loan and funding commitments hereunder to such Replacement DIP ABL Lender in accordance with the procedures set forth in Section 11.17(a); *provided, however,* that (A) Borrowers shall have reimbursed such DIP ABL Lender for its increased costs and additional payments for which it is entitled to reimbursement under Sections 2.8 and 2.13, as applicable, of this Agreement through the date of such sale and assignment, and (B) Borrowers or, at the Borrowers' option, Replacement DIP ABL Lender shall pay to DIP ABL Agent the $3,500 processing fee in respect of such assignment.  In the event that a replaced DIP ABL Lender does not execute an Assignment Agreement pursuant to Section 11.17(a) within three (3) Business Days after receipt by such replaced DIP ABL Lender of notice of replacement pursuant to this Section 11.17(c) and presentation to such replaced DIP ABL Lender of an Assignment Agreement evidencing an assignment pursuant to this Section 11.17(c), such replaced DIP ABL Lender shall be deemed to have consented to the terms of such Assignment Agreement, and any such Assignment Agreement executed by DIP ABL Agent, the Replacement DIP ABL Lender and, to the extent required pursuant to Section 11.17(a), Borrowers, shall be effective for purposes of this Section 11.17(c) and Section 11.17(a). Upon any such assignment and payment, such replaced DIP ABL Lender shall no longer constitute a "DIP ABL Lender" for purposes hereof, other than with respect to such rights and obligations that survive termination as set forth in Section 12.1.

(d)    Credit Party Assignments.  No Credit Party may assign, delegate or otherwise transfer any of its rights or other obligations hereunder or under any other DIP ABL Financing Document without the prior written consent of DIP ABL Agent and each DIP ABL Lender.

**Section 11.18**    Buy-Out Upon Refinancing.  MFT shall have the right to purchase from the other DIP ABL Lenders all of their respective interests in the Loan at par in connection with any refinancing of the Loan upon one or more new economic terms, but which refinancing is structured as an amendment and restatement of the Loan rather than a payoff of the Loan.

### ARTICLE 12 - MISCELLANEOUS

**Section 12.1**    Survival.  All agreements, representations and warranties made herein and in every other DIP ABL Financing Document shall survive the execution and delivery of this Agreement and the other DIP ABL Financing Documents.  The provisions of Section 2.8, Section 2.9, Section 2.13, Article 11 (other than Sections 11.14 (other than the last sentence thereof) and Sections 11.16 through 11.18), and Section 12.8, Section 12.14 and Section 12.16 (and any other provision herein expressly stated to survive termination) shall survive the payment of the DIP ABL Obligations (both with respect to any DIP ABL Lender and all DIP ABL Lenders collectively) and any termination of this Agreement and any judgment with respect to any DIP ABL Obligations, including any final foreclosure judgment with respect to any Security Document, and no unpaid or unperformed, current or future, DIP ABL Obligations will merge into any such judgment.

**Section 12.2**      No Waivers.  No failure or delay by DIP ABL Agent or any DIP ABL Lender in exercising any right, power or privilege under any DIP ABL Financing Document shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein and therein provided shall be cumulative and not exclusive of any rights or remedies provided by law.  Any reference in any DIP ABL Financing Document to the "continuing" nature of any DIP Event of Default shall not be construed as establishing or otherwise indicating that any Borrower or any other Credit Party has the independent right to cure any such DIP Event of Default, but is rather presented merely for convenience should such DIP Event of Default be waived in accordance with the terms of the applicable DIP ABL Financing Documents.

**Section 12.3**      Notices.

(a)      All notices, requests and other communications to any party hereunder shall be in writing (including prepaid overnight courier, facsimile transmission or similar writing) and shall be given to such party at its address, facsimile number or e-mail address set forth on the signature pages hereof (or, in the case of any such DIP ABL Lender who becomes a DIP ABL Lender after the date hereof, in an assignment agreement or in a notice delivered to Borrower Representative and DIP ABL Agent by the assignee DIP ABL Lender forthwith upon such assignment) or at such other address, facsimile number or e-mail address as such party may hereafter specify for the purpose by notice to DIP ABL Agent and Borrower Representative; provided, however, that notices, requests or other communications shall be permitted by electronic means only in accordance with the provisions of Section 12.3(b) and (c).  Each such notice, request or other communication shall be effective (i) if given by facsimile, when such notice is transmitted to the facsimile number specified by this Section 12.3 and the sender receives a confirmation of transmission from the sending facsimile machine, or (ii) if given by mail, prepaid overnight courier or any other means, when received or when receipt is refused at the applicable address specified by this Section 12.3(a).

(b)      Notices and other communications to the parties hereto may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved from time to time by DIP ABL Agent, provided, however, that the foregoing shall not apply to notices sent directly to any DIP ABL Lender if such DIP ABL Lender has notified DIP ABL Agent that it is incapable of receiving notices by electronic communication.  DIP ABL Agent or Borrower Representative may, in their discretion, agree to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by it, *provided*, *however*, that approval of such procedures may be limited to particular notices or communications.

(c)      Unless DIP ABL Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor, provided, however, that if any such notice or other communication is not sent or posted during normal business hours, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day.

**Section 12.4**      Severability.  In case any provision of or obligation under this Agreement or any other DIP ABL Financing Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

123

Section 12.5    Headings.  Headings and captions used in the DIP ABL Financing Documents (including the Exhibits, Schedules and Annexes hereto and thereto) are included for convenience of reference only and shall not be given any substantive effect.

Section 12.6    Confidentiality.

(a)    Each Credit Party agrees (i) not to transmit or disclose provisions of any DIP ABL Financing Document to any Person (other than to each Credit Party's current and prospective direct and indirect financing sources, acquirors and holders of Indebtedness of Credit Parties and the Credit Parties' direct and indirect equityholders, and its and their respective attorneys, advisors, directors, managers and officers on a need-to-know basis or as otherwise may be required by law, subpoena, judicial order or similar order or in connection with any litigation) without DIP ABL Agent's prior written consent, and (ii) to inform all Persons of the confidential nature of the DIP ABL Financing Documents and to direct them not to disclose the same to any other Person and to require each of them to be bound by these provisions, in each case within the foregoing clauses (i) and (ii), without limiting the Credit Parties' and their direct and indirect equityholders' right to incorporate any terms of the DIP ABL Financing Documents into their financial statements and other financial materials.

(b)    DIP ABL Agent and each DIP ABL Lender shall hold all non-public information regarding the Credit Parties and their respective businesses obtained by DIP ABL Agent or any DIP ABL Lender in connection with the DIP ABL Financing Documents in accordance with how such Person customarily requires a third-party to handle its non-public information, except that disclosure of such information may be made  (i) to their respective agents, employees, Subsidiaries, Affiliates, attorneys, auditors, professional consultants, rating agencies, insurance industry associations and portfolio management services (in each case, on a need-to-know basis), (ii) to prospective transferees or purchasers of any interest in the Loans, DIP ABL Agent or a DIP ABL Lender, and to prospective contractual counterparties (or the professional advisors thereto) in Swap Contracts permitted hereby, *provided, however*, that any such Persons are bound by customary obligations of confidentiality, (iii) as required by Requirements of Law, subpoena, judicial order or similar order and in connection with any litigation, (iv) as may be required in connection with the examination, audit or similar investigation of such Person, and (v) to a Person that is a trustee, investment advisor or investment manager, collateral manager, servicer, noteholder or secured party in a Securitization (as hereinafter defined) in connection with the administration, servicing and reporting on the assets serving as collateral for such Securitization. For the purposes of this Section, "**Securitization**" means (A) the pledge of the Loans as collateral security for loans to a DIP ABL Lender, or (B) a public or private offering by a DIP ABL Lender or any of its Affiliates or their respective successors and assigns, of securities which represent an interest in, or which are collateralized, in whole or in part, by the Loans; *provided*, that such person are bound by customary obligations of confidentiality.  Confidential information shall not include information that:  (x) has been identified in writing as public by the Borrower Representative, (y) is in the public domain, or becomes part of the public domain after disclosure to such Person through no fault of such Person or such Person's agents, employees, Subsidiaries, Affiliates, attorneys, auditors, professional consultants, rating agencies, insurance industry associations and portfolio management services or (z) is disclosed to such Person by a Person other than a Credit Party, *provided, however*, DIP ABL Agent does not have actual knowledge that such Person is prohibited from disclosing such information.  The obligations of DIP ABL Agent and DIP ABL Lenders under this Section 12.6 shall supersede and replace the obligations of DIP ABL Agent and DIP ABL Lenders under any confidentiality agreement in respect of this financing executed and delivered by DIP ABL Agent or any DIP ABL Lender prior to the date hereof.  Notwithstanding the foregoing, DIP ABL Agent or the respective DIP ABL Lender shall use commercially reasonable efforts to ensure any Person that is controlled by or acts at the direction of such DIP ABL Agent or DIP ABL Lender maintains the confidentiality of information provided to such Person by DIP ABL Agent or DIP ABL Lender, as applicable.

124

**Section 12.7**    Other Damages.   No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other DIP ABL Financing Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Indemnitee results from such Indemnitee's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

**Section 12.8**    GOVERNING LAW; SUBMISSION TO JURISDICTION.

(a)    THIS AGREEMENT, EACH NOTE AND EACH OTHER DIP ABL FINANCING DOCUMENT, AND ALL DISPUTES AND OTHER MATTERS RELATING HERETO OR THERETO OR ARISING THEREFROM (WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE), SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)    EACH PARTY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION (OR IF THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION LOCATED IN THE STATE OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK) TO HEAR AND DETERMINE ANY SUCH CLAIMS OR DISPUTES; PROVIDED THAT EACH PARTY ACKNOWLEDGES THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT.   EACH BORROWER EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. EACH BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH BORROWER BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH BORROWER AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

**Section 12.9**    WAIVER OF JURY TRIAL.   EACH BORROWER, DIP ABL AGENT AND DIP ABL LENDERS HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE DIP ABL FINANCING DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.   EACH BORROWER, DIP ABL AGENT AND EACH DIP ABL LENDER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER DIP ABL FINANCING DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS.   EACH BORROWER, DIP ABL AGENT AND EACH DIP ABL LENDER WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

**Section 12.10**    Publication; Advertisement.

(a)    Publication.   No Credit Party will directly or indirectly publish, disclose or otherwise use in any public disclosure, advertising material, promotional material, press release or

125

interview, any reference to the name, logo or any trademark of MFT or any of its Affiliates or any reference to this Agreement or the financing evidenced hereby, in any case except (i) as required by Requirements of Law, subpoena or judicial or similar order, in which case the applicable Credit Party shall, to the extent permitted, give DIP ABL Agent prior written notice of such publication or other disclosure, (ii) in the ordinary course of business when describing the capital structure of the Credit Parties, (iii) in connection with debt or equity financing by the Credit Parties (including any marketing or other efforts to obtain such financing) or (iv) with MFT's prior written consent (such consent not to be unreasonably withheld, conditioned or delayed).

(b)    Advertisement.  Each DIP ABL Lender and each Credit Party hereby authorizes MFT to publish, at MFT's sole expense, the name of such DIP ABL Lender and Credit Party, the existence of the financing arrangements referenced under this Agreement, the primary purpose and/or structure of those arrangements, the amount of credit extended under each facility, the title and role of each party to this Agreement, and the total amount of the financing evidenced hereby in any "tombstone", comparable advertisement or press release which MFT elects to submit for publication.  In addition, each DIP ABL Lender and each Credit Party agrees that, at MFT's sole expense, MFT may provide lending industry trade organizations with information necessary and customary for inclusion in league table measurements after the Closing Date.  With respect to any of the foregoing, MFT shall provide Borrowers with an opportunity to review and confer with MFT regarding the contents of any such tombstone, advertisement or information, as applicable, prior to its submission for publication and, following such review period, MFT may, from time to time, publish, at MFT's sole expense, such information in any media form desired by MFT, until such time that Borrowers shall have requested MFT cease any such further publication.

**Section 12.11**    Counterparts; Integration.  This Agreement and the other DIP ABL Financing Documents may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  Signatures by facsimile or by electronic mail delivery of an executed version of any executed signature page shall bind the parties hereto.  This Agreement and the other DIP ABL Financing Documents constitute the entire agreement and understanding among the parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

**Section 12.12**    No Strict Construction.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.  To the extent that there is a conflict between this Agreement and the Interim DIP Order or the Final DIP Order, as applicable, then the Interim DIP Order or the Final DIP Order, as applicable, shall control.

**Section 12.13**    DIP ABL Lender Approvals.  Unless expressly provided herein to the contrary, any approval, consent, waiver or satisfaction of DIP ABL Agent or DIP ABL Lenders with respect to any matter that is the subject of this Agreement, the DIP Orders, or the other DIP ABL Financing Documents may be granted or withheld by DIP ABL Agent and DIP ABL Lenders in their good faith discretion and credit judgment.

**Section 12.14**    Expenses; Indemnity; Waiver of Consequential Damages, etc.

(a)    Borrowers hereby agree to promptly pay (i) all reasonable and documented costs and expenses of DIP ABL Agent (including, without limitation, the reasonable and documented fees, costs and expenses of counsel to, and independent appraisers and consultants retained by DIP ABL Agent

(which shall exclude any fees, costs or expenses of in-house counsel and shall be limited to one firm of counsel, and, if necessary, one firm of local counsel in each appropriate jurisdiction, and one specialist counsel for each appropriate specialty, and which include initially as of the Closing Date, Hogan Lovells US LLP, as counsel, and Morris, Nichols, Arsht & Tunnell LLO as bankruptcy counsel and Delaware local counsel) in connection with the examination, review, due diligence investigation, documentation, negotiation, closing and syndication of the transactions contemplated by the DIP ABL Financing Documents), in connection with the performance by DIP ABL Agent of its rights and remedies under the DIP ABL Financing Documents and in connection with the continued administration of the DIP ABL Financing Documents including (A) any amendments, modifications, consents and waivers to and/or under any and all DIP ABL Financing Documents, and (B) any reasonable periodic public record searches conducted by or at the request of DIP ABL Agent (including, without limitation, title investigations, UCC searches, fixture filing searches, judgment, pending litigation and tax lien searches and searches of applicable corporate, limited liability, partnership and related records concerning the continued existence, organization and good standing of certain Persons); (ii) without limitation of the preceding clause (i), all reasonable and documented costs and expenses of DIP ABL Agent in connection with the creation, perfection and maintenance of Liens pursuant to the DIP ABL Financing Documents; (iii) without limitation of the preceding clause (i), all costs and expenses of DIP ABL Agent in connection with (A) protecting, storing, insuring, handling, maintaining or selling any DIP ABL Collateral, (B) any litigation, dispute, suit or proceeding relating to any DIP ABL Financing Document, and (C) any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all of the DIP ABL Financing Documents; (iv) without limitation of the preceding clause (i), all reasonable and documented costs and expenses of DIP ABL Agent in connection with DIP ABL Agent's reservation of funds in anticipation of the funding of the initial Loans to be made hereunder; and (v) all costs and expenses incurred by DIP ABL Lenders in connection with any litigation, dispute, suit or proceeding relating to any DIP ABL Financing Document and in connection with any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all DIP ABL Financing Documents, whether or not DIP ABL Agent or DIP ABL Lenders are a party thereto and, in each case, excluding any costs and expenses (x) arising from the gross negligence, bad faith or willful misconduct of DIP ABL Agent, as determined by a final non-appealable judgment of a court of competent jurisdiction, (y) arising out of, or in connection with, any proceeding or other matter that does not involve an act or omission by the Credit Parties or any of their affiliates and that is brought by DIP ABL Agent, in its capacity not as DIP ABL Agent or (z) arising from a material breach of the obligations of DIP ABL Agent or any of its affiliates under any DIP ABL Financing Document (as determined by a court of competent jurisdiction in a final and non-appealable decision).

(b)     Each Borrower hereby agrees to indemnify, pay and hold harmless DIP ABL Agent and DIP ABL Lenders and the officers, directors, employees, trustees, agents, investment advisors and investment managers, collateral managers, servicers, and counsel of DIP ABL Agent and DIP ABL Lenders (collectively called the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (excluding any costs of in house counsel and including the reasonable fees and disbursements of counsel for such Indemnitee, which shall be limited to one firm of counsel for all similarly situated Indemnitees and if necessary, one firm of local counsel in each appropriate jurisdiction, one specialist counsel for each appropriate specialty and, in the case of an actual conflict of interest, one additional firm of counsel for such affected Indemnitees and one firm of local counsel in each appropriate jurisdiction) in connection with any investigative, response, remedial, administrative or judicial matter or proceeding, whether or not such Indemnitee shall be designated a party thereto and including any such proceeding initiated by or on behalf of a Credit Party, and the reasonable expenses of investigation by engineers, environmental consultants and similar technical personnel retained by DIP ABL Agent or DIP ABL Lenders and any commission, fee or compensation claimed by Cantor in connection with arranging this financing facility, which may be imposed on, incurred by or asserted against such Indemnitee as a

127

result of or in connection with the transactions contemplated hereby or by the other DIP ABL Financing Documents (including (i)(A) as a direct or indirect result of the presence on or under, or escape, seepage, leakage, spillage, discharge, emission or release from, any property now or previously owned, leased or operated by Borrower, any Subsidiary or any other Person of any Hazardous Materials, (B) arising out of or relating to the offsite disposal of any materials generated or present on any such property, or (C) arising out of or resulting from the environmental condition of any such property or the applicability of any governmental requirements relating to Hazardous Materials, whether or not occasioned wholly or in part by any condition, accident or event caused by any act or omission of Borrower or any Subsidiary, and (ii) proposed and actual extensions of credit under this Agreement) and the use or intended use of the proceeds of the Loans, except that Borrower shall have no obligation hereunder to an Indemnitee with respect to any liability (x) resulting from the gross negligence, bad faith or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction or (y) arising out of, or in connection with, any proceeding or other matter that does not involve an act or omission by the Credit Parties or any of their affiliates and that is brought by an Indemnitee against any other Indemnitee (other than in its capacity as DIP ABL Agent) or (z) arising from a material breach of the obligations of such Indemnitees or any of its affiliates under this Agreement or any DIP ABL Financing Document (as determined by a court of competent jurisdiction in a final non-appealable decision).    To the extent that the undertaking set forth in the immediately preceding sentence may be unenforceable, each Borrower shall contribute the maximum portion which it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all such indemnified liabilities incurred by the Indemnitees or any of them.  This Section 12.14 shall not apply with respect to Taxes other than any Taxes that represent losses, damages, etc. arising from any non-Tax claim.

(c)    Notwithstanding any contrary provision in this Agreement, the obligations of Borrowers under this Section 12.14 shall survive the payment in full of the DIP ABL Obligations and the termination of this Agreement.  NO PARTY HEREUNDER SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY DIP ABL FINANCING DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR SPECIAL, INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES UNDER THIS AGREEMENT OR ANY OTHER DIP ABL FINANCING DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER; *PROVIDED*, THAT NOTHING CONTAINED IN THIS SENTENCE SHALL LIMIT THE CREDIT PARTIES' INDEMNIFICATION OBLIGATIONS TO THE EXTENT SET FORTH HEREIN TO THE EXTENT SUCH SPECIAL, INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ARE INCLUDED IN ANY THIRD PARTY CLAIM IN CONNECTION WITH WHICH SUCH INDEMNITEE IS ENTITLED TO INDEMNIFICATION HEREUNDER OR PURSUANT TO THE DIP ORDERS.

(d)    It is understood and agreed that the indemnification obligations under the Prepetition ABL Financing Documents shall survive the Closing Date and the repayment of any Indebtedness thereunder and exercise of any remedies in connection therewith and shall continue as indemnification obligations hereunder following the Closing Date or exercise of any such remedies subject to the terms hereof and thereof.

**Section 12.15**    Reserved.

**Section 12.16**    Reinstatement.  This Agreement shall remain in full force and effect and continue to be effective should any petition or other proceeding be filed by or against any Credit Party for liquidation or reorganization, should any Credit Party become insolvent or make an assignment for the benefit of any creditor or creditors or should an interim receiver, receiver, receiver and manager or trustee be appointed for all or any significant part of any Credit Party's assets, and shall continue to be effective

128

or to be reinstated, as the case may be, if at any time payment and performance of the DIP ABL Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the DIP ABL Obligations, whether as a fraudulent preference reviewable transaction or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the DIP ABL Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

**Section 12.17**    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of Borrowers and DIP ABL Agent and each DIP ABL Lender and their respective successors and permitted assigns.

**Section 12.18**    USA PATRIOT Act Notification, Beneficial Ownership Certificate.  DIP ABL Agent (for itself and not on behalf of any DIP ABL Lender) and each DIP ABL Lender hereby notifies Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record certain information and documentation that identifies Borrowers, which information includes the name and address of Borrower and such other information that will allow DIP ABL Agent or such DIP ABL Lender, as applicable, to identify Borrowers in accordance with the USA PATRIOT Act.  Promptly following any request therefor, Borrowers shall provide any and all such information and documentation as may be reasonably requested by the DIP ABL Agent or any DIP ABL Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA PATRIOT Act and the Beneficial Ownership Regulation.  To the extent a Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, such information and documentation shall include a Beneficial Ownership Certification in relation to such Borrower, including, for the avoidance of doubt, a duly executed IRS Form W-9.

**Section 12.19**    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any DIP ABL Financing Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any DIP ABL Financing Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other DIP ABL Financing Document; or

(iii)    the variation of the terms of such liability  in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

129

**Section 12.20**     Modification of Prepetition ABL Financing Documents. Nothing herein is intended to or shall modify, waive or amend any obligations of Borrower or any DIP ABL Lender under the Prepetition ABL Financing Documents or Prepetition Term Loan Documents or the rights, relative priority or interests of the Prepetition ABL Agent or Prepetition Term Loan Agents (on behalf of themselves and the Prepetition ABL Lenders and Prepetition Term Loan Lenders, as applicable) under the Prepetition ABL Financing Documents or Prepetition Term Loan Documents, as applicable.

**Section 12.21**     Incorporation of DIP Orders by Reference. Each of Borrower, DIP ABL Agent, and DIP ABL Lenders agrees that any reference contained herein to the DIP Orders include all terms, conditions, and provisions of such DIP Order and that the DIP Order is incorporated herein for all purposes. To the extent there is any inconsistency between the terms of this Agreement and the terms of the DIP Orders, the terms of the DIP Orders shall govern.

**[SIGNATURES APPEAR ON FOLLOWING PAGE(S)]**

130

*(Signature Page to Credit Agreement)*

**IN WITNESS WHEREOF**, intending to be legally bound, each of the parties have caused this Agreement to be executed the day and year first above mentioned.

**BORROWERS:**

**BLACKHAWK MINING LLC**
**BLACKHAWK COAL SALES, LLC**
**BLACKHAWK LAND AND RESOURCES, LLC**
**BLACKHAWK RIVER LOGISTICS, LLC**
**BLUE CREEK MINING, LLC**
**BLUE DIAMOND MINING, LLC**
**EAGLE SHIELD, LLC**
**FCDC COAL, INC.**
**GUYANDOTTE MINING, LLC**
**HAMPDEN COAL, LLC**
**KANAWHA EAGLE MINING, LLC**
**LOGAN & KANAWHA, LLC**
**PANTHER CREEK MINING, LLC**
**PINE BRANCH LAND, LLC**
**PINE BRANCH MINING, LLC**
**PINE BRANCH RESOURCES, LLC**
**REDHAWK MINING, LLC**
**ROCKWELL MINING, LLC**
**SPRUCE PINE LAND COMPANY**
**SPURLOCK MINING, LLC**
**TRIAD MINING, LLC**
**TRIAD TRUCKING, LLC**

By: _____
Name:
Title:

**AGENT**:                                **MIDCAP FUNDING IV TRUST**

By:    Apollo Capital Management, L.P.,
       its investment manager

By:    Apollo Capital Management GP, LLC,
       its general partner


By: _____
Name: Maurice Amsellem
Title:   Authorized Signatory


Address:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  Account Manager for Blackhawk transaction
Facsimile:  301-941-1450
E-mail:  notices@midcapfinancial.com

with a copy to:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  General Counsel
Facsimile:  301-941-1450
E-mail:  legalnotices@midcapfinancial.com


Payment Account Designation

Bank Name: Wells Fargo Bank
Bank Address: 420 Montgomery Street, San Francisco, CA
94163
ABA Number: 121000248
Account Number: 4509127528
Account Name: MIDCAP FUNDING IV TRUST- Collections
Ref: Blackhawk facility

**LENDER**:                              **MIDCAP FINANCIAL TRUST**

By:   Apollo Capital Management, L.P.,
      its investment manager

By:   Apollo Capital Management GP, LLC,
      its general partner

      By: _____
      Name: Maurice Amsellem
      Title:   Authorized Signatory

<u>Address</u>:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  Account Manager for Blackhawk transaction
Facsimile:  301-941-1450
E-mail:  <u>notices@midcapfinancial.com</u>

with a copy to:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn:  General Counsel
Facsimile:  301-941-1450
E-mail:  <u>legalnotices@midcapfinancial.com</u>

## ANNEXES, EXHIBITS AND SCHEDULES

### ANNEXES

| Annex A | Commitment Annex |
| Annex B | Subsidiary Borrowers |

### EXHIBITS

| Exhibit A | First Day Motions |
|---|---|
| Exhibit B | Form of Compliance Certificate |
| Exhibit C | Borrowing Base Certificate |
| Exhibit D | Form of Notice of Borrowing |
| Exhibit E | Form of Security Agreement |
| Exhibit F | Closing Checklist |
| Exhibit G-1 | Form of U.S. Tax Compliance Certificate |
| Exhibit G -2 | Form of U.S. Tax Compliance Certificate |
| Exhibit G -3 | Form of U.S. Tax Compliance Certificate |
| Exhibit G -4 | Form of U.S. Tax Compliance Certificate |
| Exhibit H | Budget |
| Exhibit I | Interim DIP Order |

### SCHEDULES

| Schedule 3.12(c) | Certain Properties |
| Schedule 5.1 | Liens |
| Schedule 5.4(a) | Indebtedness |
| Schedule 5.6 | Transactions with Affiliates |
| Schedule 7.1(g) | Closing Date Consents |
| Schedule 7.4 | Post-Closing DIP ABL Obligations |

**ANNEX A TO DIP ABL CREDIT AGREEMENT (COMMITMENT ANNEX)**

| DIP ABL Lender | DIP Revolving Loan Commitment Amount<br><br>(from the Closing Date through the Final DIP Order Entry Date) | DIP Revolving Loan Commitment Percentage<br><br>(from the Closing Date through the Final DIP Order Entry Date) | DIP Revolving Loan Commitment Amount<br><br>(immediately after the Final DIP Order Entry Date) | DIP Revolving Loan Commitment Percentage<br><br>(immediately after the Final DIP Order Entry Date) |
|---|---|---|---|---|
| MidCap Financial Trust | The sum of (1) the amount of the Prepetition ABL Obligations that have been paid pursuant to Section 2.11 plus (2) $5,000,000 | 100% | $90,000,000.00 | 100% |
| **TOTALS** | **The sum of (1) the amount of the Prepetition ABL Obligations that have been paid pursuant to Section 2.11 plus (2) $5,000,000** | **100%** | **$90,000,000.00** | **100%** |

**ANNEX B TO DIP ABL CREDIT AGREEMENT (SUBSIDIARY BORROWER ANNEX)**

Blue Diamond Mining, LLC, a Delaware limited liability company

Triad Mining, LLC, a Delaware limited liability company

Triad Trucking, LLC, an Indiana limited liability company

Hampden Coal, LLC, a Delaware limited liability company

Logan & Kanawha, LLC, a Delaware limited liability company

Spurlock Mining, LLC, a Kentucky limited liability company

Redhawk Mining, LLC, a Kentucky limited liability company

Spruce Pine Land Company, a Kentucky corporation

Pine Branch Mining, LLC, a Kentucky limited liability company

Pine Branch Resources, LLC, a Delaware limited liability company

Pine Branch Land, LLC, a Delaware limited liability company

FCDC Coal, Inc., a Delaware corporation

Eagle Shield, LLC, a Kentucky limited liability company

Blackhawk Coal Sales, LLC, a Delaware limited liability company

Blackhawk Land and Resources, LLC, a Delaware limited liability company

Blue Creek Mining, LLC, a Delaware limited liability company

Panther Creek Mining, LLC, a Delaware limited liability company

Rockwell Mining, LLC, a Delaware limited liability company

Guyandotte Mining, LLC, a Delaware limited liability company

Kanawha Eagle Mining, LLC, a Delaware limited liability company

Blackhawk River Logistics, LLC, a Delaware limited liability company

**EXHIBIT A TO DIP ABL CREDIT AGREEMENT (RESERVED)**

**EXHIBIT B TO DIP ABL CREDIT AGREEMENT (COMPLIANCE CERTIFICATE)**

**COMPLIANCE CERTIFICATE**

Date: _____, 201__

This Compliance Certificate is given by _____, a Responsible Officer of _____ LLC, a Kentucky limited liability company (the "**Borrower Representative**"), pursuant to that certain Senior Secured Superpriority Debtor In Possession ABL Credit Agreement, dated as of July __, 2019 among the Borrower Representative, certain subsidiaries of the Borrower Representative set forth on Annex B thereto and any additional Borrower that may hereafter be added thereto (collectively, "**Borrowers**"), MidCap Funding IV Trust, a Delaware statutory trust, as DIP ABL Agent, and Midcap Financial Trust, a Delaware statutory trust, and the financial institutions or other entities from time to time parties hereto, each as a DIP ABL Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**DIP ABL Credit Agreement**"). Capitalized terms used herein without definition shall have the meanings set forth in the DIP ABL Credit Agreement.

The undersigned Responsible Officer hereby certifies to DIP ABL Agent and DIP ABL Lenders that:

(a)    the financial statements delivered with this certificate in accordance with Section 4.1[(a)]/[(b)] of the DIP ABL Credit Agreement fairly present in all material respects the results of operations and financial condition of Borrowers and their Consolidated Subsidiaries as of the dates and the accounting period covered by such financial statements;

(b)    I have reviewed the terms of the DIP ABL Credit Agreement and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and conditions of Borrowers and their Consolidated Subsidiaries during the accounting period covered by such financial statements and such review has not disclosed the existence during or at the end of such accounting period, and I have no knowledge of the existence as of the date hereof, of any condition or event that constitutes a Default or a DIP Event of Default, except as set forth in Schedule 1 hereto, which includes a description of the nature and period of existence of such Default or a DIP Event of Default and what action Borrowers have taken, are undertaking and propose to take with respect thereto;

(c)    except as noted on Perfection Certificate Supplement attached hereto as Schedule 2, there have been no changes to the Perfection Certificate since the Closing Date or, if later, since the date of the most recent certificate delivered pursuant Section 4.1(e), and Credit Parties have otherwise taken all actions required to be taken by them pursuant to the Security Documents in connections with any such changes set forth in such Perfection Certificate Supplement; and

The foregoing certifications and computations are made as of _____, 201__ (end of month) and as of _____, 20____.

Exhibit B

Sincerely,

**BLACKHAWK MINING LLC**, a Kentucky
limited liability company

By: _____
Name: _____
Title: _____

**EXHIBIT C TO DIP ABL CREDIT AGREEMENT (BORROWING BASE CERTIFICATE)**

**EXHIBIT D TO DIP ABL CREDIT AGREEMENT (NOTICE OF BORROWING)**

**NOTICE OF BORROWING**

This Notice of Borrowing is given by _____, a Responsible Officer of **BLACKHAWK MINING LLC**, a Kentucky limited liability company (the "**Borrower Representative**"), pursuant to that certain Senior Secured Superpriority Debtor In Possession ABL Credit Agreement, dated as of July __, 2019 among the Borrower Representative, certain subsidiaries of the Borrower Representative set forth on Annex B thereto and any additional Borrower that may hereafter be added thereto (collectively, "**Borrowers**"), MidCap Funding IV Trust, a Delaware statutory trust, as DIP ABL Agent, and Midcap Financial Trust, a Delaware statutory trust, and the financial institutions or other entities from time to time parties hereto, each as a DIP ABL Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**DIP ABL Credit Agreement**").  Capitalized terms used herein without definition shall have the meanings set forth in the DIP ABL Credit Agreement.

The undersigned Responsible Officer hereby gives notice to DIP ABL Agent of Borrower Representative's request to on _____, 201__ borrow $_____ of Loans on _____, 201__.  Attached is a Borrowing Base Certificate complying in all respects with the DIP ABL Credit Agreement and confirming that, after giving effect to the requested advance, the DIP Revolving Loan Outstandings will not exceed the DIP Revolving Loan Limit.

The undersigned officer hereby certifies that, both before and after giving effect to the request above (a) each of the conditions precedent set forth in Section 7.2 have been satisfied, (b) all of the representations and warranties contained in the DIP ABL Credit Agreement and the other DIP ABL Financing Documents are true, correct and complete as of the date hereof, except to the extent such representation or warranty relates to a specific date, in which case such representation or warranty is true, correct and complete as of such earlier date, (c) no Default or DIP Event of Default has occurred and is continuing on the date hereof, and (d) Borrowers shall not have available cash, including Cash Collateral, in excess of $10,000,000 on either of (A) the date of this request and/or (B) the date of the proposed borrowing.

**IN WITNESS WHEREOF**, the undersigned officer has executed and delivered this Notice of Borrowing this _____ day of _____, 201__.

Sincerely,

**BLACKHAWK MINING LLC**, a Kentucky
limited liability company

By: _____
Name: _____
Title: _____

**EXHIBIT E TO DIP ABL CREDIT AGREEMENT (FORM OF SECURITY AGREEMENT)**

**EXHIBIT F TO DIP ABL CREDIT AGREEMENT (CLOSING CHECKLIST)**

**Exhibit G-1 to DIP ABL Credit Agreement (Form of U.S. Tax Compliance Certificate)**

**U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign DIP ABL Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Senior Secured Superpriority Debtor In Possession ABL Credit Agreement, dated as of July __, 2019 among the Borrower Representative, the other Borrowers listed therein and any additional Borrower that may hereafter be added thereto (collectively, "**Borrowers**"), MidCap Funding IV Trust, a Delaware statutory trust, as DIP ABL Agent, and Midcap Financial Trust, a Delaware statutory trust, and the financial institutions or other entities from time to time parties hereto, each as a DIP ABL Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**DIP ABL Credit Agreement**"). Capitalized terms used herein without definition shall have the meanings set forth in the DIP ABL Credit Agreement.

Pursuant to the provisions of Section 2.8(c) of the DIP ABL Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of any Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished DIP ABL Agent and the Borrower Representative with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower Representative and DIP ABL Agent, and (2) the undersigned shall have at all times furnished the Borrower Representative and DIP ABL Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF DIP ABL LENDER]

By:_____

    Name:

    Title:

Date: _____ __, 20[  ]

**Exhibit G-2 to DIP ABL Credit Agreement (Form of U.S. Tax Compliance Certificate)**

**U.S. TAX COMPLIANCE CERTIFICATE**

**(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is made to that certain Senior Secured Superpriority Debtor In Possession ABL Credit Agreement, dated as of July __, 2019 among the Borrower Representative, the other Borrowers listed therein and any additional Borrower that may hereafter be added thereto (collectively, "**Borrowers**"), MidCap Funding IV Trust, a Delaware statutory trust, as DIP ABL Agent, and Midcap Financial Trust, a Delaware statutory trust, and the financial institutions or other entities from time to time parties hereto, each as a DIP ABL Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**DIP ABL Credit Agreement**").  Capitalized terms used herein without definition shall have the meanings set forth in the DIP ABL Credit Agreement.

Pursuant to the provisions of Section 2.8(c) of the DIP ABL Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of any Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating DIP ABL Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such DIP ABL Lender in writing, and (2) the undersigned shall have at all times furnished such DIP ABL Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

    Name:

    Title:

Date: ＿＿＿＿＿ __, 20[  ]

**Exhibit G-3 to DIP ABL Credit Agreement (Form of U.S. Tax Compliance Certificate)**

**U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Senior Secured Superpriority Debtor In Possession ABL Credit Agreement, dated as of July __, 2019 among the Borrower Representative, the other Borrowers listed therein and any additional Borrower that may hereafter be added thereto (collectively, "**Borrowers**"), MidCap Funding IV Trust, a Delaware statutory trust, as DIP ABL Agent, and Midcap Financial Trust, a Delaware statutory trust, and the financial institutions or other entities from time to time parties hereto, each as a DIP ABL Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**DIP ABL Credit Agreement**"). Capitalized terms used herein without definition shall have the meanings set forth in the DIP ABL Credit Agreement.

Pursuant to the provisions of Section 2.8(c) of the DIP ABL Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of any Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating DIP ABL Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such DIP ABL Lender and (2) the undersigned shall have at all times furnished such DIP ABL Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By:_____

    Name:

    Title:

Date: _____ __, 20[  ]

**Exhibit G-4 to DIP ABL Credit Agreement (Form of U.S. Tax Compliance Certificate)**

**U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign DIP ABL Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to that certain Senior Secured Superpriority Debtor In Possession ABL Credit Agreement, dated as of July \_\_, 2019 among the Borrower Representative, the other Borrowers listed therein and any additional Borrower that may hereafter be added thereto (collectively, "**Borrowers**"), MidCap Funding IV Trust, a Delaware statutory trust, as DIP ABL Agent, and Midcap Financial Trust, a Delaware statutory trust, and the financial institutions or other entities from time to time parties hereto, each as a DIP ABL Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**DIP ABL Credit Agreement**").  Capitalized terms used herein without definition shall have the meanings set forth in the DIP ABL Credit Agreement.

Pursuant to the provisions of Section 2.8(c) of the DIP ABL Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this DIP ABL Credit Agreement or any other DIP ABL Financing Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of any Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished DIP ABL Agent and the Borrower Representative with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower Representative and DIP ABL Agent, and (2) the undersigned shall have at all times furnished the Borrower Representative and DIP ABL Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF DIP ABL LENDER]

By: _____

      Name: _____

      Title: _____

Date: _____ \_\_, 20[  ]

**EXHIBIT H TO DIP ABL CREDIT AGREEMENT (BUDGET)**

**EXHIBIT I TO DIP ABL CREDIT AGREEMENT (INTERIM DIP ORDER)**

**Schedule 3.12(c) – Certain Properties**

None

**Schedule 5.1 – Liens**

**Schedule 5.4(a) – Indebtedness**

**Schedule 5.6 – Transactions with Affiliates**

**Schedule 7.1(g) – Closing Date Consents**

**Schedule 7.4 – Post Closing Requirements**

Borrowers shall satisfy and complete each of the following obligations, or provide DIP ABL Agent each of the items listed below, as applicable, on or before the date indicated below, all to the satisfaction of DIP ABL Agent in its sole and absolute discretion:

1. [TBD]

Borrower's failure to complete and satisfy any of the above obligations on or before the date indicated above, or Borrower's failure to deliver any of the above listed items on or before the date indicated above (or such later date as may be agreed by DIP ABL Agent), shall constitute an immediate an automatic DIP Event of Default.

