# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| BLACKHAWK MINING LLC, *et al.*,[1] | ) Case No. 19-11595 (LSS) |
| Debtors. | ) (Joint Administration Requested) |

**DECLARATION OF MARC D. PUNTUS IN SUPPORT OF
THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING
AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING
ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Marc Puntus, make this declaration pursuant to 28 U.S.C. § 1746:

1. I submit this declaration in support of the motion of the above captioned debtors and debtors in possession (collectively, the "Debtors") for authority to obtain postpetition debtor in possession ("DIP") financing and to use cash collateral (the "Motion"). In particular, I submit this declaration in support of my view that the DIP facilities (a) are the product of an arm's-length, good faith negotiation process, (b) are the best available postpetition financing options for the Debtors, and (c) contain reasonable terms and conditions under the circumstances.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: Blackhawk Mining LLC (5600); Blackhawk Coal Sales, LLC (9456); Blackhawk Land and Resources, LLC (7839); Blackhawk River Logistics, LLC (3388); Blue Creek Mining, LLC (2427); Blue Diamond Mining, LLC (3488); Eagle Shield, LLC (6721); FCDC Coal, Inc. (6188); Guyandotte Mining, LLC (4882); Hampden Coal, LLC (8241); Kanawha Eagle Mining, LLC (0586); Logan & Kanawha, LLC (3178); Panther Creek Mining, LLC (0627); Pine Branch Land, LLC (9661); Pine Branch Mining, LLC (9681); Pine Branch Resources, LLC (9758); Redhawk Mining, LLC (0852); Rockwell Mining, LLC (3874); Spruce Pine Land Company (2254); Spurlock Mining, LLC (2899); Triad Mining, LLC (7713); and Triad Trucking, LLC (6112). The location of the Debtors' service address in these chapter 11 cases is 3228 Summit Square Place, Suite 180, Lexington, Kentucky 40509.

2. The statements in this declaration are, except where specifically noted, based upon my personal knowledge or opinion, on information that I have obtained from the Debtors' advisors or employees working directly with me or from other members of the Centerview Partners LLC ("Centerview") team working under my supervision or direction, or from the Debtors' books and records. Specifically, I have overseen a Centerview team which, since February 2019, has been one of the principal advisors for the Debtors, and in that capacity I have been directly involved in the matters leading up to the Debtors' chapter 11 filings. I am not specifically compensated for this testimony other than through payments received by Centerview as a professional whose retention the Debtors will seek to obtain pursuant to an application to be filed with this Court at a later date. I am over the age of 18 years and authorized to submit this declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## Background and Qualifications

3. I am a Partner and co-head of the Debt Advisory and Restructuring Group of Centerview, which I co-founded in 2011. Centerview is an independent investment banking firm providing financial advisory services with respect to mergers and acquisitions, capital raising, debt advisory, and restructuring across a broad range of industries. Centerview and its senior professionals have extensive experience in the reorganization, restructuring, and sale of distressed companies, both out-of-court and in chapter 11 proceedings.

4. I have over 25 years of experience advising and executing financing, debt advisory, and restructuring transactions and mergers and acquisitions. I have extensive experience negotiating, marketing, executing, and managing chapter 11 restructuring deals and debtor-in-possession financings. Prior to joining Centerview, I was a co-founder of, and served as a Managing Director at, Miller Buckfire & Co. and served in the financial restructuring group of

Dresdner Kleinwort Wasserstein. Prior to entering the financial services industry, I was a Partner in the Business, Finance, and Restructuring department of Weil, Gotshal & Manges LLP. I graduated from Georgetown University with a B.S.B.A./Finance and Boston University School of Law with a J.D.

### The Debtors' Efforts to Secure DIP Financing

5. As a result of the Debtors' over-leveraged capital structure and sizeable debt service requirements, the Debtors and their advisors began discussing potential restructuring proposals in February 2019 with certain lenders who hold a majority of both the prepetition first lien term loan and prepetition second lien term loan. In light of the terms of restructuring proposals being discussed and the Debtors' liquidity needs (as discussed in the First Day Declaration), the Debtors instructed Centerview to explore potential sources of postpetition financing.

