**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BLACKHAWK MINING LLC, *et al.*,[1] | ) Case No. 19—— (——)-11595 (LSS) |
| | ) |
| Debtors. | ) (Joint Administration Requested)(Jointly |
| | ) Administered) |
| | ) |

**DEBTORS' MODIFIED JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**

---

THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.

---

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet, P.C. (admitted *pro hac vice* pending)
Joseph M. Graham (admitted *pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

-and-

Stephen E. Hessler, P.C. (admitted *pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Christopher M. Samis (DE 4909)
L. Katherine Good (DE 5101)
**POTTER ANDERSON CORROON LLP**
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, Delaware 19801-6108
Telephone:      (302) 984-6000
Facsimile:      (302) 658-1192

*Proposed* Co-Counsel to the Debtors and Debtors in Possession

Dated:  ~~July 15~~August 26, 2019

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  Blackhawk Mining LLC (5600); Blackhawk Coal Sales, LLC (9456); Blackhawk Land and Resources, LLC (7839); Blackhawk River Logistics, LLC (3388); Blue Creek Mining, LLC (2427); Blue Diamond Mining, LLC (3488); Eagle Shield, LLC (6721); FCDC Coal, Inc. (6188); Guyandotte Mining, LLC (4882); Hampden Coal, LLC (8241); Kanawha Eagle Mining, LLC (0586); Logan & Kanawha, LLC (3178); Panther Creek Mining, LLC (0627); Pine Branch Land, LLC (9661); Pine Branch Mining, LLC (9681); Pine Branch Resources, LLC (9758); Redhawk Mining, LLC (0852); Rockwell Mining, LLC (3874); Spruce Pine Land Company (2254); Spurlock Mining, LLC (2899); Triad Mining, LLC (7713); and Triad Trucking, LLC (6112).  The location of the Debtors' service address in these chapter 11 cases is 3228 Summit Square Place, Suite 180, Lexington, Kentucky 40509.

**TABLE OF CONTENTS**

Page

INTRODUCTION ...........................................................................................................................1

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
    GOVERNING LAW, AND OTHER REFERENCES.................................................................1
    A.     Defined Terms .................................................................................................................1
    B.     Rules of Interpretation ...................................................................................................12
    C.     Computation of Time .....................................................................................................13
    D.     Governing Law...............................................................................................................13
    E.     Reference to Monetary Figures......................................................................................13
    F.     Reference to the Debtors or the Reorganized Debtors...................................................13
    G.     Controlling Document....................................................................................................13

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS.................................................13
    A.     DIP Claims.....................................................................................................................13
    B.     Administrative Claims ...................................................................................................14
    C.     Professional Fee Claims .................................................................................................15
    D.     Priority Tax Claims ........................................................................................................16

ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS.........16
    A.     Classification of Claims and Interests ...........................................................................16
    B.     Treatment of Classes of Claims and Interests ...............................................................17
    C.     Special Provision Governing Unimpaired Claims .........................................................21
    D.     Elimination of Vacant Classes .......................................................................................21
    E.     Voting Classes; Presumed Acceptance by Non-Voting Classes ....................................21
    F.     Subordinated Claims ......................................................................................................22
    G.     Intercompany Interests ...................................................................................................22
    H.     Controversy Concerning Impairment.............................................................................22
    I.     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.............................22

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .........................................22
    A.     General Settlement of Claims and Interests ...................................................................22
    B.     Restructuring Transactions .............................................................................................22
    C.     Sources of Consideration for Plan Distributions ...........................................................23
    D.     Shareholders Agreement ................................................................................................25
    E.     Potter Settlement ............................................................................................................25
    F.     Vendor Agreements ........................................................................................................25
    G.     Exemption from Registration Requirements ..................................................................25
    H.     Corporate Existence .......................................................................................................26
    I.     Corporate Action ...........................................................................................................26
    J.     Vesting of Assets in the Reorganized Debtors ..............................................................26
    K.     Cancellation of Notes, Instruments, Certificates, and Other Documents......................26
    L.     Effectuating Documents; Further Transactions.............................................................27
    M.     Exemptions from Certain Taxes and Fees.....................................................................27
    N.     New Organizational Documents ....................................................................................28
    O.     Directors and Officers ...................................................................................................28
    P.     Management Incentive Plan............................................................................................29
    Q.     Preservation of Causes of Action ..................................................................................29

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .....................29
    A.     Assumption of Executory Contracts and Unexpired Leases..........................................29
    B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases.....................30
    C.     Cure of Defaults and Objections to Cure and Assumption ...........................................30

|   |   |   |   |
|---|---|---|---|
| *D.* | *Insurance Policies and Surety Bonds* | | 31 |
| *E.* | *Indemnification Provisions* | | 3232 |
| *F.* | *Director, Officer, Manager, and Employee Liability Insurance* | | 32 |
| *G.* | *Employee and Retiree Benefits* | | 32 |
| *H.* | *Modifications, Amendments, Supplements, Restatements, or Other Agreements* | | 3333 |
| *I.* | *Reservation of Rights* | | 33 |
| *J.* | *Nonoccurrence of Effective Date* | | 33 |
| *K.* | *Contracts and Leases Entered Into After the Petition Date* | | 33 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** .......................................................**33**
| *A.* | *Timing and Calculation of Amounts to Be Distributed* | | 33 |
|---|---|---|---|
| *B.* | *Distributions on Account of Obligations of Multiple Debtors* | | 3434 |
| *C.* | *Distribution Agent* | | 34 |
| *D.* | *Rights and Powers of Distribution Agent* | | 34 |
| *E.* | *Delivery of Distributions* | | 34 |
| *F.* | *Manner of Payment* | | 35 |
| *G.* | *Compliance Matters* | | 35 |
| *H.* | *No Postpetition or Default Interest on Claims* | | 35 |
| *I.* | *Allocation Between Principal and Accrued Interest* | | 3636 |
| *J.* | *Setoffs and Recoupment* | | 3636 |
| *K.* | *Claims Paid or Payable by Third Parties* | | 36 |

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS**..................**3737**
| *A.* | *Disputed Claims Process* | | 3737 |
|---|---|---|---|
| *B.* | *Claims Administration Responsibilities.* | | 37 |
| *C.* | *Estimation of Claims and Interests* | | 37 |
| *D.* | *Adjustment to Claims Without Objection* | | 3838 |
| *E.* | *No Distributions Pending Allowance* | | 3838 |
| *F.* | *Distributions After Allowance* | | 38 |
| *G.* | *No Interest* | | 38 |

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ....................**38**
| *A.* | *Compromise and Settlement of Claims, Interests, and Controversies* | | 38 |
|---|---|---|---|
| *B.* | *Discharge of Claims* | | 38 |
| *C.* | *Release of Liens* | | 39 |
| *D.* | *Debtor Release* | | 39 |
| *E.* | *Third-Party Release* | | 4040 |
| *F.* | *Exculpation* | | 40 |
| *G.* | *Injunction* | | 41 |
| *H.* | *Protection Against Discriminatory Treatment* | | 41 |
| *I.* | *Recoupment* | | 4141 |
| *J.* | *Reimbursement or Contribution* | | 4242 |
| *K.* | *Term of Injunctions or Stays* | | 42 |
| *L.* | *Document Retention* | | 42 |

**ARTICLE IX. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**........................................**42**
| *A.* | *Conditions Precedent to the Effective Date.* | | 42 |
|---|---|---|---|
| *B.* | *Waiver of Conditions Precedent* | | 43 |
| *C.* | *Substantial Consummation* | | 43 |
| *D.* | *Effect of Non-Occurrence of Conditions to Consummation* | | 43 |

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**..........................**43**
| *A.* | *Modification of Plan* | | 43 |
|---|---|---|---|
| *B.* | *Effect of Confirmation on Modifications* | | 4343 |
| *C.* | *Revocation or Withdrawal of Plan* | | 4444 |

KE 60280927

**ARTICLE XI. RETENTION OF JURISDICTION** ................................................................. **44**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ............................................................ **4545**
| | | |
|---|---|---|
| A. | Immediate Binding Effect | 4545 |
| B. | Additional Documents | 4646 |
| C. | Statutory Fees | 46 |
| D. | Payment of Certain Fees and Expenses | 46 |
| E. | Reservation of Rights | 46 |
| F. | Certain Governmental Matters. | 46 |
| F.G. | Successors and Assigns | 4747 |
| G.H. | Service of Documents | 4747 |
| H.I. | Entire Agreement | 5050 |
| I.J. | Plan Supplement Exhibits | 5050 |
| J.K. | Non-Severability | 5050 |
| K.L. | Votes Solicited in Good Faith | 5050 |
| L.M. | Waiver or Estoppel | 5050 |
| M.N. | Closing of Chapter 11 Cases | 5050 |

## INTRODUCTION

Blackhawk Mining LLC and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY, PARTICULARLY HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A.    *Defined Terms*

1.    "*Ad Hoc Group of First Lien Lenders*" means the group of certain Holders of First Lien Term Loan Claims represented by Shearman & Sterling LLP.

2.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; and (b) Allowed Professional Fee Claims.

3.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity was a debtor in a case under the Bankruptcy Code.

4.    "*Allowed*" means with respect to any Claim or Interest, except as otherwise provided in the Plan: (a) a Claim that either (i) is not Disputed or (ii) has been allowed by a Final Order; (b) a Claim that is allowed, compromised, settled, or otherwise resolved (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court by a Final Order, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; (c) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order; or (d) a Claim or Interest as to which a Proof of Claim or Proof of Interest, as applicable, has been timely filed and as to which no objection has been filed.

5.    "*Assumed Executory Contracts and Unexpired Leases*" means those Executory Contracts and Unexpired Leases to be assumed by the applicable Reorganized Debtors, as set forth on the Assumed Executory Contract and Unexpired Lease List.

6.    "*Assumed Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases (with proposed cure amounts) that will be assumed by the Reorganized Debtors, which list shall be included in the Plan Supplement.

7.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

8.　　　"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

9.　　　"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

10.　　　"*Blackhawk*" means Blackhawk Mining LLC, a Kentucky limited liability company.

11.　　　"*Blackhawk Operating Agreement*" means that certain Fifth Amended and Restated Operating Agreement of Blackhawk, dated as of December 15, 2017, as amended, modified, or supplemented from time to time in accordance with its terms.

12.　　　"*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

13.　　　"*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

14.　　　"*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

15.　　　"*CEO Director*" means the Chief Executive Officer of Reorganized Blackhawk.

16.　　　"*Chapter 11 Cases*" means the procedurally consolidated cases filed or to be filed (as applicable) for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

17.　　　"*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors, whether or not assessed or Allowed.

18.　　　"*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Solicitation Agent.