**<u>Exhibit C</u>**

**Term DIP Credit Agreement**

EXECUTION VERSION

---

**SENIOR SECURED DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT**

AMONG

**BLACKHAWK MINING LLC,**
AS A DEBTOR AND DEBTOR-IN-POSSESSION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE,

**THE LENDERS PARTY HERETO**

AND

**CANTOR FITZGERALD SECURITIES,**
AS **ADMINISTRATIVE AGENT**

_____

DATED AS OF [  ], 2019
_____

---

#91897284v80

## TABLE OF CONTENTS

Page

Article I. Definitions and Accounting Terms. ............................................................2

    Section 1.01    Defined Terms. .................................................................2
    Section 1.02    Other Definitional Provisions. ...........................................36
    Section 1.03    LLC Division. ..................................................................37
    Section 1.04    Covenants........................................................................37

Article II. Amount and Terms of Credit. ...............................................................37

    Section 2.01    Commitments....................................................................37
    Section 2.02    Notice of Borrowing. ........................................................38
    Section 2.03    Disbursement of Funds. .....................................................39
    Section 2.04    Repayment of Loans; Notes.................................................39
    Section 2.05    Pro Rata Borrowings.........................................................40
    Section 2.06    Interest.............................................................................41
    Section 2.07    Increased Costs. ...............................................................41
    Section 2.08    [Reserved]. ......................................................................43
    Section 2.09    Designation of a Different Lending Office. .........................43
    Section 2.10    Replacement of Lenders. ...................................................43
    Section 2.11    [Reserved]........................................................................44
    Section 2.12    [Reserved]........................................................................44
    Section 2.13    Conversions......................................................................44
    Section 2.14    Interest Periods.................................................................45
    Section 2.15    Compensation. ..................................................................46
    Section 2.16    Illegality. .........................................................................46
    Section 2.17    Inability to Determine Rates. .............................................47
    Section 2.18    Minimum Amount of Each Borrowing.................................48
    Section 2.19    No Discharge. ...................................................................48

Article III. Fees .................................................................................................48

    Section 3.01    Fees. ................................................................................48
    Section 3.02    Reduction of Commitments. ..............................................49

Article IV. Prepayments; Payments; Taxes. ..........................................................49

    Section 4.01    Voluntary Prepayments......................................................49
    Section 4.02    Mandatory Repayments. ....................................................50
    Section 4.03    Method and Place of Payment. ...........................................51
    Section 4.04    Taxes. ..............................................................................51

#91897284v80

Article V. Conditions Precedent ...................................................................................55

    Section 5.01    Conditions Precedent to the Closing Date and the making of the Initial Loans. .............................................................................55

    Section 5.02    Conditions Precedent to the Delayed Draw Borrowing.........................59

Article VI. Representations and Warranties. ..................................................................60

    Section 6.01    Company Status. ..................................................................60
    Section 6.02    Power and Authority; Enforceability. ...................................61
    Section 6.03    No Violation; No Default..................................................61
    Section 6.04    Approvals. .........................................................................62
    Section 6.05    Financial Statements; Financial Condition; Undisclosed Liabilities; DIP Budget. .....................................................62
    Section 6.06    Litigation. ..........................................................................63
    Section 6.07    True and Complete Disclosure.............................................63
    Section 6.08    Use of Proceeds; Margin Regulations..................................63
    Section 6.09    Tax Returns and Payments. ................................................63
    Section 6.10    Compliance with ERISA.....................................................64
    Section 6.11    Security Documents. ...........................................................65
    Section 6.12    Properties. ..........................................................................66
    Section 6.13    Subsidiaries. .......................................................................67
    Section 6.14    Compliance with Laws, etc.................................................67
    Section 6.15    Investment Company Act. ...................................................68
    Section 6.16    Insurance. ...........................................................................68
    Section 6.17    Environmental Matters........................................................68
    Section 6.18    Employment and Labor Relations. ......................................69
    Section 6.19    Intellectual Property, etc. ...................................................69
    Section 6.20    [Reserved]. .........................................................................70
    Section 6.21    Anti-Terrorism Laws; Sanctions.........................................70
    Section 6.22    Flood Zone. ........................................................................70
    Section 6.23    Beneficial Ownership Certificate.........................................71

Article VII. Affirmative Covenants. ..............................................................................71

    Section 7.01    Information Covenants........................................................71
    Section 7.02    Books, Records and Inspections; Conference Calls. .............74
    Section 7.03    Maintenance of Property; Insurance. ...................................75
    Section 7.04    Existence; Franchises..........................................................76
    Section 7.05    Compliance with Laws, etc.................................................76
    Section 7.06    Compliance with Environmental Laws.................................77
    Section 7.07    ERISA. ...............................................................................77
    Section 7.08    End of Fiscal Years; Fiscal Quarters. ..................................78
    Section 7.09    Performance of Obligations. ...............................................78
    Section 7.10    Payment of Taxes...............................................................79
    Section 7.11    Use of Proceeds.................................................................79
    Section 7.12    Additional Guarantees and Security; Further Assurances; etc. .............79

#91897284v80

Section 7.13   Certain Long-Term Liabilities and Environmental Reserves. ...............82
Section 7.14   Post-Closing Actions. ................................................................................82
Section 7.15   Designation of Subsidiaries. .....................................................................83
Section 7.16   Milestones. ................................................................................................84
Section 7.17   Bankruptcy-Related Matters. ...................................................................84
Section 7.18   Priority of Liens. .......................................................................................84
Section 7.19   USA PATRIOT ACT, Beneficial Ownership Regulation. .....................86

Article VIII. Negative Covenants. ..........................................................................................86

Section 8.01   Liens. ..........................................................................................................86
Section 8.02   Asset Sales. ................................................................................................89
Section 8.03   Restricted Payments. .................................................................................90
Section 8.04   Indebtedness. .............................................................................................90
Section 8.05   Merger, Consolidation or Sale of Assets. .................................................92
Section 8.06   Transactions with Affiliates. .....................................................................93
Section 8.07   Limitation on Certain Restrictions on Subsidiaries;
               Negative Pledge. ........................................................................................94
Section 8.08   Business Activities. ....................................................................................96
Section 8.09   Amendments, etc. of Organizational Documents and Pre-Petition
               Credit Documents. .....................................................................................96
Section 8.10   [Reserved]. .................................................................................................96
Section 8.11   Investments. ...............................................................................................96
Section 8.12   [Reserved]. .................................................................................................96
Section 8.13   Prepayments, etc. of Indebtedness. ...........................................................96
Section 8.14   Accounting Changes. .................................................................................97
Section 8.15   [Reserved]. .................................................................................................97
Section 8.16   Variance Covenant. ....................................................................................97

Article IX. Events of Default. .................................................................................................97

Section 9.01   Payments. ...................................................................................................97
Section 9.02   Representations, etc. ..................................................................................97
Section 9.03   Covenants. ..................................................................................................98
Section 9.04   Default Under Other Agreements. .............................................................98
Section 9.05   Bankruptcy, etc. ........................................................................................99
Section 9.06   ERISA. .......................................................................................................99
Section 9.07   Security Documents. ..................................................................................99
Section 9.08   Guaranties. .................................................................................................99
Section 9.09   Judgments. ...............................................................................................100
Section 9.10   Change of Control. ...................................................................................100
Section 9.11   DIP ABL Intercreditor Agreement. .........................................................100
Section 9.12   Inability to Pay Debt. ...............................................................................100
Section 9.13   Certain Bankruptcy Matters. ...................................................................100

#91897284v80

Article X. The Administrative Agent..................................................................104

    Section 10.01    Appointment. ..................................................................104
    Section 10.02    Nature of Duties; Exculpatory Provisions .............................105
    Section 10.03    Lack of Reliance on the Administrative Agent....................106
    Section 10.04    Certain Rights of the Administrative Agent. .......................107
    Section 10.05    Reliance...............................................................................107
    Section 10.06    Indemnification ..................................................................108
    Section 10.07    The Administrative Agent in Its Individual Capacity..........109
    Section 10.08    Holders................................................................................110
    Section 10.09    Resignation by the Agents. ................................................110
    Section 10.10    Collateral Matters................................................................111
    Section 10.11    Delivery of Information. .....................................................112
    Section 10.12    Delegation of Duties. .........................................................112
    Section 10.13    Withholding. .......................................................................113

Article XI. Miscellaneous. ................................................................................113

    Section 11.01    Payment of Expenses, etc. .................................................113
    Section 11.02    Right of Setoff....................................................................115
    Section 11.03    Notices. ...............................................................................116
    Section 11.04    Benefit of Agreement; Assignments; Participations...........116
    Section 11.05    No Waiver; Remedies Cumulative. .....................................119
    Section 11.06    Payments Pro Rata. ............................................................119
    Section 11.07    Computations. .....................................................................120
    Section 11.08    GOVERNING LAW; SUBMISSION TO JURISDICTION;
                  VENUE; WAIVER OF JURY TRIAL. ...............................120
    Section 11.09    Counterparts. ......................................................................122
    Section 11.10    [Reserved]...........................................................................122
    Section 11.11    Headings Descriptive. .........................................................122
    Section 11.12    Amendment or Waiver; etc. ................................................122
    Section 11.13    Survival. ..............................................................................124
    Section 11.14    Domicile of Loans...............................................................124
    Section 11.15    Register. ..............................................................................124
    Section 11.16    Confidentiality. ...................................................................125
    Section 11.17    PATRIOT Act; Beneficial Ownership Certification............126
    Section 11.18    Interest Rate Limitation. .....................................................126
    Section 11.19    DIP ABL Intercreditor Agreement. ....................................126
    Section 11.20    Acknowledgement and Consent to Bail-In of EEA Financial
                  Institutions..........................................................................127
    Section 11.21    Certain ERISA Matters ......................................................127

Article XII. Real Property Leases .....................................................................129

    Section 12.01    Special Rights with Respect to Real Property Leases .........129

SCHEDULE 1.01(b)         Competitors of the Borrower

#91897284v80

SCHEDULE 2.01(a)          Commitments
SCHEDULE 5.01(w)         [Reserved]
SCHEDULE 5.01(h)          Consents
SCHEDULE 5.01(k)(i)       Closing Mortgaged Properties
SCHEDULE 6.12(c)          Notice Regarding Certain Mining Activities
SCHEDULE 7.14             Post-Closing Matters
SCHEDULE 8.01             Existing Liens
SCHEDULE 8.04             Existing Indebtedness
SCHEDULE 8.06             Existing Affiliate Transactions


EXHIBIT A-1      Form of Notice of Borrowing
EXHIBIT A-2      Form of Notice of Conversion/Continuation
EXHIBIT B        Form of Note
EXHIBIT C-1      Form of U.S. Tax Compliance Certificate (Foreign Lenders that are Not Partnerships)
EXHIBIT C-2      Form of U.S. Tax Compliance Certificate (Foreign Lenders that are Partnerships)
EXHIBIT C-3      Form of U.S. Tax Compliance Certificate (Foreign Participants that are Not Partnerships)
EXHIBIT C-4      Form of U.S. Tax Compliance Certificate (Foreign Participants that are Partnerships)
EXHIBIT D        Form of Interim Order
EXHIBIT E        Form of Compliance Certificate
EXHIBIT F        Form of Assignment and Assumption Agreement
EXHIBIT H        Form of Security Agreement
EXHIBIT I        Form of DIP ABL Intercreditor Agreement
EXHIBIT J        Form of Guaranty

#91897284v80

SENIOR SECURED DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT, dated as of [   ], 2019, among BLACKHAWK MINING LLC, a Kentucky limited liability company and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "***Borrower***"), the Lenders party hereto from time to time, and CANTOR FITZGERALD SECURITIES, as Administrative Agent.  All capitalized terms used herein and defined in **Section 1.01** are used herein as therein defined.

## W I T N E S S E T H:

WHEREAS, on [   ], 2019 (the "***Petition Date***"), the Borrower and certain of the Borrower's Subsidiaries filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code (the "***Cases***"; the debtors and debtors-in-possession thereunder, the "***Debtors***" and each a "***Debtor***") and have continued in the possession of their assets and the management of their business pursuant to Section 1107 and 1108 of the Bankruptcy Code;

WHEREAS, all of the claims and the Liens granted under the Orders and the Credit Documents to the Administrative Agent and the Lenders in respect of the DIP Term Facility shall be subject to the Carve-Out;

WHEREAS, the relative priority of the DIP Term Facility with respect to the Collateral granted to secure the Obligations shall be as set forth in the Interim Order and the Final Order, as applicable, in each case, upon entry thereof by the Bankruptcy Court, and in the DIP ABL Intercreditor Agreement;

WHEREAS, the Borrower and the Guarantors are engaged in related businesses, and each Guarantor will derive substantial direct and indirect benefit from the making of the extensions of credit under this Agreement;

WHEREAS, the Borrower has requested that (i) the Lenders provide a delayed draw term loan facility denominated in U.S. Dollars in an aggregate principal amount of up to $150,000,000 (the "***DIP Term Facility***") comprised of (x) New Money Loans (as defined herein) in an aggregate principal amount of up to $50,000,000, to be funded hereunder (A) in an aggregate principal amount of up to $35,000,000 on the Closing Date and (B) in an aggregate principal amount of up to $15,000,000 on the Delayed Draw Borrowing Date and (y) the roll-up of a portion of the existing Pre-Petition First Lien Term Loans into Term Loans hereunder in an aggregate principal amount of up to $100,000,000, to be deemed funded hereunder (A) in an aggregate principal amount of up to $70,000,000 on the Closing Date and (B) in an aggregate principal amount of up to $35,000,000 on the Delayed Draw Borrowing Date and (ii) certain other lenders extend credit to the Borrower and certain of its Subsidiaries in the form of an asset-based revolving facility in an aggregate principal amount of up to $90,000,000 pursuant to the DIP ABL Credit Agreement (the "***DIP ABL Facility***" and, together with the DIP Term Facility, the "***DIP Facilities***"), with all of each borrower's obligations under the DIP Facilities to be guaranteed by each applicable guarantor; and

WHEREAS, subject to and upon the terms and conditions set forth herein, the Lenders are willing to make available to the Borrower the DIP Term Facility provided for herein.

#91897284v80

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I.
## DEFINITIONS AND ACCOUNTING TERMS.

**Section 1.01    Defined Terms.**    As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Acceptable Disclosure Statement*" shall mean the disclosure statement relating to the Acceptable Plan of Reorganization in form and substance consistent with the RSA, with any such changes thereto as are acceptable to the Required Lenders.

"*Acceptable Plan of Reorganization*" shall mean a Reorganization Plan for each of the Cases in form and substance consistent with the RSA, with any such changes thereto as are acceptable to the Required Lenders.

"*Ad Hoc Crossholder Lender Group*" shall have the meaning provided in the Orders.

"*Ad Hoc First Lien Lender Group*" shall have the meaning provided in the Orders.

"*Additional Roll-Up Loans*" shall have the meaning provided in **Section 2.01(b)**.

"*Additional Security Documents*" shall have the meaning provided in **Section 7.12(b)**.

"*Administrative Agent*" shall mean Cantor Fitzgerald Securities, in its capacity as Administrative Agent for the Lenders hereunder and under the other Credit Documents, and shall include any successor to the Administrative Agent appointed pursuant to **Section 10.09**.

"*Affiliate*" of any specified Person shall mean any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that Beneficial Ownership of 10% or more of the Voting Stock of a Person will be deemed to be control.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.  No Lender as of the Closing Date or any of their respective Affiliates shall be considered an Affiliate of the Borrower or any Subsidiary thereof.

"*Affiliate Transaction*" shall have the meaning provided in **Section 8.06**.

"*After-Acquired Real Property*" shall have the meaning provided in **Section 7.12(c)**.

"*Agent Fee Letter*" means that certain Agency Fee Letter, dated the date hereof, between the Borrower and the Administrative Agent.

"*Agents*" shall mean the Administrative Agent and the Collateral Agent.

"*Agreement*" shall mean this Senior Secured Debtor-In-Possession Term Loan Credit Agreement, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time, including any joinders thereto.

"*Anti-Terrorism Laws*" shall mean any Requirement of Law related to terrorism financing, economic sanctions or money laundering including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("*USA PATRIOT Act*") of 2001 (Title III of Pub. L. 107-56), The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5314 and 5316-5332 and 12 U.S.C. §§ 1829b and 1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) and Executive Order 13224 (effective September 24, 2001), the International Emergency Economic Powers Act and Executive Orders issued thereunder.

"*Applicable Margin*" shall mean a percentage per annum equal to, in the case of Term Loans maintained as (i) Base Rate Loans, 8.50% and (ii) LIBOR Loans, 9.50%.

"*Applicable Real Property*" shall have the meaning provided in **Section 7.12(c)**.

"*Applicable Subsidiary*" shall have the meaning provided in **Section 9.05**.

"*Approved Budget*" shall have the meaning provided in **Section 7.01(f)**.

"*Approved Fund*" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"*As-Extracted Collateral Filing*" shall mean a completed UCC-1 financing statement with respect to as-extracted collateral which lies upon owned or leased Real Property of the Borrower or any of its Subsidiaries.

"*Asset Sale*" shall mean:

(a)    the sale, lease, transfer, assignment, conveyance or other disposition (including any sale and lease back transaction) of any assets or rights by the Borrower or any of its Restricted Subsidiaries; *provided* that the sale, lease, conveyance or other disposition of all or substantially all of the assets of the Borrower and its Restricted Subsidiaries taken as a whole will be governed by the provisions of **Section 8.05**; and

(b)    the issuance or sale of Equity Interests by any Restricted Subsidiary or the sale by the Borrower or any of its Restricted Subsidiaries of Equity Interests in any Restricted Subsidiary.

"*Assignment and Assumption Agreement*" shall mean an Assignment and Assumption Agreement substantially in the form of **Exhibit F** or such other form as may be agreed between the Borrower and the Administrative Agent (in each case, appropriately completed).

"***Attributable Indebtedness***" shall mean, on any date, in respect of any Capital Lease Obligations of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"***Authorized Officer***" shall mean, with respect to (a) delivering Notices of Borrowing and Notices of Conversion/Continuation and similar notices, any person or persons that has or have been authorized by the board of directors of the Borrower to deliver such notices pursuant to this Agreement, (b) delivering financial information and officer's certificates pursuant to this Agreement, the chief financial officer, the treasurer or the principal accounting officer of the Borrower and (c) any other matter in connection with this Agreement or any other Credit Document, any officer (or a person or persons so designated by any two officers) of the Borrower.

"***Automatic Rejection Date***" shall mean, with respect to any particular lease, the last day of the assumption period for the Credit Parties in the Cases provided for in Section 365(d)(4) of the Bankruptcy Code, to the extent applicable (including as may have been extended in accordance with Section 365(d)(4)).

"***Avoidance Action***" shall mean the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code.

"***Avoidance Proceeds***" shall mean any proceeds or property recovered, unencumbered or otherwise in connection with successful Avoidance Actions, whether by judgment, settlement or otherwise.

"***Bail-In Action***" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"***Bail-In Legislation***" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"***Bankruptcy Code***" shall have the meaning provided in **Section 9.05**.

"***Bankruptcy Court***" shall mean, the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"***Base Rate***" shall mean, at any time, the highest of

(a)     the Prime Lending Rate at such time,

(b)     ½ of 1% per annum in excess of the overnight Federal Funds Rate at such time and

(c)     the LIBO Rate for a LIBOR Loan with a one month interest period commencing on such day plus 1.00%.

#91897284v80

For purposes of this definition, the LIBO Rate shall be determined using the LIBO Rate as otherwise determined by the Administrative Agent in accordance with the definition of LIBO Rate, except that (x) if a given day is a Business Day, such determination shall be made on such day (rather than two Business Days prior to the commencement of an Interest Period) or (y) if a given day is not a Business Day, the LIBO Rate for such day shall be the rate determined by the Administrative Agent pursuant to preceding **clause (x)** for the most recent Business Day preceding such day.  Any change in the Base Rate due to a change in the Prime Lending Rate, the Federal Funds Rate or such LIBO Rate shall be effective as of the opening of business on the day of such change in the Prime Lending Rate, the Federal Funds Rate or such LIBO Rate, respectively.

"***Base Rate Loan***" shall mean each Loan designated or deemed designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"***Beneficial Ownership Certification***" shall mean a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"***Beneficial Ownership Regulation***" shall mean 31 C.F.R. § 1010.230, as amended, or any successor thereto.

"***Beneficial Owner***" shall have the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time.  The terms "***Beneficially Owns***", "***Beneficially Owned***" and "***Beneficial Ownership***" have a corresponding meaning.

"***Benefit Plan***" means, other than a Multiemployer Plan, an "employee benefit plan" (as defined in ERISA) that is subject to Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA with respect to which the Borrower or any of its Restricted Subsidiaries has any liability (including on account of an ERISA Affiliate).

"***Board of Directors***" shall mean:

(a)      with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(b)      with respect to a partnership, the board of directors of the general partner of the partnership;

(c)      with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(d)      with respect to any other Person, the board or committee of such Person serving a similar function.

"***Borrower***" shall have the meaning provided in the first paragraph of this Agreement.

#91897284v80

"***Borrowing***" shall mean the borrowing of one Type of Term Loans on a given date (or resulting from a conversion or conversions on such date) having in the case of LIBOR Loans, the same Interest Period.

"***Borrowing Date***" shall mean the date occurring on the Closing Date on which the Borrowing of the Initial Loans occurred, or the Delayed Draw Borrowing Date, as applicable.

"***Budget Variance Report***" shall mean a variance report setting forth in each case (x) for the one-week period ended on the immediately preceding Friday prior to the delivery thereof (a "***Weekly Period***") and (y) for the period commencing on the Petition Date and ending on the immediately preceding Friday prior to the delivery thereof (a "**Test Period**") (1) the negative variance (as compared to the Approved Budget) of the aggregate operating cash receipts of the Debtors, (2) the positive variance (as compared to the Approved Budget) of the aggregate operating disbursements (excluding professional fees) made by the Debtors and (3) an explanation, in reasonable detail, for any material variance, certified by an Authorized Officer of the Borrower.

"***Business Day***" shall mean (a) for all purposes other than as covered by **clause (b)** below, any day except Saturday, Sunday and any day which shall be in New York, New York, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (b) with respect to all notices and determinations in connection with, and payments of principal and interest on, LIBOR Loans, any day which is a Business Day described in **clause (a)** above and which is also a day for trading by and between banks in U.S. dollar deposits in the London interbank market.

"***Cantor***" shall mean Cantor Fitzgerald Securities, in its individual capacity, and any successor company thereto by merger, consolidation or otherwise.

"***Capital Lease Obligation***" shall mean, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with GAAP, and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty.

"***Capital Stock***" shall mean:

(a)      in the case of a corporation, corporate stock;

(b)      in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(c)      in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(d)      any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding

6

from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"***Carve-Out***" shall have the meaning set forth in the Interim Order or the Final Order, as applicable.

"***Cases***" shall have the meaning provided in the recitals to this Agreement.

"***Cash Collateral***" shall have the meaning set forth in the Interim Order or the Final Order, as applicable.

"***Cash Equivalents***" shall mean:

(a)     Dollars;

(b)     securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (***provided*** that the full faith and credit of the United States is pledged in support of those securities) having maturities of not more than twelve months from the date of acquisition;

(c)     certificates of deposit and eurodollar time deposits with maturities of six months or less from the date of acquisition, bankers' acceptances with maturities not exceeding twelve months and overnight bank deposits, in each case, with any domestic commercial bank having capital and surplus in excess of $500,000,000 and a Thomson Bank Watch Rating of "B" or better;

(d)     repurchase obligations with a term of not more than seven days for underlying securities of the types described in **clauses (b)** and **(c)** above entered into with any financial institution meeting the qualifications specified in **clause (c)** above;

(e)     commercial paper having one of the two highest ratings obtainable from Moody's or S&P and, in each case, maturing within six months after the date of acquisition; and

(f)     money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in **clauses (a)** through **(e)** of this definition.

"***Cash Management Obligations***" shall mean obligations in respect of cash management services (including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements), including obligations for the payment of fees, interest, charges, expenses and disbursements in connection therewith to the extent provided for in the documents evidencing such cash management services.

"***Change in Law***" shall mean the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; ***provided*** that notwithstanding anything herein to the contrary,

#91897284v80

(x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"***Change of Control***" shall mean the occurrence of any of the following:

(a)    any direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger, amalgamation or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Borrower and its Subsidiaries taken as a whole to any Person (including any "person" or "group" (as such terms are used in Sections 13(d)(3) and 14(d), respectively, of the Exchange Act)); and

(b)    any "Change of Control" (or comparable term) in any document pertaining to the DIP ABL Facility.

"***Closing Date***" shall mean [  ], 2019, which is the date on which the conditions specified in **Section 5.01** are satisfied (or waived in accordance with **Section 11.12**).

"***Coal***" shall mean all types of solid naturally occurring hydrocarbons (other than oil shale or Gilsonite), including without limitation, bituminous and sub-bituminous coal, and lignite.

"***Code***" shall mean the Internal Revenue Code of 1986, as amended from time to time (unless otherwise specified herein), and the regulations promulgated and rulings issued thereunder.

"***Collateral***" shall have the meaning provided for the term "DIP Term Collateral" in the Orders and shall include all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Security Document, including, without limitation, all Security Agreement Collateral, all Mortgaged Properties and all cash and Cash Equivalents delivered as collateral pursuant to **Article IX**.

"***Collateral Agent***" shall mean Cantor Fitzgerald Securities, in its capacity as collateral agent for the Secured Creditors pursuant to the Security Documents and shall include any successor appointed pursuant to **Section 10.09**.

"***Commitment***" shall mean individually or collectively, as the context may require, the Initial Commitment and the Delayed Draw Commitment. The aggregate amount of the Lenders' Commitments on the Closing Date is $50,000,000.

"***Commitment Schedule***" means the Schedule attached hereto as **Schedule 2.01(a)**.

"***Company***" shall mean any corporation, limited liability company, partnership or other business entity (or the adjectival form thereof, where appropriate).

#91897284v80

"***Confirmation Date***" shall have the meaning provided in **Section 7.16(d)**.

"***continuing***" shall mean, with respect to any Default or Event of Default, that such Default or Event of Default has not been cured or waived.

"***Contractual Obligation***" shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"***Control Agreement***" shall mean, with respect to any deposit account, any securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance reasonably satisfactory to the Collateral Agent, among the Collateral Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Credit Party maintaining such account, effective to grant "control" (as defined under the applicable UCC) over such account to the Collateral Agent.

"***Credit Documents***" shall mean this Agreement, each Note, the Subsidiary Guaranty, the Security Agreement, each other Security Document, the DIP ABL Intercreditor Agreement and, except for purposes of **Section 11.12**, the Agent Fee Letter.

"***Credit Party***" shall mean the Borrower and each Guarantor.

"***Default***" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"***Delayed Draw Borrowing Date***" means the date on which Delayed Draw Loans are made, which shall be within one Business Day following the Final Order Entry Date (or such later date as agreed to by the Required Lenders).

"***Delayed Draw Commitment***" means, with respect to each Lender, the commitment of such Lender to make Delayed Draw Loans to the Borrower in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on the Commitment Schedule, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The aggregate amount of the Lenders' Delayed Draw Commitments on (i) the Closing Date is $15,000,000 and (ii) the Delayed Draw Commitment Termination Date will be $0.

"***Delayed Draw Commitment Termination Date***" means the earlier to occur of (a) the Delayed Draw Borrowing Date and (b) the Termination Date.

"***Delayed Draw Loans***" has the meaning assigned to such term in **Section 2.01**.

"***DIP ABL Asset Priority Lien Documents***" shall mean, collectively, (i) the credit agreements or other agreements providing for the DIP ABL Facility Commitments and pursuant to which the Borrower or any Guarantor will incur the DIP ABL Asset Priority Lien Obligations and (ii) the security documents, intercreditor agreements (including the DIP ABL Intercreditor Agreement), guarantees, joinders and other agreements or instruments executed in connection with such credit agreements or other agreements.

"*DIP ABL Asset Priority Lien Obligations*" shall mean all Indebtedness and other obligations of the Borrower or any Guarantor outstanding under the DIP ABL Asset Priority Lien Documents, together with guarantees thereof that are secured, or intended to be secured, under the DIP ABL Asset Priority Lien Documents; *provided* that, on or before the date on which such Indebtedness is incurred by the Borrower or any Guarantor:

(a)    such Indebtedness is designated by the Borrower, in an officer's certificate delivered to the Administrative Agent and the Collateral Agent, as a "DIP ABL Asset Priority Lien Obligation" for purposes of the DIP ABL Asset Priority Lien Documents;

(b)    the DIP ABL Agent shall have duly executed and delivered to the Administrative Agent and the Collateral Agent the DIP ABL Intercreditor Agreement; and

(c)    such Indebtedness and such guarantees thereof are permitted to be incurred and secured under each applicable ABL Asset Priority Lien Document and under this Agreement.

"*DIP ABL Asset Priority Liens*" shall mean Liens granted to the collateral agent under any DIP ABL Asset Priority Lien Documents, at any time, upon DIP ABL Priority Collateral of the Borrower or any Guarantor to secure DIP ABL Asset Priority Lien Obligations.

"*DIP ABL Credit Agreement*" shall mean the Credit Agreement, dated as of the date hereof, among the Borrower, the other Credit Parties party thereto, MidCap Funding IV Trust, a Delaware statutory trust, as agent, and the lenders party thereto from time to time, as the same may be amended, amended and restated, modified and/or supplemented prior to the date hereof in accordance with the terms thereof.

"*DIP ABL Agent*" shall mean MidCap Funding IV Trust, a Delaware statutory trust, as administrative agent and collateral agent under the DIP ABL Credit Agreement, together with its successors and assigns.

"*DIP ABL Facility*" shall have the meaning provided in the recitals to this Agreement.

"*DIP ABL Facility Commitments*" shall mean the commitments of the lenders under the DIP ABL Facility.

"*DIP ABL Intercreditor Agreement*" shall mean that certain Debtor-in-Possession ABL Intercreditor Agreement, dated as of the date hereof, among the Borrower, the other Credit Parties party thereto, the DIP ABL Agent and the Collateral Agent, as the same may be amended, modified and/or supplemented from time to time in accordance with the terms thereof.

"*DIP ABL Priority Collateral*" shall have the meaning provided in the DIP ABL Intercreditor Agreement.

"*DIP Budget*" shall mean a rolling 13-week cash flow forecast delivered on or prior to the Closing Date and every four weeks after the Petition Date in accordance with **Section 7.01(f)**, setting forth the Debtors' projected cash receipts and cash disbursements during such 13-week period (i) initially, covering the period commencing on or about the Closing Date and (ii) thereafter, covering the period commencing on the first day of each four-week anniversary

thereafter, it being understood that no changes shall be made in any such updated DIP Budget with respect to any periods that were included in a previously delivered DIP Budget.

"***DIP Term Facility***" shall have the meaning provided in the recitals to this Agreement.

"***DIP Term Loan Priority Collateral***" shall have the meaning provided in the DIP ABL Intercreditor Agreement.

"***Disqualified Stock***" shall mean any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is 91 days after the Maturity Date.  Notwithstanding the preceding sentence, any Capital Stock that would constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the issuer thereof to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale will not constitute Disqualified Stock if the terms of such Capital Stock provide that the issuer thereof may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such repurchase or redemption complies with **Section 8.03**.  The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Borrower and its Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.

"***Dollars***" and the sign "***$***" shall each mean freely transferable lawful money of the United States.

"***Domestic Subsidiary***" of any Person shall mean any Subsidiary of such Person incorporated or organized under the laws of the United States, any State thereof or the District of Columbia.

"***EEA Financial Institution***" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in **clause (a)** of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in **clauses (a)** or **(b)** of this definition and is subject to consolidated supervision with its parent.

"***EEA Member Country***" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"***EEA Resolution Authority***" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***Eligible Transferee***" shall mean and include a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), but in any event excluding any

natural person, the Borrower and its Subsidiaries and Affiliates and the Persons listed on **Schedule 1.01(b)**.

"***Embargoed Person***" shall mean any party that (a) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the U.S. Treasury Department's Office of Foreign Assets Control ("***OFAC***") or resides, is organized or chartered, or has a place of business in a country or territory subject to OFAC sanctions or embargo programs or (b) is otherwise prohibited from doing business with the United States under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any other Requirement of Law.

"***Employee Benefit Plan***" shall mean any employee benefit plan (within the meaning of Section 3(3) of ERISA, other than a Multiemployer Plan) established or maintained by the Borrower or any of its Restricted Subsidiaries or, with respect to any such plan subject to Section 412 of the Code or Title IV of ERISA, an ERISA Affiliate.

"***Environmental Claims***" shall mean any and all actions, suits, demands, demand letters, directives, claims, liens, notices of noncompliance or violation, by or from any Person relating in any way to any noncompliance with, or liability arising under, Environmental Law.

"***Environmental Law***" shall mean any applicable Federal, state, local or foreign law (including to the extent related, Mining Laws and principles of common law), rule, regulation, ordinance, code, directive, judgment, order or agreement, now or hereafter in effect and in each case as amended, relating to the protection of the environment, or of human health (as it relates to the exposure to environmental hazards) or to Hazardous Materials.

"***Equity Interests***" shall mean Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"***ERISA***" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"***ERISA Affiliate***" shall mean any Person that for purposes of Title I or Title IV of ERISA or Section 412 of the Code would be deemed at any relevant time to be a single employer or otherwise aggregated with the Borrower or any of its Restricted Subsidiaries under Section 414(b), (c) or (m) of the Code or Section 4001 of ERISA.

"***ERISA Event***" shall mean any one or more of the following:

(a)    any Reportable Event;

(b)    the filing of a notice of intent to terminate any Benefit Plan under Section 4041(b) of ERISA, if such termination would require material additional contributions in order to be considered a standard termination, the filing under Section 4041(c) of ERISA of a notice of intent to terminate any Benefit Plan or the termination of any Benefit Plan under Section 4041(c) of ERISA;

12

(c)     the institution of proceedings, or the occurrence of an event or condition which would reasonably be expected to constitute grounds for the institution of proceedings, by the PBGC under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Benefit Plan;

(d)     the failure to make a required contribution to any Benefit Plan that would result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a lien or encumbrance; the failure by any Benefit Plan to satisfy the minimum funding standard under Section 430 of the Code or Section 303 of ERISA, whether or not waived; the filing of any request for or receipt of a minimum funding waiver under Section 412 of the Code with respect to any Benefit Plan, or that such filing may be made; or the determination that any Benefit Plan is, or is expected to be, in "at-risk" status within the meaning of Section 430 of the Code or Section 303 of ERISA;

(e)     a withdrawal by the Borrower or any ERISA Affiliate from a Benefit Plan subject to Section 4063 of ERISA during a Benefit Plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA;

(f)     engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA with respect to any Benefit Plan;

(g)     the complete or partial withdrawal of the Borrower, any of its Restricted Subsidiaries or any ERISA Affiliate from a Multiemployer Plan, the insolvency under Title IV of ERISA of any Multiemployer Plan; or the receipt by the Borrower or any of its Restricted Subsidiaries or any ERISA Affiliate, of any notice that a Multiemployer Plan is insolvent within the meaning of Section 4245 of ERISA or in endangered or critical status under Section 305 of ERISA; or

(h)     the Borrower, any of its Restricted Subsidiaries or an ERISA Affiliate incurring any liability under Title IV of ERISA with respect to any Benefit Plan (other than premiums due and not delinquent under Section 4007 of ERISA).

"*EU Bail-In Legislation Schedule*" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"*Event of Default*" shall have the meaning provided in **Article IX**.

"*Exchange Act*" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Excluded Assets*" shall mean each of the following:

(a)     any lease, license, contract, property right or agreement to which the Borrower or any Guarantor is a party or by which the Borrower or any Guarantor is bound or any right or interest of the Borrower or any Guarantor under any such lease, license, contract, property right or agreement, if and only for so long as the grant of a Lien under the Security Documents will

13

constitute or result in a breach, termination or default under any such lease, license, contract, property right or agreement or require any consent thereunder (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC of any relevant jurisdiction, the Orders, or any other applicable law or principles of equity); *provided* that such lease, license, contract, property right or agreement will be an Excluded Asset only to the extent and for so long as the consequences specified above will result; *provided, further,* unless such term has been rendered ineffective pursuant to the applicable Order, (i) the Credit Parties are using or have used commercially reasonable efforts (in each case, for a period of up to sixty (60) days from the Closing Date) to obtain such consent or waiver as may be necessary to grant such a Lien except in the case of any lease, license, contract, property right or agreement which, when considered in the aggregate with all such other items requiring such consent or waiver, would not be material (*provided* that the obligation of the Borrower and other Credit Parties to use commercially reasonable efforts shall not require the Borrower or any other Credit Party to request any consent or waiver with respect to a restriction on assignment in any agreement which is imposed by any legal requirement or which the Borrower or such other Credit Party reasonably determines would have a material adverse effect on such agreement or on the Borrower's or other Credit Party's relationship with the other party or parties to such agreement; *provided*, *further*, that the use of commercially reasonable efforts shall not require any payment or other consideration from the Borrower or other Credit Parties) and (ii) such lease, license, contract, property right or agreement will cease to be an Excluded Asset and will become subject to the Lien granted under the Security Documents, immediately and automatically, at such time as such consent or waiver is obtained or such consequences will no longer result;

(b)    [reserved];

(c)    any of the outstanding voting stock (within the meaning of Section 956 of the Code and the regulations promulgated thereunder) of a first tier Foreign Subsidiary or first tier FSHCO in excess of 65% of such voting stock;

(d)    any application for a registration of a trademark filed in the United States Patent and Trademark Office on an intent-to-use basis, but only to the extent that the grant of a security interest in any such trademark application would adversely affect the validity or enforceability or result in a cancellation of such trademark application;

(e)    property subject to Liens permitted under **clause (c)** of **Section 8.01**, but only to the extent that the grant of a Lien under the Security Documents will constitute or result in a breach, termination or default under the agreements governing such acquired property;

(f)    property subject to Liens permitted under **clause (e)** of **Section 8.01**, to the extent the terms of the Indebtedness secured by such Liens prohibit any other Lien on such property;

(g)    cash, certificates of deposit or similar instruments that are subject to Liens permitted under **Section 8.01(d)**;

14

(h)    cash securing reimbursement obligations with respect to letters of credit issued under or pursuant to the Pre-Petition LC Facility Agreement that are subject to Liens permitted under **Section 8.01(a)**;

(i)    [reserved];

(j)    [reserved];

(k)    [reserved];

(l)    margin stock to the extent a security interest therein would violate the provisions of the regulations of the Board of Governors, including Regulation T, Regulation U or Regulation X) and Equity Interests in any Person other than wholly owned Restricted Subsidiaries that cannot be pledged without the consent of unaffiliated third parties;

(m)    any property or assets to the extent the creation or perfection of pledges thereof or security interests therein could reasonably be expected to result in material adverse tax consequences or material adverse regulatory consequences to the Borrower, any of its Subsidiaries or any direct or indirect equity owner(s) of the Borrower, as reasonably determined by the Borrower in consultation with the Administrative Agent;

(n)    particular assets if and for so long as, if reasonably agreed by the Administrative Agent and the Borrower, the cost (including, without prejudice to **clause (m)** of this definition of Excluded Assets, any adverse tax consequences) of creating a pledge or security interest in such assets exceed the practical benefits to be obtained by the Lenders therefrom;

(o)    [reserved];

(p)    any "building" or "mobile home" (each as defined in Regulation H as promulgated by the Federal Reserve Board under the Flood Insurance Laws) presently or hereafter located on any land comprising part of any Real Property located in a flood zone, until the Administrative Agent has received the Flood Documentation in form and substance reasonably satisfactory to the Administrative Agent; and

(q)    any assets specifically excluded from the Collateral in the Orders;

*provided*, *however*, (x) at any time any property described in **clauses (e)**, **(f)** or **(g)** of this definition of Excluded Assets is not subject to a Lien permitted by the applicable clause of **Section 8.01**, such property shall be deemed at all times from and after the Closing Date to constitute Collateral and (y) Excluded Assets shall not include any proceeds (as defined in the UCC), substitutions or replacements of any Excluded Assets referred to in any of **clauses (a)**-**(p)** (unless such proceeds, substitutions or replacements would constitute Excluded Assets referred to in any of **clauses (a)**-**(p)**); *provided*, that **clauses (a)** through **(p)** shall only be Excluded Assets to the extent that such assets do not constitute collateral with respect to Indebtedness under the Pre-Petition Credit Documents or the DIP ABL Facility.  For avoidance of doubt, while Specified Excluded Unencumbered Property (as defined in the Orders) shall not be "Excluded Collateral" and shall secure the Obligations, such Specified Excluded Unencumbered Property will secure the Obligations only to the extent such Obligations do not constitute Roll-Up Loans.