6. In advance of Centerview reaching out to potential financing providers, the Debtors undertook an analysis of how much postpetition financing would be required to operate the Debtors' business and pay administrative costs during the chapter 11 process. This analysis included, among other things, assessing the potential acceleration of demands on available liquidity following the commencement of these chapter 11 cases, including potential working capital contraction. Based on this analysis, the Debtors determined that they would require incremental liquidity of approximately $55 million and continued access to an asset-based revolving loan facility to operate smoothly postpetition, and satisfy all administrative costs and expenses. Centerview relied on this DIP budget in its conversations with potential financing providers.

7. The Debtors, with the assistance of their advisors, solicited interest for a $90 million DIP asset-based revolver to primarily refinance the $85 million prepetition ABL

revolver and a $50 million new money term loan to fund incremental liquidity needs. Centerview solicited interest from seven third-party financial institutions to determine the extent to which third-parties would be willing to provide postpetition financing to the Debtors. Of these lenders, six executed confidentiality agreements and received access to non-public information. None of these lenders indicated a willingness to provide the Debtors with DIP financing on an unsecured, junior-lien, priming, or *pari passu* basis. The Debtors received no third party new money term loan proposals. The Debtors did receive two third party proposals with indicative terms for the ABL facility, both of which were subject to material due diligence.

8. Centerview also solicited a DIP ABL facility proposal from MidCap Financial Services, LLC, the existing administrative agent and sole lender under the prepetition ABL facility (together with its affiliates, "MidCap"), and a new money term loan proposal backstopped by Knighthead Capital Management, LLC ("Knighthead"), Solus Alternative Asset Management LP ("Solus"), and Redwood Capital Management, LLC ("Redwood," collectively with Knighthead and Solus, the "Crossover Group"), the primary parties with which the Debtors were negotiating a global restructuring transaction.

9. Over the course of multiple weeks, the Debtors and their advisors engaged in various conversations and extensive negotiations with MidCap, the Crossover Group, and a group of lenders representing approximately 39% of the Debtors' first lien term loan debt (the "1L Group") to achieve the best possible terms for a DIP ABL facility and DIP term loan facility. Following these arm's-length negotiations, the Debtors were able to secure the proposed $240 million DIP facilities (the "DIP Facilities"), which consists of (a) a $90 million DIP ABL facility, which will roll up the prepetition ABL facility on a rolling basis (the "DIP ABL Facility"), and (b) a $150 million DIP term loan facility, which will roll up $100 million of the Debtors'

prepetition first lien term loan claims (the "Term DIP Roll-Up Loans") and provide $50 million of new money to fund the Debtors' operations during these chapter 11 cases (the "New Money Term DIP Loan" and collectively the "Term DIP Loan"). The negotiations resulted in material concessions being made by MidCap and the Crossover Group, including with respect to interest rates, fees, and other material terms. Significantly, the DIP Facilities were the Debtors' only viable source of postpetition funding and no other, better alternative was reasonably attainable.

**I.      The DIP ABL Facility Proposal.**

10.     MidCap worked constructively with the Debtors throughout the prepetition process, indicating that it would be willing to provide the DIP ABL Facility under economic terms more favorable than the prepetition ABL facility. These economic terms were also more favorable to the Debtors than the fees associated with the two indicative ABL facility proposals the Debtors received from potential third party lenders. The Debtors and their advisors negotiated over a number of weeks regarding the structure and economic costs of the DIP ABL facility and an exit ABL facility upon the Debtors' emergence from chapter 11. Ultimately, the Debtors and MidCap agreed to a set of terms that provided the Debtors with necessary access to liquidity during the pendency of these chapter 11 cases on economic terms superior to the terms proposed by competing financing providers.