19.　　　"*Class*" means a category of Holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

20.　　　"*Class A Blackhawk Interests*" means the Class A Units in Blackhawk, as defined in the Blackhawk Operating Agreement.

21.　　　"*Class B Blackhawk Interests*" means the Class B Units in Blackhawk, as defined in the Blackhawk Operating Agreement.

22.　　　"*Class C Blackhawk Interests*" means the Class C Units in Blackhawk, as defined in the Blackhawk Operating Agreement.

KE 60280927

23.    "*Confirmation*" means entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

24.    "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

25.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and section 1128 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan.

26.    "*Confirmation Objection Deadline*" means the date that is at least five (5) Business Days prior to the date first set by the Bankruptcy Court for the Confirmation Hearing.

27.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and approving the Disclosure Statement.

28.    "*Consenting Parties*" means, collectively, the Consenting First Lien Term Loan Lenders, the Consenting Second Lien Term Loan Lenders, and the Potter Group Entities.

29.    "*Consenting First Lien Term Loan Lenders*" means, collectively, the Consenting First Lien Lenders as defined in the RSA.

30.    "*Consenting Second Lien Term Loan Lenders*" means, collectively, the Consenting Second Lien Lenders as defined in RSA.

31.    "*Consummation*" means the occurrence of the Effective Date.

32.    "*Contingent DIP ABL Obligations*" means all of the Debtors' obligations under the DIP ABL Agreement and the DIP Order that are contingent and/or unliquidated as of the Effective Date, other than DIP ABL Claims that are paid in Full in Cash as of the Effective Date and contingent indemnification obligations as to which a claim has been asserted as of the Effective Date.

33.    "*Contingent DIP Term Obligations*" means all of the Debtors' obligations under the DIP Term Agreement and the DIP Order that are contingent and/or unliquidated as of the Effective Date, other than DIP Term Claims that are paid in Full in Cash as of the Effective Date and contingent indemnification obligations as to which a Claim has been asserted as of the Effective Date.

34.    "*Contingent First Lien Term Loan Obligations*" means all of the Debtors' obligations under the First Lien Term Loan Agreement that are contingent and/or unliquidated as of the Effective Date, other than First Lien Term Loan Claims that are paid in Full in Cash as of the Effective Date and contingent indemnification obligations as to which a Claim has been asserted as of the Effective Date.

35.    "*Contingent Prepetition ABL Obligations*" means all of the Debtors' obligations under the Prepetition ABL Credit Agreement that are contingent and/or unliquidated as of the Effective Date, other than the Obligations (defined thereunder) that are paid in Full in Cash pursuant to the ABL Discharge (as defined in the DIP Order) and contingent indemnification obligations as to which a Claim has been asserted as of the Effective Date.

36.    "*Contingent Second Lien Term Loan Obligations*" means all of the Debtors' obligations under the Second Lien Term Loan Agreement that are contingent and/or unliquidated as of the Effective Date, other than Second Lien Term Loan Claims that are paid in Full in Cash as of the Effective Date and contingent indemnification obligations as to which a Claim has been asserted as of the Effective Date.

37.    "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under

3

section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

38.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") maintained by the Debtors as of the Petition Date for liabilities against any of the Debtors' current or former directors, managers, and officers.

39.     "*Debtor Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

40.     "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.D of the Plan.

41.     "*DIP ABL Agent*" means MidCap Funding IV Trust, solely in its capacity as administrative agent and collateral agent under the DIP ABL Facility, together with its respective successors and assigns solely in such capacity.

42.     "*DIP ABL Agreement*" means that certain senior secured super-priority debtor-in-possession credit agreement by and among the Debtors, as borrowers and/or guarantors, the DIP ABL Agent, and the lenders party thereto, including any and all notes, instruments, and any other document delivered pursuant thereto or entered into in connection therewith, in each case as amended, modified, or supplemented from time to time.

43.     "*DIP ABL Claim*" means any Claim arising under the DIP ABL Agreement, including all Claims for any fees and expenses of the DIP ABL Agent and the DIP ABL Lenders thereunder.

44.     "*DIP ABL Facility*" means that certain debtor-in-possession asset-based credit facility available pursuant to the terms and conditions of DIP ABL Agreement in the aggregate principal amount of up to $90 million.

45.     "*DIP ABL Lenders*" means, collectively, the banks, financial institutions, and other lenders party to the DIP ABL Agreement from time to time, each solely in their capacity as such.

46.     "*DIP Agents*" means, together, the DIP ABL Agent and the DIP Term Agent.

47.     "*DIP Claims*" means, together, the DIP ABL Claims and the DIP Term Claims.

48.     "*DIP Facilities*" means, together, the DIP ABL Facility and DIP Term Facility.

49.     "*DIP Lenders*" means, together, the DIP ABL Lenders and the DIP Term Lenders.

50.     "*DIP Order*" means, collectively, the interim and final orders entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP ABL Agreement and the DIP Term Agreement.

51.     "*DIP Term Agent*" means Cantor Fitzgerald Securities, in its capacity as administrative agent and collateral agent under the DIP Term Facility, together with its respective successors and assigns solely in such capacity.

52.     "*DIP Term Agreement*" means that certain senior secured super-priority debtor-in-possession credit agreement by and among the Debtors, as borrowers and/or guarantors, the DIP Term Agent, as administrative agent, and the lenders party thereto, any and all notes, instruments, and any other document delivered pursuant thereto or entered into in connection therewith, in each case as amended, modified, or supplemented from time to time.

53.     "*DIP Term Claim*" means any Claim arising under the DIP Term Agreement, including any Claims for fees and expenses of the DIP Term Agent and DIP Term Lenders thereunder.

54.    "*DIP Term Facility*" means that certain debtor-in-possession financing facility, available pursuant to the terms and conditions of the DIP Term Agreement in the aggregate principal amount of up to $150 million, consisting of up to $50 million in New Money DIP Loans and up to $100 million in Roll-Up DIP Loans.

55.    "*DIP Term Lenders*" means, collectively, the banks, financial institutions, and other lenders party to the DIP Term Agreement, from time to time, each solely in their capacity as such.

56.    "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, to be approved by the Confirmation Order.

57.    "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest, or any portion thereof, (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code, or (b) for which a Proof of Claim or Proof of Interest or a motion for payment has been timely filed with the Bankruptcy Court, to the extent the Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order; *provided*, *however*, that in no event shall a Claim that is deemed Allowed pursuant to this Plan be a Disputed Claim.

58.    "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or to facilitate distributions in accordance with the Plan, *provided* that the Second Lien Term Loan Agent shall be the Distribution Agent for the Second Lien Term Loan Claims in accordance with the Second Lien Term Loan Agreement.

59.    "*Distribution Record Date*" means the date for determining which Holders of Allowed Claims and Interests are eligible to receive distributions pursuant to the Plan, which date shall be the Effective Date.

60.    "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.

61.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

62.    "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

63.    "*Exculpated Party*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) any statutory committees appointed in the Chapter 11 Cases and each of their respective members; and (d) with respect to each of the foregoing in clauses (a) through (c), such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

64.    "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

65.    "*Exit ABL Agent*" means MidCap Funding IV Trust or its designated Affiliate, in its capacity as agent under the Exit ABL Facility Documents, together with its successors, assigns, or any replacement agent appointed pursuant to the terms of the Exit ABL Facility Documents.

66.    "*Exit ABL Facility*" means a senior secured asset-based revolving credit facility in an amount up to $90 million, which shall be consistent with the Exit ABL Facility Documents.

67.    "*Exit ABL Facility Agreement*" means that certain credit and security agreement, dated as of the Effective Date, by and among the Reorganized Debtors and the Exit ABL Facility Secured Parties, and which shall be included in the Plan Supplement.

68.    "*Exit ABL Facility Documents*" means, collectively, the Exit ABL Facility Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

69.    "*Exit ABL Facility Secured Parties*" means the lenders under the Exit ABL Facility, including the banks, financial institutions, institutional investors, or other entities serving as agents, arrangers, book runners, and/or letter of credit issuers thereto, each solely in their capacity as such.

70.    "*FCC*" means the Federal Communications Commission.

70.71.    "*First Lien Term Loan Agent*" means Cantor Fitzgerald Securities, and its predecessors thereto prior to the Petition Date, each solely in its capacity as administrative agent and collateral agent under the First Lien Term Loan Facility.

71.72.    "*First Lien Term Loan Agreement*" means that certain credit agreement, dated as of February 17, 2017, as amended, supplemented, or modified from time to time, by and among the Debtors as borrowers or guarantors, the First Lien Term Loan Lenders, and the First Lien Term Loan Agent, as administrative agent.

72.73.    "*First Lien Term Loan Claim*" means all Claims against any Debtor arising under, derived from, or based upon the First Lien Term Loan Agreement.

73.74.    "*First Lien Term Loan Facility*" means that certain prepetition first lien secured term loan credit facility provided for under the First Lien Term Loan Agreement in the original aggregate principal amount of $660,000,000 between certain of the Debtors as obligors or guarantors and the First Lien Term Loan Lenders.

74.75.    "*First Lien Term Loan Lenders*" means, collectively, the banks, financial institutions, and other lenders party to the First Lien Term Loan Agreement from time to time, each solely in their capacity as such.

75.76.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

76.77.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, is not subject to any pending stay and as to which the time to reasonable appeal, move for reargument, reconsideration, or rehearing, or seek certiorari has expired and no appeal, motion for reargument, reconsideration, or rehearing or petition for certiorari has been timely taken or filed, or as to which any appeal that has been taken, motion for reargument, reconsideration, or rehearing that has been granted or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

77.78.    "*General Unsecured Claim*" means any Claim that is not secured and is not a Contingent DIP ABL Obligation, a Contingent DIP Term Obligation, a Contingent Prepetition ABL Obligation, a Contingent First Lien Term Loan Obligation, a Contingent Second Lien Term Loan Obligation, a DIP Claim, an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, a First Lien Term Loan Claim, a Second Lien Term Loan Claim, a Debtor Intercompany Claim, a Non-Debtor Intercompany Claim, or a Section 510(b) Claim.

78.79.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

79.80.    "*Holder*" means an Entity holding a Claim or an Interest, or, if applicable, an Entity receiving or retaining Interests in Blackhawk, the New First Lien Loan, or the New Common Stock, as applicable.

80.81.    "*Impaired*" means, with respect to any Class of Claims or Interests, a Claim or an Interest that is not Unimpaired.

81.82.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in place immediately prior to the Effective Date whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, or contracts for the current and former directors, officers, managers, employees, attorneys, other professionals, and agents and such current and former directors, officers, and managers' respective Affiliates.

82.83.    "*Intercompany Interest*" means an Interest held by a Debtor or an Affiliate of a Debtor.

83.84.    "*Interest*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

84.85.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

85.86.    "*Knighthead*" means Knighthead Capital Management, LLC, a Delaware limited liability company.