"*Excluded Subsidiary*" shall mean each of BHM-WV, LLC, Fanco Plant Loadout, LLC, Campbell's Creek Mining, LLC, Black Oak Mining, LLC, Wells Prep Plant, LLC, Rock Lick Prep Plant, LLC and Gateway Eagle Mining, LLC so long as such Subsidiary does not (i) guarantee or provide a pledge of assets securing any Indebtedness, including any Indebtedness under the Pre-Petition Credit Documents or the DIP ABL Facility, (ii) hold any material assets or (iii) become a debtor or debtor-in-possession under Chapter 11 of the Bankruptcy Code.

"*Excluded Taxes*" shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient,

(a)    Taxes imposed on or measured by net income (however denominated), franchise Taxes imposed in lieu of net income Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes,

(b)    in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which such Lender (i) becomes a party to this Agreement (other than pursuant to an assignment request by the Borrower under **Section 2.10**) or (ii) if applicable, changes its lending office (other than pursuant to a request by the Borrower under **Section 2.09**), except in each case to the extent that, pursuant to **Section 4.04**, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office,

(c)    any Taxes attributable to the applicable Lender's or Administrative Agent's failure to comply with **Section 4.04(e)** or **Section 4.04(g)**, as applicable, and

(d)    any withholding Taxes imposed under FATCA.

"*Existing Indebtedness*" shall have the meaning provided in **Section 8.04(a)**.

"*Exit Fee*" shall have the meaning provided in **Section 3.01(c)**.

"*Fair Market Value*" shall mean the value (which, for the avoidance of doubt, will take into account any liabilities associated with related assets) that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the Borrower.

"*FASB ASC*" shall mean the Accounting Standards Codification of the Financial Accounting Standards Board.

"*FATCA*" shall mean Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement, treaty, or convention entered into in connection with any of

the foregoing and any law, fiscal or regulatory legislation, rule, regulation or other official written practice implementing such intergovernmental agreement, treaty, or convention.

"*FCPA*" shall have the meaning provided in **Section 6.14**.

"*Federal Funds Rate*" shall mean, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal Funds brokers of recognized standing selected by the Administrative Agent.

"*Fees*" shall mean all amounts payable pursuant to or referred to in **Section 3.01**.

"*Final Order*" shall mean an order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the Term Loans (including the Roll-Up Loans) and the Transactions contemplated by this Agreement in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are satisfactory to the Required Lenders in their sole discretion) (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders in their sole discretion) as to which no stay has been entered.

"*Final Order Entry Date*" shall mean the date on which the Final Order is entered by the Bankruptcy Court.

"*Fiscal Quarter*" shall mean, for any Fiscal Year,

(a)    the fiscal period commencing on January 1 of such Fiscal Year and ending on March 31 of such Fiscal Year,

(b)    the fiscal period commencing on April 1 of such Fiscal Year and ending on June 30 of such Fiscal Year

(c)    the fiscal period commencing on July 1 of such Fiscal Year and ending on September 30 of such Fiscal Year and

(d)    the fiscal period commencing on October 1 of such Fiscal Year and ending on December 31 of such Fiscal Year.

"*Fiscal Year*" shall mean the fiscal year of the Borrower and its Subsidiaries ending on December 31 of each calendar year.

"*Flood Documentation*" shall mean, with respect to any fee interest in any real property improved by a "building" or a "mobile home" (each as defined in Regulation H as promulgated by the Federal Reserve Board under the Flood Insurance Laws) located in the United States or any territory thereof of any Credit Party, a completed "life-of-loan" Federal Emergency Management Agency Standard Flood Hazard Determination, and if such real property is located

in a special flood hazard area, (1) a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Credit Party relating thereto and (2) a copy of, or a certificate as to coverage under, and a declaration page relating to, the flood insurance policies required by **Section 7.03(b)** of this Agreement, which shall (A) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable endorsement (as applicable); (B) name the Collateral Agent, on behalf of the Secured Creditors, as additional insured and loss payee/mortgagee (as applicable); and (C) (I) identify the addresses of each property located in a special flood hazard area, (II) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto and (III) provide that the insurer will endeavor to give the Collateral Agent forty-five (45) days' written notice of cancellation or non-renewal and (IV) otherwise be in form and substance satisfactory to the Administrative Agent.

"***Flood Insurance Laws***" shall mean, collectively,

(a)    National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto,

(b)    the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and

(c)    the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"***Foreign Lender***" shall mean a Lender that is not a U.S. Person.

"***Foreign Pension Plan***" shall mean any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States by the Borrower or any one or more of its Restricted Subsidiaries primarily for the benefit of the employees residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"***Foreign Subsidiary***" of any Person shall mean any Subsidiary of such Person that is not a Domestic Subsidiary.

"***FSHCO***" shall mean any Subsidiary that has, directly or indirectly through Subsidiaries, no material assets other than the Equity Interests (or Equity Interests and debt securities) of one or more Foreign Subsidiaries that are controlled foreign corporations within the meaning of Section 957 of the Code.

"***Fund***" shall mean any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"*GAAP*" shall mean generally accepted accounting principles in the United States as in effect from time to time.

"*Governmental Authority*" shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Guarantee*" shall mean a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take or pay or to maintain financial statement conditions or otherwise).

"*Guaranteed Obligations*" shall mean the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the principal and interest on each Note issued by, and all Loans made to, the Borrower under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due), indebtedness and liabilities (including, without limitation, indemnities, fees and interest (including all interest, fees, and other amounts accruing after the commencement of any bankruptcy, insolvency, receivership or similar proceeding at the rate provided for herein, whether or not such interest, fees and other amounts are allowed or allowable in any such proceeding) thereon) of the Borrower to the Lenders, the Administrative Agent and the Collateral Agent now existing or hereafter incurred under, arising out of or in connection with this Agreement and each other Credit Document to which the Borrower is a party and the due performance and compliance by the Borrower with all the terms, conditions and agreements contained in this Agreement and in each such other Credit Document.

"*Guarantor*" shall mean each direct or indirect wholly-owned Domestic Subsidiary of the Borrower (for the avoidance of doubt, excluding each Excluded Subsidiary), whether currently existing or hereafter acquired, that executes the Subsidiary Guaranty, unless and until such time as the respective Subsidiary is released from all of its obligations under the Subsidiary Guaranty in accordance with the terms and provisions thereof.

"*Hazardous Materials*" shall mean any chemicals, materials, wastes, mining wastes, pollutants, contaminants or substances in any form that is prohibited, limited or regulated pursuant to any Environmental Law by virtue of their toxic or otherwise deleterious characteristics, including without limitation petroleum or petroleum products and by-products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls, and radon gas.

"*Hedging Obligations*" shall mean, with respect to any specified Person, the obligations of such Person under any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions,

interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement.

"*Impacted Loans*" shall have the meaning provided in **Section 2.17(a)(ii)**.

"*Indebtedness*" shall mean, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables):

(a)      in respect of borrowed money;

(b)      evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof), including, without limitation, Mining Financial Assurances;

(c)      in respect of banker's acceptances;

(d)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(e)      representing Capital Lease Obligations;

(f)      Disqualified Stock;

(g)      representing the balance deferred and unpaid of the purchase price of any property or services due more than six months after such property is acquired or such services are completed; or

(h)      representing any Hedging Obligations,

if and to the extent any of the preceding items (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person in accordance with GAAP.  In addition, the term "Indebtedness" includes all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) and, to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person.  Indebtedness shall be calculated without giving effect to the effects of FASB ASC 825 and FASB ASC 470-20 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness.  The amount of any Capital Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.  The loans under the Pre-Petition Credit Agreements, the Pre-Petition LC Facility Agreement and the DIP ABL Facility shall always be considered

"Indebtedness" hereunder, whether or not such loans are treated as indebtedness for U.S. federal income tax purposes.

"***Indemnified Person***" shall have the meaning provided in **Section 11.01(a)(ii)**.

"***Indemnified Taxes***" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of a Credit Party under any Credit Document and (b) to the extent not otherwise described in **clause (a)**, Other Taxes.

"***Independent Auditors***" shall have the meaning provided in **Section 7.01(c)**.

"***Initial Commitment***" shall mean, with respect to each Lender, the commitment of such Lender to make an Initial Loan to the Borrower in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on the Commitment Schedule, as such amount may be adjusted from time to time in accordance with this Agreement. The aggregate amount of the Lenders' Initial Commitments on (i) the Closing Date is $35,000,000 and (ii) upon the funding of the Initial Loan, will be $0.

"***Initial Loan***" has the meaning assigned to such term in **Section 2.01(a)**.

"***Initial Roll-Up Loans***" shall have the meaning provided in **Section 2.01(b).**

"***Intellectual Property***" shall have the meaning provided in **Section 6.19**.

"***Interest Determination Date***" shall mean, with respect to any LIBOR Loan, the second Business Day prior to the commencement of any Interest Period relating to such LIBOR Loan.

"***Interest Period***" shall have the meaning provided in **Section 2.14**.

"***Interim Order***" shall mean an order of the Bankruptcy Court, in the form set forth in Exhibit D, authorizing on an interim basis, among other things, the Term Loans (including the Roll-Up Loans) and the Transactions contemplated by this Agreement, with only such modifications as are satisfactory to the Borrower and the Required Lenders in their sole discretion.

"***Interim Order Entry Date***" shall mean the date on which the Interim Order is entered by the Bankruptcy Court.

"***Investments***" shall mean, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.  The acquisition by the Borrower or any Restricted Subsidiary of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Borrower or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value as of the date of such acquisition of the Investments held by the

#91897284v80

acquired Person in such third Person.  Except as otherwise provided in this Agreement, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value and net of any dividends, distributions, repayments or redemptions in cash received in respect of such Investment.

"*IRS*" shall mean the United States Internal Revenue Service.

"*Leaseholds*" of any Person shall mean all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"*Lenders*" shall mean each financial institution listed on **Schedule 2.01**, as well as any Person that becomes a "Lender" hereunder pursuant to **Sections 2.10** or **11.04(b)** or any amendment to this Agreement.

"*LIBO Base Rate*" shall mean, with respect to any Borrowing of LIBOR Loans for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two (2) Business Days prior to the commencement of such Interest Period by reference to the Reuters Screen LIBOR01 for deposits in Dollars (or such other comparable page as may, in the opinion of the Administrative Agent, replace such page for the purpose of displaying such rates) for a period equal to such Interest Period; *provided* that to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two (2) Business Days prior to the beginning of such Interest Period; *provided*, *further*, that if any such rate determined pursuant to this definition is below 2.00%, the LIBO Base Rate will be deemed 2.00%.

"*LIBO Rate*" shall mean, with respect to any Borrowing of LIBOR Loans for any Interest Period, (a) the rate per annum (rounded upwards, if necessary, to the nearest 1/100th of 1%) determined by the Administrative Agent to be equal to the LIBO Base Rate for such Loan for such Interest Period divided by (b) a percentage equal to 100% minus the then stated maximum rate of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special or other reserves required by applicable law) applicable to any member bank of the Federal Reserve System in respect of Eurocurrency funding or liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D).

"*LIBOR Loan*" shall mean each Loan designated as such by the Borrower at the time of the incurrence thereof or conversion thereto.

"*Lien*" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

#91897284v80

"***LLC Division***" shall mean the statutory division of any limited liability company into two or more limited liability companies pursuant to Section 18-217 of the Delaware Limited Liability Company Act or a comparable provision of a different jurisdiction's laws, as applicable.

"***Loan***" shall mean any Term Loan.

"***Margin Stock***" shall have the meaning provided in Regulation U.

"***Material Adverse Effect***" shall mean (a) a material adverse effect on the business, operations, property, assets or financial condition of the Borrower and its Subsidiaries taken as a whole; ***provided*** that the mere filing or continuation of the Cases or the events and conditions existing prior to the Petition Date related to, as a result of and/or leading up to such filing or continuation of the Cases shall not be deemed to have caused a Material Adverse Effect in and of themselves or (b) a material adverse effect (i) on the rights or remedies of the Lenders, the Administrative Agent or the Collateral Agent hereunder or under any other Credit Document or (ii) on the ability of any Credit Party to perform its obligations to the Lenders, the Administrative Agent or the Collateral Agent hereunder or under any other Credit Document.

"***Material Real Property***" shall mean (a) any Real Property with a Fair Market Value in excess of $2,500,000, which determination shall include the Fair Market Value of any improvements located on such owned or leased Real Property; (b) all of the owned or leased Real Property identified on **Schedule 5.01(k)(i)**; (c) in the case of any Real Property with coal reserves, any owned or leased Real Property which (i) contains more than 7,500,000 recoverable tons of coal, and (ii) is within Borrower's five-year mine plan and (d) any Material Real Property or similar term (as defined in the Pre-Petition Credit Documents or the DIP ABL Facility).

"***Material Lease***" shall mean any Real Property Lease or other contractual obligations in respect of Material Leased Real Property.

"***Material Leased Real Property***" shall mean any Material Real Property subject to a Real Property Lease with a Credit Party, as lessee.

"***Material Surface Property***" shall have the meaning provided in **Section 7.12(c)(ii)**.

"***Maturity Date***" shall mean [   ], 2019[1]; ***provided***, ***however***, that if such date is not a Business Day, the Maturity Date shall be the immediately preceding Business Day.

"***Maximum Rate***" shall have the meaning provided in **Section 11.18**.

"***Milestone***" shall have the meaning provided in **Section 7.16**.

"***Mine***" shall mean any excavation or opening into the earth now and hereafter made from which Coal or other minerals are or can be extracted on or from any of the Real Properties in which any Credit Party holds an ownership, leasehold or other interest.

---

[1] To be the date that is six (6) months after the commencement of the Cases.

#91897284v80

"***Minimum Borrowing Amount***" shall mean (a) for the Initial Loans made on the Closing Date, prior to the Final Order Entry Date, the lesser of (x) $35,000,000 and (y) the maximum amount of Loans authorized by the Interim Order and (b) for the Delayed Draw Loans made on the Delayed Draw Borrowing Date, $15,000,000.

"***Mining Financial Assurances***" shall mean performance bonds for reclamation or otherwise, surety bonds or escrow agreements and any payment or prepayment made with respect to, or certificates of deposit or other sums or assets required to be posted by the Borrower or any Subsidiary under Mining Laws for reclamation or otherwise.

"***Mining Laws***" shall mean any and all applicable current or future foreign or domestic, Federal, state or local statutes, ordinances, orders, rules, regulations, judgments, governmental authorizations, or any other requirements of governmental authorities relating to surface or subsurface mining operations, activities, and reclamation including, but not limited to, the Federal Coal Leasing Amendments Act; the Surface Mining Control and Reclamation Act; all other applicable land reclamation and use statutes and regulations; the Federal Mine Safety Act of 1977; the Black Lung Act; and the Coal Act; each as amended, and any comparable state and local laws or regulations.

"***Mining Lease***" shall mean a lease, license or other use agreement held on the Closing Date or thereafter acquired which provides the Borrower or any Restricted Subsidiary the real property and water rights, other interests in land, including Coal, mining and surface rights, easements, rights of way and options, and rights to timber and natural gas (including coalbed methane and gob gas) necessary to recover Coal from any Mine (a) currently operated by the Borrower or any Restricted Subsidiary or (b) part of any of the Borrower's mine plans. Leases which provide the Borrower or any Restricted Subsidiary the right to construct and operate a preparation plant and related facilities on the surface of the Real Property containing such reserves shall also be deemed a Mining Lease.

"***Mining Permits***" shall mean any and all permits, licenses, registrations, notifications, exemptions and any other authorization required under any applicable Mining Law or otherwise necessary to recover Coal from any Mine being operated by the Borrower or any Restricted Subsidiary.

"***Moody's***" shall mean Moody's Investors Service, Inc.

"***Mortgage***" shall mean a mortgage, leasehold mortgage, deed of trust, leasehold deed of trust, deed to secure debt, leasehold deed to secure debt, debenture or similar security instrument.

"***Mortgage Policy***" shall mean a Lender's title insurance policy (Form 2006).

"***Mortgaged Property***" shall mean any Real Property owned or leased by the Borrower or any of its Subsidiaries which is encumbered (or required to be encumbered) by the Interim Order (or, if applicable, the Final Order) or by a Mortgage pursuant to the terms hereof.

"***Multiemployer Plan***" shall mean any multiemployer plan as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is an obligation to contribute of) the Borrower or any of its Restricted Subsidiaries or with respect to which the

#91897284v80

Borrower or any of its Restricted Subsidiaries has any liability (including on account of an ERISA Affiliate).

"***Net Cash Proceed***s" shall mean

(a)       for any event, requiring a repayment of Loans pursuant to **<u>Section 4.02(c)</u>** or **<u>(e)</u>**, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such event, net of reasonable transaction costs of the Debtors (including, as applicable, any underwriting, brokerage or other customary commissions and reasonable legal, advisory and other fees and expenses associated therewith) received from any such event; ***provided*** that, with respect to **clauses (d)** and **(e)** of **Section 4.02**, no proceeds shall constitute Net Cash Proceeds until the aggregate amount of all such proceeds shall exceed $1,000,000; and

(b)       for any issuance of Equity Interests, the cash proceeds received from such issuance net of attorneys' fees, investment banking fees, accountants' fees, consulting fees, underwriting discounts and commissions and other fees and expenses of the Debtors actually incurred in connection therewith.

"***Net Sale Proceeds***" shall mean for any sale or other disposition of assets, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such sale or other disposition of assets, net of

(a)       reasonable transaction costs (including, without limitation, any underwriting, brokerage or other customary selling commissions, reasonable legal, advisory and other fees and expenses (including title and recording expenses), associated therewith and sales, VAT and transfer Taxes arising therefrom),

(b)       payments of unassumed liabilities relating to the assets sold or otherwise disposed of at the time of, or within 30 days after, the date of such sale or other disposition,

(c)       the amount of such gross cash proceeds required to be used to permanently repay any Indebtedness (other than Indebtedness of the Lenders pursuant to this Agreement) which is secured by the respective assets which were sold or otherwise disposed of, and

(d)       the estimated net marginal increase in income Taxes payable or Tax Distributions made by the Borrower or any Restricted Subsidiary of the Borrower with respect to the Fiscal Year of the Borrower in which the sale or other disposition occurs as a result of such sale or other disposition;

***provided***, ***however***, that such gross proceeds shall not include any portion of such gross cash proceeds which the Borrower determines in good faith should be reserved for post-closing adjustments (to the extent the Borrower delivers to the Lenders a certificate signed by an Authorized Officer as to such determination), it being understood and agreed that on the day that all such post-closing adjustments have been determined (which shall not be later than a time period following the date of the respective asset sale as agreed to by the Required Lenders), the amount (if any) by which the reserved amount in respect of such sale or disposition exceeds the

actual post-closing adjustments payable by the Borrower or any of its Restricted Subsidiaries shall constitute Net Sale Proceeds on such date received by the Borrower and/or any of its Restricted Subsidiaries from such sale or other disposition; *provided*, *further*, that no proceeds shall constitute Net Sale Proceeds until the aggregate amount of such proceeds shall exceed $1,000,000.

"*New Money Loans*" shall have the meaning provided in **Section 2.01(a)**.

"*Note*" shall have the meaning provided in **Section 2.04(b)**.

"*Notice of Borrowing*" shall have the meaning provided in **Section 2.02(a)**.

"*Notice of Conversion/Continuation*" shall have the meaning provided in **Section 2.13**.

"*Notice Office*" shall mean the office of the Administrative Agent located at Cantor, 900 West Trade Street, Suite 725, Charlotte, North Carolina  28202, with a copy to Cantor, 55 Water Street, 28th Floor, New York, NY 10041, or such other office or person as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"*Obligations*" shall mean all amounts owing from time to time by the Borrower and the other Credit Parties to the Administrative Agent, the Collateral Agent, any Lender or any other Secured Creditor pursuant to the terms of this Agreement or any other Credit Document (including all interest, fees and other amounts which accrue after the commencement of any bankruptcy, insolvency, receivership or similar proceeding whether or not allowed or allowable in any such proceeding).

"*OFAC*" shall have the meaning provided in the definition of "Embargoed Person."

"*Orders*" shall mean, collectively, the Interim Order and the Final Order.

"*Organizational Documents*" shall mean, with respect to any Person, the charter, articles or certificate of organization or incorporation and by-laws or other organizational or governing documents of such Person (including any limited liability company or operating agreement).

"*Other Connection Taxes*" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"*Other Taxes*" shall mean all present or future stamp, court or documentary, intangible, recording, filing or other similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to **Section 2.10**).

26

"*Participant*" shall have the meaning provided in **Section 11.04(a)**.

"*Participant Register*" shall have the meaning provided in **Section 11.04(e)**.

"*Patriot Trust RSA*" shall mean that certain Restructuring Support Agreement, dated as of July 15, 2019, among the Borrower and the trustee of the PPC Liquidating Trust established in connection with the jointly administered chapter 11 cases captioned *In re Patriot Coal Corporation*, Case No. 15-32450 (KLP), in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.

"*Payment Office*" shall mean the office of the Administrative Agent located at Cantor, 900 West Trade Street, Suite 725, Charlotte, North Carolina 28202, or such other office or person as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

"*PBGC*" shall mean the U.S. Pension Benefit Guaranty Corporation or any successor agency, referred to and defined in ERISA.

"*Perfection Certificate*" shall mean a certificate in a form approved by the Collateral Agent, as the same shall be supplemented from time to time.

"*Perfection Certificate Supplement*" shall mean a certificate in a form approved by the Collateral Agent.

"*Permitted Asset Sale*" shall have the meaning provided in Section 8.02.

"*Permitted Business*" shall mean any business that is the same as, or reasonably related, ancillary or complementary to, or a reasonable extension of, any of the businesses in which the Borrower and its Restricted Subsidiaries are engaged on the Closing Date.

"*Permitted Encumbrance*" shall mean, with respect to any Mortgaged Property, (i) those items described in **Section 8.01(i)** hereof and (ii) such other exceptions to title not described in **Section 8.01(i)** hereof as are set forth in the Mortgage Policy delivered with respect thereto which such other exceptions described in this **clause (ii)** must be acceptable to the Administrative Agent in its reasonable discretion.

"*Permitted Investments*" shall mean:

(a)    any Investment in the Borrower or a Guarantor;

(b)    any Investment in Cash Equivalents;

(c)    [reserved];

(d)    any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with **Section 8.02**;

(e)      any Investments received in compromise or resolution of (i) obligations of trade creditors or customers that were incurred in the ordinary course of business of the Borrower or any of its Restricted Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (ii) litigation, arbitration or other disputes;

(f)      Investments represented by Hedging Obligations permitted hereunder;

(g)      [reserved];

(h)      loans or advances to employees, including advances to employees for moving and travel expenses and similar expenditures, made in the ordinary course of business of the Borrower or any Restricted Subsidiary in an aggregate principal amount not to exceed $100,000 at any one time outstanding;

(i)      any Guarantee of Indebtedness to the extent such Guarantee is permitted to be incurred by **Section 8.04**, other than a Guarantee of Indebtedness of an Affiliate of the Borrower that is not a Restricted Subsidiary;

(j)      letters of credit issued to support reclamation liabilities of Unrestricted Subsidiaries to the extent permitted by **Section 8.04**;

(k)      to the extent constituting Investments, purchases and acquisitions of inventory, real property, equipment or supplies in the ordinary course of business;

(l)      (i) Investments in effect on the Closing Date and any Investment consisting of an extension, modification or renewal of any such Investment existing on the Closing Date in an amount not to exceed the amount of such Investment on the Closing Date and (ii) so long as no Event of Default is continuing at the time of such Investment, additional investments after the date of this Agreement in an amount, together with all other Investments made pursuant to clause (ii) of this clause (l) not to exceed $500,000.

"***Permitted Liens***" shall have the meaning provided in **Section 8.01**.

"***Person***" shall mean any individual, partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or any Governmental Authority.

"***Pledge Agreement***" shall mean that certain Pledge Agreement, dated as of the date hereof, by and among JMP Coal Holdings, LLC, JMP Blackhawk, LLC, and the Collateral Agent, as the same may be amended, amended and restated, modified and/or supplemented from time to time.

"***Pre-Petition ABL Asset Priority Liens***" shall mean Liens granted to the collateral agent under the Pre-Petition ABL Credit Agreement and the collateral documents relating thereto upon the ABL Priority Collateral (as defined in the ABL Credit Agreement) as amended and as in effect on the Petition Date.

#91897284v80

"***Pre-Petition ABL Asset Priority Lien Obligations***" shall mean the Obligations (as defined in the Pre-Petition ABL Credit Agreement).

"***Pre-Petition ABL Credit Agreement***" shall mean the Credit Agreement, dated as of September 6, 2017, among the Borrower, the other Credit Parties party thereto, Midcap Financial Trust, as agent and the other lenders party thereto from time to time, as the same may be amended, amended and restated, modified and/or supplemented from time to time in accordance with the terms thereof and as in effect on the Petition Date.

"***Pre-Petition ABL Credit Agreement Documents***" shall mean, the collective reference to the Pre-Petition ABL Credit Agreement, any notes issued pursuant thereto and the guarantees thereof, the collateral documents relating thereto, and the other Credit Documents (as defined therein) as amended and as in effect on the Petition Date.

"***Pre-Petition ABL Intercreditor Agreement***" shall mean that certain ABL Intercreditor Agreement, dated as of September 6, 2017, among the Borrower, the other Credit Parties party thereto, Midcap Financial Trust, as Collateral Agent, and each other agent or representative party thereto from time to time, as the same may be amended, modified and/or supplemented from time to time in accordance with the terms thereof.

"***Pre-Petition Credit Agreements***" shall mean the Pre-Petition First Lien Term Loan Credit Agreement and the Pre-Petition Second Lien Term Loan Credit Agreement.

"***Pre-Petition Credit Documents***" shall mean the Pre-Petition First Lien Term Loan Credit Agreement Documents and the Pre-Petition Second Lien Term Loan Credit Agreement Documents.

"***Pre-Petition First Lien Term Lenders***" shall mean the Lenders (as defined in the Pre-Petition First Lien Term Loan Credit Agreement).

"***Pre-Petition First Lien Term Loans***" shall mean the Loans (as defined in the Pre-Petition First Lien Term Loan Credit Agreement).

"***Pre-Petition First Lien Term Loan Credit Agreement***" shall mean the First Lien Term Loan Credit Agreement, dated as of February 17, 2017, among the Borrower, the other credit parties party thereto, Cantor Fitzgerald Securities, as successor administrative agent, and the other lenders party thereto from time to time, as the same may be amended, amended and restated, modified and/or supplemented from time to time in accordance with the terms thereof and as in effect on the Petition Date.

"***Pre-Petition First Lien Term Loan Credit Agreement Documents***" shall mean, the collective reference to the Pre-Petition First Lien Term Loan Credit Agreement, any notes issued pursuant thereto and the guarantees thereof, the collateral documents relating thereto, and the other Credit Documents (as defined therein), as amended and as in effect on the Petition Date.

"***Pre-Petition LC Facility Agreement***" shall mean that certain Letter of Credit and Reimbursement Agreement, dated as of February 17, 2017, by and between the Borrower and

Jefferies Group LLC, as the same may be amended, amended and restated, modified and/or supplemented from time to time in accordance with the terms thereof.

"***Pre-Petition Second Lien Term Loan Credit Agreement***" shall mean the First Lien Term Loan Credit Agreement, dated as of October 8, 2015, among the Borrower, the other credit parties party thereto, Cortland Capital Market Services LLC as successor administrative agent, and the other lenders party thereto from time to time, as the same may be amended, amended and restated, modified and/or supplemented from time to time in accordance with the terms thereof and as in effect on the Petition Date.

"***Pre-Petition Second Lien Term Loan Credit Agreement Documents***" shall mean, the collective reference to the Pre-Petition Second Lien Term Loan Credit Agreement, any notes issued pursuant thereto and the guarantees thereof, and the collateral documents relating thereto, as amended and as in effect on the Petition Date.

"***Prime Lending Rate***" shall mean, for any day, the prime rate published in The Wall Street Journal for such day; ***provided*** that, if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Lending Rate" shall mean the prime lending rate as set forth on the Bloomberg page PRIMBB Index (or successor page) for such day (or such other service as determined by the Administrative Agent from time to time for purposes of providing quotations of prime lending interest rates); each change in the Prime Lending Rate shall be effective on the date such change is effective.

"***PTE***" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"***Quarterly Payment Date***" shall mean the last Business Day of each March, June, September and December occurring after the Closing Date.

"***Real Property***" of any Person shall mean all the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"***Real Property Lease***" shall mean any lease, license, letting, concession, occupancy agreement, sublease, farm-in, farm-out, joint operating agreement, easement or right of way to which such Person is a party and is granted a possessory interest in or a right to use or occupy all or any portion of the Real Property (including, without limitation, the right to extract Coal, minerals oil, natural gas and other hydrocarbons and their constituents from any portion of Real Property not owned in fee by such Person) and every amendment or modification thereof, including with respect to the Credit Parties, without limitation, the leases with respect to Real Property and any contractual obligation with respect to any of the foregoing.

"***Recipient***" shall mean (a) the Administrative Agent and (b) any Lender, as applicable.

"***Recovery Event***" shall mean any event that gives rise to the receipt by the Borrower or any of its Restricted Subsidiaries of any cash insurance proceeds or condemnation awards payable (a) by reason of theft, loss, physical destruction, damage, taking or any other similar event with respect to any property or assets of the Borrower or any of its Restricted Subsidiaries and (b) under any policy of insurance required to be maintained under **Section 7.03**.

"***Register***" shall have the meaning provided in **Section 11.15**.

"***Regulation D***" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"***Regulation T***" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"***Regulation U***" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"***Regulation X***" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"***Release***" shall mean disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, or migrating into, through or upon any land or water or air, or otherwise entering into the outdoor or indoor environment.

"***Reorganization Plan***" shall mean a plan of reorganization or liquidation in any or all of the Cases.

"***Replaced Lender***" shall have the meaning provided **Section 2.10**.

"***Replacement Lender***" shall have the meaning provided in **Section 2.10**.

"***Reportable Event***" shall mean an event described in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Benefit Plan that is subject to Title IV of ERISA other than those events as to which the 30-day notice period is waived under applicable regulations.

"***Required Lenders***" shall mean, at any time, Lenders the sum of whose outstanding Loans and Commitments, without duplication, at such time represents a majority of the sum of all outstanding Loans and Commitments at such time.

"***Requirements of Law***" shall mean, collectively, any and all applicable requirements of any Governmental Authority including any and all laws, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes, case law or treaties.

"***Restricted Junior Debt Payment***" shall mean any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value (a) any Indebtedness of the Borrower or any Guarantor that is contractually subordinated (or required to be subordinated) to the Obligations or any Guaranteed Obligations, (b) any Indebtedness of the Borrower or any Guarantor (other than DIP ABL Asset Priority Lien Obligations) that is secured by Liens on all or any portion of the Collateral that are junior to the Liens on such Collateral securing the Obligations (including Indebtedness under the Pre-Petition Credit Documents) or (c) any other unsecured Indebtedness for borrowed money of the Borrower or any Restricted Subsidiary including the Patriot Trust RSA.

"*Restricted Payments*" shall mean

(a)    the declaration or payment of any dividend or making of any other payment or distribution (whether in cash, securities or other property) on account of the Borrower or any Restricted Subsidiary's Equity Interests (including, without limitation, any payment in connection with any merger, amalgamation or consolidation involving the Borrower or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Borrower or any Restricted Subsidiary's Equity Interests in their capacity as such,

(b)    the purchase, redemption, acquisition, retirement for value, acquisition, cancellation or termination (including, without limitation, in connection with any merger, amalgamation or consolidation involving the Borrower) of the Borrower or any Restricted Subsidiary's Equity Interests or

(c)    any payment or distribution (whether in cash, securities or other property) on account of any return of capital to the Borrower's or any Restricted Subsidiary's stockholders, partners or members (or the equivalent Person thereof).

"*Restricted Subsidiary*" of a Person shall mean any Subsidiary of the Borrower that is not an Unrestricted Subsidiary.

"*Returns*" shall have the meaning provided in **Section 6.09**.

"*Roll-Up*" shall have the meaning provided in **Section 2.01(b)**.

"*Roll-Up Loan*" shall have the meaning provided in **Section 2.01(b)**.

"*RSA*" shall mean that certain Restructuring Support Agreement, dated as of July 15, 2019 by and among the Credit Parties, and the creditor parties party thereto, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"*S&P*" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill Financial, Inc.

"*SEC*" shall have the meaning provided in **Section 7.01(i)**.

"*Secured Creditors*" shall mean the Administrative Agent, the Collateral Agent and the Lenders and their respective successors and assigns.

"*Securities Act*" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*Security Agreement*" shall have the meaning provided in **Section 5.01(j)**.

"*Security Agreement Collateral*" shall mean all "Pledged Collateral" as defined in the Security Agreement.

"*Security Document*" shall mean and include each of the Security Agreement, the Pledge Agreement, each Mortgage with respect to a Mortgaged Property, the DIP ABL Intercreditor Agreement, any Control Agreement and, after the execution and delivery thereof, each Additional Security Document, and any other related document, agreement or grant pursuant to which the Borrower or any of its Subsidiaries grants, perfects or continues a security interest in favor of the Collateral Agent for the benefit of the Secured Creditors. The Security Documents shall supplement, and shall not limit, the security interests granted pursuant to the Orders, but in the event of any conflict between the security interests granted pursuant to the Orders and the security interest granted pursuant to the Security Documents, the Orders shall govern.

"*Stated Maturity*" shall mean, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the documentation governing such Indebtedness, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

"*Subsidiary Guaranty*" shall have the meaning provided in **Section 5.01(i)**.

"*Subsidiary*" shall mean, with respect to any specified Person:

(a)      any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(b)      any partnership or limited liability company of which (i) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (ii) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*Superpriority Claim*" shall mean any administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in the case of any Credit Party having priority over any and all other administrative expenses, diminution claims and all other priority claims against the Debtors, subject only to the Carve-Out, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject only to and effective upon entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.

#91897284v80

"***Tax Distributions***" shall mean, (a) any payment made by the Borrower to the holders of its Equity Interests, for any Fiscal Year (or portion thereof) ending after the Closing Date for which the Borrower is treated as a partnership (or disregarded as an entity separate from a partnership) for U.S. federal income tax purposes, in an aggregate amount with respect to any such Fiscal Year not to exceed the maximum combined marginal U.S. federal, state and local income tax rate (after taking into account applicable limitations on the deductibility of items and the character of income in question (i.e., long term capital gain, qualified dividend income, etc.)) applicable to any direct (or, where the direct equity holder is a pass-through entity, indirect) equity holder of the Borrower multiplied by the amount of the Borrower's net taxable income for the relevant Fiscal Year (taking into account any audit adjustment made after the Closing Date (with respect to any Fiscal Year) but, for the avoidance of doubt, without regard to any adjustments pursuant to Section 734 or 743 of the Code), reduced by any net taxable loss with respect to all Fiscal Years (or portion thereof) beginning after the Closing Date to the extent such net taxable loss was not previously taken into account in calculating the Tax Distribution and is of a character that would permit such loss to be deducted against the income of the Fiscal Year (or portions thereof) in question, or (b) for any Fiscal Year (or portion thereof) ending after the Closing Date for which the Borrower is disregarded as an entity separate from a corporate parent (a "***Corporate Parent***") for U.S. federal income tax purposes, or is treated as a corporation for U.S. federal income tax purposes and is a member of a consolidated, combined, unitary or similar income tax group of which a direct or indirect parent of the Borrower is the common parent (a "***Tax Group***"), in each case, distributions to such Corporate Parent (or other parent of the Borrower), to pay the portion of the U.S. federal, state or local income Taxes of such Corporate Parent (or such Tax Group) that are attributable to the income of the Borrower and/or its Subsidiaries, in an aggregate amount not to exceed the amount of such Taxes that the Borrower and/or its applicable Subsidiaries would have paid had the Borrower and/or such Subsidiaries, as applicable, been a stand-alone corporate taxpayer (or a stand-alone corporate group); provided, that Tax Distributions in respect of any Fiscal Year may be paid throughout the Fiscal Year to cover estimated tax payments as reasonably determined by the Borrower; provided, further, that, to the extent the aggregate amount of estimated payments in respect of any Fiscal Year exceeds the actual amount of permitted Tax Distributions for such Fiscal Year, such excess shall reduce dollar for dollar the permitted Tax Distributions in respect of succeeding Fiscal Years (including, without duplication, any estimated payments); provided, further, that no Tax Distributions may be paid by the Borrower in respect of Taxes payable or paid directly by the Borrower or any Subsidiary.

"***Taxes***" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax, penalties or similar liabilities applicable thereto.

"***Term Loan***" shall mean a loan made pursuant to **Section 2.01**.

"***Termination Date***" shall mean the earliest of (a) the Maturity Date, (b) the effective date of the Acceptable Plan of Reorganization (the "***Plan Effective Date***") or any other Reorganization Plan, (c) the consummation of a sale or other disposition of all or substantially all assets of the Debtors under section 363 of the Bankruptcy Code, (d) the date of acceleration of the Loans and the termination of the Commitments with respect to the DIP Term Facility in

#91897284v80

accordance with the terms of this Agreement upon and during the continuance of an Event of Default and (e) the date that is 45 days after the entry of the Interim Order (or such later date as may be agreed by the Required Lenders), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date.

"***Transactions***" shall mean, collectively,

(a)    the execution, delivery and performance by each Credit Party of the Credit Documents to which it is a party, the incurrence of Term Loans (including, without limitation, the Roll-Up Loans) and the use of proceeds thereof,

(b)    the execution, delivery and performance by each Credit Party of the DIP ABL Facility and the other loan documents thereunder, the incurrence of loans thereunder and the use of the proceeds thereof, and

(c)    the payment of all fees and expenses in connection with the foregoing.

"***Type***" when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined.  For purposes hereof, the term "***Rate***" shall mean the LIBO Rate and the Base Rate.

"***U.S. Person***" shall mean any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"***U.S. Tax Compliance Certificate***" shall have the meaning provided to such term in **Section 4.04(e)(ii)(B)(3)**.

"***UCC***" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; ***provided***, ***however***, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of any Secured Creditor's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"***Unfunded Pension Liability***" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all plan assets (excluding any accrued but unpaid contributions).