11.     Upon entry of the interim order, the Debtors' obligations under the prepetition ABL facility will be refinanced by, or roll up into, the DIP ABL Facility as borrowings are made under, and cash is swept to, the DIP ABL Facility. Upon entry of the final order, any obligations remaining under the prepetition ABL facility will be refinanced by, or roll up into, the DIP ABL Facility. The roll-up of the prepetition ABL facility is required by MidCap as a condition to provide postpetition financing. Refinancing these obligations into the DIP ABL Facility will allow the Debtors to continue to make critical investments in their business at an interest rate that is

5

lower than the prepetition ABL facility interest rate. Importantly, MidCap reduced the fees owed under the prepetition ABL facility and the DIP ABL Facility (including the prepetition ABL facility's delayed origination fee) to amounts well below the fees proposed by potential third-party providers. MidCap will also provide an exit ABL facility on terms consistent with the DIP ABL Facility. In the aggregate, the Debtors believe the DIP ABL Facility and exit ABL facility provided by MidCap will save the Debtors' millions of dollars compared to potentially available competing facilities.

12. In my experience, refinancing of prepetition ABL facilities is not uncommon, particularly in the distressed energy environment. I understand that the Debtors have stipulated, pursuant to the interim order, that the obligations under the prepetition ABL facility are fully secured by perfected, first priority liens with respect to the prepetition ABL collateral. The Debtors believe that the value of that collateral is well in excess of the outstanding borrowings under the prepetition ABL facility. Based on the DIP ABL Facility terms and related benefits, the Debtors believe that entry into the DIP ABL Facility with MidCap is in the best interests of the Debtors and their estates.

**II.     Term DIP Loan Proposal.**

13. Simultaneously with the DIP ABL Facility negotiations, the Debtors and the Crossover Group engaged in arm's-length negotiations regarding a chapter 11 plan of reorganization and a DIP term loan to fund the plan process. In March 2019, the Crossover Group proposed a $50 million DIP term loan credit facility to be provided by prepetition first lien term loan lenders and backstopped by the Crossover Group in connection with a restructuring transaction that would leave the reorganized company with significantly more leverage than would the restructuring support agreement. Following continued negotiations, the Debtors, the Crossover Group and the 1L Group were only willing to move forward with a more comprehensive

6

restructuring that would include the equitization of a significant portion of the prepetition first lien term loan.  As part of the more comprehensive restructuring, the Crossover Group and the 1L Group were only willing to provide the $50 million New Money Term DIP Loan if it included the roll up of $100 million of prepetition first lien term loan claims.  Notably, the Debtors' first lien lenders agreed that upon confirmation of the Debtors' proposed prepackaged chapter 11 plan of reorganization, the Term DIP Loan will convert into exit term loans, ensuring that the Debtors will not need to solicit additional sources of capital to fund the Debtors' emergence.  Importantly, the New Money Term DIP Loan is an integral part of the Debtors' restructuring support agreement and all lenders also signed the restructuring support agreement documenting their support for the Debtors' proposed plan and solidifying support for a prepackaged, value-maximizing restructuring.

14.     The Term DIP Loan is critical to the Debtors' ability to pay the administrative costs of these chapter 11 cases, and provides the Debtors with sufficient liquidity to operate their business without creating a value-destructive "priming" or valuation dispute at the outset of these chapter 11 cases.  In tandem with the DIP ABL Facility and the Debtors' restructuring support agreement, the Term DIP Loan provides a path to emergence that is important to reassure customers and vendors, protect operations, and maximize value for all stakeholders.

### DIP Facilities Were Negotiated in Good Faith and At Arms' Length

15.     Over the course of multiple months, my team and I, along with the Debtors' other advisors, actively negotiated the terms and provisions of the DIP Facilities on behalf of the Debtors.  The process was rigorous and marked by hard bargaining.  During that time, the parties exchanged numerous term sheets and mark-ups, each with significant changes to the material terms of the respective DIP Facilities.  Over the course of these negotiations, the economic and other terms of the DIP Facilities improved to the benefit of the Debtors.

KE 61264652

16. The fees and rates to be paid under the proposed DIP Facilities were the subject of arm's-length and good faith negotiation between the Debtors and the DIP lenders, are an integral component of the overall terms of the proposed DIP Facilities, and were required by MidCap and the Term DIP Loan lenders as consideration for the extension of postpetition financing. Moreover, the Debtors were unable to obtain other DIP financing on similar or better terms. Under the current circumstances, I believe that the fees, rates, and other economics provided for in the DIP Facilities are reasonable.