86.87.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

87.88.    "*Management Incentive Plan*" means the management incentive plan to be implemented with respect to Reorganized Blackhawk (and/or its subsidiaries) after the Effective Date, which plan shall reserve the Management Incentive Plan Equity for distributions to its participants on the terms and conditions to be determined by the Reorganized Blackhawk Board.

88.89.    "*Management Incentive Plan Equity*" means synthetic equity interests to be issued pursuant to the Management Incentive Plan, which shall economically represent up to 6 percent of the value of the New Common Stock in Reorganized Blackhawk as of the Effective Date, on a fully diluted basis.

89.90.    "*New Common Stock*" means the common stock, limited liability company membership units, or functional equivalent thereof of Reorganized Blackhawk to be issued on the Effective Date.

90.91.    "*New First Lien Loan*" means that certain term loan facility in an aggregate principal amount of $375,000,000 issued pursuant to the New First Lien Loan Documents.

91.92.    "*New First Lien Loan Agent*" means Cantor Fitzgerald Securities, solely in its capacity as administrative agent and collateral agent under the New First Lien Loan Documents, together with its successors, assigns, or any replacement administrative agent appointed pursuant to the terms of the New First Lien Loan Documents.

92.93.    "*New First Lien Loan Agreement*" means that certain credit and security agreement, dated as of the Effective Date, by and among the Reorganized Debtors, the New First Lien Loan Agent, and the lenders party thereto, which shall be included in the Plan Supplement.

93.94.    "*New First Lien Loan Documents*" means, collectively, the New First Lien Loan Agreement and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith,

including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, which shall be in form and substance consistent with the RSA.

94.95.    "*New Money DIP Claim*" means any Claim arising under, derived from, or based upon the New Money DIP Loans.

95.96.    "*New Money DIP Loans*" means up to $50,000,000 in new money delayed draw term loans provided by the DIP Term Lenders pursuant to the DIP Term Agreement and DIP Order.

96.97.    "*New Organizational Documents*" means the form of certificate or articles of incorporation, bylaws, or such other applicable formation documents (if any) of Reorganized Blackhawk, each of which shall be included in the Plan Supplement and materially consistent with the RSA, and in form and substance reasonably acceptable to the DIP ABL Agent or Exit ABL Agent in all material respects.

97.98.    "*Non-Debtor Intercompany Claim*" means any Claim held by a non-Debtor Affiliate of the Debtors against a Debtor.

99.       "*NRC*" means the United States Nuclear Regulatory Commission.

98.100.   "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

99.101.   "*Other Secured Claim*" means any Secured Claim, other than a DIP Claim, a Contingent Prepetition ABL Obligation, a First Lien Term Loan Claim and Second Lien Term Loan Claim.

100.102.  "*Patriot Chapter 11 Cases*" means the jointly administered chapter 11 cases captioned *In re Patriot Coal Corporation*, Case No. 15-32450 (KLP), in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.

101.103.  "*Patriot Plan*" means the chapter 11 plan confirmed in the Patriot Chapter 11 Cases, as may be amended, supplemented, or modified from time to time in accordance with its terms.

102.104.  "*Patriot Trust*" means the PCC Liquidating Trust established in connection with the Patriot Chapter 11 Cases.

103.105.  "*Patriot Trust Debtor Affiliates*" means the debtors in the Patriot Chapter 11 Cases.

104.106.  "*Patriot Trust RSA*" means that certain Restructuring Support Agreement, dated as of July 15, 2019, among Blackhawk and the trustee of the Patriot Trust.

105.107.  "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

106.108.  "*Petition Date*" means the date on which each of the Debtors commence the Chapter 11 Cases.

107.109.  "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan to be filed by the Debtors as may be amended, supplemented, altered, or modified from time to time on the terms set forth herein, and which includes:  (a) the New Organizational Documents; (b) the New First Lien Loan Agreement; (c) the Exit ABL Facility Agreement; (d) the Shareholders Agreement; (e) Restructuring Steps Memorandum; (f) the identity of the members of the Reorganized Blackhawk Board and the officers of Reorganized Blackhawk; (g) the Rejected Executory Contract and Unexpired Lease List; (h) the Assumed Executory Contract and Unexpired Lease List; (i) the schedule of retained Causes of Action; and (j) any other necessary documentation related to the Restructuring Transactions, each of which shall be in form and substance consistent with the RSA.

8

108.110. "*Potter Group Entity*" means, respectively, and in each case, in such capacity, those Entities owned or controlled by John Mitchell Potter that are counterparties to the Potter Group Vendor Contracts with the Debtors.

109.111. "*Potter Group Vendor Contracts*" means the "Affiliate Contracts" as defined in the Restructuring Term Sheet attached thereto as Schedule 1.

110.112. "*Potter Consulting Services Agreement*" means that certain consulting services agreement, dated as of July 15, 2019, by and between Blackhawk and John Mitchell Potter.

111.113. "*Potter Settlement*" means that certain settlement set forth in Article IV.E hereof.

112.114. "*Prepetition ABL Agent*" means MidCap Funding IV Trust, and its predecessors thereto prior to the Petition Date, each solely in its capacity as administrative agent under the Prepetition ABL Facility.

113.115. "*Prepetition ABL Credit Agreement*" means that certain credit agreement, dated as of September 6, 2017, as amended, supplemented, or modified from time to time, by and among the Debtors as borrowers or guarantors, the Prepetition ABL Lenders, and the Prepetition ABL Agent.

114.116. "*Prepetition ABL Facility*" means that certain prepetition asset-based credit facility with aggregate commitments of $85,000,000 under the Prepetition ABL Credit Agreement between certain of the Debtors as obligors or guarantors and the Prepetition ABL Lenders.

115.117. "*Prepetition ABL Lenders*" means, collectively, the banks, financial institutions, and other lenders party to the Prepetition ABL Credit Agreement from time to time, each solely in their capacity as such.

116.118. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

117.119. "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

118.120. "*Professional*" means an Entity retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

119.121. "*Professional Fee Claims*" means all Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Confirmation Date that the Bankruptcy Court has not denied by Final Order.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

120.122. "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount, *provided* that the Cash funds in the Professional Fee Escrow Account shall be increased from Cash on hand at the Reorganized Debtors to the extent applications are filed after the Effective Date in excess of the amount of Cash funded into the escrow as of the Effective Date.

121.123. "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.C of the Plan.

122.124. "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

9

123.125. "*Proof of Interest*" means a proof of Interest filed in any of the Debtors in the Chapter 11 Cases.

124.126. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

125.127. "*Rejected Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, of Executory Contracts and Unexpired Leases that will be rejected by the Reorganized Debtors pursuant to the Plan, which list shall be included in the Plan Supplement.

126.128. "*Released Party*" means collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the First Lien Term Loan Lenders; (d) each of the Second Lien Term Loan Lenders; (e) the First Lien Term Loan Agent; (f) the Second Lien Term Loan Agent; (g) each of the Potter Group Entities; (h) each of the New First Lien Loan Lenders; (i) the New First Lien Loan Agent; (j) the Prepetition ABL Agent; (k) each of the Prepetition ABL Lenders; (l) the DIP ABL Agent; (m) each of the DIP ABL Lenders; (n) the DIP Term Agent; (o) each of the DIP Term Lenders; (p) the Patriot Trust and its trustee; (q) the Patriot Trust Debtor Affiliates; (r) all Holders of Class A Blackhawk Interests, Class B Blackhawk Interests, and Class C Blackhawk Interests, in each case that vote to accept the Plan; and (s) with respect to each of the foregoing entities in clauses (a) through (r), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, managed accounts or funds, participants, and each of their respective current and former equity holders, officers, directors, managers, principals, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided*, the release in favor of the Potter Group Entities and John Mitchell Potter shall include and be effective as to all matters previously invoiced and paid between any of the Potter Group Entities and the Debtors as of the Petition Date but shall not apply to the continuing obligations between any of the Potter Group Entities and the Debtors under the terms of the agreements assumed by the Debtors; *provided*, *however*, that any Entity identified in the foregoing clauses (a) through (r) that opts out of the releases shall not be a "Released Party."

127.129. "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Term Loan Lenders; (d) each of the Potter Group Entities; (e) each of the New First Lien Loan Lenders; (f) the New First Lien Loan Agent; (g) the Prepetition ABL Agent; (h) each of the Prepetition ABL Lenders; (i) the DIP ABL Agent; (j) each of the DIP ABL Lenders; (k) the DIP Term Agent; (l) each of the DIP Term Lenders; (m) the First Lien Term Loan Agent; (n) the Second Lien Term Loan Agent; (o) the Patriot Trust and its trustee; (p) the Patriot Trust Debtor Affiliates; (q) all Holders of Claims or Interests that vote to accept or are deemed to accept the Plan; (r) all Holders of Claims or Interests that vote to reject the Plan or do not vote to accept or reject the Plan but, in either case, do not affirmatively elect to "opt out" of being a releasing party by timely objecting to the Plan's third-party release provisions; (s) all Holders of Claims or Interests that are deemed to reject the Plan that do not affirmatively elect to "opt out" of being a releasing party by timely objecting to the Plan's third-party release provisions; (t) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (s), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, managed accounts or funds, participants, and each of their respective current and former equity holders, officers, directors, managers, principals, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively.

128.130. "*Reorganized Blackhawk*" means either (a) Blackhawk, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, or (b) a new corporation, limited liability company, or partnership that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Common Stock to be distributed pursuant to the Plan.

129.131. "*Reorganized Blackhawk Board*" means the Board of Directors (or other applicable governing body) of Reorganized Blackhawk.

130.132. "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Blackhawk.

131.133. "*Required Consenting First Lien Lenders*" means the Required Consenting First Lien Lenders as defined in the RSA.

132.134. "*Required Consenting Parties*" means, collectively, the Required Consenting First Lien Lenders, the Required Consenting Second Lien Lenders, and the Potter Group Entities party to the RSA from time to time.

133.135. "*Required Consenting Second Lien Lenders*" means the Required Consenting Second Lien Lenders as defined in the RSA.

134.136. "*Required Consenting Term Lenders*" means the Required Consenting First Lien Lenders and the Required Consenting Second Lien Lenders.

135.137. "*Restructuring Steps Memorandum*" means the summary of transaction steps to complete the restructuring contemplated by the Plan, which shall be included in the Plan Supplement.

136.138. "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

137.139. "*Roll-Up DIP Claim*" means any Claim arising under, derived from, or based upon the Roll-Up DIP Loans.

138.140. "*Roll-Up DIP Loans*" means the $100,000,000 of the First Lien Term Loan Claims rolled-up pursuant to the DIP Term Agreement and DIP Order.