"***United States***" and "***U.S.***" shall each mean the United States of America.

"***Unrestricted Subsidiary***" shall mean any Subsidiary of the Borrower that is designated by the Board of Directors  of the Borrower as an Unrestricted Subsidiary and approved by the Required Lenders.

#91897284v80

"*Unused Commitment Fee*" shall have the meaning set forth in **Section 3.01(a)**.

"*Unused Commitment Fee Rate*" shall mean 1.00% per annum.

"*Upfront Fee*" shall have the meaning set forth in **Section 3.01(b)**.

"*USA PATRIOT Act*" shall have the meaning provided in the definition of "Anti-Terrorism Laws."

"*Voting Stock*" of any specified Person as of any date shall mean the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"*Write-Down and Conversion Powers*" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

### Section 1.02    Other Definitional Provisions.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Credit Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Credit Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms not defined in **Section 1.01** shall have the respective meanings given to them under GAAP, (ii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) unless the context otherwise requires, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Equity Interests, securities, revenues, accounts, leasehold interests and contract rights, (v) the word "will" shall be construed to have the same meaning and effect as the word "shall," (vi) any definition of or reference to any Credit Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein) and (vii) unless the context otherwise requires, any reference herein (A) to any Person shall be construed to include such Person's successors and assigns and (B) to the Borrower or any other Credit Party shall be construed to include the Borrower or such Credit Party as debtor and debtor-in-possession and any receiver or trustee for the Borrower or any other Credit Party, as the case may be, in any insolvency or liquidation proceeding.

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular

#91897284v80

provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)     For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Type (e.g., a "LIBOR Loan").

### Section 1.03    LLC Division.

For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws, as applicable): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

### Section 1.04    Covenants.

For purposes of any calculation under **Sections 8.01** and **8.04**, if the Borrower elects to give pro forma effect in such calculation to the entire committed amount of any proposed Indebtedness, whether or not then drawn, such committed amount may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with **Section 8.01** or **8.04**, but for so long as such commitment or Indebtedness is outstanding or in effect, the entire committed amount of such Indebtedness then in effect shall be deemed drawn and outstanding for all purposes hereunder.

## ARTICLE II.
## AMOUNT AND TERMS OF CREDIT.

### Section 2.01    Commitments.

(a)     **New Money Loans**. Subject to the terms and conditions set forth herein and in the Orders, each Lender agrees, severally and not jointly, (a) following entry of the Interim Order and satisfaction of the conditions to Borrowing set forth in **Section 5.01**, to make a term loan to the Borrower in a single Borrowing on the Closing Date (the "***Initial Loan***") in a principal amount not to exceed such Lender's Initial Commitment amounts and (b) following satisfaction of the conditions to Borrowing set forth in **Section 5.02**, to make a term loan to the Borrower in a single Borrowing on the Delayed Draw Borrowing Date (the "***Delayed Draw Loan***" and, together with the Initial Loan, the "***New Money Loans***") in a principal amount not to exceed such Lenders' Delayed Draw Commitment.  Once funded each Initial Loan and each Delayed Draw Loan shall be a "***Loan***" and a "***Term Loan***" for all purposes under this Agreement and the other Credit Documents.

(b)     **Roll-Up Loans**.  Subject to the terms and conditions set forth herein, (i) subject to entry of the Interim Order, on the Closing Date, Pre-Petition First Lien Term Loans held by Pre-

#91897284v80

Petition First Lien Term Lenders who are also Lenders or Affiliates of Lenders hereunder, shall be automatically substituted and exchanged for (and prepaid by) loans hereunder (the "***Initial Roll-Up Loans***"), on a pro rata basis (based on the Initial Loans that such Pre-Petition First Lien Term Lender or its Affiliate funded to the Borrower on the Closing Date pursuant to **Section 2.01(a)**), in a principal amount equal to $2.00 of Pre-Petition First Lien Term Loans of such Lender or such Affiliate of such Lender for each $1.00 of the Initial Loans funded hereunder on the Closing Date by such Lender and (ii) subject to entry of the Final Order, on the Delayed Draw Borrowing Date, Pre-Petition First Lien Term Loans held by Pre-Petition First Lien Term Lenders who are also Lenders or Affiliates of Lenders hereunder, shall be automatically substituted and exchanged for (and prepaid by) loans hereunder (the "***Additional Roll-Up Loans***" and, together with the Initial Roll-Up Loans, the "***Roll-Up Loans***"), on a pro rata basis (based on the Delayed Draw Loans that such Pre-Petition First Lien Term Lender or its Affiliate funded to the Borrower on the Delayed Draw Borrowing Date pursuant to **Section 2.01(a)**) in a principal amount equal to $2.00 of Pre-Petition First Lien Term Loans of such Lender or Affiliate of such Lender for each $1.00 of Delayed Draw Loans funded hereunder by such Lender on the Delayed Draw Borrowing Date (the Initial Roll-Up Loans shall be deemed funded on the Closing Date and the Additional Roll-Up Loans shall be deemed funded on the Delayed Draw Borrowing Date and each shall constitute and be deemed to be a "***Loan***" and a "***Term Loan***" hereunder) (the foregoing substitution and exchange of Pre-Petition First Lien Term Loans into Roll-Up Loans shall be defined herein, generally, as the "***Roll-Up***").

(c)     Amounts borrowed (or deemed borrowed) under **Section 2.01** and paid or prepaid in respect of the Term Loans may not be reborrowed.

(d)     For the avoidance of doubt, solely with respect to the applicable calculations in determining the Lenders constituting "Required Lenders" hereunder, the New Money Loans and the Roll-Up Loans shall constitute a single class of Loans.

### Section 2.02    Notice of Borrowing.

(a)     When the Borrower desires to incur Term Loans hereunder, the Borrower shall give the Administrative Agent at the Notice Office at least one Business Day's prior notice of each Term Loan to be incurred hereunder, ***provided*** that (in each case) any such notice shall be deemed to have been given on a certain day only if given before 11:00 A.M. (New York City time) (or such later time as may be agreed by the Administrative Agent in its sole discretion) on such day.  Each such notice (each, a "***Notice of Borrowing***") shall be irrevocable and shall be in writing, or by telephone promptly confirmed in writing, in the form of **Exhibit A-1**, appropriately completed to specify:  (i) the aggregate principal amount of the Term Loans to be incurred pursuant to such Borrowing, (ii) the date of such Borrowing (which shall be a Business Day) and (iii) whether the Term Loans being incurred pursuant to such Borrowing are to be initially maintained as Base Rate Loans or LIBO Rate Loans and, if LIBO Rate Loans, the initial Interest Period to be applicable thereto.  The Administrative Agent shall promptly give each Lender which is required to make Term Loans notice of such proposed Borrowing, of such Lender's proportionate share thereof and of the other matters required by the immediately preceding sentence to be specified in the Notice of Borrowing.

(b)        Without in any way limiting the obligation of the Borrower to confirm in writing any telephonic notice of any Borrowing or prepayment of Term Loans, the Administrative Agent may act without liability upon the basis of telephonic notice of such Borrowing or prepayment, as the case may be, believed by the Administrative Agent in good faith to be from an Authorized Officer of the Borrower, prior to receipt of written confirmation.   In each such case, the Borrower hereby waives the right to dispute the Administrative Agent's record of the terms of such telephonic notice of such Borrowing or prepayment of Term Loans, as the case may be, absent manifest error.

### Section 2.03    Disbursement of Funds.

No later than 1:00 P.M. (New York City time) on the date specified in each Notice of Borrowing, each Lender will make available its pro rata portion (determined in accordance with **Section 2.05**) of each such Borrowing requested to be made on such date.  All such amounts will be made available in Dollars and in immediately available funds at the Payment Office, and the Administrative Agent will make available to the Borrower at the Payment Office, or to such other account as the Borrower may specify in writing prior to a Borrowing Date, the aggregate of the amounts so made available by the Lenders.  Unless the Administrative Agent shall have been notified by any Lender prior to the date of Borrowing that such Lender does not intend to make available to the Administrative Agent such Lender's portion of any Borrowing to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Borrower a corresponding amount.  If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender on such Borrowing Date.  If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent.   The Administrative Agent also shall be entitled to recover on demand from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if recovered from such Lender, the overnight Federal Funds Rate for the first three days and at the interest rate otherwise applicable to such Term Loans for each day thereafter and (ii) if recovered from the Borrower, the rate of interest applicable to the respective Borrowing, as determined pursuant to **Section 2.06**.  Nothing in this **Section 2.03** shall be deemed to relieve any Lender from its obligation to make Term Loans hereunder or to prejudice any rights which the Borrower may have against any Lender as a result of any failure by such Lender to make Term Loans hereunder.

### Section 2.04    Repayment of Loans; Notes.

(a)        The Borrower hereby unconditionally promises to (i) subject to clause (e) below, repay in full in cash the outstanding Loans to the Administrative Agent for the account of each Lender on the Termination Date, together with accrued and unpaid interest on the principal

#91897284v80

amount to be paid to but excluding the date of such payment and (ii) to pay all fees under and in accordance with **Section 3.01**.

(b)    The Borrower's obligation to pay the principal of, and interest on, the Loans made by each Lender shall be evidenced in the Register maintained by the Administrative Agent pursuant to **Section 11.15** and shall, if requested by such Lender, also be evidenced by a promissory note duly executed and delivered by the Borrower substantially in the form of **Exhibit B**, with blanks appropriately completed in conformity herewith (each, a "*Note*" and, collectively, the "*Notes*").

(c)    Each Lender will note on its internal records the amount of each Loan made by it and each payment in respect thereof and prior to any transfer of any of its Notes will endorse on the reverse side thereof the outstanding principal amount of Loans evidenced thereby.  Failure to make any such notation or any error in such notation shall not affect the Borrower's obligations in respect of such Loans.

(d)    Notwithstanding anything to the contrary contained above in this **Section 2.04** or elsewhere in this Agreement, Notes shall only be delivered to Lenders which at any time specifically request the delivery of such Notes.  No failure of any Lender to request or obtain, maintain or produce a Note evidencing its Loans to the Borrower shall affect or in any manner impair the obligations of the Borrower to pay the Loans (and all related Obligations) incurred by the Borrower which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to any Credit Document.  Any Lender which does not have a Note evidencing its outstanding Loans shall in no event be required to make the notations otherwise described in the preceding **clause (c)**.  At any time when any Lender requests the delivery of a Note to evidence any of its Loans, the Borrower shall promptly execute and deliver to the respective Lender the requested Note in the appropriate amount or amounts to evidence such Loans.

(e)    The Loans shall mature, and shall be due and payable without any further notice, on the Termination Date; provided that if the Termination Date occurs due to the occurrence of the Plan Effective Date, notwithstanding anything contained herein or any other Credit Document, the principal amount of Loans shall not be repaid by the Borrower in cash but shall be repaid by means of conversion of such principal amount of Loans on a dollar for dollar basis into exit term loans in accordance with the Acceptable Plan of Reorganization and the RSA and otherwise upon terms satisfactory to the Required Lenders, and the principal amount of the Loans and other Obligations (other than interest and Obligations which, by the terms of any Credit Document, expressly survive the repayment in full of the Loans) shall be deemed fully satisfied by such conversion.

### Section 2.05    Pro Rata Borrowings.

All Borrowings shall be incurred from the Lenders pro rata on the basis of their applicable Commitments.  It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Loans hereunder and that each Lender shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

#91897284v80

### Section 2.06    Interest.

(a)    The Borrower agrees to pay interest in respect of the unpaid principal amount of each Base Rate Loan from the date of Borrowing thereof until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such Base Rate Loan to a LIBOR Loan pursuant to **Section 2.13** or **2.14**, as applicable, at a rate per annum which shall be equal to the sum of the Applicable Margin for Base Rate Loans plus the Base Rate, each as in effect from time to time.

(b)    The Borrower agrees to pay interest in respect of the unpaid principal amount of each LIBOR Loan from the date of Borrowing thereof until the earlier of (i) the maturity thereof (whether by acceleration or otherwise) and (ii) the conversion of such LIBOR Loan to a Base Rate Loan pursuant to **Section 2.07**, **2.13** or **2.14**, as applicable, at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the Applicable Margin for LIBOR Loans as in effect from time to time during such Interest Period plus the LIBO Rate for such Interest Period.

(c)    Overdue principal and, to the extent permitted by law, overdue interest in respect of each Loan shall, in each case, bear interest at a rate per annum equal to the rate which is 2.00% in excess of the rate then borne by such Loans, and all other overdue amounts payable hereunder and under any other Credit Document shall bear interest at a rate per annum equal to the rate which is 2.00% in excess of the rate applicable to Loans.  Interest that accrues under this **Section 2.06(c)** shall be payable on demand.

(d)    Accrued (and theretofore unpaid) interest shall be payable (i) in respect of each Base Rate Loan, (x) quarterly in arrears on each Quarterly Payment Date, (y) on the date of any repayment or prepayment (on the amount repaid or prepaid) of such Base Rate Loan, and (z) at maturity (whether by acceleration or otherwise) and, after such maturity, on demand and (ii) in respect of each LIBOR Loan, (x) on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each date occurring at three month intervals after the first day of such Interest Period, (y) on the date of any repayment or prepayment (on the amount repaid or prepaid) of such LIBOR Loan and (z) at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

(e)    Upon each Interest Determination Date, the Administrative Agent shall determine the LIBO Rate for each Interest Period applicable to the respective LIBOR Loans and shall promptly notify the Borrower and the Lenders thereof.  Each such determination shall, absent manifest error, be final and conclusive and binding on all parties hereto.

### Section 2.07    Increased Costs.

(a)    **Increased Costs Generally**.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the LIBO Rate);

41

(ii)      subject any Recipient to any additional Taxes (other than (A) Indemnified Taxes, (B) Taxes described in **clauses (b)** through **(d)** of the definition of Excluded Taxes and (C) Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)      impose on any Lender any other condition, cost or expense (other than with respect to Taxes) affecting this Agreement or Term Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any Term Loan, or of maintaining its obligation to make any such Term Loan, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then, upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)      **Capital Requirements**.  If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's parent company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's parent company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Term Loans made by such Lender to a level below that which such Lender or such Lender's parent company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's parent company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's parent company for any such reduction suffered.

(c)      **Certificates for Reimbursement**.  Any Lender requesting compensation under this **Section 2.07** shall deliver to the Borrower a certificate setting forth, in reasonable detail, the amount or amounts necessary to compensate such Lender or its parent company, as the case may be, as specified in **subsection (a)** or **(b)** of this **Section 2.07** and the basis for calculating such amounts, which certificate shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate promptly after receipt thereof.

(d)      **Delay in Requests**.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this **Section 2.07** shall not constitute a waiver of such Lender's right to demand such compensation, ***provided*** that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this **Section 2.07** for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

#91897284v80

Section 2.08    [Reserved].

Section 2.09    Designation of a Different Lending Office.

If any Lender requests compensation under **Section 2.07**, or if any Lender gives a notice pursuant to **Section 2.16** or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to **Section 4.04**, then at the request of the Borrower such Lender shall, as applicable, use reasonable efforts to designate a different lending office for funding or booking its Term Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to **Section 2.07** or **4.04**, as the case may be, in the future, or eliminate the need for the notice pursuant to **Section 2.16**, as applicable and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 2.10    Replacement of Lenders.

(a)        (x) Upon the occurrence of any event giving rise to the operation of **Section 2.07** with respect to any Lender which results in such Lender charging to the Borrower increased costs in excess of those being generally charged by the other Lenders, or of **Section 4.04** with respect to any Lender which results in the Borrower paying any Indemnified Taxes or additional amounts to such Lender or any Governmental Authority for the account of such Lender, or (y) in the case of a refusal by a Lender to consent to a proposed change, waiver, discharge or termination with respect to this Agreement which has been approved by the Required Lenders as (and to the extent) provided in **Section 11.12(b)**, the Borrower shall have the right, in accordance with **Section 11.04(b)**, if no Default or Event of Default then exists or would exist after giving effect to such replacement, to replace such Lender (the "*Replaced Lender*") with one or more other Eligible Transferees (collectively, the "*Replacement Lender*") and each of which shall be reasonably acceptable to the Administrative Agent; *provided* that:

(i)        at the time of any replacement pursuant to this **Section 2.10**, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to **Section 11.04(b)** (and with all fees payable pursuant to said **Section 11.04(b)** to be paid by the Replacement Lender and/or the Replaced Lender  (as may be agreed to at such time by and among the Borrower, the Replacement Lender and the Replaced Lender)) pursuant to which the Replacement Lender shall acquire all of the Term Loan Commitments and outstanding Term Loans of the Replaced Lender and, in connection therewith, shall pay to the Replaced Lender in respect thereof an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Term Loans of the respective Replaced Lender and (B) an amount equal to all accrued, but theretofore unpaid, Fees owing to the Replaced Lender pursuant to **Section 3.01**; and

(ii)        all obligations of the Borrower then owing to the Replaced Lender (other than those specifically described in **clause (i)** above in respect of which the assignment

#91897284v80

purchase price has been, or is concurrently being, paid but including all amounts, if any, owing under **Section 2.15**) shall be paid in full to such Replaced Lender concurrently with such replacement.

(b)    Upon receipt by the Replaced Lender of all amounts required to be paid to it pursuant to this **Section 2.10**, the Administrative Agent shall be entitled (but not obligated) and is authorized (which authorization is coupled with an interest) to execute an Assignment and Assumption Agreement on behalf of such Replaced Lender, and any such Assignment and Assumption Agreement so executed by the Administrative Agent and the Replacement Lender shall be effective for purposes of this **Section 2.10** and **Section 11.04**.  Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in **clauses (i)** and **(ii)** of the proviso in **Section 2.10(a)**, recordation of the assignment on the Register by the Administrative Agent pursuant to **Section 11.15**, the Replacement Lender shall become a Lender hereunder and the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, **Sections 2.07**, **4.04**, **10.06**, **11.01** and **11.06**), which shall survive as to such Replaced Lender.  To the extent requested by any Replacement Lender, a Note will be promptly issued, at the Borrower's expense, to such Replacement Lender in conformity with the requirements of **Section 2.04**.

Section 2.11    **[Reserved].**

Section 2.12    **[Reserved].**

Section 2.13    **Conversions**.  The Borrower shall have the option to convert, on any Business Day, all or a portion equal to at least $5,000,000 of the outstanding principal amount of Loans made pursuant to one or more Borrowings of one or more Types of Loans into a Borrowing of another Type of Loan; ***provided*** that,

(a)    except as otherwise provided in **Sections 2.15** or **2.16**, LIBOR Loans may be converted into Base Rate Loans only on the last day of an Interest Period applicable to the Loans being converted and no such partial conversion of LIBOR Loans shall reduce the outstanding principal amount of such LIBOR Loans made pursuant to a single Borrowing to less than $5,000,000,

(b)    unless the Required Lenders otherwise agree, Base Rate Loans may only be converted into LIBOR Loans if no Default or Event of Default is in existence on the date of the conversion, and

(c)    no conversion pursuant to this **Section 2.13** shall result in a greater number of Borrowings of LIBOR Loans than is permitted under **Section 2.16**.

Each such conversion shall be effected by the Borrower by giving the Administrative Agent at the Notice Office prior to 11:00 A.M. (New York City time) at least (x) in the case of conversions of Base Rate Loans into LIBOR Loans, three Business Days' prior notice and (y) in the case of conversions of LIBOR Loans into Base Rate Loans, one Business Day's prior notice (each, a "***Notice of Conversion/Continuation***"), in each case in the form of **Exhibit A-2**, appropriately completed to specify the Loans to be so converted, the Borrowing or Borrowings

pursuant to which such Loans were incurred and, if to be converted into LIBOR Loans, the Interest Period to be initially applicable thereto.  The Administrative Agent shall give each Lender prompt notice of any such proposed conversion affecting any of its Loans.

### Section 2.14    Interest Periods.

At the time the Borrower gives any Notice of Borrowing or Notice of Conversion/Continuation in respect of the making of, or conversion into, any LIBOR Loan (in the case of the initial Interest Period applicable thereto) or prior to 11:00 A.M. (New York City time) on the third Business Day prior to the expiration of an Interest Period applicable to such LIBOR Loan (in the case of any subsequent Interest Period), the Borrower shall have the right to elect the interest period (each, an "*Interest Period*") applicable to such LIBOR Loan, which Interest Period shall, at the option of the Borrower, be (x) a one, two, three or six month period or, if approved by each Lender that holds such Loans (or commitments with respect thereto), a twelve month period or (y) if agreed by the Administrative Agent and each Lender that holds such Loans (or commitments with respect thereto) in its sole discretion, such other period; *provided* that (in each case):

(a)    all LIBOR Loans comprising a Borrowing shall at all times have the same Interest Period;

(b)    the initial Interest Period for any LIBOR Loan shall commence on the date of Borrowing of such LIBOR Loan (including the date of any conversion thereto from a Base Rate Loan) and each Interest Period occurring thereafter in respect of such LIBOR Loan shall commence on the day on which the next preceding Interest Period applicable thereto expires;

(c)    if any Interest Period for a LIBOR Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

(d)    if any Interest Period for a LIBOR Loan would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; *provided*, *however*, that if any Interest Period for a LIBOR Loan would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(e)    unless the Required Lenders otherwise agree, no Interest Period may be selected at any time when a Default or an Event of Default is then in existence (and, upon the expiration of any Interest Period then in effect, such LIBOR Loan shall be converted to a Base Rate Loan); and

(f)    no Interest Period in respect of any Borrowing shall be selected which extends beyond the Maturity Date.

If by 11:00 A.M. (New York City time) on the third Business Day prior to the expiration of any Interest Period applicable to a Borrowing of LIBOR Loans, the Borrower has failed to elect, or is not permitted to elect, a new Interest Period to be applicable to such LIBOR Loans as provided above, the Borrower shall be deemed to have elected to convert such LIBOR Loans into LIBOR

Loans with an Interest Period of one month effective as of the expiration date of such current Interest Period unless a Default or an Event of Default is then in existence, in which case, such expiring LIBOR Loans shall be converted in to Base Rate Loans.

Section 2.15    **Compensation.**

Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any LIBOR Loan on a day other than the last day of the Interest Period for such LIBOR Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any LIBOR Loan on the date or in the amount notified by the Borrower; or

(c)    any assignment of a LIBOR Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to **Section 2.10**;

including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such LIBOR Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrower to the Lenders under this **Section 2.15**, each Lender shall be deemed to have funded each LIBOR Loan made by it at the LIBO Base Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Loan was in fact so funded.

Section 2.16    **Illegality.**

If any Lender determines that any Requirement of Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to perform any of its obligations hereunder or make, maintain or fund or charge interest with respect to any Loan or to determine or charge interest rates based upon the LIBO Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (a) any obligation of such Lender to issue, make, maintain, fund or charge interest with respect to any such Loan or continue LIBOR Loans or to convert Base Rate Loans to LIBOR Loans shall be suspended, and (b) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the LIBO Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the LIBO Rate component of the Base Rate, in each case until such Lender notifies the Administrative Agent

and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (x) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all LIBOR Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the LIBO Rate component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBOR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the LIBO Rate, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the LIBO Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the LIBO Rate. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

**Section 2.17    Inability to Determine Rates.**

If in connection with any request for a LIBOR Loan or a conversion to or continuation thereof, (a) the Administrative Agent determines that (i) Dollar deposits are not being offered to banks in the London interbank market for the applicable amount and Interest Period of such LIBOR Loan, or (ii) adequate and reasonable means do not exist for determining the LIBO Rate for any requested Interest Period with respect to a proposed LIBOR Loan or in connection with an existing or proposed Base Rate Loan (in each case with respect to **clause (a)(i)** above, "*Impacted Loans*"), or (b) the Administrative Agent or the Required Lenders determine that for any reason the LIBO Rate for any requested Interest Period with respect to a proposed LIBOR Loan does not adequately and fairly reflect the cost to such Lenders of funding such LIBOR Loan, the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain LIBOR Loans shall be suspended (to the extent of the affected LIBOR Loans or Interest Periods) and (y) in the event of a determination described in the preceding sentence with respect to the LIBO Rate component of the Base Rate, the utilization of the LIBO Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent upon the instruction of the Required Lenders revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of LIBOR Loans (to the extent of the affected LIBOR Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Notwithstanding the foregoing, if the Administrative Agent has made the determination described in **clause (a)(i)** of the preceding paragraph, the Administrative Agent, in consultation with the Borrower and the affected Lenders, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans until (1) the Administrative Agent revokes the notice delivered with respect to the Impacted Loans under **clause (a)** of the first sentence of this section, (2) the Administrative Agent or the Required Lenders notify the Administrative Agent and the Borrower that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding

the Impacted Loans, or (3) any Lender determines that any Requirement of Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides the Administrative Agent and the Borrower written notice thereof.

### Section 2.18    Minimum Amount of Each Borrowing.

The aggregate principal amount of each Borrowing of Loans of a specific Type shall not be less than the Minimum Borrowing Amount applicable thereto. More than one Borrowing may occur on the same date, but at no time shall there be outstanding more than four Borrowings of LIBOR Loans in the aggregate for all Loans (or such greater number of Borrowings of LIBOR Loans as may be agreed to from time to time by the Administrative Agent and the Required Lenders).

### Section 2.19    No Discharge.

Each of the Credit Parties agrees that to the extent that its obligations under the Credit Documents have not been satisfied in full in cash or otherwise satisfied as set forth in **Section 2.04(e)**, (i) its obligations under the Credit Documents shall not be discharged by any Reorganization Plan or any order confirming a Reorganization Plan (and each of the Credit Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) as to the Obligations and (ii) the Superpriority Claim granted to the Agents and the Lenders pursuant to the Orders and the Liens granted to the Agents and the Lenders pursuant to the Orders shall not be affected in any manner by any Reorganization Plan or any order confirming a Reorganization Plan.

### ARTICLE III.
### FEES

### Section 3.01    Fees.

The Borrower agrees to pay to the Administrative Agent and any Lender such fees as may be agreed to in writing from time to time by the Borrower and the Administrative Agent and any Lender, including the following fees:

(a)    The Borrower agrees to pay to the Administrative Agent for the account of each Lender according to its pro rata share of the Delayed Draw Commitments a nonrefundable commitment fee (the "***Unused Commitment Fee***") for each day from and including the Closing Date until but excluding the Delayed Draw Commitment Termination Date equal to the Unused Commitment Fee Rate (computed on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed) multiplied by the average daily amount of unused Delayed Draw Commitments.  All Unused Commitment Fees shall be payable in arrears for each month (x) on the last Business Day of such month ending after the Closing Date and (y) on the Delayed Draw Borrowing Date;

(b)     The Borrower agrees to pay to the Administrative Agent for the account of each Lender, an upfront fee (the "*Upfront Fee*") in an amount equal to 1.00% of (i) the principal amount of each such Lender's aggregate Initial Commitment on the Closing Date, payable on the Closing Date upon the funding of the Initial Loan and (ii) the principal amount of each such Lender's aggregate Delayed Draw Commitment on the Delayed Draw Borrowing Date, payable on the Delayed Draw Borrowing Date upon the funding of the Delayed Draw Loans, in each case, which may, at the option of the Required Lenders, be in the form of original issue discount;

(c)     The Borrower agrees to pay to the Lenders an exit fee (the "*Exit Fee*") in an aggregate amount equal to 1.00% of the aggregate principal amount of the New Money Loans made by each such Lender under this Agreement, which shall be due and payable in cash on the Termination Date or, in the case of New Money Loans prepaid in whole or in part prior to the Termination Date pursuant to Sections **4.01** or **4.02**, if any, shall be due and payable in cash on the date of such prepayment; and

(d)     The Borrower shall pay to the Agents such other fees as shall have been separately agreed upon in writing for its own account fees in the amounts and at the times so specified, including the fees specified in the Agent Fee Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the Administrative Agent).

### Section 3.02    Reduction of Commitments.

(a)     The Initial Commitment of each Lender shall terminate in its entirety on the Closing Date after giving effect to the making of the Initial Loans on such date.

(b)     The Delayed Draw Commitment of each Lender shall terminate in its entirety on the Delayed Draw Borrowing Date after giving effect to the making of the Delayed Draw Loans on such date.

**ARTICLE IV.**
**PREPAYMENTS; PAYMENTS; TAXES.**

### Section 4.01    Voluntary Prepayments.

(a)     Subject to **Section 3.01(c)**, the Borrower shall have the right to prepay the Loans, without premium or penalty, in whole or in part at any time and from time to time on the following terms and conditions:

(i)     the Borrower shall give the Administrative Agent prior to 12:00 Noon (New York City time) at the Notice Office (A) at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) of its intent to prepay Base Rate Loans and (B) at least three Business Days' prior written notice (for telephonic notice promptly confirmed in writing) of its intent to prepay LIBOR Loans, which notice (in each case) shall specify the amount of such prepayment and the Types of Loans to be prepaid and, in the case of LIBOR Loans, the specific Borrowing or Borrowings pursuant to which such LIBOR Loans were made, and which notice the Administrative Agent shall promptly transmit to each of the Lenders;

#91897284v80

(ii)      each partial prepayment of Term Loans pursuant to this **Section 4.01(a)** shall be in an aggregate principal amount of at least $1,000,000 (or such lesser amount as is acceptable to the Administrative Agent in any given case); and

(iii)      each prepayment of Term Loans pursuant to this **Section 4.01(a)** shall be applied (A) first, pro rata among the New Money Loans then outstanding until such New Money Loans are repaid in full and (B) thereafter, pro rata among the Roll-Up Loans then outstanding until such Roll-Up Loans are repaid in full.

### Section 4.02    Mandatory Repayments.

(a)      [Reserved].

(b)      [Reserved].

(c)      **Indebtedness**.  Subject to **Section 3.01(c)**, on each date upon which the Borrower or any of its Restricted Subsidiaries receives any Net Cash Proceeds from any issuance or incurrence by the Borrower or any of its Restricted Subsidiaries of Indebtedness (other than Indebtedness permitted to be incurred pursuant to **Section 8.04**), an amount equal to 100% of the Net Cash Proceeds of the respective incurrence of Indebtedness shall be applied on such date as a mandatory repayment in accordance with the requirements of **Section 4.02(g)**.

(d)      **Asset Sales**.  Subject to **Section 3.01(c)**, if the Borrower or any Restricted Subsidiary receives any Net Sale Proceeds from an Asset Sale (other than any Permitted Asset Sale), on the fifth Business Day following the receipt of such Net Sale Proceeds, the Borrower shall apply an amount equal to 100% of the Net Sale Proceeds therefrom on such date as a mandatory repayment in accordance with the requirements of **Section 4.02(g)**.

(e)      **Recovery Events**.  Subject to **Section 3.01(c)**, if the Borrower or any Restricted Subsidiary receives any Net Cash Proceeds from a Recovery Event, on the fifth Business Day following the receipt of such Net Cash Proceeds, the Borrower shall apply an amount equal to 100% of the Net Cash Proceeds therefrom on such date as a mandatory repayment in accordance with the requirements of **Section 4.02(g)**.

(f)      [Reserved].

(g)      Application.  Subject to the Orders and the DIP ABL Intercreditor Agreement, each amount required to be applied pursuant to Section 4.02(c), (d) or (e) in accordance with this Section 4.02(g) shall be applied (i) first, pro rata among the New Money Loans then outstanding until such New Money Loans are repaid in full and (ii) thereafter, pro rata among the Roll-Up Loans then outstanding until such Roll-Up Loans are repaid in full.

(h)      In addition to any other mandatory repayments pursuant to this **Section 4.02**, for the avoidance of doubt all then outstanding Term Loans shall be repaid in full on the Termination Date.

**Section 4.03    Method and Place of Payment.**

(a)    Except as otherwise specifically provided herein, all payments under this Agreement and under any Note shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 12:00 Noon (New York City time) on the date when due and shall be made in Dollars in immediately available funds at the Payment Office. Whenever any payment to be made hereunder or under any Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

(b)    All payments made by the Borrower hereunder and under any Note will be made without setoff, counterclaim or other defense.

**Section 4.04    Taxes.**

(a)    **Payments Free of Taxes**.  Any and all payments by or on account of any obligation of any Credit Party under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment, then the applicable withholding agent shall make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, to the extent such deduction or withholding is on account of an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this **Section 4.04**) the applicable Lender (or, in the case of any amount received by the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    **Payment of Other Taxes by the Borrower**.  The Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law or, at the option of the Administrative Agent, reimburse it for the payment of, any Other Taxes.

(c)    **Indemnification by the Borrower**.  The Borrower shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this **Section 4.04**) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and all expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    **Evidence of Payments**.  As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this **Section 4.04**, such Credit Party

#91897284v80

shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     **Status of Lenders**.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or a reduced rate of, withholding Tax.  In addition, each Lender shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraph (e)(ii)(A), (ii)(B)(1) - (4) and (ii)(C)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.  Each Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documents required below in this **Section 4.04(e)**) expired, obsolete or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so.

(ii)     Without limiting the generality of the foregoing:

(A)     each Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), two duly executed copies of IRS Form W-9 (or any subsequent versions thereof or successor thereto) certifying that such Lender is exempt from U.S. federal backup withholding;

(B)     each Foreign Lender shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

#91897284v80

(1)     duly executed, properly completed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, (or any subsequent versions thereof or successor thereto) claiming eligibility for benefits of an income tax treaty to which the United States is a party;

(2)     duly executed, properly completed copies of IRS Form W-8ECI (or any subsequent versions thereof or successor thereto);

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of **Exhibit C-1** to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "Controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "***U.S. Tax Compliance Certificate***") and (y) duly executed, properly completed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable (or any subsequent versions thereof or successor thereto);

(4)     to the extent a Foreign Lender is not the beneficial owner, duly executed, properly completed copies of IRS Form W-8IMY of the Foreign Lender, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable successor form), a U.S. Tax Compliance Certificate substantially in the form of **Exhibit C-2** or **Exhibit C-3**, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; ***provided*** that if the Foreign Lender is a partnership and one or more partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of **Exhibit C-4** on behalf of each such direct or indirect partner; or

(5)     any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(C)     if a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this **Section 4.04(e)(ii)(C)**, "***FATCA***" shall include any amendment made to FATCA after the date of this Agreement.

#91897284v80

Notwithstanding any other provision of this **Section 4.04(e)**, a Lender shall not be required to deliver any form that such Lender is not legally entitled to deliver.

(iii)    Each Lender hereby authorizes the Administrative Agent to deliver to the Credit Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to this **Section 4.04(e)**.

(f)    **Treatment of Certain Refunds**.  If a Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Credit Party or with respect to which a Credit Party has paid additional amounts pursuant to this **Section 4.04**, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by a Credit Party under this **Section 4.04** with respect to the Indemnified Taxes or Other Taxes giving rise to such refund) net of all out-of-pocket expenses (including any Taxes) of such Recipient and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Borrower, upon the request of the Recipient, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after Tax position than the indemnified party would have been in if Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be construed to require a Recipient to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(g)    **Status of Administrative Agent**.  On or before the date the Administrative Agent becomes a party to the Agreement, the Administrative Agent shall provide to the Borrower two duly executed copies of either (i) IRS Form W-9 (or any subsequent versions thereof or successor thereto) or (ii) IRS Form W-8ECI and a U.S. branch withholding certificate on IRS Form W-8IMY (in each case, or any subsequent versions thereof or successor thereto) evidencing its agreement with the Borrower to be treated as a U.S. person, as applicable; *provided* that the Administrative Agent shall not be required to provide any documentation pursuant to this **Section 4.04(g)** that the Administrative Agent is unable to deliver as a result of a Change in Law after such Administrative Agent becomes the Administrative Agent under this Agreement.

(h)    **Applicable Law**.  For the avoidance of doubt, for purposes of this **Section 4.04**, the "applicable law" includes FATCA.

(i)    **Survival**.  Each party's obligations under this **Section 4.04** shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

#91897284v80

## ARTICLE V.
## CONDITIONS PRECEDENT

**Section 5.01** **Conditions Precedent to the Closing Date and the making of the Initial Loans.**

The occurrence of the Closing Date and the obligation of each Lender to make the Initial Loans on the Closing Date are subject to the satisfaction of the following conditions precedent.

(a)    **Credit Documents; Perfection Certificate**. On or prior to the Closing Date, the Administrative Agent shall have received a counterpart of (i) this Agreement signed on behalf of the Borrower, (ii) the executed DIP ABL Intercreditor Agreement, acknowledged and agreed to on behalf of each of the Credit Parties and signed on behalf of each party thereto (other than the Administrative Agent) substantially in the form of Exhibit I, (iii) each Note (to the extent requested at least three Business Days prior to the Closing Date) signed on behalf of the Borrower, (iv) a Perfection Certificate signed on behalf of each Credit Party and (v) each other Credit Document to be executed on the Closing Date, signed on behalf of each Credit Party party thereto.

(b)    **Officer's Certificate**. On the Closing Date, the Administrative Agent shall have received a certificate, dated the Closing Date and signed on behalf of the Borrower by the Chairman of the Board, the Chief Executive Officer, the President or any Vice President of the Borrower, certifying on behalf of the Borrower that all of the conditions in **Sections 5.01(g)**, **(h)**, **(m)**, **(t)**, and **(v)** have been satisfied on such date.

(c)    **Opinions of Counsel.** On the Closing Date, the Administrative Agent shall have received:

(i)    from Kirkland & Ellis LLP, counsel to the Credit Parties, an opinion addressed to the Administrative Agent, the Collateral Agent and each of the Lenders and dated the Closing Date covering such matters incident to the transactions contemplated herein as the Administrative Agent may reasonably request,

(ii)    from Frost Brown Todd LLC, special Kentucky counsel to the Credit Parties, an opinion, in form and substance reasonably satisfactory to the Administrative Agent, addressed to the Administrative Agent and each of the Lenders and dated the Borrowing Date covering such matters incident to the transactions contemplated herein as the Administrative Agent may reasonably request, and

(iii)    from Frost Brown Todd LLC, special Indiana counsel to the Credit Parties, an opinion, in form and substance reasonably satisfactory to the Administrative Agent, addressed to the Administrative Agent and each of the Lenders and dated the Borrowing Date covering such matters incident to the transactions contemplated herein as the Administrative Agent may reasonably request.

(d)    **Company Documents**. On the Closing Date, the Administrative Agent shall have received a certificate from each Credit Party, dated the Closing Date, signed by the Secretary or

any Assistant Secretary of such Credit Party, together with copies of the Organizational Documents of such Credit Party and the resolutions of such Credit Party referred to in such certificate, and each of the foregoing shall be in form and substance reasonably acceptable to the Administrative Agent.

(e)    **Good Standing Certificate**. On the Closing Date, the Administrative Agent shall have received all good standing certificates and bring-down telegrams or facsimiles, if any, which the Administrative Agent (or the primary counsel to the Required Lenders) reasonably may have requested in connection therewith, such documents and papers where appropriate to be certified by proper Company personnel or Governmental Authorities.

(f)    **Historical Financial Statements; DIP Budget**. On or prior to the Closing Date, the Administrative Agent and each Lender shall have received true and correct copies of the historical financial statements and DIP Budget referred to in **Sections 6.05(a)**, **(b)** and **(c)**, which historical financial statements and DIP Budget shall be in form and substance reasonably satisfactory to the Required Lenders.

(g)    **Material Adverse Effect**. Since December 31, 2018, nothing shall have occurred which has had, or could reasonably be expected to have, a Material Adverse Effect.