17. The DIP Facilities also contain certain milestones that the Debtors must meet throughout their chapter 11 cases. The milestones were negotiated by MidCap and the Term DIP Loan lenders as a condition to providing the DIP Facilities and provide the Debtors with adequate time to implement a value-maximizing restructuring. Accordingly, I believe these milestones are appropriate under the circumstances.

**DIP Facilities Are Best Postpetition Financing Arrangement Available to the Debtors**

18. Based on my experience with DIP financing transactions, as well as my involvement in the negotiation of the DIP Facilities and pursuit of alternative postpetition financing proposals, the DIP Facilities are the best financing option available to the Debtors in the circumstances. The proposed DIP Facilities maximize the value of the enterprise by (a) providing the Debtors with access to crucial liquidity at the outset of these chapter 11 cases and (b) facilitating a consensual chapter 11 plan of reorganization with the support of the Crossover Group, the 1L Group, and other key stakeholders. In short, the proposed DIP Facilities will allow the Debtors to maximize value by continuing operations with minimal disruption.

19. MidCap and the Term DIP Loan lenders agreed to provide the DIP Facilities to the Debtors on terms that I consider to be reasonable under the circumstances. Both MidCap and the Term DIP Loan lenders expressly conditioned their proposals on, among other things, priming

first-priority liens on assets encumbered by the Debtors' prepetition ABL facility and prepetition first lien term loan credit facility, respectively, and customary forms of adequate protection. MidCap also premised its proposals for the DIP ABL facility on a full payoff of the prepetition ABL facility with the proceeds of the DIP ABL facility.

20.  The Term DIP Loan lenders also insisted on postpetition liens on the Debtors' prepetition unencumbered assets as part of the collateral package securing the New Money Term DIP Loan.[2] Additionally, although the Term DIP Loan primes prepetition secured parties' liens, such priming is being done on a consensual basis. With respect to the Term DIP Loan, the Crossover Group and 1L Group—holding over 90 percent of the outstanding prepetition first lien term loan debt and prepetition second lien term loan debt—have consented to the priming. MidCap has similarly consented to the priming liens of the DIP ABL Facility, and in any event, the full prepetition ABL facility will be repaid in full from the proceeds of the DIP ABL Facility.

21.  In addition to providing the Debtors with incremental liquidity, the DIP Facilities will provide the Debtors with access to the use of cash collateral on a consensual basis, and will allow the Debtors to fund their business in the ordinary course, which will ensure continued, uninterrupted operations, preserving the value of the estate for the benefit of all stakeholders.

22.  Finally, and perhaps most importantly, the DIP Facilities provide the Debtors a path towards a successful and expeditious reorganization. Notwithstanding the Debtors' considerable prepetition secured debt and diminishing liquidity, the Debtors were able to reach an agreement with the Crossover Group and 1L Group on the reorganization as contemplated by the restructuring support agreement. The proposed DIP Facilities, together with the restructuring support agreement

---

[2]  For the avoidance of doubt, the $100 million Roll-Up Term DIP Loan will not hold a lien on the Debtors' prepetition unencumbered assets.

KE 61264652

and related prepackaged chapter 11 plan, provide the clearest path to an expeditious and adequately funded exit from chapter 11, which would best preserve the value of the Debtors' business and operations.

23.     In sum, it is my professional opinion that the terms of the DIP Facilities are reasonable under the circumstances, and were the product of good faith, arm's length negotiations and that the DIP Facilities will benefit all stakeholders in these chapter 11 cases.  For all of the reasons included in this Declaration, I submit it would be appropriate for the Court to approve the DIP Facilities and the use of cash collateral as contemplated by the Motion.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

July 19, 2019
Wilmington, Delaware

                                             By:
                                             */s/ Marc D. Puntus*
                                             Marc D. Puntus
                                             Centerview Partners LLC