139.141. "*RSA*" means that certain Restructuring Support Agreement, dated as of July 15, 2019, by and among the Debtors and the Consenting Parties, including all exhibits and attachments thereto, and as amended, restated, and supplemented from time to time in accordance with its terms.

140.142. "*SEC*" means the Securities and Exchange Commission.

141.143. "*Second Lien Term Loan Agent*" means Cortland Capital Market Services LLC, and its predecessors thereto prior to the Petition Date, each in its capacity as administrative agent under the Second Lien Term Loan Facility.

142.144. "*Second Lien Term Loan Agreement*" means that certain Credit Agreement, dated as of October 28, 2015, (as amended, supplemented, or modified from time to time) among certain of the Debtors as borrowers or guarantors and the Second Lien Term Loan Lenders.

143.145. "*Second Lien Term Loan Claim*" means all Claims against any Debtor arising under, derived from, or based upon the Second Lien Term Loan Agreement.

144.146. "*Second Lien Term Loan Facility*" means that certain prepetition second lien secured term loan credit facility provided for under the Second Lien Term Loan Agreement in the original aggregate principal amount of up to $229,238,375.55 between certain of the Debtors as obligors or guarantors and the Second Lien Term Loan Lenders.

145.147. "*Second Lien Term Loan Lenders*" means, collectively, the banks, financial institutions, and other lenders party to the Second Lien Term Loan Agreement from time to time, each solely in their capacity as such.

146.148. "*Section 510(b) Claim*" means any Claim arising from: (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

147.149. "*Secured Claim*" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

148.150. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

149.151. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

150.152. "*Shareholders Agreement*" means that certain shareholders agreement that will govern certain matters related to the governance of Reorganized Blackhawk and the New Common Stock, which shall be included in the Plan Supplement.

151.153. "*Solicitation Agent*" means Prime Clerk, LLC, the notice, claims, and solicitation agent retained by the Debtors for the Chapter 11 Cases.

152.154. "*Solus*" means Solus Alternative Asset Management LP, a New York limited partnership.

153.155. "*Term Loan Agents*" means the First Lien Term Loan Agent and the Second Lien Term Loan Agent.

154.156. "*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article VIII.E of the Plan.

155.157. "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

156.158. "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

157.159. "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

158.160. "*Vendor Agreements*" means, collectively, the promissory notes and similar agreements entered into by Blackhawk with certain of the Debtors' vendors, setting forth the terms of the repayment for certain General Unsecured Claims that otherwise arose prior to the Petition Date.

B.      *Rules of Interpretation*

For purposes of the Plan, except as otherwise provided in this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in the Plan to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (3) unless otherwise specified, all references in the Plan to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (4) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (5) any effectuating provisions may be interpreted by the Debtors (subject to the terms of the RSA) or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (11) references to

12

"shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the terms "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (13) except as otherwise provided in the Plan, any reference to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.      *Computation of Time*

Unless otherwise specifically stated in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between the Plan, the RSA, and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control.  In the event of any inconsistency between the Plan Supplement and the Confirmation Order, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

A.      *DIP Claims*

1.      DIP ABL Claims

All DIP ABL Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP ABL Facility on such date, (ii) all interest accrued and unpaid thereon to the date of payment, (iii) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP ABL Agreement and the DIP Order, and (iv) all other DIP ABL Obligations as defined in the DIP ABL

13

Agreement other than Contingent DIP ABL Obligations. Except to the extent that a Holder of an Allowed DIP ABL Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP ABL Claim, each such Allowed DIP ABL Claim shall receive on the Effective Date either: (i) payment in full in Cash of such Holder's Allowed DIP ABL Claim or (ii) at such Holder's election and agreement by the Debtors, such Holder's Pro Rata share of the Exit ABL Facility. All reasonable and documented unpaid fees and expenses of the DIP ABL Agent, including reasonable and documented fees, expenses, and costs of its advisors, shall be paid in Cash on the Effective Date. Contemporaneously with the foregoing receipt of payment in full in Cash or satisfaction through a Pro Rata share of the Exit ABL Facility of the Allowed DIP ABL Claims, except with respect to contingent obligations under the DIP ABL Agreement (which contingent obligations shall survive the Effective Date and shall continue to be governed by the DIP ABL Agreement as provided below), the DIP ABL Facility, the DIP ABL Agreement, and all related loan documents, shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP ABL Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP ABL Agent or the DIP ABL Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP ABL Claims shall be automatically discharged and released, in each case without further action by the DIP ABL Agent or the DIP ABL Lenders. The DIP ABL Agent and the DIP ABL Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

2.    DIP Term Claims

All DIP Term Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Term Facility on such date, (ii) all interest accrued and unpaid thereon to the date of payment, (iii) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP Term Agreement and the DIP Order, and (iv) all other Obligations as defined in the DIP Term Agreement other than Contingent DIP Term Obligations. Except to the extent that a Holder of an Allowed DIP Term Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Term Claim, each such Allowed DIP Term Claim shall receive on the Effective Date such Holder's Pro Rata share of $150,000,000 of the New First Lien Loan. All reasonable and documented unpaid fees and expenses of the DIP Term Agent, including reasonable and documented fees, expenses, and costs of its advisors, shall be paid in Cash on the Effective Date. Contemporaneously with the foregoing satisfaction, except with respect to contingent obligations under the DIP Term Agreement (which contingent obligations shall survive the Effective Date and shall continue to be governed by the DIP Term Agreement as provided below), the DIP Term Facility, the DIP Term Agreement, and all related loan documents shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Term Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Term Agent or the DIP Term Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Term Claims shall be automatically discharged and released, in each case without further action by the DIP Term Agent or the DIP Term Lenders. The DIP Term Agent and the DIP Term Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

B.    *Administrative Claims*

Unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors (with the reasonable consent of the Required Consenting Parties), or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such

Allowed Administrative Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

**C.**    *Professional Fee Claims*

1.    Professional Fee Escrow Account

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Reorganized Debtors, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

2.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Reorganized Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

3.    Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.    Post-Confirmation Date Fees and Expenses.

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court,

pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten business days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors or the Reorganized Debtors, as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

D.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests*

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |

16

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 7 | Non-Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 10A | Class A Blackhawk Interests | Impaired | Entitled to Vote |
| 10B | Class B Blackhawk Interests | Impaired | Entitled to Vote |
| 10C | Class C Blackhawk Interests | Impaired | Entitled to Vote |

B.    *Treatment of Classes of Claims and Interests*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

1.    Class 1 — Other Secured Claims

(a)    *Classification*: Class 1 consists of any Other Secured Claims.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

(i)    payment in full in Cash;

(ii)    delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

(iii)    Reinstatement of such Allowed Other Secured Claim; or

(iv)    such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*: Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 — Other Priority Claims

(a)    *Classification*: Class 2 consists of any Other Priority Claims.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

(i)    payment in full in Cash; or

KE 60280927

(ii)    such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 — First Lien Term Loan Claims

(a)    *Classification*: Class 3 consists of any First Lien Term Loan Claims against any Debtor.

(b)    *Allowance:* On the Effective Date, First Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $538,974,437, plus any accrued but unpaid interest, fees, and other expenses arising under or in connection with the First Lien Term Loan Agreement.

(c)    *Treatment*: Except to the extent that a Holder of an Allowed First Lien Term Loan Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each First Lien Term Loan Claim, each Holder of an Allowed First Lien Term Loan Claim shall receive its Pro Rata share of:

(i)    $225,000,000 of the New First Lien Loan; and

(ii)    71% of the New Common Stock in Reorganized Blackhawk.

(d)    *Voting*: Class 3 is Impaired under the Plan. Holders of Allowed First Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

4.    Class 4 — Second Lien Term Loan Claims

(a)    *Classification*: Class 4 consists of any Second Lien Term Loan Claims against any Debtor.

(b)    *Allowance:* On the Effective Date, Second Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $318,307,228, plus any accrued but unpaid interest, fees, and other expenses arising under or in connection with the Second Lien Term Loan Agreement.

(c)    *Treatment*: Except to the extent that a Holder of an Allowed Second Lien Term Loan Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Second Lien Term Loan Claim, each Holder of an Allowed Second Lien Term Loan Claim shall receive its Pro Rata share of 29% of the New Common Stock in Reorganized Blackhawk.

(d)    *Voting*: Class 4 is Impaired under the Plan. Holders of Allowed Second Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

(e)    Distributions to each Holder of an Allowed Second Lien Term Loan Claim shall be subject to the terms of the Second Lien Term Loan Agreement and the rights of the Second Lien Term Loan Agent as set forth thereunder and in Article IV.K hereof.

5.    Class 5 — General Unsecured Claims

(a)    *Classification*: Class 5 consists of any General Unsecured Claims against any Debtor.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed Claim (including pursuant to a Vendor Agreement or the Patriot Trust RSA), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Claim, each Holder of an Allowed General Unsecured Claim shall receive either:

(i)    payment in Cash in an amount equal to such Allowed General Unsecured Claim in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim; or

(ii)    payment in Cash, including interest, if applicable, as required by contract or applicable law, in an amount equal to such Allowed General Unsecured Claim, upon the later of (A) the Effective Date, (B) the date on which such General Unsecured Claim becomes an Allowed Claim, or (C) such other date as may be ordered by the Bankruptcy Court.  Notwithstanding anything in the foregoing to the contrary, the Allowed Claim of the Patriot Trust shall be paid pursuant to the terms of the Patriot Trust RSA.

(c)    *Voting*:  Class 5 is Unimpaired under the Plan.  Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

6.    Class 6 — Debtor Intercompany Claims

(a)    *Classification*:  Class 6 consists of any Debtor Intercompany Claims.

(b)    *Treatment*:  Except to the extent otherwise provided in the Restructuring Steps Memorandum, each Allowed Debtor Intercompany Claim shall, at the option of the applicable Debtors, either on or after the Effective Date, be:

(i)    Reinstated;

(ii)    converted to equity; or

(iii)    extinguished, compromised, addressed, cancelled, or settled, without any distribution on account of such Claims.

(c)    *Voting*:  Holders of Allowed Debtor Intercompany Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Debtor Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.    Class 7 — Non-Debtor Intercompany Claims

(a)    *Classification*:  Class 7 consists of any Non-Debtor Intercompany Claims.

(b)    *Treatment*:  Except to the extent otherwise provided in the Restructuring Steps Memorandum, each Allowed Non-Debtor Intercompany Claim shall, at the option of the applicable Debtors, be:

(i)    Reinstated;

(ii)    converted to equity; or

19

(iii) extinguished, compromised, addressed, cancelled, or settled, without any distribution on account of such Claims.

(c) *Voting*: Holders of Allowed Non-Debtor Intercompany Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Allowed Non-Debtor Intercompany Claims are not entitled to vote to accept or reject the Plan.