(h)    **Approvals**. On or prior to the Closing Date, subject to the Orders and the terms thereof, all necessary governmental (domestic and foreign) and material third party approvals and/or consents, including, without limitation, the consents listed on **Schedule 5.01(h)**, in connection with the Transactions, the other transactions contemplated hereby and the granting of Liens under the Credit Documents shall have been obtained and remain in effect, and all applicable waiting periods with respect thereto shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the consummation of the Transactions or the other transactions contemplated by the Credit Documents or otherwise referred to herein or therein. On the Closing Date, there shall not exist any judgment, order, injunction or other restraint issued or filed or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon the Transactions or the other transactions contemplated by the Credit Documents or otherwise referred to herein or therein.

(i)    **Subsidiary Guaranty**. On the Closing Date, each Guarantor shall have duly authorized, executed and delivered the Subsidiary Guaranty in the form of Exhibit J (as amended, modified and/or supplemented from time to time, the "**Subsidiary Guaranty**"), and the Subsidiary Guaranty shall be in full force and effect.

(j)    **Security Agreement**. On the Closing Date, each Credit Party shall have duly authorized, executed and delivered the Security Agreement in the form of Exhibit H (as amended, modified, restated and/or supplemented from time to time, the "Security Agreement") covering all of such Credit Party's Security Agreement Collateral, together with:

(i)    proper financing statements (Form UCC-1, Form UCC-3 or such other form as may be appropriate) for filing under the UCC or other appropriate filing offices of each jurisdiction as may be necessary or, in the reasonable opinion of the Collateral

Agent, desirable, to perfect the security interests purported to be created by the Security Agreement;

(ii)     certified copies of requests for information or copies (Form UCC-11), or equivalent reports as of a recent date, listing all effective financing statements that name the Borrower or any other Credit Party as debtor and that are filed in the jurisdictions referred to in **clause (i)** above and in such other jurisdictions in which Collateral is located on the Closing Date, together with copies of such other financing statements that name the Borrower or any other Credit Party as debtor, and such other searches that are required by the Perfection Certificate or that the Collateral Agent deems necessary or advisable (none of which shall cover any of the Collateral except (x) to the extent evidencing Permitted Liens or (y) those in respect of which the Collateral Agent shall have received termination statements (Form UCC-3) or such other termination statements as shall be required by local law fully executed for filing);

(iii)     evidence that all other recordings and filings of, or with respect to, the Security Agreement as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable, to perfect the security interests intended to be created by the Security Agreement have been (or, substantially concurrently with the Closing Date, will be) taken;

(iv)     evidence that all other actions necessary or, in the reasonable opinion of the Collateral Agent, desirable to perfect and protect the security interests purported to be created by the Security Agreement have been (or, substantially concurrently with the Closing Date, will be) taken, and the Security Agreement shall be in full force and effect;

(v)     (x) evidence that all promissory notes constituting Collateral together with undated endorsements executed in blank have been delivered to and are in the possession of the Collateral Agent and (y) evidence that Equity Interests constituting certificated Collateral together with undated stock powers executed in blank have been (or, substantially concurrently with the Closing Date, will be) delivered to and are in the possession of the Collateral Agent; and

(vi)     a Perfection Certificate duly executed by the Borrower and each other Credit Party.

(k)     **Insurance Certificates**. On or prior to the Closing Date, the Administrative Agent shall have received, except as otherwise set forth on **Schedule 7.14**, certificates of insurance complying with the requirements of **Section 7.03** for the business and properties of the Borrower and its Subsidiaries, in form and substance reasonably satisfactory to the Administrative Agent and naming the Collateral Agent as an additional insured and/or as loss payee, and stating that such insurance provider shall use commercially reasonable efforts to provide the Collateral agent with at least 30 days' prior written notice of any cancellation or material revision to such insurance.

(l)     **Fees and Expenses**. On or prior to the Closing Date, the Borrower shall have paid to the Administrative Agent (and its relevant Affiliates), the Collateral Agent and each Lender all

costs, fees and expenses (including, without limitation, legal fees and expenses) and other compensation contemplated hereby payable to the Administrative Agent, the Collateral Agent or such Lender to the extent then due.

(m)     **No Default; Representations and Warranties**. On the Closing Date, and after giving effect to the Borrowing of Initial Loans on the Closing Date, (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the date of such Borrowing (it being understood and agreed that (x) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (y) any representation or warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct in all respects on such date).

(n)     **Notice of Borrowing**. Prior to the making of the Initial Loans, the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of **Section 2.02**.

(o)     **Petition Date**. The Petition Date shall have occurred, and the Borrower and each Guarantor shall be a debtor and debtor-in-possession in the Cases.

(p)     **Restructuring Support Agreement**. The RSA shall have become effective and binding pursuant to Section [  ] thereof, and shall not have been terminated.

(q)     **Acceptable Plan of Reorganization**. The Acceptable Plan of Reorganization, the Acceptable Disclosure Statement and a motion, in form and substance satisfactory to the Required Lenders, seeking approval of the DIP Term Facility, shall have been filed in each of the Cases within one (1) day of the Petition Date.

(r)     **First Day Orders**. All "first day" orders and all related pleadings intended to be entered on or prior to the Interim Order Entry Date shall have been entered by the Bankruptcy Court and shall be acceptable in form and substance to the Required Lenders (it being understood that drafts approved by the primary counsel to the Required Lenders prior to the Petition Date are acceptable).

(s)     **No Trustee**. No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases.

(t)     **Other Litigation**. There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Credit Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases) that would reasonably be expected to have a Material Adverse Effect.

(u)     **Interim Order**. The Interim Order Entry Date shall have occurred not later than five calendar days following the Petition Date, and the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required

Lenders or the Administrative Agent (with the consent of the Required Lenders), and the Administrative Agent shall have received a certified copy of the Interim Order entered by the Bankruptcy Court; *provided*, for the avoidance of doubt, no Lender holding Initial Commitments shall be required to fund any Initial Loans to the extent that the Interim Order does not approve the Roll-Up that is to be consummated on the Closing Date pursuant to **Section 2.01(b)**.

(v)     **DIP ABL Facility**. On the Closing Date, the DIP ABL Facility shall be effective and shall be in form and substance reasonably satisfactory to the Required Lenders.

(w)     **Pledge Agreement**. On the Closing Date, JMP Coal Holdings, LLC and JMP Blackhawk, LLC shall have executed the Pledge Agreement in form and substance satisfactory to the Administrative Agent.

(x)     **USA PATRIOT Act; Beneficial Ownership Certification.** No later than three days prior to the Closing Date, the Administrative Agent shall have received all documentation and other information reasonably requested by it in writing at least 10 days in advance of the Closing Date, which documentation or other information is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and, to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to the Borrower, including, for the avoidance of doubt, a duly executed IRS Form W-9.

In determining the satisfaction of the conditions specified in this **Article V**, (x) to the extent any item is required to be satisfactory to any Lender, such item shall be deemed satisfactory to each Lender which has not notified the Administrative Agent in writing prior to the occurrence of the Closing Date that the respective item or matter does not meet its satisfaction and (y) in determining whether any Lender is aware of any fact, condition or event that has occurred and which could reasonably be expected to have a Material Adverse Effect or a material adverse effect of the type described in **Section 5.01(g)**, each Lender which has not notified the Administrative Agent in writing prior to the occurrence of the Closing Date of such fact, condition or event shall be deemed not to be aware of any such fact, condition or event on the Closing Date.

**Section 5.02   Conditions Precedent to the Delayed Draw Borrowing.**  The obligations of the Lenders to make Delayed Draw Loans hereunder shall not become effective until the date on which each of the following conditions are satisfied ) as otherwise agreed or waived pursuant to **Section 11.12**:

(a)     **Closing Date**. The Closing Date shall have occurred.

(b)     **Notice of Borrowing**. Prior to the making of the Delayed Draw Loans, the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of **Section 2.02**.

(c)     **Interim Order**. At any time prior to the Final Order Entry Date, the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior

written consent of the Required Lenders or the Administrative Agent (with the consent of the Required Lenders).

(d)     **Final Order**. The Final Order Entry Date shall have occurred no later than 45 days after the Petition Date (unless such period is extended by the Required Lenders or the Administrative Agent (with the consent of the Required Lenders)) and the Final Order shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay and shall not have been modified or amended other than as acceptable to the Required Lenders (or the Administrative Agent at the direction of the Required Lenders); *provided*, for the avoidance of doubt, no Lender holding Delayed Draw Commitments shall be required to fund any Delayed Draw Loans to the extent that the Final Order does not approve the Roll-Up that is to be consummated on the Delayed Draw Borrowing Date pursuant to **Section 2.01(b)**.

(e)     **No Default; Representations and Warranties**. At the time of and immediately after giving effect to the Delayed Draw Loans, no Default or Event of Default shall have occurred and be continuing. On the Delayed Draw Borrowing Date, all representations and warranties made by any Credit Party contained herein or in the other Credit Documents shall be true and correct (with respect to representations and warranties that contain a materiality qualification), or true and correct in all material respects (with respect to representations and warranties that do not contain a materiality qualification) with the same effect as though such representations and warranties had been made on and as of such date (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date).

(f)     **Second Day Orders**. With respect to Borrowings on or after the Final Order Entry Date, all material "second day orders" approving on a final basis any first day orders intended to be entered on or prior to the date of entry of the Final Order shall have been entered by the Bankruptcy Court, shall be acceptable to the Required Lenders, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended other than as acceptable to the Required Lenders (or the Administrative Agent at the direction of the Required Lenders).

## ARTICLE VI.
## REPRESENTATIONS AND WARRANTIES.

In order to induce the Lenders to enter into this Agreement and to make the Term Loans, the Borrower makes the following representations, warranties and agreements, in each case after giving effect to the Transactions and the applicable Borrowing Date, all of which shall survive the execution and delivery of this Agreement and the Notes and the making of the Term Loans.

### Section 6.01   Company Status.

Each of the Borrower and each of its Restricted Subsidiaries (a) is a duly organized and validly existing Company in good standing under the laws of the jurisdiction of its organization, (b) has the Company power and authority, and all necessary material authorizations and consents, to own its property and assets and to transact the business in which it is engaged and

#91897284v80

presently proposes to engage and (c) is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except for failures to (x) be so qualified or authorized, (y) be in good standing or (z) obtain authorizations and consents which, either individually or in the aggregate for **clauses (x)** through **(z)**, could not reasonably be expected to have a Material Adverse Effect.

### Section 6.02    Power and Authority; Enforceability.

Subject to the entry of the Orders and the terms thereof, each Credit Party has the Company power and authority to execute, deliver and perform the terms and provisions of each of the Credit Documents to which it is party and to consummate the other Transactions and has taken all necessary Company action to authorize the execution, delivery and performance by it of each of such Credit Documents and consummation of the other Transactions.  Subject to the entry of the Orders and the terms thereof, each Credit Party has duly executed and delivered each of the Credit Documents to which it is party, and each of such Credit Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights (in each case, other than with respect to the Debtors) and by equitable principles (regardless of whether enforcement is sought in equity or at law).

### Section 6.03    No Violation; No Default.

(a)     Neither the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party, nor compliance by it with the terms and provisions thereof,

(i)     will materially contravene any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or Governmental Authority (including, without limitation, any Mining Law), other than violations arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy Court,

(ii)     will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except pursuant to the Security Documents) upon any of the property or assets of any Credit Party or any of its Restricted Subsidiaries pursuant to the terms of any Contractual Obligation (including, without limitation, any Mining Lease), to which any Credit Party or any of its Restricted Subsidiaries is a party or by which it or any its property or assets is bound or to which it may be subject, except for any such conflict, breach or default which, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, other than violations arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy Court, or

(iii)     will violate any provision of any Organizational Document of any Credit Party or any of its Restricted Subsidiaries.

#91897284v80

(b)     Other than violations arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy Court, neither the Borrower nor any of its Restricted Subsidiaries is in default in any manner under any provision of any Contractual Obligation, where such default could reasonably be expected to result in a Material Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default.

(c)     No Default or Event of Default has occurred and is continuing.

**Section 6.04    <u>Approvals.</u>**

Subject to the Orders and the terms thereof, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for (x) those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date and (y) filings which are necessary to perfect the security interests created under the Security Documents, which filings will be made within ten days following the Closing Date or such other applicable period specified in the Security Documents), or exemption by, any Governmental Authority is required to be obtained or made by, or on behalf of, any Credit Party to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party in connection with, (a) the execution, delivery and performance of any Credit Document, (b) the legality, validity, binding effect or enforceability of any such Credit Document or (c) the consummation of the other Transactions.

**Section 6.05    <u>Financial Statements; Financial Condition; Undisclosed Liabilities; DIP Budget.</u>**

(a)     The audited consolidated balance sheets of the Borrower at December 31, 2018, 2017, 2016 and 2015 and the related consolidated statements of income and cash flows and changes in shareholders' equity of the Borrower for the years ended on such dates, in each case furnished to the Lenders prior to the Closing Date, present fairly in all material respects the consolidated financial position of the Borrower at the date of said financial statements and the results for the respective periods covered thereby and the unaudited consolidated balance sheet of the Borrower at March 31, 2019 and the related consolidated statements of income and cash flows and changes in shareholders' equity of the Borrower for the three months ended on such date, in each case, furnished to the Lenders prior to the Closing Date, present fairly in all material respects the consolidated financial condition of the Borrower at the date of said financial statements and the results for the period covered thereby, subject to normal year-end adjustments. All such financial statements have been prepared in accordance with GAAP consistently applied except to the extent provided in the notes to said financial statements and subject, in the case of the unaudited financial statements, to normal year-end audit adjustments and the absence of footnotes.

(b)     **Closing Date**. The DIP Budget delivered to the Administrative Agent and the Lenders on or prior to the Closing Date has been prepared in good faith and is based on reasonable assumptions, and there are no statements or conclusions in the DIP Budget which are based upon or include information known to the Borrower to be misleading in any material

respect or which fail to take into account material information known to the Borrower regarding the matters reported therein.

(c)    Since December 31, 2018, nothing has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect.

**Section 6.06    Litigation.**

Except for the Cases, there are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened (i) with respect to the Transactions or any Credit Document or (ii) that have had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**Section 6.07    True and Complete Disclosure.**

All factual information (taken as a whole) furnished by or on behalf of the Borrower or any of its Subsidiaries in writing to the Administrative Agent or any Lender for purposes of or in connection with this Agreement, the other Credit Documents or any transaction contemplated herein or therein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of the Borrower or any of its Subsidiaries in writing to the Administrative Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided, it being understood and agreed that for purposes of this **Section 6.07**, such factual information shall not include the Projections or any pro forma financial information or information of a general economic or industry specific nature.

**Section 6.08    Use of Proceeds; Margin Regulations.**

(a)    All proceeds of the Term Loans will be used by the Borrower (i) for the general corporate purposes of the Borrower and its Restricted Subsidiaries, (ii) to pay the fees, costs and expenses of the Administrative Agent and the Lenders, (iii) to pay fees and expenses of professionals associated with the Cases, (iv) to effect the Roll-Up and (v) to provide certain adequate protection payments permitted by the Orders.

(b)    No part of any Borrowing (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock.  Neither the making of any Term Loan nor the use of the proceeds thereof nor the occurrence of any other Borrowing will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.  Not more than 25% of the value of the assets of the Borrower and its Restricted Subsidiaries taken as a whole is represented by Margin Stock.

**Section 6.09    Tax Returns and Payments.**

Each of the Borrower and each of its Restricted Subsidiaries (a) has timely filed or caused to be timely filed with the appropriate taxing authority all returns, statements, forms and

reports for Taxes (the "**Returns**") required to be filed by them, including with respect to the income, properties or operations of, the Borrower and/or any of its Restricted Subsidiaries and (b) has timely paid all Taxes payable by it which have become due, other than those that are being contested in good faith and provided for on the financial statements of the Borrower and its Restricted Subsidiaries to the extent required in accordance with GAAP, except, in the case of **clauses (a)** and **(b)**, (x) where the failure to file any such Returns or pay such Taxes would not reasonably be expected to have a Material Adverse Effect, or (y) to the extent otherwise excused or prohibited by the Bankruptcy Code and for which payment has not otherwise been required by the Bankruptcy Court.

### Section 6.10    Compliance with ERISA.

(a)    Each Employee Benefit Plan is in compliance in form and operation with its terms and with ERISA and the Code (including without limitation the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations, except where any failure to comply would not reasonably be expected to have a Material Adverse Effect.  Except as would not have a Material Adverse Effect: each Employee Benefit Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code covering all applicable tax law changes or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and to the knowledge of the Borrower or any of its Restricted Subsidiaries, nothing has occurred since the date of such determination that would reasonably be expected to adversely affect such determination (or, in the case of an Employee Benefit Plan with no determination, to the knowledge of the Borrower or any of its Restricted Subsidiaries, nothing has occurred that would reasonably be expected to materially adversely affect the issuance of a favorable determination letter or otherwise materially adversely affect such qualification).  No ERISA Event has occurred or is reasonably expected to occur other than as would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    There exists no Unfunded Pension Liability with respect to any Benefit Plan that would have a Material Adverse Effect.

(c)    None of the Borrower or any of its Restricted Subsidiaries or any ERISA Affiliate has incurred a complete or partial withdrawal from any Multiemployer Plan, and, if each of the Borrower, any of its Restricted Subsidiaries and each ERISA Affiliate were to withdraw in a complete withdrawal as of the date this assurance is given or deemed given, the aggregate withdrawal liability that would be incurred would not reasonably be expected to result in a Material Adverse Effect.

(d)    There are no actions, suits or claims pending against or involving an Employee Benefit Plan (other than routine claims for benefits) or, to the knowledge of the Borrower or any of its Restricted Subsidiaries, threatened, which would reasonably be expected to be asserted successfully against any Employee Benefit Plan and, if so asserted successfully, would reasonably be expected either singly or in the aggregate to have a Material Adverse Effect.

(e)     The Borrower, its Restricted Subsidiaries and any ERISA Affiliate have made all material contributions to or under each Benefit Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, the terms of such Benefit Plan or Multiemployer Plan, respectively, or any contract or agreement requiring contributions to a Benefit Plan or Multiemployer Plan save where any failure to comply, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(f)     Except as would not, individually or in the aggregate, have a Material Adverse Effect, (i) the Borrower, its Restricted Subsidiaries and each ERISA Affiliate have not ceased operations at a facility so as to become subject to the provisions of Section 4062(e) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions to any Benefit Plan subject to Section 4064 of ERISA to which it made contributions, (ii) no lien imposed under the Code or ERISA on the assets of the Borrower, its Restricted Subsidiaries or any ERISA Affiliate exists or is likely to arise on account of any Benefit Plan and (iii) none of the Borrower, its Restricted Subsidiaries or any ERISA Affiliate has any liability under Section 4069 or 4212(c) of ERISA.

(g)     Except as would not individually or in the aggregate, have a Material Adverse Effect, (i) each Foreign Pension Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities, (ii) all contributions required to be made with respect to a Foreign Pension Plan have been timely made, (iii) neither the Borrower nor any of its Restricted Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Pension Plan and (iv) the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Pension Plan, determined as of the end of the Borrower's most recently ended fiscal year on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the assets of such Foreign Pension Plan allocable to such benefit liabilities.

### Section 6.11   Security Documents.

(a)     Subject to, and upon the entry of the Orders, the Orders and the Security Documents are effective to create in favor of the Collateral Agent for the benefit of the Secured Creditors a legal, valid and enforceable security interest in all right, title and interest of the Credit Parties in the Collateral described therein, and:

(i)     when financing statements and other filings in appropriate form are filed in the offices specified in **Schedule 4** to the Perfection Certificate (or **Schedule 4** to any Perfection Certificate Supplement),

(ii)     when all promissory notes and certificated Equity Interests, together with undated endorsements or stock powers, as applicable, duly executed in blank, have been delivered to the Collateral Agent, and

(iii)     when all Control Agreements required pursuant to the terms of the Security Agreement have been entered into, or in each case, upon the entry of the Orders, the Collateral Agent, for the benefit of the Secured Creditors, has a fully perfected

security interest in all right, title and interest in all of the Security Agreement Collateral described therein, subject to no other Liens other than Permitted Liens.

(b)     The Orders are sufficient to create, as security for the obligations purported to be secured thereby, a valid and enforceable perfected security interest in the Real Property constituting Collateral in favor of the Collateral Agent (or such other trustee as may be required or desired under local law) for the benefit of the Secured Creditors, superior and prior to the rights of all third Persons (except that the security interest created on such Real Property may be subject to the Permitted Encumbrances related thereto) and subject to no other Liens (other than Permitted Encumbrances related thereto).

### Section 6.12    Properties.

(a)     All Real Property owned or leased by the Borrower or any of its Restricted Subsidiaries as of the Closing Date, and the nature of the interest therein, is correctly set forth in **Schedule 5(a)** to the Perfection Certificate.  Each of the Borrower and each of its Restricted Subsidiaries has good and indefeasible title to all material Real Property (and to all buildings, fixtures and improvements located thereon) owned by it, including all material property reflected in the most recent historical balance sheets referred to in **Section 6.05(a)** (except as sold or otherwise disposed of since the date of such balance sheet in the ordinary course of business or as permitted by the terms of this Agreement), free and clear of all Liens, other than Permitted Liens.  Each of the Borrower and each of its Restricted Subsidiaries has a valid leasehold interest in the material properties leased by it free and clear of all Liens other than Permitted Liens.  The Borrower and the Restricted Subsidiaries have maintained or caused to be maintained, in all respects and in accordance with normal mining industry practice, all of the machinery, equipment, vehicles, preparation plants or other Coal processing facilities, loadout and other transportation facilities and other tangible personal property now owned or leased by the Borrower and the Restricted Subsidiaries that is necessary to conduct their business as it is now conducted at such properties, except where the failure to maintain would not reasonably be expected to have a Material Adverse Effect.

(b)     All leases (including, without limitation, Mining Leases) to which the Borrower or any of its Restricted Subsidiaries is a party are in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect.  Each of the Borrower and the Restricted Subsidiaries enjoys peaceful and undisturbed possession under all such leases, in each case other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)     As of the Closing Date, except as set forth on **Schedule 6.12(c)**, none of the Borrower or any of the Restricted Subsidiaries has received written or, to the knowledge of the Borrower and the Restricted Subsidiaries, other notice of claims that the Borrower or any Restricted Subsidiary has mined any Coal that it did not have the right to mine on any Mortgaged Property or mined any Coal in such a manner as to give rise to any claims for loss, waste or trespass on any Mortgaged Property, and, to the knowledge of the Borrower and the Restricted Subsidiaries, no facts exist upon which such a claim could be based other than claims that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)      As of the Closing Date, none of the Borrower and its Restricted Subsidiaries has received any written or, to the knowledge of the Borrower, other notice of any pending or contemplated condemnation proceeding affecting any of the Mortgaged Properties or any sale or disposition thereof in lieu of condemnation that remains unresolved as of the Closing Date, except where such condemnation proceeding would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(e)      None of the Borrower and its Restricted Subsidiaries is obligated on the Closing Date under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Mortgaged Property or any interest therein, other than customary buy-back provisions following the termination of mining operations, satisfaction of reclamation obligations and release of applicable Mining Permits with respect to a Mortgaged Property, except where such right of first refusal, option or other contractual right would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(f)      With respect to each Mortgaged Property on which significant surface improvements are located, including, without limitation, surface Mines, refuse areas and haulroads, there are no rights or claims of parties in possession not shown by the public records, encroachments, overlaps, boundary line disputes or other matters which would be disclosed by an accurate survey or inspection of the premises except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

### Section 6.13   Subsidiaries.

On and as of the Closing Date after giving effect to the Transactions, the Borrower has no Subsidiaries other than those Subsidiaries listed on **Schedule 6(a)** to the Perfection Certificate. **Schedule 6(a)** to the Perfection Certificate sets forth, as of the Closing Date, the percentage ownership (direct and indirect) of the Borrower in each class of capital stock or other Equity Interests of each of its Subsidiaries and also identifies the direct owner thereof. All outstanding shares of Equity Interests of each Restricted Subsidiary of the Borrower have been duly and validly issued, are fully paid and non-assessable and have been issued free of preemptive rights. No Restricted Subsidiary of the Borrower has outstanding any securities convertible into or exchangeable for its Equity Interests or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its Equity Interests or any stock appreciation or similar rights.   There are no Unrestricted Subsidiaries as of the Closing Date.

### Section 6.14   Compliance with Laws, etc.

Each of the Borrower and each of its Restricted Subsidiaries is in compliance with all applicable Requirements of Law, statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property, including all applicable laws administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury and the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations promulgated thereunder ("*FCPA*"), except such non-compliances as (i) could not, either individually or in the aggregate, reasonably

#91897284v80

be expected to have a Material Adverse Effect (ii) or is excused by the Bankruptcy Court.  None of the Borrower or any Restricted Subsidiary has been notified in writing, or, to the knowledge of the Borrower and the Restricted Subsidiaries, otherwise notified, by the Federal Office of Surface Mining, the Environmental Protection Agency, the U.S. Army Corps of Engineers or the agency of any state administering the Surface Mining Control and Reclamation Act of 1977, as amended, any comparable state statute or any other Mining Law that it is (i) ineligible for the receipt or renewal of any Mining Permit; or (ii) under investigation to determine whether their eligibility for the receipt or renewal of any Mining Permit should be revoked (*e.g.*, "permit blocked"), not transferred to any Credit Party or not renewed; and to the knowledge of the Borrower, no facts exist that presently or upon the giving of notice or the lapse of time or otherwise would render any of the Borrower or any Restricted Subsidiary ineligible for the receipt or renewal of any Mining Permit.

**Section 6.15    Investment Company Act.**

Neither the Borrower nor any of its Restricted Subsidiaries is an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

**Section 6.16    Insurance.**

The Borrower and its Restricted Subsidiaries is insured against such losses and risks and in such amount as are prudent and customary in the businesses in which it is engaged.

**Section 6.17    Environmental Matters.**

In each case, except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect,

(a)    each of the Borrower and each of its Restricted Subsidiaries is in compliance with all Environmental Laws and has obtained and is in compliance with the terms of any permits required under such Environmental Laws to conduct their respective operations as currently conducted;

(b)    there are no Environmental Claims pending against the Borrower or any of its Restricted Subsidiaries and, to the knowledge of the Borrower, no such Environmental Claims are either threatened or are reasonably expected to result from any pending investigation or proceeding;

(c)    no Lien, other than a Permitted Lien, has been recorded, or to the knowledge of the Borrower, threatened under any Environmental Law with respect to any Real Property owned or operated by the Borrower or any Restricted Subsidiary;

(d)    neither the Borrower nor any of its Restricted Subsidiaries has agreed to assume or accept responsibility, for any liability of any other Person under any Environmental Law;

#91897284v80

(e)    there are no existing facts, circumstances, conditions or occurrences with respect to the business, operations, properties or facilities of the Borrower or any of its Restricted Subsidiaries, or, to the knowledge of the Borrower, any of their respective predecessors, that could reasonably be expected to give rise to any Environmental Claim; and

(f)    there are no current, or reasonably anticipated future, requirements under Environmental Law (including without limitation, permit requirements, operational restrictions, clean-up or reclamation costs) that would result in expenditures other than expenditures for which there is a current financial reserve or other appropriate allocation in the Borrower's or its Restricted Subsidiaries' operating or capital expenditure budgets.

### Section 6.18    Employment and Labor Relations.

Neither the Borrower nor any of its Restricted Subsidiaries is engaged in any unfair labor practice that would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  There is:

(a)    no unfair labor practice complaint pending against the Borrower or any of its Restricted Subsidiaries or, to the knowledge of the Borrower, threatened against any of them, before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against the Borrower or any of its Restricted Subsidiaries or, to the knowledge of the Borrower, threatened against any of them,

(b)    on the Closing Date, no strike, labor dispute, slowdown or stoppage pending against the Borrower or any of its Restricted Subsidiaries or, to the knowledge of the Borrower, threatened against the Borrower or any of its Restricted Subsidiaries,

(c)    no equal employment opportunity charges or other claims of employment discrimination are pending or, to the Borrower's knowledge, threatened against the Borrower or any of its Restricted Subsidiaries, and

(d)    no wage and hour department investigation has been made of the Borrower or any of its Restricted Subsidiaries,

except (with respect to any matter specified in **clauses (a)** through **(d)** above, either individually or in the aggregate) such as would not reasonably be expected to have a Material Adverse Effect.

### Section 6.19    Intellectual Property, etc.

Each of the Borrower and each of its Restricted Subsidiaries owns or has the right to use all the patents, trademarks, permits, domain names, service marks, trade names, copyrights, licenses, franchises, inventions, trade secrets, technology, data, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases) and formulas, or rights with respect to the foregoing (collectively, "***Intellectual Property***"), and has obtained assignments of all leases, licenses and other rights of whatever nature, necessary for the present conduct of its business, without any known conflict

with the rights of others which, or the failure to own or have which, as the case may be, could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.  The conduct of the Borrower's and each of its Restricted Subsidiaries' respective businesses does not infringe, violate or otherwise conflict with, in any material respect, the proprietary rights of any third party.  None of the Borrower or any of its Restricted Subsidiaries has received any notice, or is otherwise aware, of any infringement or violation of or conflict with the proprietary rights of any third party, which infringement, violation or conflict, if the subject of an unfavorable decision, would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or materially interfere with the operation of their respective businesses by the Borrower or its Restricted Subsidiaries.

Section 6.20    [Reserved].

Section 6.21    **Anti-Terrorism Laws; Sanctions.**

(a)    No Credit Party, none of its Restricted Subsidiaries and, to the knowledge of each Credit Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Credit Party, such Restricted Subsidiary or Affiliate (i) has violated or is in violation of Anti-Terrorism Laws or (ii) has engaged or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in the "Forty Recommendations" and "Nine Special Recommendations" published by the Financial Action Task Force on Money Laundering.

(b)    No Credit Party, none of its Restricted Subsidiaries and, to the knowledge of each Credit Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Credit Party, such Restricted Subsidiary or such Affiliate that is acting or benefiting in any capacity in connection with the Term Loans is an Embargoed Person.

(c)    No Credit Party, none of its Restricted Subsidiaries and, to the knowledge of each Credit Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Credit Party, such Restricted Subsidiary or such Affiliate acting or benefiting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Embargoed Person, (ii) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(d)    Neither the use of the Borrowing or any other proceeds by the Borrower and its Subsidiaries, nor any other transaction contemplated by this Agreement, will violate the FCPA or Anti-Terrorism Laws.

Section 6.22    **Flood Zone.**

No Mortgage and no lien granted under the Orders encumbers improved Real Property that is located in an area that has been identified by the Federal Emergency Management Agency (or any successor agency) as an area having special flood hazards within the meaning of the

#91897284v80

Flood Insurance Laws unless flood insurance available under such Flood Insurance Laws has been obtained in accordance with **Section 7.03(b)**.

### Section 6.23    Beneficial Ownership Certificate.

As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

### ARTICLE VII.
### AFFIRMATIVE COVENANTS.

The Borrower hereby covenants and agrees that on and after the Closing Date and until the Term Loans and Notes (in each case together with interest thereon), Fees and all other Obligations (other than indemnities described in **Section 11.13** and reimbursement obligations under **Section 11.01** which, in either case, are not then due and payable) incurred hereunder and under any other Credit Document, are paid in full:

### Section 7.01    Information Covenants.

The Borrower will furnish to the Administrative Agent, on behalf of each Lender:

(a)    **Monthly Financial Statements**.  On or before the date that is 30 days after the end of each calendar month the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such monthly accounting period and the related consolidated statements of income and retained earnings and statement of cash flows (together with a detailed reconciliation, reflecting such financial information for the Borrower and its Restricted Subsidiaries, on the one hand, and the Borrower's Unrestricted Subsidiaries, on the other hand) for such monthly accounting period and for the elapsed portion of the Fiscal Year ended with the last day of such monthly accounting period, in each case setting forth comparative figures for the corresponding monthly accounting period in the prior Fiscal Year and comparable budgeted figures for such monthly accounting period as set forth in the respective budget delivered pursuant to **Section 7.01(d)**, all of which shall be certified by an Authorized Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes,

(b)    **Quarterly Financial Statements**.  Within 45 days after the close of each of the first three Fiscal Quarters in each Fiscal Year of the Borrower commencing with the quarter ending June 30, 2019, (i) the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such quarterly accounting period and the related consolidated statements of income and retained earnings and statement of cash flows (together with a detailed reconciliation, reflecting such financial information for the Borrower and its Restricted Subsidiaries, on the one hand, and the Borrower's Unrestricted Subsidiaries, on the other hand) for such quarterly accounting period and for the elapsed portion of the Fiscal Year ended with the last day of such quarterly accounting period, in each case setting forth comparative figures for the corresponding quarterly accounting period in the prior Fiscal Year and comparable budgeted figures for such quarterly accounting period as set forth in the respective budget delivered pursuant to **Section**

#91897284v80

**7.01(d)**, all of which shall be certified by an Authorized Officer of the Borrower that they fairly present in all material respects in accordance with GAAP the financial condition of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes, and (ii) management's discussion and analysis of the consolidated financial condition of the Borrower and its Subsidiaries and important operational and financial developments during such quarterly accounting period.

(c)  **Annual Financial Statements**.  Within 90 days after the close of each Fiscal Year of the Borrower, (i) the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income and retained earnings, and statement of cash flows (together with a detailed reconciliation, reflecting such financial information for the Borrower and its Restricted Subsidiaries, on the one hand, and the Borrower's Unrestricted Subsidiaries, on the other hand) for such Fiscal Year setting forth comparative figures for the preceding Fiscal Year and certified by KPMG LLP or other independent certified public accountants of recognized national standing reasonably acceptable to the Administrative Agent (the "*Independent Auditors*"), accompanied by a report of such accounting firm (which report shall be without any qualification or exception as to scope of audit) stating that in the course of its regular audit of the financial statements of the Borrower and its Subsidiaries, which audit was conducted in accordance with generally accepted auditing standards, such accounting firm obtained no knowledge of any Default or an Event of Default relating to financial or accounting matters which has occurred and is continuing or, if in the opinion of such accounting firm such a Default or an Event of Default has occurred and is continuing, a statement as to the nature thereof, and (ii) management's discussion and analysis of the consolidated financial condition of the Borrower and its Subsidiaries and important operational and financial developments during such Fiscal Year.

(d)  **DIP ABL Facility Borrowing Base.**  (i) Promptly upon delivery to DIP ABL Agent, copies of all borrowing base certificates delivered pursuant to Section 4.1(c)of the DIP ABL Credit Agreement and (ii) promptly upon obtaining knowledge thereof, the imposition of any new reserves and any changes in the eligibility criteria set forth in the borrowing base (or the components thereof) in the DIP ABL Credit Agreement.

(e)  **Budget Variance Reports.**  No later than 5:00 p.m. on the Wednesday of every week (commencing with the second Wednesday following the Petition Date) (or, to the extent such Wednesday is not a Business Day, the next Business Day thereafter), a Budget Variance Report for the immediately preceding Weekly Period and the cumulative Test Period.  Each such report shall be certified by an Authorized Officer of the Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein.

(f)  **DIP Budgets**.  On or prior to the Closing Date and on the last Wednesday of every four-week anniversary (commencing with the fourth Wednesday following the Petition Date) (or, to the extent such Wednesday is not a Business Day, the next Business Day thereafter), a DIP Budget.  Each DIP Budget shall be reasonably acceptable to the Required Lenders and no such DIP Budget shall be effective until so approved; *provided* that the Required Lenders shall be deemed to have approved a DIP Budget delivered after the Closing Date pursuant to this **Section 7.01(f)** unless Lenders constituting the Required Lenders shall have

objected to such DIP Budget within 5 Business Days after delivery thereof. To the extent any such updated DIP Budget is approved pursuant to this **Section 7.01(f)**, the line item amounts set forth therein shall only be used to calculate the projected line items commencing with the week in which such updated DIP Budget is approved by the Required Lenders and for subsequent weeks set forth therein, and any prior weeks tested as part of any then applicable cumulative period shall be calculated using the projected line items set forth in the previously Approved Budget in which such prior weeks were first forecasted. Upon such approval or deemed approval by the Required Lenders pursuant to this **Section 7.01(f)**, a DIP Budget delivered pursuant to this **Section 7.01(f)** and the DIP Budget delivered pursuant to **Section 5.01(f)** shall constitute an "***Approved Budget***".

(g)    **Officer's Certificates**.  At the time of the delivery of the financial statements provided for in **Sections 7.01(a)**, **(b)** and **(c)**, a compliance certificate from an Authorized Officer of the Borrower in the form of **Exhibit E** certifying on behalf of the Borrower that, to such officer's knowledge after due inquiry, no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof, which certificate shall if delivered with the financial statements required by **Section 7.01(c)**, certify that there have been no changes to the Perfection Certificate since the Closing Date or, if later, since the date of the most recent certificate delivered pursuant to this **Section 7.01(g)**, or if there have been any such changes, include a Perfection Certificate Supplement and certify whether the Credit Parties have otherwise taken all actions required to be taken by them pursuant to the Security Documents in connections with any such changes.

(h)    **Notice of Default, Litigation and Material Adverse Effect**.  Promptly, and in any event within five Business Days after any Authorized Officer of the Borrower or any of its Restricted Subsidiaries obtains actual knowledge thereof, notice of:

(i)    the occurrence of any event which constitutes a Default or an Event of Default,

(ii)    any litigation or governmental investigation or proceeding pending against the Borrower or any of its Restricted Subsidiaries (x) which, either individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect or (y) with respect to any Credit Document, or

(iii)    any other event, change or circumstance that has had, or could reasonably be expected to have, a Material Adverse Effect.

(i)    **Other Reports and Filings**.  Promptly after the filing or delivery thereof, copies of all financial information, proxy materials, registration statements and reports, if any, which the Borrower or any of its Subsidiaries shall publicly file with the Securities and Exchange Commission or any successor thereto (the "***SEC***") or deliver to holders (or any trustee, agent or other representative therefor) of any of its material Indebtedness pursuant to the terms of the documentation governing the same.

(j)    **Environmental Matters**.  Promptly after any Authorized Officer of the Borrower or any of its Restricted Subsidiaries obtains actual knowledge thereof, notice of the following

#91897284v80

environmental matters to the extent that such environmental matters, either individually or aggregated with all other such environmental matters, could reasonably be expected to have a Material Adverse Effect:

(i)     any pending or threatened Environmental Claim against the Borrower or any of its Restricted Subsidiaries;

(ii)     any condition or occurrence on or arising from any Real Property owned, leased or operated by the Borrower or any of its Restricted Subsidiaries that (A) results in noncompliance by the Borrower or any of its Restricted Subsidiaries with any Environmental Law or (B) could reasonably be expected to form the basis of an Environmental Claim against the Borrower or any of its Restricted Subsidiaries or any such Real Property;

(iii)     any condition or occurrence on any Real Property owned, leased or operated by the Borrower or any of its Restricted Subsidiaries that could reasonably be expected to cause such Real Property to be subject to any restrictions on the ownership, lease, occupancy, use or transferability by the Borrower or any of its Restricted Subsidiaries of such Real Property under any Environmental Law;

(iv)     the taking of any removal or remedial action to the extent required by any Environmental Law or any Governmental Authority in response to the Release or threatened Release of any Hazardous Material on any Real Property owned, leased or operated by the Borrower or any of its Restricted Subsidiaries; or

(v)     any material delay, or material conditions imposed, in connection with the issuance, transfer or renewal of any mining permit or other governmental authorization.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the Borrower's or such Restricted Subsidiary's response thereto.