8. Class 8 — Section 510(b) Claims

(a) *Classification*: Class 8 consists of any Section 510(b) Claims.

(b) *Allowance*: Notwithstanding anything to the contrary in the Plan, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court. The Debtors are not aware of any asserted Class 8 Claim and believe that no Section 510(b) Claims exist.

(c) *Treatment*: Allowed Section 510(b) Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and Holders of Allowed Section 510(b) Claims shall not receive any distribution on account of such Allowed Section 510(b) Claims.

(d) *Voting*: Class 8 is Impaired. Holders, if any, of Allowed Section 510(b) Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Holders, if any, of Allowed Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

9. Class 9 — Intercompany Interests

(a) *Classification*: Class 9 consists of all Interests in the Debtors other than Blackhawk.

(b) *Treatment*: On the Effective Date, Intercompany Interests shall be, at the option of the Debtors, either:

(i) Reinstated in exchange for the Debtors' and the Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims; or

(ii) discharged, cancelled, released, and extinguished and of no further force or effect without any distribution on account of such Interests.

For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor unless otherwise provided in the Restructuring Steps Memorandum.

(c) *Voting*: Holders of Intercompany Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

10. Class 10A — Class A Blackhawk Interests

(a) *Classification*: Class 10A consists of all Class A Blackhawk Interests.

(b) *Treatment*: On the Effective Date, all Class A Blackhawk Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further

20

force or effect, and Holders of Class A Blackhawk Interests will not receive any distribution on account of such Interests. Holders of Class A Blackhawk Interests that vote to accept the Plan shall be a "Released Party" for purposes of the Debtor Release and the Third-Party Release.

(c)  *Voting*: Class 10A is Impaired under the Plan. Holders of Class A Blackhawk Interests are entitled to vote to accept or reject the Plan.

11.  Class 10B — Class B Blackhawk Interests

(a)  *Classification*: Class 10B consists of all Class B Blackhawk Interests.

(b)  *Treatment*: On the Effective Date, all Class B Blackhawk Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and Holders of Class B Blackhawk Interests will not receive any distribution on account of such Interests. Holders of Class B Blackhawk Interests that vote to accept the Plan shall be a "Released Party" for purposes of the Debtor Release and the Third-Party Release.

(c)  *Voting*: Class 10B is Impaired under the Plan. Holders of Class B Blackhawk Interests are entitled to vote to accept or reject the Plan.

12.  Class 10C — Class C Blackhawk Interests

(a)  *Classification*: Class 10C consists of all Class C Blackhawk Interests.

(b)  *Treatment*: On the Effective Date, all Class C Blackhawk Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and Holders of Class C Blackhawk Interests will not receive any distribution on account of such Interests. Holders of Class C Blackhawk Interests that vote to accept the Plan shall be a "Released Party" for purposes of the Debtor Release and the Third-Party Release.

(c)  *Voting*: Class 10C is Impaired under the Plan. Holders of Class C Blackhawk Interests are entitled to vote to accept or reject the Plan.

C.  *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.  *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.  *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

F.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

G.      *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests, but for the purposes of administrative convenience and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to provide management services to certain other Debtors and Reorganized Debtors, to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors and Reorganized Debtors to the holders of certain Allowed Claims.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

H.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor; *provided* that this Article III.I shall not limit the respective rights of each party to the RSA or the DIP ABL Agent and DIP ABL Lenders under the DIP ABL Agreement.

### ARTICLE IV.
### MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests*

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including with respect to issues related to the value of the Debtors' unencumbered property.

B.      *Restructuring Transactions*

On and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions set forth in the Restructuring Steps Memorandum and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan and the RSA, which transactions may include, as applicable:

(a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (a), pursuant to applicable state law; (d) the execution and delivery of the Shareholders Agreement and the New Organizational Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor; (e) the execution and delivery of the New First Lien Loan Documents and Exit ABL Facility Documents (in both cases, including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (f) the execution and delivery of the New Organizational Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable), and the issuance, distribution, reservation, or dilution, as applicable, of the New Common Stock, as set forth herein; (g) the adoption of the Management Incentive Plan and the issuance and reservation of the Management Incentive Plan Equity to the participants in the Management Incentive Plan on the terms and conditions set by the Reorganized Blackhawk Board after the Effective Date; (h) all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Blackhawk, which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (i) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

C.    *Sources of Consideration for Plan Distributions*

The Debtors shall fund distributions under the Plan, as applicable, with: (1) the New First Lien Loan; (2) the New Common Stock; (3) the Exit ABL Facility; and (4) the Debtors' encumbered Cash on hand. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain securities in connection with the Plan, including the New First Lien Loan and the New Common Stock, will be exempt from SEC registration, as described more fully in Article IV.G below.

1.    Issuance and Distribution of the New First Lien Loan

On the Effective Date, the Reorganized Debtors shall (a) execute and deliver the New First Lien Loan Documents and such documents shall become effective in accordance with their terms, and (b) issue (i) $225,000,000 of the New First Lien Loan to the Holders of the First Lien Term Loan Claims on the terms and conditions set forth in the New First Lien Loan Documents and (ii) $150,000,000 of the New First Lien Loan to the Holders of the DIP Term Claims on the terms and conditions set forth in the New First Lien Loan Documents, to collectively total $375,000,000. On and after the Effective Date, the New First Lien Loan Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms. The terms and conditions of the New First Lien Loan Documents shall bind Reorganized Blackhawk and each other Entity that enters into such New First Lien Loan Documents as a guarantor. Any Entity's entry into the New First Lien Loan Agreement shall be deemed as its agreement to the terms of such New First Lien Loan Documents, as amended or modified from time to time following the Effective Date in accordance with its terms.

Confirmation shall be deemed approval of the New First Lien Loan Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees and expenses paid in connection therewith), and, to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to obtain the New First Lien Loan, including the New First Lien Loan Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent,

23

authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate the New First Lien Loan.

On the Effective Date, immediately upon receipt of the payments required in Article II.A hereof, all of the claims, liens, and security interests to be granted in accordance with the terms of the New First Lien Loan Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New First Lien Loan Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such other liens and security interests as may be permitted under the New First Lien Loan Documents, and (c) subject to contractual subordination pursuant to the intercreditor agreement between the Exit ABL Agent and the New First Lien Loan Agent, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

2.      Exit ABL Facility

On the Effective Date, the Reorganized Debtors shall execute and deliver the Exit ABL Facility Documents and such documents shall become effective in accordance with their terms.  The Exit ABL Facility shall be a $90 million secured revolving credit facility.  If the ABL Discharge (as defined in the DIP Order) has not occurred prior to the Effective Date, the Reorganized Debtors shall provide for the indefeasible payment of the Prepetition ABL Debt (as defined in the DIP Order) outstanding as of the Effective Date in full in Cash, including interest and fees through the date of repayment (at the non-default contract rate), on or as soon as practicable after the Effective Date, with the proceeds of the Exit ABL Facility or otherwise.

On and after the Effective Date, the Exit ABL Facility Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.  The terms and conditions of the Exit ABL Facility Agreement shall bind Reorganized Blackhawk and each other Entity that enters into such Exit ABL Facility Agreement as a guarantor.  Any Entity's entry into the Exit ABL Facility Agreement shall be deemed as its agreement to the terms of such Exit ABL Facility Agreement, as amended or modified from time to time following the Effective Date in accordance with its terms.

Confirmation shall be deemed approval of the Exit ABL Facility Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and, to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors will be authorized to execute and deliver those documents necessary or appropriate to obtain the Exit ABL Facility, including the Exit ABL Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate the Exit ABL Facility.

On the Effective Date, immediately upon receipt of the payments required in Article II.A hereof, all of the claims, liens, and security interests to be granted in accordance with the terms of the Exit ABL Facility Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit ABL Facility Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit ABL Facility Documents, and (c) subject to contractual subordination pursuant to the intercreditor agreement between the Exit ABL Agent and the New First Lien Loan Agent, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

3.      Issuance and Distribution of the New Common Stock

On the Effective Date, the New Common Stock shall be issued and distributed to the Entities entitled to receive the New Common Stock pursuant to the Plan in accordance with the Restructuring Steps Memorandum.  The

issuance of New Common Stock shall be authorized without the need for any further corporate action and without any action by the Holders of Claims or other parties in interest. All of the New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution, issuance, and/or dilution, as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution, issuance, and/or dilution, as applicable, including the Shareholders Agreement and the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution of the New Common Stock. Any Entity's acceptance of New Common Stock shall be deemed as its agreement to the New Organizational Documents and the Shareholders Agreement, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The New Common Stock will not be registered on any exchange as of the Effective Date and shall not meet the eligibility requirements of the Depository Trust Company.

4.      Cash on Hand

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand to fund distributions to certain Holders of Claims, including the payment of Allowed General Unsecured Claims as set forth in Article III of the Plan.

D.      *Shareholders Agreement*

On the Effective Date, Reorganized Blackhawk shall enter into and deliver the Shareholders Agreement, in substantially the form included in the Plan Supplement, to each Holder of New Common Stock, and such parties shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Blackhawk.

E.      *Potter Settlement*

On the Effective Date, the Debtors shall assume the Potter Consulting Services Agreement, and John Mitchell Potter and the Reorganized Debtors shall perform thereunder pursuant to the terms and conditions of the Potter Consulting Services Agreement. On and after the Effective Date, the Potter Group Entities that are party to the Potter Group Vendor Contracts agree to continue to satisfy their obligations under the Potter Group Vendor Contracts, as amended on the terms described in the RSA. In exchange for performing under the Potter Consulting Services Agreement and the modifications to the Potter Group Vendor Contracts set forth in the RSA, John Mitchell Potter shall receive (a) $500,000 in Cash on the Effective Date, and (b) reimbursement for his reasonable attorney's fees incurred in connection with the negotiation and execution of the Potter Consulting Services Agreement up to a maximum of $60,000.

F.      *Vendor Agreements*

On the Effective Date, the Debtors shall assume the Vendor Agreements, and the applicable vendors and the Reorganized Debtors shall perform thereunder pursuant to the terms and conditions of the applicable Vendor Agreement.

G.      *Exemption from Registration Requirements*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Stock pursuant to the Plan is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The shares of New Common Stock to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) subject to the terms of the Shareholders Agreement, are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

H.      *Corporate Existence*

Except as otherwise provided in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

I.      *Corporate Action*

On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the agreements with existing management; (2) selection of the directors, managers, and officers for the Reorganized Debtors; (3) implementation of the Restructuring Transactions; (4) the applicable Reorganized Debtors' entry into the Exit ABL Facility Documents and New First Lien Loan Documents; and (5) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit ABL Facility Documents, the New First Lien Loan Documents and the Shareholders Agreement, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy law.