(k)     **Insurance**.  By the last day of each Fiscal Year (commencing with the Fiscal Year ending December 31, 2019), a certificate from the Borrower's insurance broker(s) as to the Borrower's satisfaction of the requirements of **Section 7.03** as of the date of such certificate.

(l)     **Other Information**.  From time to time, such other business, financial or corporate information or documents with respect to the Borrower or any of its Subsidiaries as the Administrative Agent or any Lender may reasonably request.

### Section 7.02     Books, Records and Inspections; Conference Calls.

(a)     The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and accounts in which full, true and correct entries in conformity with GAAP and all requirements of law shall be made in relation to its business and activities.  The Borrower will, and will cause each of its Restricted Subsidiaries to, permit officers and designated representatives of the Administrative Agent, or, if an Event of Default has occurred and is continuing, any Lender, to visit and inspect, under guidance of officers of the Borrower or such

74

Restricted Subsidiary, any of the properties of the Borrower or such Restricted Subsidiary, and to examine the books of account of the Borrower or such Restricted Subsidiary and discuss the affairs, finances, cash and liquidity management, restructuring activities and accounts of the Borrower or such Restricted Subsidiary with, and be advised as to the same by, its and their officers and Independent Auditors, all upon reasonable prior notice and at such reasonable times and intervals and to such reasonable extent as the Administrative Agent, the Required Lenders or any such Lender may reasonably request; *provided* that, unless an Event of Default has occurred and is continuing, the Borrower shall be subject to one such inspection during any twelve-month period.

(b)        At the request of the Administrative Agent or the Required Lenders, the Borrower will within 10 days (or such later time as may be agreed by the Administrative Agent or the Required Lenders, if applicable) after the date of the delivery (or, if later, required delivery) of the monthly, quarterly and annual financial information pursuant to **Sections 7.01(a)**, **(b)**, and **(c)** hold a conference call or teleconference, at a time selected by the Borrower and reasonably acceptable to the Administrative Agent or the Required Lenders, if applicable, with all of the Lenders that choose to participate, to review the financial results of the previous Fiscal Quarter or Fiscal Year, as the case may be, and the financial condition of the Borrower and its Subsidiaries and the budgets presented for the current Fiscal Year of the Borrower and its Subsidiaries.

### Section 7.03    Maintenance of Property; Insurance.

(a)        The Borrower will, and will cause each of its Restricted Subsidiaries to,

(i)        keep all property necessary to the business of the Borrower and its Restricted Subsidiaries in good working order and condition, ordinary wear and tear excepted and subject to the occurrence of casualty events,

(ii)        maintain with financially sound and reputable insurance companies insurance on all such property and against all such risks as is consistent and in accordance with industry practice for companies similarly situated owning similar properties and engaged in similar businesses as the Borrower and its Restricted Subsidiaries, and

(iii)        furnish to the Administrative Agent, upon its request therefor, full information as to the insurance carried.

Such insurance shall include physical damage insurance on all real and personal property (whether now owned or hereafter acquired) on an all risk basis (subject to customary exceptions) and business interruption insurance on coal preparation plants and rail load-outs (subject to customary exceptions).  The provisions of this **Section 7.03** shall be deemed supplemental to, but not duplicative of, the provisions of any Security Documents that require the maintenance of insurance.

(b)        If any "building" or "mobile home" (each as defined in Regulation H as promulgated by the Federal Reserve Board under the Flood Insurance Laws) constituting Collateral is at any time located on Real Property in an area identified by the Federal Emergency

Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the Flood Insurance Laws, then the Borrower shall, or shall cause each Credit Party to:

       (i)    maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and

       (ii)    deliver to the Collateral Agent executed borrower notices as required by the Flood Insurance Laws and evidence of such compliance both in form and substance reasonably acceptable to the Collateral Agent.

(c)    All policies or certificates (or certified copies thereof) with respect to the insurance required by **Sections 7.03(a)** and **(b)** (and any other insurance maintained by the Borrower and/or such Restricted Subsidiaries) (i) shall be endorsed (solely to the extent such policies permit endorsement) to the Collateral Agent's satisfaction for the benefit of the Collateral Agent (including, without limitation, by naming the Collateral Agent as loss payee and/or additional insured (solely to the extent such policies permit such designation)), and (ii) shall state that the respective insurer shall use commercially reasonable efforts to provide the Collateral Agent with at least 30 days' prior written notice of cancellation thereof.

(d)    If the Borrower or any of its Restricted Subsidiaries shall fail to maintain insurance in accordance with this **Section 7.03**, or if the Borrower or any of its Restricted Subsidiaries shall fail to so endorse and deposit all policies or certificates with respect thereto, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and the Borrower agrees to reimburse the Administrative Agent for all costs and expenses of procuring such insurance.

### Section 7.04   Existence; Franchises.

The Borrower will, and will cause each of its Restricted Subsidiaries to, do or cause to be done, all things necessary to preserve and keep in full force and effect its existence and its material rights, franchises, licenses, permits and Intellectual Property, necessary to its business; *provided*, *however*, that nothing in this **Section 7.04** shall prevent (i) sales of assets and other transactions by the Borrower or any of its Restricted Subsidiaries in accordance with **Section 8.02** or **8.05** or (ii) the withdrawal by the Borrower or any of its Restricted Subsidiaries of its qualification as a foreign Company in any jurisdiction if such withdrawal could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

### Section 7.05   Compliance with Laws, etc.

Except as otherwise excused or prohibited by the Bankruptcy Code, and subject to any required approval by the Bankruptcy Court, the Borrower will, and will cause each of its Restricted Subsidiaries to, comply with all applicable Requirements of Law, statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property (owned or leased) (including all Mining Laws, Mining Permits, applicable statutes, regulations and orders), except such non-

compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 7.06   **Compliance with Environmental Laws.**

(a)      Subject to any required approval by the Bankruptcy Court, the Borrower will comply, and will cause each of its Restricted Subsidiaries to comply, with all Environmental Laws and permits applicable to or required in respect of the conduct of its business or operations or by the ownership, lease or use of any Real Property now or hereafter owned, leased or operated by the Borrower or any of its Restricted Subsidiaries, except for such noncompliance as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, and will keep or cause to be kept all such Real Property free and clear of any Liens imposed pursuant to Environmental Laws.

(b)      (i) After the receipt by the Administrative Agent or any Lender of any notice of the type described in **Section 7.01(h)**, (ii) at any time that the Borrower or any of its Restricted Subsidiaries is not in compliance with **Section 7.06(a)** or (iii) in the event that the Administrative Agent or the Lenders have exercised any of the remedies pursuant to the last paragraph of **Article IX**, the Borrower will (in each case) provide, at the sole expense of the Borrower and at the request of the Administrative Agent, an environmental report concerning any relevant Real Property owned, leased or operated by the Borrower or any of its Restricted Subsidiaries, prepared by an environmental consulting firm reasonably approved by the Administrative Agent, evaluating the identified noncompliance or potential liability and indicating, if relevant, the presence or absence of Hazardous Materials and the estimated cost of any removal or remedial action in connection with such Hazardous Materials on such Real Property.  If the Borrower fails to take diligent efforts to commence preparation of such report or fails to provide the same within a reasonable time (not to exceed 60 days, unless a longer time is required to complete the required investigations or assessments) after such request was made, the Administrative Agent may after written notice to Borrower, retain an environmental consulting firm to prepare such report, the cost of which shall be borne by the Borrower, and the Borrower shall and hereby does grant to the Administrative Agent and the Lenders and their respective agents access to such Real Property, and specifically grants the Administrative Agent and the Lenders an irrevocable non-exclusive license, subject to the rights of tenants, to undertake such an assessment at any reasonable time upon reasonable notice to the Borrower, all at the sole expense of the Borrower; ***provided***, ***however***, that such environmental assessment shall not include the taking of soil, groundwater, surface water, air, or building material samples or other invasive testing unless the Borrower has provided its prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

Section 7.07   **ERISA.**

The Borrower shall supply to the Administrative Agent (in sufficient copies for all Lenders, if the Administrative Agent so requests):

(a)      promptly and in any event within 15 days after receiving a request from the Administrative Agent a copy of IRS Form 5500 (including the Schedule S) with respect to a Plan;

(b)      promptly and in any event within 30 days after the Borrower, any Restricted Subsidiary of the Borrower or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred that would reasonably be expected to result in a Material Adverse Effect, a certificate of an Authorized Officer of the Borrower describing such ERISA Event and the action, if any, proposed to be taken with respect to such ERISA Event and a copy of any notice filed with the PBGC or the IRS pertaining to such ERISA Event and any notices received by the Borrower, any Restricted Subsidiary of the Borrower or any ERISA Affiliate from the PBGC or any other Governmental Authority with respect thereto; ***provided*** that, in the case of ERISA Events under **paragraph (d)** of the definition thereof, the 30-day period set forth above shall be a 10-day period, and, in the case of ERISA Events under **paragraph (b)** of the definition thereof, in no event shall notice be given later than 10 days after the occurrence of the ERISA Event; and

(c)      to the extent it is reasonably expected to result in a Material Adverse Effect, promptly, and in any event within 30 days, after becoming aware that there has been:

(i)      an increase in Unfunded Pension Liabilities (taking into account only Benefit Plans with positive Unfunded Pension Liabilities),

(ii)      an increase since the date the representations hereunder are given or deemed given, or from any prior notice, as applicable, in potential withdrawal liability under Section 4201 of ERISA, if the Borrower, any Restricted Subsidiary or any ERISA Affiliate were to withdraw completely from any and all Multiemployer Plans, or

(iii)      the adoption of any amendment to a Benefit Plan which results in an increase in contribution obligations of the Borrower or Restricted Subsidiary, a detailed written description thereof from an Authorized Officer of the Borrower.

**Section 7.08      End of Fiscal Years; Fiscal Quarters.**

The Borrower will cause (i) its fiscal year to end on December 31 of each calendar year and (ii) its fiscal quarters to end on the last day of each period described in the definition of "Fiscal Quarter".

**Section 7.09      Performance of Obligations.**

The Borrower will, and will cause each of its Restricted Subsidiaries to, perform all of its obligations under the terms of each mortgage, indenture, security agreement, loan agreement or credit agreement and each other Contractual Obligation by which it is bound (including all Mining Leases), except such non-performances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

### Section 7.10    Payment of Taxes.

In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court (it being understood that no Debtor shall be obligated to make any payments hereunder that may, in its reasonable judgment, result in a violation of any applicable law, including the Bankruptcy Code, without an order of the Bankruptcy Court authorizing such payments), the Borrower will pay and discharge, and will cause each of its Restricted Subsidiaries to pay and discharge, all Taxes required to be paid by them, prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, might become a Lien or charge upon any properties of the Borrower or any of its Restricted Subsidiaries not otherwise permitted under **Section 8.01(g)**; *provided* that neither the Borrower nor any of its Restricted Subsidiaries shall be required to pay any such Tax (i) which is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP, (ii) the nonpayment of which could not reasonably be expected to cause a Material Adverse Effect, or (iii) to the extent otherwise excused or prohibited by the Bankruptcy Code and for which payment has not otherwise been required by the Bankruptcy Court.

### Section 7.11    Use of Proceeds.

The Borrower will use the proceeds of the Term Loans only as provided in **Section 6.08**.

### Section 7.12    Additional Guarantees and Security; Further Assurances; etc.

(a)    If the Borrower or any of its Restricted Subsidiaries acquires or creates another Subsidiary (other than an Excluded Subsidiary) after the Closing Date (which acquisition or creation may occur only with the consent of the Required Lenders) or if a Subsidiary ceases to be an Excluded Subsidiary, then the Borrower shall cause:

(i)    the capital stock or other Equity Interests of such Subsidiary to be pledged pursuant to, and to the extent required by, this Agreement and the Security Agreement and the certificates, if any, representing such stock or other Equity Interests, together with stock or other appropriate powers duly executed in blank, to be delivered to the Collateral Agent within 30 days (or such later date as determined by the Administrative Agent in its sole discretion) of the date on which such Subsidiary was acquired or created,

(ii)    each such Subsidiary to become a Debtor and to execute a counterpart of the Subsidiary Guaranty and the Security Agreement within 30 days (or such later date as determined by the Administrative Agent in its sole discretion) of the date on which such Subsidiary was acquired or created and upon such execution such Subsidiary shall automatically become a Guarantor and each such Subsidiary's assets shall automatically be subject to the Liens created by the Orders and **Section 7.18**, and

(iii)    each such Subsidiary, to the extent reasonably requested by the Administrative Agent or the Required Lenders, to take all actions required pursuant to the other provisions of this **Section 7.12** within the time periods set forth in such other provisions of this **Section 7.12**.

#91897284v80

In addition, each such Subsidiary that is required to execute any Credit Document shall, if requested by the Administrative Agent, execute and deliver, or cause to be executed and delivered, all other relevant documentation (including opinions of counsel) of the type described in **Article V** as such Subsidiary would have had to deliver if such Subsidiary were a Credit Party on the Closing Date.

(b)     The Borrower will, and will cause each other Credit Party to, grant to the Collateral Agent for the benefit of the Secured Creditors security interests in any after-acquired assets (other than (i) Real Property, which is addressed in **subsection (c)** below, and (ii) Excluded Assets) of the Borrower and such other Credit Party that are not covered by the Security Documents then in effect or that cease to be Excluded Assets (or as otherwise required at such time pursuant to the DIP ABL Intercreditor Agreement or the Orders), in each case, within 60 days (or such later date as determined by the Collateral Agent in its sole discretion) after the close of the fiscal quarter of Borrower in which the relevant acquisition occurred or the relevant asset ceased to be an Excluded Asset.  All such security interests shall be granted pursuant to documentation (collectively, the "*Additional Security Documents*") in substantially the same form as the original Security Documents and shall constitute valid and enforceable perfected security interests and hypothecations superior to and, subject to the DIP ABL Intercreditor Agreement and the Orders, prior to the rights of all third Persons and enforceable against third parties and subject to no other Liens except for Permitted Liens and subject to the Orders.  Within 30 days after the grant of any such security interest (or such later date as determined by the Collateral Agent in its sole discretion), the Additional Security Documents or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Additional Security Documents and all taxes, fees and other charges payable in connection therewith shall be paid in full.

(c)     Within 60 days (or such later date as determined by the Collateral Agent in its sole discretion) after (x) the close of the fiscal quarter of Borrower in which any Material Real Property (other than Excluded Assets) is acquired or ceases to be an Excluded Asset (collectively, "*After-Acquired Real Property*") and (y) the reasonable request of the Required Lenders with respect to any Material Real Property existing on the Closing Date (together with the After-Acquired Real Property, collectively, the "*Applicable Real Property*"), in each case if reasonably requested by the Required Lenders, the Collateral Agent shall have received:

(i)     fully executed counterparts of Mortgages and corresponding UCC fixture filings and As-Extracted Collateral Filings, in substantially the same form as the applicable security documents under the Pre-Petition First Lien Term Loan Credit Agreement, which Mortgages, UCC fixture filings and As-Extracted Collateral Filings, shall cover each Applicable Real Property, together with evidence that counterparts of such Mortgages, UCC fixture filings and As-Extracted Collateral Filings have been delivered to the Collateral Agent or its designee for recording;

(ii)     a Mortgage Policy relating to each Applicable Real Property that consists of surface tracts with improvements valued in excess of $10,000,000 ("*Material Surface Property*"), issued by a title insurer reasonably satisfactory to the Collateral Agent, in an insured amount satisfactory to the Collateral Agent (but in each case not to exceed 100%

of the Fair Market Value of such Material Surface Property) and insuring the Collateral Agent that the Mortgage on each such Material Surface Property is a valid and enforceable first priority mortgage lien on such Material Surface Property, free and clear of all defects and encumbrances except Permitted Encumbrances, with each such Mortgage Policy (1) to be in form and substance reasonably satisfactory to the Collateral Agent, (2) to include, to the extent available in the applicable jurisdiction, the same or comparable supplemental endorsements as those included in the mortgage policies delivered pursuant to the Pre-Petition First Lien Term Loan Credit Agreement, (3) to not include the "standard" title exceptions and (4) to provide for affirmative insurance and such reinsurance or coinsurance as the Collateral Agent in its discretion may reasonably request;

(iii)    to induce the title company to issue the mortgage policies referred to in the Pre-Petition First Lien Term Loan Credit Agreement and as deemed prudent by the Collateral Agent with respect to confirming each applicable Credit Parties' title to the Applicable Real Property, such affidavits, certificates, information and instruments of indemnification (including, without limitation, a so-called "gap" indemnification) as shall be required by the title company, together with payment by the Borrower of all Mortgage Policy premiums, search and examination charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of such Mortgages and issuance of such Mortgage Policies;

(iv)    subject to **subsection (d)** below, such material consents and approvals as shall be reasonably deemed necessary by the Collateral Agent in order for the owner or holder of the fee or leasehold interest constituting such Applicable Real Property to grant the Lien contemplated by the Mortgage with respect to the Applicable Real Property;

(v)    to the extent requested by the Administrative Agent, copies of all leases in which the Borrower or any of its Subsidiaries holds the lessor's interest or other agreements relating to possessory interests, if any; *provided* that, to the extent any of the foregoing affect such Applicable Real Property, to the extent requested by the Administrative Agent, such agreements shall be subordinate to the Lien of the Mortgage to be recorded against such Applicable Real Property, either expressly by its terms or pursuant to a subordination, non-disturbance and attornment agreement (with any such agreement being reasonably acceptable to the Administrative Agent);

(vi)    with respect to each After-Acquired Real Property improved by a "building" or "mobile home" (each as defined in Regulation H as promulgated by the Federal Reserve Board under the Flood Insurance Laws), to the extent such building or mobile home is required to be included in the Collateral, Flood Documentation reasonably satisfactory in form and substance to the Administrative Agent; and

(vii)    from local counsel in each state in which Applicable Real Property is located, an opinion in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

#91897284v80

(d)     The Borrower will, and will cause each other Credit Party to, use commercially reasonable efforts to obtain the consent or waiver of any Person necessary to permit the Borrower and other Credit Parties to grant to the Collateral Agent, for the benefit of the Secured Creditors, security interests and/or Mortgages in such assets and Real Property (whether owned or leased on the date hereof or subsequently acquired by the Borrower or the other Credit Parties) as would otherwise constitute Excluded Assets under this Agreement; *provided* that the obligation of the Borrower and other Credit Parties to use commercially reasonable efforts shall not require the Borrower or any other Credit Party to request any consent or waiver with respect to a restriction on assignment in any agreement which is imposed by any legal requirement or which the Borrower or such other Credit Party reasonably determines would have a material adverse effect on such agreement or on the Borrower's or other Credit Party's relationship with the other party or parties to such agreement; *provided*, *further*, that the use of commercially reasonable efforts shall not require any payment or other consideration from the Borrower or other Credit Parties; *provided*, *further*, that any such use of commercially reasonable efforts with respect to any such assets may be terminated by the Borrower sixty (60) days after the commencement of such commercially reasonable efforts.  When negotiating the terms of any lease or other agreement entered into after the date of this Agreement, the Borrower will, and will cause each other Credit Party to, use commercially reasonable efforts (as described above) to eliminate any restriction on the assignment and/or granting of a Lien in such lease or other agreement.

(e)     Subject to the terms of the Security Documents and the Orders, the Borrower will, and will cause each other Credit Party to, execute any and all further documents, financing statements, agreements, and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust, and other documents) that may be required under any applicable law, or that the Administrative Agent, the Collateral Agent or the Required Lenders may reasonably request, in order to grant, preserve, protect, and perfect the validity and priority of the security interests created or intended to be created by the applicable Security Documents, all at the expense of the Borrower and the Restricted Subsidiaries.

### Section 7.13    Certain Long-Term Liabilities and Environmental Reserves.

To the extent required by GAAP, the Borrower will, and will cause each of its Restricted Subsidiaries to, maintain adequate reserves for (a) future costs associated with any lung disease claim alleging pneumoconiosis or silicosis or arising out of exposure or alleged exposure to coal dust or the coal mining environment, (b) future costs associated with retiree and healthcare benefits, (c) future costs associated with reclamation of disturbed acreage, removal of facilities and other closing costs in connection with its mining operations and (d) future costs associated with other potential environmental liabilities.

### Section 7.14    Post-Closing Actions.

Notwithstanding anything to the contrary contained in this Agreement or the other Credit Documents, the parties hereto acknowledge and agree that the Borrower and its Restricted Subsidiaries shall be required to take the actions specified in **Schedule 7.14** as promptly as practicable, and in any event within the time periods set forth in **Schedule 7.14**. The provisions

of **Schedule 7.14** shall be deemed incorporated by reference herein as fully as if set forth herein in its entirety.

### Section 7.15    Designation of Subsidiaries.

(a)    The Board of Directors of the Borrower may, with the consent of the Required Lenders, designate any Restricted Subsidiary to be an Unrestricted Subsidiary if that designation would not cause a Default or Event of Default (and so long as no Default or Event of Default is then continuing); ***provided*** that (i) in no event will the Borrower or any Subsidiary of the Borrower that is a Restricted Subsidiary (or similar term as defined in the Pre-Petition Credit Agreements and/or the DIP ABL Credit Agreement) be designated as an Unrestricted Subsidiary and (ii) the requirements set forth in the definition of "Unrestricted Subsidiary" shall be satisfied. If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate Fair Market Value of all outstanding Investments owned by the Borrower and its Restricted Subsidiaries in the Subsidiary designated as an Unrestricted Subsidiary will be deemed to be an Investment made as of the time of the designation and will utilize the amount available under **clause (l)(ii)** of the definition of "***Permitted Investments***"; ***provided*** that the redesignation of any such Unrestricted Subsidiary as a Restricted Subsidiary shall increase the amount of Investments permitted pursuant to **clause (l)(ii)** of the definition of "Permitted Investments" by the Fair Market Value of outstanding Investments in such Subsidiary on the date of such redesignation up to an aggregate amount of such original Investment.  That designation will only be permitted if the Investment would be permitted at that time and if the Restricted Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.  As of the Closing Date, there are no Unrestricted Subsidiaries.

(b)    Any designation of a Subsidiary of the Borrower as an Unrestricted Subsidiary will be evidenced to the Administrative Agent by an officer's certificate of an Authorized Officer of the Borrower certifying that such designation complied with the preceding conditions and was permitted by **Section 8.11**.  If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Agreement and any Indebtedness, Liens or Investments of such Subsidiary will be deemed to be incurred by a Restricted Subsidiary of the Borrower as of such date and, if such Indebtedness, Liens or Investments is not permitted to be incurred as of such date under the terms of this Agreement, the Borrower will be in default of such covenant.

(c)    The Borrower may at any time, with the consent of the Required Lenders, designate any Unrestricted Subsidiary to be a Restricted Subsidiary of the Borrower; ***provided*** that such designation will be deemed to be an incurrence of Indebtedness, Liens and Investments by a Restricted Subsidiary of the Borrower of any outstanding Indebtedness of such Unrestricted Subsidiary, and such designation will only be permitted if (x) such Indebtedness, Liens and Investments are permitted under the terms of this Agreement, calculated on a pro forma basis as if such designation had occurred at the beginning of the most recent four consecutive fiscal quarters of the Borrower then last ended for which financial statements have been delivered or were required to have been delivered pursuant to Section 7.01(b) or 7.01(c); and (y) no Default or Event of Default would be in existence following such designation.

### Section 7.16    Milestones.

The Credit Parties shall ensure the satisfaction of the following milestones (collectively, the "***Milestones***", and each, a "***Milestone***"), unless waived or extended with the consent of the Required Lenders or the Administrative Agent (with the consent of the Required Lenders):

(a)        No later than one day after the Petition Date, filing of a motion, in form and substance satisfactory to the Required Lenders, seeking approval of the DIP Term Facility;

(b)        No later than five days after the Petition Date, entry of the Interim Order and filing of an Acceptable Disclosure Statement and an Acceptable Plan of Reorganization;

(c)        No later than 45 days after the Petition Date, entry of the Final Order;

(d)        No later than 75 days after the Petition Date, approval of an Acceptable Disclosure Statement and approval of the Acceptable Plan of Reorganization (the "***Confirmation Date***"); and

(e)        No later than 14 days after the Confirmation Date, effectiveness of the Acceptable Plan of Reorganization.

The Milestones may be amended, modified or extended, in each case, only by (i) order of the Bankruptcy Court or (ii) the prior written consent of the Required Lenders.

### Section 7.17    Bankruptcy-Related Matters.

The Borrower will and will cause each of the Guarantors and Restricted Subsidiaries to:

(a)        comply in all material respects with the Orders; and

(b)        comply in all material respects with each chapter 11 order in connection with the Cases (other than the Orders).

### Section 7.18    Priority of Liens.

Each Credit Party hereby covenants, represents and warrants that, upon the execution of this Agreement and entry of the Interim Order (and when applicable, the Final Order), the Obligations of each Credit Party hereunder and under the Credit Documents:

(a)        pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed Superpriority Claims payable from and have recourse to all pre- and post-petition property of the Credit Parties and all proceeds thereof (excluding  Avoidance Actions but, subject only to and effective upon entry of the Final Order, including Avoidance Proceeds), subordinated and subject only to the Carve-Out and any payments or proceeds on account of such Superpriority Claims shall be distributed in accordance with **Section 2.19**;

(b)        pursuant to Section 364(c)(2) of the Bankruptcy Code and subject to the Carve-Out to the extent provided in the Interim Order or Final Order, as applicable, shall be secured by

(i) a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest and Lien on all of the assets of the Credit Parties, whether currently existing or thereafter acquired, of the same nature, scope and type as the DIP Term Loan Priority Collateral and (ii) a junior security interest in and Lien on all assets of the Credit Parties of the same nature, scope and type as the DIP ABL Priority Collateral, in each case that are not subject to (x) valid, perfected and non-avoidable Liens as of the Petition Date or (y) valid Liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, excluding Avoidance Actions but including, subject to entry of the Final Order, Avoidance Proceeds;

(c)    pursuant to section 364(d)(1) of the Bankruptcy Code and subject only to the Carve-Out to the extent provided in the applicable Order, shall at all times be secured by (i) a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and Lien upon the property of the Credit Parties of the same nature, scope and type as the DIP Term Loan Priority Collateral to the extent that such Collateral is subject to existing Liens that secure the obligations of the applicable Credit Party under the Pre-Petition First Lien Term Loan Credit Agreement Documents and the Pre-Petition Second Lien Term Loan Credit Agreement Documents and (ii) such priming liens shall be senior in all respects to any Prepetition ABL Adequate Protection Liens and Prepetition Term Adequate Protection Liens (each, as defined in the Orders), but as to the Prepetition ABL Adequate Protection Liens only as it relates to unencumbered property of the same nature, scope and type as the Prepetition Term Priority Loan Collateral (as defined in the Orders);

(d)    pursuant to Section 364(c)(3) of the Bankruptcy Code and subject only to the Carve-Out to the extent provided in the applicable Order, shall be secured by a valid, binding, continuing, enforceable, fully-perfected junior security interest in and Lien on (i) the DIP Term Loan Priority Collateral, which is subject to (A) valid, perfected and non-avoidable senior Liens in existence at the time of the commencement of the Cases and (B) valid senior Liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code and (ii) the DIP ABL Priority Collateral with the priority of the Liens in respect of the DIP Facilities (relative to the Liens in respect of the DIP Term Facility) as set forth in the Orders and the DIP ABL Intercreditor Agreement;

(e)    shall not be subject or subordinate to or made pari passu with (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (ii) unless otherwise provided for in the Credit Documents or an order of the Bankruptcy Court in form and substance approved by the Required Lenders, any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (iii) any intercompany affiliate liens of the Credit Parties or security interests of the Credit Parties, or (iv) any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof; and

(f)    for the avoidance of doubt, the Collateral shall exclude Avoidance Actions, but shall, subject only to and effective upon entry of the Final Order, include Avoidance Proceeds.

Subject to and effective only upon entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the Required Lenders, as the case may be with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by the Lenders. Subject to and effective only upon entry of the Final Order, in no event shall the Administrative Agent or the Lenders be subject to the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code (subject only to and effective upon entry of the Final Order). In no event shall the Administrative Agent, the Lenders or the Prepetition Secured Parties (as defined in the applicable Order) be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

Except for the Carve-Out and as otherwise set forth in the applicable Order and herein, the Superpriority Claims shall at all times be senior to the rights of the Borrower, any chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 cases (if any of the Cases are converted to cases under chapter 7 of the Bankruptcy Code).

### Section 7.19   USA PATRIOT ACT, Beneficial Ownership Regulation.

Promptly following any request therefor, information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA PATRIOT Act and the Beneficial Ownership Regulation.

### ARTICLE VIII.
### NEGATIVE COVENANTS.

The Borrower hereby covenants and agrees that on and after the Closing Date and until the Loans and Notes (in each case together with interest thereon), Fees and all other Obligations (other than any indemnities described in **Section 11.13** and reimbursement obligations under **Section 11.01** which, in either case, are not then due and payable) incurred hereunder and under any other Credit Documents, are paid in full:

### Section 8.01   Liens.

The Borrower will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind securing Indebtedness or trade payables on any asset now owned or hereafter acquired, except Permitted Liens. For purposes of this Agreement, "*Permitted Liens*" shall mean:

(a)    Liens securing Indebtedness incurred pursuant to Section 8.04(c), with such Indebtedness incurred under (x) the DIP ABL Asset Priority Loan Documents subject to the

terms of the DIP ABL Intercreditor Agreement and (y) the Pre-Petition ABL Credit Agreement Documents subject to the terms of the Pre-Petition ABL Intercreditor Agreement; *provided* that (i) in the case of any such Liens on Collateral (other than DIP ABL Asset Priority Liens and the Pre-Petition ABL Asset Priority Liens), such Liens shall be junior in priority to the Liens that secure the Obligations and (ii) in the case of any such DIP ABL Asset Priority Liens or Pre-Petition ABL Asset Priority Liens, such Liens may be senior in priority to the Liens that secure the Obligations and the Obligations shall be secured by Liens on the applicable DIP ABL Collateral that are pari passu with or junior to such DIP ABL Asset Priority Liens;

(b)    Liens held by the Collateral Agent securing the Obligations, including any Liens created pursuant to the Orders in favor of the Collateral Agent securing the Obligations;

(c)    the Carve-Out;

(d)    Liens to secure the performance of Mining Financial Assurances, statutory obligations, insurance, performance obligations under coal sales agreements (which performance obligations may only be secured by Liens on cash and deposit accounts, either directly or by securing letters of credit or performance bonds permitted under this Agreement issued to assure such performance obligations), return of money bonds, surety or appeal bonds (including surety bonds obtained as required in connection with federal coal leases), workers compensation obligations, unemployment insurance and other types of social security and deposits securing liability to insurance carriers under insurance or self-insurance arrangements, performance bonds or other obligations of a like nature (*provided* that to the extent such obligations constitute Indebtedness, they are permitted under **Section 8.04**) incurred in the ordinary course of business and consistent with past practices (including Liens to secure letters of credit permitted under this Agreement issued to assure payment of such obligations); *provided*, in each case, that such secured performance obligations shall not constitute prepaid amounts or other advances of cash or other value for future delivery of coal;

(e)    Liens to secure Indebtedness (including but not limited to Capital Lease Obligations) permitted by **Section 8.04(d)**, *provided* that such Liens do not at any time encumber any property other than the property acquired with or financed by such Indebtedness;

(f)    Liens existing on the Closing Date and set forth on **Schedule 8.01**;

(g)    Liens for Taxes that are not yet delinquent, or that are being contested in good faith by appropriate proceedings diligently pursued, *provided* that, any reserve as is required in conformity with GAAP or other appropriate provision therefor under an Acceptable Plan of Reorganization has been made, or that are attributable to Taxes the nonpayment of which is required pursuant to the Bankruptcy Code;

(h)    Liens imposed by law, such as carriers', warehousemen's, landlord's and mechanics' Liens (including Liens imposed by law in favor of lessors of coal reserves (which shall only be on assets located on or under the leased premises covered by the applicable lease) securing payment of unpaid royalties, and similar liens imposed by contract), in each case, incurred in the ordinary course of business;

#91897284v80

(i)     survey exceptions, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(j)     Liens on insurance policies and proceeds thereof, or other deposits, to secure insurance premium financings;

(k)     notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(l)     Liens on specific items of inventory or other goods (and the proceeds thereof) of any Person securing such Person's obligations in respect of bankers' acceptances issued or created in the ordinary course of business for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(m)     (x) licenses to mine on behalf of the Borrower or its Restricted Subsidiaries granted under contract mining agreements and (y) leases granted to third parties, in each case, in the ordinary course of business and consistent with past practices and that do not interfere with the ordinary conduct of business of the Borrower or its Restricted Subsidiaries;

(n)     [reserved];

(o)     Liens securing judgments for the payment of money not constituting an Event of Default, so long as such Liens are adequately bonded;

(p)     Liens arising from protective filings of Uniform Commercial Code financing statements (or the equivalent) regarding operating leases entered into by the Borrower and its Restricted Subsidiaries in the ordinary course of business;

(q)     Liens in favor of banking institutions arising as a matter of law or contract encumbering deposits (including the right of set-off) which are within the general parameters customary in the banking industry;

(r)     [reserved];

(s)     [reserved];

(t)     Liens on cash and deposit accounts to secure Cash Management Obligations;

(u)     [reserved];

(v)     [reserved];

(w)     additional Liens to secure Indebtedness permitted pursuant to **Section 8.04** in an aggregate principal amount not to exceed $500,000 at any one time outstanding;

#91897284v80

(x)    [reserved]; and

(y)    Liens on the Collateral granted to provide adequate protection pursuant to the Interim Order (or the Final Order, if applicable).

**Section 8.02    <u>Asset Sales.</u>**

The Borrower will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale, except for the following ("***Permitted Asset Sales***"):

(a)    Asset Sales of used, worn out, obsolete or surplus property by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business or the abandonment in the ordinary course of business that is, in the reasonable judgment of the Borrower, no longer economically practicable to maintain or useful in the conduct of the Borrower and its Restricted Subsidiaries in their respective businesses taken as a whole;

(b)    Asset Sales of inventory in the ordinary course of business;

(c)    Asset Sales of equipment or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Asset Sale are reasonably promptly (but in no event later than 60 days after the Asset Sale) applied to the purchase price of such replacement property;

(d)    Asset Sales of property by any Restricted Subsidiary to the Borrower or to a wholly-owned Restricted Subsidiary; ***provided***, that if the transferor of such property is a Credit Party, the transferee thereof must either be the Borrower or another Credit Party and, to the extent such property is Collateral, such property shall remain Collateral (for the avoidance of doubt, for the benefit of all Secured Creditors) after giving effect to such Asset Sale;

(e)    Asset Sales permitted by **<u>Section 8.05</u>** and Restricted Payments permitted by **<u>Section 8.03</u>**;

(f)    [reserved];

(g)    so long as no Default or Event of Default shall occur and be continuing, the grant of any option or other right to purchase any asset in a transaction that would be permitted under the provisions of this **<u>Section 8.02</u>**;

(h)    leases (including operating and capital leases), subleases, assignments, licenses, sublicenses of real or personal property in the ordinary course of business and in accordance with the applicable Security Documents (excluding, for the avoidance of doubt, sale-leaseback agreements);

(i)    [reserved];

(j)    transfers of property subject to casualty or condemnation events upon receipt of Net Cash Proceeds from a Recovery Event in respect thereof;

(k)      to the extent constituting an Asset Sale, the granting of Permitted Liens under **Section 8.01** (but not the sale or other Asset Sale of the property subject to such Permitted Liens);

(l)      dispositions in the ordinary course of business of cash and Cash Equivalents in transactions not otherwise prohibited by any Credit Document; and

(m)      [reserved].

Provided that if the aggregate Fair Market Value of all such Permitted Asset Sales (other than clauses (b), (c) (but solely with respect to equipment) and (d) above) since the Closing Date exceeds $1,000,000, such Permitted Asset Sales shall require the consent of the Required Lenders.

### Section 8.03    Restricted Payments.

The Borrower will not, and will not permit any of its Restricted Subsidiaries to, declare or make, directly or indirectly, any Restricted Payment, except:

(a)      dividends or distributions payable to the Borrower or any Credit Party; and

(b)      payments of Tax Distributions;

The amount of all Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Borrower or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment.

### Section 8.04    Indebtedness.

The Borrower will not, and will not permit any of its Restricted Subsidiaries to create, incur, assume or suffer to exist any Indebtedness, except for the following:

(a)      the incurrence by the Borrower and its Restricted Subsidiaries of Indebtedness (i) existing as of the Closing Date and set forth on **Schedule 8.04** ("*Existing Indebtedness*") and (ii) outstanding on the Petition Date under the Pre-Petition Credit Agreements or Pre-Petition LC Facility Agreement; ***provided*** that any such Existing Indebtedness owed to any Equity Holder shall be Subordinated Indebtedness;

(b)      the incurrence by the Borrower and any Guarantor of Indebtedness under the Credit Documents;

(c)      the incurrence by the Borrower and any Guarantor of Indebtedness under the DIP ABL Asset Priority Loan Documents and the Pre-Petition ABL Credit Agreement Documents in an aggregate principal amount not to exceed $90,000,000;

(d)      the incurrence by the Borrower or any of its Restricted Subsidiaries of Indebtedness represented by Capital Lease Obligations or purchase money obligations or other

Indebtedness, in each case, incurred for the purpose of financing all or any part of the purchase price or cost of design, construction, installation or improvement of property (real or personal), plant or equipment used in the business of the Borrower or any of its Restricted Subsidiaries, in an aggregate principal amount, not to exceed the aggregate principal amount of $500,000 in the aggregate at any time outstanding;

(e)    [reserved];

(f)    Indebtedness of (x) the Borrower or any Guarantor to any other Credit Party that is a Debtor or any Restricted Subsidiary that is a non-Credit Party and (y) any Restricted Subsidiary that is a non-Credit Party to any other Restricted Subsidiary that is a non-Credit Party; *provided* that, any Indebtedness incurred under **sub-clause (x)** that is owed to a non-Credit Party must be unsecured and expressly subordinated to the prior payment in full in cash of all Obligations, in the case of the Borrower, or all Guaranteed Obligations, in the case of a Guarantor, in each case, on terms reasonably acceptable to the Administrative Agent;

(g)    the incurrence by the Borrower or any of its Restricted Subsidiaries of Indebtedness in respect of Mining Financial Assurances, reclamation liabilities, water treatment, workers' compensation claims, payment obligations in connection with health or social security benefits, unemployment or other insurance obligations, statutory obligations, bankers' acceptances, performance under coal sales agreements (which Indebtedness shall be in the form of letters of credit or performance bonds), letters of credit, or completion or performance guarantees (including, without limitation, performance guarantees pursuant to coal supply agreements or equipment leases) and surety bonds in the ordinary course of business; *provided*, Indebtedness in respect of performance obligations shall not constitute prepaid amounts or other advances of cash or other value for future delivery of coal;

(h)    the incurrence by the Borrower or any of its Restricted Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Indebtedness is covered within five Business Days;

(i)    Indebtedness of the Borrower or the Guarantors incurred prior to the Petition Date in connection with agreements providing for indemnification, adjustment of purchase price or similar obligations incurred in connection with any disposition of any business, assets or Restricted Subsidiary of the Borrower (other than Guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or Restricted Subsidiary for the purpose of financing such acquisition), so long as the principal amount does not exceed the gross proceeds actually received by the Borrower or any of the Guarantors in connection with such disposition;

(j)    [reserved];

(k)    Indebtedness incurred by the Borrower or any of its Restricted Subsidiaries in respect of netting services, overdraft protections and otherwise in respect of deposit accounts;

(l)    any Guarantee of Indebtedness of the Borrower or a Restricted Subsidiary to the extent that the guaranteed Indebtedness was permitted to be incurred by another provision of this

#91897284v80

**Section 8.04**; *provided* that if the Indebtedness being guaranteed is subordinated to the Obligations or Guaranteed Obligations, then the Guarantee must be subordinated, as applicable, to the same extent as the Indebtedness guaranteed;

(m)    Indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

(n)    guarantees in the ordinary course of business of the obligations of suppliers and licensees (other than suppliers and licensees that are Affiliates of the Borrower) of Borrower and its Restricted Subsidiaries;

(o)    the incurrence by any Borrower or any Guarantor of additional Indebtedness in an aggregate principal amount not to exceed $500,000 at any time outstanding; and

(p)    the incurrence by the Borrower or any of its Restricted Subsidiaries of (x) Hedging Obligations in the ordinary course of business and on a non-speculative basis and (y) Cash Management Obligations in the ordinary course of business.