J.      *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the Exit ABL Facility Documents and the New First Lien Loan Documents and the Liens securing obligations on account of Other Secured Claims that are Reinstated pursuant to the Plan, if any). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

K.      *Cancellation of Notes, Instruments, Certificates, and Other Documents*

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims shall be cancelled, and the obligations of the Debtors or the Reorganized Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged and deemed satisfied in full, and the Term Loan Agents shall be released from all duties thereunder; *provided, however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of (1) allowing Holders of Allowed Claims to receive distributions under the Plan, (2) allowing and preserving the rights of the Term Loan Agents and DIP Agents to make distributions pursuant to the Plan, (3) preserving the Term Loan Agents', the Prepetition ABL Agent's, and the DIP Agents' rights to compensation and indemnification as against any money or property distributable to the Prepetition ABL Lenders, Holders of First Lien Term Loan Claims, Second Lien Term Loan Claims, DIP ABL Claims, and DIP Term Claims, including permitting the Term Loan Agents and DIP Agents

26

to maintain, enforce, and exercise its charging liens against such distributions, (4) preserving all rights, including rights of enforcement, of the Term Loan Agents, the Prepetition ABL Agent, and DIP Agents against any person other than a Released Party (including the Debtors), including with respect to indemnification or contribution from the Prepetition ABL Lenders, Holders of the First Lien Term Loan Claims, Second Lien Term Loan Claims, DIP ABL Claims, and DIP Term Claims pursuant and subject to the terms of the Prepetition ABL Credit Agreement, the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement, the DIP ABL Agreement, and the DIP Term Agreement as in effect on the Effective Date, (5) permitting the Term Loan Agents, the Prepetition ABL Agent, and DIP Agents to enforce any obligation (if any) owed to the Term Loan Agents, the Prepetition ABL Agent, or DIP Agents under the Plan, (6) permitting the Prepetition ABL Agent, the Term Loan Agents, and the DIP Agents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, (7) permitting the DIP Agents, the DIP ABL Lenders, the DIP Term Lenders, the Prepetition ABL Agent, the Prepetition ABL Lenders, the First Lien Term Loan Agent, the First Lien Term Loan Lenders, the Second Lien Term Loan Agent, and the Second Lien Term Loan Lenders to assert any rights with respect to the Contingent DIP Term Obligations, the Contingent DIP ABL Obligations, the Contingent Prepetition ABL Obligations, the Contingent First Lien Term Loan Obligations or the Contingent Second Lien Term Loan Obligations, as applicable, and (8) permitting the Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, *however*, that (a) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan and (b) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan.  The Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents shall be discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents and their representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents shall be relieved of and released from any obligations and duties arising thereunder.  The fees, expenses, and costs of the Term Loan Agents, the Prepetition ABL Agent, and the DIP Agents, including fees, expenses, and costs of its professionals incurred after the Effective Date in connection with the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement, the Prepetition ABL Agreement, the DIP Term Agreement, and the DIP ABL Agreement, as applicable, and reasonable and documented costs and expenses associated with effectuating distributions pursuant to the Plan will be paid by the Reorganized Debtors in the ordinary course.

L.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the RSA, the Exit ABL Facility Documents, the New First Lien Loan Documents, the New Organizational Documents, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

M.    *Exemptions from Certain Taxes and Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors, including the Exit ABL Facility, the New First Lien Loan, and the New Common Stock; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; (e) the grant of collateral as security for any or all of the Exit ABL Facility and the New First Lien Loan; or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code

27

filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### N.    New Organizational Documents

The New Organizational Documents shall, among other things:  (1) contain the terms and minority protections consistent with the RSA; (2) authorize the issuance, distribution, and reservation of the New Common Stock to the Entities entitled to receive such Interests under the Plan; and (3) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, prohibit the issuance of non-voting equity Securities.

On or immediately before the Effective Date, Blackhawk or Reorganized Blackhawk, as applicable, will file its New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in its state of incorporation or formation in accordance with the applicable laws of their respective state of incorporation or formation, to the extent required for such New Organizational Documents to become effective.  After the Effective Date, Reorganized Blackhawk may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of such documents.

### O.    Directors and Officers

On the Effective Date, the Reorganized Blackhawk Board shall consist of five persons and will include: (1) the CEO Director; (2) one director selected by Knighthead; (3) one director selected by Solus; (4) one independent director selected by Knighthead and Solus, subject to the consent, not to be unreasonably withheld, of the majority of a three-member committee consisting of members of the Ad Hoc Group of First Lien Lenders, which three-member committee shall be selected by members of the Ad Hoc Group of First Lien Lenders holding at least 50.01% of the First Lien Term Loan Claims held by such group; and (5) one independent director acceptable to a group consisting of each Holder (other than Knighthead and Solus) that will be entitled to receive under the Plan at least 10% of the New Common Stock issued on the Effective Date, with the consent of Knighthead and Solus (such consent not to be unreasonably withheld), as set forth in the RSA.  On the Effective Date, the terms of the current members of the Blackhawk board of directors shall expire, and the Reorganized Blackhawk Board will include those directors set forth in the list of directors of the Reorganized Debtors included in the Plan Supplement; *provided* that, as set forth in the RSA, prior to the selection of a Chief Executive Officer of Reorganized Blackhawk by the Reorganized Blackhawk Board to replace John Mitchell Potter, the seat of the CEO Director shall be filled by a member of the executive team selected by a majority of the remaining members of the Reorganized Blackhawk Board until a new individual becomes the Chief Executive Officer of Reorganized Blackhawk.

On the Effective Date, the officers and overall management structure of Reorganized Blackhawk, and all officers and management decisions with respect to Reorganized Blackhawk (and/or any of its direct or indirect subsidiaries), compensation arrangements, and affiliate transactions shall only be subject to the approval of the Reorganized Blackhawk Board.

From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, including the Shareholders Agreement and the New Organizational Documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.  To the extent that any such director or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors will disclose the nature of any compensation to be paid to such director or officer.

KE 60280927

*P.*     *Management Incentive Plan*

On or after the Effective Date, the Reorganized Debtors shall adopt and implement the Management Incentive Plan, which shall be funded with the Management Incentive Plan Equity. The Reorganized Blackhawk Board shall be authorized to institute such Management Incentive Plan, enact and enter into related policies and agreements, and distribute the Management Incentive Plan Equity to participants based on the terms and conditions determined by the Reorganized Blackhawk Board. For the avoidance of doubt, the terms and conditions of the Management Incentive Plan (including any related agreements, policies, programs, other arrangements, and the Management Incentive Plan participants) shall be determined solely by the Reorganized Blackhawk Board after the Effective Date.

*Q.*     *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date. For the avoidance of doubt, the retained Causes of Action shall not include any Causes of Action: (1) of any kind or nature with respect to the Patriot Trust, its trustee or the Patriot Trust Debtor Affiliates, or (2) expressly contemplated to be released under the RSA or the Potter Consulting Services Agreement, so long as the parties to such agreements do not opt out of the releases contained in Article VIII of the Plan.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.** Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.*     *Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, and regardless of whether such Executory Contract or Unexpired Lease is identified on the Assumed Executory Contract and Unexpired Lease List, unless such Executory Contract and Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumption and assignment, or rejections, as applicable, of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Lease List, and the Rejected Executory Contract and Unexpired Leases List, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed

pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Notwithstanding anything to the contrary in the Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List and the Assumed Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Solicitation Agent and served on the Reorganized Debtors no later than thirty days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.G of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.      *Cure of Defaults and Objections to Cure and Assumption*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Within seven calendar days before the Confirmation Objection Deadline, the Debtors shall provide notices of proposed cure amounts to counterparties to Executory Contracts and Unexpired Leases, which shall include a description of the procedures for objecting to assumption thereof based on the proposed cure amounts or the Reorganized Debtors' ability to provide "adequate assurance of future performance thereunder" (within the meaning of section 365 of the Bankruptcy Code).  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served, and actually received by the counsel to the Debtors, counsel to the Consenting Term Lenders, counsel to the DIP ABL Agent, the Solicitation Agent, and the U.S. Trustee no later than 5:00 p.m., prevailing Eastern Time, on ~~the date that is twenty-one calendar days after the Debtors cause such notices to be mailed to the counterparties to such Executory Contracts and Unexpired Leases.~~August 20, 2019.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

In the event of a dispute regarding: (1) the amount of any payments to cure such a default; (2) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following either (a) the entry of a Final Order or orders resolving the dispute and approving the assumption or (b) the settlement of the dispute between the parties which may be entered into without further order of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. For the avoidance of doubt, assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not override or otherwise release any indemnification obligations in such Executory Contract or Unexpired Lease. **Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

D.      *Insurance Policies and Surety Bonds*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and, as well as any agreements, documents, and instruments relating to such insurance policies or coverage of all insured Claims. Except as set forth in Article V.F of the Plan, nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third party administrators shall not need to or be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

The automatic stay pursuant to section 362(a) of the Bankruptcy Code and the permanent injunction set forth in Article VIII.G, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (1) claimants with valid direct action claims under applicable non-bankruptcy law to proceed with their claims; (2) any insurer of the Debtors to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (i) all claims (x) where a claimant asserts a direct claim against any insurer of the Debtors under applicable law or (y) that are subject to an order of the Bankruptcy Court granting the applicable claimant relief from the automatic stay or the injunction set forth in Article VIII.G to proceed with such claim and (ii) all costs in relation to the foregoing; and (3) subject to the terms of the Debtors' agreement with any insurer of the Debtors and/or applicable non-bankruptcy law, any insurer of the Debtors to (i) cancel any policies under the Debtors' agreement with such insurer, and (ii) take other actions relating thereto.

On the Effective Date, (1) all of the Debtors' obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Reorganized Debtors, (2) surety bonds and related indemnification and collateral agreements entered into by any Debtor will be vested and performed by the applicable Reorganized Debtor and will survive and remain unaffected by entry of the Confirmation Order, and (3) the Reorganized Debtors shall be authorized to enter into new surety bond agreements and related indemnification and collateral agreements, or to modify any such existing agreements, in the ordinary course of business, and (4) all liens and security interests, if any, granted pursuant to or in connection with the Debtors' surety bond program shall remain valid, binding, perfected, enforceable liens and security interests with the priorities established in respect thereof under applicable non-bankruptcy law, and shall remain unaffected by the Plan and the Confirmation Order. The applicable Reorganized Debtors will continue to pay all premiums and other amounts due, including loss adjustment expenses, on the existing surety bonds as they become due prior to the execution and issuance of new surety bonds. Surety bond providers shall have the discretion to replace (or issue name-change riders with respect to) any existing surety bonds or related general agreements of indemnity

31

with new surety bonds and related general agreements of indemnity on the same terms and conditions provided in the applicable existing surety bonds or related general agreements of indemnity.  For the avoidance of doubt, nothing in this Plan shall affect in any way any surety's rights against any non-debtor, or any non-debtor's rights against a surety, including under the Debtors' surety bonds and the Debtors' obligations arising therefrom.