The Borrower will not incur, and will not permit any Guarantor to incur, any Indebtedness that is contractually subordinated in right of payment to any other Indebtedness of the Borrower or such Guarantor unless such Indebtedness is also contractually subordinated in right of payment to the Obligations and the applicable Subsidiary Guaranty on substantially identical terms; *provided*, *however*, that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Borrower or any Guarantor solely by virtue of being unsecured or by virtue of being secured on a junior priority basis.

### Section 8.05    Merger, Consolidation or Sale of Assets.

The Borrower will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, merge, dissolve, liquidate, consolidate with or into another Person, or sell, assign, lease, transfer, convey or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default or Event of Default exists or would result therefrom:

(a)    any Restricted Subsidiary may merge with (i) the Borrower, *provided* that the Borrower shall be the continuing or surviving Person, or (ii) any one or more other Restricted Subsidiaries, *provided* that when any Restricted Subsidiary that is a Credit Party is merging with another Restricted Subsidiary, the Credit Party shall be the continuing or surviving Person;

(b)    any Restricted Subsidiary may sell, assign, lease, transfer, convey or otherwise dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Restricted Subsidiary that is a Debtor; *provided* that, if the transferor in such a transaction is a Credit Party, then the transferee must either be the Borrower or another Credit Party that is a Debtor;

(c)    [reserved]; and

(d)      the Borrower and its Restricted Subsidiaries may consummate any transaction that would be permitted as an Investment under **Section 8.11**.

**Section 8.06    Transactions with Affiliates.**

The Borrower will not, and will not permit any of its Restricted Subsidiaries to, make any payment to or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate (each, an "***Affiliate Transaction***"), unless the Affiliate Transaction is (i) not prohibited by this Agreement and (ii) on terms that are not materially less favorable to the Borrower or the relevant Restricted Subsidiary than those that would have been obtained in a comparable arm's-length transaction by the Borrower or such Restricted Subsidiary with a Person other than an Affiliate (or if, in the good faith judgment of the Borrower's Board of Directors, no comparable transaction is available with which to compare any such transaction, such transaction is otherwise fair to the Borrower or the relevant Restricted Subsidiary from a financial point of view).  The foregoing restrictions shall not apply to the following:

(a)      transactions between or among the Borrower and its Restricted Subsidiaries that are Debtors;

(b)      [reserved];

(c)      [reserved];

(d)      combined insurance programs and 401(k) plans with JMP Coal Holdings, LLC, in each case, consistent with past practice;

(e)      Restricted Payments that do not violate the provisions of **Section 8.03** and Permitted Investments;

(f)      transactions (including payments and performance) pursuant to agreements or arrangements in effect on the date of this Agreement and set forth on **Schedule 8.06**; or any amendment, replacement, extension or renewal thereof (so long as such agreement or arrangement as so amended, replaced, extended or renewed is not materially less advantageous, taken as a whole, to the Lenders than the original agreement or arrangement as in effect on the date of this Agreement);

(g)      [reserved];

(h)      [reserved]; and

(i)      the execution of the Transactions, the performance of the obligations under the Credit Documents, the entering into the RSA, the transactions specifically contemplated by the RSA and the Acceptable Plan of Reorganization, the payment of all fees and expenses related to the Transactions, the RSA and the Acceptable Plan of Reorganization, and any other transaction approved by the Bankruptcy Court pursuant to an order in form and substance satisfactory to the Required Lenders.

**Section 8.07    Limitation on Certain Restrictions on Subsidiaries; Negative Pledge.**

(a)    The Borrower will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(i)    pay dividends or make any other distributions on its Capital Stock to the Borrower or any of its Restricted Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any indebtedness owed to the Borrower or any of its Restricted Subsidiaries;

(ii)    make loans or advances to the Borrower or any of its Restricted Subsidiaries; or

(iii)    sell, lease or transfer any of its properties or assets to the Borrower or any of its Restricted Subsidiaries.

(b)    **Clause (a)** above will not apply to encumbrances or restrictions existing under or by reason of:

(i)    Existing Indebtedness, the DIP ABL Asset Priority Lien Documents, the Pre-Petition LC Facility Agreement and the Pre-Petition Credit Documents as in effect on the Closing Date;

(ii)    this Agreement and the other Credit Documents;

(iii)    agreements governing other Indebtedness permitted to be incurred or issued under **Section 8.04(d)**; *provided* that the restrictions therein are (x) customary for instruments of such type and (y) will not materially adversely impact the ability of the Borrower to make any payments required to be made under this Agreement;

(iv)    applicable Requirements of Law;

(v)    any instrument governing Indebtedness or Capital Stock of a Person acquired by the Borrower or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness or Capital Stock was incurred in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired; *provided* that, in the case of Indebtedness, such Indebtedness was permitted by this Agreement;

(vi)    customary non-assignment provisions in contracts, leases, sub-leases and licenses entered into in the ordinary course of business;

(vii)    purchase money obligations for property acquired in the ordinary course of business and Capital Lease Obligations;

(viii)    Liens, including real property mortgages, permitted to be incurred under **Section 8.01** that limit the right of the debtor to dispose of the assets subject to such Liens;

(ix)    customary provisions limiting the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements entered into in the ordinary course of business and permitted to be entered into pursuant to this Agreement, which limitation is applicable only to the assets that are the subject of such agreements;

(x)    customary restrictions and conditions contained in agreements relating to the sale of a Restricted Subsidiary or assets pending such sale; *provided* that such restrictions and conditions apply only to such Restricted Subsidiary or such assets that are to be sold and such sale is permitted hereunder; and

(xi)    restrictions on cash or other deposits or net worth imposed by customers (other than customers that are Affiliates of the Borrower) under contracts entered into in the ordinary course of business.

(c)    In addition, the Borrower will not, and will not permit any of its Restricted Subsidiaries to, enter into any Contractual Obligation which prohibits or limits the ability of any Credit Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following:

(i)    this Agreement, the other Credit Documents, the DIP ABL Asset Priority Lien Documents, the Pre-Petition LC Facility Agreement and the Pre-Petition Credit Agreements;

(ii)    covenants in documents creating Liens permitted by **Section 8.01** to the extent such covenants relate solely to the assets (and any proceeds in respect thereof) which are the subject of such Liens;

(iii)    any other agreement that does not restrict in any manner (directly or indirectly) Liens created pursuant to the Credit Documents on any Collateral securing the Obligations and does not require the direct or indirect granting of any Lien securing any Indebtedness or other obligation by virtue of the granting of Liens on or pledge of property of any Credit Party to secure the Obligations; and

(iv)    any prohibition or limitation that:

(A)    exists pursuant to applicable Requirements of Law,

(B)    consists of customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under **Section 8.02** pending the consummation of such sale,

#91897284v80

(C)    restricts subletting, assignment or other transfer of interests contained in any lease, license or similar agreement of the Borrower or any of its Restricted Subsidiaries,

(D)    exists in any agreement in effect at the time such Restricted Subsidiary becomes a Restricted Subsidiary of the Borrower, so long as such agreement was not entered into in contemplation of such person becoming a Restricted Subsidiary or

(E)    is imposed by any amendments or refinancings that are otherwise permitted by the Credit Documents of the contracts, instruments or obligations referred to in **clause (iv)(D)**;

*provided* that such amendments and refinancings are no more restrictive with respect to such prohibitions and limitations in any material respect than those prior to such amendment or refinancing.

**Section 8.08    Business Activities.**

The Borrower will not, and will not permit any of its Restricted Subsidiaries to, engage directly or indirectly in any business other than Permitted Businesses.

**Section 8.09    Amendments, etc. of Organizational Documents and Pre-Petition Credit Documents.**

The Borrower will not, and will not permit any of its Restricted Subsidiaries to (a) terminate, amend, waive or otherwise modify any of its Organizational Documents in a manner materially adverse to any Credit Party or to the Lenders (in their capacity as Lenders) or (b) amend or otherwise modify any term or condition of any Pre-Petition Credit Document or the Pre-Petition LC Facility Agreement Documents or give any consent, waiver or approval thereunder, or waive any default under or any breach of any term or condition of any Pre-Petition Credit Document without the consent of the Required Lenders.

**Section 8.10    [Reserved].**

**Section 8.11    Investments.**

The Borrower will not, and will not permit any of its Restricted Subsidiaries to, make or hold any Investments, except for Permitted Investments.

**Section 8.12    [Reserved].**

**Section 8.13    Prepayments, etc. of Indebtedness.**

The Borrower will not, and will not permit any Guarantor to, make any Restricted Junior Debt Payment, except:

(a)    adequate protection payments thereof pursuant to the Orders;

(b)      [reserved], and

(c)      any Indebtedness owed to the Borrower or any wholly-owned Restricted Subsidiary that is a Debtor.

### Section 8.14    Accounting Changes.

The Borrower will not change its federal tax identification number without providing at least 15 days' prior written notice to the Administrative Agent.

### Section 8.15    [Reserved].

### Section 8.16    Variance Covenant.

Beginning with the delivery of the initial Budget Variance Report, as of the last day of each applicable Test Period, (i) the negative variance (as compared to the Approved Budget) of the actual operating cash receipts of the Debtors shall not exceed 20% and (ii) the positive variance (as compared to the Approved Budget) of the aggregate operating disbursements (excluding professional fees and expenses) made by the Debtors shall not exceed 10%.

### Section 8.17    Bankruptcy Case Prohibitions.

Notwithstanding anything else herein to the contrary, no Credit Party shall, without the reasonable consent of the Required Lenders, file with the Bankruptcy Court a motion to approve or otherwise seek to assume, assign or reject any material executory contract.


## ARTICLE IX.
## EVENTS OF DEFAULT.

Upon the occurrence of any of the following specified events (each, an "*Event of Default*"):

### Section 9.01    Payments.

The Borrower shall (a) default in the payment when due of any principal of any Loan or any Note or (b) default, and such default shall continue unremedied for three or more Business Days, in the payment when due of any interest on any Loan or Note or any Fees or any other amounts owing hereunder or under any other Credit Document; or

### Section 9.02    Representations, etc.

Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate delivered to the Administrative Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect (or, in the case of any such representation, warranty or statement that is qualified as to

"materiality", "Material Adverse Effect" or similar language, shall prove to be untrue in any respect) on the date as of which made or deemed made; or

### Section 9.03    Covenants.

The Borrower or any of its Restricted Subsidiaries shall (a) default in the due performance or observance by it of any term, covenant or agreement contained in **Sections 7.01(h)**, **7.04** (with respect to the existence of the Borrower and its Restricted Subsidiaries), **7.08**, **7.11**, **7.16**, **7.17**, **7.18**, or **Article VIII** or (b) default in the due performance or observance by it of any other term, covenant or agreement contained in this Agreement (other than those set forth in **Sections 9.01** and **9.02**) or any other Credit Document and, in the case of this **clause (b)**, such default shall continue unremedied for a period of 30 days after the date on which written notice thereof is given to the defaulting party by the Administrative Agent or the Required Lenders; or

### Section 9.04    Default Under Other Agreements.

(a)    The Borrower or any of its Subsidiaries shall (x) default in any payment of Indebtedness (other than the Obligations and any Indebtedness of any Debtor that was incurred prior to the Petition Date) (including, without limitation, any Indebtedness under the DIP ABL Asset Priority Lien Documents and/or Indebtedness incurred prior to the Petition Date that is required to be paid under the Bankruptcy Code or by an order of the Bankruptcy Court) beyond the period of grace, if any, provided in an instrument or agreement under which such Indebtedness was created (or, in respect of Indebtedness required to be paid by Bankruptcy Court order, the period set forth in such order) or (y) default in the observance or performance of any agreement or condition relating to any Indebtedness (other than the Obligations and any Indebtedness of any Debtor that was incurred prior to the Petition Date) (including, without limitation, any Indebtedness under the DIP ABL Asset Priority Lien Documents and/or any agreement or condition relating to any Indebtedness incurred prior to the Petition Date that is required to be observed or performed under the Bankruptcy Code or by an order of the Bankruptcy Court) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, in the case of this **clause (y)**, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause (determined without regard to whether any notice is required), any such Indebtedness to become due prior to its Stated Maturity or the commitments thereunder to be terminated; or

(b)    any Indebtedness (other than the Obligations and any Indebtedness of any Debtor that was incurred prior to the Petition Date (or, if later, the date on which such Person became a Debtor)) of the Borrower or any of its Subsidiaries shall be declared to be (or shall become) due and payable, or required to be prepaid other than by a regularly scheduled required prepayment, prior to the Stated Maturity thereof;

*provided* that it shall not be a Default or an Event of Default under **clauses (a)** or **(b)** of this **Section 9.04** unless the aggregate principal amount of all Indebtedness to which a circumstance described in such clauses applies is at least $10,000,000.

### Section 9.05    Bankruptcy, etc.

Any Restricted Subsidiary that is not a Debtor (any such Restricted Subsidiary, an "***Applicable Subsidiary***") shall commence a voluntary case concerning itself under Title 11 of the United States Code entitled "Bankruptcy", as now or hereafter in effect, or any successor thereto (the "***Bankruptcy Code***") and such Applicable Subsidiary shall fail to become a Guarantor pursuant to **Section 7.12** within 10 Business Days; or an involuntary case is commenced against an Applicable Subsidiary, and the petition is not controverted within 10 days, or is not dismissed within 45 days after the filing thereof, ***provided***, ***however***, that during the pendency of such period, each Lender shall be relieved of its obligation to extend credit hereunder; or a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of an Applicable Subsidiary, to operate all or any substantial portion of the business of an Applicable Subsidiary, commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to an Applicable Subsidiary, or there is commenced against an Applicable Subsidiary any such proceeding which remains undismissed for a period of 45 days after the filing thereof, or an Applicable Subsidiary is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or an Applicable Subsidiary makes a general assignment for the benefit of creditors; or any Company action is taken by an Applicable Subsidiary for the purpose of effecting any of the foregoing; or

### Section 9.06    ERISA.

One or more ERISA Events shall have occurred and the liability of any or all of the Borrower, any Restricted Subsidiary of the Borrower and the ERISA Affiliates contemplated by the foregoing either individually or in the aggregate, has had or would be reasonably expected to have, a Material Adverse Effect; or

### Section 9.07    Security Documents.

(a)    Any of the Security Documents that extend to assets constituting a material portion of the Collateral shall cease to be in full force and effect (other than in accordance with its terms), or shall cease to give the Collateral Agent for the benefit of the Secured Creditors the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected security interest in, and Lien on, any material portion of the Collateral, in favor of the Collateral Agent, superior to and prior to the rights of all third Persons (except as permitted by **Section 8.01** and, with respect to perfection, except as otherwise expressly provided in the applicable Security Document)); or

(b)    the Borrower or any other Credit Party, or any Person acting for or on behalf of such Credit Party, shall deny or disaffirm in writing such Credit Party's obligations under any Security Document to which it is a party; or

### Section 9.08    Guaranties.

Any Subsidiary Guaranty or any provision thereof shall cease to be in full force or effect as to any Guarantor (except as a result of a release of any Guarantor in accordance with the terms

thereof), or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm in writing such Guarantor's obligations under the Subsidiary Guaranty to which it is a party; or

**Section 9.09    Judgments.**

(a)    One or more judgments or decrees shall be entered against the Borrower or any Restricted Subsidiary of the Borrower (which, in the case of the Debtors only, arose after the Petition Date) involving in the aggregate for the Borrower and its Restricted Subsidiaries a liability (not paid to or to the extent not covered by a reputable and solvent insurance company) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed or bonded pending appeal for any period of 30 consecutive days, and the aggregate amount of all such judgments equals or exceeds $10,000,000; or

(b)    One or more judgments or orders shall have been rendered against any Restricted Subsidiary of the Borrower (which, in the case of the Debtors only, arose following the Petition Date), and such judgment or order shall not have been stayed (including as a result of the automatic stay of the Cases), and which shall cause or could reasonably be expected to cause a Material Adverse Effect, and in each case, such action shall not be effectively stayed (including as a result of the automatic stay under the Cases); or

**Section 9.10    Change of Control.**

Any Change of Control shall have occurred, other than pursuant to the Acceptable Plan of Reorganization; or

**Section 9.11    DIP ABL Intercreditor Agreement.**

The DIP ABL Intercreditor Agreement or any provision thereof shall, as a result of any act or omission of any Credit Party, cease to be in full force and effect other than in accordance with its terms, or any Lien securing or purporting to secure Indebtedness or other obligations owing under the DIP ABL Asset Priority Lien Documents shall cease to be subordinated (to the extent required to be subordinated under the Security Documents or the Orders) to all Liens created under the Security Documents and the Orders securing the Obligations; or

**Section 9.12    Inability to Pay Debt.**

Any Restricted Subsidiary (other than a Debtor) becomes unable or admits in writing its inability or fails generally to pay its debts as they become due; or

**Section 9.13    Certain Bankruptcy Matters.**

(a)    **Dismissal or Conversion of Cases; Appointment of Trustee or Examiner; Cash Collateral Use.**

(i)    Any of the Cases of the Credit Parties shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(ii)    a trustee or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) (other than a fee examiner) is appointed or elected in the any of the Cases, or the Bankruptcy Court shall have entered an order providing for such appointment;

(iii)    an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the Credit Parties and the Credit Parties shall have not obtained use of Cash Collateral pursuant to an order consented to by, and in form and substance reasonably acceptable to, the Required Lenders;

(iv)    any Credit Party shall file a motion or other pleading seeking, or otherwise consenting to, any of the matters set forth in **clauses (i)** through **(iii)** above or the granting of any other relief that if granted would give rise to an Event of Default except to the extent that such motion, proceeding or consent shall have been withdrawn; or

(v)    any Credit Party or any of its Subsidiaries, or any person claiming by or through any Credit Party or any of its Subsidiaries, with any Credit Party's or any Subsidiary's consent, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against (A) the Administrative Agent, the Collateral Agent, or any of the Lenders relating to the DIP Term Facility, or (B) the administrative agent, the collateral agent or any lender relating to any of the Pre-Petition Credit Agreements;

(b)    the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing (i) any claims or charges, other than in respect of the DIP Facilities and the Carve-Out or as otherwise permitted under the applicable Credit Documents or the Orders, entitled to superpriority administrative expense claim status in any chapter 11 case pursuant to Section 364(c)(1) of the Bankruptcy Code that are *pari passu* with or senior to the claims of the Administrative Agent, the Collateral Agent and the Lenders under the DIP Term Facility, or there shall arise or be granted by the Bankruptcy Court any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out), or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein, except, in each case, as expressly provided in the Credit Documents or in the Orders then in effect (but only in the event specifically consented to by the Required Lenders (or the Administrative Agent with the consent of the Required Lenders)), whichever is in effect;

(c)    the Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Credit Parties which have a value in excess of $3,000,000 in the aggregate;

(d)    Certain Orders.

(i)    an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the

#91897284v80

Interim Order or the Final Order, without the prior written consent of the Required Lenders, or a Credit Party shall apply for the authority to do so except to the extent such application shall have been withdrawn or shall support or fail to promptly oppose any other party's application for entry of such an order;

(ii)    the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Required Lenders (or the Administrative Agent with the consent of the Required Lenders);

(iii)    an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the Administrative Agent or any of the Lenders of any amounts received in respect of the Obligations;

(iv)    any of the Credit Parties shall fail to comply with any material provision of the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date); or

(v)    an order in the Cases shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders or the commencement of other actions that is materially adverse to Administrative Agent, the Collateral Agent, the Lenders or their respective rights and remedies under the DIP Term Facility in any of the Cases or inconsistent with any of the Credit Documents;

(e)    a Reorganization Plan that is not an Acceptable Plan of Reorganization shall be confirmed in any of the Cases of the Credit Parties, or any order shall be entered which dismisses any of the Cases of the Credit Parties and which order does not provide for the Obligations (other than contingent indemnification obligations not yet due and payable) to be satisfied in full in cash or otherwise satisfied pursuant to **Section 2.04(e)**, or any of the Credit Parties and their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such Reorganization Plan or entry of any such order;

(f)    failure to satisfy any of the Milestones in accordance with the terms relating to such Milestone (unless waived or extended with the consent of the Required Lenders);

(g)    any Credit Party or any Subsidiary thereof shall take any action in support of any matter set forth in **clauses (l)** through **(p)** (inclusive) of this **Section 9.13** or any other Person shall do so and such application is not contested in good faith by the Credit Parties and the relief requested is granted in an order that is not stayed pending appeal;

(h)    any Credit Party or any Subsidiary thereof shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations or any other rights granted to the Administrative Agent, the Collateral Agent and the Lenders in the

Orders or this Agreement or (ii) any relief under section 506(c) of the Bankruptcy Code with respect to any Collateral;

(i)       any Credit Party shall file a pleading in support of a challenge of any payments made to the Administrative Agent, the Collateral Agent or any Lender with respect to the Obligations or the administrative agent, the collateral agent or any lender under any Pre-Petition Credit Agreement with respect to the obligations thereunder, other than to challenge the occurrence of a Default or Event of Default;

(j)       without the consent of the Required Lenders, the filing of any motion by the Credit Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any pre-petition agent or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date);

(k)       without the Required Lenders' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Credit Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Administrative Agent's and the Required Lenders' consent or to obtain any financing under section 364 of the Bankruptcy Code other than the facility hereunder unless such motion or order contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby;

(l)       if any Credit Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any part of the business affairs of the Credit Parties and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect; *provided*, that the Credit Parties shall have 10 Business Days after the entry of such an order to obtain a court order vacating, staying or otherwise obtaining relief from the Bankruptcy Court or another court to address any such court order;

(m)       any Credit Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or payables other than payments in respect of any Pre-Petition Credit Agreement or as otherwise not prohibited under this Agreement, in each case, to the extent authorized by one or more "first day" orders, the Interim Order or the Final Order and consistent with the Approved Budget;

(n)       if, unless otherwise approved by the Administrative Agent and the Required Lenders, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Cases and such order shall not be reversed or vacated within 10 days;

(o)       without the Required Lenders' consent, any Credit Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (i) to grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral, whether senior, equal or subordinate to the Administrative Agent's or Collateral Agent's liens and security interests except to the extent permitted by this Agreement; (ii) to use, or seek to use, Cash Collateral (as defined in the Orders); or (iii) to modify or affect any of the rights of the Administrative Agent, the Collateral Agent, or the Lenders under the Orders or the

Credit Documents, by any Reorganization Plan confirmed in the Cases or subsequent order entered in the Cases;

(p)     the RSA shall cease to be in full force and effect;

(q)     without the Required Lenders' consent, an order shall have been entered by the Bankruptcy Court terminating the exclusive right of any Credit Party or any Subsidiary thereof to file a chapter 11 plan or solicit a disclosure statement; or

(r)     without the Required Lenders' consent, any Credit Party or any Subsidiary thereof shall move or otherwise apply in the Cases for authority to (i) sell all or substantially all of the assets or equity of any Credit Party or any Subsidiary thereof pursuant to section 363 of the Bankruptcy Code or otherwise, or (ii) consummate a sale of assets or equity of any Credit Party or any Subsidiary thereof or Collateral having a value in excess of $500,000 outside of the ordinary course of business and not otherwise permitted hereunder;

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Required Lenders, shall by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent, the Collateral Agent and any Lender or the holder of any Note to enforce its claims against any Credit Party:

(a)     declare all of the Commitments terminated, whereupon all Commitments of each Lender shall forthwith terminate immediately without any other notice of any kind;

(b)     declare the principal of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party;

(c)     enforce, as Collateral Agent, all of the Liens and security interests created pursuant to the Security Documents or the Orders; and

(d)     enforce each Subsidiary Guaranty.

Following the occurrence of an Event of Default, the Administrative Agent and Lenders may enforce any or all of their rights and remedies set forth in the Orders, this Agreement and the other Credit Documents in accordance with the Orders.

## ARTICLE X.
## THE ADMINISTRATIVE AGENT

### Section 10.01 **Appointment.**

(a)     The Lenders hereby irrevocably designate and appoint Cantor as Administrative Agent and Collateral Agent (for purposes of this **Article X** (other than **Section 10.09**) and **Section 11.01**, the term "Administrative Agent" also shall include Cantor in its capacity as

Collateral Agent pursuant to the Security Documents) to act as specified herein and in the other Credit Documents.  Each Lender hereby irrevocably authorizes, and each holder of any Note by the acceptance of such Note shall be deemed irrevocably to authorize, the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto.  The Administrative Agent may perform any of its respective duties hereunder by or through its officers, directors, agents, employees or affiliates.

**Section 10.02  Nature of Duties; Exculpatory Provisions**

(a)    The Administrative Agent's duties hereunder and under the other Credit Documents are solely mechanical and administrative in nature and the Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(i)    Shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)    Shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that the Administrative Agent is required to exercise upon the written direction of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents); *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent or any of its Affiliates to liability or that is contrary to any Credit Document or applicable law; *provided further* that the Administrative Agent shall not be required to take any action unless the written direction of the Required Lenders with respect to such action includes an agreement to indemnify the Administrative Agent with respect to such action; and

(iii)    Except as expressly set forth herein and in the other Credit Documents, the Administrative Agent shall not have any duty to disclose or be liable for the failure to disclose, any information relating to the Credit Parties or any of their Affiliates that is communicated to or obtained by the Administrative Agent or any of its Affiliates in any capacity.

(b)    Neither the Administrative Agent, nor any of its officers, directors, agents, employees, attorneys or affiliates, shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in **Section 11.12** or in **Article IX**) or (ii) in the absence of its own gross negligence or willful misconduct, in each case, as determined by a court

of competent jurisdiction in a final non-appealable judgment. The Administrative Agent shall not be deemed to have knowledge of any Default or the event or events that give or may give rise to any Default unless and until notice describing such Default, identified as a "notice of default", and such event or events is given to the Administrative Agent by the Credit Parties or any Lender.

(c)     The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness of genuineness of this Agreement, any other Credit Document or any other agreement, instrument or document or the perfection or priority of any Lien or security interest created or purported to be created by the Credit Documents or (v) the satisfaction of any condition set forth in Article V or elsewhere herein, other than (but subject to the foregoing clause (ii)) to confirm receipt of items expressly required to be delivered to the Administrative Agent.  Neither the Administrative Agent nor any of its related parties shall be responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by the Administrative Agent or any other Person given in, pursuant to or in connection with any Credit Documents.

(d)     Nothing in this Agreement or any other Credit Document shall require the Administrative Agent to carry out any "know your customer" or other checks in relation to any person on behalf of any Lender and each Lender confirms to the Administrative Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Administrative Agent.

**Section 10.03  Lack of Reliance on the Administrative Agent.**

(a)     Each Lender confirms to the Administrative Agent, each other Lender and each of their respective related parties that it (i) possesses such knowledge and experience in financial and business matters that it is capable, without reliance on the Administrative Agent, any other Lender or any of their respective related parties, of evaluating the merits and risks (including tax, legal, regulatory, accounting and other financial matters) of entering into this Agreement, making advances and other extensions of credit hereunder and under the other Credit Documents and in taking or not taking actions hereunder and thereunder, (ii) is financially able to bear such risk and (iii) has determined that entering into this Agreement and making advances and other extensions of credit hereunder and under the other Credit Documents is suitable and appropriate for it.

(b)     Each Lender acknowledges that it is solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement and the other Credit Documents and that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their respective related parties and based on such documents and information, as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will,

#91897284v80

independently and without reliance upon the Administrative Agent or any other Lender or any of their related parties and based on such documents and information as it shall from time to time deem appropriate, continue to be solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement and the other Credit Agreements, including but not limited to:

>       (i)      The financial condition, status and capitalization of the Borrower and each other Credit Party;

>       (ii)     The legality, validity, effectiveness, adequacy or enforceability of this Agreement and each other Credit Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Credit Document;

>       (iii)    Determining compliance or non-compliance with any condition hereunder to the making of advances or the issuance of Letters of Credit; and

>       (iv)     The adequacy, accuracy and/or completeness of any of the information delivered by the Administrative Agent, any other Lender or by any other Person under or in connection with this Agreement and the other Credit Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Credit Document.

**Section 10.04  Certain Rights of the Administrative Agent.**

If the Administrative Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders; and the Administrative Agent shall not incur liability to any Lender by reason of so refraining.  Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders.

**Section 10.05  Reliance.**

The Administrative Agent shall be entitled to rely upon, and shall be fully protected in relying upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document, note, resolution, telex, teletype or telecopier message, cablegram, radiogram, order, or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of any advances, or the issuance of a letter of credit, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the

Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such advances or the issuance of such letter of credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower or any other Credit Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. No Lender shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders other than with respect to the Administrative Agent's gross negligence or willful misconduct.

### Section 10.06 **Indemnification**

(a)    To the extent the Administrative Agent (or any Affiliate thereof in such capacity) is not promptly reimbursed and indemnified by the Borrower, each Lender severally agrees to indemnify the Administrative Agent (and any Affiliate thereof in such capacity) from and against such Lender's ratable share (determined provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Administrative Agent in any way relating to or arising out if the Credit Documents (collectively, the "***Indemnified Costs***"); ***provided, however***, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction; ***provided, further***, that, no action taken or refrained from in accordance with the directions or consent of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this **Section 11.08**. Without limitation of the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by the Borrower under **Section 11.01**, to the extent that the Administrative Agent is not promptly reimbursed for such costs and expenses by the Borrower. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this **Section 11.08** applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person and whether or not the Administrative Agent is a party to such investigation, litigation or proceeding.

(b)    For purposes of this **Section 10.06**, each Lender's ratable share of any amount shall be determined, at any time, according to the sum of (i) the aggregate principal amount of the advances outstanding at such time and owing to such Lender, (ii) such Lender's pro rata share of the aggregate available amount of all letters of credit outstanding at such time, and (iii) the aggregate unused portions of such Lender's term commitments at such time. The failure of any Lender to promptly reimburse the Administrative Agent upon demand for its ratable share of any amount required to be paid by the Lender parties to the Administrative Agent, as provided herein, shall not relieve any other Lender of its obligation hereunder to reimburse the Administrative Agent for its ratable share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse the Administrative Agent for such other Lender's ratable share of such amount. Without prejudice to the survival of any other agreement of any

Lender hereunder, the agreement and obligations of each Lender contained in this **Section 10.06** shall survive the payment in full of principal, interest and all other amounts hereunder and under the other Credit Documents.

### Section 10.07  The Administrative Agent in Its Individual Capacity.

(a)　　With respect to its obligation to make Loans under this Agreement, the Administrative Agent shall have the rights and powers specified herein for a "***Lender***" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "***Lender***", "***Required Lenders***", or any similar terms shall, unless the context clearly indicates otherwise, include the Administrative Agent in its respective individual capacities.  The Administrative Agent and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

(b)　　Each Lender acknowledges that Cantor Fitzgerald Securities and its respective Affiliates are engaged in wide range of financial services and businesses (including investment management, financing, securities, trading, corporate and investment banking and research) (such services and business are collectively referred to in this **Section 10.07** as "***Activities***") and may engage in the Activities with or on behalf of one or more of the Credit Parties or their respective Affiliates.  Furthermore, Cantor Fitzgerald Securities and its respective Affiliates may, in undertaking the Activities, engage in trading in financial products or undertake other investment businesses for their own account or on behalf of others (including the Credit Parties and their Affiliates and including holding, for their own account or on behalf of others, equity and similar positions in the Borrower, another Credit Party or their respective Affiliates), including trading in or holding long, short or derivative positions in securities, loans or other financial products of one or more of the Credit Parties or their Affiliates.  Each Lender understands and agrees that in engaging in the Activities, Cantor Fitzgerald Securities and its respective Affiliates may receive or otherwise obtain information concerning the Credit Parties or their Affiliates (including information concerning the ability of the Credit Parties to perform their respective obligations hereunder and under the other Financing Agreements), which information may not be available to any of the Lender parties that are not Affiliates of Cantor Fitzgerald Securities and its respective Affiliates.  Except for documents expressly required by any Financing Agreement to be transmitted by the Administrative Agent to the Lender parties, neither the Administrative Agent nor any of its respective Affiliates shall have any duty or responsibility to provide, and shall not be liable for the failure to provide, any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Credit Party or any Affiliate of any Credit Party that may come into the possession of any Administrative Age or any Affiliate thereof or any employee of Administrative Agent thereof.

#91897284v80

### Section 10.08 **Holders.**

The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with the Administrative Agent. Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or endorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

### Section 10.09 **Resignation by the Agents.**

(a)    Either Agent may resign from the performance of all its respective functions and duties hereunder and/or under the other Credit Documents at any time by giving 10 Business Days' prior written notice to the Lenders and, unless a Default or an Event of Default under **Section 9.05** then exists, the Borrower; ***provided*** that such resignation shall only take effect upon the appointment of a successor Agent pursuant to **clauses (b)** and **(c)** below or as otherwise provided below. In addition, the Required Lenders shall have the right, at any time, with or without cause, to remove the Administrative Agent.

(b)    Upon receipt of any such notice of resignation by either Agent, the Required Lenders shall have the right to appoint a successor Agent hereunder or thereunder who shall be reasonably acceptable to the Borrower, which acceptance shall not be unreasonably withheld, conditioned or delayed (***provided*** that the Borrower's approval shall not be required if an Event of Default under **Section 9.01** then exists).

(c)    If a successor Agent shall not have been so appointed within such 10 Business Day period, the applicable Agent, with the consent of the Borrower (which consent shall not be unreasonably withheld, conditioned or delayed, provided that the Borrower's consent shall not be required if an Event of Default under **Section 9.01** or **9.05** then exists), may (but shall not be obligated to) then appoint a successor Agent who shall serve as Administrative Agent or Collateral Agent, as applicable, hereunder and/or thereunder until such time, if any, as the Required Lenders appoint a successor Agent as provided above.

(d)    If no successor Agent has been appointed pursuant to **clause (b)** or **(c)** above by the 20th Business Day after the date such notice of resignation was given by the applicable Agent, such Agent's resignation shall become effective (unless a later effective time is agreed to by the resigning Agent) and the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents; ***provided*** that, in the case of collateral security or other Liens (if any) held by the retiring Agent on behalf of the Lenders under any of the Credit Documents, the retiring Agent shall continue to hold such collateral security or other Liens until such time as a successor Agent is appointed. After the effectiveness of any such resignation and until such time, if any, as the Required Lenders appoint a successor Agent as provided above, (i) all payments and communications to be made by, to or through such resigning Agent shall instead be made by or to each applicable Lender directly and (ii) the Required Lenders shall perform all the duties of the resigning Agent, as applicable, hereunder and/or under any other Credit Document.

#91897284v80

(e)     Upon the acceptance of a successor's appointment as an Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this paragraph).  Upon a resignation of either Agent pursuant to this **Section 10.09**, such Agent shall remain indemnified to the extent provided in this Agreement and the other Credit Documents and the provisions of this **Article X** (and the analogous provisions of the other Credit Documents) and **Section 11.01** of this Agreement shall continue in effect for the benefit of such Agent, its sub agents and their respective related parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Administrative Agent under this Agreement.

### Section 10.10  Collateral Matters.

(a)     Each Lender authorizes and directs the Collateral Agent to enter into the Security Documents for the benefit of the Lenders and the other Secured Creditors.  Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein or in the applicable Intercreditor Agreement, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.  The Lenders also hereby authorize the Administrative Agent and Collateral Agent to enter into the DIP ABL Intercreditor Agreement and any other intercreditor agreement contemplated by **Section 8.01** on behalf of the Lenders and to comply with the terms thereof.

(b)     The Lenders hereby authorize and direct the Collateral Agent to release any Lien granted to or held by the Collateral Agent upon any Collateral:

(i)     upon termination of the Commitments and payment and satisfaction of all of the Obligations (other than inchoate indemnification obligations) at the time arising under or in respect of this Agreement or the Credit Documents or the transactions contemplated hereby or thereby,

(ii)     constituting property being sold or otherwise disposed of (to Persons other than a Credit Party) upon the sale or other disposition thereof in compliance with **Section 8.02**,

(iii)     if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by **Section 11.12**),

(iv)     to the extent constituting Excluded Assets,

(v)     to the extent provided in the DIP ABL Intercreditor Agreement, or

(vi)    as otherwise may be expressly provided in the relevant Security Documents or the last sentence of **Section 8.01**.

Upon request by the Administrative Agent at any time, subject to the DIP ABL Intercreditor Agreement and the Orders, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this **Section 10.10**.

(c)    The Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this **Section 10.10** or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final, non-appealable decision).

### Section 10.11  Delivery of Information.

The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Party, any Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except (i) as specifically provided in this Agreement or any other Credit Document and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

### Section 10.12  Delegation of Duties.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Documents by or through any one or more sub agents appointed by the Administrative Agent.  The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective related parties.  Each such sub agent and the related parties of the Administrative Agent and each such sub agent shall be entitled to the benefits of all provisions of this Article X and Article XI (as though such sub-agents were the "Agent" under the Credit Documents) as if set forth in full herein with respect thereto; ***provided*** that the Administrative Agent shall not be responsible for the gross negligence or misconduct of any sub agents.