E.    **Indemnification Provisions**

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' governance documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, and agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.  None of the Reorganized Debtors will amend and/or restate their respective governance documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

On and as of the Effective Date, any of the Debtors' indemnification obligations with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by the Chapter 11 Cases.

F.    **Director, Officer, Manager, and Employee Liability Insurance**

On or before the Effective Date, the Debtors, on behalf of the Reorganized Debtors, shall be authorized to and shall purchase and maintain directors, officers, managers, and employee liability tail coverage for the six (6)-year period following the Effective Date for the benefit of the Debtors' current and former directors, managers, officers, and employees on terms no less favorable to such persons than their existing coverage under the D&O Liability Insurance Policies with available aggregate limits of liability upon the Effective Date of no less than the aggregate limit of liability under the existing D&O Liability Insurance Policies.

After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any such policies (including, if applicable, any "tail policy") with respect to conduct occurring as of the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full six-year term of such policy regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

On and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

G.    **Employee and Retiree Benefits**

Except as otherwise provided in the Plan, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the Reorganized Blackhawk Board under the Debtors' respective formation and constituent documents, the Reorganized Debtors shall:  (1) amend, adopt, assume, and/or honor in the ordinary course of business any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans, retention plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order; *provided* that the consummation of the transactions contemplated in the Plan shall not constitute a "change in control" with respect to any of the foregoing

32

arrangements.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

H.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

I.      *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have thirty calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

J.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

K.      *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such Claim becomes an Allowed Claim or Interest) each Holder of an Allowed Claim and Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class and in the manner provided in the Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article VII.  Except as otherwise provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

B.      *Distributions on Account of Obligations of Multiple Debtors*

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan; *provided* that Claims held by a single Entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor.  Any such Claims shall be released and discharged pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.  For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee fees until such time as a particular case is closed, dismissed, or converted.

C.      *Distribution Agent*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Distribution Agent on the Effective Date.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

D.      *Rights and Powers of Distribution Agent*

1.      Powers of the Distribution Agent

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

E.      *Delivery of Distributions*

1.      Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the Distribution Agent, as appropriate:  (a) to the signatory set forth on any Proof of Claim or Proof of Interest filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Interest is filed or if the Debtors have not been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim or Proof of Interest; or (c) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

The amount of any reasonable fees and out-of-pocket expenses incurred by the DIP Agents or Term Loan Agents on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense

34

reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the DIP Agents or Term Loan Agents in connection with effectuating distributions under the Plan shall be paid in Cash by the Reorganized Debtors.

2.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the later of (a) the Effective Date and (b) the date of the distribution.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged of and forever barred.

3.    No Fractional Distributions

No fractional notes or shares, as applicable, of the Exit ABL Facility, the New First Lien Loan, or the New Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an applicable Allowed Claim would otherwise result in the issuance of a number of notes or shares, as applicable, of the Exit ABL Facility, the New First Lien Loan, or the New Common Stock that is not a whole number, the actual distribution of notes or shares, as applicable, of the Exit ABL Facility, the New First Lien Loan, or the New Common Stock shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized notes and shares, as applicable, of the Exit ABL Facility, the New First Lien Loan, or New Common Stock shall be adjusted as necessary to account for the foregoing rounding.

F.    *Manner of Payment*

At the option of the Distribution Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

G.    *Compliance Matters*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

H.    *No Postpetition or Default Interest on Claims*

Unless otherwise specifically provided for in the Plan, the DIP Order, or the Confirmation Order, and notwithstanding any documents that govern the Debtors' prepetition indebtedness to the contrary, (1) postpetition and/or default interest shall not accrue or be paid on any Claims and (2) no Holder of a Claim shall be entitled to: (a) interest accruing on or after the Petition Date on any such Claim; or (b) interest at the contract default rate, as applicable.

I.      *Allocation Between Principal and Accrued Interest*

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Petition Date.

J.      *Setoffs and Recoupment*

Unless otherwise provided in the Plan or the Confirmation Order, each Debtor and each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against or recoup any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled as of the Effective Date (whether pursuant to the Plan or otherwise); *provided, however,* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off or recoup any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff or recoupment on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 of the Bankruptcy Code or otherwise.

K.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent that a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.      Claims Payable by Third Parties

The availability, if any, of insurance policy proceeds for the satisfaction of an Allowed Claim shall be determined by the terms of the insurance policies of the Debtors or Reorganized Debtors, as applicable. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Solicitation Agent without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

A.      *Disputed Claims Process*

Holders of Claims and Interests need not file a Proof of Claim or Proof of Interest, as applicable, with the Bankruptcy Court and shall be subject to the Bankruptcy Court process only to the extent provided in the Plan, except to the extent a Claim arises on account of rejection of an Executory Contract or Unexpired Lease in accordance with Article V.B hereof.  On and after the Effective Date, except as otherwise provided in the Plan, all Allowed Claims shall be paid pursuant to the Plan in the ordinary course of business of the Reorganized Debtors and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced.  Other than Claims arising from the rejection of an Executory Contract or Unexpired Lease, if the Debtors or the Reorganized Debtors dispute any Claim or Interest, such dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced, and all parties shall retain any and all rights, claims, causes of action, defenses, and remedies that such parties had immediately prior to or arising after the Petition Date.  Solely to the extent that an Entity is required to file a Proof of Claim and the Debtors or the Reorganized Debtors, as applicable, do not determine, and without the need for notice to or action, order, or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this Article VII of the Plan.  For the avoidance of doubt, there is no requirement to file a Proof of Claim or Proof of Interest (or move the Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan. Notwithstanding the foregoing, Entities must file cure objections as set forth in Article V.C hereof to the extent such Entity disputes the amount of the cure set forth in the Assumed Executory Contract and Unexpired Lease List**.  All Proofs of Claim required to be filed by the Plan that are filed after the date that they are required to be filed pursuant to the Plan shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority to:  (1) file, withdraw, or litigate to judgment, objections to Claims or Interests; (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.Q of the Plan.

C.      *Estimation of Claims and Interests*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *No Distributions Pending Allowance*

Notwithstanding any other provision hereof, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

F.      *Distributions After Allowance*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

G.      *No Interest*

Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.      *Discharge of Claims*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan  (including, with respect to the Contingent DIP ABL Obligations, the Contingent DIP Term Obligations, the Contingent Prepetition ABL Obligations, the Contingent First Lien Term Loan Obligations, and the Contingent Second Lien Term Loan Obligations, in each case which are not discharged hereunder), or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims or Non-Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any

interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan or voted to reject the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan (including, with respect to the Contingent DIP ABL Obligations, the Contingent DIP Term Obligations, the Contingent Prepetition ABL Obligations, the Contingent First Lien Term Loan Obligations, and the Contingent Second Lien Term Loan Obligations, in each case which are not discharged hereunder).

C.      *Release of Liens*

**Except (1) with respect to the Liens securing (a) the Exit ABL Facility, (b) the New First Lien Loan, and (c) Other Secured Claims that are Reinstated pursuant to the Plan, (d) obligations pursuant to Executory Contracts and Unexpired Leases assumed pursuant to the Plan, or (2) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, at the sole cost of and expense of the Reorganized Debtors, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.**

D.      *Debtor Release*

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition ABL Facility, the First Lien Term Loan, the Second Lien Term Loan, the DIP Order, the DIP Facilities, the Chapter 11 Cases, the Plan, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the RSA, the Disclosure Statement, the Exit ABL Facility, the New First Lien Loan, the Potter Settlement, the New Organizational Documents, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the Exit ABL Facility, the New First Lien Loan, the Potter Settlement, the New Organizational Documents, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other**

related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act, or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (2) any retained Causes of Action.

E.     *Third-Party Release*

Effective as of the Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Prepetition ABL Facility, the First Lien Term Loan, the Second Lien Term Loan, the DIP Order, the DIP Facilities, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the RSA, the Disclosure Statement, the Exit ABL Facility, the New First Lien Loan, the Potter Settlement, the New Organizational Documents, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Exit ABL Facility, the New First Lien Loan, the Potter Settlement, the New Organizational Documents, or the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (2) the Patriot Trust and Patriot Trust Debtor Affiliates from any claims filed in the Patriot Chapter 11 Cases, other than with respect to any claims filed by the Debtors or any Affiliates of the Debtors, (3) any claims or other rights, including rights of setoff, counterclaim, or recoupment, with respect to any claims filed in the Patriot Chapter 11 Cases (except to the extent expressly released pursuant to the Patriot Plan), and (4) any Cause of Action maintained by the Patriot Trust or the Patriot Trust Debtor Affiliates with respect to any Released Party or any other Entity (other than the Debtors or any Affiliates of the Debtors) that existed as of the date of substantial consummation of the Patriot Plan or that otherwise is based on or relating to, or in any manner arising from, in whole or in part, the Patriot Chapter 11 Cases or any dealings or transactions relating to or in any manner arising therefrom.

F.     *Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating

to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

G.    Injunction

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

H.    Protection Against Discriminatory Treatment

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.    Recoupment

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually

41

has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent, or (2) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

K.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

L.      *Document Retention*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.B of the Plan:

1.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance consistent with the approval rights set forth in the RSA and the DIP ABL Agreement;

2.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3.      the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been filed and shall be in form and substance consistent with the approval rights set forth in the RSA and the DIP ABL Agreement;

4.      the Exit ABL Facility Documents, shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements;

5.      the New First Lien Loan Documents, shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements;

6.     the New Organizational Documents and the Shareholders Agreement shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements;

7.     all Professional Fee Claims and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court; and

8.     all reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by all of the attorneys, advisors, and other professionals payable under the RSA or the DIP Order, shall have been paid in Cash.

**B.**    *Waiver of Conditions Precedent*

The Debtors, with the reasonable consent of the Required Consenting Term Lenders and the DIP ABL Agent, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

**C.**    *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

**D.**    *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (2) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.**    *Modification of Plan*

Subject to the limitations contained in the Plan and the RSA and the consent rights and limitations in the DIP ABL Agreement, the Debtors, with the reasonable consent of the Required Consenting Term Lenders, reserve the right to modify the Plan prior to Confirmation and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the consent rights and limitations in the DIP ABL Agreement (or the Exit ABL Agent with respect to provisions relating to the treatment, rights, or terms of the Exit ABL Facility), the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

**B.**    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

Without limiting the respective rights of each party to the RSA or the DIP ABL Agent and DIP ABL Lenders, the Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if the Confirmation Date or the Effective Date does not occur, then:  (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Interests (as applicable) are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

44

9.      adjudicate, decide, or resolve any and all matters related to the Restructuring Transactions;

10.      adjudicate, decide, or resolve any and all matters related to enforcement of the RSA;

11.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.      resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

13.      hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including:  (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI.K.1 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and, subject to any applicable forum selection clauses, contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

14.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17.      enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18.      enforce all orders previously entered by the Bankruptcy Court; and

19.      hear any other matter not inconsistent with the Bankruptcy Code;

*Provided, however*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court, and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

45

*B.*     *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the RSA.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

*C.*     *Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, will be paid by each of the applicable Reorganized Debtors for each quarter (including any fraction thereof) until the applicable Chapter 11 Case of such Reorganized Debtor is converted, dismissed, or closed, whichever occurs first.