#91897284v80

**Section 10.13  Withholding.**

To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any withholding tax applicable to such payment.  Without limiting or expanding the provisions of **Section 4.04**, each Lender shall severally indemnify and hold harmless the Administrative Agent, within 10 days after demand therefor, for any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction in the rate of, withholding Tax ineffective, or because of a Lender's failure to comply with the provisions of **Section 11.04** relating to the maintenance of a Participant Register).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this **Section 10.12**.  The agreements in this **Section 10.12** shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

## ARTICLE XI.
## MISCELLANEOUS.

**Section 11.01  Payment of Expenses, etc.**

(a)     The Borrower hereby agrees to:

(i)     whether or not the transactions herein contemplated are consummated, pay all reasonable out-of-pocket costs and expenses of the Administrative Agent (including, without limitation, the reasonable fees and disbursements of the Administrative Agent's advisors and the Lenders' advisors, but, prior to an Event of Default, limited, in the case of outside legal counsel, to reasonable fees and disbursements of each of (u) Davis Polk & Wardwell LLP as primary counsel to the Ad Hoc Crossholder Lender Group, (v) Herrick, Feinstein LLP as primary counsel to the Administrative Agent and to the Collateral Agent, (w) Simpson Thacher & Bartlett LLP as primary counsel to Solus Alternative Asset Management LP, (x) Shearman & Sterling LLP as primary counsel to the Ad Hoc First Lien Lender Group, (y) one additional local counsel in each applicable jurisdiction and (z) one specialist counsel for each applicable specialty) in connection with the preparation, execution, delivery and administration of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein and any amendment, waiver or consent relating hereto or thereto, of the Administrative Agent and its Affiliates in connection with its or their syndication efforts with respect to

#91897284v80

this Agreement and of the Administrative Agent and, after the occurrence of an Event of Default, each of the Lenders in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings (including, in each case without limitation, the reasonable fees and disbursements of (v) Davis Polk & Wardwell LLP as primary counsel to the the Ad Hoc Crossholder Lender Group, (w) Simpson Thacher & Bartlett LLP as primary counsel to Solus Alternative Asset Management LP, (x) Shearman & Sterling LLP as primary counsel to the Ad Hoc First Lien Lender Group, (y) counsel and consultants for the Administrative Agent and, (z) after the occurrence of an Event of Default, counsel for each of the Lenders); and

(ii)    indemnify the Administrative Agent, the Collateral Agent and each Lender, and each of their respective affiliates and the respective officers, directors, employees, representatives, agents, affiliates, trustees and investment advisors of the foregoing (each, an "***Indemnified Person***") from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable advisors' fees and disbursements, but limited, in the case of outside legal counsel, to the reasonable fees and disbursements of one counsel for all similarly situated Indemnified Persons, plus, in each case for all similarly situated Indemnified Persons, one additional local counsel in each applicable jurisdiction, one specialist counsel for each applicable specialty and one additional conflict counsel in the event of any actual or perceived conflict of interest between Indemnified Persons) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of,

(A)    any investigation, litigation or other proceeding (whether or not the Administrative Agent, the Collateral Agent or any Lender is a party thereto and whether or not such investigation, litigation or other proceeding is brought by or on behalf of any Credit Party) related to the entering into and/or performance of this Agreement or any other Credit Document or the proceeds of any Term Loans hereunder or the consummation of the Transactions or any other transactions contemplated herein or in any other Credit Document or the exercise of any of their rights or remedies provided herein or in the other Credit Documents, or

(B)    any Environmental Claim or any liability arising under Environmental Law in connection with the Borrower, any of its Subsidiaries or any of their respective current or former properties (but excluding any losses, liabilities, claims, damages or expenses to the extent incurred by reason of the gross negligence or willful misconduct of the Indemnified Person (as determined by a court of competent jurisdiction in a final and non-appealable decision)); or

(C)    the execution or delivery of this Agreement, any other Credit Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or

#91897284v80

thereunder or the consummation of the transactions contemplated hereby or thereby; or

(D)     any Loan or the use or proposed use of the proceeds therefrom.

To the extent that the undertaking to indemnify, pay or hold harmless the Administrative Agent, the Collateral Agent or any Lender set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.  This **Section 11.01(a)** shall not apply with respect to Taxes other than any Taxes that represent liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements arising from any non-Tax claim.

(b)     To the full extent permitted by applicable law, each party hereto agrees not to assert, and hereby waives, any claim against any other party hereto and any Indemnified Person, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Term Loan or the use of the proceeds thereof; ***provided*** that the foregoing shall not limit the Borrower's indemnification and other obligations pursuant to **Section 11.01(a)** above. No Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Indemnified Person results from such Indemnified Person's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

### Section 11.02  Right of Setoff.

In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent, the Collateral Agent and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived to the extent permitted by the Orders, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by the Administrative Agent, the Collateral Agent or such Lender (including, without limitation, by branches and agencies of the Administrative Agent, the Collateral Agent or such Lender wherever located) to or for the credit or the account of the Borrower or any of its Subsidiaries against and on account of the Obligations and liabilities of the Credit Parties to the Administrative Agent, the Collateral Agent or such Lender under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Obligations purchased by such Lender pursuant to **Section 11.04(b)**, and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of

#91897284v80

whether or not the Administrative Agent, the Collateral Agent or such Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.  To the extent permitted by law, each Participant also shall be entitled to the benefits of this **Section 11.02** as though it were a Lender; ***provided*** that such Participant agrees to be subject to **Section 11.06(b)** as though it were a Lender.

### Section 11.03  Notices.

(a)     Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including telegraphic, telecopier or cable communication) and mailed, telegraphed, telecopied, cabled or delivered:  if to any Credit Party, at the address specified opposite its signature below or in the other relevant Credit Documents; if to any Lender, at its address on file with the Administrative Agent; and if to the Administrative Agent, at the Notice Office; or, as to any Credit Party or the Administrative Agent, at such other address as shall be designated by such party in a written notice to the other parties hereto and, as to each Lender, at such other address as shall be designated by such Lender in a written notice to the Borrower and the Administrative Agent.  All such notices and communications shall, when mailed, telegraphed, telecopied, or cabled or sent by overnight courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telecopier, except that notices and communications to the Administrative Agent and the Borrower shall not be effective until received by the Administrative Agent or the Borrower, as the case may be.

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; ***provided*** that the foregoing shall not apply to notices pursuant to **Article II** unless otherwise agreed by the Administrative Agent and the applicable Lender.  Each of the Administrative Agent and the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; ***provided*** that approval of such procedures may be limited to particular notices or communications.

### Section 11.04  Benefit of Agreement; Assignments; Participations.

(a)     This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; ***provided***, ***however***, the Borrower may not assign or transfer any of its rights, obligations or interests hereunder without the prior written consent of the Lenders and, ***provided***, ***further***, that, although any Lender may grant participations to any Person (other than any natural person, the Borrower or any of its Subsidiaries or Affiliates) (each, a "***Participant***") in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments or Loans hereunder except as provided in **Sections 2.10** and **11.04(b)**) and the Participant shall not constitute a "Lender" hereunder and, ***provided***, ***further***, that any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and any other Credit Document and to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document; ***provided***, ***further***, that such agreement or instrument may provide

116

that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver to the extent such amendment, modification or waiver would:

(i)    extend the final scheduled maturity of any Loan or Note in which such Participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the Participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the total Commitments or a mandatory prepayment of the Loans shall not constitute a change in the terms of such participation, and that an increase in any Commitment (or the available portion thereof) or Loan shall be permitted without the consent of any Participant if the Participant's participation is not increased as a result thereof),

(ii)    consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement or

(iii)    release all or substantially all of the Collateral under all of the Security Documents (except as expressly provided in the Credit Documents) supporting the Loans and Commitments hereunder in which such Participant is participating.

In the case of any such participation, except as otherwise set forth in **Section 11.04(e)**, the Participant shall not have any rights under this Agreement or any of the other Credit Documents (the Participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the Participant relating thereto) and all amounts payable by the Borrower hereunder shall be determined as if such Lender had not sold such participation.

(b)    Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may (x) assign all or a portion of its Commitments and related outstanding Obligations (or, if the Commitments have terminated, outstanding Obligations) hereunder to any Lender, an Affiliate of any Lender or an Approved Fund; or (y) assign all, or if less than all, a portion equal to at least $1,000,000 (or such lesser amount as the Administrative Agent and, so long as no Event of Default then exists and is continuing, the Borrower may otherwise agree) in the aggregate for the assigning Lender or assigning Lenders, of such Commitments and related outstanding Obligations (or, if the Commitments have terminated, outstanding Obligations) hereunder to one or more Eligible Transferees (treating any fund that invests in loans and any other fund that invests in loans and is managed or advised by the same investment advisor of such fund or by an Affiliate of such investment advisor as a single assignor or Eligible Transferee (as applicable) (if any)), each of which assignees shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement, *provided* that:

(i)    at such time, **Schedule 2.01** shall be deemed modified to reflect the Commitments and/or outstanding Loans, as the case may be, of such new Lender and of the existing Lenders,

#91897284v80

(ii)    upon the surrender of the relevant Notes by the assigning Lender (or, upon such assigning Lender's indemnifying the Borrower for any lost Note pursuant to a customary indemnification agreement) new Notes will be issued, at the Borrower's expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, such new Notes to be in conformity with the requirements of **Section 2.04** (with appropriate modifications) to the extent needed to reflect the revised Commitments and/or outstanding Loans, as the case may be,

(iii)    the consent of the Administrative Agent shall be required in connection with any such assignment pursuant to **clause (y)** above (such consent, in any case, not to be unreasonably withheld, delayed or conditioned),

(iv)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption Agreement via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) and

(v)    no such transfer or assignment will be effective until recorded by the Administrative Agent on the Register pursuant to **Section 11.15**.

To the extent of any assignment pursuant to this **Section 11.04(b)**, the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and outstanding Loans.  To the extent that an assignment of all or any portion of a Lender's Commitments and related outstanding Obligations pursuant to **Section 2.10** or this **Section 11.04(b)** would, at the time of such assignment, result in increased costs under **Section 2.07** from those being charged by the respective assigning Lender prior to such assignment, then the Borrower shall not be obligated to pay such increased costs (although the Borrower, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment).

(c)    Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Term Loans and Notes hereunder to a Federal Reserve Bank or other central bank in support of borrowings made by such Lender from such Federal Reserve Bank or other central bank, any Lender which is a fund may pledge all or any portion of its Term Loans and Notes to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be.  No pledge pursuant to this **clause (c)** shall release the transferor Lender from any of its obligations hereunder.

(d)    Any Lender which assigns all of its Commitments and/or Loans hereunder in accordance with **Section 11.04(b)** shall cease to constitute a "Lender" for all purposes hereunder; *provided* that the indemnification provisions under this Agreement (including, without limitation, **Sections 2.07**, **4.04**, **10.06**, **10.12**, **11.01** and **11.06**) shall survive as to such Lender solely with respect to the period of time that such Person constituted a Lender.

(e)      The Borrower agrees that each Participant shall be entitled to the benefits of **Sections 2.07** and **4.04** (subject to the requirements and limitations therein (it being understood that the documentation required under **Section 4.04(e)** shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment; ***provided*** that such Participant (A) agrees to be subject to the provisions of **Section 2.10** as if it were an assignee under **paragraph (b)** of this Section; and (B) shall not be entitled to receive any greater payment under **Sections 2.07** or **4.04**, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Term Loans or other obligations under the Credit Documents (the "***Participant Register***"); ***provided*** that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

### Section 11.05  No Waiver; Remedies Cumulative.

No failure or delay on the part of the Administrative Agent, the Collateral Agent or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrower or any other Credit Party and the Administrative Agent, the Collateral Agent or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Collateral Agent or any Lender would otherwise have.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Collateral Agent or any Lender to any other or further action in any circumstances without notice or demand.

### Section 11.06  Payments Pro Rata.

(a)      Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrower in respect of any Obligations hereunder, the Administrative Agent shall distribute such payment to the Lenders entitled thereto (other than any Lender that has consented in writing to waive its pro rata

share of any such payment) pro rata based upon their respective shares, if any, of the Obligations with respect to which such payment was received.

(b)    Each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise), which is applicable to the payment of the principal of, or interest on, the Loans, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such Obligation then owed and due to such Lender bears to the total of such Obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; *provided* that (i) if all or any portion of such excess amount is thereafter recovered from such Lenders, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest and (ii) the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant.

### Section 11.07  Computations.

All computations of interest and other Fees hereunder shall be made on the basis of a year of 360 days (except for interest calculated by reference to the Prime Lending Rate, which shall be based on a year of 365 days or 366 days, as applicable) for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or Fees are payable.

### Section 11.08 GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL.

(a)    THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN ANY MORTGAGE, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT MAY BE BROUGHT IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM, JURISDICTION, THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, THE BORROWER HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE JURISDICTION OF THE

AFORESAID COURTS. THE BORROWER HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACK PERSONAL JURISDICTION OVER THE BORROWER, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN ANY OF THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER THE BORROWER.    THE BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT ITS ADDRESS SET FORTH OPPOSITE ITS SIGNATURE BELOW, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.    THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE.    NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT, ANY LENDER OR THE HOLDER OF ANY NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST THE BORROWER IN ANY OTHER JURISDICTION.

(b)    THE BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN **CLAUSE (a)** ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

(d)    For the avoidance of doubt, each of the parties to this Agreement hereby agrees and acknowledges that (i) it is the intention of the parties hereto that the execution and performance of this Agreement is intended to be governed by the laws of the State of New York, (ii) the choice of New York law was bona fide and there was no collusion or fraud in respect of such choice of law, and (iii) significant negotiations with respect to this Agreement and the other Credit Documents have taken place in the State of New York.

#91897284v80

**Section 11.09  Counterparts.**

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.  Delivery of an executed signature page to this Agreement by facsimile transmission or in electronic (e.g., "pdf" or "tif") format shall be as effective as delivery of a manually signed counterpart of this Agreement.

**Section 11.10  [Reserved].**

**Section 11.11  Headings Descriptive.**

The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

**Section 11.12  Amendment or Waiver; etc.**

(a)    Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (with a copy to the Administrative Agent if not a party thereto) (or the Administrative Agent with the consent of and at the direction of such Required Lenders) (although additional parties may be added to (and annexes may be modified to reflect such additions), and Subsidiaries of the Borrower may be released from, the Subsidiary Guaranty and the Security Documents in accordance with the provisions thereof without the consent of the other Credit Parties party thereto or the Required Lenders), ***provided*** that no such change, waiver, discharge or termination shall, without the consent of each Lender (with Obligations being directly affected in the case of following **clauses (i)(y)**, **(vii)** and **(ix)** or whose Obligations are being extended in the case of following **clause (i)(x)**) (or the Administrative Agent with the consent of and at the direction of such Lender):

(i)    (x) extend the final scheduled maturity of any Loan or Note or (y) reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with the waiver of applicability of any post-default increase in interest rates), or reduce (or forgive) the principal amount thereof;

(ii)    release all or substantially all of the Collateral (except as expressly provided in the Credit Documents) under all the Security Documents;

(iii)    release all or substantially all of the value of the Subsidiary Guaranty (except to the extent the release of any Subsidiary from its Guaranteed Obligations is expressly permitted hereunder);

(iv)    amend, modify or waive any provision of this **Section 11.12(a)** or any other provision of this Agreement expressly requiring consent of all Lenders;

(v)    reduce the "majority" voting threshold specified in, or otherwise amend or modify, the definition of "Required Lenders";

(vi)    consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement;

(vii)    increase the Commitment of such Lender;

(viii)    amend, modify or waive any provision of **Section 4.01(a)** (with respect to pro rata payments), **Section 4.02(g)** (with respect to pro rata payments) or **11.06** or any other pro rata sharing provision;

(ix)    amend, modify or waive any provision of **Section 9.1(a)** of the Security Agreement in a manner that would alter the order of payments specified therein; or

(x)    amend, modify or waive any provision of **Section 11.04(b)** in any manner that adversely affects a Lender's ability to assign its Loans or Commitments;

*provided*, *further*, that no such change, waiver, discharge or termination shall (1) increase the Commitments of any Lender over the amount thereof then in effect without the consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the total Commitments or a mandatory repayment of the Loans shall not constitute an increase of the Commitment of any Lender, and that an increase in the available portion of any Commitment of any Lender shall not constitute an increase of the Commitment of such Lender), (2) without the consent of the Administrative Agent, amend, modify or waive any provision of **Article X** or any other provision of this Agreement or any other Credit Document as same relates to the rights or obligations of the Administrative Agent, (3) without the consent of the Collateral Agent, amend, modify or waive any provision relating to the rights or obligations of the Collateral Agent, (4) except as provided by operation of any Requirement of Law or in the DIP ABL Intercreditor Agreement, subordinate the Liens granted hereunder or under the other Credit Documents to any other Lien, in each case without the prior written consent of each Lender, (5) except as provided by operation of law or otherwise permitted hereunder, amend or modify the Superpriority Claims status of the Obligations under the Orders or under any Credit Document; or extend the effective date of any Acceptable Plan of Reorganization set forth in **Section 7.16**, without the consent of the Required Lenders.

(b)    Notwithstanding anything to the contrary contained in this **Section 11.12**, (x) Security Documents (including any Additional Security Documents) and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be amended, supplemented and waived with the consent of the Administrative Agent, the Collateral Agent and the Borrower without the need to obtain the consent of any other Person if such amendment, supplement or waiver is delivered in order (i) to cure ambiguities, omissions, mistakes or defects or (ii) to cause such Security Document or other document to be consistent with this Agreement and the other Credit Documents and (y) if following the Closing Date, the Administrative Agent and any Credit Party

#91897284v80

shall have jointly identified an ambiguity, inconsistency, obvious error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Credit Documents (other than the Security Documents), then the Administrative Agent and the Credit Parties shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Credit Documents if, solely in the case of **clause (y)**, the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

### Section 11.13 **Survival.**

All indemnities (other than those provided under **Section 4.04**) set forth herein including, without limitation, in **Sections 2.07**, **10.06** and **11.01**, shall survive the execution, delivery and termination of this Agreement and the Notes and the making and repayment of the Obligations. For the avoidance of doubt, the indemnity set forth in **Section 4.04** shall survive as described in **Section 4.04(i)**.

### Section 11.14 **Domicile of Loans.**

Each Lender may transfer and carry its Loans or Commitments at, to or for the account of any office, Subsidiary or Affiliate of such Lender.

### Section 11.15 **Register.**

The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain a register (the "***Register***") on which it will record the Commitments from time to time of each of the Lenders, the Loans made by each of the Lenders, the stated interest, and each repayment in respect of the principal amount of the Loans of each Lender.  Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations in respect of such Loans.  With respect to any Lender, the transfer of the Commitments of such Lender and the rights to the principal of, and interest on, any Loan made pursuant to such Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Commitments and Loans and prior to such recordation all amounts owing to the transferor with respect to such Commitments and Loans shall remain owing to the transferor.  The registration of assignment or transfer of all or part of any Commitments and Loans shall be recorded by the Administrative Agent on the Register upon and only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to **Section 11.04(b)**.  The entries in the Register shall be conclusive absent manifest error, and the Borrower and the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable times and from time to time upon reasonable prior notice.  Upon such acceptance and recordation, the assignee specified therein shall be treated as a Lender for all purposes of this Agreement.  Coincident with the delivery of such an Assignment and Assumption Agreement to the Administrative Agent for acceptance and registration of assignment or transfer of all or part of a Loan, or as soon thereafter as practicable, the assigning or transferor Lender shall surrender the Note (if any) evidencing such Loan, and thereupon one or more new Notes in the same

124

aggregate principal amount shall be issued to the assigning or transferor Lender and/or the new Lender at the request of any such Lender.  The Borrower agrees to indemnify the Administrative Agent from and against any and all losses, claims, damages and liabilities of whatsoever nature which may be imposed on, asserted against or incurred by the Administrative Agent in performing its duties under this **Section 11.15**, unless caused by the Administrative Agent's gross negligence or willful misconduct (in each case as determined by a court of competent jurisdiction in a final and non-appealable decision).

### Section 11.16 **Confidentiality.**

(a)    Subject to the provisions of **clause (b)** of this **Section 11.16**, each of the Administrative Agent, the Collateral Agent and each Lender (solely for purposes of this **Section 11.16**, the Administrative Agent, the Collateral Agent and each Lender are collectively referred to as the "*Lenders*") agrees that it will not disclose without the prior consent of the Borrower (other than to its employees, auditors, advisors or counsel or to another Lender if such Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information, provided that such Persons shall be subject to the provisions of this **Section 11.16** to the same extent as such Lender) any information with respect to the Borrower or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document, provided that any Lender (including, in the case of Agents, their counsel) may disclose any such information:

(i)    as has become generally available to the public other than by virtue of a breach of this **Section 11.16(a)** by the respective Lender,

(ii)    as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors,

(iii)    as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation (*provided* that, unless specifically prohibited by applicable law, such Lender shall make reasonable efforts to notify the Borrower promptly of any such request or requirement),

(iv)    in order to comply with any law, order, regulation or ruling applicable to such Lender (*provided* that, unless specifically prohibited by applicable law, such Lender shall make reasonable efforts to notify the Borrower promptly of any such request or requirement),

(v)    to the Administrative Agent or the Collateral Agent, and

(vi)    to any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes, Loans or Commitments or any interest therein by such Lender, *provided* that such prospective transferee agrees to be bound by the confidentiality provisions contained in this **Section 11.16**.

(b)     The Borrower hereby acknowledges and agrees that each Lender may share with any of its affiliates and agents, and such affiliates and agents may share with such Lender, any information related to the Borrower or any of its Subsidiaries (including, without limitation, any non-public customer information regarding the creditworthiness of the Borrower and its Subsidiaries), provided that such Persons shall be subject to the provisions of this **Section 11.16** to the same extent as such Lender.

### Section 11.17  PATRIOT Act; Beneficial Ownership Certification.

Each Lender subject to the USA PATRIOT Act hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower and the other Credit Parties and other information that will allow such Lender to identify the Borrower and the other Credit Parties in accordance with the USA PATRIOT Act and, to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to the Borrower, including, for the avoidance of doubt, a duly executed IRS Form W-9.

### Section 11.18  Interest Rate Limitation.

Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "***Maximum Rate***").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

### Section 11.19  DIP ABL Intercreditor Agreement.

Reference is made to the DIP ABL Intercreditor Agreement.  Each Lender hereby agrees that it will be bound by and will take no actions contrary to the provisions of the DIP ABL Intercreditor Agreement and authorizes and instructs the Administrative Agent and the Collateral Agent to enter into the DIP ABL Intercreditor Agreement on behalf of such Lender.  The foregoing provisions are intended as an inducement to the Lenders under this Agreement to extend credit and such Lender are intended as third party beneficiaries of such provisions and the DIP ABL Intercreditor Agreement.  Each Credit Party understands that the DIP ABL Intercreditor Agreement will be for the sole benefit of the ABL Claimholders or similar term (as defined in the DIP ABL Intercreditor Agreement) and the Term Loan Claimholders or similar term (as defined in the DIP ABL Intercreditor Agreement) and their respective successors and assigns, and that such Credit Party is not an intended beneficiary or third party beneficiary thereof (except as expressly provided therein).

**Section 11.20** <u>**Acknowledgement and Consent to Bail-In of EEA Financial Institutions.**</u>

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)    the variation of the terms of such liability  in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

**Section 11.21** <u>**Certain ERISA Matters**</u>

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more ERISA Plans in connection with the Loans or the Commitments,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable, and the conditions of such exemption have been satisfied, with respect to

such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, and (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (a) through (g) of Part I of PTE 84-14.

(b)     In addition, unless **sub-clause (i)** in the immediately preceding **clause (a)** is true with respect to a Lender, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender involved in the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Credit Document or any documents related to hereto or thereto).

The Administrative Agent hereby informs the Lenders that it is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Credit Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term-out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

For purposes of this **Section 11.21**, "ERISA Plan" shall mean any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code that is subject to Section 4975 of Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

128

# ARTICLE XII.
## Real Property Leases

### Section 12.01 <u>Special Rights with Respect to Real Property Leases</u>.

(a)     No Credit Party shall, nor shall it permit any of its Subsidiaries to, pursuant to Section 365 of the Bankruptcy Code, reject or otherwise terminate (including, without limitation, as a result of the expiration of the assumption period provided for in Section 365(d)(4) of the Bankruptcy Code to the extent applicable) (x) a Material Lease or (y) during the continuance of an Event of Default, a Real Property Lease, in each case, without first providing 30 days' prior written notice to the Administrative Agent (unless such notice provision is waived by the Administrative Agent (with the consent of the Required Lenders) during which time the Administrative Agent shall be permitted to find an acceptable (in the Administrative Agent's good faith and reasonable discretion (with the consent of the Required Lenders)) replacement lessee (which may include the Administrative Agent, any Lender or their respective Affiliates) to whom such lease may be assigned.  If a prospective assignee is not found within such 30-day notice period, the Credit Party may proceed to reject such lease  If such a prospective assignee is timely found, the Credit Parties shall (i) not seek to reject such lease, (ii) promptly withdraw any previously filed rejection motion, (iii) promptly file a motion seeking expedited relief and a hearing on the earliest court date available for purposes of assuming such lease and assigning it to such prospective assignee and (iv) cure any defaults that have occurred and are continuing under such lease unless the Borrower and the Administrative Agent (with the consent of the Required Lenders) agree that any such cure obligation is overly burdensome on the cash position of the Debtors with such agreement not to be unreasonably withheld; *provided* that this Section 12.01(a) shall not apply to Real Property Leases that are rejected on the effective date of an Acceptable Plan of Reorganization.  For the avoidance of doubt, it is understood and agreed that on or prior to the 30th day prior to the Automatic Rejection Date, the Credit Parties shall have delivered (and hereby agree to deliver) written notice to the Administrative Agent of each outstanding Real Property Lease that they intend to reject (including, without limitation, through automatic rejection on the Automatic Rejection Date, to the extent applicable) from and after the date of such notice (or, if applicable, notice that the Credit Parties will seek to extend the Automatic Rejection Date as provided in Section 365(d)(4) of the Bankruptcy Code); *provided* that if the Credit Parties fail to deliver any such notice to the Administrative Agent prior to such date with respect to any such Real Property Lease (or a notice indicating that no such Real Property Leases shall be rejected), the Credit Parties shall be deemed, for all purposes hereunder, to have delivered notice to the Administrative Agent as of such date that it intends to reject all outstanding Real Property Leases.

(b)     If an Event of Default shall have occurred and be continuing, the Administrative Agent may exercise any Debtor's rights pursuant to section 365(f) of the Bankruptcy Code with respect to any Real Property Lease or group of Real Property Leases and, subject to the Bankruptcy Court's approval after notice and hearing, assign any such Real Property Lease in accordance with section 365 of the Bankruptcy Code notwithstanding any language to the contrary in any of the applicable lease documents or executory contracts. In connection with the exercise of such rights, the Administrative Agent may (w) access the leasehold interests of the Credit Parties in any such Real Property Lease(s) for the purposes of marketing such property or properties for sale, (x) find an acceptable (in the Administrative Agent's good faith and reasonable discretion (with the consent of the Required Lenders)) replacement lessee (which may include the Adminis-

trative Agent or its designee, any Lender or their respective Affiliates) to whom a Real Property Lease may be assigned, (y) hold, and manage all aspects of, an auction or other bidding process to find such reasonably acceptable replacement lessee, and (z) in connection with any such auction, agree, on behalf of the Credit Parties and subject to Bankruptcy Court approval, to a break-up fee or to reimburse fees and expenses of any stalking horse bidder up to an amount not to exceed 3.00% of the purchase price of such Real Property Lease and may make any such payments on behalf of such Credit Party and any amount used by the Administrative Agent to make such payments shall, at the election of the Administrative Agent, at the written direction of the Required Lenders in their reasonable discretion and subject to satisfaction of the conditions in Section 7.03, be deemed a borrowing of Term Loans hereunder. Upon receipt of notice that the Administrative Agent elects to exercise its rights under this Section 12.01(b), the Credit Parties shall promptly file a motion seeking expedited relief and a hearing on the earliest court date available for purposes of assuming such Real Property Lease and assigning it to such assignee and cure any defaults that have occurred and are continuing under such Real Property Lease. Notwithstanding the foregoing, this Section 12.01(b) shall not apply to Real Property Leases that are rejected on the effective date of an Acceptable Reorganization Plan. Notwithstanding anything to the contrary in this Section 11.01(b), or any consent or direction of the Required Lenders, in no event shall any Real Property Lease be assigned to the Administrative Agent without the express written consent of the Administrative Agent in its sole discretion.

(c)     If an Event of Default shall have occurred and be continuing, the Administrative Agent shall have the right, at the written direction of the Required Lenders, to direct any Debtor that is a lessee under a Real Property Lease to assign such Real Property Lease to the Administrative Agent or its designee, on behalf of the Administrative Agent and the Lenders, as collateral for the Obligations and to direct such Debtor lessee to assume such Real Property Lease to the extent assumption is required under the Bankruptcy Code as a prerequisite to such assignment. Upon receipt of notice that the Administrative Agent elects to exercise its rights under this **Section 12.01(c)**, the Credit Parties shall (i) promptly file a motion seeking expedited relief and a hearing on the earliest court date available for purposes of, if necessary, assuming such Real Property Lease and assigning it to the Administrative Agent and (ii) cure any defaults that have occurred and are continuing under such Real Property Lease. Notwithstanding the foregoing, this Section 12.01(c) shall not apply to Real Property Leases that are rejected on the effective date of an Acceptable Reorganization Plan.  Notwithstanding anything to the contrary in this Section 11.01(c), or any consent or direction of the Required Lenders, in no event shall any Real Property Lease be assigned to the Administrative Agent without the express written consent of the Administrative Agent in its sole discretion.

(d)     Any order of the Bankruptcy Court approving the assumption (but not the assignment) of any Real Property Lease shall specifically provide that the applicable Debtor shall be authorized to assign such Real Property Lease pursuant to section 365(f) of the Bankruptcy Code subsequent to the date of such assumption designated by the Administrative Agent.

(e)     No Credit Party shall, nor shall it permit any of its Subsidiaries to, pursuant to section 365 of the Bankruptcy Code, sell or assign a Real Property Lease without first providing fifteen (15) days' prior written notice to the Administrative Agent (unless such notice provision is waived by the Administrative Agent (with the consent of the Required Lenders)) of any hearing in the Bankruptcy Court seeking approval of a sale or assignment,  and the Administrative

Agent, on behalf of the Administrative Agent and the Lenders, shall be permitted to credit bid forgiveness of some or all of the outstanding Obligations in respect of the DIP Term Facility (in an amount equal to at least the consideration offered by any other party in respect of such assignment) as consideration in exchange for any such Real Property Lease. In connection with the exercise of any of the Administrative Agent's rights under Sections 12.01(b) and 12.01(c) to direct or compel a sale or assignment of any Real Property Lease, the Administrative Agent, on behalf of the Administrative Agent and the Lenders, shall be permitted to credit bid forgiveness of a portion of the Indebtedness (in an amount equal to at least the consideration offered by any other party in respect of such sale or assignment) outstanding under the Term Loans in exchange for such Real Property Lease.

If any Credit Party is required to cure any monetary default under any Real Property Lease under this Section 11.01, or otherwise in connection with any assumption of such Real Property Lease pursuant to section 365 of the Bankruptcy Code, and such monetary default is not cured within five (5) Business Days of the receipt by such Credit Party of notice from the Administrative Agent under Section 12.01(a), (b) or (c) or any other notice from the Administrative Agent requesting the cure of such monetary default, then the Administrative Agent (with the consent of the Required Lenders) may, but shall not be obligated to, cure any such monetary default on behalf of such Credit Party and any such payments shall, at the election of the Administrative Agent, at the written direction of the Required Lenders in their reasonable discretion and subject to satisfaction of the conditions in Section 5.02, be deemed a borrowing of Term Loans hereunder.

#91897284v80

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute and deliver this Agreement as of the date first above written.

<u>Address</u>:

Blackhawk Mining LLC
3228 Summit Square Place, Suite 180
Lexington, KY 40509

BLACKHAWK MINING LLC

By: _____
     Name:
     Title:

*[Signature Page to Senior Secured Debtor-in-Possession Term Loan Credit Agreement]*

CANTOR FITZGERALD SECURITIES,
as Administrative Agent

By: _____
Name:
Title:

By: _____
Name:
Title:

*[Signature Page to Senior Secured Debtor-in-Possession Term Loan Credit Agreement]*

[  ],
as Lender

By:    _____
       Name:
       Title:


By:    _____
       Name:
       Title:

*[Signature Page to Senior Secured Debtor-in-Possession Term Loan Credit Agreement]*

**<u>Exhibit D</u>**

**DIP Term Fee Letter**



*EXECUTION VERSION*

**CANTOR FITZGERALD SECURITIES**
**110 E. 59th Street**
**New York, NY 10022**

July \_\_\_\_, 2019

Blackhawk Mining LLC
3228 Summit Square Place, Suite 180
Lexington, KY 40509

Re:    Blackhawk Mining LLC Agency Fee Letter

Ladies and Gentlemen:

Reference is made to the Senior Secured Debtor-In-Possession Term Loan Credit Agreement, dated as of the date hereof (as amended, supplemented, restated and otherwise modified from time to time, the "DIP Credit Agreement"), by and among Blackhawk Mining LLC, as borrower ("you" or the "Borrower"), the Lenders from time to time parties thereto, and Cantor Fitzgerald Securities ("us" or "CFS"), as the Administrative Agent.  In connection with the DIP Credit Agreement, CFS is pleased to announce that it shall act as the sole administrative agent (in such capacity, the "Administrative Agent") and the sole collateral agent (in such capacity, the "Collateral Agent" and together with the Administrative Agent, the "Agent") under the Credit Documents.  Capitalized terms not otherwise defined in this fee letter (the "Fee Letter") shall have the same meanings as specified therefor in the DIP Credit Agreement, unless otherwise specified.

In connection with, and in consideration of the agreements contained in, this Fee Letter and the DIP Credit Agreement and the other Credit Documents, you agree as follows:

1.    you will pay to CFS, in immediately available funds, for its own account as Agent for the Lenders under the Credit Documents, an annual administrative and collateral agent fee of $50,000 (the "Agency Fee"), which fee shall be due and payable annually in advance, with the first payment due on the Closing Date, and on each anniversary of the Closing Date until the Loans are paid in full; provided, that if CFS or any of its affiliates acts as agent, administrative agent or collateral agent, or in any similar role, with respect to any exit credit facility provided to the Borrower in its exit from the Cases (the "Exit Credit Facility"), then, with respect to the Agency Fee paid by you for the Loan Year (defined below) in which the Exit Credit Facility is entered into, the full amount of such Agency Fee shall be credited against any agency fee (or comparable fee) payable by you to CFS or such affiliate of CFS in respect of such Exit Credit Facility.  As used herein, "Loan Year" shall mean each one-year period commencing on the Closing Date and each numerically corresponding date in each subsequent calendar year, and ending, as to each such Loan Year, on the date that is one day prior to the numerically corresponding date in the subsequent calendar year.

In addition to the Agency Fee and Section 11.01 of the Credit Agreement (and without limiting such Section there shall be no duplication of any costs and expenses), you agree to pay or reimburse CFS and its affiliates for all reasonable out-of-pocket costs and expenses (including such expenses incurred prior to CFS' formal appointment) incurred by CFS and its affiliates in connection with the preparation, execution, delivery and administration of this Fee Letter, the DIP Credit Agreement and the other Credit Documents and the documents and instruments referred to therein, and any amendment, waiver, consent or other modification of any of the provisions thereof, including, but not limited to (i) all reasonable fees, expenses and disbursements of counsel to the Agent, and (ii) if necessary, all reasonable out-of-pocket costs and expenses associated with creating and maintaining an electronic document delivery service (*e.g.* IntraLinks or similar services) and providing accounting for the Lenders (including such expenses incurred prior to the Closing Date). All provisions of the DIP Credit Agreement and any other Credit Document providing for the payment of fees, costs and expenses of, and providing indemnities for the benefit of, the Agent shall apply to fees, costs and expenses set forth herein for the benefit of CFS.

All of the fees described above in this Fee Letter shall be fully earned upon becoming due and payable in accordance with the terms hereof, shall be nonrefundable for any reason whatsoever (subject, however, to the proviso in paragraph number 1 above pertaining to the Agency Fee) and shall be in addition to any other fees, costs and expenses payable pursuant to the Credit Documents. Your obligation to pay the foregoing fees will not be subject to counterclaim or setoff for, or be otherwise affected by, any claim or dispute you may have.

The parties hereto hereby agree that the Borrower's obligations under this Fee Letter shall constitute Obligations. It is understood and agreed that this Fee Letter shall not constitute or give rise to any obligation to provide any financing.

You acknowledge that CFS and its affiliates (the term "CFS" being understood hereinafter in this paragraph to include such affiliates) may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. CFS will not use confidential information obtained from you by virtue of the transactions contemplated by this Fee Letter or any other Credit Document or its other relationships with you in connection with the performance by CFS of services for other companies, and CFS will not furnish any such information to other companies. CFS shall have no obligation to use in connection with the transactions contemplated by this Fee Letter, or to furnish to you, confidential information obtained from other companies. CFS is a full service securities firm and CFS may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of the Borrowers, their subsidiaries and their respective affiliates and of other companies that may be the subject of the transactions contemplated by this Fee Letter. CFS may employ the services of its affiliates in providing certain services hereunder and, in connection with the provision of such services, may exchange with such affiliates information concerning you and the other companies that may be the subject of the transactions contemplated by this Fee Letter, and, to the extent so employed, such affiliates shall be entitled to the benefits afforded CFS hereunder.

This Fee Letter is delivered to you on the understanding that neither this Fee Letter nor any of its terms or substance shall be (subject to the next sentence) disclosed by you, directly or indirectly, to any other person except (a) you and your officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents, and advisors, in each case on a confidential and need-to-know basis, and (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent permitted by law, to inform us promptly in advance thereof and the parties agree to take reasonable actions as shall

be necessary to prevent, if practicable, the terms of this Fee Letter from becoming publicly available.  The confidentiality provisions contained herein shall remain in full force and effect notwithstanding the termination of this Fee Letter.

This Fee Letter and the Credit Documents state the entire agreement and supersede all prior agreements, written or verbal, between the parties hereto with respect to the subject matter hereof and may not be amended, nor any provision hereof waived or modified, except in writing signed by a duly authorized representative of each of the respective parties hereto.

No delay or failure on the part of any party hereto in exercising any right, power or remedy hereunder shall effect or operate as a waiver thereof, nor shall any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such right, power or remedy preclude any further exercise thereof or of any other right, power or remedy.

Each party hereto hereby irrevocably and unconditionally: (a) submits for itself and its property in any legal action or proceeding relating to this Fee Letter, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, to the exclusive general jurisdiction of any New York State court or federal court of the United States of America sitting in the Borough  of  Manhattan in New York City, and appellate courts from any thereof, and (b) consents that any such action or proceeding may be brought in such courts, and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same.  Notwithstanding the foregoing consent to jurisdiction, for the duration of the Cases, each of the parties hereto hereby agrees that the United States Bankruptcy Court for the District of Delaware shall have exclusive jurisdiction over all matters arising out of or in connection with this Fee Letter.

THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS FEE LETTER AND FOR ANY COUNTERCLAIM THEREIN.

THIS FEE LETTER AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS FEE LETTER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (EXCEPT TO THE EXTENT NEW YORK LAW IS SUPERSEDED BY THE BANKRUPTCY CODE).

Any provision of this Fee Letter that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

This Fee Letter may be executed by one or more of the parties to this Fee Letter on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Fee Letter by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

[*signatures on following page*]

If the foregoing is in accordance with your understanding, please sign and return to CFS the enclosed copy of this Fee Letter.

Very truly yours,

CANTOR FITZGERALD SECURITIES

By:_____
    Name:
    Title:

[signature page to Agency Fee Letter]

ACCEPTED AND AGREED TO
AS OF JULY _____, 2019 BY:


BLACKHAWK MINING LLC


By:_____
    Name:
    Title:

[signature page to Agency Fee Letter]