*D.*     *Payment of Certain Fees and Expenses*

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, shall pay on the Effective Date all then-outstanding reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by all of the attorneys, advisors, and other professionals payable under the RSA or the DIP Order.  Any such costs and expenses that are attorneys' fees and expenses shall be submitted to the Debtors or the Reorganized Debtors in the form of summary invoices of the relevant law firms.  The Debtors and, after the Effective Date, the Reorganized Debtors, shall continue to pay, reimburse and honor Contingent DIP ABL Obligations, Contingent DIP Term Obligations, Contingent Prepetition ABL Obligations, Contingent First Lien Term Loan Obligations, and Contingent Second Lien Term Loan Obligations.  In addition, the Reorganized Debtors shall continue to pay when due and payable in the ordinary course, reasonable and documented fees and expenses of the Ad Hoc Crossholder Lender Group Advisors (as defined in the RSA) and the Ad Hoc First Lien Lender Group Advisors (as defined in the RSA) related to implementation, consummation, or defense of the Plan.  Counsel to the DIP Agents, the Term Loan Agents, the First Lien Term Loan Lenders, and Second Lien Term Loan Lenders shall be authorized to disburse any and all retainer monies in its possession to reimburse the reasonable fees and expenses of such counsel.

*E.*     *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

*F.*     *Certain Governmental Matters.*

Nothing in this Plan, the Plan Supplement, or the Confirmation Order shall discharge or release the Debtors, the Reorganized Debtors, or any non-debtor from any right, claim, liability, or Cause of Action of the United States or any State, or impair the ability of the United States or any State to pursue any claim, liability, right, defense, or Cause of Action against any Debtor, Reorganized Debtor, or non-debtor.  Contracts, purchase orders, agreements, leases, covenants, guaranties, indemnifications, operating rights agreements, or other interests of or with the United States or any State shall be, subject to any applicable legal or equitable rights or defenses of the Debtors or the Reorganized Debtors under applicable non-bankruptcy law, paid, treated, determined, and administered in the ordinary course of business as if the Chapter 11 Cases were never filed and the Debtors and the Reorganized Debtors shall comply with all applicable non-bankruptcy law.  All claims, liabilities, rights, Causes of Action, or defenses of or to the United States or any State shall survive the Chapter 11 Cases as if they had not been commenced and be determined in the ordinary course of business, including in the manner and by the administrative or judicial tribunals in which

46

such rights, defenses, claims, liabilities, or Causes of Action would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced; *provided* that nothing in the Plan or the Confirmation Order shall alter any legal or equitable rights or defenses of the Debtors or the Reorganized Debtors under non-bankruptcy law with respect to any such claim, liability, or Cause of Action.  Without limiting the foregoing, for the avoidance of doubt, nothing shall: (1) require the United States or any State to file any proofs of claim or administrative expense claims in the Chapter 11 Cases for any right, claim, liability, defense, or Cause of Action; (2) affect or impair the exercise of the United States' or any State's police and regulatory powers against the Debtors, the Reorganized Debtors, or any non-debtor; (3) be interpreted to set cure amounts or to require the United States or any State to novate or otherwise consent to the transfer of any federal or state contracts, purchase orders, agreements, leases, covenants, guaranties, indemnifications, operating rights agreements, or other interests; (4) affect or impair the United States' or any State's rights and defenses of setoff and recoupment, or ability to assert setoff or recoupment against the Debtors or the Reorganized Debtors and such rights and defenses are expressly preserved; (5) constitute an approval or consent by the United States or any State without compliance with all applicable legal requirements and approvals under non-bankruptcy law; or (6) relieve any party from compliance with all licenses and permits issued by Governmental Units in accordance with non-bankruptcy law.

Additionally, also for the avoidance of doubt, notwithstanding any other provision in the Plan, the Plan Supplement, or the Confirmation Order, nothing relieves the Debtors or the Reorganized Debtors from their obligations to comply with the Communications Act of 1934, as amended, and the rules, regulations, and orders promulgated thereunder by the FCC.  No transfer of any FCC license or authorization held by the Debtors or transfer of control of the Debtors or transfer of control of an FCC licensee controlled by the Debtors shall take place prior to the issuance of FCC regulatory approval for such transfer pursuant to applicable FCC regulations.  The FCC's rights and powers to take any action pursuant to its regulatory authority including imposing any regulatory conditions on any of the above described transfers, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority.  In addition, nothing herein relieves the Debtors or the Reorganized Debtors from their obligations to comply with the Atomic Energy Act of 1954, as amended, and the rules, regulations, and orders promulgated thereunder by the NRC.  No transfer of any NRC licenses held by the Debtors or transfer of control of the Debtors or transfer of control of an NRC licensee controlled by the Debtors shall take place prior to the issuance of NRC regulatory approval for such transfer pursuant to applicable NRC regulations.  The NRC's rights and powers to take any action pursuant to its regulatory authority, including imposing any regulatory conditions on any of the above described transfers, are fully preserved, and nothing herein shall proscribe or constrain the NRC's exercise of such power or authority.

*F.*G.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

*G.*H.    *Service of Documents*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Debtors:**

Blackhawk Mining LLC
3228 Summit Square Place, Suite 180,
Lexington, Kentucky 40509
Attention:  Jesse Parrish
E-mail:  jparrish@blackhawkmining.com

With copies to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Facsimile:  (312) 862-2200
Attention:  Ross M. Kwasteniet, P.C. and Joseph M. Graham, Esq.
E-mail:  ross.kwasteniet@kirkland.com, joe.graham@kirkland.com

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York, 10022
Facsimile:  (212) 446-4900
Attention:  Stephen E. Hessler, P.C.
E-mail:  stephen.hessler@kirkland.com

Potter Anderson Corroon LLP
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801-6108
Facsimile:  (302) 658-1192
Attention:  Christopher M. Samis, Esq., and L. Katherine Good, Esq.
Email:  csamis@potteranderson.com; kgood@potteranderson.com

**If to the Consenting Term Lenders:**

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn:   Brian M. Resnick, Esq., Dylan Consla, Esq., and Daniel Meyer, Esq.
Email: brian.resnick@davispolk.com, dylan.consla@davispolk.com; daniel.meyer@davispolk.com

**If to the Ad Hoc Group of First Lien Lenders:**

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
Attn:    Fredric Sosnick
         Ned. S. Schodek
Email: fsosnick@shearman.com
         ned.schodek@shearman.com

**If to the DIP ABL Agent or Exit ABL Agent:**

MidCap Funding IV Trust
c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn: Account Manager for Blackhawk transaction
Facsimile: 301-941-1450
E-mail: notices@midcapfinancial.com

With copies to:

MidCap Funding IV Trust
c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200

Bethesda, Maryland 20814
Attn: General Counsel
Facsimile: 301-941-1450
E-mail: legalnotices@midcapfinancial.com

Hogan Lovells US LLP
390 Madison Avenue
New York, New York 10017
Facsimile: (212) 918-3100
Attn: Deborah K. Staudinger, Esq.
Email: deborah.staudinger@hoganlovells.com

**If to the DIP Term Agent, First Lien Term Loan Agent, or New First Lien Loan Agent:**

Cantor Fitzgerald Securities
110 East 59th Street
New York, New York 10022
Attn: Nils E. Horning, Esq.
Facsimile: (646) 219-1180
Email: nhorning@cantor.com

With copies to:

Cantor Fitzgerald Securities
900 West Trade Street, Suite 725
Charlotte, North Carolina 28202
Attn: Bobbie Young
Facsimile: (646) 390-1764
Email: byoung@cantor.com

Herrick, Feinstein LLP
Two Park Avenue
New York, New York, 10016
Attn: Eric A. Stabler, Esq. and Steven B. Smith, Esq.
Email: establer@herrick.com, ssmith@herrick.com

**If to the Second Lien Term Loan Agent:**

Cortland Capital Market Services LLC
225 W. Washington Street, 9th Floor
Chicago, Illinois 60606
Attn: Legal Department and Tad White

With copies to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Attn: Alex Cota, Esq. and Gabriel E. Sasson, Esq.
Email: acota@stroock.com, gsasson@stroock.com

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002 requiring such Entity to file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

H.I.    *Entire Agreement*

Except as otherwise indicated, and without limiting the effectiveness of the RSA, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.J.    *Plan Supplement Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from https://cases.primeclerk.com/blackhawk or the Bankruptcy Court's website at www.del.uscourts.gov/bankruptcy. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, the Plan Supplement shall control. The documents considered in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

J.K.    *Non-Severability*

Except as set forth in Article VIII of the Plan, the provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Required Consenting Parties (and without the consent of the New First Lien Loan Agent solely with respect to provisions relating to the treatment, rights, or terms of the New First Lien Loan), and the DIP ABL Agent (and without the consent of the Exit ABL Agent with respect to provisions relating to the treatment, rights, or terms of the Exit ABL Facility), *provided* that any such deletion or modification must be consistent with the RSA; and (3) non-severable and mutually dependent.

K.L.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

L.M.    *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the RSA, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

M.N.    *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

Dated: ~~July 15~~August 26, 2019

Respectfully submitted,

By: */s/ Jesse Parrish*
  Name:  Jesse Parrish
  Title:   Chief Financial Officer

Prepared by:

Christopher M. Samis (DE 4909)
L. Katherine Good (DE 5101)
**POTTER ANDERSON CORROON LLP**
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, Delaware 19801-6108
Telephone:    (302) 984-6000
Facsimile:    (302) 658-1192
Email:          csamis@potteranderson.com
                  kgood@potteranderson.com
                  - and -

James H.M. Sprayregen, P.C.

Ross M. Kwasteniet, P.C. (admitted *pro hac vice* ~~pending~~)
Joseph M. Graham (admitted *pro hac vice* ~~pending~~)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:          james.sprayregen@kirkland.com
ross.kwasteniet@kirkland.com
                  joe.graham@kirkland.com
                  - and -

Stephen E. Hessler, P.C. (admitted *pro hac vice* ~~pending~~)

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:          stephen.hessler@kirkland.com

~~*Proposed*~~ *Counsel to the Debtors and Debtors in Possession*